IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| STEVEN G. MILLETT and | ) | |
| MELODY J. MILLETT, | ) | |
| On Behalf of Themselves and | ) | |
| Others Similarly Situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. |
| vs. | ) | 1:05-cv-02122 BMM |
| | ) | |
| EQUIFAX INFORMATION | ) | |
| SERVICES, LLC and | ) | |
| EQUIFAX CONSUMER | ) | |
| SERVICES, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## FIFTH AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Steven G. Millett and Melody J. Millett ("Plaintiffs"), by and through their undersigned counsel, bring this action, on behalf of themselves and other similarly situated persons, for damages against Defendants Equifax Information Systems, LLC ("Equifax") and Equifax Consumer Services, Inc. ("ECS") as well as their successors and predecessors. Plaintiffs allege the following:

1

## THE PARTIES

1.     Plaintiffs Steven and Melody Millett reside in Johnson County, Kansas.

2.     Plaintiffs bring this action, pursuant to Fed.R.Civ.P. 23, as representatives of a class of similarly situated plaintiffs who purchased the same or similar services offered by Defendants.

3.     Equifax is a corporation duly organized and existing in accordance with the laws of Georgia and is authorized to do, and does, business in the State of Georgia.

4.     ECS is a Georgia corporation with its principal place of business in Georgia. It is a wholly owned subsidiary of Equifax, and, on information and belief, is entirely controlled by Equifax.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1332.

6.     The amount in controversy exceeds $75,000 and there is diversity of citizenship between the named plaintiffs and the defendants.

## SUMMARY FACTS OUTLINING THE DEFICIENCIES

7.      This is a case about simple fraud and breach of contract that also involves violations of the Credit Repair Organizations Act and involves negligent misrepresentations.  As will be explained below, thousands upon thousands of

people in this country have become concerned that their credit identities might be stolen thereby rendering the victims uncreditworthy or worse.  Equifax took advantage of those consumers' concerns and developed a service called Credit Watch.  It induced consumers to subscribe to the service with the promise that it would both protect them from identity theft and, if it happened, allow early identification of the theft.  Equifax's service, however, is incapable of fulfilling its promise for a very simple reason that results from a design flaw in the system.  The Equifax system allows the same Social Security number, theoretically a primary identifier, to be associated with more than one person.  That fact, with the attendant reporting scheme, means that the Credit Watch service cannot give the notifications and protections that it promises.

8.      The following scenario explains the problem.  Mary Smith is the true owner of Social Security number 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.  Jane Doe has fraudulently obtained that number and is using it to secure credit.  Mary Smith subscribes to Credit Watch because of her fear of theft based on what she has read in the news. Jane Doe, armed with Ms. Smith's SSN, goes to Circuit City and attempts to buy a $5000 flat panel TV on credit.  She completes a Circuit City credit application using Ms. Smith's SSN but her – Jane Doe's – name.  The Credit Watch service does not alert Ms. Smith of this activity with her SSN.  But, when Ms. Doe

defaults, the fact of the default is likely to be reported on Ms. Smith's credit report – and she never knew about the credit in the first place. Thus, Credit Watch failed to provide the promised service – an early alert of identity theft.

## IDENTITY THEFT IS A SERIOUS PROBLEM

9.      Financial identity theft, in which an imposter utilizes personal identification information of another in order to establish credit lines or develop new identification files, most commonly results in the imposter opening new credit accounts with the victim's personal identification information and thereby impacts the victim's credit worthiness.

10.      One who is a victim of identity theft incurs tremendous expenses when reestablishing credit and rectifying the harm caused by the theft.

11.      Identity theft is a serious and well-publicized issue and one that has attracted considerable consumer attention as consumers attempt to protect themselves.

12.      Equifax, through the promotional materials for its Credit Watch service has both preyed upon and fueled consumer anxiety about identity theft and urged consumers, as further set forth below, to buy a service that could not perform as promised.

4

## THE CREDIT WATCH SERVICE

13.     Equifax maintains an internet presence through the domain name www. Equifax.com. ECS and Equifax share a common domain. Among other things, consumers who access the Equifax website can purchase and subscribe to various Equifax services.

14.     Equifax, through its ECS subsidiary, provides web based services relating to credit information and identity theft protection.  Consumers who purchase those services agree to receive electronic delivery of notices pertaining to those services.

15.     Beginning in approximately April, 2001, Defendant Equifax, through its wholly owned and controlled subsidiary ECS, began selling and marketing a credit monitoring service known variously as "Credit Watch," "Equifax Credit Watch," "Credit Watch Silver" or "Credit Watch Gold" (hereinafter collectively "Credit Watch").  Credit Watch is the service that Equifax sells to consumers as protection against identity theft.

