**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| STEVEN G. MILLETT, | ) | |
| MELODY J. MILLETT, | ) | |
| On Behalf Of Themselves and | ) | |
| All Others Similarly Situated, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No.: 05-599-SLR |
| | ) | |
| TRUELINK, INC., | ) | CLASS ACTION |
| a Trans Union Company, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' BRIEF IN SUPPORT OF
<u>MOTION FOR CLASS CERTIFICATION</u>**

Christopher J. Curtin
ERISMAN & CURTIN
DE Bar Id. No. 0226
Erisman & Curtin
629 Mount Lebanon Road
Wilmington, Delaware 19803
Phone: (302) 478-5577
Facsimile: (302) 478-5494
Email: ccurtin659@aol.com

FILED:  August 13, 2007

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................i

TABLE OF CITATIONS ..................................................................................... iii

NATURE OF THE PROCEEDINGS ...................................................................1

SUMMARY OF ARGUMENT .............................................................................1

STATEMENT OF FACTS ....................................................................................2

    A.    PROCEDURAL HISTORY...................................................................2

    B.    THE DEFENDANT ...............................................................................2

    C.    THE NATURE OF IDENTITY THEFT ...............................................3

    D.    THE CREDIT REPORTING PROCESS................................................3

    E.    TRUELINK'S CREDIT MONITORING SERVICE.............................5

    F.    PROBLEMS WITH TRUELINK'S CREDIT MONITORING
        SERVICE ...............................................................................................7

        1.    PROBLEMS ARISING FROM INCOMPLETE
               INFORMATION IN THE CONSUMER'S CREDIT
               REPORT ....................................................................................7

        2.    PROBLEMS ARISING FROM THE FAILURE TO
               PROPERLY MATCH DATA WITH THE CORRECT
               CONSUMER ..............................................................................9

    G.    MARKETING OF CREDIT MONITORING ......................................11

    H.    THE CONTRACT ...............................................................................14

ARGUMENT.......................................................................................................15

    A.    PLAINTIFFS MEET THE REQUIREMENTS OF SECTION 23(a) ..............16

        1.    NUMEROSITY ........................................................................17

        2.    COMMONALITY .....................................................................18

        3.    TYPICALITY ...........................................................................19

     4.     ADEQUACY OF REPRESENTATION ..................................................20

   B.     PLAINTIFFS MEET THE REQUIREMENTS OF SECTION 23(b)(3) .........23

     1.     PREDOMINANCE ................................................................24

         a.     ACTION FOR VIOLATIONS OF THE KCPA .........................24

         b.     ACTION FOR BREACH OF CONTRACT ..............................31

         c.     PREDOMINANCE IS ESTABLISHED FOR BOTH
              CLAIMS.................................................................33

     2.     SUPERIORITY ....................................................................33

         a.     THE INTEREST OF MEMBERS OF THE CLASS IN
              INDIVIDUALLY CONTROLLING THE PROSECUTION
              OR DEFENSE OF SEPARATE ACTIONS ................................34

         b.     THE EXTENT OR NATURE OF ANY LITIGATION
              CONCERNING THE CONTROVERSY ALREADY
              COMMENCED BY OR AGAINST THE MEMBERS OF
              THE CLASS .................................................................35

         c.     THE DESIRABILITY OF CONCENTRATING THE
              LITIGATION OF THE CLAIMS IN THE PARTICULAR
              FORUM .................................................................35

         d.     DIFFICULTIES LIKELY TO BE ENCOUNTERED IN
              MANAGEMENT OF A CLASS ACTION ..................................36

   C.     ADEQUACY OF CLASS COUNSEL ....................................................37

CONCLUSION ............................................................................................38

CERTIFICATE OF SERVICE ......................................................................40

# TABLE OF CITATIONS

**CASES**                                                                                                                    **Page**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...............................................20-21, 23-24

*Ardrey v. Fed. Kemper Ins. Co.*, 142 F.R.D. 105 (E.D.Pa. 1992) ................................17

*Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.*, 2006 WL 3371690 (D.N.J. 2006).............36

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ..........................................................24

*Carlson v. Hallinan*, 925 A.2d 506 (Del. Ch. 2006).......................................................31

*Christiana Mortgage Corp v. Delaware Mortgage Bankers Assoc.*,

    136 F.R.D. 372 (D.Del. 1991) ........................................... 16-17, 21, 24, 33

*Danvers Motor Co., Inc. v. Ford Motor Co.*, 2007 WL 419285 (D.N.J. 2007).......................34-35

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)........................................................36

*Gunter v. Ridgewood Energy Corp.*, 164 F.R.D. 391 (D.N.J. 1996)................................33

*In re Kaiser Group Int'l*, 178 B.R. 58 (Bankr.D.Del. 2002) ...................................15, 18

*In re Prudential Ins. Co.*, 148 F.3d 283 (3rd Cir. 1998)........................................33

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3rd Cir. 2004) .........................24

*Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513 (Del. Super. Ct. 2005)......................31

*Johnston v. HBO Film Mgmt, Inc.*, 265 F.3d 178 (3rd Cir. 2001).................................24

*Lerch v. Citizens First Bancorp.*, 144 F.R.D. 247 (D.N.J. 1992) ..................................15

*Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*, 149 F.R.D. 65 (D.N.J. 1993)......................21

*McQuilken v. A. & R. Dev. Corp.*, 576 F.Supp. 1023 (D.C.Pa. 1983)..........................34

*Neal v. Casey*, 43 F.3d 48 (3rd Cir. 1994) .................................................... 16, 18-21

*Newton v. Merrill Lynch, et al.*, 259 F.3d 154 (3rd Cir. 2001)................................16, 19

*Sala v. Nat'l R.R. Passenger Corp.*, 120 F.R.D. 494 (E.D.Pa. 1988)................... 16, 18, 21, 23-24

**CASES**                                                      **Page**

*Townes v. Trans Union, et al.*, U.S. District Court for the District of Delaware,

    Case No. 04-1488-JJF ...................................................................................2, 22

*VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606 (Del. 2003) .........................................31

*Weiss v. York Hosp.*, 745 F.2d 786 (3rd Cir. 1984) ....................................................................18

*Zeffiro v. First Pennsylvania Banking & Trust Co.*, 96 F.R.D. 567 (E.D.Pa. 1983) ............... 18-19


**STATUTES**                                                 **Page**

Credit Reporting Agencies Act, 15 U.S.C. § 1681, *et seq.* ............................................................2

Credit Repair Organizations Act, 15 U.S.C. § 1679, *et seq.*..........................................................2

Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq.* .................................1-2, 17-20, 24-29

K.S.A. 50-624 ..................................................................................................................... 24-27

K.S.A. 50-626 ............................................................................................................ 24-25, 28, 30

K.S.A. 50-627 ............................................................................................................ 24-25, 29-30

K.S.A. 50-634 ...............................................................................................................................25


**RULES**                                                             **Page**

Fed.R.Civ.P. 23 ................................................................................................ 1, 22-23, 33, 37

## NATURE OF THE PROCEEDINGS

This action involves an identity-theft protection service ("Credit Monitoring") that was marketed and sold to consumers by Defendant TrueLink, Inc., a Trans Union Company ("TrueLink"). Plaintiffs, Steven G. Millett ("Mr. Millett") and Melody J. Millett ("Ms. Millett"), state two types of claims: (1) that TrueLink breached the contract by which it sold Credit Monitoring, and (2) that TrueLink violated the Kansas Consumer Protection Act ("KCPA"). The core issue in this case is whether Credit Monitoring provides the services that are promised. Plaintiffs contend that Credit Monitoring does not provide the broad identity-theft protection that is promised by TrueLink.

This Brief is filed in support of Plaintiffs' Motion for Class Certification which seeks certification of a nationwide class for Plaintiffs' breach of contract claim and seeks certification of a Kansas class for Plaintiffs' KCPA claim.

