# EXHIBIT A

1

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE DISTRICT OF DELAWARE

3

4  STEVEN G. MILLETT,

5  MELODY, J. MILLETT,

6  On Behalf of themselves

7  And all others similarly situated,

8  Plaintiffs,

9  vs.                          No. 05-599-SLR

10  TRUELINK, INC.,

11  A Trans Union Company,

12  Defendant.

13

14

15  VOLUME I

16

17  DEPOSITION OF MELODY J. MILLETT, a

18  Plaintiff, taken on behalf of the Defendant

19  before Nissa M. Sharp, CSR, CCR #528, pursuant

20  to Notice on the 3rd of May, 2007, at the

21  offices of CLOON LAW FIRM, One Hallbrook Place,

22  11150 Overbrook Road, Suite 350, Leawood,

23  Kansas.

24

25

**Metropolitan**
COURT REPORTERS

8200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8860


COPY

2

```
 1                    APPEARANCES
 2           Appearing for the Plaintiffs was MS. B.
 3   JOYCE YEAGER of YEAGER LAW FIRM, LLC, City
 4   Center Square, 26th Floor, 1100 Main Street,
 5   Kansas City, Missouri 64105.
 6           Also appearing for the Plaintiffs was
 7   MR. BRYSON R. CLOON of CLOON LAW FIRM, One
 8   Hallbrook Place, 11150 Overbrook Road, Suite
 9   350, Leawood, Kansas 66211.
10           Appearing for the Defendant were
11   MR. MICHAEL O'NEIL and MS. HEATHER SCHUMAN of
12   DLA PIPER US, LLP, 203 North LaSalle Street,
13   Suite 1900, Chicago, Illinois 60601-1293.
14           Also present was Leda Gipson of MCR
15   VIDEO.
16                      INDEX
17   WITNESS:                            PAGE:
18     MELODY J. MILLETT
19       Examination by Mr. O'Neil           4
20
21
22
23
24
25
```



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7611 • 913.317.8800 • FAX 913.317.8880

41

1    question is you don't know who Mr. Perez is.

2         Q.    Uh-huh.  So, as I think you mentioned

3    before, you know, your lawsuits involve a number

4    of things, one of them is dissatisfaction with

5    the defendants' products, you know, when it

6    comes to Experian, TrueLink, and Equifax, right?

7         A.    I'm sorry, can you please reread the

8    question?

9         Q.    I'll withdraw it.  You mention identity

10   theft, do you remember?

11        A.    Yes.

12        Q.    Okay.  And that's kind of what prompted

13   your investigation, your purchase of products

14   and then the lawsuits, right?

15        A.    Well, we had identity theft, yes.

16        Q.    And to be more specific, what you were

17   referring to there is that somebody apparently

18   named "Mr. Perez" was using your husband's

19   Social Security number, right?

20        A.    Yes.

21        Q.    Okay.  Have you ever been a victim of

22   identity theft?

23        A.    I have been a victim of data breaches,

24   but I don't necessarily know that my particular

25   identity has been stolen.  But, you know, given



82

1          Q.    Well, right now I'm just asking about

2     you, we'll get to the class.  Do you know how

3     much money you've paid TrueLink over the years?

4          A.    I'm sure it's in one of those documents

5     somewhere that I've seen.

6          Q.    I haven't seen it, but.

7          A.    I believe it was in your production,

8     it's the order management screen that's got all

9     the transactions on there.

10         Q.    And do you want all -- do you want the

11    court to order that TrueLink must deliver all

12    that money back to you?

13         A.    Well, I believe I've heard the legal

14    term referred to as "disengorgement," is that

15    how that works?  When you make false claims and

16    entice people to buy something under false

17    pretenses, that you don't have the right to keep

18    the money that you've made as a result of those

19    false assertions, is that how that works?  I

20    think.

21         Q.    Is it your understanding that you

22    brought a claim for disgorgment against

23    TrueLink?

24         A.    It's my understanding that the class

25    will get some kind of relief for the products

83

1    that they purchased that did not work.  Now, how
2    much relief that is or is not is a determination
3    for the court to make or as a result of any
4    class action settlement, should there be one.
5        Q.    Well, you would agree that there's some
6    value to the products that you've purchased from
7    TrueLink, right?
8        A.    Well, I mean, the value that exists for
9    the product only exists in the fact that you're
10   viewing your consumer disclosure online.  That,
11   you know, there's a convenience value in that
12   aspect of it.  But it does not perform as it's
13   advertised to perform in the fact that it does
14   not provide complete protection from identify
15   theft.  It doesn't even provide basic protection
16   from identity theft.
17       Q.    Have you canceled the subscription that
18   Mr. Millett has with TrueLink for credit
19   monitoring?
20       A.    I believe so.  It's been canceled now.
21       Q.    Okay.  And when did you cancel it?
22       A.    I believe it was allowed to expire and
23   lapse, and the credit card that's in there was
24   expired and so you -- they have not been able to
25   place a new charge.  So, I believe it lapsed in

**Metropolitan**
COURT REPORTERS

8200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7611 • 913.317.8800 • FAX 913.317.8850

84

1    and of its own accord.  It's not like I called

2    somebody to cancel it.

