EXHIBIT F

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF DELAWARE

3

4    STEVEN G. MILLETT,

5    MELODY J. MILLETT,

6    On Behalf of Themselves and

7    All Others Similarly Situated,

8                    Plaintiffs,

9    vs.                    C.A. No. 05-599-SLR

10   TRUELINK, INC.,        Class Action

11   a Trans Union Company,    Jury Trial Demanded

12                    Defendant.

13

14

15

16

17        VIDEOTAPED DEPOSITION OF STEVEN G.

18   MILLETT, a Plaintiff, taken on behalf of the

19   Defendant before Nissa M. Sharp, CSR, CCR #528,

20   pursuant to Notice on the 30th of March, 2007,

21   at the offices of THE CLOON LAW FIRM, 11350

22   Tomahawk Creek Parkway, Suite 100, Leawood,

23   Kansas.

24

25

**COPY**

# Metropolitan
## COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

2

1                   APPEARANCES

2          Appearing for the Plaintiffs was

3      MR. BRYSON R. CLOON of THE CLOON LAW FIRM, 11150

4      Overbrook Road, Suite 350, Leawood, Kansas

5      66211.

6          Also appearing for the Plaintiffs was

7      MR. BARRY R. GRISSOM, 7270 West 98th Terrace,

8      Building 7, Suite 220, Overland Park, Kansas

9      66212.

10         Appearing for the Defendant was

11     MR. MICHAEL O'NEIL of DLA PIPER US, LLP, 203

12     North LaSalle Street, Suite 1900, Chicago,

13     Illinois 60601-1293.

14         Also present was Heather Schuman of DLA

15     Piper.

16                   INDEX

17     WITNESS:                          PAGE:

18     STEVEN G. MILLETT

19         Examination by Mr. O'Neil            4

20

21

22

23

24

25



1     Q.    And they didn't charge you a fee to

2    provide that information, did they?

3     A.    I don't recall.  No, sir.

4     Q.    They didn't charge you a fee for the

5    investigation that they had to do to contact 23

6    credit grantors, did they?

7     A.    I believe that's correct.

8     Q.    So, why did you sue Trans Union?

9     A.    Because they wrote on the same letter

10    you're talking about that they had the right to

11    maintain this information, which was my

12    information.

13     Q.    And so that's why you sued Trans Union?

14     A.    Basically, yes.

15     Q.    And you're not aware that the lawsuit

16    against Trans Union has been dismissed; is that

17    right?

18     A.    Well, if you say so, then I'll have to

19    believe you.

20     Q.    Well, I don't want you to believe me, I

21    just want to establish that you're not aware

22    that --

23     A.    Well, there's things going on right at

24    this time, you know, that I can't keep up with

25    all this, you know, I mean, I'm a working guy.

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

20

1    Q.    You can't keep up with all what?

2    A.    With all the lawyer stuff back and

3    forth.

4    Q.    Because you've filed a number of

5    lawsuits, haven't you?

6    A.    Yes, sir.

7    Q.    How many lawsuits have you filed?

8    A.    I think five.

9    Q.    And are these five separate lawsuits?

10   Are they all together in one or separate?

11   A.    They were all in one and then they got

12   separated out.

13   Q.    So, after the initial lawsuit was filed

14   against all five companies, your lawyers decided

15   that that was not a good idea and that they

16   should file them in separate lawsuits?

17          MR. CLOON:  I'm going to object

18   to the form of the question.  Lacks foundation.

19   Calls for speculation.

20          MR. O'NEIL:  I'll --

21          MR. CLOON:  Invades the

22   attorney-client privilege.

23          MR. O'NEIL:  I'll withdraw the

24   question.

25   Q.    (BY MR. O'NEIL)  Why did you first sue

1    everybody in one case and then later decide to

2    sue them in five separate cases?

3        A.    That's something the lawyers came up

4    with.

5        Q.    Okay.  And who have you sued,

6    Mr. Millett?

7        A.    Ford, Trans Union, Experian, Equifax.

8    Is that four?

9        Q.    That's four, yes.  Do you think you've

10   sued anybody else?

