## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

STEVEN G. MILLETT, MELODY J. MILLETT,　　)
On Behalf Of Themselves and All Others　　　)
Similarly Situated,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)　　　Case No. 05-599-SLR
v.　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
TRUELINK, INC.,　　　　　　　　　　　　　)
A Trans Union Company,　　　　　　　　　　)　　　REDACTED VERSION
　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　　　　　)

## DEFENDANT TRUELINK INC.'S BRIEF IN SUPPORT
## OF MOTION FOR PARTIAL SUMMARY JUDGMENT

William M. Lafferty (#2755)
Jay N. Moffitt (#4742)
**Morris, Nichols, Arsht & Tunnell LLP**
1201 N. Market Street
Wilmington, DE 19899
Phone: (302) 658-9200
Fax: (302) 658-3989

OF COUNSEL:
Michael O'Neil
Paula D. Friedman
**DLA Piper US LLP**
203 North LaSalle Street, Suite 1900
Chicago, IL 60601-1293
Phone: (312) 368-4000
Fax: (312) 236-7516

Counsel for Defendant

Original Filing Date: October 1, 2007
Redacted Date: October 9, 2007

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS ....................................................1

SUMMARY OF THE ARGUMENT .........................................................................1

STATEMENT OF FACTS ........................................................................................3

A.  The Milletts Learned That Another Individual Had Misused
    Steven Millett's Social Security Number Approximately One
    Year Before the Milletts Purchased TrueLink's Credit Monitoring Product. .................4

B.  As the Agent for Her Husband, Ms. Millett Purchased TrueLink's
    Credit Monitoring Product on Her Husband's Behalf. ....................................5

C.  TrueLink's Credit Monitoring Product And Its Marketing on its TrueCredit
    Website. ...........................................................................................5

D.  The Milletts Knew That TrueLink's Credit Monitoring Product
    Would Not Literally Provide "Complete Identity Theft Protection." ..............................7

E.  Even Knowing That It Did Not Identify Known Uses Of Steven Millett's
    Social Security Number, And Did Not Monitor Other Individuals' Files,
    The Milletts Continued to Purchase TrueLink's Credit Monitoring
    Product For More Than Three Years. ...........................................................8

F.  Another Federal Court Rejected The Milletts' Interpretation Of
    Similar Marketing And Entered Summary Judgment Against
    the Milletts in a Nearly Identical Case...........................................................10

G.  Through Discovery, it is Clear That the Milletts Seek Reimbursement
    for the Purchase Price and Have Foregone Other Damages Originally
    Set Forth in Their Fourth Amended Complaint. ...........................................11

ARGUMENT ........................................................................................................12

A.  Summary Judgment Should be Granted Where, as Here, There
    is No Genuine Issue of Material Fact for Trial................................................12

B.  Summary Judgment Should be Granted on Count I of the Fourth
    Amended Complaint for Violations of the KCPA in Favor of TrueLink. ......................13

    1.  Plaintiffs Cannot Demonstrate that they are Aggrieved
        Consumers Who have Suffered Loss as a Result
        of the Alleged Misrepresentations. ...................................................14

      a.     Ms. Millett lacks standing to bring a claim under the KCPA. ...............16

      b.     There is no evidence that plaintiffs suffered a loss as a result of the alleged violations. ............................................................................17

      c.     Monies plaintiffs paid to purchase credit monitoring cannot be the "loss" suffered as a result of the alleged KCPA violations...............19

  2.    The Representations Are Mere Puffing Which Do Not Support A KCPA Claim, And As A Matter Of Law, They Cannot Be Interpreted And Relied Upon As Plaintiffs Claim To Have Done. .......................................22

  3.    Plaintiffs Have no Evidence that they Relied Upon the Marketing Language At Issue, Thereby Precluding the Necessary Causal Connection. ......25

C.    Partial Summary Judgment Should be Granted on Count II of the Fourth Amended Complaint for Breach of Contract in Favor of TrueLink. ...................29

  1.    Melody Millett Never Entered Into a Contract on Her Own Behalf with TrueLink for the Purchase of TrueLink's Credit Monitoring Product. .......32

  2.    As a Matter of Law, the Contract Cannot be Interpreted as Promising to Monitor the Credit Files of Individuals Other Than the Purchaser of the Credit Monitoring Product. ............................................................................33

  3.    The Milletts' Allegation that TrueLink Breached its Contract By Failing to Provide Fraud Resolution Services Fails as a Matter of Law.......36

  4.    Even If This Court Cannot Rule As A Matter Of Law That The Contract Did Not Require TrueLink To Monitor The Credit Files Of Others, And Even If A Breach Is Presumed, There Is No Evidence That The Milletts Suffered Resulting Harm. ......................................................37

      a.     It is undisputed that the Milletts knew Mr. Perez had misused Mr. Millett's social security number before they purchased TrueLink's credit monitoring product. ....................................................37

      b.     It is undisputed that the Milletts knew as early as August, 2003 that TrueLink's credit monitoring product did not monitor information outside of the purchaser's credit report. ................38

      c.     The Milletts are not entitled to restitutionary damages. ..........................39

D.    There is No Evidence in the Record that Would Entitle the Milletts to Punitive
      Damages...................................................................................................................39

CONCLUSION.......................................................................................................................40

## TABLE OF AUTHORITIES

Page

**Federal Cases**

Amadeus Global Travel Distrib. v.Orbitz LLC
    303 F. Supp. 2d 329 (D. Del. 2004) ......................................................................... 13, 31

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ................................................................................................... 14

Atkinson v. Lafayette College,
    460 F.3d 447 (3d Cir. 2006) ...................................................................................... 31

Bailey v. Allgas, Inc.,
    284 F.3d 1237 (11th Cir. 2002) ................................................................................. 13

Beck v. Prupis,
    162 F.3d 1090 (11th Cir. 1998) ................................................................................. 12

Benedict v. Altria Group, Inc.,
    241 F.R.D. 668 (D. Kan. 2007) ............................................................................. 17, 25

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) ................................................................................................... 12

Green v. Kansas City Power & Light Co.,
    281 B.R. 699 (D. Kan. 2002) ................................................................................... 2, 15

MBIA Insurance Co. v. Royal Indemnity Co.,
    426 F.3d 204 (3d Cir. 2005) ............................................................................. 34, 35, 36,

Pound v. Airosol Co., Inc.,
    368 F. Supp. 2d 1210 (D. Kan. 2005) .......................................................... 2, 15, 25, 30

Sanford Inv. Co. v. Ahlstrom Machinery Holdings, Inc.,
    198 F.3d 415 (3d Cir. 1999) ...................................................................................... 35

Stein v. Sprint,
    22 F. Supp. 2d 1210 (D. Kan. 1998) ......................................................................... 17

Tamarind Resort Assoc. v. Gov. of Virgin Islands,
    138 F.3d 107 (3d Cir. 1998) ...................................................................................... 31

## State Cases

Amer. Ins. v. Material Transit, Inc.,
  446 A.2d 1101 (Del. Super. Ct. 1982) ....................................................... 32

Baldwin v. Priem's Pride Motel, Inc.,
  580 P.2d 1326 (Kan. 1978) ................................................... 2, 22, 23, 24

Emmons v. Hartford Underwriters Ins. Co.,
  697 A.2d 742 (Del. 1997) ......................................................................... 34

Finstad v. Washburn University,
  845 P.2d 685 (Kan. 1993) ................................................................ passim

Great Lakes Chem Corp. v. Pharmacia Corp.,
  788 A.2d 568 (Del. Ch. 2001) ........................................................... 37, 38

Interim Healthcare, Inc. v. Spherion Corp.,
  884 A.2d 513 (Del. Super. Ct. 2005) ................................................... 2, 30

Kansas v. DVM Enter., Inc.,
  62 P.3d 653, 657 (Kan. 2003) ................................................................. 14

Kronenberg v. Katz,
  872 A.2d 568 (Del. Ch. 2004) ................................................................. 37

McLellan v. Raines,
  140 P.3d 1034 (Kan. App. 2006) ................................... 14, 25, 26, 28

Nemours & Co. v. Allstate Ins. Co.,
  693 A.2d 1059 (Del. 1997) ...................................................................... 34

Nemours v. Pressman,
  679 A.2d 436 (Del. 1996) ............................................................... 3, 6, 40

Rhone-Poulec Basic Chem. Co. v. Amer. Mot. Ins. Co.,
  616 A.2d 1192 (Del. 1992) ................................................................ 31, 34

## Federal Statutes

Fair Credit Reporting Act

  15 U.S.C. §1681 ......................................................................................... 6

  15 U.S.C. §1681b(a) ................................................................................ 33

15 U.S.C. §1681b(a)(2)...........................................................................................6, 8, 9

## State Statutes

Cal. Civ. Code §§1750-85 ...................................................................................10, 11

Kansas Consumer Protection Act

    K.S.A §50-623 .......................................................................................................3, 39

    KSA §50-624(b)........................................................................................................16

    KSA §50-634(d)...................................................................................................16, 17

    KSA §50-634(a)........................................................................................................14

    KSA §50-634(b)...................................................................................................14, 15

## Other Authorities

Eric Dash, Protectors, Too, Gather Profits From ID Theft,
    N.Y. times, Dec. 12, 2006.........................................................................................21

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs Steven and Melody Millett (the "plaintiffs" or "Milletts") brought suit against TrueLink, Inc., now known as Trans Union Interactive Inc. ("TrueLink"), for claims arising out of plaintiffs' purchase of credit monitoring from TrueLink on behalf of themselves and a putative class. In the operative Fourth Amended Complaint (D.I. 76) (the "FAC"), plaintiffs assert a claims for violation of the Kansas Consumer Protection Act, KAN. STAT. ANN., § 50-626, et. seq. (the "KCPA") (Count I), and for breach of contract (Count II).[1]  In accordance with this Court's Scheduling Order, fact discovery closed on July 15, 2007, and the deadline for the disclosure of expert reports passed on July 30, 2007. (D.I. 82).  TrueLink now moves for judgment as a matter of law on each of plaintiffs' remaining claims.

