# Exhibit B

1

1      IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3

4    STEVEN G. MILLETT,

5    MELODY, J. MILLETT,

6    On Behalf of themselves

7    And all others similarly situated,

8              Plaintiffs,

9    vs.                    No. 05-599-SLR

10   TRUELINK, INC.,

11   A Trans Union Company,

12             Defendant.

13

14

15              VOLUME I

16

17        DEPOSITION OF MELODY J. MILLETT, a

18   Plaintiff, taken on behalf of the Defendant

19   before Nissa M. Sharp, CSR, CCR #528, pursuant

20   to Notice on the 3rd of May, 2007, at the

21   offices of CLOON LAW FIRM, One Hallbrook Place,

22   11150 Overbrook Road, Suite 350, Leawood,

23   Kansas.

24

25                              COPY



Metropolitan
COURT REPORTERS

9800 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7011 • 913.317.8600 • FAX 913.317.8650

2

1                    APPEARANCES

2          Appearing for the Plaintiffs was MS. B.

3    JOYCE YEAGER of YEAGER LAW FIRM, LLC, City

4    Center Square, 26th Floor, 1100 Main Street,

5    Kansas City, Missouri 64105.

6          Also appearing for the Plaintiffs was

7    MR. BRYSON R. CLOON of CLOON LAW FIRM, One

8    Hallbrook Place, 11150 Overbrook Road, Suite

9    350, Leawood, Kansas 66211.

10          Appearing for the Defendant were

11    MR. MICHAEL O'NEIL and MS. HEATHER SCHUMAN of

12    DLA PIPER US, LLP, 203 North LaSalle Street,

13    Suite 1900, Chicago, Illinois 60601-1293.

14          Also present was Leda Gipson of MCR

15    VIDEO.

16                      INDEX

17    WITNESS:                            PAGE:

18      MELODY J. MILLETT

19        Examination by Mr. O'Neil              4

20

21

22

23

24

25

**Metropolitan**
COURT REPORTERS        9200 INDIAN CREEK PARKWAY, SUITE 205
                       OVERLAND PARK, KANSAS 66210
                       1.800.748.7511 • 913.317.8800 • FAX 913.317.8860

41

1    question is you don't know who Mr. Perez is.

2        Q.    Uh-huh.  So, as I think you mentioned

3    before, you know, your lawsuits involve a number

4    of things, one of them is dissatisfaction with

5    the defendants' products, you know, when it

6    comes to Experian, TrueLink, and Equifax, right?

7        A.    I'm sorry, can you please reread the

8    question?

9        Q.    I'll withdraw it.  You mention identity

10   theft, do you remember?

11       A.    Yes.

12       Q.    Okay.  And that's kind of what prompted

13   your investigation, your purchase of products

14   and then the lawsuits, right?

15       A.    Well, we had identity theft, yes.

16       Q.    And to be more specific, what you were

17   referring to there is that somebody apparently

18   named "Mr. Perez" was using your husband's

19   Social Security number, right?

20       A.    Yes.

21       Q.    Okay.  Have you ever been a victim of

22   identity theft?

23       A.    I have been a victim of data breaches,

24   but I don't necessarily know that my particular

25   identity has been stolen.  But, you know, given



75

1    lead in investigating the misuse of your

2    husband's Social Security number?

3        A.    Yes.

4        Q.    Okay.   Is it fair to say that you took

5    the lead in ordering file disclosures from the

6    credit bureaus for your husband?

7        A.    Yes.   As his agent, I ordered those

8    file disclosures.

9        Q.    And were you his agent for disputing

10   information with the bureaus regarding his

11   credit file?

12       A.    Yes, myself and Mr. Adler, and of

13   course his other legal counsel.

14       Q.    And were you also his agent for

15   ordering products from TrueLink and Equifax and

16   Experian, right?

17       A.    Yes.

18       Q.    And you were also his agent in

19   answering the interrogatories that were directed

20   at him, right?

21       A.    Yes.

22       Q.    And that's because -- isn't that

23   because -- is one reason for that is because you

24   thought you knew the information better than

25   your husband?



81

1    agreement that you get for every single piece of

2    software you ever install from top to bottom?

3        Q.    I don't generally answer questions in a

4    deposition, but I'll tell you no.    I don't.    But

5    you know what, if I'm going to sue somebody on a

6    class-wide basis for it, yeah, I'm going to read

7    it.

8            MS. YEAGER:    I'm going to object

9    to the --

10       Q.    (BY MR. O'NEIL) Are you seeking any

11   money for you and your husband as part of this

12   settlement?

13       A.    Well, I believe there would be

14   statutory relief under the Kansas Consumer

15   Protect Act, and I believe there would be the

16   matter of the contract breach and the fees paid

17   on behalf for the product that is the subject of

18   the breach.

19       Q.    So, you want the money back that you

20   paid for the products that you're not satisfied

21   with; is that right?

22       A.    Yes.

23       Q.    Do you want all the money back?

24       A.    Well, yeah.    For the class, yes, of

25   course.



**Metropolitan**
COURT REPORTERS

9800 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

82

1          Q.    Well, right now I'm just asking about

2    you, we'll get to the class.  Do you know how

3    much money you've paid TrueLink over the years?

4          A.    I'm sure it's in one of those documents

5    somewhere that I've seen.

6          Q.    I haven't seen it, but.

7          A.    I believe it was in your production,

8    it's the order management screen that's got all

9    the transactions on there.

