243

1       August 6, 2003, that even though TransUnion told

2       you they couldn't give you that information,

3       that you thought TrueLink was going to be able

4       to tell you about changes to Mr. Perez's report?

5           A.    No.   I thought they were going to tell

6       me about changes relating to my husband's Social

7       Security number.

8           Q.    And why did you think that?

9           A.    Because they're advertising complete

10      identity theft protection, and I thought that

11      meant they were going to be protecting the

12      Social Security number once I signed up for this

13      product.

14          Q.    Well, Mrs. Millett, wait a minute.   As

15      of August 2003, you had already gone around and

16      round and round with TransUnion, Experian and

17      Equifax, right?  And all three of them told you

18      we can't give you any information in Mr. Perez's

19      report, right?

20          A.    No, TransUnion gave me information in

21      Mr. Perez's report, it's in the letter.

22          Q.    Okay.   They told you what the accounts

23      were, but they told you they couldn't give you

24      the details about the report, right?

25          A.    I'm sorry, I don't understand the



251

1    Mrs. Millett.

2        A.    Uh-huh.

3        Q.    It says, "Your credit monitoring

4    membership includes fraud resolution services."

5    Do you see that?

6        A.    Yes.

7        Q.    Did you ever use the fraud resolution

8    services offered by TrueLink?

9        A.    No.  Because the TrueLink product has

10   never notified me of any fraud which I needed to

11   contact fraud resolution services for.

12       Q.    Well, you thought Mr. Millett was a

13   victim of identity theft on August 6, 2003,

14   right?

15       A.    Well, that's correct, but I didn't

16   purchase the product to deal with identity theft

17   that occurred before August 6, 2003.  I

18   purchased the product to monitor for identity

19   theft in the future, which I was never notified

20   of, so, therefore, I never accessed the fraud

21   resolution services.

22       Q.    So you never had any need to access the

23   fraud resolution services, is that right?

24       A.    No, that's not a true statement either.

25   We had a need, we just didn't know we had a



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 208
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8600 • FAX 913.317.8650

252

1    need.

2        Q.    Okay, wait a minute.  August 6, 2003,

3    did you think your husband was a victim of

4    identity theft?

5        A.    Of course.

6        Q.    Okay.  So, why didn't you use it on the

7    very first day?

8        A.    Because their product services their --

9    this is specifically supposed to be used for

10   services that are notified for you by their

11   monitoring service.  So, since I don't have --

12       Q.    Okay.

13       A.    You know, I can't call them up to say,

14   oh, you need to resolve this account from 2002,

15   because I wasn't a member in 2002.

16       Q.    That's your understanding?

17       A.    That's my understanding.

18       Q.    Okay.  Has your husband been a victim

19   of identity theft since August 2003?

20       A.    Yes.

21       Q.    In what way?

22       A.    Abundio Perez has obtained additional

23   activities that are related to credit that have

24   occurred since August of 2003, yes.

25       Q.    Using your husband's SSN?



253

1      A.    Yes.

2      Q.    What activity is that?

3      A.    Judgement from Ford Motor Credit for

4   $4,000, public records information, criminal

5   conviction, I believe, recorded against my

6   husband's Social Security number in California

7   that was not part of this record.

8      Q.    I'm sorry, go ahead.

9      A.    The J. C. Penney's account, which was

10  relabeled with my husband's address which then

11  resulted in Abundio Perez's mail being sent to

12  my house.  The Home Depot account which was

13  later relabeled with my husband's name and

14  address, still has his Social Security number,

15  but has Abundio Perez's telephone number.

16     Q.    So, when you learned all this after

17  August 5, 2003, did you call the fraud

18  resolutions services then?

19     A.    I didn't learn all of that until TU

20  began -- and some of it I didn't learn until

21  2005 when we started with subpoenas and

22  subpoenaed documents.  So, I mean, you know, I

23  didn't know it in 2003, no.

24     Q.    Okay.  So, in 2005 when you learned

25  about it, did you call and take advantage of the



258

1    paragraphs and it's so long and who reads that

2    stuff?  Do you remember that?

3        A.   Yes.

4        Q.   Okay.  What's your recollection?  Did

5    you read the first sentence?  Did you read none

6    of it?  Did you skim it?  I think you said you

7    skimmed it this morning?

