# Exhibit C

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF DELAWARE

3

4    STEVEN G. MILLETT,

5    MELODY J. MILLETT,

6    On Behalf of Themselves and

7    All Others Similarly Situated,

8                    Plaintiffs,

9    vs.                          C.A. No. 05-599-SLR

10   TRUELINK, INC.,              Class Action

11   a Trans Union Company,       Jury Trial Demanded

12                   Defendant.

13

14

15

16

17        VIDEOTAPED DEPOSITION OF STEVEN G.

18   MILLETT, a Plaintiff, taken on behalf of the

19   Defendant before Nissa M. Sharp, CSR, CCR #528,

20   pursuant to Notice on the 30th of March, 2007,

21   at the offices of THE CLOON LAW FIRM, 11350

22   Tomahawk Creek Parkway, Suite 100, Leawood,

23   Kansas.

24

25                                    **COPY**



**Metropolitan**
COURT REPORTERS
9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

2

1                           APPEARANCES

2              Appearing for the Plaintiffs was

3    MR. BRYSON R. CLOON of THE CLOON LAW FIRM, 11150

4    Overbrook Road, Suite 350, Leawood, Kansas

5    66211.

6              Also appearing for the Plaintiffs was

7    MR. BARRY R. GRISSOM, 7270 West 98th Terrace,

8    Building 7, Suite 220, Overland Park, Kansas

9    66212.

10             Appearing for the Defendant was

11   MR. MICHAEL O'NEIL of DLA PIPER US, LLP, 203

12   North LaSalle Street, Suite 1900, Chicago,

13   Illinois 60601-1293.

14             Also present was Heather Schuman of DLA

15   Piper.

16                           INDEX

17   WITNESS:                               PAGE:

18     STEVEN G. MILLETT

19        Examination by Mr. O'Neil              4

20

21

22

23

24

25

**Metropolitan**
COURT REPORTERS

8200 INDIAN CREEK PARKWAY, SUITE 206
OVERLAND PARK, KANSAS 66210
1-800-748-7511 • 913.317.8300 • FAX 913.317.8350

15

1       A.    Their case is different.

2       Q.    How is that case different?

3       A.    Because I didn't know I was a victim of

4    identity theft when we purchased that.

5       Q.    So, when you purchased the Equifax

6    product, you didn't know that somebody had

7    stolen your Social Security number, right?

8       A.    I -- what had happened is I went to the

9    bank and somebody was on my account and I

10   thought, well, it's a banking error, so that's

11   why we bought the Equifax product.  She looked

12   at it and there was nothing on it, so we

13   thought, well, it's production from identity

14   theft, I'm okay.  But that's not the case.

15      Q.    You later found that in fact somebody

16   else was using your Social Security number,

17   right?

18      A.    Right.

19      Q.    And Equifax never told you that, right?

20      A.    Correct.

21      Q.    So, how is the case against Equifax

22   different than the case against Trans Union?

23      A.    I -- just what I stated.  I mean...

24      Q.    Okay.  So, at the time you bought the

25   Trans Union product, you already knew that

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 208
OVERLAND PARK, KANSAS 66210
1.800.748.7811 • 913.317.8500 • FAX 913.317.8550

16

1  somebody had stolen your Social Security number,

2  right?

3      A.    Right.

4      Q.    Okay.  So, you didn't need to have

5  Trans Union tell you that, you already knew

6  that, right?

7      A.    Right.

8              THE WITNESS:  I was wondering if

9  I could take a break?

10             MR. O'NEIL:  Sure.

11             THE WITNESS:  Okay.

12             VIDEOGRAPHER:  We are now going

13 off the record at 9:13 AM.

14             (Recess.)

15             VIDEOGRAPHER:  It is now 9:17 AM

16 and we are back on the record.  You may

17 continue.

18     Q.    (BY MR. O'NEIL) Thank you,

19 Mr. Millett, you told us that you've sued Trans

20 Union.  Are you aware that your lawyers have

21 dismissed the case that they filed against Trans

22 Union?

23     A.    I can't -- I don't -- I don't recall.

24 I mean...

25     Q.    Okay.  Isn't it true, Mr. Millett, that

26

1    to buy the credit monitoring product, right?

2        A.    Yes, sir.

3        Q.    But was it your wife's idea that she

4    proposed to you that you filed all these

5    lawsuits?

6        A.    No.   We decided together to file all

7    these lawsuits.

8        Q.    Why did you decide to file the

9    lawsuits?

10       A.    Because we don't think it's right that

11   somebody's out there running around with my

12   Social Security number and you guys just letting

13   him do it.

14       Q.    You think my clients are letting

15   Mr. Perez use your Social Security number?

16       A.    Well, you have the right to maintain

17   the information.   It's my information.   I don't

18   want to be associated with this guy in any

19   shape, form or manner.   I don't want it coming

20   back on me.

21       Q.    Have you ever been associated with

22   Mr. Perez?

23       A.    Well, yeah.

24       Q.    In what way?

25       A.    My Social Security number.



**Metropolitan**
**COURT REPORTERS**
9800 INDIAN CREEK PARKWAY, SUITE 206
OVERLAND PARK, KANSAS 66210
1.800.746.7511 • 913.317.8800 • FAX 913.317.8860

33

1          A.    I think I should be reimbursed my

2     money, and everybody who bought the product get

3     their money back, Kansas Protection Act and

4     injunctive relief and my lawyers' fees paid.

5          Q.    How much in lawyers' fees have you

6     paid?

