**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| STEVEN G. MILLETT, MELODY J. MILLETT, | ) | |
| On Behalf of Themselves and All Others | ) | |
| Similarly Situated, | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 05-599-SLR |
| v. | ) | |
| | ) | |
| TRUELINK, INC., | ) | |
| A Trans Union Company, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

ERISMAN & CURTIN

<u>/s/ Christopher J. Curtin</u>
Christopher J. Curtin
DE Bar Id. No. 0226
Erisman & Curtin
629 Mount Lebanon Road
Wilmington, Delaware 19803
Phone: (302) 478-5577
Facsimile: (302) 478-5494
Email: ccurtin659@aol.com

DATE: October 1, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| STEVEN G. MILLETT, MELODY J. MILLETT, ) | |
| On Behalf of Themselves and All Others ) | |
| Similarly Situated, ) | |
| Plaintiffs, ) | |
| ) | Case No. 05-599-SLR |
| v. ) | |
| ) | |
| TRUELINK, INC., ) | |
| A Trans Union Company, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT**

**TABLE OF CONTENTS**

Introduction.  Summary judgment standard

Sommer v. The Vanguard Group,  461 F.3d 397,  403 -404 (3rd Cir. 2006)        1

Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)        1

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)        1,2

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)        2

State ex rel. Topeka Police Dept. v. $895.00 U.S. Currency, 281 Kan. 819, 825, 133 P.3d 91 (2006)        2

State ex rel. Kline v. Berry,  35 Kan.App.2d 896, 902, 137 P.3d 500, 505 (2006)        2

**THE VIOLATION OF THE ACT**        2

K.S.A. §50-626        2

K.S.A. §50-627(a)        2

K.S.A. §50-623        2

K.S.A. §50-624(b)        3

K.S.A. § 50-624(c)        3

Dodson v. U-Needa Self Storage, LLC, 32 Kan.App.2d 1213, 1218,
96 P.3d 667, 672 (2004)                                                                    4, 5

 State ex rel. Stovall v. ConfiMed.com, 272 Kan. 1313, 1317, 38 P.3d 707 (2002)    4

K.S.A. § 50-257                                                                           4

K.S.A. § 50-257(b)                                                                        5

K.S.A. §50-639                                                                            5

K.S.A. § 50-627(a)                                                                        5

York v. InTrust Bank, N.A.,  265 Kan. 271, 290, 962 P.2d 405, 420 (1998)                  6

**KCPA CLASS VIOLATIONS**                                                                 6

The contract and (b)(1)                                                                   6

K.S.A. § 60-257(b)(1)                                                                     6

15 U.S.C.  § 1681a, et seq.                                                              6-7, 10

Griffin v. Security Pacific Automotive Financial Services Corp., 33 F.Supp.2d 926,
930 (D.Kan. 1998)                                                                         8

Pattern Instructions for Kansas, PIK Civil 3d § 103.04                                    8

Identity theft and (b)(1)                                                                 9

K.S.A. §50-627(b)(1)                                                                      11

Contract and (b)(5)                                                                      11

K.S.A. § 50-627(b)(5)                                                                    11

Hartford v. Tanner,  22 Kan.App.2d 64, 72, 910 P.2d 872, 878 (1996)                      11

Dodson v. U-Needa Self Storage, LLC, 32 Kan.App.2d 1213, 1219,
96 P.3d 667, 672 (2004)                                                                  11-12

K.S.A. §50-627(b)(7)                                                                     12

Finstad v. Washburn University, 252 Kan. 465, 473, 845 P.2d 685 (1993)                   12

Product failures and (b)(6)                                                              12

K.S.A. § 50-627(b)(6)                                                                    12

Excluded warranties and (b)(7)                                                           16

K.S.A. § 50-639                                                                                        16

K.S.A. § 84-2-314                                                                                      16

K.S.A. § 50-627(b)(7)                                                                                  16

K.S.A. § 50-639(a)(1)                                                                                  16

K.S.A. § 50-625                                                                                        16

Farrell v. General Motors Corp., 249 Kan. 231, 241, 815 P.2d 538, 546 (1991)                           16

K.S.A. §50-639(a)(1)                                                                                    17

Stair v. Gaylord. 232 Kan. 765, 776, 659 P.2d 178, 187 (1983)                                          17

K.S.A. §50-627(b)(7)                                                                                    17

Zenda Grain & Supply Co. v. Farmland Industries, Inc., 20 Kan.App.2d 728, 737,
894 P.2d 881, *rev. denied* 257 Kan. 1096 (1995)                                                       17

K.S.A. § 50-627(b)(7)                                                                                  17-18

Finstad v. Washburn Univ., 252 Kan. 465, 473, 845 P.2d 685 (1993)                                      18

K.S.A. § 50-627(b)(7)                                                                                  18

DAMAGES                                                                                                18

The remedies provided by the KCPA                                                                      18

Monetary damages available to Plaintiff Steve Millett                                                  18

Data not provided                                                                                      18

Watch status failures                                                                                  22

Remedy for Steven Millett: Monetary damages to Steven Millett                                          23

K.S.A. § 50-636(a)                                                                                     23

Dodson v. U-Needa Self Storage, LLC, 32 Kan.App.2d 1213, 1220,
96 P.3d 667, 673 (2004)                                                                                23

K.S.A. § 50-636(a)                                                                                     23

K.S.A. § 50-634(b)                                                                                     23

Alexander v. Certified Master Builders Corp., 268 Kan. 812, 822-823,
1 P.3d 899, 907 (2000)                                                                                 23-24

K.S.A. §50-634(b)                                                                24

K.S.A. §50-636(b)                                                                24

Gonzalez v. Pepsico, Inc., 489 F.Supp.2d 1233, 1248 (D. Kan. 2007)              25

Lowe v. Surpas Resource Corp.  253 F.Supp.2d 1209, 1231 (D.Kan. 2003)          25

K.S.A. §50-634(d)                                                                26

State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas,  275 Kan. 763,
776-777, 69 P.3d 1087, 1096 (2003)                                              26- 28

Equitable Life Leasing Corp. v. Abbick, 243 Kan. 513, 757 P.2d 304 (1988)      27-28

Dodson v. U-Needa Self Storage, LLC, 32 Kan. App.2d 1213, 1220-21,
96 P.3d 667, 673 (2004)                                                         29

K.S.A. §50-627(b)                                                               29

K.S.A. § 50-634                                                                 29

Attorneys fees – Statutory remedy provided by KCPA                             29

York v. InTrust Bank, N.A.,  265 Kan. 271, 308, 962 P.2d 405, 430 (1998)       29-30

Equitable relief as remedy to class members                                    30

K.S.A. §50-634(a)                                                               30

Conclusion                                                                      34

## TABLE OF AUTHORITIES

Alexander v. Certified Master Builders Corp., 268 Kan. 812, 822-823, 1 P.3d 899, 907 (2000)    24

Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)    1

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)    1,2

Dodson v. U-Needa Self Storage, LLC, 32 Kan.App.2d 1213, 1218, 96 P.3d 667, 672 (2004)  4,5, 12, 23, 29

Equitable Life Leasing Corp. v. Abbick, 243 Kan. 513, 757 P.2d 304 (1988)    27-28

Farrell v. General Motors Corp., 249 Kan. 231, 241, 815 P.2d 538, 546 (1991)    16

Finstad v. Washburn Univ., 252 Kan. 465, 473, 845 P.2d 685 (1993)    12, 18

Gonzalez v. Pepsico, Inc., 489 F.Supp.2d 1233, 1248 (D. Kan. 2007)    25

Griffin v. Security Pacific Automotive Financial Services Corp., 33 F.Supp.2d 926, 930
(D.Kan. 1998)    8

Hartford v. Tanner, 22 Kan.App.2d 64, 72, 910 P.2d 872, 878 (1996)    11

Lowe v. Surpas Resource Corp. 253 F.Supp.2d 1209, 1231 (D.Kan. 2003)    8, 25

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348,
89 L.Ed.2d 538 (1986)    2

Sommer v. The Vanguard Group, 461 F.3d 397, 403 -404 (3rd Cir. 2006)    1

Stair v. Gaylord. 232 Kan. 765, 776, 659 P.2d 178, 187 (1983)    17

State ex rel. Kline v. Berry, 35 Kan.App.2d 896, 902, 137 P.3d 500, 505 (2006)    2

State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas, 275 Kan. 763, 776-777,
69 P.3d 1087, 1096 (2003)    26- 28

State ex rel. Stovall v. ConfiMed.com, 272 Kan. 1313, 1317, 38 P.3d 707 (2002)    4

State ex rel. Topeka Police Dept. v. $895.00 U.S. Currency, 281 Kan. 819, 825,
133 P.3d 91 (2006)    2