16.     Steven and Melody Millett accessed the Equifax website and purchased the Credit Watch service.  Other class members likewise subscribed to the service in an effort to protect themselves.

17.      In order to purchase the Credit Watch service, consumers enter into a contract with Equifax's wholly-owned and directly controlled subsidiary, ECS.

Mr. and Ms. Millett purchased the service by entering into a contract on August 29, 2002. (Exhibit 1).

18.     Other class members similarly purchased the Credit Watch service from Defendants beginning in April, 2001. In purchasing the Credit Watch service, other class members entered into contracts that were substantially similar to the Contract that was entered into by Plaintiffs.

19.     The contract provides that the Credit Watch service will automatically renew after the initial subscription period and that a credit card will automatically be charged for renewal unless the consumer cancels the contract 30 days prior to the end of the contract term.

20.     On August 29, 2003, Equifax and ECS automatically renewed the Credit Watch service and made a debit card withdrawal with Melody Millett's debit card number from the Millett's joint checking account.

21.     On August 24, 2004, Equifax again automatically renewed the Credit Watch service by making a debit card withdrawal with Melody Millett's debit card from the Millett's joint checking account.

22.     At no time while subscribing to the service did either Mr. or Ms. Millett receive notice that another person was using Mr. Millett's Social Security number nor did they receive any information which might have triggered them to question

whether there was any fraudulent activity in connection with Mr. Millett's Social Security number.

### THE SYSTEMATIC AND UNIFORM MISREPRESENTATIONS APPLICABLE TO ALL CLASS MEMBERS

23.     Defendants marketed the Credit Watch service to consumers, including Plaintiffs and other class members, who feared that private, personal information would be used by the perpetrators of identity theft and credit information fraud.

24.     In part, Equifax fueled that concern through its promotional materials that told consumers that identity theft could ruin their reputations and claim their savings.  (Exhibit 2).

25.     The Credit Watch service was marketed through uniform advertising that was conveyed by means of mass-electronic-mail and by postings on web sites and internet sites that were published, circulated and available nationally.

26.     Plaintiffs and other class members were induced to purchase the Credit Watch service as a result of Defendants' advertising and marketing the service as one that would help guard against fraud and identity theft.

27.     In an April 10, 2001 press release (Exhibit 3) Equifax announced the availability of Credit Watch to allow "subscribers to quickly detect possible

identity theft and minimize its potentially devastating consequences." In the same press release, Equifax touted the significance of the service:

> "Equifax Credit Watch's 24-hour credit profile monitoring service provides consumers with a quick, unique level of identity theft detection. A change in a person's credit file, which the person did not initiate, can be an early warning of identity theft. Available online at www.equifax.com, an annual subscription to Credit Watch$^{TM}$ costs $39.95."

28.     While the precise wording may have changed over time, Equifax consistently promised consumers protection from identity theft. For example, during the period May 5, 2001 through November 28, 2001, the Equifax web site contained the following solicitation: "Looking to Protect Against Identity Theft?" A consumer who was looking for such protection was urged to purchase Equifax Credit Watch. (Exhibit 4).

29.     Similarly, beginning in approximately December 2001, the Equifax web site told consumers that Credit Watch was a "simple, automated way to help detect and protect against the impact of identity theft." Credit Watch, Equifax represented, made "monitoring a credit report easy" because it provided automatic alerts of key changes in a credit report. (Exhibit 5).

30.     Again, beginning in approximately June 2004, Equifax publicized identity theft as "one of the fastest growing crimes today." But, according to Equifax,

consumers who purchased Credit Watch could protect themselves.  (Exhibit 6).

31.     In November 2001, in anticipation of holiday shopping, an Equifax press release urged consumers to monitor their credit activity.  Quoting company Chair and CEO, Thomas Chapman, Equifax said:  "There are two ways for consumers to review their credit information this holiday season: 1) request a copy of their credit report before and after the holidays; or 2) subscribe to Equifax Credit Watch, the <u>only</u> product that provides 24 hour online service that quickly alerts consumers to changes in their credit information."  (Exhibit 7).

32.     Throughout the class period, Equifax and ECS advertised and marketed Credit Watch as a service that allows consumers to "protect against identity theft and minimize the impact if you do become a victim."  These advertisements were posted on the Equifax web site.  (See e.g. Exhibit 2).

33.     Throughout the class period, Equifax and ECS  advertised and marketed Credit Watch as a service that provides a consumer with "peace of mind" by monitoring the consumer's "credit report" on a daily basis and alerting the consumer of fraudulent activity.  (See e.g. Exhibit 2).