## SUMMARY OF ARGUMENT

1.      Counts I and II of Plaintiffs' Complaint should be certified as a class action in that the general requirements for class certification under Rule 23(a) are satisfied and the predominance and superiority requirements of Rule 23(b)(3) are satisfied.

2.      Plaintiffs should be designated as representatives of the above-referenced class in that Plaintiffs satisfy the adequacy requirements of Rule 23(a)(4).

3.      Plaintiffs' counsel should be designated as class counsel for the above-referenced class in that Plaintiffs' counsel satisfy the adequacy requirements of Rule 23(a)(4) and Rule 23(g).

## STATEMENT OF FACTS

**A.    PROCEDURAL HISTORY.**

Plaintiffs filed their Fourth Amended Complaint on September 20, 2006.  (D.I. 76).  The Complaint asserted four counts: I – Violations of Kansas Consumer Protection Act; II – Breach of Contract; III – Violations of the Credit Repair Organizations Act; and IV – Violations of the Credit Reporting Agencies Act.  (D.I. 76).  Plaintiffs voluntarily dismissed Counts III and IV, leaving only Counts I and II pending before the Court.  (D.I. 98; Declaration of Michael Blanton, ¶ 8, attached hereto as Exhibit A).

Plaintiffs have engaged in substantial discovery in this action.  In addition to written discovery, Plaintiffs have taken five depositions and have reviewed approximately 20,000 pages of documents.  (Exhibit A, ¶ 9).  Plaintiffs' counsel collectively have devoted in excess of 5000 hours to date to various litigation related activities in this action including, but not limited to, legal research, drafting pleadings and memoranda, discovery, travel and various administrative tasks related to coordination of this action.  (Exhibit A, ¶ 6).  Plaintiffs' counsel have also incurred expenses in excess of $50,000 in the process of pursuing this action.  (Exhibit A, ¶ 6).

Plaintiffs have also taken action to protect the interests of the putative classes by filing a motion to intervene in the action designated *Townes v. Trans Union, LLC, et al.*, U.S. District Court for the District of Delaware, Case No. 04-1488-JJF.  (D.I. 72; Exhibit A, ¶ 10).

**B.    THE DEFENDANT.**

TrueLink was established in 1995.  (Deposition of John Danaher, p. 29, attached hereto as Exhibit B).  Trans Union, LLC, acquired 81% of TrueLink in 2002 and acquired the remaining 19% of TrueLink in 2004.  (Exhibit B, pp. 30-31; Deposition of Kate Anderson, p. 13,

attached hereto as Exhibit C). TrueLink's name was changed to Trans Union Interactive, Inc. on

November 16, 2006. (Deposition of Barbara Kozel, p. 78, attached hereto as Exhibit D). Thus,

Trans Union Interactive is a wholly owned subsidiary of Trans Union. It is incorporated in

Delaware. (Exhibit D, p. 78).


**C.    THE NATURE OF IDENTITY THEFT.**

Identity theft is commonly defined as the use of some item of a person's personal

information, without that person's permission, for purposes of committing fraud or theft. (Expert

Report of Robert Ellis Smith, p. 7, attached hereto as Exhibit E). Most consumers consider the

misappropriation of a single personal identifier to constitute identity theft. For example, a survey

conducted by one of Plaintiffs' experts establishes that 99% of survey participants agree that

someone using a consumer's Social Security number with a different name and address to obtain

credit or employment constitutes identity theft. (Expert Report of Ronald L. Dimbert, pp. 2, 8, 9,

attached hereto as Exhibit F). Identity theft is not limited solely to the fraudulent use of

information for credit purposes. (Exhibit E, p. 7).


**D.    THE CREDIT REPORTING PROCESS.**

Credit Reporting Agencies ("CRAs") compile consumer information, such as payment

history, which is submitted by creditors and other businesses, and disseminate compilations of

that information to creditors, insurance companies, employers, and others with a legitimate

business need for that information. (Declaration of Robert Ellis Smith, ¶ 3, attached hereto as

Exhibit G; FTC Report, p. 1, attached hereto as Exhibit H). Each record is attached to

identifying information such as name, Social Security number, address and birth date. (Exhibit

G, ¶ 3; Exhibit H, p. 9). The CRAs organize these records into files, which refer to all records that the CRA believes to belong to the same person. (Exhibit G, ¶ 3; Exhibit H, p. 9).

The process by which the CRAs collect and match consumer information (i.e. compile credit files) can be summarized as follows:

(1)      Consumer information is supplied to a furnisher (creditor or other entity that intakes consumer information);

(2)      The furnisher submits consumer information to the CRAs (may be submitted to one or more CRAs);

(3)      The CRA attempts to match the consumer information to its consumer files; and

(4)      The CRA updates its consumer files with the new information.

(Exhibit G, ¶ 4; Exhibit H, p. 9). The matching process in step three is fraught with difficulties, and information is not always matched with the correct consumer. (Exhibit G, ¶ 5; Exhibit H, pp. 13-14, 36-46). The CRAs use an algorithm in an attempt to match incoming data with existing consumer files. (Exhibit G, ¶ 5; Exhibit H, p. 45). If a match is made, then the information is associated with a particular consumer file. (Exhibit G, ¶ 5; Exhibit H, p. 45). If no match is made, then a new file is created. (Exhibit G, ¶ 5; Exhibit H, p. 45). Once additional data is obtained in the future, the new file may be merged into an existing file or it may be maintained as a new file. (Exhibit G, ¶ 5; Exhibit H, p. 45).

A consumer file contains the following information: (1) information to identify the consumer; (2) credit account information; (3) public records; (4) collection accounts; and (5) inquiries wherein a subscriber requests a report. (Exhibit G, ¶ 6; Exhibit H, pp. 10-11).

One service that the CRAs provide is the ability to monitor consumer files for specific types of activity. Trans Union calls this service a "Watch." (Exhibit C, p. 58). When an entity uses this service, it requests that Trans Union set a Watch for a specific consumer file and Trans Union thereafter provides that entity with alerts when certain activity occurs in that file. (Exhibit C, p. 58).

E.     **TRUELINK'S CREDIT MONITORING SERVICE.**

TrueLink first offered its Credit Monitoring service for sale on or about July 29, 2001. (Responses to Plaintiffs' First Interrogatories, No. 3, attached hereto as Exhibit I). Credit Monitoring is available on a web portal called TrueCredit. Credit Monitoring purports to guard against identity theft by notifying a consumer of critical changes to his or her credit report. (Deposition of Lucy Duni, p. 108, attached hereto as Exhibit J).

The Credit Monitoring service notifies a consumer when certain critical changes occur in the consumer's credit report. TrueLink is notified by the CRA that a change has taken place in a consumer's credit report. (Exhibit B, p. 26). TrueLink then sends the consumer an email advising him or her that there has been a change to the credit report that should be reviewed by the consumer. (Exhibit B, p. 26; Exhibit C, p. 15). This notice is commonly referred to as a "credit alert." (Exhibit C, p. 15).

The Credit Monitoring service is essentially a conduit through which information from Trans Union is passed to a consumer. (Exhibit J, pp. 109, 112). When a consumer enrolls in Credit Monitoring, TrueLink places a request with Trans Union that a Watch be set for that consumer. (Exhibit C, p. 58, 175-81). TrueLink then receives alerts for that consumer from Trans Union if the Watch is set to trigger such an alert for that consumer. (Exhibit C, p. 58).

5

Trans Union monitors a consumer's credit file for specific and limited critical changes. The critical changes that Credit Monitoring alerts consumers about are the items a Trans Union Watch monitors. (Exhibit J, p. 108). Trans Union determines the triggers for a Watch and furnishes the credit alerts; it determines when a transaction qualifies as a credit alert. (Exhibit C, p. 21). Because TrueLink merely passes on Watch information from Trans Union, TrueLink is unable to increase the number of items monitored by Trans Union. (Exhibit J, pp. 108-109). TrueLink takes the information provided by Trans Union, reformats it, and passes it on to the consumer. (Exhibit C, pp. 44-45). Since 2005, TrueLink has monitored or received information from all three CRAs. (Exhibit B, pp. 27-28). Prior to 2005, TrueLink only used data provided by Trans Union. (Exhibit B, pp. 27-28).