3        Q.   So, when did that occur?

4        A.   I think the last charge was in November

5    of 2006 and there hasn't been one since.

6        Q.   Why didn't you make effort to give a

7    new credit card so you can continue the credit

8    monitoring service?

9        A.   Because there's no purpose in it.

10        Q.   When did you come to the conclusion

11    that there was no purpose in purchasing the

12    credit monitoring service from TrueLink?

13        A.   Well, I mean, it's been some time over

14    the course of the litigation.  But, I mean, now

15    that I know that it really doesn't even cover

16    for anything, then there was just no point in

17    it, so I've discontinued it.

18        Q.   And when did you learn that?

19        A.   Like I said, that's been a evolving

20    process as new evidence has arised in this case

21    as we've gone along.  But, I mean, there have

22    been little things.  But, I mean, getting the

23    information, for example, that the -- that the

24    -- I'm drawing a blank here for a moment -- that

25    the Home Depot account had been relabeled and

1    that that information was still not presenting

2    in the product.  The fact that we had had false

3    alert triggers on and off throughout 2005, I

4    believe was the year that those were occurring

5    in.  That it serves no purpose, so I just

6    discontinued it.

7        Q.   Prior to November of 2006, you

8    discontinued it?

9        A.   No.  I didn't renew -- the last charge

10   was in November of 2006, and I've not placed a

11   new credit card in there.

12       Q.   Was November 2006 when you came to the

13   conclusion that there was no purpose for

14   purchasing the credit monitoring service?

15       A.   No.  It was when I made the conscious

16   decision to go in there and end it.  TrueLink's

17   monitoring service is a negative opt-in.  You

18   must specifically opt out or the subscription

19   continues automatically through no interference

20   or whatever of your own.

21       Q.   Did you ever cancel it affirmatively?

22       A.   What do you mean affirmatively?

23       Q.   Meaning what you just said, that you

24   called TrueLink and said cancel it?

25       A.   I already answered that, and I said no.



**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8600 • FAX 913.317.8850

86

1   I allowed the subscription to lapse by not

2   giving them a new credit card number with the

3   correct expiration date.

4        Q.   Because you told the "New York Times"

5   reporter that there was some value to credit

6   monitoring, right?

7        A.   I told the "New York Times" reporter

8   that it was the best tool available, but it was

9   not as advertised.

10       Q.   Right.  And that you had continued to

11  purchase the product, right?

12       A.   Well, you still have to be able to look

13  at your credit report, sir.

14       Q.   Okay.  So, when you had the

15  conversation with the reporter for the "New York

16  Times", you still thought that there was value

17  in the credit monitoring service, right?

18       A.   Not the monitoring service.  There is

19  value in having access to your credit report on

20  an ongoing basis, especially when you already

21  know you're a victim of identity theft.

22  However, it is not complete identity theft

23  protection as is advertised.

24       Q.   Is that what TrueLink advertises?

25       A.   I believe that's what was on their



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

1       right?

2               A.      Yep.

3               Q.      Okay.   Do you know what the Organized

4       Crime Control Act of 1970 is?

5               A.      Are you talking about RICO?

6               Q.      Yes.

7               A.      Yes.

8               Q.      Are you familiar with RICO?

9               A.      Uh-huh.

10              Q.      Okay.   And are you aware that you

11      brought claims against these certain defendants

12      under RICO?

13              A.      Yes.

14              Q.      But those claims were ultimately

15      dropped by your lawyers, weren't they?

16              A.      As the investigation wore on, yes.

17              Q.      Well, it was actually much -- I mean,

18      it was only a few months after you first filed

19      this lawsuit, right?

20              A.      Right, but the investigation was

21      ongoing at that time.

22              Q.      Okay.   I want to -- are you generally

23      familiar with the procedural course of all of

24      the various lawsuits that you've filed against

25      all the various defendants?



101

1       A.    I'm sorry, I don't understand what you

2    mean.

3       Q.    Okay.  You get all the pleadings that

4    were filed in this case?

5       A.    Yes.

6       Q.    Okay.  And you're aware that claims

7    were filed against certain defendants that were

8    voluntarily dismissed, right?

9       A.    Or dropped, yeah.

10       Q.    Yeah.  You're also aware that claims

11    were filed in one court and then later filed in

12    another court, right?

13       A.    For those claims where whatever the

14    contracts had specified jurisdictions then, yes,

15    those courts were moved.

16       Q.    Okay.  Were you disappointed when your

17    lawyers told you that they had to dismiss all

18    but one or two of the defendants from the

19    initial case and file separate cases in the same

20    court?