11       A.    I guess that's all I can remember.

12       Q.    Did you ever sue Bank of America?

13       A.    Oh, yeah, that's right.

14       Q.    Okay, that's another one.

15       A.    Sorry.

16       Q.    That's okay, it's hard to keep all this

17   stuff straight.  Did you ever sue a company

18   called CSC?

19       A.    Yeah, I learned that at the last

20   deposition I think, yeah.

21       Q.    So, prior to that last deposition, you

22   weren't aware that a lawsuit was filed against

23   CSC in your name?

24       A.    Yes, sir.

25       Q.    Did that surprise you to find out in a

22

1    deposition that in fact you had sued another

2    company that you weren't aware of?

3         A.    Well, like I said before, all this

4    stuff is -- it's hard for me to keep track of

5    all of it.  My wife handles most of all this.

6         Q.    But were you surprised to find out that

7    you had actually sued a company that you weren't

8    aware of?

9         A.    Well, yeah.

10         Q.    Were you surprised to find out that

11    your lawsuit against Trans Union had been

12    dismissed?

13         A.    Today?

14         Q.    Yeah.

15         A.    Well, I'm getting kind of confused with

16    the Trans Union, Truelink.  To me it's all the

17    same company, but, you know.

18         Q.    You mentioned a company called

19    Truelink?

20         A.    Yeah.  Isn't that what you represent?

21         Q.    I thought you said I represented Trans

22    Union?

23         A.    Well, I'm getting confused here.

24         Q.    Was your recollection refreshed on the

25    break that we just took about Truelink?

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

23

1          MR. CLOON:  I'm going to object

2    to that question.  It's argumentative, invades

3    the attorney-client privilege.

4          MR. O'NEIL:  Are you going to

5    instruct him not to answer that question?

6          MR. CLOON:  No.

7    Q.    (BY MR. O'NEIL) Was your recollection

8    refreshed about the company Truelink during the

9    break that we just took?

10         THE WITNESS:  So go ahead and

11   answer?

12         MR. CLOON:  Yes.

13   A.    Yes, sir.

14   Q.    (BY MR. O'NEIL) So, you've heard of a

15   company called Truelink?

16   A.    Yes.

17   Q.    Okay.  And what's your understanding of

18   what that company is?

19   A.    That's who represents the credit

20   monitoring.

21   Q.    Okay.  Have you ever sued Truelink?

22   A.    That's -- I'm getting confused again.

23   I mean, is it Trans Union or Truelink?

24   Q.    Well, sir, I'm asking you.  Because you

25   identified four companies that you sued and then

**Metropolitan**
COURT REPORTERS

9800 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

24

1    I reminded you about Bank of America and CSC.

2    Did you ever sue Truelink?

3        A.    I don't recall.

4        Q.    Okay.  You said that your wife handles

5    these things for you?

6        A.    Yes, sir.

7        Q.    Does that mean your wife handles the

8    litigation?

9        A.    My lawyers do that.

10        Q.    Maybe I misheard you, Mr. Millett, but

11    I thought you said that you kind of overwhelmed

12    by all of the lawsuits that are filed, and your

13    wife handles that for you.  Do you recall saying

14    that?

15        A.    Yeah, my wife works on this.

16        Q.    And what does she do for you as part of

17    the litigation?

18        A.    Well, as soon as I found out that we

19    had -- I had a problem with my identify, I just

20    turned it all over to her.  She pays the bills,

21    she, you know, she runs the household.

22        Q.    And you think filing five or six or

23    seven lawsuits is part of running the household?

24        A.    I'm confused by your question.  I

25    mean....



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.3800 • FAX 913.317.8850

1      Q.    Well, you said that she runs the
2  household, right?
3      A.    Right.
4      Q.    And so do you think filing lawsuits on
5  your behalf and managing the litigation is part
6  of running the household?
7      A.    Well, she's better at this kind of
8  stuff than I am.
9      Q.    At litigation you mean?
10      A.    She's not a lawyer.
11      Q.    Well, what is she better at than you
12  are?
13      A.    She's better at remembering things than
14  I am.
15      Q.    Oh.  You told us earlier that she's the
16  one that came to you and said we should buy this
17  credit monitoring product from Trans Union, do
18  you recall that?
19      A.    Yes.
20      Q.    Did she also come to you and say,
21  Steven, I think we should file all these
22  lawsuits?
23      A.    That was like a -- we came to the
24  decision together.
25      Q.    Kind of like you came to the decision

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

1      A.    Yes, sir.

2      Q.    And did you immediately cancel your

3  product?