## SUMMARY OF THE ARGUMENT

1.    The Milletts' only remaining claims against TrueLink are for violations of the KCPA (Count I) and for breach of contract (Count II), arising out of Ms. Millett's August 6, 2003 purchase – on her husband's behalf - of TrueLink's credit monitoring product from TrueLink's TrueCredit website.

2.    TrueLink moves for summary judgment on Count I for violations of the KCPA in its entirety for the following reasons:  (1) The Milletts are not "aggrieved consumers" under the KCPA.  In order to recover damages for a claim for violations of the KCPA, the plaintiff must be an "aggrieved consumer."  See KAN. STAT. ANN. 50-634(b).  See also KAN. STAT. ANN. 50-634(a), (d); Finstad v. Washburn Univ. of Topeka, 845 P.2d 685, 690 (Kan. 1993) (ruling that claims for damages or for civil penalties under KCPA, KAN. STAT. ANN 50-634, are reserved for plaintiffs who have been "aggrieved" by the allegedly deceptive conduct; and persons

---

[1]  The two other claims alleged as Counts III and IV of the FAC were voluntarily dismissed by plaintiffs. (D.I. 76).

"aggrieved," are those who have "suffered loss or injury" as a result of the challenged conduct); see also Pound v. Airosol Co., Inc., 369 F. Supp. 2d 1210, 1217-18 (D. Kan. 2005) (private remedies under the KCPA are reserved to consumers "aggrieved by a violation of this act"); Green v. Kansas City Power & Light Co., 281 B.R. 699, 704 (D. Kan. 2002) ("[T]he question of whether [the plaintiff] is an 'aggrieved consumer' is elemental to the issue of whether [he] may recover a civil penalty" under K.S.A. 50-634); and (2) the Milletts' interpretation of the phrase "complete identity theft protection" as used by TrueLink in its marketing of the credit monitoring product is unreasonable and, at best, constitutes mere "puffing" under Kansas law. See Baldwin v. Priem's Pride Motel, Inc., 580 P.2d 1326, 1329 (Kan. 1978). Further, another federal court has already found the Milletts' interpretation of nearly identical language marketing a nearly identical credit monitoring product to be unreasonable as well. (See Order granting in part and denying in part Experian's Motion for Summary Judgment attached hereto as Exhibit A).

3.    TrueLink moves for partial summary judgment on Count II for breach of contact on three independent grounds. As an initial matter, Ms. Millett did not enter into a contract with TrueLink for the purchase of the credit monitoring product, Mr. Millett did. Separately, the claims of both plaintiffs fail as a matter of law for the following reasons: (1) As a matter of law, the contract cannot be interpreted as promising to monitor the credit files of individuals other than the purchaser of the credit monitoring product; (2) the Milletts' allegation that TrueLink breached its contract by failing to provide fraud resolution services fails as a matter of law; and (3) even if this Court cannot rule as a matter of law at this time that the contract did not require TrueLink to monitor the credit reports of others, and even if a breach is presumed, there is no evidence that the Milletts suffered resulting harm. Interim Healthcare, Inc. v. Spherion Corp., 884 A.2d 513, 548 (Del. Super. Ct. 2005).

4.      Finally, there is no evidence in the record that would entitle the Milletts to punitive damages.  As an initial matter, punitive damages are not recoverable under the KCPA. See K.S.A 50-623 et seq.  Likewise, punitive damages are not recoverable under Delaware contact law.  See E.I. DuPont de Nemours v. Pressman, 679 A.2d 436, 445 (Del. 1996) ("no matter how reprehensible the breach, damages that are punitive in the sense of being in excess of those required to compensate the injured party for lost expectation, are not ordinarily awarded for breach of contract") (internal citation omitted).  Further, the Milletts provide absolutely no evidence that TrueLink acted  willfully or maliciously when it allegedly misrepresented its credit monitoring product.

### STATEMENT OF FACTS

1.      None of the facts set forth in this Brief in Support of Motion for Summary Judgment are in dispute.  The plaintiffs here, married couple Steven and Melody Millett (the "Milletts" or "plaintiffs"), have filed this lawsuit against TrueLink on behalf of themselves and both a Kansas-wide and nation-wide class for violations of the KCPA and for breach of contract arising out of the purchase by Mr. Millett of TrueLink's credit monitoring product.  (D.I. 76). The Milletts' claims are both premised upon the contention that TrueLink misrepresented to the Milletts (as well as the putative class the Milletts seek to represent) that TrueLink would provide "complete identity theft protection," and that TrueLink would monitor the credit files of all individuals, not just the subscriber's credit file, and would alert the subscriber to any addition to any credit file that might suggest identity theft.  (See Deposition of Melody Millett, attached hereto as Exhibit B ("M. Millett Dep."), pp. 242-43; see also Deposition of Steven Millett, attached hereto as Exhibit C ("S. Millett Dep."), pp. 51, 115).

**A.    The Milletts Learned That Another Individual Had Misused Steven Millett's Social Security Number Approximately One Year Before the Milletts Purchased TrueLink's Credit Monitoring Product.**

2.    The Milletts claim that an individual by the name of Abundio P. Cuatle or Abundio Perez ("Mr. Perez") began misusing Plaintiff Steven Millett's Social Security Number (SSN) at some point in 1989. (S. Millett Dep, p. 67). The Milletts first discovered such misuse in August, 2002. (S. Millett Dep., pp. 70-71). The Milletts readily concede that, at the time Ms. Millett purchased TrueLink's credit monitoring product on her husband's behalf on August 6, 2003, the Milletts were well aware that Mr. Perez had misused Steven Millett's SSN. (S. Millett Dep., pp. 15-16, 37). It is also undisputed that the Milletts do not "blame TrueLink for anything that occurred" prior to Mr. Millett's purchase from TrueLink. (S. Millett Dep., pp. 112-13).

3.    Although the Milletts contend that Mr. Millett is the victim of identity theft, they do not allege that Mr. Perez – or any other individual – ever used any identifying information belonging to Mr. Millett other than his SSN. (Mr. Perez apparently is an alien residing illegally in the U.S.). Mr. Perez never used Mr. Millett's name, address or other identifying information, and never opened any new credit or other accounts in Mr. Millett's name, or usurped his existing accounts. After learning that Mr. Perez was using Mr. Millett's SSN the Milletts reviewed Mr. Millett's credit reports from the three major credit bureaus and confirmed that none of those reports contained information relating to any other individual, including Mr. Perez. (S. Millett Dep., p. 83). Notably, no information relating to Mr. Perez – or any other individual – ever appeared on Mr. Millett's credit reports provided by TrueLink. (S. Millett Dep., pp. 146-47; M. Millett Dep., p. 147). The Milletts have presented absolutely no evidence that Mr. Millett has been the victim of identity theft since the date Mr. Millett purchased the credit monitoring product. (S. Millett Dep., pp. 37-38, 51, 113, 125; M. Millett Dep., p. 171).

**B.    As the Agent for Her Husband, Ms. Millett Purchased TrueLink's Credit Monitoring Product on Her Husband's Behalf.**

4.    After having already purchased credit monitoring products from TrueLink's competitors, Plaintiff Melody Millett visited the TrueLink website, www.truecredit.com on August 6, 2003, and purchased the TrueLink credit monitoring product in her husband's name and on his behalf.  (S. Millett Dep. p. 107; M. Millett Dep., p. 75).  Ms. Millett was the self-proclaimed "agent" for her husband and she admittedly never entered into any contract with TrueLink on her own behalf to purchase the credit monitoring product at issue in this action. (See M. Millett Dep., pp. 195-96, 227; S. Millett Dep. pp. 136-37; See also Plaintiffs' Response to TrueLink's First Interrogatories to Plaintiff Steven Millett ("Response to First Interrogatories") a true and correct copy of which is attached hereto as Exhibit D, p. 2, Resp. to Interrogatory No. 4, p. 9, Resp. to Interrogatory No. 12).[2]  Mr. Millett never read the alleged misrepresentations which are the core of plaintiffs' claims and, in fact, he has never even visited TrueLink's TrueCredit website.  When asked when he visited the TrueCredit website, Mr. Millett stated, "[m]y wife, as my agent, visited the TransUnion [sic][3] website often . . . I understand that she visited the site on my behalf . . ."  (Response to First Interrogatories, p. 2, Resp. to Interrogatory No. 2) (emphasis added).

**C.    TrueLink's Credit Monitoring Product and Its Marketing on its TrueCredit Website.**

5.    TrueLink offers consumers access to credit report information from the three national credit bureaus (including Trans Union), as well as credit scores, and related products.

---

[2]  Though she believes she purchased a credit report from TrueLink, that purchase is not the subject of this lawsuit.  (M. Millett Dep., pp. 206-2).

[3]  Not until the morning of his deposition, during the initial questioning, was Mr. Millett aware that the instant lawsuit was filed against TrueLink, and not Tans Union (S. Millett Dep., p. 45).

(Declaration of Lucy Duni ("Duni Decl."), ¶6, attached hereto as Exhibit F). TrueLink offers these products through its TrueCredit internet portal. (Id.) The credit monitoring product purchased on behalf of Mr. Millett from TrueLink's TrueCredit website monitors the Trans Union credit file of the subscriber and notifies the subscriber by email when there are certain changes to the credit file. (Id. at ¶7).

6.     Trans Union – but not TrueLink – is a "consumer reporting agency" which may not disclose credit history information except as permitted by the Fair Credit Reporting Act, 15 U.S.C. §1681 et seq ("FCRA"). Because the FCRA permits consumers to review their own credit information maintained by credit bureaus, TrueCredit is permitted to obtain Mr. Millett's information for his review and upon his request. 15 U.S.C. §1681b(a)(2) (permitting disclosure as directed by the consumer). Notably, Trans Union is not permitted to disclose information from Mr. Perez's credit file without his written instruction, or some other "permissible purpose." See id. §1681b(a).