10         Q.    And do you want all -- do you want the

11   court to order that TrueLink must deliver all

12   that money back to you?

13         A.    Well, I believe I've heard the legal

14   term referred to as "disengorgement," is that

15   how that works?  When you make false claims and

16   entice people to buy something under false

17   pretenses, that you don't have the right to keep

18   the money that you've made as a result of those

19   false assertions, is that how that works?  I

20   think.

21         Q.    Is it your understanding that you

22   brought a claim for disgorgment against

23   TrueLink?

24         A.    It's my understanding that the class

25   will get some kind of relief for the products



83

1    that they purchased that did not work.  Now, how

2    much relief that is or is not is a determination

3    for the court to make or as a result of any

4    class action settlement, should there be one.

5        Q.    Well, you would agree that there's some

6    value to the products that you've purchased from

7    TrueLink, right?

8        A.    Well, I mean, the value that exists for

9    the product only exists in the fact that you're

10   viewing your consumer disclosure online.  That,

11   you know, there's a convenience value in that

12   aspect of it.  But it does not perform as it's

13   advertised to perform in the fact that it does

14   not provide complete protection from identify

15   theft.  It doesn't even provide basic protection

16   from identity theft.

17       Q.    Have you canceled the subscription that

18   Mr. Millett has with TrueLink for credit

19   monitoring?

20       A.    I believe so.  It's been canceled now.

21       Q.    Okay.  And when did you cancel it?

22       A.    I believe it was allowed to expire and

23   lapse, and the credit card that's in there was

24   expired and so you -- they have not been able to

25   place a new charge.  So, I believe it lapsed in



84

1    and of its own accord.  It's not like I called

2    somebody to cancel it.

3         Q.   So, when did that occur?

4         A.   I think the last charge was in November

5    of 2006 and there hasn't been one since.

6         Q.   Why didn't you make effort to give a

7    new credit card so you can continue the credit

8    monitoring service?

9         A.   Because there's no purpose in it.

10        Q.   When did you come to the conclusion

11   that there was no purpose in purchasing the

12   credit monitoring service from TrueLink?

13        A.   Well, I mean, it's been some time over

14   the course of the litigation.  But, I mean, now

15   that I know that it really doesn't even cover

16   for anything, then there was just no point in

17   it, so I've discontinued it.

18        Q.   And when did you learn that?

19        A.   Like I said, that's been a evolving

20   process as new evidence has arised in this case

21   as we've gone along.  But, I mean, there have

22   been little things.  But, I mean, getting the

23   information, for example, that the -- that the

24   -- I'm drawing a blank here for a moment -- that

25   the Home Depot account had been relabeled and



85

1    that that information was still not presenting

2    in the product. The fact that we had had false

3    alert triggers on and off throughout 2005, I

4    believe was the year that those were occurring

5    in. That it serves no purpose, so I just

6    discontinued it.

7        Q. Prior to November of 2006, you

8    discontinued it?

9        A. No. I didn't renew -- the last charge

10    was in November of 2006, and I've not placed a

11    new credit card in there.

12        Q. Was November 2006 when you came to the

13    conclusion that there was no purpose for

14    purchasing the credit monitoring service?

15        A. No. It was when I made the conscious

16    decision to go in there and end it. TrueLink's

17    monitoring service is a negative opt-in. You

18    must specifically opt out or the subscription

19    continues automatically through no interference

20    or whatever of your own.

21        Q. Did you ever cancel it affirmatively?

22        A. What do you mean affirmatively?

23        Q. Meaning what you just said, that you

24    called TrueLink and said cancel it?

25        A. I already answered that, and I said no.



**Metropolitan**
COURT REPORTERS    3200 INDIAN CREEK PARKWAY, SUITE 206
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8300 • FAX 913.317.8350

86

1    I allowed the subscription to lapse by not

2    giving them a new credit card number with the

3    correct expiration date.

4        Q.    Because you told the "New York Times"

5    reporter that there was some value to credit

6    monitoring, right?

7        A.    I told the "New York Times" reporter

8    that it was the best tool available, but it was

9    not as advertised.

10       Q.    Right.  And that you had continued to

11   purchase the product, right?

12       A.    Well, you still have to be able to look

13   at your credit report, sir.

14       Q.    Okay.  So, when you had the

15   conversation with the reporter for the "New York

16   Times", you still thought that there was value

17   in the credit monitoring service, right?

18       A.    Not the monitoring service.  There is

19   value in having access to your credit report on

20   an ongoing basis, especially when you already

21   know you're a victim of identity theft.

22   However, it is not complete identity theft

23   protection as is advertised.

24       Q.    Is that what TrueLink advertises?

25       A.    I believe that's what was on their



**PAGE 95 REDACTED**

99

1        Q.    You didn't send it, right?

2        A.    No, I did not.

3        Q.    Okay.  And you never called TrueLink

4    and said I was expecting to see accounts

5    relating to Mr. Perez on my husband's credit

6    file and I didn't see it?  You never made that

7    call to TrueLink, did you?

8        A.    No, I didn't.

9        Q.    Did you -- strike that.

10             I'm going to show you an exhibit,

11    Mrs. Millett.

12                  (M. Millett Exhibit 9 was marked

13    for identification by the reporter.)

14        Q.    (BY MR. O'NEIL) Mrs. Millett, I'm

15    showing you what's been marked Exhibit No. 9,

16    which I -- which I'll represent to you is the

17    complaint that was filed in the district -- in

18    the federal court in the District of Kansas on

19    behalf of you and your husband suing the seven

20    companies that you identified previously.