8        A.   Yep.

9        Q.   Okay.  Do you recall when you skimmed

10   the membership agreement in August of 2003, did

11   it have any reference to the fraud resolution

12   services?

13       A.   Yes.

14       Q.   You do recall that?

15       A.   I do recall some of it.

16       Q.   Okay.

17       A.   Yeah.

18       Q.   And did it tell you that they'd be

19   presented by Promise Mark?

20       A.   Well, the advertisement on the page

21   represented that, so I don't know that I

22   remember that the agreement specifically says

23   that, but it is part of my recollection.

24       Q.   Were you acting as an agent for your

25   husband when you clicked "I agree" to the credit



Metropolitan
COURT REPORTERS
9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 · 913.317.5500 · FAX 913.317.5550

**PAGE 259 REDACTED**

261

1      Q.    Oh, you recall thinking that in August

2   of 2003?

3      A.    I recall thinking that, but not

4   understanding.  Because, you have to remember, I

5   closed down Citibank accounts for Abundio Perez,

6   so I didn't know if this was a fraud inquiry or

7   what it was.  And without additional

8   investigation, I wouldn't know that.

9      Q.    Did you ever -- when you were calling

10  all of the creditors of Mr. Perez in early 2003,

11  did you ever say that they could check your

12  credit report as part of their investigation?

13     A.    No.

14     Q.    Okay.

15     A.    And nor do they have the right to do

16  so, I don't think, as part of a fraud

17  investigation.

18     Q.    They have a right to do so if you tell

19  them they can.  Do you understand that?

20     A.    Well, if I told them I could, but that

21  would have to be in writing.

22     Q.    Okay.  Let me show you what's been

23  marked Exhibit 16, which are two pages that were

24  produced by your lawyers in this case,

25  Mrs. Millett.



**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

**PAGE 262 REDACTED**

**PAGE 263 REDACTED**

PAGE 264 REDACTED

**PAGE 265 REDACTED**

**PAGE 266 REDACTED**

268

1    sorry, was that on the record.

2                    MR. O'NEIL:   She needs to pee,

3    then we've got to take a break.

4                    THE WITNESS:   Sorry, I just said

5    that on the record.

6                    MR. O'NEIL:   That's okay, let's

7    take a break.

8                    VIDEOGRAPHER:   We are now going

9    off the record at 3:21.

10                   (Recess.)

11                   VIDEOGRAPHER:   The time now is

12   3:39 p.m. and we are back on the record.   You

13   may continue.

14       Q.   (BY MR. O'NEIL) Thank you.

15   Mrs. Millett, I'm handing you what's been marked

16   as Exhibit 17, which is another document that

17   your lawyers have produced to TrueLink in this

18   case.   Appears to be a -- appears to be an

19   e-mail dated November 3, 2003 addressed to

20   Steven, but with your e-mail address, correct?

21       A.   Yes.

22       Q.   Okay.

23                   (M. Millett Exhibit 17 was marked

24   for identification by the reporter.)

25       Q.   (BY MR. O'NEIL) The subject line is



269

1      "Important upgrade to your service," and then

2      the text of the e-mail describes the upgrades.

3      Do you recall learning shortly after you had

4      purchased the credit monitoring product on

5      behalf of your husband that True Credit had

6      upgraded the service?

7           A.     Well, they sent this e-mail saying they

8      had upgraded the service.

9           Q.     Right.  Well, do you have any reason to

10     believe that it was inaccurate to say that you

11     were now going to be getting identity theft

12     insurance at no additional cost?

13          A.     I'm sorry, I don't understand.

14          Q.     Well, I asked you if you recall that

15     there was an upgrade, and you said, well, they

16     said there was an upgrade, so I was wondering if

17     you were suggesting that this was another lie

18     that they had made to you.  I mean, according to

19     the e-mail, you were being informed that the

20     credit monitoring service now includes identity

21     theft insurance, and enhanced fraud resolution.

22     Do you recall getting this e-mail?

23          A.     Yeah, I recall getting the e-mail.

24          Q.     And do you recall learning it for the

25     first time at no additional cost you would now



271

1    covered, right?

2    A.    Provided the actual identity theft

3    occurred after the policy was put in place.

4    Q.    Okay.  Okay.  So you do recall that

5    then?