7                MR. CLOON:    I'm going to object

8     to the form of the question.    Lacks foundation.

9     Calls for speculation.    He has not idea what

10    hours we spent in this case.

11         Q.    (BY MR. O'NEIL) You can answer.

12         A.    I don't know.

13         Q.    Have you paid any money to your

14    lawyers?

15         A.    Yes.

16         Q.    How much?

17         A.    I've paid -- including my first lawyer?

18    Adler?

19         Q.    Are you seeking his fees in this case?

20         A.    Well, I've spent $12,000 on lawyer

21    fees.

22         Q.    Are all those $12,000 in connection

23    with the lawsuit that you brought against Trans

24    Union?

25         A.    I'm not understanding the question.

1    A.    I mean, that's the gist of it.

2    Q.    And so when you and your wife read

3    that, did you think, great, this product will

4    protect us from identity theft?

5    A.    Yes, sir.

6    Q.    Okay.  Of course, you were already a

7    victim office identify theft, that's your

8    position, right?

9    A.    Yes, sir.

10    Q.    Okay.  Has anybody else stolen your

11    identity since Mr. Perez did?

12    A.    As far as I know, no.

13    Q.    And, to your knowledge, has Mr. Perez

14    opened up any other accounts since you first

15    bought the product from Trans Union or Truelink?

16    A.    I can't answer that, I don't know.

17    Q.    Okay.  So, as you sit here now, you

18    don't have any evidence that there was any

19    additional misuse of your Social Security number

20    after your wife first bought the product?

21            MR. CLOON:  I'm going to object

22    to the form of the question.  Lacks foundation.

23    Calls for speculation.

24    A.    Can you repeat the question?

25    Q.    (BY MR. O'NEIL) I'll ask the court



**Metropolitan**
COURT REPORTERS    9200 INDIAN CREEK PARKWAY, SUITE 206
OVERLAND PARK, KANSAS 66210
1-800-745-7611 ▪ 913.317.8600 ▪ FAX 913.317.8660

38

1    reporter to repeat the question for you,

2    Mr. Millett.

3                     (Whereupon, the requested portion

4    of the record was read by the reporter.)

5                     MR. CLOON:  Same objection.

6         A.    Correct.

7         Q.    (BY MR. O'NEIL) Okay.  You also

8    mentioned something about the KCPA.  Do you

9    recall saying that this morning?

10        A.    Who?

11        Q.    You also mentioned the Kansas Consumer

12   Protection Act?

13        A.    Right.  Right.

14        Q.    What's that?

15        A.    It's a law.

16        Q.    Do you know anything more about it?

17        A.    Well -- it's the Consumer Protection

18   Act, that's about all I know.

19        Q.    Okay.  You also said that you wanted to

20   have your money returned?

21        A.    Right.

22        Q.    What money do you want to have returned

23   to you?

24        A.    What we paid for the product.

25        Q.    The full amount that you paid for the

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8600 • FAX 913.317.8880

39

1    product you want returned to you?

2        A.    Well, it doesn't work, so we want our

3    money back.

4        Q.    Did you ever ask Trans Union or

5    Truelink for a refund?

6        A.    Not me personally, no.

7        Q.    Has somebody else?

8        A.    Well, my wife has.

9        Q.    Really?  When did she do that?

10       A.    Well, I think she's did that.  I

11   can't --

12       Q.    Okay, well, your lawyer a couple times

13   this morning said calls for speculation; I don't

14   want you to speculate.  I'm asking, do you have

15   any knowledge that anybody --

16       A.    My wife handled that.

17       Q.    So you don't have any knowledge then?

18       A.    Yes, sir.

19       Q.    Okay.  So, as far as you know, you've

20   never asked Trans Union or Truelink for a

21   refund, right?

22       A.    Correct.

23       Q.    And at some point in time, you and your

24   wife decided that this product doesn't -- it

25   doesn't work, right?

44

1    wife in your home?

2        A.    Right.

3        Q.    And are you aware that your wife made

4    statements about the lawsuits that you filed?

5        A.    I'm not aware exactly what she talked

6    about.

7        Q.    That wasn't my question, sir.  Are you

8    aware that your wife made statements about the

9    lawsuits that you have filed?

10       A.    Okay, yes.

11       Q.    Are you aware that she made statements

12   about the products which are the subject of the

13   lawsuits?

14       A.    I'm aware she talked about the

15   products.

16       Q.    Did you ever read that article that

17   featured your picture of you and your wife in

18   your home?

19       A.    No, I never read it.

20       Q.    Okay.  So, you're not aware that

21   Mrs. Millett said, quote, "I still have credit

22   monitoring because of the simple fact that it is

23   the best tool available at this time"?  You're

24   not aware she said that?

25       A.    No.



Metropolitan
COURT REPORTERS

9800 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.948.7511 • 913.317.3800 • FAX 913.317.8550

45

1    Q.   Did she ever tell you that she thought

2    that you should continue purchasing the credit

3    monitoring product?

4    A.   No.

5    Q.   And you don't know whether or not you

6    are purchasing the credit monitoring product; is

7    that correct?

8    A.   That's correct.

9    Q.   The lawsuit that you brought -- and

10   I'll represent to you, by the way, the current

11   lawsuit that we're having your deposition taken

12   today is not against Trans Union, it's against a

13   company called Truelink.  Okay?

14   A.   Okay.

15   Q.   Okay.  Are you aware that you are suing

16   Truelink, not only on your own behalf, but on

17   behalf of every person in the country who ever

18   bought credit monitoring from Truelink?