York v. InTrust Bank, N.A., 265 Kan. 271, 290, 962 P.2d 405, 420 (1998)    6, 29-30

Zenda Grain & Supply Co. v. Farmland Industries, Inc., 20 Kan.App.2d 728, 737,
894 P.2d 881, rev. denied 257 Kan. 1096 (1995)    17

## <u>OTHER AUTHORITIES</u>

15 U.S.C. 1681a, *et seq*.                                    6

K.S.A. § 50-625                                              16

K.S.A. § 50-627(b)(5)                                        11

K.S.A. § 50-627(b)(6)                                        12

K.S.A. § 50-627(b)(7)                                        16

K.S.A. § 50-634                                              23

K.S.A. § 50-634(b)                                           23

K.S.A. § 50-636(a)                                           23

K.S.A. § 50-639                                               5

K.S.A. § 50-639(a)(1)                                        16

K.S.A. § 60-257(b)(1)                                         6

K.S.A. § 84-2-314                                            16

K.S.A. §50-627(b)                                             3

K.S.A. §50-627(b)(1)                                          6

K.S.A. §50-627(b)(7)                                          7

K.S.A. §50-634(a)                                        23, 30

K.S.A. §50-634(d)                                            26

K.S.A. §50-639(a)(1)                                         16

Pattern Instructions for Kansas, PIK Civil 3d § 103.04        8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| STEVEN G. MILLETT, MELODY J. MILLETT, ) | |
| On Behalf of Themselves and All Others ) | |
| Similarly Situated, ) | |
|         Plaintiffs, ) | |
| ) | Case No. 05-599-SLR |
| v. ) | |
| ) | |
| TRUELINK, INC., ) | |
| A Trans Union Company, ) | |
| ) | |
|         Defendant. ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT**

Plaintiffs Steven G. and Melody Millett ("Named Plaintiffs"), by and through counsel of record,

present this memorandum in support of their motion for partial summary judgment, a motion as to the

violations of Defendant concerning the Kansas Consumer Protection Act at K.S.A. § 50-627(b).  In

support of their motion for summary judgment, Named Plaintiffs state as follows:

**LEGAL ARGUMENT**

Introduction.  Summary judgment standard

A court may grant summary judgment when the submissions in the record show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Sommer v. The Vanguard Group,  461 F.3d 397,  403 -404 (3rd Cir. 2006)(citing Rule 56(c), Federal

Rules of Civil Procedure).   The substantive law identifies which facts are material. Anderson v. Liberty

Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  In determining whether summary

judgment is appropriate, the evidence of the non-movant is to be believed, and all justifiable inferences

are to be drawn in its favor.  Id. (citing Anderson, 477 U.S. at 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 ).

The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." Id. (quoting Anderson, 477

U.S. at 251-252, 106 S.Ct. 2505).

An issue of fact is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.  <u>Anderson</u>, 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202.  The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once the movant has met this initial burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.   <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); <u>Anderson</u>, 477 U.S. at 256, 106 S.Ct. 2505; <u>Celotex</u>, 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. <u>Anderson</u>, 477 U.S. at 256, 106 S.Ct. 2505.

It is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. Stated another way, when a statute is plain and unambiguous, the courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in it.  <u>State ex rel. Topeka Police Dept. v. $895.00 U.S. Currency</u>, 281 Kan. 819, 825, 133 P.3d 91 (2006).  A solicitation by a supplier may be sufficient to subject a supplier to the requirements and penalties of the Act regardless of whether the solicitation results in a sale, lease or other disposition of property within the State of Kansas.  <u>State ex rel. Kline v. Berry</u>,  35 Kan.App.2d 896, 902, 137 P.3d 500, 505 (2006).

### A.  THE VIOLATION OF THE ACT.

1.    The purchases of credit monitoring are governed by The Kansas Consumer Protection Act.

The Kansas Consumer Protection Act ("KCPA" or "the Act") prohibits deceptive acts and practices.  K.S.A. §50-626.  The KCPA provides that no supplier shall engage in any deceptive act or practice in connection with a consumer transaction.  K.S.A. §50-627(a).

2

K.S.A. §50-623 provides in relevant part that the KCPA "shall be construed liberally to promote the following policies: (a) To simplify, clarify and modernize the law governing consumer transactions; [and] (b) to protect consumers from suppliers who commit deceptive and unconscionable practices."

A consumer is defined as "an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, business or agricultural purposes." K.S.A. §50-624(b). Defendant admits that Plaintiffs are consumers as defined by the Act. (Response to Plaintiffs' First Request for Admissions, Request No. 4, D.I. Ex. L)[1]

A supplier is defined as "a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer." Defendant admits that it is a "supplier" as defined by the Act. (Response to Plaintiffs' First Request for Admissions, Request No. 7, Ex. L to Plaintiffs' Motion for Class Certification)

Defendant sold a product or service which purported to monitor the credit file, or three credit files in the instance of "three bureau reporting", of those who purchased credit monitoring. (Deposition of Danaher, pp. 25-28, 88-91, App. Ex. K) A consumer transaction is defined as "a sale, lease, assignment or other disposition for value of property or services within this state . . . to a consumer; or a solicitation by a supplier with respect to any of these dispositions." K.S.A. § 50-624(c). [Redacted]

(Response to Plaintiffs'

---

[1] Plaintiffs will reference "D.I. 126" for the Appendix which accompanied its Motion for Class Certification. For ease of the court and parties, Plaintiffs file a joint Appendix for support of its Reply to Defendant's Answering Brief in Opposition to Plaintiffs' Motion for Class Certification as well as Plaintiffs' Motion for Partial Summary Judgment. Both these pleadings are related and filing a single Appendix will reduce the volume of the Court's file as these Exhibits must be filed under seal pursuant to the protective order in place in this matter. The exhibits in the Appendix filed in support of the Motion for Partial Summary Judgment and Reply as to Class Certification will be referred to as "App. Ex. _")

[2] Plaintiffs defined credit monitoring in their discovery requests as follows:

". . . the credit monitoring service known as Credit Monitoring and/or Online Credit Monitoring and/or True Credit that was advertised/marketed by Defendant Truelink, Inc. and/or its predecessors, successors or affiliates."

First Request for Admissions, Request No. 6, D.I. 126, Ex. L)  [Redacted]

(Response to Plaintiffs' First Request for Admissions, Request No. 5, D.I. 126, Ex. L)

This Court has preliminarily determined that named plaintiffs have standing to bring a claim pursuant to the Kansas Consumer Protection Act.  (Doc. 75)   Defendant has provided the number of consumers who paid money and purchased credit monitoring and provided a mailing address in the State of Kansas from September 1, 2001 through May 31, 2007.  These class members total [Redacted] persons.[3]  (Supplemental Responses to Interrogatories 5, 6, 17 and 20 of Plaintiff's First Interrogatories to Defendant TrueLink, Inc., D.I. 126, Ex. Q).

"The issue of whether an act is unconscionable under the KCPA is a question of law subject to unlimited review.  However, the determination of whether an act is unconscionable ultimately depends upon the facts of the case. Therefore, to a great extent, the determination is left to the sound discretion of the district court, to be determined based on the particular circumstances of each case."  Dodson v. U-Needa Self Storage, LLC, 32 Kan.App.2d 1213, 1218, 96 P.3d 667, 672 (2004).   In judging a claim of unconscionability, *the court* determines *both* the facts and the ultimate legal conclusion.  In making this determination, the court is permitted to weigh the credibility of the witnesses.  State ex rel. Stovall v. ConfiMed.com, 272 Kan. 1313, 1317, 38 P.3d 707 (2002) (emphasis added).

The KCPA provides, at K.S.A. § 50-257, that engaging in an unconscionable act or practice violates the Act *whether it occurs, before, during or after the transaction*:

> "(a) No supplier shall engage in any unconscionable act or practice in connection with a consumer transaction. An unconscionable act or practice violates this act whether it occurs before, during, or after the transaction."

K.S.A. § 50-257 (emphasis added).  Whether an act is unconscionable is a question of law for the court to determine.

---

[3]   The parties have completed briefing pertaining to the motion for class certification.

K.S.A. § 50-257(b).[4]  The section continues:

> "In determining whether an act or practice is unconscionable, the court shall consider circumstances of which the supplier knew or had reason to know, such as, but not limited to the following that:

>> (1) The supplier took advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor;

>> (2) when the consumer transaction was entered into, the price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by similar consumers;

>> (3) the consumer was unable to receive a material benefit from the subject of the transaction;

>> (4) when the consumer transaction was entered into, there was no reasonable probability of payment of the obligation in full by the consumer;

>> (5) the transaction the supplier induced the consumer to enter into was excessively onesided in favor of the supplier;

>> (6) the supplier made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment; and

>> (7) except as provided by K.S.A. §50-639, and amendments thereto, the supplier excluded, modified or otherwise attempted to limit either the implied warranties of merchantability and fitness for a particular purpose or any remedy provided by law for a breach of those warranties."