34.     Throughout the class period, the "Customer Care Team" from ECS or Equifax sent an email to one or more members of the class and to Plaintiffs stating that Equifax' Credit Watch Silver provided "weekly credit file monitoring and e-

mail notifications so you are aware of any potentially fraudulent activity on your

credit file and can take necessary action as soon as possible."  (See e.g. Exhibit 8).

35.     Throughout the class period, Equifax and ECS advertised in uniform

advertisements posted on the internet and elsewhere that Credit Watch allows

consumers to work directly with the credit reporting agency to correct errors in

"credit reports."  (See e.g. Exhibit 9).

36.     Throughout the class period, Equifax sent national advertisements to

Plaintiffs and members of the class indicating that Credit Watch was a way to

protect against identity theft.  (See e.g. Exhibit 2).

37.     Throughout the class period, Equifax sent emails to members of the class

and to Plaintiffs encouraging them to repay their fathers for their father's

protection for them in childhood by purchasing Equifax Credit Watch Gold, "a

credit monitoring service, which alerts you via e-mail within 24 hours to key

changes in your credit file - changes which could be signs of identity theft."  (See

e.g. Exhibit 10).

38.     Throughout the class period, Equifax sent newsletter e-mails to members

of the class and to plaintiffs representing that the alerts provided by Credit Watch

enabled a consumer to "act before serious damage is done" by identity theft.  (See

e.g. Exhibit 11).

39.     Throughout the class period, Equifax sent electronic mail to Plaintiffs and members of the class stating, "Someone can steal your identity in seconds - without you even knowing it. But it can take you over a year to clear your name and cost you thousands of dollars. With recent stories of identity theft in the news, safeguarding your identity is important now more than ever. You've worked hard to build your credit and your good name - protect it."  It referred to its Credit Watch Gold services which would notify you within 24 hours of key changes to your credit file, give "unlimited access to your Equifax Credit Report™," provide fraud specialists available 24/7, and provide $20,000 of identity theft insurance." (See e.g. Exhibit 12).

40.     Throughout the class period, Equifax sent electronic mail to Plaintiffs and members of the class stating, "With recent stories of identity theft in the news, safeguarding your identity is important now more than ever. Think of Equifax Credit Watch™ Gold as your first line of defense against identity theft. You'll have peace of mind knowing that you'll be alerted to key changes in your credit file. You've worked hard to build your credit and your good name - protect it.   $69.95 is a small price to pay for knowing you have taken an important step to protect one of your most important financial assets - your credit."  (See e.g. Exhibit 13).

41.     Throughout the class period, Equifax sent email to Plaintiffs and members
of the class stating such things as:

> "Someone can steal your identity in seconds - without you even knowing
> it.  Not to mention the fact that it can take you over a year to clear your
> name and cost you thousands of dollars. With recent stories of identity
> theft in the news, safeguarding your identity is important now more than
> ever. Equifax Credit Watch™ Gold with 3-in-1 Monitoring will monitor
> your credit file for key changes which could be signs of identity theft, so
> you can act before serious damage is done. You'll have:
>
> - 24-hour notification of key changes in your credit files from the
>   three major credit reporting companies: Equifax, Experian and
>   TransUnion;
>
> - 24/7 access to fraud specialists who are available to help if you
>   think you may be a victim of identity theft;
>
> - Access to live customer support;
>
> - An initial 3-in-1 Credit Report and unlimited access to your
>   Equifax Credit Report™;
>
> - $20,000 of identity theft insurance . . . .
>
> (See e.g. Exhibit 14).

42.     Throughout the class period, Equifax provided electronic mail to Plaintiffs and members of the class stating that it can take a year to "clear your name" if you are the victim of identity theft and "cost you thousands of dollars" if you are a victim.  It promised that Credit Watch Gold customers would have 24 hour notification of key changes in credit files from three major credit reporting agencies.  (See e.g. Exhibit 15).

43.     Throughout the class period, Equifax sent email to Plaintiffs and members of the class, stating:

> "Someone can steal your identity in seconds - without you even knowing it. Not to mention the fact that it can take you over a year to clear your name and cost you thousands of dollars. With recent stories of identity theft in the news, safeguarding your identity is important now more than ever. Equifax Credit Watch™ Gold with 3-in-1 Monitoring will monitor your credit file for key changes which could be signs of identity theft, so you can act before serious damage is done. You'll have:
>
> ▪ 24-hour notification of key changes in your credit files from the three major credit reporting companies: Equifax, Experian and TransUnion

- 24/7 access to fraud specialists who are available to help if you think you may be a victim of identity theft

- Access to live customer support

- An initial 3-in-1 Credit Report and unlimited access to your Equifax Credit Report™

- $20,000 of identity theft insurance . . . ."