A consumer currently receives an alert within 24 hours of the change or trigger. (Exhibit J, pp. 111-112). From 2001 through 2005, TrueLink issued consumer alerts on a weekly basis rather than a daily basis. (Exhibit B, p. 124; Exhibit J, p. 112).

Credit Monitoring does not inform a consumer about all changes to a credit report. (Deposition of Brian Matis, p. 32, attached hereto as Exhibit K). Credit Monitoring only informs the consumer about changes in the specific items Trans Union determines it will monitor. (Exhibit K, p. 32). Furthermore, a consumer who learns of identity theft through Credit Monitoring only learns of the theft after it occurs because TrueLink can only send an alert after the triggering event occurs. (Exhibit C, p. 102). Credit Monitoring does not notify the consumer about all types of identity theft. For example, Credit Monitoring will not inform a consumer if an identity thief is using the consumer's Social Security number, but no other personal identifiers. (Exhibit C, p. 135). Similarly, if someone is using the consumer's Social Security number for a non-credit purpose, the consumer would not be notified. (Exhibit B, p. 118).

**F.    PROBLEMS WITH TRUELINK'S CREDIT MONITORING SERVICE.**

As discussed above, Credit Monitoring merely passes information to the consumer that TrueLink has obtained from Trans Union.  Thus, the accuracy and completeness of the information and monitoring that TrueLink provides to consumers is limited by the accuracy and completeness of the information that is maintained by Trans Union.

As explained more fully below, the Credit Monitoring service cannot provide accurate and complete information because it relies upon a credit report as its sole source of information, and a credit report is not a good tool for identity-theft protection.  A credit report does not provide all of the information that a person would need to detect all forms of identity theft. (Response to Plaintiffs' First Request for Admission to Defendant TrueLink, Inc., No. 35, attached hereto as Exhibit L).  In a variety of scenarios – some of which are identified below – a CRA may not have information relevant to the theft of a consumer's identity.  Thus, Credit Monitoring cannot notify consumers of all incidents of identity theft or all information that would be useful in protecting against identity theft.  (Exhibit G, ¶ 7).

The underlying reasons for the failure of the Credit Monitoring service can be divided into two broad categories:  (1) problems arising from incomplete information in the credit report, and (2) problems arising from the failure to properly match data with the correct consumer.

**1.    Problems Arising From Incomplete Information In The Consumer's Credit Report.**

Many types of transactions are either not reported to CRAs or are not regularly reported to CRAs.  (Exhibit C, p. 118; Exhibit G, ¶ 8).  Some examples of such transactions are as follows:

- If a person provides another person's Social Security number to law enforcement personnel, that misuse of the Social Security number would not appear on the credit report. (Exhibit G, ¶ 8; Exhibit K, p. 24).

- If a person used another person's Social Security number to obtain a driver's license, that misuse of the Social Security number would not appear on the credit report. (Exhibit G, ¶ 8; Exhibit K, p. 24).

- Rental information is generally not reported to the CRAs. (Exhibit G, ¶ 8; Exhibit H, pp. 78, 80).

- Accounts with utilities generally are not reported to the CRAs. (Exhibit C, p. 118; Exhibit G, ¶ 8; Exhibit H, p. 81). In fact, utilities may be barred by regulation from providing such information to the CRAs. (Exhibit H, p. 81).

In short, a great deal of information regarding identity theft is never reported to CRAs and is never included in a credit report. (Exhibit G, ¶ 8). As a result, this information would never trigger an alert under the Credit Monitoring service. (Exhibit G, ¶ 8).

Even for those types of information that are commonly reported to the CRAs, the reporting is incomplete. (Exhibit G, ¶ 9). Some creditors do not furnish information to the CRAs at all, and some report to only one or two of the CRAs. (Exhibit G, ¶ 9; Exhibit H, p. 12). In addition, a creditor may deliberately withhold information for strategic reasons. (Exhibit G, ¶ 9; Exhibit H, p. 12). For instance, some lenders, particularly subprime lenders, choose to withhold positive credit information about their consumers to prevent their most profitable consumers from receiving competing offers. (Exhibit H, p. 12). Thus, even types of information that would commonly appear in a credit report may not appear in a particular consumer's credit report due to incomplete reporting. (Exhibit G, ¶ 9).

Due to problems with the incompleteness of information in the consumer's credit report, a consumer can be a victim of identity theft and evidence of that theft will never appear in the credit report.  (Exhibit G, ¶ 10).  This is true even for classic incidents of credit identity theft such as when an identity thief opens a new credit card using a consumer's personal identifying information.  (Exhibit G, ¶ 10).  For example, if an identity thief opens a new credit account and the creditor fails to report that new account to the CRAs (or to the particular CRA that is being used for the Credit Monitoring service), then the consumer will not be notified of that new account and will not be notified that he or she has become a victim of identity theft.

**2.      Problems Arising From The Failure To Properly Match Data With The Correct Consumer.**

Even if a creditor does report account information to the CRAs, this information may not be properly matched with the consumer in question.

A CRA may have problems assigning data to the proper consumer files.  (Exhibit G, ¶ 11; Exhibit H, p. 13).  When a CRA's system fails to correctly assign a consumer's data, it can create either a "mixed file" or a "fragmented file."  (Exhibit G, ¶ 11; Exhibit H, p. 13).  A "mixed file" refers to a file containing information pertaining to more than one consumer.  (Exhibit G, ¶ 11; Exhibit H, p. 13).  A "fragmented file" refers to a situation where more than one file in a CRA database exists for the same consumer.  (Exhibit G, ¶ 11; Exhibit H, p. 13).

Problems with matching may be caused by either the consumer or the furnisher that records and reports the consumer's information.  (Exhibit G, ¶ 12; Exhibit H, p. 41).  Problems with the information the consumer provides can arise either from error or deliberate choice (such as identity theft).  (Exhibit G, ¶ 12; Exhibit H, p. 41).  Having collected information from a

consumer, a creditor also may make mistakes when entering the consumer's data into its system. (Exhibit G, ¶ 12; Exhibit H, p. 41).

When a CRA cannot match new account information with a specific consumer, it creates a new file to store that information. (Exhibit G, ¶ 13; Exhibit H, p. 45). As the CRA receives additional information in relation to that account, it may be able to match the file to a specific consumer at a later time, in which case the new file will be merged into an existing consumer's credit file. (Exhibit G, ¶ 13; Exhibit H, p. 45). Otherwise, the new file will be maintained as a separate file. (Exhibit G, ¶ 13; Exhibit H, p. 45).

Due to these and other matching failures, a consumer may be a victim of identity theft but not have any evidence of that identity theft appear in his or her credit report. For example, if an identity thief opens a credit account using a consumer's personal identifying information, and that account is reported to Trans Union without the consumer's Social Security number being identified, Trans Union might be unable to ascertain which credit file is the appropriate file for the inaccurate or partially complete information. Thus, Trans Union will create a second file and place the information pertaining to the new credit card there instead. If a Watch is set for that consumer, the Watch would not detect this new account because the account would not be associated with the consumer's credit report. Thus, the Credit Monitoring service would not alert the consumer of this new account even though it is a clear instance of identity theft.

There is no doubt that matching failures occur. (Exhibit H, pp. 13, 41, 45). It is equally clear that such errors are common. A 2000 Consumers Union study reported that more than half of consumer credit reports contain errors. (Exhibit H, p. 23). A June 2004 U.S. Public Interest Research Group study reported that one in four of the consumer reports surveyed contained

serious errors.  (Exhibit H, p. 23).  In total, nearly eight out of ten (79%) of the consumer reports surveyed reportedly contained some error.  (Exhibit H, p. 24).