21             MS. YEAGER:  Objection.

22    Misstates the facts.  Lack of foundation.

23       A.    I'm sorry?  Can I get the question

24    reread please?

25       Q.    (BY MR. O'NEIL)  You know what, I'll

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

102

1  withdraw it.  Were you surprised when you

2  realized that you had to file multiple

3  complaints in multiple courts before you finally

4  got the right to take discovery and get the

5  court to rule on motions?

6          MS. YEAGER:  Objection.  Lack of

7  foundation.  Misstates testimony.  Misstates

8  facts.  You can answer.

9      A.    Okay, can I get the question read back?

10     Q.    (BY MR. O'NEIL) Well, hold on, I want

11  to address Ms. Yeager's objection that I

12  misstated facts.  Are you aware that the first

13  lawsuit that was filed on behalf of you and

14  Mr. Millett by Barry Grissom and his colleagues

15  was the lawsuit that's right before you,

16  Exhibit 9?

17     A.    Yes, I'm aware of that.

18     Q.    Okay.  And then are you also aware that

19  a decision was made a few months later to

20  dismiss most of those defendants and sue them in

21  separate lawsuits?

22     A.    I believe this action remained and

23  became the Equifax case.

24     Q.    Right.  And you dismissed certain of

25  the defendants here from this case, and then you



Metropolitan
COURT REPORTERS

9800 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8600 • FAX 913.317.8650

103

1    filed separate lawsuits against them?

2        A.    They were refiled, yeah, I believe.

3        Q.    Okay.   Do you have an understanding as

4    to why only a few months after the initial

5    lawsuit was filed a decision was made to dismiss

6    some of these and refile the individual cases?

7        A.    I know a decision was made.   I can't

8    discuss the content of the decision -- of the

9    discussions that were made to get to this

10   decision.

11       Q.    Were you disappointed that it slowed

12   the progress of the litigation that that had to

13   occur?

14       A.    The progress of the litigation is what

15   the progress of the litigation is.

16       Q.    Uh-huh.

17       A.    I mean, am I disappointed every time

18   the court postpones something or extends

19   deadlines or, you know, we get a new judge and

20   they set up a new schedule, I mean, it is what

21   it is.

22       Q.    Uh-huh.   And then once the individual

23   lawsuits were brought in the District of Kansas,

24   you learned that they had to be dismissed and

25   then filed in other courts, other parts of the



111

1      Q.   Okay.  And then Page 11 there's a

2  heading "Class Action Allegations - Fraud and

3  Negligence - Defendants Equifax, TransUnion

4  Experian."  Do you see that, ma'am?

5      A.   Yes.

6      Q.   And then in Paragraph 38, it refers to

7  common questions of law and fact arising in this

8  action, as an example, subparagraph A, "Whether

9  the conduct of defendants Equifax, TransUnion

10  Experian," and then it goes on.  Do you see

11  that, ma'am?

12      A.   Yeah.

13      Q.   Okay.  Is this refreshing your

14  recollection that certain of the claims that you

15  were bringing against -- well, actually, I think

16  strike that.  All of the claims that you were

17  bringing against TransUnion, Experian and

18  Equifax were all the same?

19      A.   Yeah.

20      Q.   Okay.  Because you had bought the same

21  types of products and you thought they had

22  failed in the same way, right?

23      A.   Well, I mean, they have similar

24  failures, yes.  I don't know that I'd use the

25  word "same".



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 · 913.317.8800 · FAX 913.317.8850

112

1          Q.    So you'd use the word "similar" but not
2    "same"?
3          A.    Correct.
4          Q.    Bear with me, Mrs. Millett.  Now, the
5    claims that you brought against Bank of America
6    and Ford Motor were not class action claims,
7    correct?
8          A.    No, those were specific claims I
9    believe.
10         Q.    And what do you mean by that, "specific
11   claims"?
12         A.    They were specific claims to us I
13   believe, when they were refiled at least.
14         Q.    You have a case pending against
15   Experian Information Solutions; isn't that
16   correct, ma'am?
17         A.    I believe so, and I believe
18   consumerinfo.com is also on that suit too.
19         Q.    Okay.  Let me show you the complaint,
20   you're absolutely right.  Let me hand you what's
21   been marked Millett Exhibit No. 10.
22                    (M. Millett Exhibit 10 was marked
23   for identification by the reporter.)
24         Q.    (BY MR. O'NEIL) Which has a stamp
25   indicating it was filed with the U.S. District



1    Q.    On behalf of your husband, you
2    purchased certain products from TrueLink in
3    August of 2003, right?
4    A.    Yes, sir.
5    Q.    Okay.  And have you always been the one
6    to access the e-mails and the website of
7    TrueLink on behalf of your husband?
8    A.    Pretty much, yeah, uh-huh.
9    Q.    Okay.  I mean, to your knowledge, your
10   husband never accessed the website, right?
11   A.    Not where he went like by himself and
12   logged in, no.
13   Q.    Okay.  And you testified I believe
14   earlier today that you let the subscription to
15   credit monitoring lapse in November of 2006
16   because -- when the credit card was no longer
17   active, right?
18   A.    Correct.
19   Q.    Okay.
20   A.    But the subscription probably would
21   have continued on for like three months, because
22   I think they renew it quarterly.  So, you know,
23   that was the last payment that was made.  So
24   whatever it is, three months or the quarter is
25   after that date is probably when it expired.