4      A.    You have to ask my wife that.

5      Q.    Well, I'm asking you, sir.  Once you

6  came to this conclusion that this product

7  doesn't work and that you want your money back,

8  did you -- and you don't know if you ever asked

9  for the money back, but I'm asking you now, did

10  you ever cancel the product?

11      A.    You'll have to ask my wife that.

12      Q.    I'm asking you, sir.

13      A.    I don't know.  I don't know.

14      Q.    Isn't it true, Mr. Millett, that to

15  this day, you're still paying money to Truelink

16  for the product that you're now claiming doesn't

17  work?

18              MR. CLOON:  Objection.

19  Argumentative.  But you may answer.

20      A.    I don't know.

21      Q.    (BY MR. O'NEIL) So, as you sit here

22  today, you don't know if you are still buying

23  this product; is that right?

24      A.    That's right.

25      Q.    Did you ever have a conversation with



49

1          A.    Yes, sir.

2          Q.    Okay.  And that was a credit monitoring

3     product?

4          A.    Yes, sir.

5          Q.    Did you buy anything else at that time

6     from Truelink?

7          A.    Not that I'm aware of.

8          Q.    Okay.  And that was a product that was

9     -- that provided you with information over a

10    period of time, right?

11         A.    Right.

12         Q.    Okay.  And how long a period of time

13    did that last?

14         A.    I don't know.  You said it's ongoing,

15    so we must still have it then.

16         Q.    And as part of your -- the credit

17    monitoring product you bought, e-mails were sent

18    from Truelink to your home, right?

19         A.    Right.

20         Q.    And, in fact, they weren't sent to your

21    e-mail address, but to you're wife's e-mail

22    address?

23         A.    Correct.

24         Q.    Okay.  Did you ever see any of those

25    e-mails?

50

1      A.    I think maybe I saw one.   Everything is

2   honky-dory.

3      Q.    Do you know how often your wife

4   received those e-mails?

5      A.    No, I can't answer that; I don't know.

6      Q.    Did you ever ask her, ask your wife, if

7   she ever got more than one e-mail from Truelink?

8      A.    No.   I don't recall asking her that.

9      Q.    Do you know when you purchased the

10   credit monitoring service from Truelink?

11      A.    I can't give you exact date.

12      Q.    Can you give me a rough date?

13      A.    I think it was like after the police

14   report or some time around there.

15      Q.    Okay.

16      A.    In general.

17      Q.    Do you know what year that was?

18      A.    I think it was 2003, I think.

19      Q.    And you told us today that you think

20   the product that Truelink sold to you doesn't

21   work, right?

22      A.    Yes, sir.

23      Q.    And could you tell me in what ways the

24   product doesn't work?

25      A.    Doesn't tell you if somebody's using

52

1          Q.    So you don't know if you have any
2     problem with the advertising that's occurred
3     since that date, right?
4          A.    Right.
5          Q.    Have you ever had any conversations
6     with your wife about the advertising?
7          A.    Yeah, that they should change it.
8          Q.    Okay.
9                MR. O'NEIL:  Well, looks like we
10    need to change the tape, so let's go off the
11    record.
12               VIDEOGRAPHER:  We are now going
13    off the record at 9:56 AM.
14               (Recess.)
15               VIDEOGRAPHER:  It is now 9:58 AM
16    and we are back on the record.  You may
17    continue.
18         Q.    (BY MR. O'NEIL) Mr. Millett, have you
19    ever heard of something called the Credit Repair
20    Organizations Act?
21         A.    No.
22         Q.    Okay.  Have you ever heard of something
23    called a Credit Repair Organization?
24               MR. CLOON:  I'm going to object
25    to this line of questioning.  Those claims are

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8860

1    no longer in this lawsuit, so they're totally

2    irrelevant.

3        Q.   (BY MR. O'NEIL) Have you ever heard of

4    something called a Credit Repair Organization?

5        A.   No.

6             MR. CLOON:  Same objection.

7        Q.   (BY MR. O'NEIL) Are you aware that your

8    lawyers claim that Truelink violated the Credit

9    Repair Organizations Act?

10            MR. CLOON:  Same objection.

11    Those claims have been dismissed.  They're no

12    longer in this lawsuit and they're totally

13    irrelevant.