7.     The cornerstone of the Milletts' claims are the representations on TrueLink's website, viewed by Mr. Milletts' agent-wife on August 6, 2003, which allegedly prompted her to subscribe to TrueCredit's credit monitoring product. The website page produced by the Milletts and identified as the page viewed by Ms. Millett when she purchased the product (and which is attached hereto as Exhibit E) states, in pertinent part, as follows:

> Knowledge: quarterly access to your credit report with analytical tools.
> Protection: Complete identity theft protection with weekly fraud-watch emails.
> Convenience: Toll-free credit specialists with fraud resolution services.
> 　　　　　*　　　*　　　*
> As a member, you'll receive ALL THIS –
>
> **Weekly Fraud-Watch Emails**　　　　　Learn More
> • Receive weekly email alerts to changes in your report

- Immediately find out about credit report changes including fraudulent activity, new inquiries, new accounts, late payments and more

**Quarterly Access to Your Credit Report**        Learn More
- Receive a brand new credit report four times per year
- Reports are easy-to-read with color graphics and free interactive guide

**NEW!  Fraud Resolution Services**               Learn More
- Should you become a victim of identity theft, TrueCredit provides you with Fraud Resolution services to assist you in the recovery of financial and credit losses

(Exhibit E) (emphasis in original).  Thus, the phrase "complete identity theft protection" was clearly presented with reference to the weekly fraud-watch emails.  The webpage made clear that those weekly fraud-watch emails alert the customer only to "changes in your report." (Emphasis added).  Thus, the webpage on which the challenged phrase appeared made clear that TrueLink's credit monitoring product monitored only the credit report of the purchaser and not that of other individuals.

**D.    The Milletts Knew That TrueLink's Credit Monitoring Product Would Not Literally Provide "Complete Identity Theft Protection."**

8.    Indeed, plaintiffs' own description in its pending Fourth Amended Complaint of TrueLink's advertising is that it allows subscribers "to monitor their credit report with weekly fraud-watch emails" and advises members of "changes in their credit reports." (D.I. 76, ¶10(b), 10(c) (emphasis added).

9.    The plaintiffs did not believe, at the time that Ms. Millett purchased credit monitoring on her husband's behalf, that the product would provide them "complete identity theft protection" in an unqualified and absolute sense.  (S. Millett Dep., p. 119; M. Millett Dep., p. 410).  When asked at his deposition what "was his understanding back in August 2003 of what

a credit monitoring product is," Mr. Millett testified that "it would be checking to see if there was activity on my credit report." (S. Millett Dep., p. 119) (emphasis added).

10.    Ms. Millett also knew and understood that the product would not provide "complete identity theft protection under all circumstances," and that the services TrueLink was providing were limited "as it relates to Trans Union's data." (M. Millett Dep., pp. 409-10). Ms. Millett also acknowledged that it would not be reasonable to read (and she did not read) TrueLink's marketing language literally.  For example, where a subscriber's social security number was used by an imposter on an employment application, but where that employer did not report the information to Trans Union, she did not expect TrueLink's product to advise of such activity. (Id. at p. 410). Instead, she agreed that "you have to read those types of things reasonably." (Id.) Further, Ms. Millett acknowledged that the challenged phrase did not stand alone in the marketing of the product, but rather described the product as offering "complete identity theft protection with weekly fraud watch emails." (M. Millett Dep., p. 242) (emphasis added).  She also acknowledged reading the more specific descriptions of the "weekly fraud watch emails" (the primary component of credit monitoring), which appeared on the same webpage. (Id. at pp. 238-42 and Ex. E).  The description of "weekly fraud watch emails" on that webpage made clear that customers of credit monitoring would receive alerts whenever there were "changes in your credit report," to "find out about credit report changes, including fraudulent activity, . . ." (Id. at pp. 241-42 and Ex. E) (emphasis added).

**E.    Even Knowing That It Did Not Identify Known Uses Of Steven Millett's Social Security Number, And Did Not Monitor Other Individuals' Files, The Milletts Continued to Purchase TrueLink's Credit Monitoring Product For More Than Three Years.**

11.    At the time Mr. Millett purchased credit monitoring from TrueLink in August 2003, the Milletts knew of several accounts which Mr. Perez had opened in his own name using

Steven Millett's social security number – accounts which plaintiffs had been unable to close. (M. Millett Dep., pp. 121-24, 144-46, 149-50, 173-75, 261).  However, because such activity did not occur on Mr. Millett's file, TrueLink did not alert him of such activity.  If they truly expected TrueLink's product to alert them to the existence of accounts associated with Steven Millett's social security number (even those that do not appear on his credit report), they knew within the first months of their subscription, when these known accounts were not identified, that the product did not do so.  (Id. at pp. 173-75, 261).

  Instead, in its first (and subsequent) alerts, TrueLink reaffirmed the nature of its product, i.e., to monitor the subscriber's credit file, and nothing more.

[REDACTED]

13.    The Milletts *never* called TrueLink's customer service to question why Mr.

Perez's known use of Mr. Millett's SSN did not appear in Steven Millett's credit reports or in

TrueLink's corresponding alerts. (M. Millett Dep. p. 99). Nor did the Milletts ever request (as

they do in this Court) a refund from TrueLink for their purchase of a credit monitoring product

which, they now contend, was not what was expected. (S. Millett Dep. p. 39). Instead, for more

than three (3) years the Milletts paid for the product, and never even affirmatively canceled their

subscription, but merely permitted the subscription to lapse in November, 2006 by not providing

TrueLink with a new debit card number when their previous debit card expired. (M. Millett Dep.

pp. 85-86). It is undisputed that the Milletts found value in the product. In fact, Ms. Millett

stated in an interview with the New York Times newspaper that the Milletts "still have

[TrueLink's TrueCredit] credit monitoring because of the simple fact that it is the best tool

available at this time." (S. Millett Dep., p. 44; M. Millett Dep. P. 318).

**F.     Another Federal Court Rejected The Milletts' Interpretation Of Similar Marketing And Entered Summary Judgment Against the Milletts in a Nearly Identical Case.**

14.    In their case against Experian Information Solutions and Consumerinfo.com

(collectively "Experian"), No. SACV-05-879-JVS (the "Experian Action"), the Milletts alleged

nearly identical claims on behalf of a nationwide class for deceptive marketing in violation of the

California Consumers Legal Remedies Act, Cal. Civ. Code §§1750-85 (the "CLRA") and breach

of contract. (D.I. 113 in Experian).

15.    Experian filed a motion for summary judgment on October 24, 2006, seeking

dismissal of both claims. (D.I. 116 in Experian). The primary issues raised by the motion, and

ultimately resolved by the federal court, were: (1) whether Experian had a contractual duty to

provide its customers with information that does not appear on their credit report; and (2) whether general claims of identity theft protection could be reasonably read to promise monitoring of credit files other than those of the subscribing consumer.

16.    On December 18, 2006, the Court granted in part Experian's motion for summary judgment, finding that Experian's credit monitoring product performed as promised, and that its marketing of the product did not mislead consumers.  (Order, attached as Exhibit A).  The district court found that Experian's credit monitoring product was intended to advise whether a purchaser's Experian credit report had changed in five specific ways commonly associated with identity theft.  (Id. at p. 4).  The Court further found that "it is clear that there was no offer to search for information that would not appear on a purchaser's credit report," and held that the Milletts' views as to how the product should perform were "impractical and undesirable."  (Id.)

17.    Based upon similar reasoning, the Court also dismissed the Milletts' California statutory deceptive marketing claims.  Even though defendant's website stated that its credit monitoring product will "guard against fraud and identity theft," and will "provide peace of mind," the court rejected the literal interpretation urged by the Milletts, and held that "no reasonable person would read these statements and take them literally and absolutely."  (Id. at p. 6).  On April 4, 2007, the Court denied the Milletts' motion for reconsideration.

**G.    Through Discovery, it is Clear That the Milletts Seek Reimbursement for the Purchase Price and Have Foregone Other Damages Originally Set Forth in Their Fourth Amended Complaint.**

18.    Here, the Milletts seek the following in damages:

the statutory damages available pursuant to the [KCPA], attorney's fees and costs allowed by the [KCPA], and restitution of the purchase price and interest.

(Pl. Supplemental Response to TrueLink's First Interrogatories to Steven Millett ("Supp. Resp."), Supp. Resp. to Interrogatory Nos. 7-10, 13, attached hereto as Exhibit I); see also D.I.

129, Plaintiffs' Brief in Support of Motion for Class Certification, p. 32 "the measure of damages is the reimbursement of the purchase price of Credit Monitoring."). The Milletts have foregone any recovery for physical or emotional harm they claimed to have suffered resulting from alleged defects in TrueLink's credit monitoring product. (Response to First Interrogatories, Ex. D, pp. 6-7, Response to Interrogatory Nos. 8 & 9 "[w]e understand from our lawyers that we are not going to seek money for emotional damages [or physical injury].").

19.    Plaintiffs also disclaim any economic losses normally associated with identity theft. <u>See</u> M. Millett Dep., pp. 156, 131-133 (confirming plaintiffs do not seek recovery of economic losses tied to any identity theft, such as increased insurance costs or credit rates, or an inability to obtain credit).

**ARGUMENT**

**A.    Summary Judgment Should be Granted Where, as Here, There is No Genuine Issue of Material Fact for Trial.**

Summary judgment should be granted, and plaintiffs' claims fail as a matter of law, if the pleadings, admissions, affidavits and other materials show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Summary judgment is appropriate where the moving party shows an absence of evidence to support an essential element of the nonmoving party's case. <u>Beck v. Prupis</u>, 162 F.3d 1090, 1096 (11th Cir. 1998). As the moving party, TrueLink's burden "may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support [plaintiffs'] case." <u>Celotex</u>, 477 U.S. at 325.

Once the moving party has properly supported its motion, "the burden shifts to the non-moving party to 'come forward with specific facts showing that there is a *genuine issue for*

trial.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)) (emphasis in original).  A party
opposing a properly supported motion for summary judgment "may not rest upon the mere
allegations or denials of [his] pleading" but instead "must set forth specific facts showing that
there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Plaintiffs must do far more than "simply
show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at
586.  No genuine dispute exists "[w]here the record taken as a whole could not lead a rational
trier of fact to find for the non-moving party . . ." Id. at 587.  Further, the "mere existence of
some evidence in support of the nonmoving party . . . will not be sufficient for the denial of a
motion for summary judgment ." Amadeus Global Travel Distrib. v. Orbitz LLC, 302 F. Supp.
2d 329, 333-34 (D. Del. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249
(1986)).  If the evidence presented by plaintiffs is merely "colorable" or "not significantly
probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50.