21        A.    Yes.

22        Q.    And you saw this before it was filed,

23    right?

24        A.    Oh, yes.

25        Q.    And you made sure that it was accurate,



**Metropolitan**
COURT REPORTERS    3200 INDIAN CREEK PARKWAY, SUITE 206
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

121

1    husband from each of the three major credit

2    bureaus, do you recall that?

3        A.    Yeah.  I also requested Abundio Perez's

4    credit report too.

5        Q.    Yeah, and you didn't get that, did you?

6        A.    No, I did not.

7        Q.    But you did get some information from

8    TransUnion that was helpful in your

9    investigation of Mr. Perez's misuse of your

10   husband's Social Security number, right?

11              MS. YEAGER:  Objection.

12   Foundation.

13       A.    I don't recall providing somebody a

14   list of accounts that tells you that you need to

15   dispute with each furnisher exactly helpful.

16       Q.    (BY MR. O'NEIL) Okay.  So, you didn't

17   get any helpful information from TransUnion?  Is

18   that your testimony?

19       A.    No, that's not the testimony.  I got

20   information from TransUnion.  The information

21   was not helpful because the information did not

22   contain the account numbers for the accounts in

23   question, which meant every time I called one

24   of those furnishers, I had to go through three

25   days of agony, pain and whatever just to try to



122

1    get to the bottom of what accounts he actually

2    had for those furnishers. And, in some cases,

3    those furnishers had five, six, seven, eight or

4    nine different accounts associated with them,

5    and it would have been helpful to know that

6    information.

7         Q.   What -- how did you get the information

8    regarding what furnishers to contact?

9         A.   I got that information from the TU

10   letter. But that required the retainer --

11   retention of a lawyer and $1,750 worth of legal

12   fees to get that letter.

13        Q.   Well, how do you know that?

14        A.   What?

15        Q.   How do you know that you had to get a

16   lawyer before you could get the information from

17   TransUnion?

18        A.   Because TU didn't give me that letter

19   in January when I called. They didn't give that

20   -- give me that letter until Adler sent them a

21   letter intending to sue in April of 2003

22   certified mail.

23        Q.   So, if you testified elsewhere that the

24   information from TransUnion was helpful, would

25   that have been false testimony?



123

1    A.   No.

2    Q.   Oh, okay.

3    A.   The information was somewhat helpful,

4  but, you know, I don't -- you're trying to

5  characterize it as, you know, TransUnion is

6  being altruistically helpful, and they're just

7  giving this information to me of their own free

8  will, and I don't see it that way.

9    Q.   I don't think that's what I asked you,

10  but. Let me make sure I understand. The

11  information was helpful in investigating

12  Mr. Perez's misuse of your Social Security

13  number; isn't that correct?

14    A.   Yes, the information was somewhat

15  helpful, yes.

16    Q.   And TransUnion didn't charge you

17  anything for that information; isn't that

18  correct?

19    A.   TransUnion didn't charge me anything

20  for the information?

21    Q.   Right.

22    A.   No, TransUnion did not charge me

23  anything to send that letter, but it cost me

24  money.

25    Q.   The letter cost you money?


Metropolitan
COURT REPORTERS
9200 INDIAN CREEK PARKWAY, SUITE 208
OVERLAND PARK, KANSAS 66210
1-800-748-7611 • 913.317.8800 • FAX 913.317.8860

124

1      A.    Sure it did.  I didn't get any

2  information from them until I hired a lawyer who

3  threatened to sue them.

4      Q.    And was this threat in writing?

5      A.    I believe Adler sent letters saying

6  that he was going to be seeking legal action if

7  they did not respond and provide the

8  information, so at that point the letter was

9  provided.

10     Q.    And TransUnion provided the information

11 that Experian and Equifax refused to provide,

12 right?

13     A.    I had not gotten a similar letter from

14 Equifax or Experian at that point, no.

15     Q.    Well, you've testified before that when

16 Mr. Adler made the same request of Experian and

17 Equifax, that they refused, right?

18     A.    They did not provide the information,

19 yes.

20     Q.    Okay.  And that testimony was accurate

21 when you testified previously, correct?

22     A.    Yeah.

23     Q.    Okay.

24     A.    Uh-huh.

25     Q.    Let me show you what's been marked



**PAGE 131 REDACTED**

**PAGE 132 REDACTED**

133

1       A.   I don't know.  I haven't looked the at

2   it in probably ten years, so I don't even know

3   if it's still on there or not.  It's been quite

4   a while.

5       Q.  I'm not asking if it's on there.  I'm

6   asking what was the statement that you asked

7   that TransUnion put on your file?

8       A.   It's very similar in nature to this,

9   but I don't know the exact wording because I

10   haven't looked at it in ten years.

11       Q.   I won't ask you for the exact wording.

12   But what -- so you claim to be a victim of

13   identity theft ten years ago?

14       A.   No.  It was not identity theft.  I was

15   having problems with an ex-husband.

16       Q.   Okay, well, you said it's the same as

17   this, and this says, quote, "My identifying

18   information may have been stolen."  That's not

19   what your statement says?

20       A.   It's a consumer statement, so it's the

21   same as this.

22       Q.   Okay.

23       A.   It's in the same box on the credit

24   report.

25       Q.   The consumer statement has a phone



**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

143

1    split. Fraud alerts do not work," where did you

2    get that information? Or where did you get the

3    information that lead you to that conclusion?