6    A.    Yes.

7    Q.    Okay.  And then it also describes how

8    the fraud resolution services have become

9    improved, or "enhanced" is the word they use.

10    Do you see that?

11    A.    (Indicating.)

12    Q.    And do you see that it says on the

13    right-hand side about fraud resolution, it says,

14    quote, "Previously provided by Promise Mark,

15    fraud resolution services are now provided by

16    TransUnion's Fraud Victims Assistance

17    Department"?  Do you see that?

18    A.    Yes.  I see that.

19    Q.    Okay.  Now, does that refresh your

20    recollection that there was never any lapse in

21    the fraud resolution services that were offered

22    as part of credit monitoring?

23    A.    Well, the TransUnion Fraud Victims

24    Assistance Department here doesn't take effect

25    until November 3rd of 2003 when they sent this



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8500 • FAX 913.317.8860

272

1    e-mail out.  So, the contract was started in

2    August of 2003, so who was covering it between

3    August and November?

4        Q.   Do you have any reason to believe that

5    it wasn't TransUnion?

6        A.   What do you mean?  That it wasn't

7    Promise Mark or it wasn't --

8        Q.   Well, who cares.  I mean, frankly, does

9    it matter who's providing the service?

10       A.   Well, if you've contracted for a

11   service and that person is no longer and has not

12   been providing that service -- this does not

13   show that TransUnion was covering it from August

14   until now.  This only says that TransUnion comes

15   on in November and starts covering it.

16       Q.   Do you have any evidence that fraud

17   resolution services were not available to those

18   who purchased credit monitoring at any time

19   since August 6, 2003, other than the pleading

20   that you saw your lawyers had written?

21       A.   I think there's some documents to that

22   effect, or something along those lines, relating

23   to when Promise Mark exited or whatever, there

24   are dates associated with that.

25       Q.   Well, as you sit here today now, do you



**Metropolitan**
COURT REPORTERS    9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7611 • 913.317.8300 • FAX 913.317.8350

273

1    think those documents indicate that there was a

2    lapse in the services, the fraud resolutions

3    services that were being provided by TrueLink?

4        A.    Well, I mean, the -- in my mind, at

5    least from my understanding and that's all I can

6    speak to, I don't -- I don't know who was

7    providing those service from August of 2003

8    until November of 2003 when this notice arrived.

9        Q.    Do you have any reason to believe it

10   wasn't Promise Mark?

11       A.    Well, I didn't call the fraud services,

12   so I don't know for sure that it wasn't Promise

13   Mark.  But I do know that the documents that

14   were produced, at least from my understanding

15   and my recollection as I sit here, was that

16   Promise Mark exited, I thought, some time during

17   the summer, and so then there was no coverage

18   between the time I enrolled in the product and

19   the time that TU's fraud resolutions services

20   took over.  But, I mean, that's just my

21   recollection as I'm sitting here.  I don't have

22   those documents in front of me.

23       Q.    Okay.

24             (M. Millett Exhibit 18 was marked

25   for identification by the reporter.)



**Metropolitan**
**COURT REPORTERS**    9200 INDIAN CREEK PARKWAY, SUITE 203,
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8300 • FAX 913.317.8860

309

1    A.  No.  I mean, when I act as his agent if

2  he had -- if I read a contract or whatever and I

3  say, you know, we say it's okay or whatever,

4  then it's okay, and that's okay.

5    Q.  So, basically, because you had agreed

6  to the terms of the contract, that was good

7  enough for your husband, right?

8    A.  Yeah.

9    Q.  Okay.  And you had agreed to the terms

10  of the contract, right, when you first signed up

11  for the service in August of 2003?

12    A.  Yeah, that's part -- you enter into a

13  contract, that's what the issue is I think.

14    Q.  Has -- have you suffered any damages as

15  a result of the breach of contract that you

16  allege TrueLink committed?

17    A.  My husband and I have lost the money

18  that we paid for the product.

19    Q.  Well, you understand technically your

20  husband paid for the product, right?

21    A.  No, technically, I paid for the

22  product, it's my debit card.

23    Q.  Okay.  Any other damages that you or

24  your -- well, let's stick to your husband.  Has

25  your husband suffered any other damages as a



310

1    result of the alleged breach of contract by

2    TrueLink?

3        A.    Well, he -- he's statutory damages, he

4    has -- I think there's injunctive relief that's

5    being requested, his attorney cost and fees.