19   A.   Yes, sir.

20   Q.   Okay.  And why are you doing that?

21   A.   Because your product doesn't work.

22   Q.   Well, that's your belief, right?

23   A.   Well, it's deceptive.

24   Q.   Okay.  Putting aside what your wife

25   said about the product, you don't think the



**Metropolitan**
COURT REPORTERS    9800 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.517.8800 • FAX 913.517.8850

50

1      A.    I think maybe I saw one.  Everything is

2   honky-dory.

3      Q.    Do you know how often your wife

4   received those e-mails?

5      A.    No, I can't answer that, I don't know.

6      Q.    Did you ever ask her, ask your wife, if

7   she ever got more than one e-mail from Truelink?

8      A.    No.  I don't recall asking her that.

9      Q.    Do you know when you purchased the

10  credit monitoring service from Truelink?

11     A.    I can't give you exact date.

12     Q.    Can you give me a rough date?

13     A.    I think it was like after the police

14  report or some time around there.

15     Q.    Okay.

16     A.    In general.

17     Q.    Do you know what year that was?

18     A.    I think it was 2003, I think.

19     Q.    And you told us today that you think

20  the product that Truelink sold to you doesn't

21  work, right?

22     A.    Yes, sir.

23     Q.    And could you tell me in what ways the

24  product doesn't work?

25     A.    Doesn't tell you if somebody's using



Metropolitan
COURT REPORTERS    9800 INDIAN CREEK PARKWAY, SUITE 203
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.9800 • FAX 913.317.9850

51

1    your Social Security number.

2         Q.   Any other problems that you have with

3    the product?

4         A.   Well, it says it's supposed to protect

5    me from identity theft, I'm not even sure it

6    does that.

7         Q.   So you don't know?  It may, but you

8    don't know, is that right?

9         A.   Yes, sir.

10        Q.   Okay.  And to your knowledge, you

11   haven't been the victim of identity theft, other

12   than this use by Mr. Perez of your Social

13   Security number, right?

14        A.   That's correct.

15        Q.   Okay.  Any other problems that you have

16   with the Truelink credit monitoring service?

17        A.   I think you should change your

18   advertising.

19        Q.   So, you're not happy with the

20   advertising, right?

21        A.   Correct.

22        Q.   Okay.  But you haven't seen the

23   advertising since that very first day in 2003

24   since you looked at it, right?

25        A.   Correct.

**Metropolitan**
COURT REPORTERS

9500 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

67

1       Q.   When do you think Mr. Perez first began

2   using your Social Security number?

3       A.   When I first found out, I think it was

4   like he's been using it for 13 years.

5       Q.   And, actually, let me direct your

6   attention to Page 2 of Millett Exhibit No. 1.

7   Paragraph 8 there on the bottom of Page 2,

8   Mr. Millett, says, quote, "On or about 1989 an

9   individual using the names Abundio P. Cuatle or

10   Abundio Cuatle or Abundio Perez or other similar

11   aliases began to use Plaintiff Steven Millett's

12   Social Security number." Do you see that, sir?

13       A.   Yes.

14       Q.   And that's consistent with what you

15   just said, that he had been using it for 13

16   years or so, right?

17       A.   Right.

18       Q.   Okay. How do you know that this use of

19   your Social Security number began as early as

20   1989?

21       A.   My wife obtained that. She had that

22   information from somebody, I can't recall who.

23       Q.   Okay. To your knowledge, has your

24   credit report information ever been accessed by

25   a company that was considering extending credit


Metropolitan
COURT REPORTERS    9800 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.745.7511 * 913.317.8600 * FAX 913.317.8650

70

1    quote, "had adversely impacted your credit
2    histories, credit reports and credit scores"?
3         A.    I believe that.
4         Q.    Okay.  Do you have any facts to support
5    that belief?
6         A.    Well, I should have got a first time
7    buyer for my home.
8         Q.    And were you ever told you're not
9    getting that because --
10         A.    Nobody ever told me that, no.
11         Q.    And then Paragraph 17 of the pleading,
12    it states that you and your wife discovered that
13    Bank of Amer Corporation maintained an account
14    for an individual who was fraudulently and
15    criminally utilizing the Social Security of
16    yourself, right?
17         A.    Yes, sir.
18         Q.    And that's consistent with your
19    testimony today?
20         A.    Yes, sir.
21         Q.    Okay.  But, at that time, you didn't
22    believe that that was a result -- well, wait a
23    minute.  So, in August of 2002, did you learn
24    that there was somebody out there who was
25    fraudulently and criminally using your Social


**Metropolitan**
COURT REPORTERS    9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.745.7511 • 913.317.8600 • FAX 913.317.8650

71

1    Security number?

2         A.    I had inklings.

3         Q.    Okay.  And that was why you and your

4    wife decided to buy the Equifax credit

5    monitoring product, right?

6         A.    Right.

7         Q.    Okay.  Does that refresh your

8    recollection that you may have bought the

9    Equifax product in 2002?

10        A.    I'm sorry, I'm getting confused again.

11   Yeah, we bought it some -- I think we bought it

12   like -- I can't remember.

13        Q.    Okay.

14        A.    I can't answer that.

15        Q.    And then the next paragraph of your

16   pleading states that, "On January 24, 2003, you

17   discovered that you couldn't use Ford's online

18   payment system because some other individual was

19   using your Social Security number for the same

20   purpose," right?

21        A.    Yes, sir.

22        Q.    Okay.  So, by January 2003, you knew

23   that there was a guy out there misusing your

24   Social Security number, right?

25        A.    Yes, sir.



82

1      this misuse of your Social Security number?