Defendant engaged in unconscionable acts in violation of the statute.  Unconscionable acts include actions made before during and after the sale.  K.S.A. § 50-627(a).

[Redacted]

Use of "a standard boilerplate contract" is a "factor that should be considered in determining whether an act was unconscionable."  Dodson v. U-Needa Self Storage, LLC.  32 Kan.App.2d 1213, 1219, 96 P.3d 667, 672 (2004).

---

[4]  Other violations of the KCPA, violations of K.S.A. § 50-626, have been alleged by Plaintiffs on behalf of the class.  Violations of K.S.A. § 50-626 are questions of fact for the jury and not addressed herein. There is additional documentation supporting Named Plaintiffs claims as to K.S.A. § 50-627, additional violations of K.S.A. § 50-627, and violations of K.S.A. § 50-626 which have not been included in this motion.  Plaintiffs do not waive those claims but do not include them here.

A material matter is a matter "to which a reasonable man would attach importance in determining his choice of action in the transaction in question." York v. InTrust Bank, N.A., 265 Kan. 271, 290, 962 P.2d 405, 420 (1998)(internal quotation omitted). It is important to Kansas consumers to know whether or not someone else is reporting the consumer's personal information. (D.I. 126, Ex. F)

## A.2. KCPA CLASS VIOLATIONS

a. The contract and (b)(1).

K.S.A. § 60-257(b)(1) provides that it is a violation of the Act if the "supplier took advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor."

Defendant took advantage of the inability of the consumer to reasonably protect the consumer's interest because of the consumer's inability to understand the language of an agreement. [Redacted]

(Deposition of Anderson p. 173, App. Ex. D) Defendant represented in its marketing that the purchaser of credit monitoring would be "protected" from "identity theft". (App. Ex. M) Defendant represented that access to one's "credit report" would provide notification of "identity theft". (D.I. Ex. M; Deposition of Danaher p. 24 -25, App. Ex. K; Deposition of Anderson, pp. 15-17, App. Ex. D)

The credit reporting agencies are regulated by the Fair Credit Reporting Act, 15 U.S.C. 1681a, *et seq*. ("FCRA"). Although Defendant TrueLink represented to consumers that its reports of information were not compliant with the Fair Credit Reporting Act, this exclusion, in and of itself, was a source of greater confusion for the consumer. The FCRA defines consumer reports[5] and consumer files.[6]

---

[5] The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for--

    **(A)** credit or insurance to be used primarily for personal, family, or household purposes;
    **(B)** employment purposes; or
    **(C)** any other purpose authorized by the provisions of the FCRA. 15 U.S.C. §1681d(a).

Defendant's corporate officers take the position that identity theft is limited to that information shown on one's "credit report". [Redacted]

(Deposition of Danaher pp. 106-07, App. Ex. K; Deposition of Anderson, p. 20, App. Ex. D)  "Identity theft" results, then, Defendant's officers contend, only when an  [Redacted]

Defendant could only access and supply that information posted for its customers which [Redacted] . (Deposition of Danaher pp. 25-28, App. Ex. K) This information does not contain all the information in a consumer disclosure and does not contain all of the consumer's information which is contained in Trans Union's credit file.  (FTC Report, pp. 8-16, D.I. 126,  Ex. H)[7]  In the case of a 3 in 1 report containing information from three credit reporting agencies, the information contained in the credit file of any of the credit reporting agencies is not necessarily contained in a "credit report".  (FTC Report, pp. 8-16, D.I. 126, Ex. H)  The consumer was not advised of this.

Consumers had no manner in which to know that the information which was supplied to them after they purchased the product was limited to the selected information which Trans Union elected to provide.  (FTC Report, pp. 8-16, D.I. Ex. H, See also Deposition testimony of Steven Millett referenced in Motion for Partial Summary Judgment)

The contract with purchasers of TrueCredit provided that the purchaser would be benefitting from access to the site.  The site contained information about "credit reports".  The consumer had no ability to

---

[6]  "The term 'file', when used in connection with information on any consumer, means all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored."  15 U.S.C. § 1681a(g).  Disclosures to consumers are set out in 15 U.S.C. § 1681g.

[7]  *See, e.g.*, 15 U.S.C. § 1681a(3)(g):  The term "file", when used in connection with information on any consumer, means all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored.  The information stored which pertains to any consumer is not necessarily displayed in either a "consumer report" provided to a creditor or a "consumer information statement" provided to a consumer.  (FTC report, D.I. Ex. H, 126)

understand that the language of the contract was limiting.  Purchasers had no way to know that Defendant intended to supply only that information which Trans Union would elect to supply.  [Redacted]


Consumers had no ability to understand the language of the contract was being utilized in such a manner that it limited the purchaser's ability to protect their interest.  A consumer, in order to detect identity theft, needed more information than that available from a credit file.  (FTC Report,  D.I. 126, Ex. I)  A purchaser had no manner to know this, however, as Defendant represented that it would take care of everything and that it would monitor the credit report for the consumer. (App. Ex. V)

"Under Kansas law, a willful act is one 'performed with a designed purpose or intent on the part of a person to do wrong or to cause injury to another....'" Griffin v. Security Pacific Automotive Financial Services Corp., 33 F.Supp.2d 926, 930 (D.Kan. 1998)(quoting, *e.g.*,  Pattern Instructions for Kansas, PIK Civil 3d § 103.04).  Defendant knew that the "credit report" it sold had limitations as a tool to detect "identity theft" but sold its product for this purpose.  Defendant received the contract purchase price and, in some instances, renewals as well, from Kansas consumers.

"A party is aggrieved whose legal right is invaded by an act complained of or whose pecuniary interest is directly affected." Lowe, 239 F.Supp.2d  at 1229.   "The term refers to a substantial grievance, a denial of some personal or property right, or the imposition upon a party of some burden or obligation. In this sense it does not refer to persons who may happen to entertain desires on the subject, but only to those who have rights which may be enforced at law and whose pecuniary interest may be affected." Id. Plaintiffs and members of the class have pecuniary interests involved.  All paid for the products or services of Defendant.

(App. Ex. N, Ex. O, and Ex. P; Deposition of Anderson, pp.171-72, App. Ex. D)

1. Identity theft and (b)(1).  [Redacted]

The advertising which consumers viewed from 2001 to 2007 contained similar, additional

misrepresentations.  Defendant's contract incorporated the web page information.  (Deposition of

Anderson,  p. 173, Ex. D)  The web page information stated, for example:

> • "You'll always be up-to-date about credit report changes and early warning signs of identity
> fraud."
> • "With Credit Monitoring you'll be up-to-date with your credit, informed about any fraudulent
> activity, and certain about your credit standing."
> • "You can secure your credit, your identity, & your peace of mind for just $9.95/year with the
> Web's most affordable credit monitoring service – weekly Credit Alerts.  Stay informed about
> your credit and your identity – without even lifting a finger."
> • "You can secure your credit, your identity, & your peace of mind for just 12 cents a day with
> TrueCredit's award-winning Credit Monitoring services."
> • "You have anti-theft & protection devices for your home … and your car …  But what about
> your identity?  Now you can secure your credit, your identity, & your peace of mind for less than
> 3 cents a day."

(App. Ex. M)

[Redacted]

The phrase, by Defendant's own admission, represents that credit monitoring has characteristics,

uses, and benefits that credit monitoring does not have.  [Redacted]

Defendant objects, when making this

admission, that the definition of "identity theft" utilized in the Request for Admissions is unclear and

overly broad.[8]    [Redacted]


If the term "identity theft" is too vague to allow Defendant to respond to its use in discovery, how can Defendant assert to consumers that credit monitoring will protect purchasers of credit monitoring from "identity theft"?  If the phrase utilized by Defendants is vague, then it logically follows that Defendant knowingly made representations that a consumer could not understand.  At a minimum, the corporate officers knowingly attempt to take advantage of an ambiguous phrase.

A consumer survey conducted by Plaintiffs' designated expert of a random and scientifically valid sampling of consumers in Kansas demonstrates that most consumers believe that use of personal identification information is a form of identity theft.  (D.I. 126, Ex. F; App. Ex. W).  [Redacted]

---

[8]  For the Request for Admissions, Plaintiffs provided this definition: **"Identity Theft"** shall mean the unauthorized use of personal information by another to obtain or attempt to obtain credit, make charges, secure employment or obtain identification.