(See e.g. Exhibit 15).

44.     Throughout the class period, Equifax sent email to Plaintiffs and members of the class stating, "Actively monitoring your credit is one part of good credit management. With stories of security breaches and identity theft in the news, monitoring your credit could also help you recognize the signs of identity theft. Equifax Credit Watch™ Gold with 3-in-1 Monitoring - our most comprehensive identity theft protection coverage - will alert you to key changes in your credit files from the three nationwide credit reporting agencies."  (See e.g. Exhibit 16).

45.     Throughout the class period, Equifax sent email to Plaintiffs and members of the class stating, "Regularly checking your credit report for changes you did not make is one of the best ways to combat identity theft.  But did you know that the information contained in your credit file can vary among the three major credit reporting companies?  Monitoring your credit files from all of the three major

14

companies ensures you know exactly what's being reported about you.  The 3-in-1

Credit Report is your credit history as it's reported to all three major companies in

one easy-to-read report."  (See e.g. Exhibit 17).

46.     Throughout the class period, Equifax sent electronic mail to Plaintiffs and

members of the class and asked whether they would be the next identity theft

victim.  Equifax stated that Credit Watch Gold provided "daily alerts of key file

changes" to "your Equifax credit file" and that Equifax Credit Watch Silver would

provide weekly alerts.  (See e.g. Exhibit 18).

47.     Throughout the class period, Equifax Personal Solutions sent electronic

mail to Plaintiffs and members of the class indicating that "Credit Watch Gold will

alert you within 24 hours of key changes to your Equifax Credit Report."  The

electronic mail refers to 10 million "identity theft victims last year."  (See e.g.

Exhibit 19).

48.     Defendants provided information about the services they would provide

and provided such information on internet web sites which were posted

continuously.  These web sites included earthlink and msnbc.

49.     Defendants sent electronic mail notifications, advertisements, and

newsletters to Plaintiffs and members of the class periodically, each touting the

benefits of the Credit Watch service.

50.     Plaintiffs and other class members uniformly and systematically relied upon Defendants' representations that Defendants would alert them to information about their credit.

51.     Plaintiffs and other class members uniformly and systematically relied upon Defendants' representations that Defendants would protect or guard them against fraud and identity theft.

## THE CREDIT WATCH SERVICE CANNOT PERFORM AS REPRESENTED

52.     Because Equifax allows Social Security numbers and other personal identifying information to be associated with more than one individual, Equifax is incapable of providing the services that it led Credit Watch purchasers to believe they were buying.

53.     The Credit Watch service does not provide the services it promises because it does not protect consumers from identity theft or credit information fraud since it allows Social Security numbers and other personal identifying information to be associated with more than one individual.   Moreover, Equifax and its subsidiaries knew or should have known that Credit Watch and related services would not provide the protection that they represented it would provide.

54.     The Credit Watch service failed to perform as represented by Defendants and failed to provide all or some of the services identified in the Contract entered into by Plaintiffs, in the similar contracts entered into by other class members, and in the advertising and marketing materials that induced Plaintiffs and other class members to purchase the Credit Watch service.

55.     Equifax continually collected, added, stored, maintained, analyzed, and disseminated information about Plaintiffs and other class members in reports, scores, histories, and credit files.

56.     Defendant Equifax maintains credit files which identify multiple individuals with the same Social Security number, but Equifax only reports to Equifax Credit Watch subscribers those activities more closely related to a single individual.  Thus the service cannot provide the relief that was promised.

57.     Equifax sells a service to its business subscribers who wish to access information about the individual who is most likely to be the true owner of personal identification information such as a Social Security number.   The information provided by this service to business subscribers is not available to subscribers to Credit Watch even though it would assist subscribers in protecting against identity theft.

58.     Equifax sells a service to its business subscribers to identify when multiple

individuals are being reported with the same identification information.  The

information provided by this service to business subscribers is not available to

purchasers of Credit Watch even though it would assist subscribers in protecting

against identity theft.

## CLASS ACTION ALLEGATIONS

59.    This action is brought as a class action pursuant to Federal Rule of Civil

Procedure 23(b)(2) and (b)(3). The Credit Repair Organization Act provides for the

maintenance of class actions.  See 15 U.S.C. § 1579g.