There is also no doubt that TrueLink was aware of the problems regarding matching consumer credit reports.  In 2005, TrueLink identified a need to improve consumer record matching because it was getting too many "no-hits" from the CRA.  (Exhibit C, p. 52).  This occurred when the CRA was unable to provide a matching credit file for the consumer who was attempting to enroll.  (Exhibit C, p. 52).  In other words, the CRA data was so faulty that the CRA could not match a potential purchaser of Credit Monitoring to a particular credit file in the first instance.

## G.     MARKETING OF CREDIT MONITORING.

Despite the inability of the Credit Monitoring service to detect a wide spectrum of identity-theft incidents, TrueLink marketed the Credit Monitoring service as providing very broad protection against identity theft.  In fact, TrueLink marketed the Credit Monitoring service as providing "complete identity theft protection."  (Marketing Materials, pp. 7, 8, attached hereto as Exhibit M).

The marketing materials for Credit Monitoring include numerous other representations regarding the broad protection provided by Credit Monitoring.  The following are examples:

- "You'll always be up-to-date about credit report changes and early warning signs of identity fraud."  (Exhibit M, pp. 3, 4, 5).

- "With Credit Monitoring you'll be up-to-date with your credit, informed about any fraudulent activity, and certain about your credit standing."  (Exhibit M, p. 6).

- "You can secure your credit, your identity, & your peace of mind for just $9.95/year with the Web's most affordable credit monitoring service – weekly Credit Alerts." (Exhibit M, p. 1). "Stay informed about your credit and your identity – without even lifting a finger." (Exhibit M, p. 1).

- "You can secure your credit, your identity, & your peace of mind for just 12 cents a day with TrueCredit's award-winning Credit Monitoring services." (Exhibit M, p. 9).

- "You have anti-theft & protection devices for your home … and your car …
  But what about your identity?
  Now you can secure your credit, your identity, & your peace of mind for less than 3 cents a day." (Exhibit M, p. 2).

These marketing materials generally indicate that the purchaser of Credit Monitoring will be warned about "identity fraud" and "fraudulent activity." These marketing materials also distinguish between your "credit" and your "identity," indicating that **both** will be protected by Credit Monitoring. The last of the above-referenced items goes so far as to compare Credit Monitoring to a general purpose alarm system, implying that Credit Monitoring will act as a general purpose alarm system for identity theft.

The marketing materials for Credit Monitoring produce extremely high expectations among consumers. Plaintiffs have had a survey conducted by a marketing expert. This marketing expert was retained by Plaintiffs to conduct research to understand consumer expectations that resulted from viewing an advertisement for the Credit Monitoring service. (Exhibit F, pp. 1, 5). Consumers were shown an advertisement for Credit Monitoring and were

12

asked about their expectations in relation to the Credit Monitoring service.  (Exhibit F, pp. 5, 7).
The results were as follows:

- 95% expected to receive notice if another person is using any of his or her personal information without his or her permission, and only 1% did not expect such notice. (Exhibit F, pp. 8, 10).

- 94% expected immediate notification of credit report changes, and only 1% did not expect such notification.  (Exhibit F, pp. 8, 10).

- 90% expected a credit report containing all information necessary to protect him or her against fraudulent activity, and only 3% did not expect such a report.  (Exhibit F, pp. 8, 10).

- 83% expected complete identity-theft protection, and only 2% did not expect such protection.  (Exhibit F, pp. 8, 10).

- 98% expected notice if someone was taking action that impacts his or her credit, and only 1% did not expect such notice. (Exhibit F, pp. 8, 11).

- 93% expected notice if someone was using his or her identity in a manner that would result in him or her needing to seek legal help, and only 3% did not expect such notice. (Exhibit F, pp. 8, 11).

- 86% expected notice of someone using his or her Social Security number, and only 3% did not expect such notice.  (Exhibit F, pp. 8, 11).

- 78% expected notice of someone using his or her identity to obtain a driver's license, and only 5% did not expect such notice.  (Exhibit F, pp. 8, 11).

In short, the marketing materials for Credit Monitoring lead consumers to expect that the service will provide notice of incidents of identity theft that the service cannot possibly provide.

Even TrueLink's own employee acknowledged that Credit Monitoring cannot provide the promised level of protection.  Brian Matis, a product developer for TrueLink, testified that Credit Monitoring cannot completely protect a consumer from identity theft.  (Exhibit K, p. 80).  In fact, when Mr. Matis was asked during the course of his deposition whether a consumer could completely protect him or herself from identity theft, he stated: "That sounds to me like completely protecting yourself from a car accident, and there's – there's no conceivable way." (Exhibit K, p. 79).

## H.  The Contract

The contract by which TrueLink sold Credit Monitoring to the Milletts ("Millett Contract") is attached hereto as Exhibit N.

The Millett Contract provides that an enrollee is entitled to certain privileges, stating as follows: "Enrollee whose membership fee has been paid is entitled to all privileges included in these memberships until the membership is cancelled by the enrolled member."  (Exhibit N, p. 1).  However, the contract does not define the "privileges" of membership.  Instead, the contract indicates that information pertaining to the "privileges" of membership may be obtained by looking at the TrueLink website, stating as follows: "TrueLink maintains the Site to provide you with information about our memberships, products and services to facilitate communication with us and our affiliates."  (Exhibit N, p. 1).

The above-referenced contractual language incorporates the marketing materials that are used to market Credit Monitoring into the contract by which Credit Monitoring is sold. That is, the contract promises that enrollees will receive the "privileges" of membership, and the contract further provides that such "privileges" are defined in the marketing materials on the web site. This relationship was confirmed by TrueLink's Compliance Officer, Kate Anderson. When asked what "privileges" were conferred by the contract, Ms. Anderson replied: "… the benefits of the program that are outlined in the marketing materials." (Exhibit C, pp. 172-173).

Due to the failure of the contract to clearly define the privileges of membership in the body of the contract, the contract is difficult for consumers to understand. The contract is also excessively one-sided in favor of TrueLink. Specifically, the contract provides that TrueLink may unilaterally change the contract at any time. (Exhibit N, p. 1). The contract further provides that a Credit Monitoring member will be deemed to have agreed to any such changes if he or she views the website or uses his or her membership at any time after notice of modification to the contract has been posted on the website. (Exhibit N, p. 6).

## ARGUMENT

"A court should err in favor of allowing [a class] action to be certified." *Lerch v. Citizens First Bancorp.*, 144 F.R.D. 247, 250 (D.N.J. 1992). "The Supreme Court has expressed its approval of class actions, noting that "[c]lass actions serve an important function in our system of civil justice." *In re Kaiser Group Int'l*, 178 B.R. 58 (Bankr. D.Del. 2002). "The Third Circuit has held that class actions should be looked upon favorably." *Id*.

"[C]lass actions serve their intended function when they accomplish either of two purposes: when they prevent a multiplicity of suits or when they expedite the disposition of otherwise unredressable legally cognizable grievances." *Sala v. Nat'l R.R. Passenger Corp.*, 120 F.R.D. 494, 499 (E.D.Pa. 1988)(quotation marks and citation omitted). "To obtain class certification, plaintiffs must establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met." *Neal v. Casey*, 43 F.3d 48, 55 (3rd Cir. 1994). "In determining the certification motion, the court cannot consider the merits of the plaintiffs' case but, rather, must focus exclusively on whether the requirements of Rule 23 have been met." *Sala*, 120 F.R.D. at 495. However, a "preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton v. Merrill Lynch, et al.*, 259 F.3d 154, 168 (3rd Cir. 2001).

## A.    PLAINTIFFS MEET THE REQUIREMENTS OF SECTION 23(a).

The four threshold requirements of Rule 23(a) are as follows:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*Christiana Mortgage Corp. v. Delaware Mortgage Bankers Assoc.*, 136 F.R.D. 372, 377 (D.Del. 1991).