180

```
 1      which January, maybe February of '07, I don't

 2      know.

 3          Q.   Okay.   Did you continue to get e-mails

 4      from TrueLink until January or February 2007?

 5          A.   I got an e-mail from TrueLink yesterday

 6      advertising for me to come back and resubscribe

 7      to the product.

 8          Q.   Did you continue to get e-mails, credit

 9      monitoring alert e-mails, from TrueLink until

10      January or February this year?

11          A.   Well, they only give you -- send you an

12      alert if you -- if there's been a change.

13          Q.   Okay.

14          A.   So, there's not been an alert e-mail in

15      January or February of '07.

16          Q.   When was the last time you got an

17      alert?

18          A.   Oh, it's been I think in December some

19      time.

20          Q.   December of 2006?

21          A.   Yeah.

22          Q.   Okay.

23          A.   When we bought the car.

24          Q.   That inquiry prompted the alert; is

25      that right?
```



**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

1      A.    Well, I believe in 2003 I did, but I

2   don't do it on every occasion, no.

3      Q.    Well, I'll show you some pages that

4   have the description on TrueLink's website in

5   August of 2003 regarding the credit monitoring

6   product.   Is it your testimony that in order for

7   you to access any product from TrueLink, you had

8   to look at that page or go through that page

9   first?

10     A.    I believe in the upper right-hand

11   corner there's a little button that says "log

12   in" that's what you click on to log on to the

13   product.

14     Q.    Okay.   That's on the home page?

15     A.    Yeah.

16     Q.    Okay.   There's a home page and then

17   there's pages that describe particular products,

18   right?

19     A.    Well, the home page has products

20   described on the front of it.

21     Q.    I understand.  I understand.  And --

22     A.    And I might click those ads and go and

23   view some information, but where that takes me

24   to --

25     Q.    Okay.

188

1        A.    -- in the site I can't say without the

2    HTML code in front of me that say this page

3    links to this page.

4        Q.    With I believe the exception of two

5    pieces of paper, the only website -- the only

6    screen prints from the TrueLink website that

7    were produced by your lawyers are in August of

8    2003?

9        A.    That would be a true statement.    I

10    haven't printed anything from the website since

11    then I don't think.

12        Q.    Okay.

13        A.    Unless maybe there's a printed credit

14    report or something like that where I've gone in

15    and printed out the product credit report.

16        Q.    I understand.    Have you ever viewed the

17    description that TrueLink has regarding credit

18    monitoring service since August of 2003?

19        A.    It's all over the web.    I mean,

20    obviously I do a lot of Google research on

21    identity theft.    So, I mean, every time I go to

22    Google, I get an ad or marketing for TrueLink

23    when you do searches associated with identity

24    theft.    So, you know, you click on the link and

25    you look at the stuff.    So, where that goes, I

189

1    don't know if that's at TrueLink's site or if

2    that's at another site.

3        Q.    Right now I'm just talking about the

4    TrueLink website.  Have you ever viewed

5    TrueLink's description of the credit monitoring

6    product since August of 2003?

7        A.    I just answered that question, yes.

8    But it's been as a result of I'm on Google, I'm

9    researching identity theft matters and a link

10   will come up for TrueLink that's protect your

11   identity or whatever and I might click on it and

12   that will take me to a page.  Now, whether

13   that's in TrueLink's site or not in TrueLink's

14   site, I can't say.  But it is marketing material

15   for the TrueLink product.

16       Q.    But you never printed that out?

17       A.    No.

18       Q.    Do you think it's relevant to this

19   lawsuit?

20       A.    What?

21       Q.    The marketing of the credit monitoring

22   product that you saw since August of 2003?  Do

23   you think that's relevant to this lawsuit?

24       A.    Well, I mean, yeah, it's relevant.

25       Q.    Okay.  Did you notice any changes in



Metropolitan
COURT REPORTERS    9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

190

1    the marketing of the product since August of

2    2003?

3        A.    There's been subtle changes in wording

4    and whatnot.

5        Q.    Uh-huh.    And do you think those changes

6    made the marketing more accurate, less accurate

7    or didn't make a difference?

8        A.    Well, I still think that the marketing

9    the way that it's currently being phrased and

10   presented to people leads people to believe that

11   the product contains features and services that

12   it does not contain, yes, I believe it's still

13   inaccurate.