14        Q.   (BY MR. O'NEIL) Are you aware that your

15    lawyers filed a claim against Truelink alleging

16    that Truelink has violated the Credit Repair

17    Organizations Act?

18            MR. CLOON:  Same objection.

19        A.   No.

20        Q.   (BY MR. O'NEIL) To your knowledge, have

21    you ever been denied credit based upon

22    information prepared by Truelink?

23        A.   I wouldn't know.

24        Q.   I'm sorry?

25        A.   I don't know.

1       A.    I believe she did.

2       Q.    Oh, okay.  Did she have any

3  conversation with you before she began that

4  investigation?

5       A.    I don't recall anything.

6       Q.    Okay.

7       A.    No.

8       Q.    So, if I told you that in fact your

9  wife did request an investigation, you wouldn't

10  have any idea what she asked them to

11  investigate; is that right?

12      A.    You'd have to ask her.

13      Q.    I will, sir, but I'm asking, you don't

14  have any idea --

15      A.    I don't remember.

16      Q.    Okay.  You mentioned before that your

17  wife is better at remembering things than you

18  are.  Do you have a problem with memory just

19  generally or...

20      A.    It's -- yeah, I'd say so, yeah.

21      Q.    Okay.  Has that made it difficult for

22  you to give assistance in this litigation?

23              MR. CLOON:  I'm going to object

24  to the form of that question.  Calls for

25  speculation.

**Metropolitan**
COURT REPORTERS

1       A.    Can you repeat the question?

2       Q.    (BY MR. O'NEIL) Has your memory

3   problems made it more difficult for you to

4   assist in prosecuting the claims in all of the

5   lawsuits that you've brought?

6       A.    Yeah.

7             MR. CLOON:  Same objection.

8       A.    I believe so.

9       Q.    (BY MR. O'NEIL) Okay.  And it's made it

10  difficult for you to remember things when you

11  are asked questions in depositions, right?

12      A.    Yes, sir.

13      Q.    Okay.

14            MR. CLOON:  Are we at a breaking

15  point?

16            MR. O'NEIL:  What time is it?

17            MR. CLOON:  It's 11:00.

18            MR. O'NEIL:  How much time do we

19  have on the --

20            VIDEOGRAPHER:  You have about six

21  minutes.

22            MR. O'NEIL:  Could we just use

23  the six minutes and we can take a break?

24            MR. CLOON:  Sure.

25      Q.    (BY MR. O'NEIL) Mr. Millett, I'm going



Metropolitan
COURT REPORTERS          9200 INDIAN CREEK PARKWAY, SUITE 205
                         OVERLAND PARK, KANSAS 66210
                         1.800.748.7811 • 913.317.8800 • FAX 913.317.8850

1    earlier, Mr. Millett, that when your wife first

2    purchased the credit monitoring product from

3    Truelink, that you were kind of -- you looked at

4    some of the marketing that was on the website at

5    that time?  Or maybe I'm wrong.  You know --

6    strike.

7        A.   I think --

8        Q.   Go ahead.

9        A.   Yeah, I think I said that.

10       Q.   Okay.  So, she, Mrs. Millett, purchased

11   the product over the internet, right?

12       A.   Correct.

13       Q.   And did she do it from her computer at

14   home?

15       A.   Right.

16       Q.   And were you sitting there with her in

17   front of the computer at the time?

18       A.   I was sitting behind her.

19       Q.   Okay.  Why was it that you were sitting

20   with her while she was buying the product?

21       A.   Because I was on my computer.

22       Q.   Oh, I see.  So you were in the same

23   room, but you were doing stuff on your own

24   computer?

25       A.   Right.



101

Q.    I see.  So, you weren't really watching her go through each step of purchasing the product, were you?

A.    No.

Q.    Okay.  Were you even looking at what she was doing at that time?

A.    Well, I just kind of glanced over there and read some stuff, and then I walked back to my computer.

Q.    What were you reading?

A.    The -- what your opening statements were.

Q.    You mean the statements on the website?

A.    Well, telling what about what the product was, yeah.

Q.    Okay.  And why were you interested in looking at that?

A.    Just to see what -- if you had any disclaimers in there what you did and didn't do.

Q.    So, when you -- when your wife was purchasing the product for you, you were particularly interested in --

A.    Oh, I was just reading the activity advertisement just seeing what you had in there.

Q.    Okay.  But you and your wife had



102

1    already purchased credit monitoring products

2    from other companies, right?