**B.     Summary Judgment Should be Granted on Count I of the Fourth Amended
        Complaint for Violations of the KCPA in Favor of TrueLink.**

        Because plaintiffs have no evidence to establish various prerequisites for, and elements
of, their KCPA claim, TrueLink is entitled to judgment as a matter of law on Count I of the FAC.

        Plaintiffs' claim under the Kansas statute is premised upon alleged knowing
misrepresentations by TrueLink regarding its credit monitoring product.  (FAC, ¶39)  This claim
fails for any one of three independent reasons.  First, plaintiffs suffered no loss as a result of the
alleged misrepresentations.  Indeed, because she did not purchase the product on her behalf, Ms.
Millett has no standing even if this Court cannot rule as a matter of law that no loss occurred to
Mr. Millett.  Second, the language seized upon the Milletts as misrepresentations, in complete
ignorance of specific language contradicting the Milletts' interpretation, is mere "puffing" that

cannot be reasonably interpreted as the Milletts' allegedly did.  Third, the Milletts cannot demonstrate reliance upon the alleged misrepresentations.

Where evidence necessary to establish plaintiffs' claim is lacking – including such indispensable elements as standing, the existence of damages, and whether any deceptive or practices occurred or caused a loss – summary judgment is appropriate.  See Finstad, 845 P.2d at 685 (affirming entry of summary judgment for defendant on KCPA claims);  McLellan v. Raines, 140 P.3d 1034, 1045 (Kan. Ct. App. 2006) (affirming district court's grant of summary judgment against plaintiffs on KCPA claims).  See also Kansas v. DVM Enter., Inc., 62 P.3d 653, 657 (Kan. 2003) (whether conduct is unconscionable is a question of law for the court).

### 1.    Plaintiffs Cannot Demonstrate that they are Aggrieved Consumers Who have Suffered Loss as a Result of the Alleged Misrepresentations.

Plaintiffs seek to recover compensatory damages caused by alleged violations of the KCPA.  See FAC, p. 13.  However, in order to maintain a private claim for damages (or civil penalties in the alternative)[4] under the KCPA, a plaintiff must be an "aggrieved consumer."  See KSA 50-634(b).  See also KSA 50-634(a), (d).  In Finstad, 845 P.2d at 685, the Kansas Supreme Court specifically ruled that claims for damages or for civil penalties under the KCPA are reserved to plaintiffs who have been "aggrieved" by the allegedly deceptive conduct;  and persons "aggrieved" are those who have "suffered loss or injury" as a result of the challenged

---

[4]  Notably, the recovery of civil penalties under KSA 50-634(b) also requires, as a predicate, proof that plaintiffs have suffered a loss as a result of the alleged violation.  See KSA 50-634(b). See also Finstad, 845 P.2d at 472-73; Benedict v. Altria Group, Inc., 241 F.R.D. 668 (D. Kan. 2007).  Accordingly, the fact that plaintiffs seek civil penalties in the alternative to damages does not change the result.  The same is true with respect to plaintiffs' efforts to obtain injunctive or declaratory relief.  See KSA 50-634(a) (". . . a consumer aggrieved by an alleged violation . . . may bring an action to obtain declaratory judgment or a restraining order");  Stein v. Sprint Corp., 22 F. Supp. 2d 1210, 1216 (D. Kan. 1998) (plaintiff must allege and show he is "aggrieved," and has been personally injured in order to bring an action for injunctive relief under the KCPA).

conduct. Id. at 690. "If [plaintiffs] are not aggrieved by the violation, then they do not have a remedy under KSA 50-634(b)." Id. at 689. See also Pound v. Airosol Co., Inc., 368 F.Supp. 2d 1210, 1217-18 (D. Kan. 2005) (private remedies under the KCPA are reserved to consumers "aggrieved by a violation of this act"); Green v. Kansas City Power & Light Co., 281 B.R. 699, 704 (D. Kan. 2002) ("[T]he question of whether [the plaintiff] is an 'aggrieved consumer' is elemental to the issue of whether [he] may recover a civil penalty" under KSA 50-634).

Plaintiffs allege that they are "consumers" for purposes of the KCPA (FAC, ¶34), but the relevant inquiry is whether they are "aggrieved consumers," i.e., whether they have suffered a loss causally connected to the challenged conduct. "[The plaintiffs] are consumers, but are they aggrieved by the publication of the false statement in the [defendant's] catalog? If they are not, then they cannot bring this action to recover damages or a civil penalty under 50-634(b)." Finstad at 691 (disagreeing with the notion that actual damages are not required in consumer protection cases brought by private litigants). While "[a] loss or injury resulting from a violation of the Act is not required in an action filed by the attorney general . . ., it is . . . required for one filed by a consumer under KSA 50-634(b)." Id. Proof of reliance, actual loss, and a causal connection between the alleged misrepresentation and the loss is required to maintain an action under KSA 50-634(b). Id. at 692 (affirming entry of summary judgment against plaintiffs who neither relied on the false statement, nor suffered any injury or loss as a result of the statement). See also Pound, 368 F. Supp. 2d at 1217-18 (a plaintiff who "admittedly never opened or used" the product at issue was not aggrieved by the alleged misrepresentations).

Against these standards, the plaintiffs are not "aggrieved consumers." As demonstrated by the record, plaintiffs have suffered no loss as a result of either the allegedly deceptive or

misleading statements on TrueLink's website, or the allegedly unconscionable provisions of Mr. Millett's contract with TrueLink.

              a.    <u>Ms. Millett lacks standing to bring a claim under the KCPA.</u>

As an initial matter, Ms. Millett has no standing to maintain her own claim for violation of §50-634(d) of the KCPA. Ms. Millett never purchased credit monitoring for herself. (<u>See</u> M. Millett Dep., pp. 195-96, 227, (noting that she has never bought credit monitoring other than as an agent for his husband)[5]; <u>Id.</u> at pp. 214, 258-59 (noting that she has never entered into a contract with TrueLink for credit monitoring other than as an agent for Steven Millett)). Plaintiffs suggest in their pleadings that she has standing because a married couple comes within the definition of a "consumer" under the KCPA, KSA §50-624(b). If a husband and wife jointly enter into a contract, they are together a "consumer." The contract here, however, was entered into singly by Mr. Millett albeit by his agent, Ms. Millett. In any event, whether or not Ms. Millett is a "consumer" is not the end of the inquiry to determine whether or not she has standing to maintain a claim for damages. <u>See</u> <u>Finstad</u>, 845 P.2d at 691 ("consumer" status is not sufficient; plaintiff must be an "aggrieved consumer" who has suffered economic loss). Private actions for damages under KSA §50-634(d) are reserved to those who "suffer loss as a result of a violation of th[e] act." Thus, to have standing, Ms. Millett must also have suffered harm as a result of the representation at issue.

Ms. Millett testified that she has never been a victim of identity theft. (M. Millett Dep., p. 41). Therefore, she effectively admits that she has not suffered any harm as a result of the conduct at issue – the allegedly misleading marketing statements which relate to the protection from identity theft provided by credit monitoring. In the event the alleged harm is the money

---

[5] Though she believes she purchased a credit report from TrueLink, that purchase is not the subject of this lawsuit. (M. Millett Dep., pp. 206-207).

paid to TrueLink, it was paid by (or on behalf of) Mr. Millett, not his wife. As a result, she has

no standing to maintain a claim for damages under KSA §50-634(d). See Stein v. Sprint Corp.,

22 F. Supp. 2d 1210, 1216 (D. Kan. 1998) (dismissing KCPA claim because plaintiff suffered no

personal injury) and Benedict v. Altria Group, Inc., 241 F.R.D. 668, 680 (D. Kan. 2007) ("KCPA

requires individual showings of damages caused by [the] representations"), and Finstad, supra

845 P.2d at 690-92 (a consumer's standing to sue for damages under the KCPA requires that the

plaintiff be aggrieved and suffer personal injury caused by the allegedly deceptive conduct).

      b.    There is no evidence that plaintiffs suffered a loss as a result of the alleged violations.

At the heart of plaintiffs' KCPA claim is their allegation that TrueLink misrepresented its

credit monitoring product by stating that it would do more than it could. Specifically, plaintiffs

allege that TrueLink oversold its product by suggesting it could provide "complete identity theft

protection," and that, based on this language, plaintiffs believed that TrueLink would alert them

to all unauthorized use of Mr. Millett's social security number, including such unauthorized use

that was not reflected in Mr. Millett's credit file.[6]

The harm which might be caused by an allegedly false representation concerning the

ability to detect or protect against identity theft would be that flowing from the product's failure

to do just that. But there is no evidence that either plaintiff have been a victim of identity theft at

any time *after* Mr. Millett purchased credit monitoring from TrueLink in August 2003 that

TrueLink's product failed to prevent or disclose. Certainly, plaintiffs were aware almost a year

---

[6]  As discussed infra, plaintiffs' interpretation of this portion of TrueLink's website about its product is unreasonable as a matter of law, particularly in the context of other detailed explanations of the product available on the website – indeed, on the same webpage – at the time. Regardless, however, the evidence demonstrates that plaintiffs did *not* believe that TrueLink's credit monitoring product would operate in this way, and therefore did not rely on the allegedly misleading language at issue.

*prior* to purchasing the credit monitoring product from TrueLink that Mr. Perez had "stolen" and misused Mr. Millett's social security number. (S. Millett Dep., pp. 15-16, 70-71). Therefore, plaintiffs do not and cannot sue TrueLink for harm arising from that "identity theft" that predated their August 2003 purchase of the product. (S. Millett Dep., pp. 111-13; M. Millett Dep., p. 95).

Mr. Millett testified that he has no evidence that he has been a victim of identity theft, or even that there has been any additional misuse of his social security number at any time since he purchased the product in August 2003. (S. Millett Dep., pp. 37-38, 125). See also id. at p. 51 (he does not know if the product "works" to protect against identity theft because he has not been a victim other than the use of his social security number by Mr. Perez, which he already knew about).