4          A.    That was much later.

5          Q.    Okay. And that was -- what information

6    did you get that lead you to that conclusion?

7          A.    Like I said, you know, in dealing with

8    the investigation and talking to the different

9    furnishers over time, some of the furnishers in

10   question Steve Millett already had a fraud alert

11   on file and they were still receiving

12   information from the credit bureaus obviously on

13   Abundio Perez on active accounts, and they still

14   has not received Mr. Millett's fraud alert.

15         Q.    I understand now. So, turning to the

16   second document, after you got this information

17   from TransUnion, you started contacting each of

18   the data furnishers that TransUnion identified

19   for you, right?

20         A.    Right.

21         Q.    And it was during the course of those

22   phone calls that you learned the information

23   that lead you to believe that files are split,

24   fraud alerts do not work?

25         A.    Right.

**Metropolitan**
COURT REPORTERS    9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7611 • 913.317.6800 • FAX 913.317.8850

144

1      Q.   Okay.

2      A.   Because I talked to -- for example,

3   we'll just take for an example on here, Chase,

4   NA.  This guy, Chase, Chase Mortgage, and --

5   Chase, NA, Chase Mortgage and then there's

6   another Chase, Chase had three accounts, a

7   mortgage, a car payment and a credit card.  Neal

8   had a three-in-one credit report for Abundio

9   Perez.

10     Q.   Neal?

11     A.   That's the guy I talked to.

12     Q.   Okay.

13     A.   And he had three-in-one credit report

14  for Abundio Perez, and he specifically told me

15  that your fraud alert does not appear anywhere

16  on there.

17     Q.   And when did you start making these

18  phone calls to all the data furnishers listed on

19  the April 23 letter?

20     A.   Would have been some time on or after

21  maybe April 26 or so, because the mail three

22  days, you know, bring it home, lay it on the

23  counter for a day and then you go open it up and

24  go -- because I thought it was another credit

25  report and, you know, you get nine, 10 credit



145

1    reports in the mail, they were piling up or

2    whatever. I work on them when I can.

3         Q.    But then after you finally opened them

4    up, that's when you started making all these

5    phone calls, right?

6         A.    Well, first, I looked at this and I

7    didn't know what to do, and the first phone call

8    I made was to the Foleys at the Identity Theft

9    Resource Center.

10        Q.    Okay. And do you recall anything about

11   that conversation?

12        A.    I mean, it was just a general

13   conversation. I was freaked out. Linda and Jay

14   are particularly good at calming down. They

15   provide, you know, victims assistance,

16   counseling, support, that kind of thing.

17        Q.    Who are Linda and Jay?

18        A.    Linda and Jay Foley? At the Identity

19   Theft Resource Center.

20        Q.    Oh, okay.

21        A.    Yeah.

22        Q.    I don't know them. But soon after

23   April 2003, when you first started making these

24   calls at the end of April 2003, you determined

25   that there was separate files for your husband

146

1   and for Mr. Perez, right?

2       A.   Well, that was the assumption.  I

3   didn't have concrete proof of that.

4       Q.   Understood.

5       A.   Yeah.  Because obviously none of this

6   information had ever been on our file or we

7   would have called somebody and disputed it.

8       Q.   Right.  And some of the data furnishers

9   are saying, well, we got credit reports from

10  Mr. Perez and there's no fraud alert there,

11  right?

12      A.   Well, not only that, but they couldn't

13  understand how they had gotten the credit report

14  for Mr. Perez when Mr. Millett had a police

15  report and a Social Security card with the

16  actual number that was being used.

17      Q.   Now, by my count, there's 28 different

18  furnishers identified on the April 23rd letter?

19      A.   Yep.

20      Q.   And you got even more information about

21  the particular accounts that each furnisher had

22  with Mr. Perez, right?

23      A.   That's correct.

24      Q.   Okay.  To your knowledge, had any of

25  those accounts showed up on your husband's



147

1    credit file?

2        A.    The accounts themselves?

3        Q.    Yes.

4        A.    Not on the consumer disclosure, but I

5    don't know that they're not hidden in the master

6    file.

7        Q.    Okay.  Aside from your suspicion that

8    there is something being hidden by TransUnion,

9    you don't have any evidence that these accounts

10   were actually on Mr. Millett's file, correct?

11                MS. YEAGER:   Objection.

12   Foundation.

13       A.    I don't know.  I think inquiries count

14   as being on someone's file.  So, I mean, to the

15   extent that inquiries are also disputable

16   information, I mean, if you want to be

17   technical, no trade lines have ever appeared.

18       Q.    (BY MR. O'NEIL)  Okay.  What was your

19   husband's reaction -- your husband never dealt

20   with the bureaus, right, directly?

21       A.    Well, at that point in time, my husband

22   was too -- too angry to properly deal with

23   anybody.

24       Q.    Oh, that's why you assumed the

25   responsibility?



**Metropolitan**
COURT REPORTERS    9800 INDIAN CREEK PARKWAY, SUITE 208
OVERLAND PARK, KANSAS 66210
1.800.746.7811 • 913.317.8800 • FAX 913.317.8850

149

1    Steve assumes a subservient role.  I mean, he

2    and I are partners in everything.  I mean, to

3    me, the term "pants in the family" means like

4    I'm in charge and he does what I say, and that's

5    not how it is.  We do a lot of things together.

6    Each of us have their own specialties and things

7    that we're good at, and those that are good, do,

8    and those that are good at other things, do

9    other things.