6        Q.    Well, you know, maybe I shouldn't use

7    the word "damages," because that can sometimes

8    have a legal meaning.  Let's talk about harm,

9    kind of a non-legal term.

10        A.    Okay.

11        Q.    Has your husband suffered any harm as a

12    result of TrueLink allegedly not delivering what

13    it promised?

14        A.    Yeah.

15        Q.    And what harm has he suffered?

16        A.    He's suffered the harm of not being

17    notified that there was a public judgement

18    issued against his Social Security number

19    without his knowledge.  Additional harm includes

20    accounts that have been relabeled that he was

21    never notified about that have his name and

22    address associated with him.

23        Q.    If I can just stop you.  And maybe we

24    should go back to what you said before lunch,

25    but.  Because you listed a number of things



**Metropolitan**
COURT REPORTERS    9800 INDIAN CREEK PARKWAY, SUITE 206
OVERLAND PARK, KANSAS 66210
1.800.748.7811 • 913.317.8600 • FAX 913.317.8650

311

1    that --

2          A.    Right.

3          Q.    -- you think TrueLink did or didn't do

4    that is the subject of your claim.

5          A.    Right.

6          Q.    So, let's go to that and -- first one

7    you said is just what you said before that there

8    was -- you said that TrueLink failed to disclose

9    that there was a judgement entered in a public

10   record using Mr. Millett's Social Security

11   number?

12         A.    Yep.

13         Q.    How was he harmed by that though?

14         A.    Well, he's harmed by that because the

15   collectors then started calling the house trying

16   to collect the judgement.

17         Q.    They did?

18         A.    Yes.    Ford Motor Credit called on at

19   least two occasions.

20         Q.    Okay.    Well, that -- the phone calls

21   weren't a result of TrueLink not notifying you,

22   the phone calls were the result of Mr. Perez

23   using your husband's Social Security number,

24   right?

25         A.    Right.    But public records are used as



312

1   background checks for employment and other

2   instances.  And, I mean, if I can go out there

3   to log in to LexisNexis and find that public

4   record for $2.95 with my husband's Social

5   Security number attached to it, I don't think

6   there's any reason why the TrueLink product

7   shouldn't have been able to notify me about

8   that.

9       Q.   Ma'am, I understand you think they

10  should have notified you.  What I'm asking is,

11  so what?  They didn't notify you, what harm was

12  attributable not to the identity theft, not to

13  the filing of the public record judgement.  What

14  I'm asking is, what harm did your husband suffer

15  because TrueLink didn't tell you about it?

16      A.   It took longer to find out about it.

17      Q.   Well, when was the public record

18  judgement filed?

19      A.   I'm thinking it was some time in the

20  April or May time frame or maybe it was sooner

21  than that, it was March or whatever, that whole

22  process got started.  I'd have to look at the

23  documents.  But I know that it was in the first

24  part of 2004.

25      Q.   Have you ever seen a copy of the



316

1          Q.    Well, no.  I mean, with all due

2    respect, Mrs. Millett, you're the only person I

3    ever met who thought that the credit monitoring

4    product could actually alert you to things

5    occurring outside of your credit file.  Do you

6    have any reason to believe that the Veteran

7    Administration believed that when they bought

8    the product?

9          A.    No, I don't have reason to believe

10   that, I just know they bought the product.

11         Q.    Okay.

12         A.    Because it was in one of the news

13   articles I read.

14         Q.    Because you've acknowledged that the

15   product does identify true name fraud, right?

16         A.    Well, at least I thought it did at some

17   point, but I don't believe that anymore.

18         Q.    Okay.  And when you told "The New York

19   Times" that you thought it was still a valuable

20   product, then, what, you were lying then or

21   you've changed your mind since then?

22                  MS. YEAGER:  Objection.

23   Misstates her testimony.  Misstates facts not in

24   evidence.  Foundation.

25         A.    "The New York Times" article does not



317

1    characterize it in that way.

2        Q.    (BY MR. O'NEIL) So, whenever the --

3    you've read "The New York Times" article, right?

4        A.    Yes, I participated in it.

5        Q.    Okay.  And --

6                    MS. YEAGER:  Do we have a

7    question?