2          A.    I can't remember.

3          Q.    Well, did you do anything yourself to

4      investigate?

5          A.    I think I turned it all over to my

6      wife.

7          Q.    Why did you do that?

8          A.    Because she's better at numbers,

9      remembering.

10         Q.    Were you concerned when you discovered

11     that this gentleman was using your Social

12     Security number?

13         A.    Yes, sir.

14         Q.    And what were you concerned about?

15         A.    He was just out there buying up the

16     world.

17         Q.    Do you recall that you and your wife

18     decided you had to look at your credit reports

19     now that you've learned somebody was using your

20     Social Security number?

21         A.    Right.

22         Q.    Okay.  And did you do that?

23         A.    I think my wife did.

24         Q.    Okay.  And she got credit reports from

25     each of the three major credit bureaus, right?

83

1          A.    Right.

2          Q.    Okay.  Did you ever look at those

3    credit reports?

4          A.    I, yeah, I -- I don't see anything,

5    remember anything specific, but I think I looked

6    at them.

7          Q.    And what was your purpose in looking at

8    those credit reports?

9          A.    I was just seeing if there was Abundio

10   Perez anywhere.

11         Q.    Was there?

12         A.    No, not that I recall, no.

13         Q.    So you got credit reports from Trans

14   Union, Experian and Equifax, right?

15         A.    Right.

16         Q.    Okay.  And none of those credit reports

17   had any mention of Mr. Perez, right?

18         A.    As far as I know, right.

19         Q.    And none of those credit reports had on

20   them credit accounts that were Mr. Perez's,

21   right?

22         A.    As far as I know, yes.

23         Q.    And none of those credit reports

24   indicated that your credit report had been

25   accessed by somebody who was considering giving


Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7811 * 913.317.8600 * FAX 913.317.8650

96

1    to hand you what's been marked Millett Exhibit

2    No. 4, which I'll represent to you are more

3    pages that your lawyers have produced in this

4    case.

5                (Millett Exhibit 4 was marked for

6    identification by the reporter.)

7        Q.   (BY MR. O'NEIL) Tell me if you've seen

8    any of these pages before.

9        A.   Yeah, I've seen this before.

10       Q.   Okay.  And do you recall that in April

11   2003, at the request of your wife, Trans Union

12   performed an investigation?

13       A.   Okay.

14       Q.   Do you recall that, sir?

15       A.   I remember this document.

16       Q.   Okay.  Let me take you to the second

17   page of Exhibit No. 4, Mr. Millett.  It says,

18   "Dear Consumer:  This will acknowledge receipt

19   of your recent correspondence."  Do you recall

20   that you actually sent correspondence to Trans

21   Union prior to April 23, 2003?

22       A.   I think my first lawyer did.

23       Q.   Okay.  You think it was your lawyer who

24   did it?

25       A.   Yeah, that's what I think, yeah.



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 206
OVERLAND PARK, KANSAS 66210
1.800.748.7811 • 913.317.8800 • FAX 913.317.8850

**PAGE 97 REDACTED**

98

1       of your Social Security number, correct?

2            A.    Yes, sir.

3            Q.    And no other bureau did this, right?

4            A.    Correct.

5            Q.    And they -- and Trans Union did this

6       for free; isn't that correct?

7            A.    I believe so.

8            Q.    Whose handwriting is on these pages,

9       sir?

10           A.    My wife's.

11           Q.    Did you contact any of these companies

12      that Trans Union identified for you?

13           A.    No.

14           Q.    Your wife did?

15           A.    Yes, sir.

16           Q.    Do you recall talking with your wife

17      once you got this letter from Trans Union?

18           A.    Yeah.

19           Q.    And what did the two of you discuss at

20      that time?

21           A.    Like how many accounts was on here.

22           Q.    Okay.    Were you grateful that finally

23      you were given some information after Bank of

24      America and Ford Motor and Equifax and Experian

25      wouldn't give you the information?

**Metropolitan**
COURT REPORTERS

99

1          A.    Yes.

2                     MR. O'NEIL:   Let's go off the

3     record.

4                     VIDEOGRAPHER:   We are now going

5     off the record at 11:03 AM.

6                     (Recess.)

7                     VIDEOGRAPHER:   It is now 11:12

8     and we are back on the record.   You may

9     continue.

10         Q.    (BY MR. O'NEIL) Mr. Millett, I wanted

11    to tell you something I've never told a witness

12    in the middle of a deposition, which is that I

13    appreciate your patience and we're making some

14    good progress today.   So I just wanted to let

15    you know that.

16                    MR. CLOON:   How about my

17    patience?

18                    MR. O'NEIL:   You know what,

19    that's a good point.   Because I did thank you

20    for your patience, but it was off the record.

21    So, for the record, Mr. Cloon should also be

22    commended.   I've got nothing to say about

23    Mr. Grissom.

24                    MR. CLOON:   It's early.   Sorry.

25         Q.    (BY MR. O'NEIL) I think you told us



107

1    A.    You'd have to ask her that.

2    Q.    Well, actually, I'm asking about your

3    knowledge.  To your knowledge, has she ever --

4    A.    No, I never physically saw her push the

5    buttons on the phone and called Truelink.

6    Q.    Okay.  Did she ever tell you that she

7    called Truelink?

8    A.    I don't remember.

9    Q.    Even if you hadn't seen her push the

10   buttons?  Did she ever tell you that she called

11   Truelink?

12   A.    She called a lot of people, I don't

13   remember who all she called.