[9]  The term "identity theft is defined in federal statutes:

"The term "identity theft" means a fraud committed using the identifying information of another person, subject to such further definition as the Commission may prescribe, by regulation."

15 U.S.C. 1681a(c)(3).

[10]  The definition provided by Plaintiffs was:

**"Identity Theft"** shall mean the unauthorized use of personal information by another to obtain or attempt to obtain credit, make charges, secure employment or obtain identification.

10

Because Defendant, by its own admission, cannot protect consumers from identity theft, Defendant has violated the KCPA because it has represented to consumers that it can do so. This is a violation of the Act. K.S.A. § 50-627(b)(1).

Defendant also represented that it would provide, in addition, identity theft protection and that it would provide "complete identity theft protection". (App. Ex. M) [Redacted]

To the extent Defendant could provide *some* forms of alert when *some* forms of identity theft impact a purchaser of credit monitoring, Defendant has, nevertheless misrepresented that it could provide "complete" identity theft protection. This is a violation of the Act. K.S.A. §50-627(b)(1).

Defendant represented that a consumer, by purchasing credit monitoring, would be protected from identity theft. When asked to admit whether or not the information contained on a "credit report", as that term is utilized in Defendant's advertising, would provide all of the information that a person would need to detect all forms of identity theft,    [Redacted]

2. Contract and (b)(5).

To determine if the acts of the Defendant were unconscionable, the Court considers whether the Defendant knew or had reason to know that "the transaction the supplier induced the consumer to enter into was excessively onesided in favor of the supplier." K.S.A. § 50-627(b)(5). "Where a party uses a printed form or boilerplate contract which is skillfully drawn by the party in the strongest economic position, which establishes industry-wide standards offered on a take it or leave it basis to the party in a weaker economic position, the contract is unconscionable." Hartford v. Tanner, 22 Kan.App.2d 64, 72, 910 P.2d 872, 878 (1996). When a seller uses a standard boilerplate contract, it is a factor that should be

11

considered in determining whether an act of the Defendant was unconscionable.  Dodson v. U-Needa

Self Storage, LLC, 32 Kan.App.2d 1213, 1219, 96 P.3d 667, 672 (2004). [Redacted]

Consumers

were required to monitor the web site for any changes to the contract provisions.  (D.I. 126, Exhibits N,

O, and P) [Redacted]

Defendant violated the Act.  Defendant induced the consumer to enter into an excessively

onesided contract.  K.S.A. §50-627(b)(7).  The consumer had no choice but to accept the membership

services as provided.  The consumer had no choice but to accept Defendant's representations as to the

manner in which Defendant would perform.  The consumer had no choice but to accept Defendant's

standards about efficacy of "credit reports" as tools to detect identity theft.

Defendant engaged in deceptive bargaining conduct, took advantage of unequal bargaining

power, and drafted a contract which was onesided.  Defendant committed an unconscionable act in

violation of K.S.A.2003 Supp. 50-627.

Each purchaser is an aggrieved consumer, a purchaser who suffered some loss or injury as a

result of the violation.  Finstad v. Washburn University, 252 Kan. 465, 473, 845 P.2d 685 (1993).  Each

entered into a contract that was excessively onesided.

3. Product failures and (b)(6).

It is a violation of the Act for the supplier to make a misleading statement of opinion on which

the consumer was likely to rely to the consumer's detriment.  K.S.A. § 50-627(b)(6).  In determining

---

[11]   At least once, Defendant did this.  Defendant entered into a contract during 2003 which promised its
customers the "concierge services" of a company called PromiseMark.  (Deposition of Danaher, pp. 59-
65, 78-85, App. Ex. K)   Before the Defendant's stopped entering into a contract which promised
PromiseMark services, PromiseMark was purchased by another credit reporting agency.  (App. Ex. A,
Affidavit of Yeager; App. Ex. X)    Neither Defendant nor Plaintiffs have a notice of this change.

whether the acts of Defendant were unconscionable, the Court shall consider circumstances of which the supplier knew or had reason to know of the misleading statement of opinion.  <u>Id</u>.

[Redacted]

Defendant represented that purchase of credit monitoring would protect a purchaser from identity theft.  [Redacted]

The "credit report" does not contain all information available to Trans Union about

---

<sup>12</sup>   New changes were monitored and the credit file was not reviewed upon enrollment.  (Deposition of Danaher, p. 25, App. Ex. K; Deposition of Anderson, p. 177, Ex. D)

a consumer which is contained in a consumer file held by Trans Union.  (Federal Trade Commission

Report, pp. 43-46, 56-60,  D.I. 126, Ex. H)

      Defendant was aware of this fact.  Defendant knew that there was information available from a

credit file which would be of assistance to a consumer.  Defendant, however, while excluding that

information from the "credit reports" it provided, also represented that the "credit report" was an effective

tool to provide complete identity theft protection.  [Redacted]



                         The Defendant advertised that it was

important to know the scores from each of the three credit reporting agencies.  (Ex. V)  Defendant did not

disclose that it was providing its own calculations of scores and not those which were calculated by the

three major credit reporting agencies.  This was a violation of the Act.

      [Redacted]

---

[13]      [Redacted]

Kansas consumers consider the use of a Social Security number by another to be a form of identity theft.  (App. Ex. F; App. Ex. W)   [Redacted]

Even if actual use by another of a Social Security number issued to one of Defendant's purchasers is not, for purposes of this argument, "identity theft",   [Redacted]                              use of one's Social Security number by another is a sign of possible identity theft.  (FTC Report,  pp. 37-46, D.I. 126, Ex. H )   The detection of possible identity theft was also advertised as a benefit of credit monitoring.  (App. Ex. M)

Defendant promised to alert its purchasers to potential identity theft.  (App. Ex. M) [Redacted]

This is unconscionable.  The very Kansas consumers most in need of the services allegedly provided were denied services.  Although a refund was offered or no charge was made, no explanation and no warning was made available.  For someone representing to protect consumers, this is unconscionable behavior.

When a Kansas consumer expended funds, he or she did so in order to gain access to member services.  Although such services could not be made available for the most vulnerable of Kansas consumers, no explanation or warning was provided.  [Redacted]

The provisions of the contract are unconscionable, in violation of the KCPA.  Defendant violated the Act because it engaged in an unconscionable act.  Defendant engaged in an unconscionable act because it took advantage of the inability of the consumer to protect himself or herself from identity theft. The consumer expended funds and relied upon Defendant.  The consumer could not understand the language of the parties' agreement and other similar factors, such as the advertising and the manner in which the product actually operated.  [Redacted]

15

All purchasers are aggrieved; that is, they each suffered some loss or injury as a result of the violation.  Finstad v. Washburn Univ., 252 Kan. 465, 473, 845 P.2d 685 (1993).  They each paid for a product, relying upon language which could not be understood.

    4.  Excluded warranties and (b)(7)

K.S.A. § 50-639 provides the extent to which the supplier may exclude warranties of merchantability and fitness for a particular purpose.  "A warranty that the goods shall be merchantable is implied in a contract for their sale."  K.S.A. § 84-2-314.  To attempt to prohibit all warranties is unconscionable.  K.S.A. § 50-627(b)(7).

It is prohibited to limit Uniform Commercial Code warranties provided by law.  K.S.A. § 50-639(a)(1).   K.S.A. § 50-625 provides that  "a consumer may not waive or agree to forego rights or benefits under this [Uniform Commercial Code] act."  Farrell v. General Motors Corp., 249 Kan. 231, 241, 815 P.2d 538, 546 (1991).

Defendant excluded and attempted to limit the implied warranties of merchantability and fitness for a particular purpose and any remedy at law for a breach of these warranties.  [Redacted]

TLM018070,  D.I. 126, Exhibit O.  Some of Defendants documents indicate that employees were to direct consumers to work with creditors to repair credit and/or to call others such as government agencies or credit reporting agencies.

With respect to the membership services,    [Redacted]

16

It is prohibited to limit Uniform Commercial Code warranties. K.S.A. §50-639(a)(1).  Kansas statutes prohibit use of a "limited express warranty to exclude implied warranties."  Stair v. Gaylord.  232 Kan. 765, 776, 659 P.2d 178, 187 (1983).  Defendant attempted to limit its liability that credit reporting information would be in error, to the extent permitted by law.  Then, additional, broader language would limit all warranties whatsoever by Defendant and its parent "with respect to the agreement" with the consumer, including those provided by law.   The Uniform Commercial Code provisions as to these warranties have been adopted widely.

K.S.A. §50-627(b)(7) provides that such a limitation is an "unconscionable act or practice." Implied warranties arise by operation of law to protect a contracting party from injury when the subject matter of the contract does not conform to the normal commercial standards or fails to meet the party's known particular purpose.   Zenda Grain & Supply Co. v. Farmland Industries, Inc., 20 Kan.App.2d 728, 737, 894 P.2d 881, *rev. denied* 257 Kan. 1096 (1995).