60.    The proposed class consists of all persons in the United States who

purchased Defendants' Credit Watch service between April 1, 2001 and the date of

final judgment in this case by entering into the Contract or other similar

agreements through internet transactions.

61.    Excluded from the class definition are (1) all judicial officers of the United

States and their families through the third degree of relationship; (2) Defendants

and any of their officers, directors, and/or employees; (3) any person who has

already settled or compromised their claim; and (4) anyone who has an individual

action pending on the date the class is certified that arises out of the same operative

facts.

62.     Numerosity – The members of the proposed class are so numerous that joinder of them all in this action is impracticable. The precise number of class members is unknown to Plaintiffs but readily available to Defendants. However, Plaintiffs believe that the size of the proposed class is in the range of more than 500,000 to 7,000,000 persons.

63.     Typicality – Plaintiffs' claims are typical of the claims of other class members. The Defendants' practices were uniform with regard to all class members. Defendants' actions have affected class members in similar ways; and all class members have sustained similar damages as a direct result of Defendants' improper conduct. Further, the contract at issue in this case provides that law of the State of Georgia is to be applied to any dispute, regardless of the state's conflict of laws.

64.     Adequacy of representation - In this case, the representative parties will fairly and adequately protect the interests of the class because they will pursue this action diligently and responsibly and in the best interests of the absent class members. Further, proposed class counsel are experienced counsel in class action litigation and will, like the class representatives, adequately protect the interests of the class.

65.     Common Questions of Law and Fact – There are numerous questions of law and fact arising out of Defendants' conduct making this an appropriate case for resolution by means of a class action. Among the common issues are the following:

a.  Whether Defendants' Credit Watch service provides notification that multiple individuals are making use of one's personal identification information;

b.  Whether Defendants' Credit Watch service provides any protection against identity theft or other compromise of personal information;

c.  Whether Defendants' Credit Watch service violates the Credit Repair Organizations Act;

d.  Whether Defendants' failure to provide the service for which class members contracted amounts to a breach of contract;

e.  Whether Defendants' Credit Watch service subscription contracts violate federal and state law;

f.  Whether Defendants' failure to provide the services as represented and for which class members contracted amounts to fraud;

g.  Whether Defendants' attempts to refer to the consumer reports it provides as "credit reports," in light of the fact that Equifax has an obligation to provide accurate consumer reports, amounts to fraud;

h.  Whether the fact that Defendants market Equifax' "credit reports" as an accurate assessment of one's credit information, while also including an ECS' contract disclaimer of any warranty for accuracy in the "credit reports" provided, amounts to fraud;

i.  Whether failing to disclose that some credit information files Equifax accessed or provided were actually maintained or owned by others amounts to fraud; and

j.  Whether withholding information about multiple credit files reported with the same Social Security number or other identification information to consumers and purchasers of Credit Watch, while making the same information available to business subscribers, amounts to fraud.

66.  Superiority – A class action is superior to any other means for the fair and efficient adjudication of this controversy, given that (a) common questions of law and fact predominate over individual questions that may arise such that there would be enormous economies to the courts and the parties in the litigating the common issues on a classwide, instead of repetitive, basis; (b) the size of each class member's damages may be too small to make individual litigation an economically viable alternative, such that few class members have an interest in controlling the prosecution of separate actions; (c) a class action is required for

optimal deterrence and compensation and for limiting the court-awarded reasonable legal expenses incurred by class members; and (d) no unusual difficulties are likely to be encountered in the management of this class action.

### COUNT I – VIOLATIONS OF THE
### CREDIT REPAIR ORGANIZATIONS ACT

67.    Plaintiffs and other class members incorporate the preceding paragraphs, and specifically those under the subheading The Systematic and Uniform Misrepresentations Applicable to all Class Members,  as if fully set forth herein.

68.    Named Plaintiffs and Class Plaintiffs are "consumers" for purposes of the Credit Repair Organizations Act, 15 U.S.C. § 1679, et seq. ("CROA").

69.    Defendants are "credit repair organizations" for purposes of the CROA.

70.    Pursuant to section 1679b of the CROA, a credit repair organization may not "make or use any untrue or misleading representation of the services of the credit repair organization."

71.    Pursuant to section 1679b of the CROA, a credit repair organization may not "engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization."

22

72.    Pursuant to section 1679b of the CROA, "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."

73.    Defendants have violated the provisions of section 1679b of the CROA in that Defendants have made untrue or misleading representations regarding the Credit Watch service; Defendants have engaged in acts or practices that constitute the commission of, or attempt to commit, a fraud or deception in connection with the offer and sale of the Credit Watch service;  and Defendants charged and received money for services that fall within the scope of the Credit Watch service before those services have actually been performed.  The above-referenced misrepresentations are described more fully above in this Complaint.