"The requirements of Rule 23(a) are meant to assure both that class action treatment is necessary and efficient and that it is fair to absentees under the particular circumstances." *Neal*, 43 F.3d at 55. "While numerosity addresses the first of these concerns, i.e., necessity, the last three requirements help determine whether the class action can be maintained in a fair and efficient manner." *Id*.

1.     **Numerosity.**

"Under Rule 23(a)(1), the proposed class must be so numerous that joinder of all members is impracticable." *Christiana Mortgage Corp.*, 136 F.R.D. at 377 (quotation marks and citation omitted). "No magic number exists satisfying the numerosity requirement, nor must plaintiffs allege the exact number or identity of class members." *Ardrey v. Fed. Kemper Ins. Co.*, 142 F.R.D. 105, 109 (E.D.Pa. 1992)(quotation marks and citation omitted). "Rather, the determination of whether the size of the class makes joinder impracticable must be evaluated under the particular circumstances of each case." *Christiana Mortgage Corp.*, 136 F.R.D. at 377. "While the absolute number of class members is not the sole determining factor, generally the courts have found the numerosity requirement fulfilled where the class exceeds 100." *Ardrey*, 142 F.R.D. at 109 (quotation marks and citation omitted). "It is proper for the court to accept common sense assumptions in order to support a finding of numerosity." *Id.* (quotation marks and citation omitted).

There can be no serious question that the numerosity requirement is met in this case. The number of consumers who purchased Credit Monitoring from September 9, 2001, through May 31, 2007, is 1,558,950. (Exhibit I, No. 5; Supplemental Response to Interrogatories, Nos. 5, 6, 17 & 20, attached hereto as Exhibit Q). The number of consumers who purchased Credit Monitoring and provided a mailing address in the State of Kansas from September 1, 2001, through May 31, 2007, is 12,094. (Exhibit I, No. 17; Exhibit Q, Nos. 5, 6, 17 & 20). Given that the classes for which certification is sought include all purchasers of Credit Monitoring within the state of Kansas (KCPA claim) or nationwide (breach of contract claim), these numbers provide appropriate numerosity figures. These figures clearly support a finding of numerosity.

## 2.    Commonality.

"Rule 23(a)(2) assures there is a shared interest among the class in resolving a certain issue." *Zeffiro v. First Pennsylvania Banking & Trust Co.*, 96 F.R.D. 567, 569 (E.D.Pa. 1983). "[It] requires that there be issues of law or fact common to the class as a whole. This requirement is satisfied if the plaintiff can show the existence of a 'common nucleus of operative facts.'" *Sala*, 120 F.R.D. at 497 (citation omitted).

The "threshold of commonality is not high." *In re Kaiser Group Int'l*, 178 B.R. at 64-65. "[N]ot all questions of law or fact raised need be in common." *Weiss v. York Hosp.*, 745 F.2d 786, 808-09 (3rd Cir. 1984). "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Neal*, 43 F.3d at 55. "Because the requirement may be satisfied by a single common issue, it is easily met." *Id*.

In this case, there are numerous issues of law and fact that are common to Plaintiffs and the putative class, including the following:

- Whether TrueLink entered into enforceable contracts with Plaintiffs and the putative class.

- Whether TrueLink's Credit Monitoring service is capable of providing broad protection from identity theft.

- Whether Plaintiffs and putative class members are "consumers" for purposes of the KCPA.

- Whether the transactions by which Plaintiffs and putative class members purchased Credit Monitoring constitute "consumer transactions" for purposes of the KCPA.

- Whether TrueLink is a "supplier" for purposes of the KCPA.

- Whether TrueLink, in the course of marketing and selling Credit Monitoring, engaged in deceptive acts and practices for purposes of the KCPA.

- Whether TrueLink, in the course of marketing and selling Credit Monitoring, engaged in unconscionable acts and practices for purposes of the KCPA.

- Whether TrueLink breached common terms of the contracts by which it sold Credit Monitoring.

In addition to the above-referenced specific issues, it is also true that Plaintiffs and the putative class members will be pursuing their claims against TrueLink pursuant to the same common legal theories.

### 3.     Typicality.

"The concepts of commonality and typicality are broadly defined and tend to merge, because they focus on similar aspects of the alleged claims." *Newton*, 259 F.3d at 182 (quotation marks and citations omitted). There is a "low threshold for satisfying both requirements." *Id.* "Rule 23(a) does not require that class members share every factual and legal predicate to meet the commonality and typicality standards." *Id.* (quotation marks and citation omitted). Neither commonality nor typicality mandates "that all putative class members share identical claims, and ... factual differences among the claims of the putative class members do not defeat certification." *Neal*, 43 F.3d at 56.

"Rule 23(a)(3) examines whether the named representative's particular claim presents that issue on behalf of the plaintiff class." *Zeffiro*, 96 F.R.D. at 569. "Typicality asks whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting

19

that the incentives of the plaintiffs are aligned with those of the class." *Neal*, 43 F.3d at 55.

"[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the

putative class usually satisfy the typicality requirement irrespective of the varying fact patterns

underlying the individual claims." *Id.* at 58. "[F]actual differences will not render a claim

atypical if the claim arises from the same event or practice or course of conduct that gives rise to

the claims of the class members, and if it is based on the same legal theory." *Id.* (quotation

marks and citation omitted). "Indeed, even relatively pronounced factual differences will

generally not preclude a finding of typicality where there is a strong similarity of legal theories."

*Id.*

Plaintiffs' claims are typical of the putative class because Plaintiffs and the putative class

have been subjected to the same unlawful conduct. Specifically, TrueLink failed to provide the

broad identity-theft protection services that were promised as part of the Credit Monitoring

service. TrueLink sold the Credit Monitoring service to Plaintiffs and putative class members,

and TrueLink made the same or similar representations regarding the Credit Monitoring service

to Plaintiffs and putative class members in its                national marketing materials.

Plaintiff is also pursuing legal theories that are common to all putative class members including

breach of contract and violation of the KCPA. Furthermore, each of these claims is based upon

the same operative facts arising from TrueLink's overall course of conduct in failing to provide

the services that were promised in its marketing materials and contracts.


### 4.    Adequacy of Representation.

Rule 23(a)(4) requires the named parties to "fairly and adequately protect the interest

between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*,

521 U.S. 591, 625 (1997)(quotation marks and citation omitted). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (quotation marks and citation omitted). "This element consists of two factors: (1) the plaintiffs' attorneys must be sufficiently qualified and competent to handle the litigation, and (2) the interests of the named representatives must not be antagonistic to those of the other class members." *Christiana Mortgage Corp.*, 136 F.R.D. at 380. "The burden is on the defendant to demonstrate that the representation will be inadequate." *Sala*, 120 F.R.D. at 498.

"Adequacy of representation assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class." *Neal*, 43 F.3d at 55. "A class representative need not be the best of all possible representatives but rather one that will pursue a resolution of the controversy with the requisite vigor and in the interests of the class." *Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*, 149 F.R.D. 65, 79 (D.N.J. 1993).

There is no indication in this case that Plaintiffs' interests are in any way antagonistic to, or in conflict with, the interests of the putative class members. Furthermore, it is clear that Plaintiffs are adequate class representatives.

As a result of her experiences with identity fraud and theft, Ms. Millett has become very involved in consumer advocacy issues. She previously served as the state representative for Kansas in a national consumer advocacy and consumer information group called the Identity Theft Resource Center. (Declaration of Melody Millett, ¶ 3, attached hereto as Exhibit R). She has submitted written testimony to Congress regarding the effect of identity theft on two separate occasions: once through the Identity Theft Resource Center and once through Representative Dennis Moore's office. (Exhibit R, ¶ 3). She has devoted a substantial amount of time to

studying materials relating to identity theft and credit reporting. (Exhibit R, ¶ 3). She has also been very involved in the prosecution of this action, having been twice deposed and having participated substantially in the preparation of pleadings and discovery responses. (Exhibit R, ¶ 3). Mr. Millett has also been involved in the prosecution of this action, having been deposed and having participated substantially in the preparation of the pleadings and discovery responses. (Declaration of Steven Millett, ¶ 3, attached hereto as Exhibit S). In short, Plaintiffs are zealous advocates for the members of this class, and they will be ideal class representatives.