14       Q.    But you couldn't really tell me in what

15   way, because you don't have that actual

16   marketing materials, right?

17       A.    Well, if you'd like, I'll go home

18   tonight and print out the site and I'll send it

19   to you and I'll tell you why I think it's

20   inaccurate.

21       Q.    That might be helpful actually.

22               MS. YEAGER:    Counsel's going to

23   request that you put that request in writing.

24               MR. O'NEIL:    Well, I think --

25   well...

195

1     specific question came up of the specific

2     charges that people wanted the information for

3     that.   So I went out to get the bank records

4     specifically for this purpose.

5          Q.   On behalf of your husband, you've also

6     purchased credit reports and other products from

7     TrueLink, right?

8          A.   That would be correct.

9          Q.   None of those are really mentioned in

10    your complaint though, do you recall that?   I

11    mean, your complaint is about credit monitoring,

12    that's the product you reference in the

13    complaint?

14         A.   Correct.

15         Q.   Do you -- are you suing -- are you

16    suing TrueLink with regard to the other products

17    that you purchased other than credit monitoring?

18         A.   I think we've reduced it just down to

19    the breach of contract for the credit monitoring

20    TrueLink product, so yes.   But, I mean, in the

21    beginning, I think that we were suing for fair

22    credit reporting violations which would have

23    concerned the reports that were involved.

24         Q.   And are you suing -- have you ever

25    purchased credit monitoring for yourself?



196

1      A.    No.  Not that I'm aware of.

2      Q.    Okay.  Have you ever purchased any

3  products from TrueLink for yourself?

4      A.    I think there was a purchase made for a

5  three-in-one credit report for myself at some

6  point in time.  But I cannot find the records

7  that are associated with it.

8      Q.    When did you make this purchase?

9      A.    I mean, I don't recall the exact time

10  period.  I know that there was a time period

11  that we bought both reports for my husband and

12  myself, because we didn't know what was going on

13  with all of the banking information and

14  everything was all chaotic.  So, there was a

15  point in time where I had both my report and his

16  report.

17     Q.    From TrueLink?

18     A.    Well, from TransUnion.  I don't know if

19  it's TrueLink or not.  You know, it's very hard

20  to delineate that relationship.  You know, if

21  you buy the credit report online and you go to

22  TransUnion.com, you get a credit report through

23  TrueLink.  So, whether I bought the report from

24  TransUnion or TrueLink, I don't know.  I can

25  only tell you that I bought a report.  Now, I

206

1        A.   I only gave you those things which were

2    in my possession.  If it's not in my possession,

3    I don't know that I'm obligated to produce it if

4    it's not in my possession.

5        Q.   Do you know what year you allegedly

6    purchased this three-in-one credit report from

7    TrueLink on your own behalf?

8             MS. YEAGER:   Objection.  Asked

9    and answered.

10       A.   I would assume it would have to be some

11   time after March of 2005, because that's when

12   the website records that I had a new membership

13   created.

14       Q.   (BY MR. O'NEIL) But in any event,

15   whether or not -- I mean, assuming that you

16   actually did buy this product, you're not suing

17   on that product, right?

18       A.   That's a credit report, that's not

19   monitoring.

20       Q.   Ma'am, it's really a yes or no answer.

21   I'll say it again.  Regardless -- assuming that

22   you actually bought this three-in-one credit

23   report relating to yourself from TrueLink,

24   you're not suing TrueLink on behalf -- with

25   regard to that product, right?

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

207

```
 1        A.    No.

 2        Q.    Did you actually get the

 3   interrogatories that TrueLink's lawyers sent to

 4   your lawyer asking about your purchases?

 5              MS. YEAGER:  Objection.  Asked

 6   and answered.

 7              MR. O'NEIL:  No, it wasn't.

 8        Q.    (BY MR. O'NEIL) Go ahead and answer,

 9   Mrs. Millett.

10        A.    Yes.

11        Q.    And did you prepare, physically

12   prepare, the document that was the response to

13   the interrogatories?

14        A.    The interrogatory -- my

15   interrogatories?

16        Q.    Yes.

17        A.    I worked with my attorneys to prepare

18   those.  I didn't physically type them if that's

19   what you mean.

20        Q.    That's what I meant.

21        A.    No, I didn't physically type them.

22        Q.    You just gave the information to your

23   lawyers and they prepared it?

24        A.    Right.

25        Q.    Okay.  And did you review the
```

214

1    purchased a product from TrueLink?

2        A.    I believe I purchased a three-in-one

3    credit report.

4        Q.    Do you know how much it cost you?

5        A.    I can't even say.  Maybe 19.95 or

6    whatever they charge for it.  I don't really --

7    cost wasn't the issue when I purchased it

8    anyhow.

9        Q.    What was the purchase -- what was the

10   purpose for which you purchased it?

11       A.    Just to look at my own information.

12       Q.    Did you see any defects in the

13   three-in-one credit report?