3        A.    Right.

4        Q.    And so you were familiar with what the

5    product was, right?

6        A.    In general.

7        Q.    Okay.   And when your wife purchased the

8    products from the other companies prior to

9    purchasing it from Truelink, were you sitting

10   looking at the information on the website during

11   those earlier purchases?

12       A.    I don't think so.

13       Q.    Okay.   What were you doing on the

14   computer while your wife was purchasing the

15   product?

16       A.    I think I was playing some video game

17   or something.

18       Q.    Is there a reason why your wife was

19   purchasing the product instead of you?

20       A.    Why she was doing it?

21       Q.    Right.

22       A.    I just -- I think she was looking at it

23   and she said it was -- it could help us.

24       Q.    And do you recall that she provided her

25   e-mail address instead of yours?



128

1    purchasers of credit monitoring by Truelink,

2    whether or not they were a victim of identity

3    theft or not; is that right?

4        A.    Exactly.

5        Q.    Okay.  Do you think that if you win

6    this case and if you're appointed the class

7    representative, that all members of the class

8    should get the same money?

9        A.    That's hard.  I don't know how to

10   answer that.

11       Q.    Why not?

12       A.    Well, I don't know what would be fair

13   to the whole class.  I don't know.

14       Q.    Because it depends on the particular

15   harm that each class member suffered, right?

16       A.    Well, some of them could have been

17   paying longer than others, I mean.

18       Q.    And some may have actually, in theory

19   if what you say is true, if your allegations are

20   all proven true, some people may have suffered

21   identity theft that they wouldn't have suffered

22   if Truelink's product was as delivered -- was as

23   promised; isn't that correct?

24       A.    Right.

25       Q.    Those people would really have damages,



1    wouldn't they?

2         A.    Right.

3         Q.    And you want to represent those people,

4    right?

5         A.    I want to represent the class, whoever

6    signed up for this product.

7         Q.    Well, isn't it fair to say that that

8    kind of customer who suffered identity theft

9    that really could have been prevented by

10   Truelink, that they suffered more damages than

11   somebody who never was a victim of identity

12   theft?

13        A.    I think it would have to be determined

14   individual case by case.

15        Q.    Do you recall answering written

16   questions that were posed to you and your

17   lawyers by Truelink in this case?

18        A.    Right, my wife helped me with those.

19        Q.    Okay, so you do recall it?

20        A.    Yeah.

21        Q.    Okay.  How did your wife help you?

22        A.    Well, she, like I said before, she

23   handled most of this.

24        Q.    Did she actually answer the

25   interrogatories for you?



130

1        A.    Yes.

2        Q.    Okay.  And then did she send them to

3   the lawyers after she wrote the answers?

4        A.    Yeah, I think so.  Yeah.

5        Q.    Did you look at the answers before they

6   were sent to the lawyers?

7        A.    Yeah, I looked them over.

8        Q.    Did you make any changes to them?

9        A.    No.

10       Q.    Did you look them over before they were

11   sent to the lawyers or just after they were sent

12   to the lawyers?

13       A.    I don't remember.

14              (Millett Exhibit 6 was marked for

15   identification by the reporter.)

16       Q.    (BY MR. O'NEIL) Whose decision was it

17   to have your wife write the interrogatory

18   responses rather than you?

19       A.    I don't know who -- I don't know who

20   came up with the idea.

21       Q.    Was it you, Mr. Millett?

22       A.    Well, she knows more, she was doing

23   this on my behalf.

24       Q.    Was it you that came up with the idea

25   that your wife should be writing the answers

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8600 • FAX 913.317.8660

131

1    that were directed to you?

2    A.    I don't remember.

3    Q.    Did she tell you that this was the

4    plan?  Did she tell you that -- well, strike

5    that.

6          How did you first learn that there were

7    questions directed to you in this case?

8    A.    Through the interrogatories.

9    Q.    Right.  Fancy word for questions.  How

10   did you learn that Truelink had asked you to

11   answer interrogatories?