Ms. Millett also has no evidence that anyone else has "stolen" her husband's identity or used his social security number. Ms. Millett has offered her belief that TrueLink failed to advise the Milletts of any such use by Mr. Perez after August 2003. (M. Millett Dep., p. 95). However, Ms. Millett has nothing more than conjecture and speculation of "possible instances" of any subsequent use of the social security number by Mr. Perez. (M. Millett Dep., pp. 171-72) (admitting that she "has no definite proof," and concedes "I don't know" and "I'm not sure" if SSN was used).

Further, even if evidence of post-August 2003 identity theft existed, plaintiffs still fail to identify how any such theoretical use harmed the Milletts. Indeed, *if* there had been other uses of his social security number by Mr. Perez after August 2003, that fact, in and of itself, does not translate to the requisite personal loss.[7] Plaintiffs have no evidence that Mr. Milletts' credit

---

[7]  Ms. Millett testified about a judgment entered under her husband's social security number (stemming from Mr. Perez's conduct) that they were not notified about. (M. Millett Dep., pp. 310-312). However, she was unable to identify any harm resulting from it – just that "[i]t took

rating has been affected in any way by the post-August 2003 conduct of others that might constitute "identity theft." See S. Millett Dep., pp. 140-41 (he is unaware of having to dispute any accounts appearing on his own credit report); pp. 153-58 (he has no evidence that he was unable to obtain credit or that his credit score was adversely affected as a result of an identity thief). See also M. Millett Dep., p. 400 (plaintiffs have no evidence that Mr. Perez ever opened any credit lines or accounts in Mr. Millett's name, or otherwise impacted accounts appearing on Mr. Milletts' credit file). Not only is there no evidence of such losses, plaintiffs expressly disavow any claim for such economic losses here. See Facts, ¶¶ 18,19.[8] Consequently, Mr. Millett has no evidence that he suffered a loss as a result of the alleged failure of the product to deliver protection from identity theft. Therefore, even if plaintiffs were able to prove that the product failed to perform as "promised," it is clear that no such failure caused them to suffer a loss.

c.    <u>Monies plaintiffs paid to purchase credit monitoring cannot be the "loss" suffered as a result of the alleged KCPA violations.</u>

Rather than point to a loss which resulted from their reliance upon allegedly misleading or deceptive marketing language, plaintiffs seem to rest upon the notion that the amounts they paid to purchase credit monitoring from TrueLink is the measure of their damages. See FAC, ¶47; S. Millett Dep., pp. 33, 38-39 (he seeks a full refund of all moneys paid for the product); M.

---

longer to find out about it." Id. at 312. She also testified that she believed that some accounts opened by Mr. Perez in Mr. Perez's own name may have been "relabeled" by the credit grantor. (M. Millett Dep., pp. 253, 329-331). This seems to be nothing more than speculation, and it certainly is not evidence of *harm* to Mr. Millett. Notably, as proof that no such harm occurred, she acknowledged that none of these accounts of Mr. Perez, including any which may have been relabeled, ever appeared on Mr. Millett's credit report. (M. Millett Dep., pp. 572-73).

[8]  Citations to "Facts, ¶ __" refer to designated numbered paragraphs of the Statement Of Facts portion of this brief.

Millett Dep., pp. 81-82, 309-10 (same). There are several problems with this method of proving the fact and/or the amount of plaintiffs' "damages."

First, plaintiffs' theory necessarily *presumes* that plaintiffs relied upon the allegedly misleading marketing language and believed, at the time, that by purchasing TrueLink's credit monitoring product, they would receive, literally, "complete identity theft protection." By their own testimony, however, plaintiffs did *not* have that understanding or belief at the time they purchased the product, and therefore did not reasonably rely upon the language at issue. Instead, plaintiffs knew and understood that unless activity was being reported on Mr. Millett's Trans Union credit report, they would not be alerted to any activities of the so-called "identity thief." See Facts, ¶¶ 8-10.

Any doubt as to what TrueLink's product could and could not do when Mr. Millett first purchased it in August, 2003 was extinguished when TrueLink delivered the first of its monthly emails in September and October 2003.

[REDACTED]

TrueLink's emails further specified what the absence of the alerts meant. See Facts, ¶12. Both plaintiffs testified that they understood then that TrueLink was not advising of uses of Mr. Millett's SSN that occurred outside of his credit file, and Mr. Millett acknowledged that he was aware then of the limitation on the credit monitoring product. (Id.) Yet, the Milletts continued to purchase the product for more than three (3) years. See Facts, ¶13.

Second, plaintiffs' theory of restitution as a substitute measure of plaintiffs' actual loss would also have to be predicated upon a finding that the product, as delivered to plaintiffs, had no value whatsoever. This premise is belied by the fact that as of at least October, 2003 (within

two months of initially purchasing the product), plaintiffs knew that TrueLink's credit monitoring did not alert them to specifically known accounts that Perez had opened using Steven Millett's social security number (which plaintiffs had been unable to close), or any other information outside Mr. Millett's credit report.  S. Millett Dep., pp. 82-83, 147-48, 150-51 (acknowledging receipt of October 5, 2003 email from TrueLink establishing that TrueLink's credit monitoring product would not monitor information outside of Mr. Millett's credit report). Notwithstanding this fact, they ***continued buying*** the product for 3 years thereafter.  M. Millett Dep., pp. 85-86, 179-80, 316-18.   Again, the fact that plaintiffs continued to purchase the product, even knowing its limitations, is evidence undercutting the assertion that it had no value – clearly it had value to them.

More specifically, plaintiffs affirmatively recognized that the product has value, even putting aside its features related to detecting identity theft.  See M. Millett Dep., pp. 455-56 (noting value of the credit management aspects of credit monitoring);  id. at p. 83 (noting the convenience value of the product in viewing credit information online).  In a New York Times article dated December 12, 2006 (a copy of which is attached hereto as Exhibit J), Ms. Millett was quoted as saying: "I still have credit monitoring because of the simple fact that it is the best tool available at this time." See Eric Dash, *Protectors, Too, Gather Profits From ID Theft*, N.Y. Times, Dec. 12, 2006.  See also M. Millett Dep. at pp. 316-18 (acknowledging accuracy of her quote).

Plaintiffs cannot dispute that they received at least partial performance of their contract for credit monitoring services – which Ms. Millett characterized as valuable – nor can they dispute that what was delivered is not capable of being returned.  Accordingly, restitution of the amounts paid for the product is not a measure of plaintiffs' "damages."

Even if plaintiffs seek to recover the difference between the actual value of the credit monitoring as delivered to plaintiffs, and the value of the credit monitoring contract as allegedly represented in TrueLink's marketing of the product, they can point to no evidence in support of such a new claim. In response to pointed discovery requests, plaintiffs never disclosed or identified what they believed to be the product's true value. Plaintiffs have no evidence that the value of the credit monitoring product that they received is any less than the value that they paid for the product as represented. Moreover, for plaintiffs to prove such a new damages theory they would need expert testimony to establish the relative values of the credit monitoring product as promised and as delivered. They have no such evidence. Indeed, the fact that they continued to buy the product, with full knowledge of what was and was not delivered, suggests that there is no value differential. As a result, plaintiffs cannot establish themselves as "aggrieved consumers" who have suffered a loss as a result of the challenged representations, and their KCPA claims must fail.

**2.    The Representations Are Mere Puffing Which Do Not Support A KCPA Claim, And As A Matter Of Law, They Cannot Be Interpreted And Relied Upon As Plaintiffs Claim To Have Done.**

The Kansas Supreme Court has held that innocent "puffing" cannot serve as the basis for a KCPA claim. Baldwin v. Priem's Pride Motel, Inc., 580 P.2d 1326 (Kan. 1978). In Baldwin, the Kansas Supreme Court rejected a home buyer's KCPA claim, which was premised on the seller's statement that a house would be built in "first-class condition." 580 P.2d at 1327. Despite the buyer's testimony that he relied upon this statement, the appellate court affirmed the entry of summary judgment for the seller. "The statement as to 'first-class condition' is innocent 'puffing,' to be expected by a consumer." Id. at 1329.

TrueLink's advertisement that its credit monitoring product provided "complete identity theft protection" is so non-specific and broad that a consumer could not possibly rely on such

language as a contractual explanation of the product. Further, the Milletts completely ignore the context of the challenged phrase and other statements on the same webpage and elsewhere on the TrueCredit website. On the page produced by the Milletts and identified as the page viewed by Ms. Millett when she purchased the product, the phrase "complete identity theft protection" was clearly presented with reference to the weekly fraud-watch emails. Facts, ¶¶7-10 and Exhibit E. The webpage made clear that those weekly fraud-watch emails alert the customer only to "changes in your report." Id. (emphasis added). Therefore, the language "complete identity theft protection" constitutes mere puffing and the Milletts' interpretation of TrueLink's advertisement of its credit monitoring product is unreasonable. Even Melody Millett has recognized that it would be unreasonable for anyone to read the phrase "complete identity theft protection" as advertised to inform the purchaser of information outside the files of Trans Union. (M. Millett Dep. pp. 409-410). Steven Millett correctly believed that the product would monitor for changes "in [his] credit report." (S. Millett Dep., p. 119).

Perhaps most notably and as set forth above, another federal court has already rejected the Milletts' interpretation of nearly identical language advertising a nearly identical credit monitoring product. See Facts, ¶¶14-17. The Milletts propounded the same theory against TrueLink's competitors in the Experian Action, alleging claims nearly identical to those pending here. See id, and Exhibit A hereto. In that case, the Milletts culled a portion of Experian's advertising out of context and asserted statutory consumer fraud and breach of contract claims upon Experian's failure to provide what was literally promised.

On December 18, 2006, the Experian court granted in part defendants' motion for summary judgment on these claims, finding that Experian's credit monitoring product performed as promised, and that its marketing of the product did not mislead consumers. See Facts ¶¶16-

17; Ex. A. The district court found that Experian's credit monitoring product was intended to advise whether a purchaser's Experian credit report had changed in five specific ways commonly associated with identity theft. (Ex. A, at p. 4). The Court further found that "it is clear that there was no offer to search for information that would not appear on a purchaser's credit report," and held that the Milletts' views as to how the product should perform were "impractical and undesirable." (Id.) Based upon similar reasoning, the Court also dismissed the Milletts' California statutory deceptive marketing claims. Even though Experian's website (like TrueLink's website) stated that its credit monitoring product will "guard against fraud and identity theft," and will "provide peace of mind," the court rejected the literal interpretation urged by the Milletts, and held that "no reasonable person would read these statements and take them literally and absolutely." (Id. at p. 6).