10        Q.    (BY MR. O'NEIL) So, do you recall

11   explaining to your husband what you had learned

12   after you got this information from the credit

13   bureaus and the furnishers?  Did you explain to

14   him at that time, I'm guessing this is in May of

15   2003, that Mr. Perez has opened up numerous

16   accounts using his Social Security number?

17        A.    Well, I believe we had the discussion

18   in April when we first got the letter before I

19   even started calling, but by May and possibly

20   the beginning of June, we were aware that each

21   one of these furnishers in some cases had as

22   many as five, six, seven, eight accounts.

23        Q.    Uh-huh.

24        A.    So, I mean, you know, it's not 28

25   accounts, it's 26 credit cards, 11 automobile



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 203
OVERLAND PARK, KANSAS 66210
1-800-745-7511 • 913.317.8800 • FAX 913.317.8850

**PAGE 150 REDACTED**

**PAGE 156 REDACTED**

161

1      A.    That's correct, yes.

2      Q.    Okay.  And then you've got other claims

3  that say and then after I discovered this

4  identity theft, I bought credit monitoring

5  products and they didn't work, right?

6      A.    Correct.

7      Q.    The only claims you have left against

8  TrueLink are those latter claims that the

9  product didn't work, right?

10     A.    That is correct.  But to the extent

11 that the product sits on top of the data, the

12 fact that the bureau is or is not providing you

13 all of the data or whether or not it's providing

14 to you and you're not providing it to me, I

15 think that's relevant to TrueLink's claims.

16     Q.    What data has TrueLink not provided to

17 you that you believe they should have provided

18 to you?

19     A.    Public record judgements were filed

20 with my husband's Social Security number in 2004

21 while we were subscribed to the product that

22 were not notified in the product.  In addition

23 to that, there were credit accounts belonging to

24 Abundio Perez over 2004 and 2005, most notably

25 which would be the Home Depot account and J. C.



162

1 Penney's account, and then later the CB USA,

2 Citibank USA account that were relabeled to

3 Steve Millett's name and address and/or

4 variations thereof that were never alerted in

5 the product.

6  According to your own documents which

7 you've supplied, the actual credit monitoring

8 subscription itself as registered with TU was

9 allowed to fall off and lapse for well over

10 three months before it was finally restored and

11 put back on while you were charging us.

12  And in the meantime, the product

13 proceeded to produce blank alerts which would

14 tell you you have an alert, something's changed

15 in your file.  You would go into the product,

16 click on the web link, the alert would come up

17 and be a completely blank white box with nothing

18 in it.  And I had just used my quarterly credit

19 report from the product, because the product

20 only gives you one report quarterly, and I would

21 be forced to buy a new report thinking it was

22 going to show me some change, and then there was

23 nothing.  It matched the report I had just

24 opened two weeks ago from my quarterly allowance

25 and I had just -- now I'm out 9.95.



163

1      Q.   Any other complaints that you have

2    against the TrueLink product?

3      A.   I'm sorry, I'm thinking.

4      Q.   Take your time.

5      A.   Yeah, my other complaint on the

6    TrueLink product would be that the product is

7    being marketed now for bulk purchase for

8    companies that are now purchasing it to give to

9    their data breach victims.

10      Q.   Are there any other complaints, other

11    than what you just described, that you have

12    regarding the credit monitoring service that you

13    bought on behalf of your husband from TrueLink?

14      A.   Well, the lack of notification e-mails,

15    they could have provided an alert at any time

16    that said, hey, someone's using your Social

17    Security number.  They don't have to give me

18    Abundio's file, but they could have said, hey,

19    your Social Security number appears in six other

20    people's credit reports.  I think that to me

21    would be a big indicator that you had a problem.

22    And it wouldn't violate anybody's privacy.

23      Q.   Anything else?

24      A.   Notification as to the inquiries.  When

25    soft inquiries are generated, because a lot of



**Metropolitan**
COURT REPORTERS   9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.745.7611 • 913.317.8500 • FAX 913.317.8550

155

1   policies?  It's on Page 2 of 3 at the top where

2   it says "Farmers".

3        Q.    So, what you're saying then is you

4   think TrueLink should have told you what

5   identifying information was used by the

6   inquirer --

7        A.    To generate this inquiry.

8        Q.    Okay.  Is this just something you wish

9   they would do or is that something you actually

10  believed that you would get as part of this

11  service?

12       A.    Well, I would think that if inquiries

13  were being generated as a result of the Abundio

14  Perez's information, like the Citibank inquiry

15  la was that that information would be disclosed

16  to me.  Because it would be an indicator of

17  identity fraud, and they're promising complete

18  identity theft protection.  So, I mean, the

19  Citibank USA inquiry that appears on the

20  TransUnion credit reports from later on in 2004

21  I believe and 2005 that particular inquiry was

22  generated -- my husband doesn't have an account

23  with Citibank and never did.  It was generated

24  as a result of this account that's listed here

25  on this portion of the TransUnion letter from

Metropolitan
COURT REPORTERS   9300 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1-800-748-7511 • 913.317.8800 • FAX 913.317.8860

171

1              VIDEOGRAPHER:  It is now

2      1:43 p.m. and we are back on the record.  You

3      may continue.

4          Q.   (BY MR. O'NEIL)  Thank you.  Good

5      afternoon, Mrs. Millett.

6          A.   Good afternoon.

7          Q.   Do you understand that you're still

8      under oath?

9          A.   Yes.

10         Q.   Are you aware of any instances after

11     August 6th of 2003 in which Mr. Perez used your

12     husband's Social Security number to open up a

13     new account?