8                    VIDEOGRAPHER:  Go ahead.

9                    MS. YEAGER:  I'm sorry to

10   interrupt.

11       Q.    (BY MR. O'NEIL) Were you misquoted in

12   that article?

13       A.    No, you're misquoting the article.

14       Q.    Okay.  So, is everything in that

15   article accurate as far as you're concerned?

16       A.    Fairly accurate, yeah.

17       Q.    Fairly accurate?

18       A.    Uh-huh.

19       Q.    Okay.

20       A.    I mean, because the article isn't

21   100 percent about me, so I don't know.  I can't

22   attest to the accuracy of the rest of it.

23       Q.    I understand.  Obviously.  You're

24   quoted as saying, quote, "I still have credit

25   monitoring because of the simple fact that it is

**Metropolitan**
**COURT REPORTERS**    9800 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.745.7511 • 913.317.3300 • FAX 913.317.3350

318

1    the best tool available at this time."

2        A.    And what's the rest of sentence?

3        Q.    "It is not ideal, it is broken and it

4    is not as advertised."  Is that an accurate

5    statement?

6        A.    That's the statement, yes.

7        Q.    Okay.  So, it's still valuable enough

8    for you to continue using it and continue buying

9    it; isn't that correct?

10       A.    Well, I'm not buying it anymore, am I?

11       Q.    Well, you did for years and years and

12   years after you claimed that it didn't work?

13       A.    And I don't deny that.

14       Q.    Okay.  And the only reason why you're

15   not buying it today is because your credit card

16   changed and you didn't give the company a new

17   credit card?

18            MS. YEAGER:  Objection.

19   Misstates --

20       Q.    (BY MR. O'NEIL)  Isn't that right?

21            MS. YEAGER:  -- the testimony.

22       A.    No.  I just -- I elected not to go in

23   there and put in a new credit card when it

24   arrived.  So, to that extent that's why it's no

25   longer going on.

**PAGE 329 REDACTED**

**PAGE 330 REDACTED**

**PAGE 331 REDACTED**

332

1          MR. O'NEIL:  Interrogatory No. 7.

2          MS. YEAGER:  Thank you.  Sorry to

3     interrupt.

4          MR. O'NEIL:  That's okay.

5     Q.   (BY MR. O'NEIL) So, the interrogatory

6     response says you lost a lot of money because we

7     could not get credit, we had to pay extra money

8     for insurance?

9     A.   Uh-huh.  Right.

10    Q.   But you're not seeking those damages in

11    this case, are you?

12    A.   We're seeking the damages for breach of

13    contract that we're supposed to be getting.

14    Q.   Okay.  Well, maybe I should just ask

15    you.  This interrogatory suggests that you are

16    -- that you have suffered these economic losses

17    as a result of TrueLink's conduct.  Is that

18    accurate?

19    A.   Well, to the extent that I -- my

20    thought process still thinks that TransUnion and

21    TrueLink are the same company, yes, those are

22    economic losses that have been suffered.  Now,

23    whether or not they're recoverable in this

24    particular case because of the claims that have

25    been brought is a different matter.  But it's



333

1   been answered here.

2        Q.   Are there -- are you seeking recovery

3   of those in this case?

4        A.   No.  I don't believe so.

5        Q.   Oh, okay.

6        A.   I believe the Fair Credit Reporting Act

7   portion of this case was dismissed, so.

8        Q.   Why was it dismissed?

9        A.   I don't know.  I think it was just

10  dropped.

11       Q.   You don't know why?

12       A.   I think that would be a matter between

13  myself and my attorneys as to why.

14       Q.   No.  I'm not asking you to disclose

15  conversations you've had with your lawyers.  I'm

16  asking you do you know why you decided to

17  dismiss the --

18       A.   Yes, I do.

19       Q.   Okay.  Why is that?

20       A.   That's a discussion I had with my

21  lawyers.

22       Q.   Well, I don't want you to tell me about

23  your discussion with your lawyers.  If you only

24  know why you dismissed it because your lawyers

25  told you, then don't say.