14   Q.    Did she ever tell you that she called

15   Truelink?

16   A.    I don't think she ever said that, no.

17   Q.    Did she ever tell you that she was

18   unhappy with the products that were purchased

19   from Truelink?

20   A.    I don't ever recall her saying that

21   specifically, no.

22   Q.    Did you understand that in order to

23   purchase the product from Truelink, you had to

24   agree to the terms of the contract between you

25   and Truelink?



**PAGE 110 REDACTED**

111

1     since you purchased the Truelink product, have

2     you suffered any other harm as a result of

3     Truelink not delivering what you believe it

4     promised?

5              MR. CLOON:  Same objection.

6        A.    I'm not understanding the question very

7     well.

8        Q.    (BY MR. O'NEIL) Okay.  Well, I mean,

9     you're claiming Truelink's product wasn't what

10    it promised, right?

11       A.    Correct.

12       Q.    And I think you also said you think

13    some of the advertising regarding the product

14    was not accurate, right?

15       A.    Right.

16       Q.    Okay.  And so now I'm asking you, okay,

17    Mr. Millett, so what?  What harm have you

18    suffered, if in fact what you say is true?

19            MR. CLOON:  Same objection.

20       A.    I don't know how to answer that.

21       Q.    (BY MR. O'NEIL) Why don't you know how

22    to answer it?

23       A.    Well, I mean, like I said before, the

24    guy could be out there doing whatever.

25       Q.    Okay.  Is that your complete answer?



112

1          A.    Yes, I believe so.

2          Q.    What is it that you believe Truelink

3     promised and did not deliver?

4          A.    It said it can protect me from identify

5     theft.

6          Q.    Okay.  And you don't think it's

7     protected you from identity theft?

8          A.    Not as far as Social Security numbers

9     are involved.

10          Q.    But, sir, you've already testified that

11     you believe Mr. Perez began misusing your Social

12     Security number in 1989.  Do you recall that?

13          A.    Yes.

14          Q.    And also you learned as of April 2003

15     that he had used your Social Security number to

16     open 26 accounts.  Do you recall that?

17          A.    Yes, sir.

18          Q.    Okay.  I'll represent to you that in

19     the complaint that your lawyers filed, it state,

20     quote, "Plaintiffs purchased the credit

21     monitoring service on or about August 2, 2003."

22     Okay.  So, you're not blaming Truelink for

23     anything that occurred prior to August 2, 2003,

24     are you?

25          A.    Right.



Metropolitan
COURT REPORTERS

9800 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

113

1        Q.    Okay.  So, if in fact you were a victim

2    of identity theft or if in fact as it appears

3    this guy misused your Social Security number

4    prior to August 2, 2003, you can't blame

5    Truelink for that, right?

6        A.    Right.

7        Q.    And you don't have any evidence that

8    there's been additional identity theft that has

9    occurred since August 2nd, 2003, do you?

10       A.    Right.

11       Q.    Are there any other ways that you think

12   Truelink's alleged failure to deliver what it

13   promised has hurt you?

14       A.    Well, I just -- I mean, if you said in

15   your advertisement that this doesn't protect

16   from Social Security fraud, then we probably

17   wouldn't have bought it.

18       Q.    Really?  Is that your testimony today?

19   That if Truelink had told you that we're only

20   going to give you information in your credit

21   report and not information in another person's

22   report, that you wouldn't have bought the

23   product, is that your testimony?

24       A.    Well, it said it would protect me from

25   identify theft.



Metropolitan
COURT REPORTERS

9800 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7611 • 913.317.8800 • FAX 913.317.8850

115

1     Q.   Okay.  And do you understand that that

2    was the basis, one of the bases for the Court in

3    California dismissing some of the claims you

4    brought against Experian?

5     A.   Okay.

6     Q.   Okay.  So, go back to my original

7    question.  Are you saying that if you had been

8    told by Truelink that we're only going to alert

9    you to changes in your credit report, that you

10    would not have bought the product?

11     A.   I'm saying that if they would have said

12    what this product does and doesn't do, then, I

13    mean, we might have bought it and we might not

14    have bought it.  If it was all spelled up

15    instead of with the broad statement, well, this

16    is -- we protect you from identify theft.

17     Q.   With all due respect, sir, you don't

18    know what Truelink told you in August of 2003

19    about their product, isn't that correct, because

20    you didn't look at it?

21         MR. CLOON:  I'm going to object.

22    That's argumentative.

23     Q.   (BY MR. O'NEIL) You can answer.

24     A.   Can you ask that question again?

25     Q.   With the exception of -- somehow this



**Metropolitan**
COURT REPORTERS   9800 INDIAN CREEK PARKWAY, SUITE 206
OVERLAND PARK, KANSAS 66210
1.800.748.7611 • 913.317.8600 • FAX 913.317.8850

119

1       Q.    Meaning three credit bureaus, right?

2   When you say "three in one", are you referring

3   to three credit bureaus?

4       A.    Right.

5       Q.    Okay.  I mean, you understand there's a

6   company called Trans Union?

7       A.    Right.

8       Q.    And that's a credit bureau?  Is that

9   your understanding?

10      A.    Right.

11      Q.    Do you have an understanding of the

12   business of Truelink?

13      A.    It's the credit monitoring.

14      Q.    What was your understanding back in

15   August of 2003 of what a credit monitoring

16   product is?

17      A.    It would be checking to see if there

18   was activity on my credit report.