[Redacted]

The Defendant violated the Act when it attempted to do so.  K.S.A. § 50-627(b)(7).

17

It was unconscionable for Defendant to attempt to limit the warranty provided by law for those services when the chief executive officer knew that consumers purchased the product for those purposes. The warranty for these particular purposes was provided by law.  K.S.A. § 50-627(b)(7).  Defendant was aware the product was purchased for this use, and attempted to limit this warranty.  This was unconscionable.  [Redacted]

Defendant, nevertheless, attempted to limit the warranty for this aspect of the product.

Each purchaser is an aggrieved consumer who suffered some loss or injury as a result of the violation.  Finstad v. Washburn Univ., 252 Kan. 465, 473, 845 P.2d 685 (1993).  Each purchaser expended funds in order to enter into a contract.  The supplier, however, attempted to limit the implied warranties of merchantability and fitness for a particular purposes.  This is a violation of the Act.  K.S.A. § 50-627(b)(7).

2.    The remedies provided by the KCPA.

b. Monetary damages available to Plaintiff Steve Millett

2.b.2.  Data not provided.

Steven Millett, through his spouse and agent, decided to have her physically enroll him online for the credit monitoring product and other products of Defendant because he thought it would help them. (Deposition of Steven Millett,  App. Ex. G, See also Plaintiffs' Reply to Defendant's Answering Brief in

Opposition to Plaintiffs' Motion for Class Certification)[14]  Through the delegated acts of his spouse and

agent, Melody Millett, Steven Millett became a purchaser of TrueCredit on or about August 6, 2003.

On or about January, 2005, Defendant Steven Millett was denied credit from    [Redacted]

. (Millett 01006,  App. Ex. P)  The credit report which was relied upon by the potential creditor,

[Redacted] was supplied by Trans Union.  (Millett 01006,  App. Ex. P)  Credit was denied because

the potential creditor was    [Redacted]


, in response to a subpoena issued by Plaintiffs' counsel, reported that it had record of a

[Redacted]              account which had been attributed to Steven Millett.  [Redacted]          had

purchased the portfolio of accounts in July 2003.  (April 4, 2005 letter p.1 from CitiBank, App. Ex. P)

[Redacted]            provided the documents available pertaining to the account which had been attributed

to Steven Millett.  (April 4, 2005 letter from CitiBank p. 1, App. Ex. P)  This    [Redacted]

credit account was opened by Abundio Cuautle Perez in 2002.[15]  (April 4, 2005 letter from CitiBank p.1,

App. Ex. P; Affidavit of Melody Millett, App. Ex. J)

Ms. Millett is employed in the information technologies field.  (Affidavit of Melody Millett, App.

Ex. J)  She has learned to read the codes from those who provide information to the credit reporting

agencies.  (Affidavit of Melody Millett, App. Ex. J)   The credit reporting agencies and the credit

reporting industry have a unified method of reporting credit data.  (Affidavit of Melody Millett, App. Ex.

J; See Index to Credit Reporting Resource Guide, Consumer Data Industry Association, 2003,  App. Ex.

Q (index only) )

---

[14]    [Redacted]

[15]   Abundio Cuautle Perez ("Perez") purchased the Social Security number, the one which had been issued to Steven Millett earlier, on Soto Street in Los Angeles, California from a notary public.  (Affidavit of Millett, App. Ex. J, pp. 6-8)   After filing several law suits and litigating for several years, the Milletts were able to determine, during discovery phases of their litigation, that Perez utilized this number to open bank accounts, obtain employment, obtain credit cards, finance multiple automobiles, and obtain home financing.  (Affidavit of Millett, App. Ex. J)

The record provided by [Redacted]          , pursuant to the subpoena, indicated that, as the Milletts worked to close accounts which had been opened by Perez, those accounts monitored and serviced for [Redacted]          and [Redacted]          by          [Redacted]

          ), were incorrectly changed.  (Affidavit of Melody Millett, App. Ex. J)  The accounts serviced by [Redacted] were changed so that the data information of Steven Millett and the data information of Perez were mixed.  The Milletts received refund checks and correspondence which reflected this mixed data.  (Affidavit of Melody Millett, App. Ex. J; App. Ex. P)  Melody Millett, on behalf of Steve Millett, continued to work to correct the errors.  (Affidavit of Melody Millett, App. Ex. J)

          On April 5, 2004, Plaintiffs filed their initial complaint alleging that Trans Union had engaged in fraud and other violations of statutory and common law concerning the manner in which it serviced its products.  (Affidavit of Melody Millett, App. Ex. J)  On August 6, 2004,  a person named "Debi" at "Trans Union credit bureau" contacted the company servicing the [Redacted]          account and asked if the account was "fraud".  (Affidavit of Melody Millett, App. Ex. J; April 4, 2005 letter from CitiBank p.1, App. Ex. P)  The account reflected data of Steven Millett for his name and address, the Social Security number Steven had been issued which was also being used by Perez, and California telephone numbers of Perez.  By reading the codes and the letter from [Redacted]          alongside the refunds and letters, you can see that the data had been mixed when Mrs. Millett attempted to close Perez' accounts in 2003.   No notification of this was sent by Trans Union to Steven Millett.  (Deposition of Anderson, pp. 123-26, app. Ex. D)  No notification of this was sent to Steven Millett by Defendant.   (Deposition of Anderson, pp. 123-26, App. Ex. D)   Defendant Steven Millett was a purchaser of the product at that time. (App. Ex. I)

          Defendant's parent, Trans Union, had information about identity theft pertaining to the data of Steven Millett and had information about mixed data of Steven Millett and the identity thief.  Trans Union had this information after Defendant had, allegedly, placed a "watch" on Steven Millett's credit file and had charged a fee for that service.  (App. Ex. I; App. Ex. P; App. Ex. R.)  Defendant advertised that it would provide information to "protect" from "identity theft", detect "identity theft", and alert its

paying customers to "identity theft".  It told its purchasers to relax and have "peace of mind" because the purchaser had paid for credit monitoring.  (D.I. 126, Ex. M)  Trans Union did not notify Steven Millett, who paid money from the family's joint checking account because he thought the product would help them, that it was aware of the mixed data.  Defendant did not notify Steven Millett, who paid it money, that there was mixed data in Trans Union's credit file, the data of one, Abundio Cuautle Perez. (Deposition of Anderson, pp. 123-26,  App. Ex. D)

The product or service sold by Defendant and its successors and predecessors in interest could not or did not detect this mixed data.  Defendant opposed Plaintiffs' motion to obtain the credit file from Trans Union.  With the information from the credit file, Plaintiffs could ascertain whether credit files remained which need to be corrected.  In any event, Defendant intentionally sold a product with knowledge that:

- Data it would provide to purchasers would be the data supplied to it by Trans Union;

- The credit files of its purchasers were not always able to be matched with purchasers of the product because more than one person was reporting the same Social Security number;

- More than one person could be reporting credit information about Defendant's purchasers but Defendant could only provide its purchasers with that information which Trans Union correctly detected and attributed to its purchasers;

- More than one person is reported to a credit reporting agency with the same Social Security number (Deposition of Danaher p. 97,  App. Ex. K);

- Credit files are maintained by Trans Union for more than one consumer reporting the same Social Security number (Deposition of Danaher pp. 97, 98, 104, App. Ex. K);

- The credit reporting agency and Defendant cannot ascertain which individual reporting a Social Security number is the individual who is the person to whom the number was actually issued; and

21

- Defendant utilized the Social Security number of its purchasers as one of the key informational pieces for establishing identity (Deposition of Anderson, pp. 103, 175, App. Ex. D; App. Ex. D; App. Ex. H).

Defendant knew or should have known that the credit monitoring product could not and would not perform as an identity theft detection tool.  Defendant, possessing this knowledge, continued to sell and market the credit monitoring product.

b.2.b.  Watch status failures.

[Redacted]

Although Defendant was aware of this and other "bugs" with the product, it continued to accept product renewals and continued to market its product and service as an identity theft protection device.

Plaintiff is entitled to summary judgment for violations of the Kansas Consumer Protection Act. Defendant knew or should have known that its representations were misleading, that the product had performance issues, and that the product had limitations. Plaintiffs relied upon Defendant to perform and paid moneys for a product or service. Defendant failed to perform, knew it could not perform, and continued to market the product and renew the product, all the while attempting to exclude warranties in violation of Kansas law.

<u>2.C. Remedy for Steven Millett: Monetary damages to Steven Millett<br>for violations of the Act as to Steven Millett</u>

The Kansas Consumer Protection Act provides that the supplier who violates the Act is subject to certain penalties.