74.    Pursuant to section 1679c of the CROA, before entering into any contract with a consumer, a credit repair organization shall provide the consumer with the following written statement:

Consumer Credit File Rights Under State and Federal Law

You have a right to dispute inaccurate information in your credit report by contacting the credit bureau directly.  However, neither you nor any 'credit repair' company or credit repair organization has the right to have accurate, current, and verifiable information

23

removed from your credit report. The credit bureau must remove accurate, negative information from your report only if it is over 7 years old. Bankruptcy information can be reported for 10 years.

You have a right to obtain a copy of your credit report from a credit bureau. You may be charged a reasonable fee. There is no fee, however, if you have been turned down for credit, employment, insurance, or a rental dwelling because of information in your credit report within the preceding 60 days. The credit bureau must provide someone to help you interpret the information in your credit file. You are entitled to receive a free copy of your credit report if you are unemployed and intend to apply for employment in the next 60 days, if you are a recipient of public welfare assistance, or if you have reason to believe that there is inaccurate information in your credit report due to fraud.

You have a right to sue a credit repair organization that violates the Credit Repair Organization Act. This law prohibits deceptive practices by credit repair organizations.

You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it.

Credit bureaus are required to follow reasonable procedures to ensure that the information they report is accurate. However, mistakes may occur.

You may, on your own, notify a credit bureau in writing that you dispute the accuracy of information in your credit file. The credit bureau must then reinvestigate and modify or remove inaccurate or incomplete information. The credit bureau may not charge any fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the credit bureau.

24

> If the credit bureau's reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the credit bureau, to be kept in your file, explaining why you think the record is inaccurate.  The credit bureau must include a summary of your statement about disputed information with any report it issues about you.
>
> The Federal Trade Commission regulates credit bureaus and credit repair organizations.  For more information contact:
>
> The Public Reference Branch
> Federal Trade Commission
> Washington, D.C. 20580.

This written statement must be provided as a document which is separate from the contract between the credit repair organization and the consumer.

75.     Defendants have violated the provisions of section 1679c of the CROA in that Defendants failed to provide the required written statement in connection with the Contract by which Defendants sold the Credit Watch service to Plaintiffs and other class members.

76.     Pursuant to section 1679d of the CROA, a contract between a credit repair organization and a consumer must include a description of the "total amount of all payments to be made by the consumer to the credit repair organization."

77.     Pursuant to section 1679d of the CROA, a contract between a credit repair organization and a consumer must include "a conspicuous statement in bold face

type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: 'You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right.'"

78.     Defendants have violated the provisions of section 1679d of the CROA in that the Contract fails to describe the total amount of all payments to be made by the consumer, but instead leave the payment terms open ended and continuing on a monthly or annual basis; and Defendants failed to include the required statement near the space reserved for the consumer's signature.

79.     Pursuant to section 1679e of the CROA, a contract between a credit repair organization and a consumer "shall be accompanied by a form, in duplicate, which has the heading 'Notice of Cancellation'" and shall include the following statement in bold face type:

> You may cancel this contract, without any penalty or obligation, at any time before midnight of the 3rd day which begins after the date the contract is signed by you.  To cancel this contract, mail or deliver a signed, dated copy of this cancellation notice, or any other written notice to [name of credit repair organization] at [address of credit repair organization] before midnight on [date]
> I hereby cancel this transaction,
> [date]

26

[purchaser's signature].

80.    Defendants have violated the provisions of section 1679e of the CROA in

that Defendants failed to provide Plaintiffs and class members entering into the

Contract with the form required by section 1679e.

81.    Pursuant to section 1679f of the CROA, a contract that is not in compliance

with the provisions of the CROA "shall be treated as void" and "may not be

enforced by any Federal or State court or any other person."

82.    Pursuant to section 1679g, a credit repair organization that fails to comply

with any provision of the CROA shall be liable for actual damages consisting of

amounts that consumers have actually paid to the credit repair organization,

punitive damages as determined by the court, and attorney's fees and costs of the

action.

## <u>COUNT II – BREACH OF CONTRACT</u>

83.    Plaintiffs and other class members incorporate the preceding paragraphs, and

specifically those in the section headed The Systematic and Unified

Misrepresentations Applicable to all Class Members, as if fully set forth herein.

27

84.     Defendants represent that the Credit Watch service provides protection against financial loss from identity theft and serves as an early warning device to guard against identity theft.