If there were any doubt about the zealousness of Plaintiffs' representation of the putative class, that doubt should be resolved by the action that Plaintiffs have taken in relation to the class action settlement currently being considered in the *Townes* action. Plaintiffs have sought to intervene in the *Townes* action in order to protect the interests of the putative class in this action from being injured by an overly broad release provision that is included as part of the *Townes* settlement. (Exhibit A, ¶ 10). In short, Plaintiffs are not only seeking to protect the interests of the putative class in the instant action – they are actively working to protect the interests of the putative class in other actions as well.

As for the issue of adequacy of class counsel, Plaintiffs will address that issue in the section of this Brief devoted to Rule 23(g). Since the amendment of Rule 23 in 2003, the requirements of Rule 23(a)(4) in relation to adequacy of counsel have been largely usurped by Rule 23(g) in that Rule 23(g) is both duplicative of Rule 23(a)(4) and is more specific in its requirements. To the extent that Plaintiffs are still required to address the issue of adequacy of counsel separately under Rule 23(a)(4), Plaintiffs incorporate all of the discussion that follows in relation to Rule 23(g).

**B.     PLAINTIFFS MEET THE REQUIREMENTS OF SECTION 23(b)(3).**

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc.*, 521 U.S. at 614. "To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) requirements:  Common questions must predominate over any questions affecting only individual members; and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy." *Id.* (internal quotation marks and citation omitted). "In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases in which a class action would achieve the economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results." *Id.* (internal quotation marks and citation omitted).

> Rule 23(b) includes a nonexhaustive list of factors pertinent to a court's "close look" at the predominance and superiority criteria:
>
> (A) the interest of members of the class in individually controlling the prosecution of defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Id.* (internal quotation marks and citation omitted).

"It is well recognized that 23(b)(3) certification is appropriate when the economics of the situation make it impossible for the aggrieved members to vindicate their rights by separate actions." *Sala*, 120 F.R.D. at 500 (quotation marks and citation omitted). "If a class action is otherwise proper, and if jurisdiction lies over the claims of the members of the class, the fact that the class is nationwide in scope does not necessarily mean that the relief afforded the plaintiffs

will be more burdensome than necessary to redress the complaining parties." *Califano v.*

*Yamasaki*, 442 U.S. 682, 702 (1979).

### 1.    Predominance.

"The Rule 23(b) predominance inquiry tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation." *Amchem Prods., Inc.*, 521 U.S. at 623.

"[T]he Court's finding of predominance requires the identification of the legal and factual issues,

common and diverse, and an identification of the class members to which those relate." *Sala*,

120 F.R.D. at 499 (quotation marks and citation omitted). "[C]ommon issues may predominate

under Rule 23(b)(3) even if their resolution does not alone establish liability." *Christiana*

*Mortgage Corp.*, 136 F.R.D. at 382. "Predominance is a test readily met in certain cases alleging

consumer [] fraud." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3rd Cir.

2004)(quotation marks and citation omitted).

Analysis and examination of the elements of the underlying cause of action is "critically

important to the predominance determination under Rule 23(b)(3)." *Johnston v. HBO Film*

*Mgmt., Inc.*, 265 F.3d 178, 186-87 (3rd Cir. 2001). Therefore, Plaintiffs will address their two

causes of action in some detail below.

### a.    Action for violations of the KCPA.

The KCPA prohibits suppliers from engaging in deceptive or unconscionable acts or

practices in conjunction with consumer transactions. K.S.A. §§ 50-626(a) and 50-627(a). These

provisions clearly incorporate definitions of "supplier" and "consumer transaction" for purposes

of the KCPA. Those terms are specifically defined under the KCPA. K.S.A. § 50-624(c)&(j).

The definition of "consumer transaction" in turn references the terms "services" and "consumer" which are also specifically defined under the KCPA. K.S.A. § 50-624(b)&(i).

Section 50-626 provides a non-exhaustive list of "deceptive acts or practices" for purposes of the KCPA. K.S.A. § 50-626(b). Similarly, section 50-627 provides a non-exhaustive list of acts that are unconscionable for purposes of the KCPA. K.S.A. § 50-627(b). Section 50-634 provides that "[a] consumer who suffers loss as a result of a violation of this act may bring a class action for the damages caused by an act or practice . . . [v]iolating any of the acts or practices specifically proscribed in K.S.A. 50-626 [or] 50-627." K.S.A. § 50-634(d)(1).

The above-referenced statutory sections, considered as a whole, establish the following elements for a claim under chapters 626 and/or 627 of the KCPA:

(1)    The defendant is a "supplier" pursuant to the applicable definition,

(2)    The plaintiff is a "consumer" pursuant to the applicable definition,

(3)    The transaction in question involved "services" pursuant to the applicable definition,

(4)    The transaction in question constitutes a "consumer transaction" pursuant to the applicable definition,

(5)    The transaction involved a "deceptive act or practice" or an "unconscionable act or practice" pursuant to Kansas law, and

(6)    The "deceptive act or practice" or the "unconscionable act or practice" caused the consumer to suffer a loss.

The determination of each of these elements would be common to Plaintiffs and all other class members.

**Element 1:**  The issue of whether TrueLink is a "supplier" for purposes of the KCPA would be exactly the same for all class members.  A "supplier" is defined under the KCPA as "a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions."  K.S.A. § 50-624(j).  This definition either applies to TrueLink or it does not.  There is no reason to believe that this determination would vary among different class members as TrueLink is selling the same Credit Monitoring service to all class members.  Furthermore, TrueLink has already admitted that it is a "supplier" for purposes of the KCPA.  (Exhibit L, No. 7).  Thus, Plaintiffs will be able to establish this fact for all class members.


**Element 2:**  The issue of whether Plaintiffs and other putative class members are "consumers" for purposes of the KCPA would be the same for all class members because the class, by definition, is limited to Kansas residents who purchased Credit Monitoring.  A "consumer" is defined under the KCPA as "an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, business or agricultural purposes."  K.S.A. § 50-624(b).  There is no reason to believe that Plaintiffs or any other class member would fall outside of this broad definition.  All class members would be individuals or husband and wife.  In addition, because Credit Monitoring is a service that monitors for personal identity theft, it would only be used for personal or family purposes.  Furthermore, TrueLink has already admitted that Plaintiffs and members of the class are "consumers" for purposes of the KCPA.  (Exhibit L, No. 4).  Thus, Plaintiffs will be able to establish this fact for all class members.

**Element 3:** The issue of whether the transactions in question involved "services" for purposes of the KCPA would be the same for all class members. "Services" are defined under the KCPA as including "[w]ork, labor and other personal services [and] . . . any other act performed for a consumer by a supplier." K.S.A. § 50-624(i). There is no reason to believe that the identity-theft protection services being offered by TrueLink would not fall within this broad definition. Nor is there any reason to think that the determination of whether TrueLink's identity-theft protection services constitute "services" for purposes of the KCPA would vary among different class members. Furthermore, TrueLink has already admitted that Credit Monitoring constitutes a "service" for purposes of the KCPA. (Exhibit L, No. 5). Thus, Plaintiffs will be able to establish this fact for all class members.