14       A.    What do you mean?

15       Q.    Did you see any deficiencies in the

16   product that you had purchased from TrueLink?

17       A.    Well, I mean, not on TrueLink's part,

18   but there were deficiencies in credit furnishers

19   that had misreported information on my behalf,

20   yes.

21       Q.    Have you ever entered into a contract

22   with TrueLink?

23       A.    Not for monitoring, no.

24       Q.    Have you ever entered into a contract

25   with TrueLink for any product?



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

**WHOLE PAGE 227
REDACTED**

228

1    with the phone company, you know, for my DSL

2    service.

3        Q.    Okay.  But the only people who will use

4    that address are the ones that you gave them

5    that address, right?  I mean....

6        A.    No.  What I mean is it's the default

7    account for the whole household.  It belongs to

8    the phone number.  Obviously we all use it, me,

9    my husband, some of the kids.

10       Q.    Does your husband have his own unique

11   e-mail address?

12       A.    No, he does not.

13       Q.    You're not allowed to have more than

14   one e-mail account with your phone company?

15       A.    No.  We can, but those are called sub

16   accounts.  This is the master.

17       Q.    So, your husband doesn't have his own

18   unique e-mail address; is that right?

19       A.    Right.

20       Q.    Okay.

21            MR. O'NEIL:   I think we have to

22   change the tape, so let's go off the record.

23            VIDEOGRAPHER:   We are now going

24   off the record at 2:41 p.m.

25            (Recess.)

242

1       A.   The main thing?

2       Q.   Well, you know, that's a bad question,

3  let me withdraw that.  Do you see there it says,

4  "Receive weekly e-mail alerts to changes in your

5  report"?

6       A.   Yes.

7       Q.   And then below that it says,

8  "Immediately find out about credit report

9  changes, including fraudulent activity, etc."

10  Do you see that?

11      A.   Yes.

12      Q.   When you read this, did you think to

13  yourself, well, this is only going to tell us

14  about changes to my husband's report and not

15  about changes to Mr. Perez's report?

16      A.   It says up here, "Complete identity

17  theft protection with weekly fraud watch

18  e-mails" at the very top.

19      Q.   Could you just answer my question?

20            MR. O'NEIL:  Let me go -- can the

21  court reporter read back my question?

22            (Whereupon, the requested portion

23  of the record was read by the reporter.)

24      A.   No, I did not.

25      Q.   (BY MR. O'NEIL) And did you believe on

243

1   August 6, 2003, that even though TransUnion told

2   you they couldn't give you that information,

3   that you thought TrueLink was going to be able

4   to tell you about changes to Mr. Perez's report?

5        A.   No.   I thought they were going to tell

6   me about changes relating to my husband's Social

7   Security number.

8        Q.   And why did you think that?

9        A.   Because they're advertising complete

10  identity theft protection, and I thought that

11  meant they were going to be protecting the

12  Social Security number once I signed up for this

13  product.

14       Q.   Well, Mrs. Millett, wait a minute.   As

15  of August 2003, you had already gone around and

16  round and round with TransUnion, Experian and

17  Equifax, right?   And all three of them told you

18  we can't give you any information in Mr. Perez's

19  report, right?

20       A.   No, TransUnion gave me information in

21  Mr. Perez's report, it's in the letter.

22       Q.   Okay.   They told you what the accounts

23  were, but they told you they couldn't give you

24  the details about the report, right?

25       A.   I'm sorry, I don't understand the



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

258

1    paragraphs and it's so long and who reads that

2    stuff?  Do you remember that?

3         A.   Yes.

4         Q.   Okay.  What's your recollection?  Did

5    you read the first sentence?  Did you read none

6    of it?  Did you skim it?  I think you said you

7    skimmed it this morning?

8         A.   Yep.

9         Q.   Okay.  Do you recall when you skimmed

10   the membership agreement in August of 2003, did

11   it have any reference to the fraud resolution

12   services?

13        A.   Yes.

14        Q.   You do recall that?

15        A.   I do recall some of it.

16        Q.   Okay.

17        A.   Yeah.

18        Q.   And did it tell you that they'd be

19   presented by Promise Mark?

20        A.   Well, the advertisement on the page

21   represented that, so I don't know that I

22   remember that the agreement specifically says

23   that, but it is part of my recollection.

24        Q.   Were you acting as an agent for your

25   husband when you clicked "I agree" to the credit


Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

# WHOLE PAGE 259 REDACTED

317

1    characterize it in that way.

2         Q.    (BY MR. O'NEIL) So, whenever the --

3    you've read "The New York Times" article, right?

4         A.    Yes, I participated in it.

5         Q.    Okay.  And --

6                    MS. YEAGER:  Do we have a

7    question?

8                    VIDEOGRAPHER:  Go ahead.

9                    MS. YEAGER:  I'm sorry to

10   interrupt.