12   A.    I guess through my lawyers.

13   Q.    And did you understand that the

14   questions were directed not at both you and your

15   wife, and not at your wife, but at you?

16   A.    Right.

17   Q.    Okay.  So, when it was decided by

18   somebody we don't know that actually your wife

19   would be writing the interrogatory answers, did

20   you say, well, wait a minute, I understand that

21   they're directed at me, so maybe I should be

22   writing them?

23   A.    I don't know how to answer that.

24   Q.    Do you want me to have the question

25   reread for you?



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 208
OVERLAND PARK, KANSAS 66210
1.800.748.7611 • 913.317.8800 • FAX 913.317.8850

1          A.    Well, it's --

2          Q.    Did you ask for a copy of it?

3          A.    Well, yeah, but I mean, there's e-mails

4     and I just -- I never --

5          Q.    Why couldn't you get a copy of it?

6          A.    I just couldn't get a copy of it.

7          Q.    Who did you ask?

8          A.    I asked -- I asked the -- I asked my

9     wife if she had a copy.

10         Q.    And what did she say?

11         A.    She'd have to get an e-mail from Joyce

12    Yeager.

13         Q.    But your wife wasn't able to obtain a

14    copy of this for you to review in advance of

15    your deposition?

16         A.    No.  I -- no.

17         Q.    So, when did you see this document

18    then?

19         A.    I think whenever the lawyers handed it

20    out, I think.

21         Q.    Let me direct your attention to the

22    second page of this exhibit, Mr. Millett.

23         A.    Second page.

24         Q.    If you see Interrogatory No. 4 there,

25    sir.  And it asks for some specific information

1    mean?  Or is that what you think?

2         A.    I think she's disputing all these.

3         Q.    Okay.  I mean, are you guessing there

4    or do you know that?

5              MR. CLOON:  For the record --

6         A.    Yes.

7              MR. CLOON:  -- the record the

8    reference was to the --

9         A.    Yes, these are the accounts she was

10   closing.

11        Q.    (BY MR. O'NEIL) Okay.  She never

12   disputed accounts that were on your credit

13   report, did she?

14        A.    Okay, repeat the question.

15        Q.    Mrs. Millett never disputed accounts

16   that were on your credit report, did she?

17        A.    I don't -- I don't remember.

18        Q.    Okay.  You don't recall seeing any

19   accounts on your credit report that you

20   disputed, do you?

21        A.    That's right.

22        Q.    Okay.  Your interrogatory answer goes

23   on to say, quote, "I know that she had to close

24   accounts which appeared in the letter from Trans

25   Union," closed quote.  Do you see, though, sir?

142

1    It's in the middle of that paragraph, quote, "I

2    know she had to close accounts which appeared in

3    the letter we got from Trans Union," closed

4    quote?

5         A.    Right.

6         Q.    Do you know that she actually closed

7    accounts?

8         A.    I know she was trying to close

9    accounts.  I don't know exactly if they got all

10   closed or everything.  I mean...

11        Q.    That's not what your interrogatory

12   response says though, is it?

13        A.    That's right.

14        Q.    Goes on to say, quote, "I know it took

15   her a lot of time to do that and that we spent a

16   lot of money to do that," closed quote.  Do you

17   see that, sir?

18        A.    Yes.

19        Q.    You don't really have any knowledge of

20   that, though, do you?

21        A.    I know she was on the phone a lot and I

22   shelled out $12,000, so, that's correct.

23        Q.    You shelled out $12,000 to close

24   accounts?

25        A.    No, I shelled $12,000 to retain



1      lawyers.

2           Q.   To do what?

3           A.   To dispute this stuff.

4           Q.   So, you hired lawyers to dispute the

5      accounts that Trans Union identified as relating

6      to Mr. Perez?  Is that why you hired lawyers?

7           A.   You're getting me confused, sir.

8           Q.   Well, I'm just responding to your

9      questions.  Because this talks about closing

10     accounts.

11          A.   Right, and I said these accounts here.

12          Q.   Okay.  Fine.  So, what I'm asking you

13     is, did you hire an attorney to help your wife

14     close the accounts held by Mr. Perez?

15          A.   That's not the reason we hired an

16     attorney.