> [Plaintiff] claims that a reasonable consumer would believe that the Credit Manager [Experian's credit monitoring] product provides "broad protection against identity theft," such that any information that would assist the purchaser in detecting incidents of identity theft would be relayed to them. **However, . . . a reasonable consumer would interpret the Credit Manager product as providing information relevant to detecting identity theft in the context of his or her Experian credit report. It is unreasonable to read the representations on the web pages leading to the purchase page and believe that Credit Manager somehow acts as an all-knowing private investigator, relaying any information relevant to identity theft to the purchaser.** The Millett Plaintiffs refer to statements promising that Credit Manager will "guard against fraud and identity theft," and that the product will provide "peace of mind." However, the web pages also promise "the best things in life." **No reasonable person would read these statements and take them literally and absolutely. It would be clear to any reasonable consumer that the product offers to convey information indicative of identity theft, but only if it appears in the purchaser's Experian credit report.**

Id. (emphasis added) (internal record citations omitted). On April 4, 2007, the Court denied the Milletts' motion for reconsideration.

Just as the Experian court granted summary judgment in favor of defendant Experian on the Milletts' CLRA and breach of contract claims, so too should this Court grant summary judgment in favor of TrueLink on the Milletts' KCPA and breach of contract claims here. The interpretation of a select portion of TrueLink's marketing language urged by plaintiffs here constitutes mere "puffing" at best and is simply not reasonable in the context of the TrueLink website.

### 3. Plaintiffs Have No Evidence that they Relied Upon the Marketing Language At Issue, Thereby Precluding the Necessary Causal Connection.

Even if it were reasonable to interpret the phrase "complete identity theft protection" literally, and without qualification, it is clear that plaintiffs did not interpret the subject language in that way at the time that they purchased credit monitoring in August, 2003. In fact, plaintiffs understood, prior to purchasing the product, that TrueLink's credit monitoring would not capture or alert them to activity unless it appeared in Mr. Millett's credit report. Because plaintiffs did not rely upon the allegedly deceptive marketing language in deciding to purchase credit monitoring, there can be no causal connection between the alleged KCPA violation and their claimed "damages."

To establish their claim under the KCPA, plaintiffs are required to prove that they justifiably relied upon the truth of the alleged misrepresentations. Finstad, supra, 845 P.2d at 691-92. Plaintiffs "must establish a causal connection between defendants' [allegedly deceptive or misleading] statements and her loss, i.e., she must show she relied on [the statements at issue] in purchasing [the product]." Benedict, supra, 241 F.R.D. at 678. See also Pound, 368 F. Supp. 2d at 1218 (reliance such that will establish the necessary causal connection is required under the KCPA); McLellan v. Raines, 140 P.3d 1034, 1045 (Kan. App. 2006) (granting defendant

summary judgment on KCPA claim where plaintiff contractually waive any right to rely on plaintiffs' representations).

Contrary to their pleadings, but according to their own testimony, plaintiffs did not believe at the time that Ms. Millett purchased credit monitoring on her husband's behalf that the product would provide them "complete protection against identity theft" in an unqualified and absolute sense. Instead, Ms. Millett knew and understood that the product would not alert her to potential identity theft activity unless that activity were reported to Trans Union. (M. Millett Dep., pp. 409-10). Therefore, she knew, *prior to purchasing the product,* that it would not provide "complete identity theft protection," and that the services TrueLink was providing were limited. Id. (further acknowledging that if potential identity theft activity were not reported to Trans Union, she did not expect to be notified of such activity, "and no reasonable person would").

Ms. Millett also acknowledged that it would not be reasonable to (and she did not) read TrueLink's marketing language literally and absolutely. Id. at p. 410. Instead, she agreed that "you have to read those types of things reasonably." Id. The court in Experian echoed the same principles when holding that the interpretation urged by Milletts there, which ignored other specific and explanatory descriptions of the product on the website, was unreasonable in the given context. Ex. A, D.I. 140 in Experian.

Thus, with her acknowledgement that she read TrueLink's marketing language "reasonably" and in the given context, it cannot be said that Ms. Millett relied upon the literal interpretation of "complete identity theft protection," as a stand-alone concept, that she urges now. Indeed, she acknowledges that the challenged phrase did not stand alone in the marketing of the product, but rather described the product as offering "complete identity theft protection

*with weekly fraud watch emails."* See Facts, ¶¶7-10; M. Millett Dep., p. 242 and Ex. E (emphasis added). She also acknowledges reading the more specific descriptions of the "weekly fraud watch emails" (the primary component of credit monitoring), which appeared on the same webpage. (M. Millett Dep. at pp. 238-242 and Exhibit E). The description of "weekly fraud watch emails" on that webpage made clear that customers of credit monitoring would receive alerts whenever there were "changes in *your* credit report." (Id. at pp. 241-42 and Exhibit E) (emphasis added). Reading these descriptions reasonably, it is clear that the product promised notification of potential identity theft only in the context of information available in the customer's credit report. See D.I. 140 in Experian at p. 6 (indicating that determination of whether a statement on a website is misleading requires reference to the context in which it was made and other information available on the website).[9]

With respect to Mr. Millett, the record indicates that he never read the content of TrueLink's website; therefore he cannot claim to have relied upon an understanding about what product features and descriptions were or were not represented. (See Facts, ¶4). In any event, Mr. Millett testified that his understanding in August, 2003 was that the credit monitoring product "would be checking to see if there was activity *on my credit report*." (S. Millett Dep., p. 119 (emphasis added)). Significantly, there is no evidence that TrueLink failed to notify the Milletts of a critical change in Mr. Millett's Trans Union credit report at any point during his subscription to credit monitoring.

---

9

[REDACTED]

27

Further evidence that plaintiffs did not rely upon the challenged phrase of marketing language in purchasing the product is the fact that they continued to purchase the product for several years after learning of its perceived limitations. It is undisputed that prior to purchasing credit monitoring, plaintiffs were able to identify several accounts that Mr. Perez had opened in his own name, but using Mr. Millett's social security number. (M. Millett Dep., pp. 121-24, 144-46, 149-50; S. Millett Dep., pp. 96-99, 112). While plaintiffs were able to have some of these accounts closed, they were unable to close them all. (M. Millett Dep., pp. 173-75, 261). Therefore, at the time they purchased credit monitoring from TrueLink in August, 2003, plaintiffs knew that there were several accounts that Mr. Perez had established using Steven Milletts' social security number, which remained open. Id.

With the failure of TrueLink's credit monitoring product to alert the Milletts to these remaining accounts opened by Perez, plaintiffs clearly knew, within the first months of their credit monitoring subscription, that the product was not able to capture information regarding use of Mr. Millett's social security number unless that information appeared in his credit report. (S. Millett Dep., pp. 147-48, 150-51). Both plaintiffs testified that they understood within tow months that TrueLink would not advise of uses of Mr. Millett's SSN that were not reflected in his credit file. See Facts, ¶13. Yet with this realization, plaintiffs *did not* complain to TrueLink about the manner in which the product functioned, or *ask* why the Perez accounts were not picked-up; *nor did they cancel* the subscription at that time. Id. Instead, they continued to renew and pay for the product for approximately three years thereafter. (M. Millett Dep., pp. 83-84, 179-80, 316-18). These facts belie any alleged reliance upon a literal reading of a select portion of puffing on TrueLink's website.

Because plaintiffs did not rely upon the literal truth of the challenged marketing language, and they were not misled by it, their KCPA claim must fail. "We do not interpret an aggrieved consumer to be one who is neither aware nor damaged by a violation of the Act." Finstad, 845 P.2d at 692 (affirming summary judgment against plaintiffs who neither relied on the false statement, nor suffered any injury or loss as a result of the statement). It is not enough that plaintiffs may believe the language to be misleading in a general sense, or that it may potentially mislead others. While "it is possible that other consumers were misled by defendants' allegedly deceptive acts, . . . this court does not believe that the KCPA was intended to be used as a forum by which a plaintiff may bring suit on behalf of all other potentially misled consumers when plaintiff himself, was not misled or injured as a consumer." Pound, 368 F. Supp. 2d at 1218. "[T]he KCPA does not apply when the deceptive or unconscionable act claimed has had no effect in encouraging the consumer to engage the services offered by the supplier." Dalager v. Dettbarn, 1989 Kan. App. LEXIS 668, at *12-13 (Kan. App. Sept. 22, 1989).

## C.    Partial Summary Judgment Should be Granted on Count II of the Fourth Amended Complaint for Breach of Contract in Favor of TrueLink.

The Milletts' breach of contract claim is based on TrueLink's alleged failure to provide "complete identity theft protection" to purchasers of TrueLink's credit monitoring product. (M. Millett Dep., pp. 242-43; S. Millett Dep., pp. 26, 50-51, 115). In particular, the Milletts claim that TrueLink agreed to not only monitor Mr. Millett's credit file, but also to monitor all information – even information in the credit file of an imposter – and to alert Mr. Millett to any inclusion in any credit file of Mr. Millett's SSN. (M. Millett Dep. pp. 95, 161-63, 165; S. Millett Dep. pp. 110-12; Response to First Interrogatories, pp. 9, 11, Resp. to Interrogatory Nos. 12 ("I know that the product was supposed to protect us from identity theft but it did not. For example,

Abundio Cuautle Perez is still using my information and you did not tell me") & 15 ("the product is not protecting me because Abundio Cuautle Perez is still using my information.")).

Specifically, the Milletts allege that TrueLink breached the contract by allegedly failing to provide the following "privileges and services" as described on TrueLink's TrueCredit website advertising its credit monitoring product:

    a.    Protecting Members against identity theft and fraud;
    b.    Allowing members to monitor their credit report with weekly fraud-watch emails;
    c.    Providing members with weekly email alerts of changes in their credit reports;
    d.    Allowing members to immediately find out about fraudulent activity; and
    e.    Allowing members to always be on top of what is happening with their credit.