14         A.   I believe that there are possible

15     instances of that, yes.  But I have no

16     definitive proof let's just say.

17         Q.   Do you have any proof?

18         A.   Well, his house on Pico Street was

19     refinanced in like the spring of 2005 or four, I

20     believe, I can't remember which year exactly it

21     is.  And I don't know if that information is

22     currently being reported under Steve Millett's

23     Social Security number or not.  I know the

24     number is attached to the file, but I'm not sure

25     if it was used in the initial credit granting

**Metropolitan**
COURT REPORTERS   9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8880

172

1    process.  Or that his wife was not the one that

2    was using the number.  So, I mean, that's what

3    the issue is there.

4        Q.    Any other possible openings of accounts

5    by Mr. Perez using your husband's Social

6    Security number that you're aware of?

7        A.    Judgements that were reported in the

8    Ford Motor case when Ford Motor obtained a legal

9    judgement using Steve Millett's Social Security

10   number, I believe that one was in 2004 as well.

11   That's when they start calling to collect the

12   judgement.

13       Q.    Ford Motor had a judgement entered

14   against Mr. Perez?

15       A.    Yes.

16       Q.    How did you learn that?

17       A.    There were two ways I learned about

18   that.  One was through LexisNexis public records

19   search, and the other one was via phone calls

20   that were made by Ford Motor Credit to the house

21   about Mr. Perez's debt that was outstanding.

22       Q.    Do you know why -- was Mr. Perez not

23   paying his bills to Ford Motor?  Is that what

24   prompted the judgement, do you know?

25       A.    What prompted the judgement was the



173

1    cars were repossessed, and the sell-off of the

2    cars did not satisfy the note deficiencies.

3         Q.    Okay.  And the cars were repossessed

4    because you alerted Ford Motor to the fact that

5    Mr. Perez had submitted a fraudulent

6    application, right?

7         A.    No, because when I initially alerted

8    Ford Motor, they took no action.

9         Q.    Do you have an understanding as to why

10   Ford Motor repossessed the cars?

11        A.    Yes, because I sent an e-mail to the

12   CEO.

13        Q.    So you prompted the repossession of the

14   automobiles?

15        A.    Yes.

16        Q.    Okay.  And you also succeeded in having

17   many of Mr. Perez's credit grantors close his

18   accounts, right?

19        A.    That would be a true statement.

20        Q.    Okay.  How many accounts do you think

21   you managed to have closed?

22        A.    Well, I know I was successful in a

23   majority of cases.  It's probably easier to talk

24   about the exceptions than it is to talk about

25   the ones that were actually closed, because, I



174

1      mean, to sit there and try and rattle off I

2      closed this one or I closed this one, it's

3      not --

4          Q.    That's fine.  But your understanding is

5      that you succeeded in having most of the

6      accounts that you learned about through

7      TransUnion's April 2003 letter that they be

8      closed?

9          A.    Some of the accounts were already

10     inactivated.  What I succeeded in doing is

11     marking them so they could not be reactivated.

12     But then there were some accounts that were not

13     closed.  And even though the furnishers in

14     question said that they had been closed, they

15     did not close them.  And then there were of

16     course some accounts that I did close.

17              I don't know if I'd characterize it as

18     "most" simply because there's a mixture in there

19     of different account statuses.

20         Q.    So, let me ask you about how you've

21     been able to remedy the misuse of your husband's

22     Social Security number.  Or maybe put another

23     way how you were able to limit Mr. Perez's

24     ability to benefit from the misuse of your

25     husband's Social Security number.  You prompted

175

1    Ford Motor to repossess his two cars, right?

2        A.   It took six months, but yes.

3        Q.   Okay.  You were able to have some of

4    his accounts closed, right?

5        A.   Yes.

6        Q.   Are you aware of any other consequences

7    to Mr. Perez resulting from your investigation

8    of what he had done?

9        A.   Yes.  He was convicted by the

10   Department of Motor Vehicles of lying to the

11   California DMV.

12        Q.   Do you know what kind of penalty he got

13   as a result of that conviction?

14        A.   I have no idea.  I know that it

15   originally went up there were like three charges

16   that were made, I think that was the only one

17   that was eventually followed through on.  I

18   think they were either dropped or reduced or he

19   pled guilty or however that works.

20        Q.   And have you seen any court records or

21   police records that indicate the criminal

22   charges being filed against him?

23        A.   I think the record that we received was

24   like just a partial record of what that

25   information contained, like there were three


**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.5900 • FAX 913.317.5950

1          Q.   On behalf of your husband, you

2    purchased certain products from TrueLink in

3    August of 2003, right?

4          A.   Yes, sir.

5          Q.   Okay.  And have you always been the one

6    to access the e-mails and the website of

7    TrueLink on behalf of your husband?

8          A.   Pretty much, yeah, uh-huh.

9          Q.   Okay.  I mean, to your knowledge, your

10   husband never accessed the website, right?

11         A.   Not where he went like by himself and

12   logged in, no.

13         Q.   Okay.  And you testified I believe

14   earlier today that you let the subscription to

15   credit monitoring lapse in November of 2006

16   because -- when the credit card was no longer

17   active, right?

18         A.   Correct.

19         Q.   Okay.

20         A.   But the subscription probably would

21   have continued on for like three months, because

22   I think they renew it quarterly.  So, you know,

23   that was the last payment that was made.  So

24   whatever it is, three months or the quarter is

25   after that date is probably when it expired,



**Metropolitan**
COURT REPORTERS   9800 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66810
1.800.748.7511 • 913.317.6800 • FAX 913.317.6890

180

1    which January, maybe February of '07, I don't

2    know.