348

1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4    STEVEN G. MILLETT,

5    MELODY J. MILLETT,

6    On Behalf of themselves

7    And all others similarly situated,

8                      Plaintiffs,

9    vs.                      No. 05-599-SLR

10   TRUELINK, INC.,

11   A Trans Union Company,

12                   Defendant.

13

14

15                VOLUME II

16

17        CONTINUED DEPOSITION OF MELODY J.

18   MILLETT, a Plaintiff, taken on behalf of the

19   Defendant before Nissa M. Sharp, CSR, CCR #528,

20   pursuant to Notice on the 13th of July, 2007, at

21   the offices of CLOON LAW FIRM, One Hallbrook

22   Place, 11150 Overbrook Road, Suite 350, Leawood,

23   Kansas.

24                                  **COPY**

25



9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.745.7511 • 913.317.8600 • FAX 913.317.8850

349

1              APPEARANCES

2              Appearing for the Plaintiffs was MS. B.

3      JOYCE YEAGER of YEAGER LAW FIRM, LLC, City

4      Center Square, 26th Floor, 1100 Main Street,

5      Kansas City, Missouri 64105.

6              Also appearing for the Plaintiffs was

7      MR. BRYSON R. CLOON of CLOON LAW FIRM, One

8      Hallbrook Place, 11150 Overbrook Road, Suite

9      350, Leawood, Kansas 66211.

10             Appearing for the Defendant were

11     MR. MICHAEL O'NEIL and MS. HEATHER SCHUMAN of

12     DLA PIPER US, LLP, 203 North LaSalle Street,

13     Suite 1900, Chicago, Illinois 60601-1293.

14             Also present was Lisa Hargis of MCR

15     VIDEO.

16                     INDEX

17     WITNESS:                          PAGE:

18       MELODY J. MILLETT

19         Continued Examination

20         By Mr. O'Neil                  351

21         Examination by Ms. Yeager      554

22         Examination by Mr. O'Neil      571

23

24

25

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.6800 • FAX 913.317.8850

400

1    number."

2        Q.    Okay.  So, of the three forms of

3    identity theft that the Identity Theft Resource

4    Center has identified, you believe that

5    Mr. Millett suffered the first form?

6        A.    He would be included in the first form,

7    yes.

8        Q.    Okay.  Well, let's read the whole

9    sentence that you quoted from.  It says,

10   "Financial identity theft involves the

11   impostor's use of personal identifying

12   information, primarily the Social Security

13   number, to establish new credit lines in the

14   name of the victim."  Do you see that?

15       A.    Uh-huh.  Right.

16       Q.    I mean, Mr. Abundio, or whatever his

17   name is, never established credit lines in the

18   name Steven Millett, did he?

19       A.    No, he did not.

20       Q.    Okay.  I think we --

21            MR. O'NEIL:  How much time do we

22   have left on the tape?

23            VIDEOGRAPHER:  Four.

24            MR. O'NEIL:  Four, okay, well,

25   let's keep going then.

**Metropolitan**
COURT REPORTERS

9900 INDIAN CREEK PARKWAY, SUITE 208
OVERLAND PARK, KANSAS 66210
1.800.746.7811 • 913.317.8600 • FAX 913.317.8650

409

1          You testified earlier that you recall
2    in August of 2003 you thought TrueLink was
3    promising your husband complete identity theft
4    approximately.  Do you recall that testimony?
5          A.    Yes.
6          Q.    Okay.  So, in August of 2003, did you
7    believe that TrueLink could prevent somebody
8    from using your husband's Social Security number
9    on an employment application?
10          A.    If true -- if TransUnion was contacted
11    for the background check, then, yeah, that
12    should be the case.
13          Q.    Okay.  So, you recognize that it
14    wouldn't provide complete identity theft
15    protection under all circumstances?
16          A.    Well, only as it would relate to
17    TransUnion's data.
18          Q.    So, if Mr. Abundio Perez used your
19    husband's Social Security number on a job
20    application, but the employer never sought data
21    from TransUnion, that would still be identity
22    theft, right?
23          A.    Oh, yes, it would still be identity
24    theft.
25          Q.    Okay.  But you never thought that


**Metropolitan**
COURT REPORTERS    9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66910
1.800.748.7511 * 913.317.8800 * FAX 913.317.8850

410

1    TrueLink would prevent that type of identity

2    theft, right?