19      Q.    Trans Union identified for you the

20   credit accounts for which Mr. Perez was using

21   the Social Security number, isn't that correct?

22      A.    Yes.

23      Q.    Was there some additional information

24   you wanted from Trans Union regarding those

25   accounts?

122

1     that's why --

2         A.   Okay.

3         Q.  -- that's why I asked you did you

4     understand they were a separate company?

5         A.   Yes, sir.  I'm sorry.

6         Q.   You don't have to apologize.  So, now

7     my question is, I understand that it's your

8     belief and your understanding that your wife

9     told Trans Union about the misuse of your Social

10    Security number by Mr. Perez, right?

11        A.   Yes, sir.

12        Q.   Okay.  Now my question is, do you have

13    any reason to believe that your wife informed

14    Truelink of that fact?

15        A.   I can't -- I can't answer for my wife.

16    I don't know.

17        Q.   Okay.  Have you ever told Truelink,

18    separate and apart from the filing of this

19    lawsuit, have you ever told Truelink that you

20    weren't happy with the product that you were

21    paying for?

22        A.   Not me, no.

23        Q.   To your knowledge, has your wife ever

24    informed Truelink that the two of you were not

25    happy with the product that Truelink was selling



125

1    no, strike that, I don't know if --

2         Did you ever have a conversation with

3    your wife about the fact that you had once sued

4    Trans Union and then you dismissed that lawsuit?

5         A.   I can't remember.

6         Q.   Did you ever have a conversation with

7    your wife that after that dismissal you sued

8    Truelink?

9         A.   I can't answer.  I don't remember.

10        Q.   Do you know where the lawsuit against

11   Truelink, do you know where that lawsuit is

12   pending?  What state of the country?

13        A.   It's Delaware.

14        Q.   Okay.  Do you recall that you initially

15   sued them in Kansas?

16        A.   Right.  That's when it started.

17        Q.   Now, you told us earlier that you were

18   not blaming Truelink for any identity theft that

19   occurred before you first purchased the product

20   in August of 2003.  Do you recall that?

21        A.   Could you repeat the question again?

22        Q.   Sure.  This morning I was asking about

23   the harm that you suffered because the Truelink

24   product allegedly didn't do what you thought it

25   was going to do.  Do you recall that

136

1          A.    Well, it's --

2          Q.    Did you ask for a copy of it?

3          A.    Well, yeah, but I mean, there's e-mails

4    and I just -- I never --

5          Q.    Why couldn't you get a copy of it?

6          A.    I just couldn't get a copy of it.

7          Q.    Who did you ask?

8          A.    I asked -- I asked the -- I asked my

9    wife if she had a copy.

10         Q.    And what did she say?

11         A.    She'd have to get an e-mail from Joyce

12   Yeager.

13         Q.    But your wife wasn't able to obtain a

14   copy of this for you to review in advance of

15   your deposition?

16         A.    No.  I -- no.

17         Q.    So, when did you see this document

18   then?

19         A.    I think whenever the lawyers handed it

20   out, I think.

21         Q.    Let me direct your attention to the

22   second page of this exhibit, Mr. Millett.

23         A.    Second page.

24         Q.    If you see Interrogatory No. 4 there,

25   sir.  And it asks for some specific information



137

1    regarding each time that you visited the

2    website.  Do you see that, sir?

3        A.    Yes.

4        Q.    And the response is, quote, begins,

5    quote, "My wife as my agent visited the Trans

6    Union website often," closed quote.  Do you see

7    that, sir?

8        A.    Yes, sir.

9        Q.    And that's a sentence that your wife

10   wrote, right?

11       A.    Right.

12       Q.    Do you know what it means to describe

13   your wife as your agent?

14       A.    She's working for my -- under my

15   behalf.

16       Q.    Okay.  And it says that she visited the

17   Trans Union website.  And I'll represent to you

18   that there are, and we'll go through it in these

19   answers, there's references to Trans Union in

20   almost every answer.  At the time that your wife

21   answered these interrogatories for you, you

22   weren't aware that you were suing Truelink,

23   right?

24            MR. CLOON:  Objection.  It's been

25   asked and answered on a variety of occasions.



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

140

1    financial and household management affairs for

2    our family.  She has disputed many accounts on

3    our behalf.  We do not feel as if we know about

4    all of the accounts which should be closed.  I

5    know that she had to close accounts which

6    appeared on the letter we got from Trans Union."

7    Do you see that, sir?

8        A.    Yes.

9        Q.    You don't have any information

10   regarding her disputing accounts, do you?

11       A.    I mean, what do you mean?

12       Q.    Okay.  Well, I mean, what does it mean

13   to dispute an account?  Do you have an

14   understanding of what that means?

15       A.    That you're saying something's wrong.

16       Q.    Okay.  What accounts was your wife

17   disputing, if you know?  Do you know?

18       A.    You'd have to ask her.

19       Q.    Some day maybe I will, but right now

20   I'm asking, do you have any idea what accounts

21   she was allegedly disputing?

22       A.    I think the ones on that Trans Union

23   letter here.

24       Q.    So, she was disputing the accounts that

25   were on Mr. Perez's file?  Is that what you



141

1    mean?  Or is that what you think?

2        A.    I think she's disputing all these.

3        Q.    Okay.  I mean, are you guessing there

4    or do you know that?

5              MR. CLOON:    For the record --

6        A.    Yes.

7              MR. CLOON:    -- the record the

8    reference was to the --

9        A.    Yes, these are the accounts she was

10   closing.