> "For each violation of the KCPA, the district court may impose a civil penalty, rendering the violator liable to the aggrieved consumer. K.S.A. § 50-636(a). The legislature's intent in allowing the . . . court to impose civil penalties for violations of the KCPA was to encourage enforcement of the act by a consumer acting as his own private attorney general."

<u>Dodson v. U-Needa Self Storage, LLC</u>, 32 Kan.App.2d 1213, 1220, 96 P.3d 667, 673 (2004) (quoting K.S.A. § 50-636, Kansas Comment, 1973) (internal quotations omitted). A consumer who is "aggrieved" by a violation of the KCPA may recover actual damages *or* a civil penalty as provided in K.S.A. § 50-636(a), whichever is *greater*. K.S.A. § 50-634(b) (emphasis added). This Court has discretion to award up to $20,000 for each violation. Comment, K.S.A. §50-634, comment 2.

> "The purposes of the KCPA are to: (a) simplify, clarify, and modernize the law governing consumer transactions; (b) to protect consumers from suppliers who commit deceptive and unconscionable practices; (c) to protect consumers from unbargained-for warranty disclaimers; and (d) to provide consumers with a 3-day cancellation period for door-to-door sales. K.S.A. §50-623.

"The KCPA repealed the Kansas Buyer Protection Act. As noted by Clark, the KCPA provides a private remedy to consumers in the hope that they will enforce the KCPA as "private attorneys general." 42 J.K.B.A. at 189. Under the Kansas Buyer Protection Act, the exclusive right to redress wrongs was vested in the Attorney General. K.S.A.1972 Supp. 50-601 et. seq. The legislature recognized the merit of encouraging consumers to pursue their rights and made provisions which allow actual damages or civil penalties, as well as costs and attorney fees for successful litigants. The KCPA attempts to eliminate the common-law doctrine of caveat emptor and check deceptive and unconscionable acts of suppliers in the market place.

"It is the consumer who suffers from deceptive and unconscionable acts and practices by suppliers. In most cases involving deceptive and unconscionable acts, the consumer suffers monetary damage. The purpose of the KCPA is not only to stop such practices in the market place but also to provide consumers with an avenue to recover damages suffered. By allowing the consumer personal recovery together with attorney fees the overall purpose of the KCPA is advanced.

"In some cases under the KCPA, however, the consumer suffers damages which may be difficult to quantify monetarily. In such circumstances, the amount of actual damages which may be proven by the consumer might well be insufficient to completely compensate the consumer for the damages suffered. To remedy this situation, the KCPA provides for a civil penalty as an alternative to actual damages. It is significant that the legislature in providing for a remedy did not provide for a penalty separate and distinct from damages. Rather the legislature allowed a consumer aggrieved under the KCPA to recover either damages or a civil penalty, whichever is greater. The KCPA does not provide for a separate civil penalty in addition to the consumer's damages. In this respect, although couched in terms of a penalty, the civil penalty provided by the KCPA is actually more remedial in nature than punitive."

Alexander v. Certified Master Builders Corp., 268 Kan. 812, 822-823, 1 P.3d 899, 907 (2000). "K.S.A. §50-634(b) allows the aggrieved consumer to recover either the penalty or damages, whichever is greater. Thus, the statute contemplates one action, with the consumer being allowed to collect either his or her actual damages as found by the court or a civil penalty, depending upon which is greater. Therefore, the civil penalty, while retaining punitive aspects, serves also to provide reimbursement for the private wrong done to the consumer, which is more akin to indemnity." Alexander, 268 Kan. at 822-23, 1 P.3d at 907. Because Defendant acted willfully, Claimants seek enhanced statutory damages of $10,000 pursuant to K.S.A. §50-636(b) for each violation of the act.

The purchasers of the product entered into uniform agreements based upon the sale of the "credit report" to detect and prevent identity theft or to provide accurate information about their customer's credit information. Defendant took advantage of the consumer's inability to understand the terms encountered in the contract and marketing. Kansas consumers believed they would be notified about uses of their

24

personal identification information.  (D.I. 126, Ex. F; App. Ex. W)   Defendant intentionally construed the definition of "identity theft" and took advantage of the manner in which it advertised that a "credit report" could be useful to a consumer.  The consumer was enrolled with misleading statements of opinion about what constitutes "identity theft" and the manner in which it could be detected.  The purchasers of the product were all induced to enter into the same basic contract which was excessively one sided in favor of the supplier by limiting recovery of damages and other contract remedies.  The purchasers entered into uniform contracts in which the implied warranties of merchantability and fitness for a particular purpose were excluded or modified.  At a minimum, Defendant attempted to limit them.

Plaintiffs have sufficiently alleged a defect in defendant's products which made those products unfit for their ordinary purpose and reduced their value so as to cause plaintiffs' economic loss.  Gonzalez v. Pepsico, Inc., 489 F.Supp.2d 1233, 1248 (D. Kan. 2007).  All purchasers were subjected to a defect in the manner information was maintained and conveyed to them which reduced the value of the product or made Defendant's products unfit for their ordinary use.   In such instances, recovery of the damages and penalties provided by the statute are awarded.  Id.

Steven Millett is entitled to $10,000 for each violation of the KCPA and an additional $10,000 enhancement for each violation.  Lowe, at 1230.  Plaintiff Steven  Millett may recover statutory damages in the amount of  $20,000 per violation for each separate violation of the Act.  Lowe v. Surpas Resource Corp. 253 F.Supp.2d 1209, 1231 (D.Kan. 2003).

Defendant, along with its parent corporation, sent electronic mail to consumers telling those consumers that there was no need to be concerned about their credit.  (Affidavit of Melody Millett, app. Ex. J)   Defendant, along with its parent, generated these electronic notifications.  Defendant knew, or should have known, as its parent corporation knew, that the "credit report" being provided was an inadequate tool to detect "identity theft".   Trans Union, the parent corporation, is one of the major credit reporting agencies which reported information to the Federal Trade Commission ("FTC") for the FTC report to Congress concerning credit reporting requirements imposed by federal statute.  Trans Union reported to the FTC that it determined which items being reported to it by creditors of consumers would

be attributed to any individual consumer.     Trans Union reported to the FTC that some information pertaining to a consumer would not appear on a report to the consumer.  A "credit report" is not always accurate.  (FTC Report, D.I. 126, Ex. G).   Despite this information, Defendant, and its parent, accepted payments and renewals from consumers for a product which provided "credit reports" as a tool to detect identity theft.

A single communication or contract may constitute more than one violation.  Steven Millett has identified numerous violations of the KCPA.  Steven Millett is also entitled to damages for each violation. The KCPA provides, at K.S.A. §50-634(d):

> "Any act or practice declared to be a violation of this act not identified to be in connection with a specific identifiable consumer transaction but which is continuing in nature shall be deemed a separate violation each day such act or practice exists."

Defendant was notified before August 11, 2004,  that it was in violation of the Kansas Consumer Protection Act.  (Waiver of Summons by counsel for Trans Union, Doc. T).[16]  Defendants continued to provide credit monitoring knowing that allegations were made by Plaintiffs that the "credit report" it provided was not a tool designed to protect against identity theft or alert a consumer to identity theft. Defendant continued to engage in unconscionable acts.

Defendant argued, in its opposition to the motion for class certification in this action, its Answering Brief, that individual remedies would have to be determined for each individual purchaser because some purchasers could have received a service and some might not have received the same value of service.   In such instances, it is appropriate to award the statutory fee for each day that Defendants engaged in an unconscionable act.  The Kansas Supreme Court explained the reasoning:

> "When K.S.A. §50-636 was amended in 1993 to include subsection (d), see L.1993, ch. 177, § 3, the Attorney General's office informed the legislature that the new provision:
>
>> 'would clarify that a continuing violation constitutes a separate violation each day the practice continues, and is not just a single violation. This addresses situations such as the gasoline pump labeling cases where specific consumer transactions could not easily be identified, and where the deceptive label remained in place for weeks. A single civil penalty became insignificant in comparison to the volume of consumers involved.  A

---

[16]   Defendant TrueLink was named a party, at the suggestion of counsel for Defendant.  (Affidavit of Yeager, App. Ex. A)

civil penalty for each day the practice continued would have made the practice less profitable for the supplier.' Minutes, House Comm. on Agriculture, March 17, 1993 (S.B.245), attach. 2.'"

State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas,  275 Kan. 763, 776-777, 69 P.3d 1087, 1096 (2003).  Because Defendant contends that violations could not be identified easily, it is appropriate to award damages for each day of the conduct to make the practices which violated the act "less profitable for the supplier."  Id.