85.     Defendants did not provide Credit Watch subscribers with information, such as the use by another of the subscriber's personal identification information, that would have permitted detection of identity theft.

86.     Defendants did not timely provide notices of possible changes that would indicate possible identity theft.

87.     Defendants did not assist with remedying the effects of identity theft.

88.     Defendants acted in bad faith in failing to provide the services promised under the Contract.

89.     As a result, Defendants breached the express and implied terms of their Contract with the Plaintiffs and their similar contracts with the other class members.

90.     Plaintiffs and other class members have been harmed as a result of Defendants' breach of contract, incurring litigation expenses and attorney's fees and other damages, costs and expenses as set forth herein.

## COUNT III – FRAUD

91.     Plaintiffs and other class members incorporate the preceding paragraphs, and specifically those in the section entitled The Systematic and Uniform Misrepresentations Applicable to all Class Members, as if fully set forth herein.

92.     Defendants sold their Credit Watch service to Plaintiffs and other class members who were concerned about protecting themselves from identity theft. Had the Plaintiffs and other class members not been concerned about obtaining protection from identity theft, there would have been no reason to contract for Defendants' Credit Watch service.

93.     Defendants failed to provide the services for which Plaintiffs and class members contracted because they did not provide information that would have alerted Plaintiffs and class members that their personal identification information had been compromised.  Defendants' failure to provide the services promised is itemized for fully above.

94.     Defendants knew or should have known that the "Credit Watch" service they sold Plaintiffs and class members was neither capable of providing the promised information nor of protecting Plaintiffs and class members from identity theft.

29

95.     Defendants intended that Plaintiffs and class members would be deceived by and rely upon the false representations and omissions in the promotional materials for the "Credit Watch" service.

96.     Plaintiffs and other class members were deceived by and relied upon the false representations and omissions when they contracted for the "Credit Watch" service.

97.     There was no material variation in the representations that Defendants made or in the Plaintiffs' and class members' degree of reliance thereon.

98.     Defendants' actions have exhibited that entire want of care and conscious disregard for the consequences so as to justify an award of punitive damages.

99.     As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs and class members have been injured.

100.    More specifically, Defendants failed to disclose in their internet postings and periodic electronic mails that additional pertinent information about consumers and identity theft perpetrators would not be disclosed even though Defendants were aware of the consequences of identity theft.  The failure of Defendants to provide the services promised is itemized above.

101.    At no time did Defendants notify Plaintiffs that the Credit Watch service would not provide the information necessary to notify Plaintiffs and other class members about individuals who were fraudulently utilizing personal identification information.

102.   At no time did Defendants notify Plaintiffs that the Credit Watch service would not provide the information necessary to notify Plaintiffs and other class members about individuals who were fraudulently utilizing personal identification information.

103.   Defendants knew or should have known that the Credit Watch service they sold Plaintiffs and class members was neither capable of providing the promised information nor of protecting Plaintiffs and class members from identity theft, and that the services advertised would not or could not be provided.

104.   Defendants' representations were made knowing that additional information was necessary to make the representations true or knowing that the representations were false.

105.   Defendants intended that Plaintiffs and other class members would be deceived by and rely upon the false representations and omissions in the promotional materials for the Credit Watch service.

31

106.   From April 1, 2001 to the present date, Equifax both directly and through its wholly owned and operated subsidiary ECS, in their publications, newsletters, web pages and advertising have made false representations or omissions of material fact, including:

a.  The fact that reviewing a "credit report" or consumer report provided by Equifax would not provide notification of all types of identity theft;

b.  The omission of the need to dispute errors on a "credit report" or consumer report;

c.  The omission of the fact that a new "credit report" or consumer report is not generated every 24 hours while assuring consumers that a consumer would receive notification of fraud within 24 hours or 7 days;

d.  The omission of the reference to price increases;

e.  The fact that a "credit report" is generated by CSC or Equifax and, upon information and belief, forwarded to the consumer without review or management;

f.  That some creditors do not report their credit information to Equifax and so the information for some accounts opened by a thief might not be on an Equifax consumer report;

32

g.  That the same consumer report made available for viewing would be available for an entire month and that an additional report for the time period would have to be purchased for a fee or generated;

h.  That when a consumer disputes an item in the consumer report, the consumer report will or might be taken offline and become inaccessible even though charges for the and service will continue; and

i.  That identity theft insurance does not pay for each instance of identity theft in the event you are a victim on multiple occasions and only pays claims if the consumer has purchased the service before any fraudulent activity has occurred, whether or not the victim was aware of fraudulent activity at the time of purchase or aware of the number of instances of fraudulent activity.