**Element 4:** The issue of whether the sale of Credit Monitoring constitutes a "consumer transaction" for purposes of the KCPA would be the same for all class members. A "consumer transaction" is defined under the KCPA as "a sale, lease, assignment or other disposition for value of property or services within this state (except insurance contracts regulated under state law) to a consumer; or a solicitation by a supplier with respect to any of these dispositions." K.S.A. § 50-624(c). This definition either applies to the marketing and sale of Credit Monitoring or it does not. There is no reason to think that the determination of whether the marketing and sale of Credit Monitoring constitutes a "consumer transaction" would vary among different class members. Furthermore, TrueLink has already admitted that the purchase of Credit Monitoring and the contracts through which named plaintiffs and members of the class purchased Credit Monitoring constitute "consumer transactions" for purposes of the KCPA. (Exhibit L, No. 6). Thus, Plaintiffs will be able to establish this fact for all class members.

**Element 5:**  The determination of whether the transactions by which TrueLink marketed and sold Credit Monitoring involved a "deceptive act or practice" or an "unconscionable act or practice" requires a more extensive analysis than the four previous elements.  Nevertheless, this determination would be the same for all class members.

Section 50-626(b) defines a number of specific acts that constitute a "deceptive act or practice" for purposes of the KCPA, including the following:

- Representing, knowingly or with reason to know, that services have sponsorship, approval, characteristics, uses or benefits that they do not have.  K.S.A. § 50-626(b)(1)(A).

- Representing, knowingly or with reason to know, that services are of a particular standard, quality or grade when the services are actually of another standard, quality or grade.  K.S.A. § 50-626(b)(1)(D).

- Representing, knowingly or with reason to know, that services have uses, benefits or characteristics when the supplier did not rely upon and have a reasonable basis for making such representation.  K.S.A. § 50-626(b)(1)(F).

- The willful use, in any written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact.  K.S.A. § 50-626(b)(2).

- The willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact.  K.S.A. § 50-626(b)(3).

Section 50-626(b) further indicates that these actions constitute "deceptive acts and practices" regardless of "whether or not any consumer has in fact been misled."  K.S.A. § 50-626(b).

As Plaintiffs have explained in some detail in the Statement of Facts, due to the shortcomings of a credit report as an identity-theft-detection tool, Credit Monitoring cannot

detect all types of identity theft and cannot even detect all identity theft that relates to fraudulent use of personal identifiers to obtain credit. Furthermore, Credit Monitoring cannot prevent identity theft; it can only warn a consumer about some forms of identity theft after the consumer has already become a victim of identity theft.

Despite these clear limitations of Credit Monitoring, TrueLink has marketed Credit Monitoring as a service that provides "complete identity theft protection." Similarly, TrueLink has marketed Credit Monitoring as a service that will protect a consumer's identity and that can warn a consumer about identity fraud and fraudulent activity. These representations are clearly false and misleading given the significant limitations of Credit Monitoring.

In the language of the KCPA, these representations constitute knowing representations that Credit Monitoring has characteristics, uses and benefits that it does not have. These representations constitute knowing representations that Credit Monitoring is of a particular standard, quality or grade when it is not actually of that standard quality or grade. These representations constitute knowing representations that Credit Monitoring has uses, benefits and characteristics when TrueLink did not have a reasonable basis for making such representations. These representations constitute written representations of exaggeration, falsehood, innuendo or ambiguity as to a material fact. Moreover, the failure to notify consumers regarding the limitations of Credit Monitoring as an identity-theft-protection tool constitutes a willful failure to state a material fact or the willful concealment, suppression or omission of a material fact.

Section 50-627(b) defines a number of specific acts that constitute an "unconscionable act or practice" for purposes of the KCPA, including the following:

- The supplier took advantage of the inability of the consumer reasonably to protect the consumer's interest because of the consumer's inability to understand the language of an agreement. K.S.A. § 50-627(b)(1).

- The transaction the supplier induced the consumer to enter into was excessively onesided in favor of the supplier. K.S.A. § 50-627(b)(5).

- The supplier made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment. K.S.A. § 50-627(b)(6).

Thus, TrueLink has taken advantage of the consumer's inability to understand the language of the contract.

Therefore, the proof of violations of specific provisions of section 50-626 and 50-627 will be the same for all class members.

30

**Element 6:** The issue of whether the deceptive or unconscionable acts and practices noted above caused the consumer to suffer a loss will be the same for all class members. Plaintiffs are alleging that the class members each suffered a loss of the funds that they paid for Credit Monitoring because the class members did not receive the services that were promised in exchange for those funds. In short, the measure of damages is the reimbursement of the purchase price of Credit Monitoring. While the exact damage figure may vary among different class members, the basic measure of damages will be the same. Furthermore, the amount of damages associated with a particular class member could be readily determined by reference to TrueLink's own billing records.

### b.      Action for breach of contract.

"Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages." *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2005); *see also Carlson v. Hallinan*, 925 A.2d 506, 528-29 (Del. Ch. 2006); *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).[1] The determination of each of these elements would be common to Plaintiffs and all other class members.

**Element 1:** The issue of whether there was a contractual obligation will be the same for Plaintiffs and all class members.

---

[1]      The contract by which Credit Monitoring is sold provides that Delaware law applies to contract disputes. (Exhibit N, p. 6).
Therefore, Delaware law applies to the breach of contract claim pursued by Plaintiffs on behalf of themselves and the putative class.

**Element 2:**  The issue of whether TrueLink has breached its obligation under the contract will be the same for all class members.

By proving that Credit Monitoring does not and cannot provide broad identity-theft protection, Plaintiffs will be able to prove on a class-wide basis that TrueLink has breached its obligation to provide broad identity-theft protection.  The issue of whether Credit Monitoring provides broad identity-theft protection is the same for all class members.  It either does provide broad identity-theft protection or it does not.  In either case, the issue is the same for all class members and there is no reason to believe that the determination would vary among different class members.

**Element 3:**  The issue of whether TrueLink's breach of contractual obligations caused the consumer to suffer a loss will be the same for all class members.  Plaintiffs are alleging that the class members each suffered a loss of the funds that they paid for Credit Monitoring because the class members did not receive the services that were promised in exchange for those funds.  In short, the measure of damages is the reimbursement of the purchase price of Credit Monitoring. While the exact damage figure may vary among different class members, the basic measure of

damages will be the same.  Furthermore, the amount of damages associated with a particular class member could be readily determined by reference to TrueLink's own billing records.

### c.    Predominance is established for both claims.

As explained in the two immediately preceding sections, every element of Plaintiffs' claims will allow for common proof as to all class members.  Therefore, the common issues of fact and law predominate over any issues that are not common to all class members.  Furthermore, even if there were some variation among different class members as to one or more of the above-referenced elements, that slight variation would not defeat a finding of predominance.  "[C]ommon issues may predominate under Rule 23(b)(3) even if their resolution does not alone establish liability."  *Christiana Mortgage Corp.*, 136 F.R.D. at 382.

### 2. Superiority

"The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available means of adjudication."  *In re Prudential Ins. Co.*, 148 F.3d 283, 316 (3rd Cir. 1998)(quotation marks and citations omitted).  "One of the primary considerations in evaluating whether the class action device is superior to other methods for fair and efficient adjudication of the controversy, is the number of persons injured by defendants alleged wrongful conduct."  *Gunter v. Ridgewood Energy Corp.*, 164 F.R.D. 391, 400 (D.N.J. 1996).  "When there are numerous plaintiffs, class certification avoids taxing the court with a barrage of lawsuits adjudicating the same issues and involving the same defendant."  *Id.*

When the issue of superiority is considered in the context of the Rule 23(b) factors, it is apparent that the class action mechanism is a superior means of handling this litigation.

**a.    The interest of members of the class in individually controlling the prosecution or defense of separate actions.**

"[T]he fact that so few lawsuits have been filed by individuals indicates that a *disinterest* exists among the class members in individually controlling [the] litigation." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 2007 WL 419285, *14 (D.N.J. 2007)(quotation marks and citation omitted). Moreover, "[t]hose courts which have found the interest of class members in controlling their own litigation to weigh against certification have generally done so in cases where damages for personal injuries were sought." *McQuilken v. A & R Dev. Corp.*, 576 F.Supp. 1023, 1032 (D.C.Pa. 1983).