11        Q.    (BY MR. O'NEIL) Were you misquoted in

12   that article?

13        A.    No, you're misquoting the article.

14        Q.    Okay.  So, is everything in that

15   article accurate as far as you're concerned?

16        A.    Fairly accurate, yeah.

17        Q.    Fairly accurate?

18        A.    Uh-huh.

19        Q.    Okay.

20        A.    I mean, because the article isn't

21   100 percent about me, so I don't know.  I can't

22   attest to the accuracy of the rest of it.

23        Q.    I understand.  Obviously.  You're

24   quoted as saying, quote, "I still have credit

25   monitoring because of the simple fact that it is

**Metropolitan**
COURT REPORTERS    9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

318

1      the best tool available at this time."

2          A.    And what's the rest of sentence?

3          Q.    "It is not ideal, it is broken and it

4      is not as advertised."   Is that an accurate

5      statement?

6          A.    That's the statement, yes.

7          Q.    Okay.   So, it's still valuable enough

8      for you to continue using it and continue buying

9      it; isn't that correct?

10         A.    Well, I'm not buying it anymore, am I?

11         Q.    Well, you did for years and years and

12     years after you claimed that it didn't work?

13         A.    And I don't deny that.

14         Q.    Okay.   And the only reason why you're

15     not buying it today is because your credit card

16     changed and you didn't give the company a new

17     credit card?

18              MS. YEAGER:   Objection.

19     Misstates --

20         Q.    (BY MR. O'NEIL) Isn't that right?

21              MS. YEAGER:   -- the testimony.

22         A.    No.   I just -- I elected not to go in

23     there and put in a new credit card when it

24     arrived.   So, to that extent that's why it's no

25     longer going on.

320

1    of this product, yes, I do.

2         Q.    (BY MR. O'NEIL) That's because you --

3    was that because you told him that?

4         A.    Well, he was there when we signed up

5    for it.  I mean, and he read the same ad I did.

6         Q.    No, he was playing video games.

7         A.    Well, I know he was playing video games

8    but I'm saying he read -- he -- we talked about

9    the ad, so I --

10        Q.    Okay?

11        A.    So, I know he knows what it said.

12        Q.    You're not suggesting that he read the

13   ad, are you?

14        A.    No, I read the ad to him.

15        Q.    Oh, you read it out loud to him?

16        A.    Yes.

17        Q.    Oh.

18        A.    He sits right behind me.

19        Q.    Oh.

20        A.    At his computer and I'm sitting at my

21   computer.

22        Q.    He didn't say that, though, did he, in

23   his deposition?

24        A.    What?

25        Q.    So, it's your testimony that you're at

321

1      one computer with your back to him ordering

2      products from TrueLink, he's in the same room

3      playing video games?

4          A.    Behind me.

5          Q.    And you read word for word the

6      marketing materials on the TrueLink website?  Is

7      that your testimony?

8          A.    I may have read -- I read a few

9      sentences.  I didn't read all of the testimony.

10         Q.    What sentences did you read to him?

11         A.    I don't recall specifically.  I just

12     know in general that we read and talked about

13     what the product could do for us and that we

14     discussed that.

15         Q.    Is it fair to say that you were more

16     interested in buying this product that

17     Mr. Millett was?

18         A.    No.  It was fair to say that both him

19     and I were looking for solutions to the problems

20     that we had -- were now facing.

21         Q.    But he wasn't so interested that he

22     would stop playing his video games to actually

23     read about the product that you were buying on

24     his behalf, right?

25         A.    I handle all those types of things, all

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

325

1    answers?

2                MS. YEAGER:  She did not provide

3    them.  She helped prepare them.

4                MR. O'NEIL:  Oh, no, that

5    misstates the evidence of both your clients.

6         A.    I prepared them with my lawyer.  Now

7    did I physically sit down at the typewriter and

8    type each and every answer, no, I did not.

9         Q.    (BY MR. O'NEIL) Oh, you don't?

10        A.    No.

11        Q.    Who did?

12        A.    My attorneys typed those for me.

13        Q.    Oh.

14        A.    But I provided the content and the

15   context for each answer that's on the

16   interrogatory.

17        Q.    Okay.  So, interrogatories go to

18   Mr. Millett -- were you a little irritated that

19   they only went to Mr. Millett and not you as

20   well?

21        A.    No.

22        Q.    Okay.  So the interrogatories go to

23   Mr. Millett, you provided the information and

24   Ms. Yeager types it.  Is that the way it worked?

25        A.    Yeah, I guess so.



335

1    disagreeing with him then?

2        A.    He may not have recalled it sitting

3    here in this chair, but that doesn't mean he

4    wasn't present when it occurred.

5        Q.    He said he had a bad memory; is that

6    true?

7        A.    He tends to be a very simple person.

8    Complex things are very complex.

9        Q.    This litigation is very complex, isn't

10   it?