17          Q.   Why did you hire an attorney?

18          A.   To help us with this identity theft.

19          Q.   The $12,000, was that paid to

20     Mr. Adler?

21          A.   Two thousand of it was.

22          Q.   Who did you pay the other $10,000 to?

23          A.   To Mr. Grissom.

24               THE WITNESS:  I was wondering if

25     I could take a break?



**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

162

1          A.     I would say it's 50/50.

2          Q.     Really?  What about Experian, Equifax,

3     Fair Isaac, CSC, Bank of America, Ford Motor?

4          A.     Well, they've got their portions too.

5     It's all stress related.

6          Q.     Well, if it's 50 percent Mr. Perez and

7     50 percent Truelink --

8          A.     Well, I'll take back that answer.

9          Q.     Okay.  Well, is it fair to say then

10    that of all these stresses in your life, the

11    conduct of Mr. Perez has been the greatest

12    stressor?

13         A.     It's all -- it's all proportioned.  All

14    this.

15         Q.     I understand, sir.  But is it fair to

16    say that the stress caused by Mr. Perez's acts

17    is greater than the stress caused by the alleged

18    failure of the Truelink credit monitoring

19    product?

20         A.     I can't distinguish.

21         Q.     Okay.  Has the lawsuits created stress

22    in your life?

23         A.     Yes.

24         Q.     Yeah.  Have you ever suggested to your

25    wife that you wish you had never gotten involved

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7611 • 913.317.8800 • FAX 913.317.8850

1      in these lawsuits?

2          A.    I've told her I haven't been happy with

3      all this.

4          Q.    With the lawsuits?

5          A.    With the lawsuits.

6          Q.    But you didn't feel like you could tell

7      her that you'd like to stop the lawsuits, right?

8          A.    That's -- that, I don't feel that's an

9      option.

10         Q.    That's why you felt that you couldn't

11     tell her that, right?

12         A.    Well, yeah.

13         Q.    A few pages later, Mr. Millett, there's

14     a page that has Interrogatory No. 14 on it.  Do

15     you see that, sir?

16         A.    Yes, sir.

17         Q.    And up above, there's an answer to the

18     prior interrogatory.  Do you see that?

19         A.    Yes.

20         Q.    And your answer is, "I delegated these

21     matters to my wife who handles the finances for

22     our family."  Right?  Do you see that?

23         A.    Yes.

24         Q.    It goes on to say, "She has a lot more

25     information about this."  Right?



1      A.   Yes.

2      Q.   But it was Mrs. Millett who was

3  providing these interrogatory responses, wasn't

4  it?

5      A.   She was helping me.

6      Q.   Oh, she's helping you now?  When she

7  was helping you, did you say, well, rather than

8  saying that you have a lot more information, why

9  don't we just give it to them?  Did you suggest

10  that to your wife?

11     A.   I don't understand the question.

12     Q.   Well, you told us earlier that your

13  wife wrote the responses.  Do you recall that?

14     A.   Right.

15     Q.   Okay.  But now you're kind of stepping

16  back from that and now you're kind of saying

17  that she helped you, right?

18     A.   You got me all confused.

19     Q.   Okay.  Who wrote the responses?

20     A.   My wife did.

21     Q.   Okay.  And when you reviewed them, did

22  you read them?  Did you read each response?

23     A.   Yes.

24     Q.   And when you read this one, my question

25  is, did you wonder since she's providing the

174

1    why you decided to dismiss your claims against

2    Equifax?

3        A.    That's what they came up with.

4        Q.    Who's "they"?

5        A.    My lawyers.

6        Q.    Is this another situation where you

7    felt like you didn't -- you couldn't disagree?

8        A.    I don't -- can -- I'm not understanding

9    you.

10        Q.    Well, earlier I asked you about the

11    hassles of the litigation and how you really

12    wished in retrospect that all this litigation

13    wasn't going on and it was consuming all of your

14    time and creating all this stress.  Do you

15    recall that conversation?

16        A.    Yes.

17        Q.    And you said but you felt like you

18    couldn't change the decision.  Do you recall

19    that, sir?

20        A.    Yes.

21        Q.    Okay.  So, when your lawyers suggested

22    that you settle with Equifax, was it another

23    situation where you felt like you couldn't

24    change the decision?