(D.I. 76, ¶¶10, 16 (a)-(e)).  For purposes of this Motion for Summary Judgment, TrueLink does not contest the plaintiffs' contention that the contract at issue incorporates the "privileges and services" provided by TrueLink's credit monitoring product as advertised on its TrueCredit website.  (D.I. 76, ¶¶10, 16).  TrueLink moves for summary judgment on plaintiffs' claims that TrueLink breached its contract as described in subparagraph 16(a), (d) and (e), all of which relate to the primary claim that TrueLink failed to provide "complete identity theft protection" by failing to monitor the credit files of other individuals.  Although TrueLink is not moving for summary judgment on the claim that TrueLink failed to provide weekly e-mails (see ¶16(b), (c)) – alleging that TrueLink failed to allow members to "monitor their credit report with weekly fraud watch emails or to provide members with "weekly email alerts of changes in their credit reports" – it is notable that these allegations support TrueLink's position that TrueLink's credit monitoring product only monitored the purchaser's credit file.  (Id. at (b)-(c)) (emphasis added).

Under Delaware law, the elements of a claim for breach of contract are: (1) a contractual obligation; (2) breach of that obligation; and (3) resulting damages.  Interim Healthcare, Inc. v. Spherion Corp., 884 A.2d 513, 548 (Del. Super. Ct. 2005).  Here, the Milletts' claim for breach of contract cannot survive summary judgment.  Because the contractual terms at issue are

unambiguous, the interpretation of the terms is a matter of law appropriately resolved by the Court on summary judgment. Amadeus Global Travel Distrib. v. Orbitz LLC, 302 F. Supp. 2d 329, 333-34 (D. Del. 2004) (citing Rhone-Poulec Basic Chem. Co. v. Amer. Mot. Ins. Co., 616 A.2d 1192, 1195 (Del. 1992)); see also Atkinson v. Lafayette Coll., 460 F.3d 447, 452 (3d Cir. 2006) (finding that the "court can grant summary judgment on an issue of contract interpretation if the contractual language being interpreted 'is subject to only one reasonable interpretation.'"); Tamarind Resort Assoc. v. Gov. of Virgin Islands, 138 F.3d 107, 110 (3d Cir. 1998) ("it is a fundamental principle of contract law that 'disputes involving contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment.'") (internal citations omitted).

TrueLink hereby moves for partial summary judgment on Count II for several independent reasons. As an initial matter, Ms. Millett did not enter into a contract with TrueLink for the purchase of the credit monitoring product, Mr. Millett did. Therefore, Ms. Millett's claim for breach of contract must be dismissed. Separately, the claims of both plaintiffs fail as a matter of law for the following reasons: (1) as a matter of law, the contract cannot be interpreted as promising to monitor the credit files of individuals other than the purchaser of the credit monitoring product; (2) the Milletts' allegation that TrueLink breached its contract by failing to provide fraud resolution services fails as a matter of law; and (3) even if this Court cannot rule as a matter of law at this time that the contract did not require TrueLink to monitor the credit reports of others, and even if a breach is presumed, there is no evidence that the Milletts suffered resulting harm.

1.    **Melody Millett Never Entered Into a Contract on Her Own Behalf with TrueLink for the Purchase of TrueLink's Credit Monitoring Product.**

Regardless of the specific terms of the contract entered into by Steven Millett to purchase TrueLink's credit monitoring product, no contractual relationship existed between Ms. Millett and TrueLink because Ms. Millett purchased TrueLink's credit monitoring product as her husband's agent and on his behalf.    (S. Millett Dep., p. 107; M. Millett Dep., p. 75). Accordingly, TrueLink is entitled to judgment as a matter of law on Ms. Milletts' breach of contract claim.

Delaware law is clear that where a party enters into a contract as an agent for another, the party to the contract (and therefore the party with standing to sue for a breach of that contract) is the principal, not the agent. See Amer. Ins. v. Material Transit, Inc., 446 A.2d 1101, 1104 (Del. Super. Ct. 1982).  Further, "it is established law that an agent for a disclosed principal is not a party to a contract." See also Restatement (Third) of Agency, § 6.01 (2006) ("When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal: 1) the principal and the third party are the only parties to the contract; and 2) the agent is not a party to the contract unless the agent and the third party agree otherwise.").[10]  Here, because Ms. Millett identified her husband as the subscriber, he is a disclosed principal.  The fact that payment to TrueLink was made by the plaintiffs' joint checking account does not change this analysis.

There is absolutely no question that Ms. Millett was the self-proclaimed "agent" for her husband and that she admittedly never entered into any contract with TrueLink to purchase the

---

[10]  The Restatement notes that a principal is "disclosed" when the third party has notice that the agent is acting for a principal and has notice of the principal's true identity;  a principal is "undisclosed" if the third party has no notice that the agent is acting for a principal.  Restatement (Third) of Agency § 1.04 (2006).

credit monitoring product at issue in this action.  (See M. Millett Dep., pp. 195-96, 227, (noting that she has never purchased credit monitoring from TrueLink other than as an agent for his husband); S. Millett Dep. pp. 136-37; See also Ex. D, p. 2, Resp. to Interrogatory No. 4, p. 9, Resp. to Interrogatory No. 12).  In fact, Mr. Millett never even visited TrueLink's TrueCredit website.  When asked when he "visited the [TrueCredit] website, Mr. Millett stated, "[m]y wife, as my agent, visited the TransUnion [sic] website often . . . I understand that she visited the site on my behalf . . ."  (Response to First Interrogatories, p. 2, Resp. to Interrogatory No. 2) (emphasis added).  Because it is undisputed that Ms. Millett never entered into a contract with TrueLink to purchase the credit monitoring product on her own behalf, TrueLink is entitled to summary judgment on Count II for breach of contract against Ms. Millett as a matter of law.

> **2.    As a Matter of Law, the Contract Cannot be Interpreted as Promising to Monitor the Credit Files of Individuals Other Than the Purchaser of the Credit Monitoring Product.**

The Milletts' main contention is that TrueLink's credit monitoring product, as advertised, should have alerted them to Mr. Perez's alleged misuse of Mr. Millett's social security number, even if evidence of such misuse is not filed in Mr. Millett's credit file.  (S. Millett Dep., pp. 50-51; M. Millett Dep., p. 163).  The Milletts, however, cannot point to a single contractual provision or advertisement that suggests that TrueLink's credit monitoring product would monitor anything other than Mr. Millett's credit report, much less that it would provide the Milletts with information relating to others.[11]  As set forth above, TrueLink's advertisements of its credit monitoring product emphasize that the product monitors only "changes in your report." (M. Millett Dep., pp. 241-42).  Ms. Millett has affirmatively stated that it would be unreasonable

---

[11]  The Milletts' interpretation of the credit monitoring contract at issue in this action is also at odds with the Fair Credit Reporting Act, 15 U.S.C. §1681b(a), which prohibits Trans Union from disclosing another individual's credit information to the Milletts unless they had Mr. Perez's consent or some other "permissible purpose." (See Facts, ¶6).

for any consumer to believe that TrueLink's credit monitoring product would protect a subscriber from identity theft where, as here, the subscriber's social security number was used by an imposter on an employment application, but where the employer never contacted Trans Union. (M. Millett Dep., p. 410).

The Milletts' suggested reading of the contract, that the credit monitoring product promised "complete identity theft protection" under all circumstances and that it would monitor information outside of the purchaser's credit report – including the credit files of other individuals, is patently unreasonable. When interpreting terms of a contract on summary judgment, the first inquiry the Court must make is whether the contract is ambiguous. Sanford Inv. Co. v. Ahlstrom Machinery Holdings, Inc., 198 F.3d 415, 421 (3d Cir. 1999) (internal citations omitted). "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Rhone-Poulenc, 616 A.2d at 1196. Further, the contractual provisions in controversy are "not ambiguous simply because the parties disagree on its meaning." E.I. du Pont de Nemours & Co. v. Allstate Ins. Co., 693 A.2d 1059, 1061 (Del. 1997). Courts look primarily at the language of a contract to determine whether it is ambiguous and "will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty." Rhone-Poulenc, 616 A.2d at 1196; see Emmons v. Hartford Underwriters Ins. Co., 697 A.2d 742, 745 (Del. 1997). The court will make its final determination regarding contract ambiguity based on what an objectively reasonable person in the positions of the parties would have thought. Rhone, 616 A.2d at 1196 (emphasis added); See also MBIA Insurance Co. v. Royal Indemnity Co., 426 F.3d 204, 211 (3d Cir. 2005) (emphasis added).

Here, the plaintiffs improperly – and unreasonably – isolate the phrase "complete identity theft protection," a single phrase taken out of context, from a single page on TrueLink's website advertising its credit monitoring product and use this phrase as the principle basis for their claims. (M. Millett Dep., pp. 242-43; see also S. Millett Dep., pp. 51, 115). The Milletts, however, completely ignore other statements on the very same web page – indeed, statements in the very same sentence -- viewed by Ms. Millett when purchasing the product that explicitly state that the product monitors only the purchaser's credit report. (See M. Millett Dep., pp. 241-42). For example, the very same page viewed by Ms. Millett also includes the phrases "receive weekly e-mail alerts to changes in your report," and "immediately find out about credit report changes." (M. Millett Dep., pp. 241-42) (emphasis added). Taken together, the language advertising TrueLink's credit monitoring product specifically and unambiguously states that the credit monitoring product monitored only the credit report of the purchaser and not that of other individuals.

As set forth above, the Experian court found the Milletts' interpretation of nearly identical language advertising a nearly identical product unreasonable as well. TrueLink's position is in exact alignment with the Experian court's reasoning set forth in its Order granting in part summary judgment in favor of Experian and against the Milletts in the Experian Action. (See Section B(2), supra). In granting summary judgment, the Court found that, although the website stated that Experian's credit monitoring product would "guard against fraud and identity theft" and would provide "peace of mind," "it would be clear to any reasonable consumer that the product offers to convey information indicative of identity theft, but only if it appears in the purchaser's Experian credit report." (Ex. D, p. 6) (emphasis added).