3        Q.    Okay.  Did you continue to get e-mails

4    from TrueLink until January or February 2007?

5        A.    I got an e-mail from TrueLink yesterday

6    advertising for me to come back and resubscribe

7    to the product.

8        Q.    Did you continue to get e-mails, credit

9    monitoring alert e-mails, from TrueLink until

10   January or February this year?

11       A.    Well, they only give you -- send you an

12   alert if you -- if there's been a change.

13       Q.    Okay.

14       A.    So, there's not been an alert e-mail in

15   January or February of '07.

16       Q.    When was the last time you got an

17   alert?

18       A.    Oh, it's been I think in December some

19   time.

20       Q.    December of 2006?

21       A.    Yeah.

22       Q.    Okay.

23       A.    When we bought the bar.

24       Q.    That inquiry prompted the alert, is

25   that right?

195

1    specific question came up of the specific

2    charges that people wanted the information for

3    that. So I went out to get the bank records

4    specifically for this purpose.

5        Q.    On behalf of your husband, you've also

6    purchased credit reports and other products from

7    TrueLink, right?

8        A.    That would be correct.

9        Q.    None of those are really mentioned in

10   your complaint though, do you recall that? I

11   mean, your complaint is about credit monitoring,

12   that's the product you reference in the

13   complaint?

14       A.    Correct.

15       Q.    Do you -- are you suing -- are you

16   suing TrueLink with regard to the other products

17   that you purchased other than credit monitoring?

18       A.    I think we've reduced it just down to

19   the breach of contract for the credit monitoring

20   TrueLink product, so yes. But, I mean, in the

21   beginning, I think that we were suing for fair

22   credit reporting violations which would have

23   concerned the reports that were involved.

24       Q.    And are you suing -- have you ever

25   purchased credit monitoring for yourself?



196

1       A.    No.  Not that I'm aware of.

2       Q.    Okay.  Have you ever purchased any

3    products from TrueLink for yourself?

4       A.    I think there was a purchase made for a

5    three-in-one credit report for myself at some

6    point in time.  But I cannot find the records

7    that are associated with it.

8       Q.    When did you make this purchase?

9       A.    I mean, I don't recall the exact time

10   period.  I know that there was a time period

11   that we bought both reports for my husband and

12   myself, because we didn't know what was going on

13   with all of the banking information and

14   everything was all chaotic.  So, there was a

15   point in time where I had both my report and his

16   report.

17      Q.    From TrueLink?

18      A.    Well, from TransUnion.  I don't know if

19   it's TrueLink or not.  You know, it's very hard

20   to delineate that relationship.  You know, if

21   you buy the credit report online and you go to

22   TransUnion.com, you get a credit report through

23   TrueLink.  So, whether I bought the report from

24   TransUnion or TrueLink, I don't know.  I can

25   only tell you that I bought a report.  Now, I

206

1    A.    I only gave you those things which were

2    in my possession.  If it's not in my possession,

3    I don't know that I'm obligated to produce it if

4    it's not in my possession.

5    Q.    Do you know what year you allegedly

6    purchased this three-in-one credit report from

7    TrueLink on your own behalf?

8                MS. YEAGER:  Objection.  Asked

9    and answered.

10    A.    I would assume it would have to be some

11    time after March of 2005, because that's when

12    the website records that I had a new membership

13    created.

14    Q.    (BY MR. O'NEIL) But in any event,

15    whether or not -- I mean, assuming that you

16    actually did buy this product, you're not suing

17    on that product, right?

18    A.    That's a credit report, that's not

19    monitoring.

20    Q.    Ma'am, it's really a yes or no answer.

21    I'll say it again.  Regardless -- assuming that

22    you actually bought this three-in-one credit

23    report relating to yourself from TrueLink,

24    you're not suing TrueLink on behalf -- with

25    regard to that product, right?


**Metropolitan**
COURT REPORTERS    9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

207

1          A.   No.

2          Q.   Did you actually get the

3    interrogatories that TrueLink's lawyers sent to

4    your lawyer asking about your purchases?

5                MS. YEAGER:  Objection.  Asked

6    and answered.

7                MR. O'NEIL:  No, it wasn't.

8          Q.   (BY MR. O'NEIL)  Go ahead and answer,

9    Mrs. Millett.

10         A.   Yes.

11         Q.   And did you prepare, physically

12   prepare, the document that was the response to

13   the interrogatories?

14         A.   The interrogatory -- my

15   interrogatories?

16         Q.   Yes.

17         A.   I worked with my attorneys to prepare

18   those.  I didn't physically type them if that's

19   what you mean.

20         Q.   That's what I meant.

21         A.   No, I didn't physically type them.

22         Q.   You just gave the information to your

23   lawyers and they prepared it?

24         A.   Right.

25         Q.   Okay.  And did you review the



214

1  purchased a product from TrueLink?

2      A.    I believe I purchased a three-in-one

3  credit report.

4      Q.    Do you know how much it cost you?

5      A.    I can't even say.  Maybe 19.95 or

6  whatever they charge for it.  I don't really --

7  cost wasn't the issue when I purchased it

8  anyhow.

9      Q.    What was the purchase -- what was the

10  purpose for which you purchased it?