3        A.    I'm sorry?

4        Q.    You never thought that -- and, well,

5    no, in August of 2003, you didn't think that

6    that type of identity theft would be prevented

7    by buying credit monitoring from True Credit,

8    right?

9        A.    Only to the extent that the background

10    check used for the employment was pulled from

11    one of your subsidiaries, yeah.

12        Q.    Okay. Well, I'll go back to my

13    original question because that was my

14    hypothetical.

15        A.    Uh-huh.

16        Q.    Mr. Perez uses your husband's Social

17    Security number on an employment application but

18    the employer never contacts TransUnion. You

19    never thought that your husband would be

20    protected by that type of identity theft by

21    buying credit monitoring, right?

22        A.    No, and no reasonable person would.

23        Q.    Because you have to read those types of

24    things reasonably, right?

25        A.    Yes.



455

1          THE WITNESS:  -- Exhibit 33.

2          MR. O'NEIL:  Right.

3      Q.   (BY MR. O'NEIL) And then the second

4  page of the long form notice describes the

5  litigation, Defendant's position, identifies the

6  class there in the bottom of Page 2, right?

7      A.   Yes.

8      Q.   And then on Page 3, it identifies the

9  changes that will be made to the marketing.

10     A.   Yes.

11     Q.   And do you recall reviewing that?

12     A.   Well, as I testified earlier, I used

13 some of the key words, so, yeah, I recall

14 reviewing it.

15     Q.   Do you think that offering class

16 members three free months of credit monitoring

17 is something of value to the class?

18     A.   I specifically think that the way that

19 the product is currently configured, for this

20 class it might have some value, but these, this,

21 these class members do not specifically have

22 issues with identify theft, and identity theft

23 is not at issue in this suit.

24     Q.   Uh-huh.

25     A.   People who are trying to improve their



**Metropolitan**
COURT REPORTERS

9300 INDIAN CREEK PARKWAY, SUITE 206
OVERLAND PARK, KANSAS 66210
1.800.748.7811 • 913.317.8800 • FAX 913.317.8850

456

1    credit score though do need frequent credit

2    polls or whatever as they clean up inaccuracies

3    in their reports or whatever else, where they

4    would want to see whether their adjustment is in

5    their score.   I mean, I do frequent some, you

6    know, credit reporting forms, so, I mean, I do

7    see people out there who are trying to remove

8    bad debts from old bankruptcies that are still

9    out there after 14 years that should be deleted

10   and that kind of thing.

11         So, you know, three months of free

12   credit reports or whatever for them would have

13   some value to them in a credit repair context.

14         Q.   To your knowledge, has any action been

15   taken on your behalf with regard to this

16   settlement?

17         A.   No.

18         Q.   Okay.  Do you know what a Motion For

19   Intervention is?

20         A.   Yes, I know what a Motion For

21   Intervention is.   And I believe there was one

22   filed in Browns versus Yahoo or something like

23   that.

24         Q.   Browning versus Yahoo,

25         A.   Uh-huh.



**Metropolitan**
COURT REPORTERS   9300 INDIAN CREEK PARKWAY, SUITE 906
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8600 • FAX 913.317.8550

572

1       identity theft is when the thief comes in and

2       takes over your account and then has it

3       redirected.

4           Q.    Right.    But that didn't happen with the

5       J.C. Penney or Home Depot accounts, right?

6           A.    Well, what happened --

7           Q.    Can you just answer the question yes or

8       no, please?

9           A.    Because it's not that simple.    It's not

10      a yes or no question.

11          Q.    Okay.    I understand what you think

12      happened, but you're not suggesting that

13      Mr. Perez committed account take-over fraud with

14      respect to the J.C. Penney or Home Depot trade

15      lines, are you?

16          A.    No.    What I'm suggesting --

17          Q.    Okay.

18          A.    -- that happened in that particular

19      instance is that the accounts were relabeled by

20      the furnishers to include the victim's

21      information.    They were fraudulent accounts to

22      start with, and they were relabeled with the

23      victim's information.    Then they were reported

24      to the credit bureaus.

25          Q.    But that's not account take-over fraud,



**Metropolitan**
COURT REPORTERS      9900 INDIAN CREEK PARKWAY, SUITE 205
                     OVERLAND PARK, KANSAS 66210
                     1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

# PAGE 573 REDACTED