11       Q.    (BY MR. O'NEIL)  Okay.  She never

12   disputed accounts that were on your credit

13   report, did she?

14       A.    Okay, repeat the question.

15       Q.    Mrs. Millett never disputed accounts

16   that were on your credit report, did she?

17       A.    I don't -- I don't remember.

18       Q.    Okay.  You don't recall seeing any

19   accounts on your credit report that you

20   disputed, do you?

21       A.    That's right.

22       Q.    Okay.  Your interrogatory answer goes

23   on to say, quote, "I know that she had to close

24   accounts which appeared in the letter from Trans

25   Union," closed quote.  Do you see, though, sir?

**PAGE 144 REDACTED**

**PAGE 145 REDACTED**

**PAGE 146 REDACTED**

**PAGE 147 REDACTED**

148

1    number?

2        A.    Yeah, but it wasn't showing up on here.

3        Q.    So, did you realize then that this

4    credit monitoring product is not going to tell

5    you about things that occur outside of your

6    credit report?

7        A.    That's the conclusion I came to.

8        Q.    And did you have a conversation with

9    your wife at that point about that fact?

10       A.    Yeah, something along those lines,

11   yeah.

12       Q.    Tell me about that conversation.  What

13   did you tell -- what did you say to her when you

14   realized that just like Experian and Equifax,

15   Truelink wasn't going to be telling you as part

16   of their credit monitoring service that

17   Mr. Perez was using your Social Security number?

18       A.    That's the basic conversation right

19   there.

20       Q.    And what was your wife's response?

21       A.    We didn't understand.

22       Q.    So, did you suggest to her at that

23   point that you might as well cancel this

24   subscription?

25       A.    I don't think we discussed that, no.



Metropolitan
COURT REPORTERS    9800 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7611 • 913.317.8600 • FAX 913.317.8650

149

1      Q.    Did you tell her, you know, Melody, I'm

2  thinking that maybe this credit monitoring

3  service only tells me about my credit report and

4  not Mr. Perez's credit report?

5              MR. CLOON:   Object to form.

6  Leading and suggestive.

7      Q.    (BY MR. O'NEIL) You can answer.

8      A.    Can you repeat that, sir?

9      Q.    Sure, I'll rephrase it.  Did you

10  suggest to your wife that if what you say is

11  true, you were both mistaken in believing that

12  the credit monitoring service would alert you to

13  changes outside of your own credit report?

14     A,    I think we were thinking that we'd see

15  something on my credit report that he's out

16  there charging stuff, that's what my assumption

17  was.

18     Q.    And you never saw those?

19     A.    Right.  Correct.

20     Q.    So, your assumption was wrong, right?

21     A.    Right.

22     Q.    And you knew that pretty early on,

23  didn't you?

24     A.    We were just trying to compare

25  information between the three credit



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

150

1    monitorings.

2         Q.    And they were all the same, no -- none

3    of those credit monitoring products by any of

4    those companies ever told you that Mr. Perez was

5    using your Social Security number; isn't that

6    correct?

7         A.    Yes.

8         Q.    Did you continue to believe, however,

9    that some day Truelink was going to provide that

10   information to you?

11        A.    Well, they shouldn't -- they shouldn't

12   advertise that they'd protect me from identity

13   theft, they just protect with name theft and

14   credit card.

15             MR. O'NEIL:    Could you restate

16   the question for Mr. Millett?    I'll ask you to

17   answer the question.

18             (Whereupon, the requested portion

19   of the record was read by the reporter.)

20        A.    Through their credit monitoring?

21        Q.    (BY MR. O'NEIL) Yes.

22        A.    No.

23        Q.    You realized you weren't going to get

24   that information through any credit monitoring

25   service, right?



9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8500 • FAX 913.317.8550

151

1       A.    Correct.

2       Q.    And you realized that if you or your

3   wife in fact had actually believed that that was

4   what these services did, that you were wrong,

5   right?

6       A.    Yes, sir.

7       Q.    When you saw that one e-mail that your

8   wife got from True Credit, did you click on the

9   link to get the more information that was behind

10  the e-mail?

11      A.    No, sir.

12      Q.    Let me go back to your interrogatory

13  answers, which is Exhibit No. 6, Mr. Millett.

14  If you could take a look at that.  And, again, I

15  apologize these pages don't seem to be numbered,

16  but if you can go to the sixth page --

17      A.    Just put me in the right spot.

18      Q.    Yeah, the sixth page, Mr. Millett.

19  Actually, I want to ask you to go back one page

20  to Interrogatory No. 7, on the bottom of the

21  prior page.

22      A.    Okay.

23      Q.    Here you are asked if you claim to have

24  suffered any economic loss as a result of the

25  conduct of Truelink alleged in the fourth



153

1       A.    Okay.

2       Q.    Is it your belief, and I'm asking you

3   as you sit here today under oath, is it your

4   belief that you could not get credit because of

5   the conduct of Truelink as alleged in your

6   complaint?

7       A.    I'd have to answer it's a mixture of

8   things.

9       Q.    So, it's you couldn't get credit

10  because of things other than the conduct of

11  Truelink?

12      A.    I'd say it's all one big mess.

13      Q.    What conduct of Truelink made it

14  impossible for you to get credit?

15      A.    I can't -- I don't know.  I can't

16  answer that.

17      Q.    Were you ever denied credit?

18      A.    I couldn't get some credit cards I

19  think.

20      Q.    You think?  What credit cards could you

21  not get?

22      A.    I can't remember specifically which

23  ones they were.