Steven Millett, for his role in acting as a private attorney general, is entitled to damages of up to $20,000 for each day of a continuing violation from August 11, 2004, to the date of the judgment in this matter.  From August 11, 2004, to September 15, 2007, is 1130 days.[17]  Named Plaintiffs seek statutory damages in an amount of  $20,000 per day *for each* violation from the date of the waiver of service for the first complaint,  August 11, 2004, to date of judgment.    There were, *at a minimum*, violations for each of the following dates:

1)   Each date the Milletts received an email which told them that Steven Millett had no issues in his credit file (App. Ex. S);

2)   Each date Plaintiffs were told to check the credit file for changes, sometimes incurring additional expense to do so, only to discover that there was no visible change to the "credit report" or no report could be viewed  (App. Ex. M; App. Ex. R; Affidavit of Millett, App. Ex. J);

---

[17]   The numbers of days was calculated utilizing an internet calculator service, www.timeanddate.com, last viewed on September 11, 2007.

Defendant TrueLink was notified by the District of Delaware of this Court's Order denying the motion to dismiss and the Court's finding that Plaintiffs had stated a KCPA claim which would be prosecuted against TrueLink, Inc. on September 7, 2006.  This is the absolute latest date which could be utilized for calculation of the date upon which TrueLink received notice.  This date of September 7, 2006, to the date of September 15, 2007, is 374 days.  Plaintiffs contend that the appropriate date to be considered is a date no later than the date counsel waived service on August 11, 2004.  Service was mailed and counsel for Defendant telephoned Ms. Yeager prior to agreeing to waive service.  Defendant began investigation prior to August 11, 2004.  (App. Ex. P; App. Ex. J)

3) Each date Plaintiffs received an electronic mail advertisement which represented that credit monitoring was a valuable product to purchase for oneself or even as a gift (App. Ex. S; Affidavit of Millett, App. Ex. J);

4) Each date that a "watch" was removed (App. Ex. R ); and

5) Each and every date from the date Trans Union was aware of the mixed data, beginning from August 11, 2004, to the date of judgment, and did not alert Defendant to that fact, a total of 1,130 violations.

6) The violations continued for 1130 days.

Although the KCPA provides no guidelines for the trial court in determining the exact amount of a civil penalty, aside from "the upper limit per violation",  Kansas courts have been directed to consider "(1) The extent of harm caused by the violation; (2) the nature and persistence of the violation; (3) the length of time over which the violation occurs; (4) any corrective actions taken; and (5) any and all relevant circumstances".  State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas,  275 Kan. 763, 777, 69 P.3d 1087, 1096 (2003).[18]   [Redacted]                                                   In contrast, the Milletts were unable to obtain credit until after engaging in extensive litigation.   The Milletts expended sums from the family checking account.  (Affidavit of Millett, App. Ex. J)  Steve Millett and the Millett children's trusts are identified in financial institutions, [Redacted]          , and for purposes of taxation, with the fraudulently utilized Social Security number.  (Affidavit of Millett, App. Ex. J)  The Milletts were told by police in Los Angeles to be cautious for a few days during the time period when Ford Motor Credit repossessed Perez' fraudulently obtained vehicles after Ford Motor Credit learned of the identity theft from Plaintiff.  (App. Ex. J)

Defendant continues to deny any responsibility for its actions.  Its parent was willing to "give up the sub".  It has been years since Plaintiffs asked for remedial steps to be taken.  Defendant charged fees

---

[18]   In *Oshman*, the Kansas Supreme Court remanded for a reduced finding of the proper penalty amount to be paid by Defendant and, in doing so, noted that there was no evidence, in *that* matter, of intentional fraudulent behavior.  Id. 69 P.3d at 777 (emphasis added).   The income from the deceptive act in *Oshman*, using inadequate scales, was less than $150, and the number of undercharges to consumers was greater than the number of overcharges.  Id. at 777.  These issues are not present in this matter.

knowing that its product had performance issues. Defendant continues to offer the product through its affiliate companies or companies which co-brand the product and continues to market the "credit report" as a tool to detect identity theft.

The court may award damages which are remedial and such damages which will encourage consumers with small claims to file suit as a private attorney general. In *Equitable Life Leasing Corp. v. Abbick*, 243 Kan. 513, 757 P.2d 304 (1988), the Kansas Supreme Court discussed the legislature's intent. The Kansas Consumer Protection Act is remedial rather than punitive. "Its purpose is to encourage aggrieved consumers with small claims to file suit." Dodson v. U-Needa Self Storage, LLC, 32 Kan. App.2d 1213, 1220-21, 96 P.3d 667, 673 (2004).

This Court has discretion to determine the amount of damages to award for each violation. The KCPA defines the violations of Defendant, at a minimum, to include violations of K.S.A. §50-627(b)(1), (b)(5), (b)(6) and (b)(7). The Court can determine that statutory damages should be awarded to Steven Millett because actual damages would be an inadequate remedy and because the statute allows for the greater amount of actual damages or the statutory remedy. K.S.A. § 50-634.

Given the extent to which the Milletts have exerted effort to enforce the Kansas Consumer Protection Act, given the expenses they have incurred in attorneys fees and the hours invested in litigation, a refund of the purchase price of the product would be an inadequate remedy. It is more appropriate to award the statutory penalty. The statutory penalty amount is the greater amount.[19]

The KCPA was enacted, and a private right of action for statutory damages provided, in order to encourage those Kansas consumers such as Steven and Melody Millett to act as a private attorney general on behalf of others who have small actual damages. Acting in this capacity, the Milletts have endured years of litigation, are still unable to access some types of credit, have invested large amounts of energy and effort, and have conscientiously and diligently represented purchasers of Defendant's product.

<u>D. Attorneys fees – Statutory remedy provided by KCPA</u>

---

[19]   Plaintiffs paid $24.95 per quarter for credit monitoring.   The total purchases paid for products ordered through Defendant was            . (Response Number 16, Response to Plaintiffs' First Interrogatories to Defendant TrueLink, Inc., D.I. 126, Ex. I)

Attorneys fees may also be awarded under the KCPA.  Statutory attorney fees constitute a remedy under the KCPA which is in addition to and separate from the allowance of other damages.  <u>York v. InTrust Bank, N.A.</u>, 265 Kan. 271, 308, 962 P.2d 405, 430 (1998).  If there are multiple counts raised in a complaint but the actions are intertwined and attorneys fees are sought because there was one factual transaction in question, all attorneys fees may be awarded and not simply those fees directly attributable to the KCPA count.  <u>York</u>, 265 Kan. at 308, 962 P.2d at 430.  All attorneys fees are awarded when "the KCPA claim is inextricably intertwined with the single transaction which is the subject of this litigation" <u>Id</u>.  This court, after the presentation of evidence from counsel about the attorneys fees of Plaintiffs' counsel, may award the appropriate amount of attorneys fees.

<u>E.  Equitable relief as remedy to class members</u>

"[A] consumer aggrieved by an alleged violation of this act may bring an action to (1) [o]btain a declaratory judgment that an act or practice violates this act; or (2) enjoin or obtain a restraining order against a supplier who has violated, is violating or is likely to violate this act."  K.S.A. §50-634(a).  Injunctive relief should be provided.  The following should be ordered:

A.1. within 30 days all class members will receive, via electronic mail, an educational piece or pieces explaining each of the following items:[20]

A.1.a. There is a difference between a credit file, a consumer information statement, a consumer report, and the term "credit report" which is used in Defendant's marketing and the marketing of its parent.

A.1.b. Individual personal identifiers such as a Social Security number can be contained in the credit file of more than one person.

A.1.c.  TrueLink, now TransUnion Interactive, Inc., is a separate entity from TransUnion.

---

[20]  This educational piece or pieces could be drafted by Plaintiffs for Defendant's approval or could be drafted with the assistance of a neutral party who is an expert in the field.  Much of the language could be drawn from the report provided to Congress by the Federal Trade Commission, a 2004 report which was required by the Fair and Accurate Credit Transactions Act of 2003.  (D.I. 126, Exhibit H)

A.1.d.  TransUnion and the other two credit reporting agencies generate the "credit reports" provided and the credit reports are a compilation of part of the data which the credit reporting agencies compile about an individual.

A.1.e.  TrueLink orders the 'credit reports" it provides from TransUnion or, in the instance of the 3 in 1 credit monitoring product offered by Defendant, another credit reporting agency.

A.1.f.  TrueLink orders the "credit reports" by sending your personal information to TransUnion and/or to the other two credit reporting agencies.

A.1.g.  It is the credit reporting agency which determines what data will be attributed to your credit file and that determination is made before TrueLink orders the "credit report".

A.1.h.  TrueLink does not review your credit data.