107.  Plaintiffs and other class members were deceived by and relied upon the false representations and omissions when they contracted for the Credit Watch service.

108.  The representations and omissions of Defendants regarding the Credit Watch service were intended to induce consumers, including Plaintiffs and other class

members, to purchase the Credit Watch service and consumers justifiably relied upon the representations made by Defendants.

109.   Defendants' actions have exhibited that entire want of care and conscious disregard for the consequences so as to justify an award of punitive damages.

110.   As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs and class members have been injured.

## NEGLIGENT MISPRESENTATION

111.   Plaintiffs and other class members incorporate the preceding paragraphs, and specifically those in the section entitled The Systematic and Uniform Misrepresentations Applicable to all Class Members, as if fully set forth herein.

112.   Defendants owed a duty to Plaintiffs and other Class Members, as subscribers to Defendants' Credit Watch service, to completely and accurately represent the capabilities of the service.

113.   In failing to tell Plaintiffs and other Class Members that the service was incapable to providing the promised protection and incapable of detecting fraudulent uses of a subscriber's personal identifying information, Defendants were negligent in the performance of their duty.

114.   Defendants therefore negligently misrepresented the nature of the service to which they induced Plaintiffs and other Class Members to subscribe.

115.   As a result of their negligent misrepresentations Defendants are liable to Plaintiffs and other Class Members.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request the following relief:

a.  An award of compensatory damages in an amount to be determined by the jury;

b.  An award of punitive damages in an amount to be determined by the jury;

c.  An award of costs and attorneys fees;

d.  Certification of this case as a class action pursuant to Fed.R.Civ.P. 23;

e.  Injunctive and declaratory relief as the Court deems proper; and

f.   Such other and further relief as may be deemed appropriate.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.


s/Leslie J. Bryan
Leslie J. Bryan
Georgia Bar No. 091175

35

                                        Everette L. Doffermyre
                                        Georgia Bar No. 224750
                                        Ralph I. Knowles, Jr.
                                        Georgia Bar No. 426721
                                        Kimberly J. Johnson
                                        Georgia Bar No. 687678

DOFFERMYRE SHIELDS CANFIELD
   KNOWLES & DEVINE, LLC
1355 Peachtree Street
Suite 1600
Atlanta, Georgia  30309
Telephone: (404) 881-8900
Facsimile: (404) 881-3007
Email: lbryan@dsckd.com

Bryson R. Cloon *admitted pro hac vice*
CLOON LAW FIRM
1 Hallbrook Place
11150 Overbrook Road, Suite 350
Leawood, KS  66211
Telephone (913) 661-9600
Facsimile (913) 661-9614
Email:  bryson@cloonlaw.com

Barry R. Grissom *admitted pro hac vice*
Law Offices of Barry R. Grissom
7270 W. 98th Terrace
Building 7, Suite 220
Overland Park, KS 66212
Telephone (913) 341-6616
Facsimile (913) 341-4780
Email:  bgrissom@sprintmail.com

YEAGER LAW FIRM, L.L.C.
B. Joyce Yeager *admitted pro hac vice*
7270 W. 98th Terrace
Building 7, Suite 220
Overland Park, KS 66212
Telephone (913) 648-6673
Facsimile (913) 648-6921
Email:  jyeager@joyceyeagerlaw.com

ATTORNEYS FOR PLAINTIFFS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

STEVEN G. MILLETT and )
MELODY J. MILLETT, )
On Behalf of Themselves and )
Others Similarly Situated, )
 )
    Plaintiffs, )
 )    Case No.
vs. )    1:05-cv-02122 BMM
 )
EQUIFAX INFORMATION )
SERVICES, LLC and )
EQUIFAX CONSUMER )
SERVICES, INC. )
 )
    Defendants. )
_____)

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on April 19, 2006, I electronically filed the Fifth

Amended Class Action Complaint with the Clerk of Court using the CM/ECF

system which will automatically send email notification of such filing to the

following attorneys of record:

        Cindy D. Hanson
        Kilpatrick Stockton LLP
        1100 Peachtree Street
        Suite 2800
        Atlanta, Georgia  30309-4530
        chanson@kilpatrickstockton.com

s/Leslie J. Bryan
Leslie J. Bryan
Georgia State Bar No. 091175

**Attorney for Plaintiffs**

DOFFERMYRE SHIELDS CANFIELD
  KNOWLES & DEVINE, LLC
1355 Peachtree Street, Suite 1600
Atlanta, Georgia 30309
Telephone: (404) 881-8900
Facsimile: (404) 881-3007
Email: lbryan@dsckd.com