Plaintiffs are not aware of any other cases that have been filed that pursue the specific claims that Plaintiffs are pursuing. (Exhibit A, ¶ 11). In fact, Plaintiffs are only aware of two actions that involve the Credit Monitoring service sold by TrueLink. (Exhibit A, ¶ 11). Both actions state claims for violations of the Credit Repair Organizations Act ("CROA"). (Exhibit A, ¶ 11). Plaintiffs breach of contract and consumer protection claims are completely different from a CROA claim and involve an entirely different aspect of the Credit Monitoring service. (Exhibit A, ¶ 11). Specifically, Plaintiffs claims focus on the identity-theft protection aspects of the Credit Monitoring service, not upon the credit repair aspects of the Credit Monitoring service. (Exhibit A, ¶ 11).

Plaintiffs are not seeking personal damages arising from particular failures of the Credit Monitoring service. Plaintiffs are merely seeking reimbursement of the funds expended as

payment for the Credit Monitoring service.  These reimbursements would generally be for small amounts, measuring, at most, in the range of hundreds of dollars for an individual consumer.  In light of the small amounts involved, it appears highly unlikely that individual class members would have any desire to pursue their individual claims against TrueLink.  Given the litigation expense involved in even a minor lawsuit, it would make no economic sense for class members to pursue their claims individually.

        **b.**        **The extent or nature of any litigation concerning the controversy already commenced by or against members of the class.**

"[T]he lack of individual actions weighs in favor of the second superiority factor: certifying the proposed class will not disrupt litigation commenced elsewhere because at this time no other actions based on [the] claims have been filed."  *Danvers Motor Co., Inc.*, 2007 WL 419285 at *14.

As noted in the immediately preceding section, Plaintiffs and their counsel are not aware of any cases involving similar claims.

        **c.**        **The desirability of concentrating the litigation of the claims in the particular forum.**

Members of the proposed class are located across the United States and across the State of Kansas.  There is no one geographic location that is more convenient or centralized.  However, the forum selection clause in TrueLink's contract selects Delaware as the forum.

        Given that no one geographic location

is preferable to any other

this factor is either neutral or weighs slightly in favor of superiority.

### d.     Difficulties likely to be encountered in management of a class action.

"Commonly referred to as 'manageability,' this consideration encompasses the whole

range of practical problems that may render the class action format inappropriate for a particular

suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). "[A] court in its superiority

analysis is not required to determine whether the class action will create significant management

problems, but rather whether certification could create relatively more management problems

than any other alternative." *Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.*, 2006 WL

3371690, *11 (D.N.J. 2006).

Alternatives involving "either a complex joinder of the parties or the simultaneous

adjudication of [numerous] different litigations across the nation, [are] … inefficient and

redundant because they would involve the same Defendant and course of conduct, similar

injuries to each Plaintiff, and the same legal issues being adjudicated." *Id.* "This would provide

no benefit toward federal or state judicial economy and as a whole would needlessly inundate

our judicial system with repetitious adjudication." *Id.* "Similarly, allowing individual actions,

would most likely preclude [potential plaintiffs from] bringing their meritorious claims against

[potential defendants] when the cost of doing so may exceed the recovery they might receive,

and they may be barred under their state's applicable statute of limitations." *Id.* "This would

effectively undermine the fundamental purpose of the class action device, which, as the Supreme

Court has put it, vindicates the rights of groups of people who individually would be without

effective strength to bring their opponents into court at all." *Id*. (quotation marks and citation omitted).

It appears that the only alternative method of handling the claims of the putative class would be by individual lawsuits on behalf of each class member. As noted above, that alternative is neither feasible nor desirable. Thus, to the extent that it is feasible, the class action mechanism is clearly the preferable method of handling the claims of the putative class.

Plaintiffs do not believe that any unusual difficulties would arise from handling this action as a class action. To the contrary, Plaintiffs contend that it is quite feasible to handle this action as a class action. In support of that contention, Plaintiffs are attaching as an exhibit to this Brief a trial plan that briefly sets forth the methodology by which this case could be handled as a class action. (Trial Plan, attached hereto as Exhibit T).

## C.     ADEQUACY OF CLASS COUNSEL.

Rule 23(g) provides that "a court that certifies a class must appoint class counsel." FED.R.CIV.P. 23(g)(A). Class counsel "must fairly and adequately represent the interests of the class." FED.R.CIV.P. 23(g)(B). In making the determination regarding the adequacy of class counsel, the court must consider: "[1] the work counsel has done in identifying or investigating potential claims in the action, [2] counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, [3] counsel's knowledge of the applicable law, and [4] the resources counsel will commit to representing the class." FED.R.CIV.P. 23(g)(C).

The information set forth in the declarations of Plaintiffs' counsel establishes that Plaintiffs' counsel are appropriate class counsel. (Exhibit A; Declaration of Bryson Cloon,

attached hereto as Exhibit U; Declaration of Barry Grissom, attached hereto as Exhibit V;

Declaration of Joyce Yeager, attached hereto as Exhibit W).  Specifically, Plaintiffs' counsel

have engaged in extensive work identifying and investigating potential claims, Plaintiffs counsel

are experienced in class action litigation, including class actions similar to the instant action, and

Plaintiffs' counsel have committed substantial effort and resources to representing the putative

class in this action.  Plaintiffs also contend that the briefing submitted to this Court in this action

illustrates that Plaintiffs' counsel have a substantial knowledge of the applicable law.


## **CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully request that this Court grant

Plaintiffs' Motion for Class Certification, appoint Plaintiffs as the designated Class

Representatives, and appoint Plaintiffs' Counsel as the designated Class Counsel.


Respectfully submitted,


/s/ Christopher J. Curtin
Christopher J. Curtin
DE Bar Id. No. 0226
Erisman & Curtin
629 Mount Lebanon Road
Wilmington, Delaware 19803
Phone: (302) 478-5577
Facsimile: (302) 478-5494
Email: ccurtin659@aol.com

/s/ Michael W. Blanton
Michael W. Blanton,
MO Bar. Id. No. 46490
Swanson Midgley, LLC
2420 Pershing Road, Ste. 400
Kansas City, Missouri 64108
Phone: (816) 842-6100

Barry R. Grissom, Esq.
KS Bar. Id. No. 10866
7270 W. 98th Terrace
Building 7, Suite 220
Overland Park, Kansas 66212
Phone: (913) 341-6616

Bryson R. Cloon
KS Bar. Id. No. 08660
MO Bar. Id. No. 36843
Cloon Law Firm
11350 Tomahawk Creek Parkway, Suite 100
Leawood, KS 66211
Phone: (913) 661-9600
Facsimile: (913) 661-9614

and

YEAGER LAW FIRM LLC
B. Joyce Yeager, Esq.
KS Bar. Id. No.  18932
7270 W. 98th Terrace
Building 7, Suite 220
Overland Park, Kansas 66212
Phone: (913) 648-6673

**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I, Christopher J. Curtin, Esq., hereby certify that on August 13, I electronically filed the foregoing redacted version of Plaintiffs' Brief in Support of Motion for Class Certification with the Clerk of the District Court using CM/ECF, which will send notification of such filing to the following:

William M. Lafferty, Esq.
Jerry Clyde Harris, Jr., Esq.
Morris Nichols Arsht & Tunnell
1201 N. Market St.
Wilmington, DE 19801


ERISMAN & CURTIN

/s/ Christopher J. Curtin
Christopher J. Curtin
DE Bar Id. No. 0226
Erisman & Curtin
629 Mount Lebanon Road
Wilmington, Delaware 19803
Phone: (302) 478-5577
Facsimile: (302) 478-5494
Email: ccurtin659@aol.com

DATE: August 13, 2007