11       A.    It would be complex for any person.    I

12   -- wouldn't matter if Albert Einstein was

13   sitting in this chair.

14       Q.    Now, let me direct your attention to

15   Interrogatory No. 12.  And you can read the

16   interrogatory, but it's not really relevant to

17   my question.  In the answer you said:  "I asked

18   my wife to handle this as my agent.  I know that

19   she has a lot more information about this."

20       A.    Uh-huh.

21       Q.    Okay.  And there's other responses, No.

22   15, "My wife and my attorneys have more

23   information about this."  Number 16 and 17, "My

24   wife has more information about this."  Number

25   18, "My wife has more information about this."



Metropolitan
COURT REPORTERS          9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8860

348

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4      STEVEN G. MILLETT,

5      MELODY J. MILLETT,

6      On Behalf of themselves

7      And all others similarly situated,

8                        Plaintiffs,

9      vs.                         No. 05-599-SLR

10     TRUELINK, INC.,

11     A Trans Union Company,

12                      Defendant.

13

14

15                      VOLUME II

16

17          CONTINUED DEPOSITION OF MELODY J.

18     MILLETT, a Plaintiff, taken on behalf of the

19     Defendant before Nissa M. Sharp, CSR, CCR #528,

20     pursuant to Notice on the 13th of July, 2007, at

21     the offices of CLOON LAW FIRM, One Hallbrook

22     Place, 11150 Overbrook Road, Suite 350, Leawood,

23     Kansas.

24                                    **COPY**

25



349

1                    APPEARANCES

2        Appearing for the Plaintiffs was MS. E.

3   JOYCE YEAGER of YEAGER LAW FIRM, LLC, City

4   Center Square, 26th Floor, 1100 Main Street,

5   Kansas City, Missouri 64105.

6        Also appearing for the Plaintiffs was

7   MR. BRYSON R. CLOON of CLOON LAW FIRM, One

8   Hallbrook Place, 11150 Overbrook Road, Suite

9   350, Leawood, Kansas 66211.

10       Appearing for the Defendant were

11  MR. MICHAEL O'NEIL and MS. HEATHER SCHUMAN of

12  DLA PIPER US, LLP, 203 North LaSalle Street,

13  Suite 1900, Chicago, Illinois 60601-1293.

14       Also present was Lisa Hargis of MCR

15  VIDEO.

16                     INDEX

17  WITNESS:                              PAGE:

18    MELODY J. MILLETT

19    Continued Examination

20    By Mr. O'Neil                        351

21    Examination by Ms. Yeager            554

22    Examination by Mr. O'Neil            571

23

24

25



9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

**WHOLE PAGE 427
REDACTED**

455

1              THE WITNESS:  -- Exhibit 33.

2              MR. O'NEIL:  Right.

3         Q.   (BY MR. O'NEIL) And then the second

4    page of the long form notice describes the

5    litigation, Defendant's position, identifies the

6    class there in the bottom of Page 2, right?

7         A.   Yes.

8         Q.   And then on Page 3, it identifies the

9    changes that will be made to the marketing.

10        A.   Yes.

11        Q.   And do you recall reviewing that?

12        A.   Well, as I testified earlier, I used

13   some of the key words, so, yeah, I recall

14   reviewing it.

15        Q.   Do you think that offering class

16   members three free months of credit monitoring

17   is something of value to the class?

18        A.   I specifically think that the way that

19   the product is currently configured, for this

20   class it might have some value, but these, this,

21   these class members do not specifically have

22   issues with identify theft, and identity theft

23   is not at issue in this suit.

24        Q.   Uh-huh.

25        A.   People who are trying to improve their



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

456

1    credit score though do need frequent credit

2    polls or whatever as they clean up inaccuracies

3    in their reports or whatever else, where they

4    would want to see whether their adjustment is in

5    their score.  I mean, I do frequent some, you

6    know, credit reporting forms, so, I mean, I do

7    see people out there who are trying to remove

8    bad debts from old bankruptcies that are still

9    out there after 14 years that should be deleted

10   and that kind of thing.

11        So, you know, three months of free

12   credit reports or whatever for them would have

13   some value to them in a credit repair context.

14        Q.    To your knowledge, has any action been

15   taken on your behalf with regard to this

16   settlement?

17        A.    No.

18        Q.    Okay.  Do you know what a Motion For

19   Intervention is?

20        A.    Yes, I know what a Motion For

21   Intervention is.  And I believe there was one

22   filed in Browns versus Yahoo or something like

23   that.

24        Q.    Browning versus Yahoo.

25        A.    Uh-huh.



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

# WHOLE PAGE 484 REDACTED

# WHOLE PAGE 491
# REDACTED

# WHOLE PAGE 499
# REDACTED

**WHOLE PAGE 501
REDACTED**

**WHOLE PAGE 508
REDACTED**

# WHOLE PAGE 510 REDACTED