25        MR. CLOON:  I'm going to object



**Metropolitan**
COURT REPORTERS   9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

STEVEN G. MILLETT, MELODY J. MILLETT, )
On Behalf Of Themselves and All Others )
Similarly Situated, )
 )
 )
              Plaintiffs, )
 )                    Case No. 05-599-SLR
 )
v. )
 )
TRUELINK, INC., )
A Trans Union Company, )
 )
              Defendant. )

## RESPONSE TO PLAINTIFFS' FIRST REQUESTS FOR
## ADMISSION TO DEFENDANT TRUELINK, INC.

Defendant TrueLink, Inc., now known as Trans Union Interactive, Inc.
("TrueLink"), by its attorneys, hereby responds to Plaintiffs' First Requests for
Admission to Defendant TrueLink, Inc. as follows:

### GENERAL OBJECTIONS

1.    TrueLink objects to the definition of "Consumer," as overly broad and
unduly burdensome.

2.    TrueLink objects to the definition of "Credit Monitoring" as overly broad,
unduly burdensome, vague and ambiguous.

3.    TrueLink objects to the definition of "Customers," as overly broad, unduly
burdensome, and seeks information that is neither relevant to the claims or defenses of
any party in this litigation, nor reasonably calculated to lead to the discovery of
admissible evidence insofar as the definition includes persons who purchased Credit
Monitoring from Trans Union, LLC. TrueLink further objects as it is unclear whether the

term "customer" referenced in certain Requests for Admission is intended to refer to the term "Customer."

4.    TrueLink objects to the definition of "Identity Theft" as overly broad, unduly burdensome, vague and ambiguous.  TrueLink further objects as it is unclear whether the term "identity theft" referenced in certain Requests for Admission is intended to refer to the term "Identity Theft."

5.    TrueLink objects to the definition of "Defendant," "You," and "Your," as overly broad, unduly burdensome and seeks information that is neither relevant to the claims or defenses of any party in this litigation, nor reasonably calculated to lead to the discovery of admissible evidence insofar as the definition includes "any parent corporations and holding companies with which the Defendant is associated . . ."

6.    TrueLink objects to each and every Request for Admission to the extent that it calls for information protected from disclosure by the attorney-client privilege or other applicable privilege, and/or is otherwise protected from disclosure on the basis of the attorney work product doctrine.

7.    TrueLink incorporates each of these general objections into each Response below.

## REQUESTS FOR ADMISSION

1.    Please admit that Credit Monitoring does not provide complete protection from identity theft.

RESPONSE: TrueLink objects to Request No. 1 as overly broad and unduly burdensome, and because the phrase "complete protection from identity theft" is vague and ambiguous.  Subject to and without waiving the foregoing General Objections and

# WHOLE PAGE REDACTED

# WHOLE PAGE REDACTED

# WHOLE PAGE REDACTED

**WHOLE PAGE REDACTED**

**WHOLE PAGE REDACTED**

# WHOLE PAGE REDACTED

**WHOLE PAGE REDACTED**

# WHOLE PAGE REDACTED

# WHOLE PAGE REDACTED

**WHOLE PAGE REDACTED**

# WHOLE PAGE REDACTED

## CERTIFICATE OF SERVICE

I, Heather Schuman, an attorney, depose and state that on this 12th day of July, 2007, I caused a true and accurate copy of the above and foregoing *Response to Plaintiffs' First Requests for Admission to Defendant Truelink, Inc.* to be served upon Attorneys of Record via First Class, U.S. Mail and electronic mail, addressed to said counsel as indicated below:

Christopher J. Curtin
Erisman & Curtin
629 Mount Lebanon Road
Wilmington, DE 19803

Bryson R. Cloon
Cloon Law Firm
11150 Overbrook Road
Leawood, KS 66211

Michael W. Blanton
Swanson Midgley, LLC
2420 Pershing Road, Suite 400
Kansas City, MO 64108

Barry R. Grissom
7270 W. 98th Terrace
Building 7, Suite 220
Overland Park, KS 66212

B. Joyce Yeager
Yeager Law Firm LLC
City Center Square, 26th Floor
1100 Main Street
Kansas City, MO 64105

*Heather Schuman*
Heather Schuman