Analogously, TrueLink's use of the phrases "receive weekly e-mail alerts to changes in your report," and "immediately find out about credit report changes" unambiguously inform the customer that TrueLink's credit monitoring product monitors only the credit report of the purchaser. This is the only reasonable interpretation of the contract. Therefore, as a matter of law, the contract did not promise complete protection from identity theft in a literal and unqualified sense. Therefore, the alleged failure to provide protection beyond the context of changes appearing in Mr. Milletts' credit report was not a breach of any provision of the contract.

3.    **The Milletts' Allegation that TrueLink Breached its Contract By Failing to Provide Fraud Resolution Services Fails as a Matter of Law.**

The Milletts also allege "upon information and belief" that TrueLink breached the contract because the Fraud Resolution Services – initially provided by a third party vendor, PromiseMark - to subscribers who requested such services were "no longer available to Named Plaintiffs for a substantial portion of the term of the contract," (Id. at ¶¶26-27), and that they "did not receive adequate notification of any modification made to the terms of the contract." (Id. at ¶28). The record, however, reflects that there is insufficient evidence to support a claim for breach of contract based on either of these alleged failed promises.

As an initial matter, the Milletts concede that they never sought the Fraud Resolution Services. (Id.; M. Millett Dep., 251:3-252:17; see also Response to First Interrogatories, p. 17, Resp. to Interrogatory No. 26 (when asked whether named plaintiffs ever requested Fraud Resolution services, Mr. Millett stated: "My wife has more information about this. . . It is my understanding that those services were promised in the contract.")). Moreover, the Milletts admittedly have absolutely no evidence - beyond mere speculation - to support the allegation that the services were unavailable. (M. Millett Dep., pp. 271-73). Further, it is undisputed that the

36

Milletts received an email on November 3, 2003, stating: "[p]reviously provided by PromiseMark, fraud resolution services are now provided by Trans Union's Fraud Victim's Assistant Department." (M. Millett Dep., pp. 268-69, 271-73). The simple fact that the Milletts received this email providing notification that TrueLink had changed its fraud resolution services provider belies their allegation that they "did not receive adequate notification of any modification made to the terms of the contract." (Id. at ¶28). Based on the foregoing, the Milletts claim for breach of contract based on their allegations relating to the fraud resolution services fails as a matter of law.

4.   **Even If This Court Cannot Rule As A Matter Of Law That The Contract Did Not Require TrueLink To Monitor The Credit Files Of Others, And Even If A Breach Is Presumed, There Is No Evidence That The Milletts Suffered Resulting Harm.**

The Milletts' breach of contract claim must fail as a matter of law for the separate and independent reason that the Milletts have suffered no resulting harm from the alleged breach of contract. See Kronenberg v. Katz, 872 A.2d 568 (Del. Ch. 2004) (granting summary judgment where non-movant failed to establish damages resulting from breach of contract); Great Lakes Chem Corp. v. Pharmacia Corp., 788 A.2d 544 (Del. Ch. 2001) (dismissing breach of contract claim where plaintiff failed to prove damages resulting from breach).

a.   It is undisputed that the Milletts knew Mr. Perez had misused Mr. Millett's social security number before they purchased TrueLink's credit monitoring product.

It is undisputed that, at the time Ms. Millett purchased TrueLink's credit monitoring product on her husband's behalf on August 6, 2003, the Milletts already knew that Mr. Perez had misused Steven Millett's social security number. (S. Millett Dep., pp. 15-16, 37). It is also undisputed that the Milletts do not "blame TrueLink for anything that occurred prior to August 2, 2003." (S. Millett Dep., pp. 112-13). Further, the Milletts have absolutely no definitive

evidence that Mr. Millett has been the victim of identity theft since August 6, 2003. (S. Millett Dep., pp. 37, 51, 113; M. Millett Dep., p. 171).

     b.    <u>It is undisputed that the Milletts knew as early as August, 2003 that TrueLink's credit monitoring product did not monitor information outside of the purchaser's credit report.</u>

Perhaps most importantly, the undisputed record evidence shows that the Milletts knew as early as August, 2003 that TrueLink's credit monitoring product would not "provide complete identity theft protection under all circumstances" where, as here, an imposter had used Mr. Millett's social security number on an employment application. (M. Millett Dep., pp. 409-10).

Any doubt as to what TrueLink's product could and could not do when Mr. Millett first purchased it in August, 2003 was extinguished when TrueLink delivered the first of its monthly emails in September and October 2003.

[REDACTED]

Both plaintiffs testified that they understood then that TrueLink was not advising of uses of Mr. Millett's SSN that occurred outside of his credit file, and Mr. Millett acknowledged that he was aware then of the limitation on the credit monitoring product. (<u>Id.</u>) Yet, the Milletts continued to purchase the product for more than three (3) years. <u>See</u> Facts, ¶13.

In fact, Ms. Millett stated in an interview with the New York Times newspaper that the Milletts "still have [TrueLink's TrueCredit] credit monitoring because of the simple fact that it is the best tool available a this time." (S. Millett Dep., p. 44; M. Millett Dep., p. 318).

The record evidence is clear. The Milletts continued to subscribe to TrueLink's credit monitoring product more than three years after they learned that it would not provide "complete identity theft protection under all circumstances." (M. Millett Dep., pp. 85-86). At a minimum,

the Milletts' continued subscription to TrueLink's credit monitoring product casts significant doubt on their contention that they believed that TrueLink's product would monitor information outside of Mr. Millett's credit report. The Milletts' suggestion that they are now entitled to economic damages in an amount equivalent to what they paid to TrueLink for the credit monitoring product (even for the three years after they acknowledge they understood the true nature of the product) is, at best, disingenuous. (See M. Millett Dep., pp. 85-86).

              c.      <u>The Milletts are not entitled to restitutionary damages.</u>

Here, the Milletts seek damages in the form of "restitution of the purchase price and interest" for their breach of contract claim. (Supp. Resp., Ex, I, Resp. to Interrogatory Nos. 7-10, 13; <u>see also</u> D.I. 129, Plaintiffs' Brief in Support of Motion for Class Certification, p. 32 "the measure of damages is the reimbursement of the purchase price of Credit Monitoring."). Under Delaware law, restitution is not a remedy for breach of contract unless the plaintiffs are willing to return all benefits they received under the contract. See <u>R.M. Williams Co.</u>, 1993 Del. Super. LEXIS 55, at *45 ("Plaintiff is not entitled to request restitution in this case as Plaintiff has retained the performance tendered by Defendants, and does not intend to return it.") (citing <u>Restatement (2d) of Contracts</u> § 373 cmt. a); <u>Restatement (2d) of Contracts</u> § 373 cmt. a ("[R]estitution is available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach."). Because the Milletts have already received TrueLink services that cannot be returned, restitution or a refund is not an appropriate remedy.

**D.**    **There is No Evidence in the Record that Would Entitle the Milletts to Punitive Damages.**

As an initial matter, punitive damages are not recoverable under the KCPA. See <u>K.S.A</u> <u>50-623 et seq</u>. Likewise, punitive damages are not recoverable under Delaware contact law. See

E.I. DuPont de Nemours v. Pressman, 679 A.2d 436, 445 (Del. 1996) ("no matter how reprehensible the breach, damages that are punitive in the sense of being in excess of those required to compensate the injured party for lost expectation, are not ordinarily awarded for breach of contract") It is well established that punitive damages are not a proper form of recovery for a breach of contract claim under Delaware law.

In the FAC, the Milletts allege that TrueLink "willfully and/or with malice" misrepresented its credit monitoring product. (D.I.. 76, ¶53). Even if this Court finds that there is a fact issue relating to the representations made by TrueLink on its TrueCredit website, there is not a shred of evidence presented by the Milletts that TrueLink "willfully" or "maliciously" misrepresented its credit monitoring product. In fact, as described in meticulous detail above, TrueLink's advertising stresses that its credit monitoring product monitors only the credit report of the purchaser and not that of any other individual. (See Facts, ¶¶ 7, 11, 12).

## CONCLUSION

As set forth above, the record evidence establishes that there are no genuine issues of material fact and that TrueLink is entitled to a judgment as a matter of law. For these reasons, TrueLink respectfully requests that this Court grant TrueLink's Motion for Partial Summary Judgment.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

By: _____
    William M. Lafferty (#2755)
    Jay N. Moffitt (#4742)
    1201 N. Market Street
    Wilmington, DE 19801
    (302) 658-9200

OF COUNSEL:
Michael O'Neil
Paula D. Friedman
DLA Piper US LLP
203 North LaSalle Street, Suite 1800
Chicago, Illinois 60601

E.I. DuPont de Nemours v. Pressman, 679 A.2d 436, 445 (Del. 1996) ("no matter how reprehensible the breach, damages that are punitive in the sense of being in excess of those required to compensate the injured party for lost expectation, are not ordinarily awarded for breach of contract") It is well established that punitive damages are not a proper form of recovery for a breach of contract claim under Delaware law.

In the FAC, the Milletts allege that TrueLink "willfully and/or with malice" misrepresented its credit monitoring product. (D.I.. 76, ¶53). Even if this Court finds that there is a fact issue relating to the representations made by TrueLink on its TrueCredit website, there is not a shred of evidence presented by the Milletts that TrueLink "willfully" or "maliciously" misrepresented its credit monitoring product. In fact, as described in meticulous detail above, TrueLink's advertising stresses that its credit monitoring product monitors only the credit report of the purchaser and not that of any other individual. (See Facts, ¶¶ 7, 11, 12).

## CONCLUSION

As set forth above, the record evidence establishes that there are no genuine issues of material fact and that TrueLink is entitled to a judgment as a matter of law. For these reasons, TrueLink respectfully requests that this Court grant TrueLink's Motion for Partial Summary Judgment.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

By:  /s/ William M. Lafferty
       William M. Lafferty (#2755)
       Jay N. Moffitt (#4742)
       1201 N. Market Street
       Wilmington, DE  19801
       (302) 658-9200

OF COUNSEL:
Michael O'Neil
Paula D. Friedman
DLA Piper US LLP
203 North LaSalle Street, Suite 1800
Chicago, Illinois 60601