11      A.    Just to look at my own information.

12      Q.    Did you see any defects in the

13  three-in-one credit report?

14      A.    What do you mean?

15      Q.    Did you see any deficiencies in the

16  product that you had purchased from TrueLink?

17      A.    Well, I mean, not on TrueLink's part,

18  but there were deficiencies in credit furnishers

19  that had misreported information on my behalf,

20  yes.

21      Q.    Have you ever entered into a contract

22  with TrueLink?

23      A.    Not for monitoring, no.

24      Q.    Have you ever entered into a contract

25  with TrueLink for any product?



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 * 913.317.8800 * FAX 913.317.8880

**PAGE 227 REDACTED**

238

1      more than just tell you how much you owed,

2      right?  I mean, for example, the very first page

3      of Exhibit 15.  That doesn't tell you how much

4      you're going to have to pay, does it?

5           A.   10.95 per quarter.

6           Q.   Okay.  Did you read the text on the

7      first page of Exhibit 15 prior to deciding to

8      purchase the product?

9           A.   Yes.

10          Q.   Did you read all of it?

11          A.   I read a lot of this, yes.

12          Q.   Directing your attention to the very

13     first page, did you read all of the text on that

14     first page before you decided to buy the

15     product?

16          A.   Well, like I probably didn't read this

17     little box down here where it says "example

18     credit trending."  I mean, you know, I read the

19     basic text that's on the page.

20          Q.   Well, on the right-hand side of the

21     page, it tells you what you're going to get as

22     part of the product, right?

23          A.   Yes.

24          Q.   Did you read that part?

25          A.   Oh, yeah.



239

```
1         Q.    Oh okay.  And then on the far right of

2    each of those four categories, it says, says

3    "learn M" but I'll represent to you it says

4    "learn more."  Okay?

5         A.    It probably was cut off because this is

6    one of those elongated pages that --

7         Q.    Sure.

8         A.    -- didn't want to print right.

9         Q.    Do you recall, did you click on these

10   "learn more" links to learn more about the

11   characteristics of the product that you were

12   about to buy?

13        A.    I probably read all of this and then

14   read -- clicked the "yes keep me informed"

15   button.

16        Q.    So, then is it your testimony that you

17   did not click on the "learn more" links

18   associated with each of the four categories of

19   information?

20        A.    No, that's not what I'm representing to

21   you.

22        Q.    Okay.  That's my question, that's

23   why --

24        A.    I can't say that before I signed up for

25   the product I clicked the "learn more" buttons,
```



Metropolitan
COURT REPORTERS    9300 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

240

1    because I may not have.  But I may have done so

2    at a later date.

3        Q.   Okay.

4        A.   And so I may have a copy in here of the

5    "learn more" and I may have actually read those

6    pages.

7        Q.   All right.

8        A.   But I can't recall in what order I

9    might have viewed that information, only that

10   I've probably viewed every page that's out there

11   on the TU site at some point in time or other

12   now.

13       Q.   The TU site?

14       A.   The TU, TrueLink, whoever it is now.

15       Q.   Okay.  Well, I think it's important

16   that we understand what site we're talking

17   about, wouldn't you agree?

18       A.   Well, as I sit here, it still says

19   "TransUnion" at the top.

20       Q.   Okay.  Let me go back to the question I

21   asked some time ago.

22       A.   Okay.

23       Q.   Do you know if you ever clicked on the

24   "learn more" hyperlinks which is reflected on

25   the first page of Exhibit 15?



**Metropolitan**
COURT REPORTERS    9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

241

```
 1          A.    I couldn't answer that one way or the

 2    other.

 3          Q.    Okay.  Because you don't know, right?

 4          A.    I don't know for sure, no.  I could

 5    have and I also could not have.

 6          Q.    The top of the page says "Knowledge,

 7    protection, convenience."  Do you see that,

 8    ma'am?

 9          A.    Yes.

10          Q.    Says, "Knowledge, quarterly access to

11    your credit report with the analytical tools,"

12    right?

13          A.    Yes.

14          Q.    Okay.  Did you read that?

15                MS. YEAGER:  I'm so to interrupt.

16    What page are we on?

17                MR. O'NEIL:  First page.

18                THE WITNESS:  We're on the first

19    page.

20          A.    Yes, I read that.

21          Q.    (BY MR. O'NEIL) Okay.  And then going

22    down in the right-hand side, it describes your

23    weekly fraud watch e-mails.  I mean, that was

24    the main thing that you were getting as part of

25    the credit monitoring service, right?
```

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7811 • 913.317.8600 • FAX 913.317.8850

242

1     A.    The main thing?

2     Q.    Well, you know, that's a bad question,

3     let me withdraw that.  Do you see there it says,

4     "Receive weekly e-mail alerts to changes in your

5     report"?

6     A.    Yes.

7     Q.    And then below that it says,

8     "Immediately find out about credit report

9     changes, including fraudulent activity, etc."

10    Do you see that?

11    A.    Yes.

12    Q.    When you read this, did you think to

13    yourself, well, this is only going to tell us

14    about changes to my husband's report and not

15    about changes to Mr. Perez's report?

16    A.    It says up here, "Complete identity

17    theft protection with weekly fraud watch

18    e-mails" at the very top.

19    Q.    Could you just answer my question?

20          MR. O'NEIL:  Let me go -- can the

21    court reporter read back my question?

22          (Whereupon, the requested portion

23    of the record was read by the reporter.)

24    A.    No, I did not.

25    Q.    (BY MR. O'NEIL) And did you believe on