24      Q.    Was this prior to August of 2003 that

25  you couldn't get credit?



Metropolitan
COURT REPORTERS    8200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.217.8500 • FAX 913.517.8550

154

1           A.    I don't remember when.

2           Q.    What conduct of Truelink contributed to

3      you not being able to get a credit card?

4           A.    I don't know.

5           Q.    Your answer also says, "We had to pay

6      extra money for insurance, too."  What insurance

7      did you have to pay extra money for?

8           A.    I think, I can't remember if it was All

9      State.

10          Q.    What kind of insurance is that, sir?

11          A.    It's for the cars and the house.

12          Q.    Okay.  And why couldn't -- why did you

13     have to pay extra money for insurance with All

14     State?

15          A.    Because my credit score wasn't as high

16     as it should be.

17          Q.    Okay.  And was that because you didn't

18     have many credit accounts?

19          A.    No, I believe because of this Abundio.

20          Q.    Do you have any evidence of that,

21     Mr. Millett?

22          A.    No, that's what I believe.

23          Q.    What's the reason why you believe that

24     Mr. Perez's conduct made your All State

25     insurance more expensive?



Metropolitan
COURT REPORTERS    9800 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

155

1        A.    Because I feel like he lowered my

2   credit score because he's out there charging

3   stuff.

4        Q.    Is that your complete answer?

5        A.    Yeah, I guess so.  Yeah.

6        Q.    Do you think the conduct of Truelink

7   somehow contributed to --

8        A.    I don't know.

9        Q.    Let me finish my question.  Do you

10  think that the conduct of Truelink made your All

11  State insurance more expensive?

12       A.    I don't know.  I can't answer that.

13       Q.    Well, actually, you did answer it and

14  you said, yes.  You said that, yes, conduct of

15  Truelink made you have to spend a lot more money

16  to get insurance.  Are you withdrawing that

17  statement now, sir?

18       A.    I think it all contributed.

19       Q.    You also state that you had to borrow

20  money for your home from the family trust.  Do

21  you see that, sir?

22       A.    Yes, sir.

23       Q.    Was the alleged failure of Truelink to

24  deliver a credit monitoring product that you

25  think they promised somehow require you to

**Metropolitan**
COURT REPORTERS    9200 INDIAN CREEK PARKWAY, SUITE 905
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8600 • FAX 913.317.8850

156

1       borrow money from a family trust?

2           A.    Can you repeat the question?

3           Q.    Do you think that somehow Truelink's

4       alleged failure to deliver a credit monitoring

5       product that it allegedly promised, somehow

6       required you to borrow money from your family

7       trust?

8           A.    I'd say yeah.

9           Q.    And how did that -- why do you think

10      that those two things are connected?

11          A.    I think it's all connected.

12          Q.    Sir, I'm not asking about all. I'm

13      asking about the conduct alleged by Truelink.

14      The failure of Truelink to deliver the product

15      that you think it promised, how did that

16      contribute to you having to spend -- you having

17      to borrow money from a family trust?

18          A.    Because I couldn't get a mortgage rate.

19          Q.    And you think that that was because of

20      some conduct by Truelink?

21          A.    I can answer it this way, I think it's

22      -- I think so, yeah.

23          Q.    Okay.

24                MR. O'NEIL:  We apparently have

25      to change the tape, so let's go off the record.



157

1            VIDEOGRAPHER:  We are now going

2    off the record at 2:15 PM.

3            (Recess.)

4            VIDEOGRAPHER:  It is now 2:17 PM

5    and we are back on the record.  You may

6    continue.

7            MR. CLOON:  For the record, I

8    have a statement.  Off the record, I advised

9    counsel that we have amended or supplemented

10   these answers to Interrogatories 7, 8, 9 and 10,

11   and basically withdrew the damages as set out in

12   the original answer to Interrogatories 7, 8, 9

13   and 10.  But if you wish to inquire, I'm going

14   to object that it's no longer relevant to that

15   line of questioning.

16           MR. O'NEIL:  Well, I don't want

17   to get into debate, but you did mischaracterize

18   the supplement to the interrogatory responses,

19   and I sure as hell don't want to waste

20   Mr. Millett's time having you and I debate the

21   relevance of this line of questioning.  Your

22   relevance objection is noted, and we'll just

23   move on.

24           MR. CLOON:  Thank you.

25        Q.   (BY MR. O'NEIL) Mr. Millett, that same



Metropolitan
COURT REPORTERS        9200 INDIAN CREEK PARKWAY, SUITE 205
                       OVERLAND PARK, KANSAS 66210
                       1.800.748.7611 • 913.317.3500 • FAX 913.317.3550

158

1  response a few lines down says, quote, "I

2  remember sometimes my wife ordered a credit

3  report because Trans Union told us there was a

4  change, and then the report did not have a

5  change on it," closed quote. Do you see that,

6  sir?

7       A.   Yes.

8       Q.   But you now know that it was actually

9  Truelink who was advising of changes in your

10 report, right?  It was Truelink that was

11 providing you the credit monitoring service,

12 right?

13      A.   Yes.

14      Q.   Okay.  Does this refresh your

15 recollection that your wife ordered credit

16 reports from Truelink?

17      A.   Yes.

18      Q.   Okay.  Because this morning you recall

19 you testified that you thought it was just

20 credit monitoring that you purchased from

21 Truelink?  Do you remember that?

22      A.   Yes, sir.

23      Q.   Okay.  But now this interrogatory

24 answer that your wife prepared, that reminds you

25 that you actually purchased credit reports too?



**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 208
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850