A.1.i.  TrueLink utilizes TransRisk, a scoring model, to determine the credit scores it provides to you.  The score provided for your "Experian credit report" is based upon the information contained in the credit files of Experian but scored, not as Experian scores it, but as TransRisk scores the data.  The score provided for your "Equifax credit report" is based upon the information contained in the credit files of Equifax, information owned by either Equifax or CSC, and it is scored, not as Equifax would score it, but as TransRisk scores the data.

A.1.j  The matching of only a single identifying piece of information (including the subscriber's name or address or Social Security number) in data received by TransUnion (or the credit reporting agency which is providing your "credit report") is insufficient for the credit reporting agency to determine that the data it received (from reporters of credit information) should be matched to your credit file or included in your credit report;  consequently, credit monitoring may not advise or alert you if a single piece of identifying information about you (including your Social Security number) is contained in another consumer's credit file or consumer report.

A.1.k.  The credit reporting agencies might have information in their data bases pertaining to you which will not appear on your "credit report".

A.1.l.  Credit reporting agencies allow more than one "credit report" displaying the same Social Security number to be maintained in their data systems.

B.   Injunctive Relief – Marketing and Contracts  Injunctive relief should be ordered.

B.1.  Defendant, and those who affiliate with it in order to co-brand or resell Defendant's credit monitoring , are required, within 30 days, to include that clarifying language as ordered by the Court to included in 12 point bold face type and in such a manner that it is displayed to the consumer in the first screen viewable by the consumer who views the contract.

B.2. Defendant, and those who affiliate with it in order to co-brand or resell Defendant's unlimited TransUnion credit monitoring and/or Defendant's unlimited three bureau credit monitoring, will be required to include the language as ordered by this Court to be set forth in 12 point bold face type and in such a manner that it is displayed to the consumer in the first screen viewable by the consumer who views the contract.

B.3. Defendant, and those who affiliate with it to co-brand or resell Defendant's credit monitoring product, will be required, within 30 days, to clearly display, on all marketing pieces, the web site URL for the educational piece(s) as ordered by the court.

B.4.  Defendant, and those who affiliate with it in order to co-brand or resell Defendant's credit monitoring product, will be required to clearly display, on all marketing pieces and on each page which pertains to, or discusses credit monitoring products, all of the following disclaimer:

•        No product or service can protect you from all forms of identity theft or credit fraud.

•        No product or service can detect all forms of identity theft or credit fraud.

•        Credit monitoring products may assist the consumer in detecting some forms of identity theft.

•        An identity thief can commit theft or credit fraud with the use of an individual item of personal identification information such as your Social Security number.

B.5.  An injunction is appropriate pertaining to specific terms and phrases which would be excluded in future marketing and web sites.   Such clarification is necessary in order to sell the product

without misleading consumers. A preliminary injunction should issue which would prohibit references by Defendant to identity theft protection or prevention. Specifically, Defendant and TransUnion, LLC and related entities, affiliates, and those who co-brand with them, as well as any related company or predecessor in interest, shall not refer to the following:

B.5.a. all forms of the word "complete" shall not be utilized within 10 words of the following:

"identity theft"

"identity fraud"

"credit fraud"

B.5.b. all forms of the word "protect" shall not be utilized within 10 words of the following:

"identity theft"

"identity fraud"

"credit fraud"

B.5.c. all forms of the word "prevent" shall not be utilized within 10 words of the following:

"identity theft"

"identity fraud"

"credit fraud"

C. Customer Assistance. Because most class members believed that the products and services offered would alert them to identity theft, including the use of the subscriber's Social Security number, Defendant will inform class members, within 60 days, about the existence of any information available to Defendant about the use of a subscriber's Social Security number by another.

C.1. Disclosure. Defendant will disclose, in an email alert, the fact that it ordered a "credit report" from a credit reporting agency which contains or reflects the Social Security number which was provided to Defendant by a subscriber. (For example, if a subscriber named Jane Smith has been enrolled in credit monitoring, during the applicable class period, by reference to Social Security number 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 and Defendant has ordered a credit report for Tom Smith by including the Social Security number of 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, then Defendant's subscriber, Jane Smith, would receive a notification.) The alert will state that

Defendant previously ordered credit reports for more than one person by making a request to the credit reporting agency which listed the Social Security number that the subscriber also provided to Defendant and which was represented to Defendant as having been issued to the subscriber.

C.2. Trans Union, the parent of Defendant, owns, maintains, and provides the Trans Union credit information provided to Defendant's credit monitoring subscribers. Trans Union has a service available which will detect and list all the credit files in its databases which contain a particular Social Security number. Trans Union will notify TrueLink to send an alert to those credit monitoring customers who have a credit file which contains a Social Security number identical to the Social Security number reflected on more than one credit file maintained by Trans Union. The notice will be in the form of a credit monitoring alert, an electronic communication. The alert will notify the credit monitoring customer that Trans Union maintains more than one credit file reflecting the Social Security number which has been reported to TrueCredit by that customer.

D. Defendant should be enjoined from engaging in such deceptive advertising as described herein. The KCPA authorizes declaratory and injunctive remedies. Once this Court determines those acts of Defendant which constitute violations of the KCPA, the court may permanently enjoin Defendant from engaging in those acts and practices. State ex rel. Stovall v. Martinez, 27 Kan.App.2d 9, 13, 996 P.2d 371, 375 - 376 (2000). The injunction may prohibit Defendant from engaging in specific conduct and must be narrowly tailored to define and prevent future KCPA violations. Id.

## CONCLUSION

Plaintiffs request a finding that Defendant is in violation of the Kansas Consumer Protection Act because defendant engaged in unconscionable acts as defined by the Kansas Consumer Protection Act. Named Plaintiffs request that the Court determine that Plaintiffs are due the sum of $20,000 for each day of its ongoing violations. Finally, Named Plaintiffs, as class relief, request injunctive relief for the class as provided by the Kansas Consumer Protection Act. Plaintiffs request a hearing before this Honorable Court so that the Court may determine the number of Defendants violations, the length of the violations,

the extent of injunctive relief appropriate, entertain evidence on the reasonable amount of attorneys fees

to be awarded, and consider what injunctive relief can be narrowly tailored to address the acts of

Defendant, its affiliates and/or parent corporation.

<div style="margin-left:40%">

Respectfully submitted,
 /s/ Cristopher J. Curtin
Christopher J. Curtin
DE Bar Id. No. 0226
Erisman & Curtin
629 Mount Lebanon Road
Wilmington, Delaware 19803
Phone: (302) 478-5577
Facsimile: (302) 478-5494
Email: ccurtin659@aol.com

and

Barry R. Grissom, Esq., *pro hac vice*
KS Bar. Id. No. 10866
10990 Quivira, Ste. 200
Overland Park, Kansas 66210
Phone: (913) 341-6616

Bryson R. Cloon, *pro hac vice*
KS Bar. Id. No. 08660, MO Bar. Id. No. 36843
Cloon Law Firm
11150 Overbrook Road
Leawood, KS 66211
Phone: (913) 661-9600
Facsimile: (913) 661-9614

Yeager Law Firm
  /s/  B. Joyce Yeager
B. Joyce Yeager, *pro hac vice*
KS Bar No.  18932, MO Bar No. 46013
P.O. Box 2469
Mission, KS  66201-2469
(913) 648-6673
Facsimile (773) 326-3538

Michael W. Blanton, *pro hac vice*
MO Bar. Id. No. 46490
Swanson Midgley, LLC
2420 Pershing Road, Ste. 400
Kansas City, Missouri 64108
Phone: (816) 842-6100
**COUNSEL FOR PLAINTIFFS**

</div>

## CERTIFICATE OF SERVICE

I, B. Joyce Yeager, Esq., hereby certify that on October 11, 2007, I served a copy of the foregoing

redacted version of Plaintiff's Motion for Summary Judgment by depositing the same in the United States

Mail, postage prepaid to:

> William M. Lafferty, Esq.
> Jay N. Moffitt., Esq.
> Morris Nichols Arsht & Tunnell
> 1201 N. Market St.
> Wilmington, DE 19801
> wlafferty@mnat.com

and that I served a copy electronically this day to the following:

> Michael C. O'Neil
> Paula D. Friedman
> DLA Piper US LLP
> 203 N. LaSalle St., Ste. 1900
> Chicago, IL 60601-1293
> michael.Oneil@dlapiper.com
> paula.friedman@dlapiper.com

> Yeager Law Firm
>   /s/  B. Joyce Yeager
> B. Joyce Yeager, *pro hac vice*
> KS Bar No. 18932, MO Bar No. 46013
> P.O. Box 2469
> Mission, KS 66201-2469
> (913) 648-6673
> Facsimile (773) 326-3538

DATE: October 11, 2007