## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STEVEN G. MILLETT, MELODY J. MILLETT, | ) | |
| On Behalf of Themselves and All Others | ) | |
| Similarly Situated, | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 05-599-SLR |
| v. | ) | |
| | ) | |
| TRUELINK, INC., | ) | |
| A Trans Union Company, | ) | |
| | ) | |
| Defendant. | ) | |

## APPENDIX OF EXHIBITS

## IN SUPPORT OF

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## AND

## PLAINTIFFS' REPLY TO DEFENDANT'S ANSWERING BRIEF IN OPPOSITION TO MOTION FOR CLASS CONSIDERATION

ERISMAN & CURTIN

/s/ Christopher J. Curtin
Christopher J. Curtin
DE Bar Id. No. 0226
Erisman & Curtin
629 Mount Lebanon road
Wilmington, Delaware 19803
Phone: (302) 478-5577
Facsimile: (302) 478-5494
Email: ccurtin659@aol.com

DATE: October 1, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| STEVEN G. MILLETT, MELODY J. MILLETT, | ) | |
| On Behalf of Themselves and All Others | ) | |
| Similarly Situated, | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 05-599-SLR |
| v. | ) | |
| | ) | |
| TRUELINK, INC., | ) | |
| A Trans Union Company, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX
("App. Ex.")**

**IN SUPPORT OF**

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT**

**PLAINTIFFS' REPLY TO DEFENDANT'S ANSWERING BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**APP. EX. A – YEAGER AFFIDAVIT – Confidential and filed under seal, Doc. 150**

**APP EX. B – CURRENT ADVERTISEMENTS, EXPERIAN AND TRUELINK**

**APP. EX. C – DEPOSITION OF  DUNI – Confidential and filed under seal, Doc. 150**

**APP. EX. D -  DEPOSITION OF ANDERSON – Confidential and filed under seal, Doc. 150**

**APP. EX. E – DEPOSITION OF MATIS – Confidential and filed under seal, Doc. 150**

**APP. EX. F – DEFENDANT'S DOCUMENT PRODUCTION – TRAINING (FAMILY) –
Confidential and filed under seal, Doc. 150**

**APP. EX. G - DEPOSITION OF STEVEN MILLETT –
Millett V. TrueLink; Millett v. Ford Motor Credit**

**APP. EX. H – DEFENDANT'S DOCUMENT PRODUCTION - TRAINING (SSN
IDENTIFIER) – Confidential and filed under seal, Doc. 150**

**APP. EX. I – DEFENDANT'S DOCUMENT PRODUCTION - SPREADSHEET LOG OF
ACTIVITY – Confidential and filed under seal, Doc. 150**

**APP. EX. J – MELODY MILLETT AFFIDAVIT – Confidential and filed under seal, Doc. 150**

**APP. EX. K – DEPOSITION OF DANAHER – Confidential and filed under seal, Doc. 150**

**APP. EX. L – DEFENDANT'S DOCUMENT PRODUCTION – TRAINING (DEFINITIONS) – Confidential and filed under seal, Doc. 150**

**APP. EX. M – DEFENDANT'S DOCUMENT PRODUCTION – TRAINING (BUG LOGS/FAILURES) – Confidential and filed under seal, Doc. 150**

**APP. EX. N – DEFENDANT'S DOCUMENT PRODUCTION – SCORE ADVERTISING – Confidential and filed under seal, Doc. 150**

**APP. EX. 0 - DEFENDANTS' DOCUMENT PRODUCTION  - COREFAIL – Confidential and filed under seal, Doc. 150**

**APP. EX. P – DOCUMENT COMPILATION OF SUBPOENAED INFORMATION – MONOGRAM BANK OF GEORGIA/PENNEYS/SEARS/CITIBANK/HOME DEPOT/LEXIS SEARCH FOR SOCIAL SECURITY NUMBER SHOWING JUDGMENT**

**APP. EX Q – INDEX, "METRO II" – INDUSTRY REPORTING**

**APP. EX. R – DEFENDANT'S DOCUMENT PRODUCTION – LISTS OF ACTIVITY – MILLETT ACCOUNTS – Confidential and filed under seal, Doc. 150**

**APP. EX. S – ELECTRONIC COMMUNICATIONS FROM DEFENDANT TO PLAINTIFFS – Confidential and filed under seal, Doc. 150**

**APP. EX. T – WAIVER OF SUMMONS OF COUNSEL OF TRANS UNION**

**APP. EX. U – DEFENDANT'S DOCUMENT PRODUCTION – FINANCIAL REPORT – Confidential and filed under seal, Doc. 150**

**APP. EX. V – DEFENDANT'S DOCUMENT PRODUCTION – ADVERTISING/MARKETING – Confidential and filed under seal, Doc. 150**

**APP. EX. W – TABULATION, CONSUMER SURVEY**

**APP. EX. X – COMPILATION OF DOCUMENTS FOR PROMISEMARK – PRESS REPORT, DEFENDANTS' DOCUMENT PRODUCTION OF LIST OF SERVICES – Confidential and filed under seal, Doc. 150**

**APP. EX. Y – DEFENDANT'S DOCUMENT PRODUCTION – SCORING ADVERTISEMENTS/INTERNAL ELECTRONIC MAIL ON SCORING PROGRAM – Confidential and filed under seal, Doc. 150**

**Print date and time**

Thursday, September 27, 2007
12:55 PM

---

Online Personal Credit Reports & Credit Scores - TrueCredit | Page 1 of 1

# truecredit
by ⚇ TransUnion.

*Manage your credit. Manage your life.*℠

home | privacy | learn | help | login

---

## Your Credit Monitoring service includes...



**Credit Alerts Within 24 Hours of Critical Changes**
- 24 hour notification of critical changes to your credit report
- Swiftly find out about credit report changes including fraudulent activity, new inquiries, new accounts, late payments, & more



**Unlimited Access to Your Credit Report**
- Receive a brand new credit report anytime you want
- Reports are easy-to-read with color graphics and free interactive guide

**EXAMPLE: CREDIT TRENDING**

**Powerful Tools and Analysis**
- Graphical trending helps you manage your progress
- View colorful charts and graphs on changes in your debt, income, credit score, and more

PLUS up to $25,000 ID theft insurance* at no additional cost!

*Coverage not available for residents of New York.

home | learning center | privacy | help | member login | terms of use | about | sitemap
TrueCredit features TransUnion data for all complimentary credit scores as well as fraud-watch emails.
TrueCredit.com is powered by TransUnion Interactive, a wholly owned subsidiary of TransUnion.
© Copyright 1998-2007 TrueCredit. All Rights Reserved.

---

http://www.truecredit.com/popup/cmu/example.jsp | 9/27/2007

**1**



Unfiled Notes Page 1

experian

| | CREDIT REPORT & SCORE | CREDIT ADVICE | CALCULATORS |

**CREDIT MANAGER**
JOIN NOW | SEE A DEMO

## Comprehensive credit management service
### brought to you by real credit experts

Sign up now for a FREE 30 day trial membership.

## Learn how Credit Manager gives you control

**Guard against fraud and identity theft**

Credit Manager gives you peace of mind by scanning your credit report daily and alerting you to potential fraudulent items and other critical changes in your credit report.

● Receive notification of new inquiries, bankcard accounts, delinquencies and public record items
● Get daily notification via e-mail
● See a snapshot of these notices on a personalized page designed just for you

**Get the best things in life**

Lenders frequently use your credit score to determine your credit worthiness. Credit Manager gives you the power to see your Experian credit score as often as you like.

● See your score— updated daily
● Use our tool to track it over time
● Try our score simulator to show how different factors affect your score

**Take control of your credit health**

Work directly with the source to catch credit inaccuracies quickly and easily. Have access to an updated credit report every day.

● Work directly with Experian to quickly correct errors
● Secure, quick online access for reports and disputes
● No third party involvement

## Get Credit Manager now!

Home / Sale overview / About our security / Privacy statement
Contact us / About CreditExpert / Affiliate program / Newsletter signup
©2003 CreditExpert, LLC

Sidebar:
- View the Credit Manager demo!
- Click here to start the demo.
- Try Credit Manager Online!
- Online access to your credit report
- Daily alerts of potential fraud
- Exclusive Experian score, analysis and tools
- Access to three credit experts

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


STEVEN G. MILLETT,

MELODY J. MILLETT,

On Behalf of Themselves and

All Others Similarly Situated,

            Plaintiffs,

vs.                     C.A. No. 05-599-SLR

TRUELINK, INC.,         Class Action

a Trans Union Company,    Jury Trial Demanded

            Defendant.


VIDEOTAPED DEPOSITION OF STEVEN G. MILLETT, a Plaintiff, taken on behalf of the Defendant before Nissa M. Sharp, CSR, CCR #528, pursuant to Notice on the 30th of March, 2007, at the offices of THE CLOON LAW FIRM, 11350 Tomahawk Creek Parkway, Suite 100, Leawood, Kansas.

Ex. G

```
 1                    APPEARANCES

 2            Appearing for the Plaintiffs was

 3   MR. BRYSON R. CLOON of THE CLOON LAW FIRM, 11150

 4   Overbrook Road, Suite 350, Leawood, Kansas

 5   66211.

 6            Also appearing for the Plaintiffs was

 7   MR. BARRY R. GRISSOM, 7270 West 98th Terrace,

 8   Building 7, Suite 220, Overland Park, Kansas

 9   66212.

10            Appearing for the Defendant was

11   MR. MICHAEL O'NEIL of DLA PIPER US, LLP, 203

12   North LaSalle Street, Suite 1900, Chicago,

13   Illinois 60601-1293.

14            Also present was Heather Schuman of DLA

15   Piper.

16                      INDEX

17   WITNESS:                        PAGE:

18     STEVEN G. MILLETT

19       Examination by Mr. O'Neil          4

20

21

22

23

24

25
```

```
 1   EXHIBITS:                    MARKED:   IDENTIFIED:

 2      Millett Exhibit 1          55          55

 3      Millett Exhibit 2          72          72

 4      Millett Exhibit 3          86          87

 5      Millett Exhibit 4          96          96

 6      Millett Exhibit 5         106         106

 7      Millett Exhibit 6         130         135

 8      Millett Exhibit 7         144         144

 9      Millett Exhibit 8         166         167

10

11          (Original Millett Exhibits 1 through 8

12   were filed with the original transcript.)

13

14          (The deposition commenced at 8:59 AM.)

15

16

17

18

19

20

21

22

23

24

25
```

1    credit.

2        Q.    You talked this morning about some

3    expectation you had about this product.  Was it

4    your decision to buy the product from Trans

5    Union?

6        A.    It was my wife's -- I mean, we agreed

7    on it.  My wife said this would help us out.  I

8    said okay, go ahead and buy it.

9        Q.    And what did your wife tell you in that

10    conversation as to why she thought you should

11    buy the product?

12        A.    Could you repeat the question, I'm

13    sorry?

14        Q.    Sure.  I think you told me that your

15    wife suggested that you buy the product and you

16    agreed, right?

17        A.    Right.

18        Q.    Okay.  What did she say to you, if

19    anything, besides, Steven, we should buy this

20    product?

21        A.    She said we should buy this, this would

22    help us out.

23        Q.    Did she explain to you how she thought

24    it would help you out?

25        A.    No.  But that's where I thought it

1    would help us out finding information about the

2    other party.

3        Q.    What else --

4        A.    I guess that was my own expectation.

5        Q.    So, you had a conversation with your

6    wife and she says, Steven, we should buy this

7    product from Trans Union, right?

8        A.    Correct.

9        Q.    And she told you that -- and maybe I

10   misheard you -- but she told you that she

11   thought it would help you out?

12       A.    Right.

13       Q.    Okay.   What else do you recall about

14   that conversation?

15       A.    That's basically it.

16       Q.    Okay.   Did you agree with her that it

17   would help you out?

18       A.    Yeah, I told her go ahead and buy it.

19       Q.    And how -- did you tell her anything

20   else in this conversation when you told her to

21   go ahead and buy the product?

22       A.    No.

23       Q.    Okay.   So you just described the entire

24   conversation that you had with your wife before

25   you decided to buy the credit monitoring product

1    from Trans Union, right?

2        A.    Yes, sir.

3        Q.    At the time, had you or your wife

4    purchased a credit monitoring product from any

5    other company, at the time that you decided to

6    buy it from Trans Union?

7        A.    You'll have to ask my wife that.  I

8    don't recall.

9        Q.    Do you think your wife would recall?

10       A.    You'd have to ask her that.

11       Q.    Have you ever asked her?

12       A.    No.

13       Q.    And you haven't talked to your wife --

14   strike that.

15            Prior to your deposition today, did you

16   talk to your wife about the facts of the lawsuit

17   in order to prepare for your deposition today?

18       A.    Just in general terms, I mean.

19       Q.    Describe to me that conversation.

20       A.    Well, I was just asking her about when

21   stuff happened.

22       Q.    And did she tell you?

23       A.    Yeah.

24       Q.    What stuff were you asking her about

25   when it happened?

1    Trans Union was the only company that identified

2    for you the particular credit accounts that

3    Mr. Perez used your Social Security number with?

4        A.    That's correct, after my lawyer wrote a

5    letter to you.

6        Q.    Oh, so the lawyer wrote a letter to

7    Trans Union asking for that information?

8        A.    He wrote it to all the credit bureaus.

9        Q.    Have you ever seen that letter?

10       A.    I think just I kind of remember it, but

11   not...

12       Q.    I've never seen it.  Who was the lawyer

13   who wrote to Trans Union asking for that

14   information?

15       A.    Adler.

16       Q.    Okay.  And so Mr. Adler wrote to all

17   three credit bureaus asking them to provide

18   information regarding the accounts opened up by

19   the person who stole your Social Security

20   number, right?

21       A.    I believe that's the content, yes.

22       Q.    Okay.  And what is this person's name,

23   do you know, who stole your Social Security

24   number?

25       A.    He's got several different aliases,

1    Abundio Perez.

2        Q.    So can we just refer to him as

3    Mr. Perez during this conversation today?

4        A.    (Indicating.)

5        Q.    Okay.  So, your lawyer wrote to all

6    three credit bureaus asking for information

7    about Mr. Perez's use of your Social Security

8    number, right?

9        A.    I think he was also asking to shutdown

10   his accounts.

11       Q.    Okay.  Well, we'll get to that in a

12   second.

13       A.    Okay.

14       Q.    But...

15       A.    All right.

16       Q.    Your lawyer to wrote to each of the

17   three credit bureaus and said give us this

18   information, right?

19       A.    Yes, sir.

20       Q.    And Trans Union was the only one who

21   provided it to you, right?

22       A.    Yes, sir.

23       Q.    Okay.  The other bureaus refused to do

24   that for you, right?

25       A.    Yes, sir.

1      Q.    You can't keep up with all what?

2      A.    With all the lawyer stuff back and

3    forth.

4      Q.    Because you've filed a number of

5    lawsuits, haven't you?

6      A.    Yes, sir.

7      Q.    How many lawsuits have you filed?

8      A.    I think five.

9      Q.    And are these five separate lawsuits?

10   Are they all together in one or separate?

11     A.    They were all in one and then they got

12   separated out.

13     Q.    So, after the initial lawsuit was filed

14   against all five companies, your lawyers decided

15   that that was not a good idea and that they

16   should file them in separate lawsuits?

17              MR. CLOON:  I'm going to object

18   to the form of the question.  Lacks foundation.

19   Calls for speculation.

20              MR. O'NEIL:  I'll --

21              MR. CLOON:  Invades the

22   attorney-client privilege.

23              MR. O'NEIL:  I'll withdraw the

24   question.

25     Q.    (BY MR. O'NEIL) Why did you first sue

1    everybody in one case and then later decide to

2    sue them in five separate cases?

3        A.    That's something the lawyers came up

4    with.

5        Q.    Okay.  And who have you sued,

6    Mr. Millett?

7        A.    Ford, Trans Union, Experian, Equifax.

8    Is that four?

9        Q.    That's four, yes.  Do you think you've

10   sued anybody else?

11       A.    I guess that's all I can remember.

12       Q.    Did you ever sue Bank of America?

13       A.    Oh, yeah, that's right.

14       Q.    Okay, that's another one.

15       A.    Sorry.

16       Q.    That's okay, it's hard to keep all this

17   stuff straight.  Did you ever sue a company

18   called CSC?

19       A.    Yeah, I learned that at the last

20   deposition I think, yeah.

21       Q.    So, prior to that last deposition, you

22   weren't aware that a lawsuit was filed against

23   CSC in your name?

24       A.    Yes, sir.

25       Q.    Did that surprise you to find out in a

```
 1                    MR. CLOON:  I'm going to object
 2    to that question.  It's argumentative, invades
 3    the attorney-client privilege.
 4                    MR. O'NEIL:  Are you going to
 5    instruct him not to answer that question?
 6                    MR. CLOON:  No.
 7        Q.   (BY MR. O'NEIL) Was your recollection
 8    refreshed about the company Truelink during the
 9    break that we just took?
10                    THE WITNESS:  So go ahead and
11    answer?
12                    MR. CLOON:  Yes.
13        A.   Yes, sir.
14        Q.   (BY MR. O'NEIL) So, you've heard of a
15    company called Truelink?
16        A.   Yes.
17        Q.   Okay.  And what's your understanding of
18    what that company is?
19        A.   That's who represents the credit
20    monitoring.
21        Q.   Okay.  Have you ever sued Truelink?
22        A.   That's -- I'm getting confused again.
23    I mean, is it Trans Union or Truelink?
24        Q.   Well, sir, I'm asking you.  Because you
25    identified four companies that you sued and then
```

1    to buy the credit monitoring product, right?

2        A.    Yes, sir.

3        Q.    But was it your wife's idea that she

4    proposed to you that you filed all these

5    lawsuits?

6        A.    No.  We decided together to file all

7    these lawsuits.

8        Q.    Why did you decide to file the

9    lawsuits?

10       A.    Because we don't think it's right that

11   somebody's out there running around with my

12   Social Security number and you guys just letting

13   him do it.

14       Q.    You think my clients are letting

15   Mr. Perez use your Social Security number?

16       A.    Well, you have the right to maintain

17   the information.  It's my information.  I don't

18   want to be associated with this guy in any

19   shape, form or manner.  I don't want it coming

20   back on me.

21       Q.    Have you ever been associated with

22   Mr. Perez?

23       A.    Well, yeah.

24       Q.    In what way?

25       A.    My Social Security number.

1      Q.    Well, I understand that you think he's

2   using your Social Security number to open up

3   accounts, right?

4      A.    Yes, sir.

5      Q.    Okay.  But has anyone ever called you

6   up and said you owe them money that Mr. Perez --

7   that we lent to Mr. Perez?

8      A.    Ford Motor called the house.

9      Q.    Ford Motor called you?

10      A.    Yeah, then my wife took the phone out

11   of my hand.  They wanted my Social Security

12   number and then she took the phone out of my

13   hand.

14      Q.    Well, why wouldn't she let you talk to

15   Ford?

16      A.    Because she, like I said, she handles

17   this stuff.  She was wondering what they want my

18   Social Security number for.

19      Q.    Trans Union identified for you, I

20   think, 23 credit accounts that Mr. Perez had

21   opened using your Social Security number, do you

22   recall that?

23      A.    Yes.

24      Q.    Okay.  Have any of those 23 credit

25   grantors asked you to pay his bills?

1      A.   No.

2      Q.   Has anyone ever said to you, I think

3   you're Mr. Perez?

4      A.   When I first was checking on the bank

5   account at Bank of America, I had to identify

6   which party I was.

7      Q.   I understand that.  Has anyone ever

8   said to you that I think you're Mr. Perez?

9      A.   No.

10     Q.   And so, you filed these lawsuits

11  because you think Trans Union is helping

12  Mr. Perez use your Social Security number; is

13  that your testimony?

14     A.   Yeah.

15     Q.   Okay.  And what facts do you have to

16  support that belief?

17     A.   Well, it's like you're -- I'll just say

18  this, you're not stopping him.

19     Q.   Okay.  Any other facts you have to

20  support your belief?

21     A.   Could you re-ask the question again?

22     Q.   Sure.  I asked you earlier what facts

23  do you have to support the belief that Trans

24  Union is facilitating the misuse of your Social

25  Security number, and you said, well, Trans Union

1    is not stopping him.  And I'm asking you, is

2    that your complete answer or is there something

3    else that you believe is a fact that supports

4    your belief that Trans Union is facilitating the

5    misuse of your Social Security number?

6        A.    Well, you had the right to maintain

7    that information that you sent me, I mean...

8        Q.    Okay.

9        A.    I'm not liking that at all.

10        Q.    Have any of the police done anything to

11    stop Mr. Perez from using your Social Security

12    number?

13        A.    No.

14        Q.    Okay.  Has the Federal Trade Commission

15    -- well, strike that.

16            Has the federal government done

17    anything to stop Mr. Perez from using your

18    Social Security number?

19        A.    To the best of my knowledge, no.

20        Q.    Okay.  But you haven't sued the federal

21    government, have you?

22        A.    No.

23        Q.    And you haven't sued the police?

24        A.    No.

25        Q.    Have you sued Mr. Perez?

1    lawsuit, you have to file what's called a

2    complaint?

3        A.    Yeah.

4        Q.    Okay.  Have you ever seen a complaint

5    that was filed on your behalf?

6        A.    I think, yes.

7        Q.    Okay.  And you understand that in the

8    complaint you have to describe facts, right?

9        A.    Right.

10       Q.    And you also have to identify the legal

11   claims that you're asserting, do you understand

12   that?

13       A.    That's why I hired my lawyer, sir.

14       Q.    Okay.  But do you understand that a

15   complaint has to describe the legal claims that

16   you're asserting?

17       A.    Right.

18       Q.    Okay.  And do you also understand that

19   as part of a complaint, you have to tell the

20   Court what you want the Court to do?

21       A.    Right.

22       Q.    The relief that you're seeking?

23       A.    I understand.

24       Q.    Okay.  What relief are you seeking in

25   the lawsuit that we're talking about today?

1      A.    I think I should be reimbursed my

2   money, and everybody who bought the product get

3   their money back, Kansas Protection Act and

4   injunctive relief and my lawyers' fees paid.

5      Q.    How much in lawyers' fees have you

6   paid?

7                  MR. CLOON:   I'm going to object

8   to the form of the question.   Lacks foundation.

9   Calls for speculation.   He has not idea what

10  hours we spent in this case.

11     Q.    (BY MR. O'NEIL) You can answer.

12     A.    I don't know.

13     Q.    Have you paid any money to your

14  lawyers?

15     A.    Yes.

16     Q.    How much?

17     A.    I've paid -- including my first lawyer?

18  Adler?

19     Q.    Are you seeking his fees in this case?

20     A.    Well, I've spent $12,000 on lawyer

21  fees.

22     Q.    Are all those $12,000 in connection

23  with the lawsuit that you brought against Trans

24  Union?

25     A.    I'm not understanding the question.

1    Q.   Well, I'm asking you -- I've asked you

2    what do you want the Court to do, and you said

3    one of them is to pay your lawyers' fees, right?

4       A.   Right.

5       Q.   I'm asking what lawyers' fees do you

6    want them to pay?  You said $12,000, does that

7    include money spent for suing other people?

8       A.   I don't know.

9       Q.   Okay.

10      A.   Whatever they're asking, I guess.

11      Q.   I'm sorry?

12      A.   Whatever they're asking.

13      Q.   Who's asking?

14      A.   What -- I don't know what my lawyer

15   fees are.

16      Q.   Okay.  You also mentioned something

17   called injunctive relief?  What's that?

18      A.   Well, you're marketing is deceptive,

19   like disclaimers, and they're saying exactly

20   what this product does and does not do.

21      Q.   So what do you want the Court to do?

22      A.   Change you guy's marketing.

23      Q.   Okay.  Have you ever seen the marketing

24   our guy's marketing?

25      A.   I think when she first bought it, yeah.

1    I saw it online.

2        Q.    So, when your wife first bought the

3    Trans Union credit monitoring product --

4                  MR. CLOON:   I'm going to object

5    to the form of the question.  That misstates the

6    evidence.  You've maintained that it's not Trans

7    Union's product, it's Truelink's product.

8                  MR. O'NEIL:   I haven't maintained

9    anything.  I'm just asking the question.

10                 MR. CLOON:   Well, that's what the

11   pleadings state.

12                 MR. O'NEIL:   You know what, I

13   would rather -- if you're going to try to remind

14   your client of what the facts are, let's take a

15   break and you can do it there.  Let's not do it

16   here on the record.  I'm just --

17                 MR. CLOON:   Mike, I objected to

18   the form of the question because it misstated

19   the evidence.

20                 MR. O'NEIL:   Well, actually, I

21   didn't even get my question out before you

22   started objecting.  I'll withdraw it.

23                 MR. CLOON:   Because you used the

24   term "Trans Union".  You said "Trans Union's

25   product", and you've maintained in the pleadings

1   that it's not Trans Union's product, it's

2   Truelink's product.  Am I mistaken about that?

3                    MR. O'NEIL:  I'm asking your

4   client about his knowledge.  He told me it was a

5   Trans Union product.

6                    MR. CLOON:  But you've misled him

7   by saying it is a Trans Union product.  He's

8   stated on the record that he's got them all

9   confused.  He thinks Trans Union is a part of

10  Truelink.

11                   MR. O'NEIL:  Okay.  I'll withdraw

12  the question, you know what, because it's a

13  waste of time.

14      Q.   (BY MR. O'NEIL) At some point in time,

15  your wife went online and bought a credit

16  monitoring product from either Trans Union or

17  Truelink, right?

18      A.   Correct.

19      Q.   Okay.  At that time, did you actually

20  see the website pages she was looking at?

21      A.   Yeah, I think it said protect me from

22  identity theft.

23      Q.   Uh-huh.  What else did it say?

24      A.   I can't recall.

25      Q.   Okay.

1      A.    I mean, that's the gist of it.

2      Q.    And so when you and your wife read

3   that, did you think, great, this product will

4   protect us from identity theft?

5      A.    Yes, sir.

6      Q.    Okay.  Of course, you were already a

7   victim office identify theft, that's your

8   position, right?

9      A.    Yes, sir.

10      Q.    Okay.  Has anybody else stolen your

11   identity since Mr. Perez did?

12      A.    As far as I know, no.

13      Q.    And, to your knowledge, has Mr. Perez

14   opened up any other accounts since you first

15   bought the product from Trans Union or Truelink?

16      A.    I can't answer that, I don't know.

17      Q.    Okay.  So, as you sit here now, you

18   don't have any evidence that there was any

19   additional misuse of your Social Security number

20   after your wife first bought the product?

21           MR. CLOON:  I'm going to object

22   to the form of the question.  Lacks foundation.

23   Calls for speculation.

24      A.    Can you repeat the question?

25      Q.    (BY MR. O'NEIL) I'll ask the court

1      Q.    Did she ever tell you that she thought

2   that you should continue purchasing the credit

3   monitoring product?

4      A.    No.

5      Q.    And you don't know whether or not you

6   are purchasing the credit monitoring product; is

7   that correct?

8      A.    That's correct.

9      Q.    The lawsuit that you brought -- and

10  I'll represent to you, by the way, the current

11  lawsuit that we're having your deposition taken

12  today is not against Trans Union, it's against a

13  company called Truelink.  Okay?

14     A.    Okay.

15     Q.    Okay.  Are you aware that you are suing

16  Truelink, not only on your own behalf, but on

17  behalf of every person in the country who ever

18  bought credit monitoring from Truelink?

19     A.    Yes, sir.

20     Q.    Okay.  And why are you doing that?

21     A.    Because your product doesn't work.

22     Q.    Well, that's your belief, right?

23     A.    Well, it's deceptive.

24     Q.    Okay.  Putting aside what your wife

25  said about the product, you don't think the

1    product works, right?

2        A.    The product doesn't work --

3        Q.    Okay.

4        A.    -- as far as my knowledge is.

5        Q.    Have you ever talked to anybody else

6    who bought the credit monitoring product from

7    Truelink?

8        A.    No.

9        Q.    So you don't know whether or not they

10   think it works, do you?

11       A.    No.

12       Q.    All these lawsuits that you've filed,

13   they're kind of a hassle, aren't they,

14   Mr. Millett?

15       A.    Well, it's not pleasant.

16       Q.    Yeah.  You have to have your deposition

17   taken, you have to answer written questions,

18   right?

19       A.    Yes, sir.

20       Q.    Okay.  And do you understand that the

21   lawsuits are more complicated because you've

22   sued not only on your behalf, but on behalf of

23   everybody in the country who has also purchased

24   the product?

25                    MR. CLOON:  I'm going to object

```
 1    to this line of questioning as being totally

 2    irrelevant to the issues in this case.

 3         Q.    (BY MR. O'NEIL) You can answer.

 4         A.    Can you repeat the question?

 5         Q.    Sure.

 6                   MR. O'NEIL:  Could you please

 7    repeat the question, Ms. Court Reporter?

 8                   (Whereupon, the requested portion

 9    of the record was read by the reporter.)

10                   MR. CLOON:  Same objection and

11    lacks foundation.

12         A.    Yeah.  Yes, sir.

13         Q.    (BY MR. O'NEIL) Why do you think the

14    Court should permit you to represent all those

15    other credit monitoring customers, instead of

16    having them represent themselves?

17         A.    We bought the product just like

18    everybody else.

19         Q.    And you made the decision that you

20    thought the product was defective and you sued

21    Truelink, right?

22         A.    Yes, sir.

23         Q.    And now you want to make that decision

24    for everybody else who bought the product; isn't

25    that correct?
```

```
 1      A.    Yes, sir.

 2      Q.    But you haven't talked to any of those

 3   people, right?

 4      A.    Well, maybe they don't know.

 5      Q.    You haven't talked to any of those

 6   people, right?

 7      A.    No, I haven't talked to all your

 8   customers.

 9      Q.    So you don't know whether or not they

10   have the same complaints that you allegedly have

11   about the product, right?

12      A.    I don't think they're aware of what the

13   product does and does not do.

14      Q.    Uh-huh.  When you first bought the

15   product from Truelink, you and your wife had a

16   conversation where you both agreed you're going

17   to buy it, correct?

18      A.    Yes, sir.

19      Q.    Do you understand that additional

20   products have been purchased from Truelink by

21   your wife since that time?

22      A.    No, I'm not aware of that.

23      Q.    Okay.  So, as far as you know, there

24   was just the one product that you agreed to buy

25   at the very beginning, right?
```

1      A.    Yes, sir.

2      Q.    Okay.  And that was a credit monitoring

3    product?

4      A.    Yes, sir.

5      Q.    Did you buy anything else at that time

6    from Truelink?

7      A.    Not that I'm aware of.

8      Q.    Okay.  And that was a product that was

9    -- that provided you with information over a

10   period of time, right?

11     A.    Right.

12     Q.    Okay.  And how long a period of time

13   did that last?

14     A.    I don't know.  You said it's ongoing,

15   so we must still have it then.

16     Q.    And as part of your -- the credit

17   monitoring product you bought, e-mails were sent

18   from Truelink to your home, right?

19     A.    Right.

20     Q.    And, in fact, they weren't sent to your

21   e-mail address, but to you're wife's e-mail

22   address?

23     A.    Correct.

24     Q.    Okay.  Did you ever see any of those

25   e-mails?

1    A.    I think maybe I saw one.  Everything is

2    honky-dory.

3    Q.    Do you know how often your wife

4    received those e-mails?

5    A.    No, I can't answer that, I don't know.

6    Q.    Did you ever ask her, ask your wife, if

7    she ever got more than one e-mail from Truelink?

8    A.    No.  I don't recall asking her that.

9    Q.    Do you know when you purchased the

10   credit monitoring service from Truelink?

11   A.    I can't give you exact date.

12   Q.    Can you give me a rough date?

13   A.    I think it was like after the police

14   report or some time around there.

15   Q.    Okay.

16   A.    In general.

17   Q.    Do you know what year that was?

18   A.    I think it was 2003, I think.

19   Q.    And you told us today that you think

20   the product that Truelink sold to you doesn't

21   work, right?

22   A.    Yes, sir.

23   Q.    And could you tell me in what ways the

24   product doesn't work?

25   A.    Doesn't tell you if somebody's using

1    your Social Security number.

2        Q.    Any other problems that you have with

3    the product?

4        A.    Well, it says it's supposed to protect

5    me from identity theft, I'm not even sure it

6    does that.

7        Q.    So you don't know?  It may, but you

8    don't know; is that right?

9        A.    Yes, sir.

10       Q.    Okay.  And to your knowledge, you

11   haven't been the victim of identity theft, other

12   than this use by Mr. Perez of your Social

13   Security number, right?

14       A.    That's correct.

15       Q.    Okay.  Any other problems that you have

16   with the Truelink credit monitoring service?

17       A.    I think you should change your

18   advertising.

19       Q.    So, you're not happy with the

20   advertising, right?

21       A.    Correct.

22       Q.    Okay.  But you haven't seen the

23   advertising since that very first day in 2003

24   since you looked at it, right?

25       A.    Correct.

1      Q.    So you don't know if you have any

2    problem with the advertising that's occurred

3    since that date, right?

4      A.    Right.

5      Q.    Have you ever had any conversations

6    with your wife about the advertising?

7      A.    Yeah, that they should change it.

8      Q.    Okay.

9              MR. O'NEIL:  Well, looks like we

10   need to change the tape, so let's go off the

11   record.

12             VIDEOGRAPHER:  We are now going

13   off the record at 9:56 AM.

14             (Recess.)

15             VIDEOGRAPHER:  It is now 9:58 AM

16   and we are back on the record.  You may

17   continue.

18     Q.    (BY MR. O'NEIL) Mr. Millett, have you

19   ever heard of something called the Credit Repair

20   Organizations Act?

21     A.    No.

22     Q.    Okay.  Have you ever heard of something

23   called a Credit Repair Organization?

24             MR. CLOON:  I'm going to object

25   to this line of questioning.  Those claims are

1      Q.    Okay.   To your knowledge, have you ever

2    been denied credit based upon a credit report

3    prepared by Trans Union?

4      A.    I don't know.

5      Q.    Are you aware that your lawyers filed a

6    complaint alleging that you were, quote,

7    "unfairly denied credit based upon a credit

8    report prepared by Trans Union"?   Were you aware

9    of that?

10     A.    It sounds familiar.

11     Q.    Does it sound familiar because I just

12   asked you the question or because somebody told

13   you that previously?

14     A.    Because you asked me the question.

15     Q.    Oh.   Because you knew I was reading

16   from the complaint, right?

17     A.    You're reading something over there.

18     Q.    Who are your lawyers in the case that

19   you've brought against Truelink?

20     A.    Barry Grissom, Joyce Yeager, I can't

21   remember all of them.

22     Q.    Are there more?

23     A.    Yeah.

24              THE WITNESS:   I was wondering if

25   I could take another break?

1           MR. O'NEIL: Sure.

2           VIDEOGRAPHER: We are now going

3    off the record at 10:02 AM.

4           (Recess.)

5           (Millett Exhibit 1 was marked for

6    identification by the reporter.)

7           VIDEOGRAPHER: It is now 10:08 AM

8    and we are back on the record. You may

9    continue.

10    Q.   (BY MR. O'NEIL) Mr. Millett, I'm going

11   to hand you what's been marked Millett Exhibit

12   No. 1.

13          MR. O'NEIL: Do we have copies?

14    Q.   (BY MR. O'NEIL) And I'll represent to

15   you, Mr. Millett, that this is a document that

16   your lawyers produced to us in connection with

17   this lawsuit. Take as much time as you need,

18   but my question to you right now is simply have

19   you ever seen this document before, Mr. Millett?

20          MR. CLOON: Excuse me.

21    A.   It's the Ford Motor Credit Company.

22    Q.   (BY MR. O'NEIL) Do you understand that

23   this is a complaint that was filed on your

24   behalf and on behalf of your wife against the

25   Ford Motor Credit company?

1      A.   Yes, sir.

2      Q.   Do you recall if you got an opportunity

3   to review this document before it was filed with

4   the Court?

5      A.   I don't remember.

6      Q.   I think we discussed before about the

7   fact that whenever you file a lawsuit, you have

8   to file what's called a complaint.  Do you

9   understand that?

10     A.   Right.

11     Q.   And you've sued at least five or six

12   companies, right?

13     A.   Yes, sir.

14     Q.   Did you get an opportunity to review

15   the complaint that was filed on your behalf in

16   those cases before it was filed?

17     A.   I think I looked at each one, yes.

18     Q.   Okay.  Do you recall, did you make any

19   changes to the complaint before it was filed

20   with the Court?

21     A.   Not me personally, no.

22     Q.   Okay.  Did you have -- what was the

23   purpose of you reviewing the document before it

24   was filed with the Court?

25     A.   I guess just to see what was in it.

1    Q.   Okay.  So you weren't asked to review

2    it to make sure it's accurate then?

3    A.   I don't remember.

4    Q.   The lawsuit that you and your wife have

5    filed against Ford Motor Credit Company, is that

6    still in existence?

7    A.   I think we -- it's been dropped.

8    Q.   Do you recall that there was a ruling

9    by the Court that said Ford Motor didn't violate

10   the law?

11   A.   I don't remember that statement, no.

12   Q.   But your understanding is that your

13   lawyers dropped the lawsuit, dismissed it?

14   A.   Right.

15   Q.   Okay.  Did you get any compensation or

16   money as part of the agreement to drop the

17   lawsuit?

18   A.   No.

19   Q.   Did your lawyers get any payment or

20   money for the agreement to drop the lawsuit?

21   A.   I'm not aware if they did or didn't.

22   Q.   Did you ever sign a settlement

23   agreement with Ford Motor Credit?

24   A.   I don't remember.

25   Q.   And as you sit here today, you're not

1   his testimony, but continue.

2        Q.   (BY MR. O'NEIL) Maybe my question

3   wasn't clear.  I'm not asking about the

4   Defendant trying to dismiss a claim and losing.

5   I'm asking about you've asked multiple courts

6   throughout the country to determine that

7   Experian and Equifax and Ford and Bank of

8   America and CSC and Truelink and Trans Union

9   have violated the law; isn't that correct?

10       A.   Yes, sir.

11       Q.   And no court has ever agreed with you;

12  isn't that correct?

13                MR. CLOON:  I'm going to object

14  to the form of the question.  That's

15  argumentative.

16       A.   The Experian, there's one claim left,

17  so he did agree with me on there.

18       Q.   (BY MR. O'NEIL) Okay.  Well, whatever

19  the Experian, I'll show you the ruling.  But

20  aside from the Experian case, are you aware of

21  any court that says, yes, Mr. and Mrs. Millett

22  and your lawyers, you're right, this Defendant

23  did violate the law?

24       A.   Well, we settled with the other

25  lawsuits.  Another one was dropped.

1    A.    That's when I was in Phoenix, yeah.

2    Q.    Okay.  And do you recall that the terms

3  of that home loan financing were less favorable

4  than you wanted them to be?

5    A.    Right.  I remember that, yeah.

6    Q.    And do you have any reason to believe

7  that the reason why those terms were less

8  favorable was because of Mr. Perez's use of your

9  Social Security number?

10    A.    Okay, repeat the question again.

11    Q.    It was a long question.

12    A.    I'm sorry.

13    Q.    No, you don't have to apologize, it was

14  a long question.  Paragraph 14 states, and I'm

15  paraphrasing here, that you agreed to home loan

16  financing on less favorable terms, quote,

17  "because you and your wife were unaware that the

18  fraudulent use of Plaintiff Steven Millett's

19  Social Security number and the identity theft

20  had adversely impacted their credit histories,

21  credit reports and credit scores," closed quote.

22  Do you see that?

23    A.    Yes, sir.

24    Q.    Do you have any reason to believe that

25  Mr. Perez's use of your Social Security number,

1    quote, "had adversely impacted your credit

2    histories, credit reports and credit scores"?

3        A.    I believe that.

4        Q.    Okay.  Do you have any facts to support

5    that belief?

6        A.    Well, I should have got a first time

7    buyer for my home.

8        Q.    And were you ever told you're not

9    getting that because --

10       A.    Nobody ever told me that, no.

11       Q.    And then Paragraph 17 of the pleading,

12   it states that you and your wife discovered that

13   Bank of Amer Corporation maintained an account

14   for an individual who was fraudulently and

15   criminally utilizing the Social Security of

16   yourself, right?

17       A.    Yes, sir.

18       Q.    And that's consistent with your

19   testimony today?

20       A.    Yes, sir.

21       Q.    Okay.  But, at that time, you didn't

22   believe that that was a result -- well, wait a

23   minute.  So, in August of 2002, did you learn

24   that there was somebody out there who was

25   fraudulently and criminally using your Social

1    Security number?

2       A.   I had inklings.

3       Q.   Okay.  And that was why you and your

4    wife decided to buy the Equifax credit

5    monitoring product, right?

6       A.   Right.

7       Q.   Okay.  Does that refresh your

8    recollection that you may have bought the

9    Equifax product in 2002?

10      A.   I'm sorry, I'm getting confused again.

11   Yeah, we bought it some -- I think we bought it

12   like -- I can't remember.

13      Q.   Okay.

14      A.   I can't answer that.

15      Q.   And then the next paragraph of your

16   pleading states that, "On January 24, 2003, you

17   discovered that you couldn't use Ford's online

18   payment system because some other individual was

19   using your Social Security number for the same

20   purpose," right?

21      A.   Yes, sir.

22      Q.   Okay.  So, by January 2003, you knew

23   that there was a guy out there misusing your

24   Social Security number, right?

25      A.   Yes, sir.

1      A.    I can tell you what I think.

2      Q.    Please do.

3      A.    That she had to close the accounts

4  opened by Mr. Perez.

5      Q.    Did she ever tell you that?

6      A.    I know she was working on that.

7      Q.    Did she ever close accounts that

8  somebody else had opened?

9      A.    She was trying to close down those

10  Abundio accounts that Trans Union sent from that

11  letter.

12      Q.    Did she ever succeed?

13      A.    I think she did on most of them.

14      Q.    So, it's your understanding that your

15  wife succeeded in closing credit accounts that

16  Mr. Perez had with other companies?

17      A.    Yes, sir.

18      Q.    Okay.  And what's the basis for that

19  understanding?  Is it because your wife told you

20  that?

21      A.    Because she was calling up people on

22  the phone.

23      Q.    Well, I understand she was calling

24  people on the phone.  But my question is, did

25  she actually close accounts?

1           MR. CLOON:  I'm going to object

2    to the question.  Calls for speculation, and

3    it's vague as to what the term "closing"

4    actually means.

5        Q.   (BY MR. O'NEIL) To your knowledge, has

6    your wife ever closed accounts that were opened

7    by fraud?

8        A.   I don't know.

9        Q.   To your knowledge, have criminal

10   charges ever been brought against Mr. Perez?

11       A.   Concerning what?

12       Q.   Concerning anything?  Well, actually,

13   have any criminal charges been brought against

14   Mr. Perez regarding the misuse of your Social

15   Security number?

16       A.   I don't know.

17       Q.   Okay.  Well, let me direct your

18   attention to Page 9 of that document,

19   Mr. Millett.  At the very top there is paragraph

20   48.  Do you see that, sir?  First sentence of

21   Paragraph 48 says, quote, "Criminal charges have

22   been brought against the individual who utilized

23   or was utilizing Plaintiff Steven Millett's

24   Social Security number."  Do you see that, sir?

25       A.   Yes.

1       Q.    (BY MR. O'NEIL) Were you relieved to

2   learn that there was no reference to Mr. Abundio

3   in your credit report?

4       A.    No.

5       Q.    Why not?

6       A.    Well, it seemed like to me that there's

7   another file.

8       Q.    That's what you thought back then?

9       A.    Yeah.

10      Q.    Okay.  And the other file didn't relate

11  to you, but related to Mr. Perez, right?

12      A.    Well, yeah, but it has my Social

13  Security number on it.

14      Q.    Uh-huh.  But were you relieved to learn

15  that nobody had accessed your credit report for

16  Mr. Perez's purposes?

17      A.    Well, could you ask the question again?

18  I'm sorry.

19      Q.    Sure.

20              MR. O'NEIL:  Ms. Court reporter,

21  can you read it back please?

22              (Whereupon, the requested portion

23  of the record was read by the reporter.)

24      A.    No, I wasn't relieved at all.

25              (Millett Exhibit 3 was marked for

1    identification by the reporter.)

2        Q.    (BY MR. O'NEIL) Mr. Millett, I'm

3    handing you what's been marked Millett Exhibit

4    No. 3.

5        A.    Done with this?

6        Q.    Let me get this out of your way.

7        A.    Okay.

8        Q.    You've got enough paper in front of

9    you.

10            And I'll represent to you, Mr. Millett,

11    that this document was among the pages that were

12    produced by your lawyers in this case.  Have you

13    ever seen this document before, Mr. Millett?

14        A.    I don't think I've seen it like this.

15        Q.    I'm sorry, so you don't think you saw

16    it like this you said?

17        A.    I --

18        Q.    I will represent to you that this is a

19    file disclosure, or at least I'll represent to

20    you that this is a form of a file disclosure

21    that Trans Union makes to consumers whenever

22    they ask for their credit report.  Have you ever

23    seen this form of document?

24        A.    I don't remember this.

25        Q.    Okay.  Have you ever -- do you recall

1    ever seeing a credit report from Trans Union in

2    this form?

3        A.    No.  I don't remember.

4        Q.    Have you ever seen a credit report --

5    well, strike that.

6            Have you ever seen any document that

7    reflects the credit information that Trans Union

8    maintains on you?

9        A.    I think I've seen it on the internet.

10        Q.    But never printed out?

11        A.    I don't remember.

12        Q.    Do you recognize any of the handwriting

13    on Exhibit No. 3, on the first page?

14        A.    It kind of looks like my wife's, but

15    I'm not -- I'm not totally sure.

16        Q.    Okay.  On the first page, there's four

17    accounts listed there.

18        A.    Right.

19        Q.    The first one is a Ford Motor Credit

20    account, the second one seems to be a Ford Motor

21    Credit account that was closed.  Do you see

22    that?

23        A.    Yes, sir.

24        Q.    And that accurately reflects the

25    account that you either had or had in the past

1    with Ford Motor Credit as of January 2003,

2    right?

3        A.    Right.

4        Q.    And then the next account is for Jared,

5    do you see that, sir?

6        A.    Yes, sir.

7        Q.    Do you have a credit account a Jared

8    Jewelers?

9        A.    Yes, sir.

10       Q.    Okay.  And then there is a closed

11    mortgage account with Washington Mutual.  Do you

12    see that, sir?

13       A.    Yes, sir.

14       Q.    And, at one point, did you have a

15    mortgage account with Washington Mutual?

16       A.    Yes, sir.

17       Q.    And then -- so then these accounts all

18    relate to you, Mr. Millett, right?

19       A.    As far as I know, yes.

20       Q.    Okay.  And on the first page, there's

21    some -- there is an address for you and there's

22    some former addresses, right?

23       A.    Right.

24       Q.    Are those -- is that information

25    accurate?

1    to hand you what's been marked Millett Exhibit

2    No. 4, which I'll represent to you are more

3    pages that your lawyers have produced in this

4    case.

5              (Millett Exhibit 4 was marked for

6    identification by the reporter.)

7       Q.   (BY MR. O'NEIL) Tell me if you've seen

8    any of these pages before.

9       A.   Yeah, I've seen this before.

10      Q.   Okay. And do you recall that in April

11   2003, at the request of your wife, Trans Union

12   performed an investigation?

13      A.   Okay.

14      Q.   Do you recall that, sir?

15      A.   I remember this document.

16      Q.   Okay. Let me take you to the second

17   page of Exhibit No. 4, Mr. Millett. It says,

18   "Dear Consumer: This will acknowledge receipt

19   of your recent correspondence." Do you recall

20   that you actually sent correspondence to Trans

21   Union prior to April 23, 2003?

22      A.   I think my first lawyer did.

23      Q.   Okay. You think it was your lawyer who

24   did it?

25      A.   Yeah, that's what I think, yeah.

1      Q.   I see.  So, you weren't really watching

2   her go through each step of purchasing the

3   product, were you?

4      A.   No.

5      Q.   Okay.  Were you even looking at what

6   she was doing at that time?

7      A.   Well, I just kind of glanced over there

8   and read some stuff, and then I walked back to

9   my computer.

10     Q.   What were you reading?

11     A.   The -- what your opening statements

12   were.

13     Q.   You mean the statements on the website?

14     A.   Well, telling what about what the

15   product was, yeah.

16     Q.   Okay.  And why were you interested in

17   looking at that?

18     A.   Just to see what -- if you had any

19   disclaimers in there what you did and didn't do.

20     Q.   So, when you -- when your wife was

21   purchasing the product for you, you were

22   particularly interested in --

23     A.   Oh, I was just reading the activity

24   advertisement just seeing what you had in there.

25     Q.   Okay.  But you and your wife had

1    already purchased credit monitoring products

2    from other companies, right?

3        A.    Right.

4        Q.    And so you were familiar with what the

5    product was, right?

6        A.    In general.

7        Q.    Okay.  And when your wife purchased the

8    products from the other companies prior to

9    purchasing it from Truelink, were you sitting

10   looking at the information on the website during

11   those earlier purchases?

12       A.    I don't think so.

13       Q.    Okay.  What were you doing on the

14   computer while your wife was purchasing the

15   product?

16       A.    I think I was playing some video game

17   or something.

18       Q.    Is there a reason why your wife was

19   purchasing the product instead of you?

20       A.    Why she was doing it?

21       Q.    Right.

22       A.    I just -- I think she was looking at it

23   and she said it was -- it could help us.

24       Q.    And do you recall that she provided her

25   e-mail address instead of yours?

1    information about Mr. Perez, right?

2        A.    Right.

3        Q.    And you already knew that the Experian

4    product didn't give you any information about

5    Mr. Perez, right?

6        A.    Right.

7        Q.    Did you and your wife have any

8    conversations along the lines of, but we think

9    Truelink will provide information about

10   Mr. Perez?

11       A.    I think we bought the other two to

12   cross reference information.

13       Q.    Okay.  Well, you and your wife were

14   disappointed -- or correct me if I'm wrong, this

15   is a question -- were you and your wife

16   disappointed that the Experian and Equifax

17   products didn't give you any information about

18   Mr. Perez's use of your Social Security number?

19                 MR. CLOON:  I'm going to object

20   to the form of the question.  Lacks foundation.

21   There are no dates, times or places stated.

22       Q.    (BY MR. O'NEIL) You can answer.

23       A.    I wasn't happy.

24       Q.    Okay.  So, did you have any

25   conversations with your wife prior to purchasing

1    the product from Truelink where you thought that

2    Truelink would provide that information?

3        A.    We didn't know.

4        Q.    Okay, I understand you didn't know.

5    What I'm asking is, did you have any

6    conversation with your wife prior to purchasing

7    the product from Truelink where you discussed

8    whether or not Truelink would provide the

9    information that you were looking for?

10       A.    I don't think we had a conversation

11   like that, no.

12       Q.    Did you ever ask your wife why are we

13   buying the same product from another credit

14   bureau?

15       A.    I think that was the same time when she

16   said it would help us.

17       Q.    I understand that, sir.  But did you

18   ever question why you were buying the same

19   product from a different credit bureau?

20       A.    It was just a cross reference to see

21   what the other two had.

22       Q.    Were you ever concerned about the

23   expense of these credit monitoring products that

24   you were purchasing?

25       A.    No.

1    A.    My wife purchased it on my behalf.

2    Q.    Okay.  Well, then did she ever tell you

3  that there was a contract that had to be agreed

4  to before Truelink delivered the product?

5    A.    No.

6    Q.    Did she ever indicate to you whether or

7  not she read the contract?

8    A.    No.

9    Q.    Have you ever filed a lawsuit against a

10  company called Fair Isaac?

11    A.    I think that was one of the early ones.

12    Q.    Have you ever attended high school?

13    A.    Yes, sir.

14    Q.    And did you graduate from high school?

15    A.    Yes, sir.

16    Q.    What high school did you graduate from?

17    A.    Blue Valley High School.

18    Q.    Where was that, sir?

19    A.    It's out in Stanley, Kansas.

20    Q.    Okay.  When did you graduate from that

21  high school?

22    A.    '81.

23    Q.    Have you taken any college courses?

24    A.    I graduated from DeVry.

25    Q.    And was that a two-year program?

1      Q.    Do you have any children, sir?

2      A.    Yes, I have two.

3      Q.    And how old are they?

4      A.    My son just turned seven, and I think

5    my daughter is 13.

6      Q.    Have you suffered any harm as a result

7    of Truelink not delivering what you believe it

8    promised?

9              MR. CLOON:   Object to the form of

10   the question.   Vague and ambiguous.   You can

11   answer.

12     A.    I can't determine what harm I've

13   received or hadn't received.

14     Q.    (BY MR. O'NEIL) Why not?

15     A.    Because I don't know.   He could still

16   be out there buying all kinds of stuff for all I

17   know.

18     Q.    When you say "he", you mean Mr. Perez?

19     A.    Yes, sir.

20     Q.    Okay.   Have you done any investigation

21   to find out what Mr. Perez has been doing since

22   you purchased the Truelink product?

23     A.    No.

24     Q.    Okay.   Well, aside from the possibility

25   that Mr. Perez may have done some harm to you

1    since you purchased the Truelink product, have

2    you suffered any other harm as a result of

3    Truelink not delivering what you believe it

4    promised?

5                    MR. CLOON:  Same objection.

6        A.    I'm not understanding the question very

7    well.

8        Q.    (BY MR. O'NEIL) Okay.  Well, I mean,

9    you're claiming Truelink's product wasn't what

10   it promised, right?

11       A.    Correct.

12       Q.    And I think you also said you think

13   some of the advertising regarding the product

14   was not accurate, right?

15       A.    Right.

16       Q.    Okay.  And so now I'm asking you, okay,

17   Mr. Millett, so what?  What harm have you

18   suffered, if in fact what you say is true?

19                    MR. CLOON:  Same objection.

20       A.    I don't know how to answer that.

21       Q.    (BY MR. O'NEIL) Why don't you know how

22   to answer it?

23       A.    Well, I mean, like I said before, the

24   guy could be out there doing whatever.

25       Q.    Okay.  Is that your complete answer?

1        A.    Yes, I believe so.

2        Q.    What is it that you believe Truelink

3   promised and did not deliver?

4        A.    It said it can protect me from identify

5   theft.

6        Q.    Okay.  And you don't think it's

7   protected you from identity theft?

8        A.    Not as far as Social Security numbers

9   are involved.

10       Q.    But, sir, you've already testified that

11  you believe Mr. Perez began misusing your Social

12  Security number in 1989.  Do you recall that?

13       A.    Yes.

14       Q.    And also you learned as of April 2003

15  that he had used your Social Security number to

16  open 26 accounts.  Do you recall that?

17       A.    Yes, sir.

18       Q.    Okay.  I'll represent to you that in

19  the complaint that your lawyers filed, it state,

20  quote, "Plaintiffs purchased the credit

21  monitoring service on or about August 2, 2003."

22  Okay.  So, you're not blaming Truelink for

23  anything that occurred prior to August 2, 2003,

24  are you?

25       A.    Right.

1      Q.   Okay.  So, if in fact you were a victim

2   of identity theft or if in fact as it appears

3   this guy misused your Social Security number

4   prior to August 2, 2003, you can't blame

5   Truelink for that, right?

6      A.   Right.

7      Q.   And you don't have any evidence that

8   there's been additional identity theft that has

9   occurred since August 2nd, 2003, do you?

10      A.   Right.

11      Q.   Are there any other ways that you think

12   Truelink's alleged failure to deliver what it

13   promised has hurt you?

14      A.   Well, I just -- I mean, if you said in

15   your advertisement that this doesn't protect

16   from Social Security fraud, then we probably

17   wouldn't have bought it.

18      Q.   Really?  Is that your testimony today?

19   That if Truelink had told you that we're only

20   going to give you information in your credit

21   report and not information in another person's

22   report, that you wouldn't have bought the

23   product; is that your testimony?

24      A.   Well, it said it would protect me from

25   identify theft.

1      Q.    So --

2      A.    I consider Social Security -- stealing

3   my Social Security is an identity theft.

4             MR. O'NEIL:  Could you please

5   read back my question for the witness, and I'll

6   ask him to answer that question?

7             (Whereupon, the requested portion

8   of the record was read by the reporter.)

9      A.    I'm not understanding.

10      Q.    (BY MR. O'NEIL) Well, I understand that

11   you haven't ever looked at the marketing of

12   Truelink, other than some undefined page on the

13   one date that your wife purchased the product,

14   but.  Do you understand during the course of

15   your lawsuits against Trans Union, Truelink,

16   Experian, Equifax, that all of those companies

17   have explained that we only give you information

18   about your credit report, and we only tell you

19   about changes to your credit report?  Do you

20   understand that?

21      A.    Okay.

22      Q.    But did you understand that that's been

23   the positions of the companies that you have

24   sued?

25      A.    Okay.  Yeah.

1    Q.    Okay.  And do you understand that that

2    was the basis, one of the bases for the Court in

3    California dismissing some of the claims you

4    brought against Experian?

5    A.    Okay.

6    Q.    Okay.  So, go back to my original

7    question.  Are you saying that if you had been

8    told by Truelink that we're only going to alert

9    you to changes in your credit report, that you

10   would not have bought the product?

11   A.    I'm saying that if they would have said

12   what this product does and doesn't do, then, I

13   mean, we might have bought it and we might not

14   have bought it.  If it was all spelled up

15   instead of with the broad statement, well, this

16   is -- we protect you from identify theft.

17   Q.    With all due respect, sir, you don't

18   know what Truelink told you in August of 2003

19   about their product, isn't that correct, because

20   you didn't look at it?

21             MR. CLOON:  I'm going to object.

22   That's argumentative.

23   Q.    (BY MR. O'NEIL) You can answer.

24   A.    Can you ask that question again?

25   Q.    With the exception of -- somehow this

 1      A.    I don't ever recall her saying that,

 2    no.

 3      Q.    Do you ever recall her saying, Steven,

 4    I'm disappointed, I completely believed that

 5    Truelink was going to give us information --

 6      A.    I never --

 7      Q.    -- about Mr. Perez?

 8      A.    I don't remember her saying that.

 9      Q.    By the time you and your wife had

10    decided to buy the Truelink product in August of

11    2003, you and your wife had already hired

12    lawyers, right?

13      A.    I don't -- I think we hired Adler.

14      Q.    Right.  Did he ever suggest to you that

15    you buy the product from all of the people who

16    were selling credit monitoring products?

17      A.    No.

18                  MR. O'NEIL:  I think this is a

19    good time to take a break for lunch.

20                  MR. CLOON:  Okay.

21                  VIDEOGRAPHER:  We are now going

22    off the record at 11:40 AM.

23                  (Recess.)

24                  VIDEOGRAPHER:  It is now 1:08 PM

25    and we are back on the record.  You may

1    to you?

2        A.    I can't speak for my wife.  I don't

3    know.

4        Q.    Did you ever have any conversations

5    with her about that topic?

6        A.    No.

7        Q.    Okay.  So, you did talk to your wife

8    about the fact that you were unhappy with the

9    product, right, from Truelink?

10       A.    We weren't happy with all three of

11   them.

12       Q.    Did you ever talk specifically about

13   the Truelink product?

14       A.    Well, we didn't -- we didn't

15   distinguish between the three, we just clumped

16   them all as in a general discussion with all

17   three of them.

18       Q.    So, in your view, your lawsuits against

19   Experian, Equifax and Truelink are all

20   essentially the same complaint, right?

21       A.    Basically, yeah.

22       Q.    And you don't ever recall having a

23   separate discussion with your wife about the

24   product that Truelink was offering you?

25       A.    No, I never had a specific conversation

1      Q.    Meaning three credit bureaus, right?

2    When you say "three in one", are you referring

3    to three credit bureaus?

4      A.    Right.

5      Q.    Okay.  I mean, you understand there's a

6    company called Trans Union?

7      A.    Right.

8      Q.    And that's a credit bureau?  Is that

9    your understanding?

10     A.    Right.

11     Q.    Do you have an understanding of the

12   business of Truelink?

13     A.    It's the credit monitoring.

14     Q.    What was your understanding back in

15   August of 2003 of what a credit monitoring

16   product is?

17     A.    It would be checking to see if there

18   was activity on my credit report.

19     Q.    Trans Union identified for you the

20   credit accounts for which Mr. Perez was using

21   the Social Security number; isn't that correct?

22     A.    Yes.

23     Q.    Was there some additional information

24   you wanted from Trans Union regarding those

25   accounts?

1      A.    I'm not -- I'm not understanding the

2  question.

3      Q.    Okay.  Maybe I'll try to rephrase it.

4  Was there any other information that you wanted

5  from Trans Union back in April of 2003 after

6  they had reported the results of their

7  investigation as reflected in Millett Exhibit

8  No. 4?

9      A.    I don't think so.

10     Q.    Okay.  To your knowledge, did you or

11 your wife ever advise Truelink that Mr. Perez

12 was using your Social Security number?

13     A.    I never personally did that.

14     Q.    Okay.  Do you know if your wife did?

15     A.    I'm assuming that she did somewhere.

16     Q.    Why are you assuming that?

17     A.    Because she talked to all three credit

18 bureaus.

19     Q.    Okay, sir, let me step back again.  You

20 don't think Truelink is a credit bureau, do you?

21     A.    No.  That's the credit monitoring.

22     Q.    Do you understand that Truelink --

23     A.    I know I'm getting them confused.

24     Q.    Do you understand that Truelink and

25 Trans Union are separate companies?

1   no, strike that, I don't know if --

2          Did you ever have a conversation with

3   your wife about the fact that you had once sued

4   Trans Union and then you dismissed that lawsuit?

5      A.   I can't remember.

6      Q.   Did you ever have a conversation with

7   your wife that after that dismissal you sued

8   Truelink?

9      A.   I can't answer.  I don't remember.

10      Q.   Do you know where the lawsuit against

11   Truelink, do you know where that lawsuit is

12   pending?  What state of the country?

13      A.   It's Delaware.

14      Q.   Okay.  Do you recall that you initially

15   sued them in Kansas?

16      A.   Right.  That's when it started.

17      Q.   Now, you told us earlier that you were

18   not blaming Truelink for any identity theft that

19   occurred before you first purchased the product

20   in August of 2003.  Do you recall that?

21      A.   Could you repeat the question again?

22      Q.   Sure.  This morning I was asking about

23   the harm that you suffered because the Truelink

24   product allegedly didn't do what you thought it

25   was going to do.  Do you recall that

1    conversation?

2        A.    Yes.

3        Q.    And you said, well, my identity was

4    stolen, or something along those lines, do you

5    recall that?

6        A.    Yes.

7        Q.    And then I reminded you that the

8    identity theft actually occurred prior to

9    purchasing the product, do you recall that?

10       A.    Yes, sir.

11       Q.    Now, you -- you understand that you

12   have asked the Court to appoint you to be a

13   class representative in this case?

14       A.    Right.

15       Q.    Do you know what a "class

16   representative" is?

17       A.    Represents the group of people that are

18   suing the company.

19       Q.    Do you have an understanding of what

20   obligations you would have if in fact the Court

21   appointed you the class representative?

22       A.    What my obligation would be?

23       Q.    Yes.

24       A.    To tell the truth.

25       Q.    Okay.  Do you have any understanding as

1    to whether or not you would have obligations to

2    the other unnamed members of the class if you

3    were to represent them?

4         A.    I'm representing the whole class.

5         Q.    Okay.  And are you aware that if you

6    are appointed to represent the class, are you

7    aware of any duties that you would owe to that

8    class?

9         A.    I'd be responsible for them.

10        Q.    Okay.  Do you understand that you'd be

11   responsible for making decisions in the lawsuit

12   on their behalf?

13        A.    Yes, sir.

14        Q.    Okay.  Are you seeking to represent

15   other people who bought the credit monitoring

16   product from Truelink who are victims of

17   identify theft?

18        A.    Yes, sir.

19        Q.    And are you seeking to represent people

20   who bought the Truelink product who are not

21   victims of identity theft?

22        A.    Well, I think whoever bought this, they

23   didn't get -- it is deceptive from the get-go in

24   my view.

25        Q.    So you're seeking to represent all

1    purchasers of credit monitoring by Truelink,

2    whether or not they were a victim of identity

3    theft or not; is that right?

4        A.    Exactly.

5        Q.    Okay.  Do you think that if you win

6    this case and if you're appointed the class

7    representative, that all members of the class

8    should get the same money?

9        A.    That's hard.  I don't know how to

10   answer that.

11       Q.    Why not?

12       A.    Well, I don't know what would be fair

13   to the whole class.  I don't know.

14       Q.    Because it depends on the particular

15   harm that each class member suffered, right?

16       A.    Well, some of them could have been

17   paying longer than others, I mean.

18       Q.    And some may have actually, in theory

19   if what you say is true, if your allegations are

20   all proven true, some people may have suffered

21   identity theft that they wouldn't have suffered

22   if Truelink's product was as delivered -- was as

23   promised; isn't that correct?

24       A.    Right.

25       Q.    Those people would really have damages,

1    wouldn't they?

2        A.    Right.

3        Q.    And you want to represent those people,

4    right?

5        A.    I want to represent the class, whoever

6    signed up for this product.

7        Q.    Well, isn't it fair to say that that

8    kind of customer who suffered identity theft

9    that really could have been prevented by

10   Truelink, that they suffered more damages than

11   somebody who never was a victim of identity

12   theft?

13       A.    I think it would have to be determined

14   individual case by case.

15       Q.    Do you recall answering written

16   questions that were posed to you and your

17   lawyers by Truelink in this case?

18       A.    Right, my wife helped me with those.

19       Q.    Okay, so you do recall it?

20       A.    Yeah.

21       Q.    Okay.  How did your wife help you?

22       A.    Well, she, like I said before, she

23   handled most of this.

24       Q.    Did she actually answer the

25   interrogatories for you?

1     A.    Yes.

2     Q.    Okay.  And then did she send them to

3   the lawyers after she wrote the answers?

4     A.    Yeah, I think so.  Yeah.

5     Q.    Did you look at the answers before they

6   were sent to the lawyers?

7     A.    Yeah, I looked them over.

8     Q.    Did you make any changes to them?

9     A.    No.

10    Q.    Did you look them over before they were

11  sent to the lawyers or just after they were sent

12  to the lawyers?

13    A.    I don't remember.

14              (Millett Exhibit 6 was marked for

15  identification by the reporter.)

16    Q.    (BY MR. O'NEIL) Whose decision was it

17  to have your wife write the interrogatory

18  responses rather than you?

19    A.    I don't know who -- I don't know who

20  came up with the idea.

21    Q.    Was it you, Mr. Millett?

22    A.    Well, she knows more, she was doing

23  this on my behalf.

24    Q.    Was it you that came up with the idea

25  that your wife should be writing the answers

 1   that were directed to you?

 2       A.   I don't remember.

 3       Q.   Did she tell you that this was the

 4   plan?  Did she tell you that -- well, strike

 5   that.

 6            How did you first learn that there were

 7   questions directed to you in this case?

 8       A.   Through the interrogatories.

 9       Q.   Right.  Fancy word for questions.  How

10   did you learn that Truelink had asked you to

11   answer interrogatories?

12       A.   I guess through my lawyers.

13       Q.   And did you understand that the

14   questions were directed not at both you and your

15   wife, and not at your wife, but at you?

16       A.   Right.

17       Q.   Okay.  So, when it was decided by

18   somebody we don't know that actually your wife

19   would be writing the interrogatory answers, did

20   you say, well, wait a minute, I understand that

21   they're directed at me, so maybe I should be

22   writing them?

23       A.   I don't know how to answer that.

24       Q.   Do you want me to have the question

25   reread for you?

1     A.   Yes.  Yes, sir.

2              MR. O'NEIL:  Could you please

3   read the question back for Mr. Millett?

4              (Whereupon, the requested portion

5   of the record was read by the reporter.)

6     Q.   (BY MR. O'NEIL) Did you say that?

7     A.   I -- yeah, I guess so.

8     Q.   And what was your wife's response?

9     A.   I think she said that she could write

10  them down for me on my behalf.

11    Q.   Did she ever tell you that the lawyers

12  wanted it to be done that way?

13    A.   No.  She never -- she never told me

14  that.  I don't think so.

15    Q.   In retrospect as you sit here today, do

16  you wish that you hadn't been involved in all

17  these lawsuits?

18              MR. CLOON:  I'm going to object

19  on the grounds of relevance.

20    Q.   (BY MR. O'NEIL) You can answer.

21    A.   Well, I feel like I didn't have a

22  choice.

23    Q.   Why didn't you have a choice?

24    A.   Because this is the only way I can do

25  something about this.

1    Q.    Is it because your wife insisted that

2    you be involved in these lawsuits?

3    A.    No, we agreed together.

4    Q.    But you didn't think you had a choice?

5    A.    I mean, I didn't have a choice that I

6    had to dispute this stuff, and this is the only

7    way I -- this was the only route or access I

8    could go through.  We tried the government, we

9    tried everybody.

10    Q.    So, someone told you the only way that

11    you could get Mr. Perez to stop using your

12    Social Security number was to sue Equifax,

13    Experian, Trans Union, Truelink, Bank of America

14    and Ford Motor Credit?  Is that what you were

15    told?

16    A.    Could you repeat the question, please?

17              MR. O'NEIL:  Could the court

18    reporter repeat that question for Mr. Millett,

19    please?

20              (Whereupon, the requested portion

21    of the record was read by the reporter.)

22    A.    I was -- that's not what I was told,

23    that's what I believe.

24    Q.    (BY MR. O'NEIL) Did you ever share that

25    belief with anybody?

1      A.    That's -- I think maybe my wife.

2      Q.    And did she tell you that even if you

3   won all those cases, because you weren't suing

4   Mr. Perez, the Court couldn't direct Mr. Perez

5   to stop using your Social Security number?

6               THE WITNESS:  Could you repeat

7   the question, please?

8               (Whereupon, the requested portion

9   of the record was read by the reporter.)

10     A.    My answer to that is if -- I feel that

11  if we change the system, then this won't happen

12  to somebody else.

13     Q.    (BY MR. O'NEIL) Well, directing your

14  attention to Truelink, what changes in the

15  system do you want to make?

16     A.    Well, you guys need to say what your

17  product does and does not do.  It doesn't

18  protect against Social Security theft.

19     Q.    Okay.  So, if Truelink, assuming

20  Truelink didn't tell you that, if Truelink told

21  you that, then you think that somehow that would

22  have eliminated the possibility that Mr. Perez

23  would have misused your Social Security number?

24              THE WITNESS:  Can you repeat the

25  question?  I'm sorry.

```
 1        A.    Well, it's --

 2        Q.    Did you ask for a copy of it?

 3        A.    Well, yeah, but I mean, there's e-mails

 4   and I just -- I never --

 5        Q.    Why couldn't you get a copy of it?

 6        A.    I just couldn't get a copy of it.

 7        Q.    Who did you ask?

 8        A.    I asked -- I asked the -- I asked my

 9   wife if she had a copy.

10        Q.    And what did she say?

11        A.    She'd have to get an e-mail from Joyce

12   Yeager.

13        Q.    But your wife wasn't able to obtain a

14   copy of this for you to review in advance of

15   your deposition?

16        A.    No.  I -- no.

17        Q.    So, when did you see this document

18   then?

19        A.    I think whenever the lawyers handed it

20   out, I think.

21        Q.    Let me direct your attention to the

22   second page of this exhibit, Mr. Millett.

23        A.    Second page.

24        Q.    If you see Interrogatory No. 4 there,

25   sir.  And it asks for some specific information
```

1    regarding each time that you visited the

2    website.  Do you see that, sir?

3        A.    Yes.

4        Q.    And the response is, quote, begins,

5    quote, "My wife as my agent visited the Trans

6    Union website often," closed quote.  Do you see

7    that, sir?

8        A.    Yes, sir.

9        Q.    And that's a sentence that your wife

10   wrote, right?

11       A.    Right.

12       Q.    Do you know what it means to describe

13   your wife as your agent?

14       A.    She's working for my -- under my

15   behalf.

16       Q.    Okay.  And it says that she visited the

17   Trans Union website.  And I'll represent to you

18   that there are, and we'll go through it in these

19   answers, there's references to Trans Union in

20   almost every answer.  At the time that your wife

21   answered these interrogatories for you, you

22   weren't aware that you were suing Truelink,

23   right?

24            MR. CLOON:  Objection.  It's been

25   asked and answered on a variety of occasions.

```
 1    He said he felt that those two companies were
 2    the same and that Trans Union owned Truelink.
 3                  MR. O'NEIL:  Do you want him to
 4    repeat that answer back to me?
 5                  MR. CLOON:  No.  I just want to
 6    make my statement for the record.
 7                  MR. O'NEIL:  Okay.
 8                  MR. CLOON:  Wasn't that his
 9    earlier testimony?
10                  MR. O'NEIL:  No, not in response
11    to that question.
12                  MR. CLOON:  Your earlier question
13    was asked and answered, that was my objection.
14                  MR. O'NEIL:  You know what, let's
15    just move on.
16        Q.    (BY MR. O'NEIL) At the time that your
17    wife answered these interrogatories for you --
18                  MR. CLOON:  All right, calm down.
19        Q.    (BY MR. O'NEIL) -- you were not aware
20    that you had sued Truelink, correct?
21                  MR. CLOON:  Off the record.
22    Don't answer another question.  We're going to
23    take a five-minute break.  You're not going to
24    badger this poor man.
25                  MR. O'NEIL:  No, I don't want to
```

1    take a break.  I'll withdraw the question, we'll

2    go on.  Let's stay on the record.  We're not

3    taking a break, let's move on.

4                MR. CLOON:  You're not going to

5    badger this witness.

6                MR. O'NEIL:  I'll withdraw -- I'm

7    not badgering the witness.  I'm just asking him

8    to answer the question and not have you answer

9    the question.  I'll withdraw it.

10   Q.    (BY MR. O'NEIL) Let me direct your

11   attention, Mr. Millett, to Interrogatory No. 5,

12   which begins on the second page, and it

13   continues on and there's a final answer --

14   unfortunately, these pages are not numbered --

15   if you go to the fourth page, Mr. Millett.

16   A.    From five?  From Interrogatory 5?

17   Q.    I'm sorry, the fourth page of the

18   document, sir.  It says Interrogatory No. 6 in

19   the middle of it.

20   A.    Okay.

21   Q.    But there's an answer to Interrogatory

22   No. 5 right before it.  Okay?  Do you see that,

23   sir?

24   A.    Yes, sir.

25   Q.    It says:  "My wife handles the

1    financial and household management affairs for

2    our family.  She has disputed many accounts on

3    our behalf.  We do not feel as if we know about

4    all of the accounts which should be closed.  I

5    know that she had to close accounts which

6    appeared on the letter we got from Trans Union."

7    Do you see that, sir?

8        A.    Yes.

9        Q.    You don't have any information

10   regarding her disputing accounts, do you?

11       A.    I mean, what do you mean?

12       Q.    Okay.  Well, I mean, what does it mean

13   to dispute an account?  Do you have an

14   understanding of what that means?

15       A.    That you're saying something's wrong.

16       Q.    Okay.  What accounts was your wife

17   disputing, if you know?  Do you know?

18       A.    You'd have to ask her.

19       Q.    Some day maybe I will, but right now

20   I'm asking, do you have any idea what accounts

21   she was allegedly disputing?

22       A.    I think the ones on that Trans Union

23   letter here.

24       Q.    So, she was disputing the accounts that

25   were on Mr. Perez's file?  Is that what you

1    mean?  Or is that what you think?

2        A.    I think she's disputing all these.

3        Q.    Okay.  I mean, are you guessing there

4    or do you know that?

5                    MR. CLOON:  For the record --

6        A.    Yes.

7                    MR. CLOON:  -- the record the

8    reference was to the --

9        A.    Yes, these are the accounts she was

10   closing.

11       Q.    (BY MR. O'NEIL) Okay.  She never

12   disputed accounts that were on your credit

13   report, did she?

14       A.    Okay, repeat the question.

15       Q.    Mrs. Millett never disputed accounts

16   that were on your credit report, did she?

17       A.    I don't -- I don't remember.

18       Q.    Okay.  You don't recall seeing any

19   accounts on your credit report that you

20   disputed, do you?

21       A.    That's right.

22       Q.    Okay.  Your interrogatory answer goes

23   on to say, quote, "I know that she had to close

24   accounts which appeared in the letter from Trans

25   Union," closed quote.  Do you see, though, sir?

1    It's in the middle of that paragraph, quote, "I
2    know she had to close accounts which appeared in
3    the letter we got from Trans Union," closed
4    quote?
5        A.    Right.
6        Q.    Do you know that she actually closed
7    accounts?
8        A.    I know she was trying to close
9    accounts.  I don't know exactly if they got all
10   closed or everything.  I mean...
11       Q.    That's not what your interrogatory
12   response says though, is it?
13       A.    That's right.
14       Q.    Goes on to say, quote, "I know it took
15   her a lot of time to do that and that we spent a
16   lot of money to do that," closed quote.  Do you
17   see that, sir?
18       A.    Yes.
19       Q.    You don't really have any knowledge of
20   that, though, do you?
21       A.    I know she was on the phone a lot and I
22   shelled out $12,000, so, that's correct.
23       Q.    You shelled out $12,000 to close
24   accounts?
25       A.    No, I shelled $12,000 to retain

1   lawyers.

2       Q.   To do what?

3       A.   To dispute this stuff.

4       Q.   So, you hired lawyers to dispute the

5   accounts that Trans Union identified as relating

6   to Mr. Perez?  Is that why you hired lawyers?

7       A.   You're getting me confused, sir.

8       Q.   Well, I'm just responding to your

9   questions.  Because this talks about closing

10  accounts.

11      A.   Right, and I said these accounts here.

12      Q.   Okay.  Fine.  So, what I'm asking you

13  is, did you hire an attorney to help your wife

14  close the accounts held by Mr. Perez?

15      A.   That's not the reason we hired an

16  attorney.

17      Q.   Why did you hire an attorney?

18      A.   To help us with this identity theft.

19      Q.   The $12,000, was that paid to

20  Mr. Adler?

21      A.   Two thousand of it was.

22      Q.   Who did you pay the other $10,000 to?

23      A.   To Mr. Grissom.

24                THE WITNESS:  I was wondering if

25  I could take a break?

1                    MR. O'NEIL:  Sure.

2                    VIDEOGRAPHER:  We are now going

3    off the record at 1:46 PM.

4                    (Recess.)

5                    VIDEOGRAPHER:  One moment please.

6    It is now 1:54 PM and we are back on the record.

7    You may continue.

8        Q.    (BY MR. O'NEIL) Mr. Millett, do you

9    recall testifying this morning that you believed

10   you did see one of the e-mails that Truelink

11   sent to your wife?

12       A.    I think so.

13       Q.    And I think you said that it indicated

14   that everything was honky-dory.  Do you remember

15   that?

16       A.    Yes, sir.

17       Q.    Okay.

18                    (Millett Exhibit 7 was marked for

19   identification by the reporter.)

20       Q.    (BY MR. O'NEIL) Let me show you what's

21   been marked Exhibit No. 7, which I'll represent

22   to you are some pages that were produced by your

23   lawyers in this case.  And, for the record, it

24   seems to be an e-mail from True Credit sent on

25   October 5, 2003.  Do you recall, is -- have you

1      Q.    Okay.  Let me just read the first

2    paragraph to you.  It says, quote:  "During the

3    last 30 days, no credit alerts have been

4    triggered by changes to your credit report.

5    This means you can have peace of mind knowing

6    that according to Trans Union, one of the three

7    national credit bureaus...", and then it lists

8    five statements there.  Do you see that, sir?

9      A.    Yes, sir.

10     Q.    So, the e-mail that you described as

11   indicating everything was honky-dory, was that

12   an e-mail that indicated there were no credit

13   alerts on your file?

14     A.    Yes, sir.

15     Q.    Okay.  So, Truelink further describes

16   what it means to not have any credit alerts.  It

17   says:  "One, no one has applied for credit in

18   your name; two, no one has opened an account in

19   your name; three, there were no lay payments

20   recorded on your credit report; four, there were

21   no bankruptcies or other public records posted

22   to your credit reports; and, five, no one has

23   changed your address with the credit bureaus."

24   Do you see that, sir?

25     A.    Yes, sir.

1      Q.   Do you have any reason to believe that

2   those five statements weren't accurate in

3   October of 2003?

4      A.   Yeah.  That would be accurate.

5      Q.   So, is it fair to say that this e-mail

6   is describing changes, or the lack of changes,

7   in your credit report?

8      A.   Yes.

9      Q.   Nowhere on this e-mail does it say that

10  no one is using your Social Security number,

11  does it?

12     A.   No.

13     Q.   When you read this type of e-mail, were

14  you surprised that Truelink wasn't telling you

15  what Trans Union had previously told you, that

16  Mr. Perez had been using your Social Security

17  number?

18     A.   I'd think there would be some kind of

19  alert.

20     Q.   So, were you surprised when you didn't

21  get that alert from Truelink?

22     A.   Yeah.  If somebody's using my Social

23  Security number, I want to know about it.

24     Q.   And you knew in October 2003 that

25  somebody had been using your Social Security

1    number?

2        A.    Yeah, but it wasn't showing up on here.

3        Q.    So, did you realize then that this

4    credit monitoring product is not going to tell

5    you about things that occur outside of your

6    credit report?

7        A.    That's the conclusion I came to.

8        Q.    And did you have a conversation with

9    your wife at that point about that fact?

10       A.    Yeah, something along those lines,

11   yeah.

12       Q.    Tell me about that conversation.  What

13   did you tell -- what did you say to her when you

14   realized that just like Experian and Equifax,

15   Truelink wasn't going to be telling you as part

16   of their credit monitoring service that

17   Mr. Perez was using your Social Security number?

18       A.    That's the basic conversation right

19   there.

20       Q.    And what was your wife's response?

21       A.    We didn't understand.

22       Q.    So, did you suggest to her at that

23   point that you might as well cancel this

24   subscription?

25       A.    I don't think we discussed that, no.

1      Q.    Did you tell her, you know, Melody, I'm

2   thinking that maybe this credit monitoring

3   service only tells me about my credit report and

4   not Mr. Perez's credit report?

5               MR. CLOON:  Object to form.

6   Leading and suggestive.

7      Q.    (BY MR. O'NEIL) You can answer.

8      A.    Can you repeat that, sir?

9      Q.    Sure, I'll rephrase it.  Did you

10  suggest to your wife that if what you say is

11  true, you were both mistaken in believing that

12  the credit monitoring service would alert you to

13  changes outside of your own credit report?

14     A.    I think we were thinking that we'd see

15  something on my credit report that he's out

16  there charging stuff, that's what my assumption

17  was.

18     Q.    And you never saw those?

19     A.    Right.  Correct.

20     Q.    So, your assumption was wrong, right?

21     A.    Right.

22     Q.    And you knew that pretty early on,

23  didn't you?

24     A.    We were just trying to compare

25  information between the three credit

1    monitorings.

2        Q.   And they were all the same, no -- none

3    of those credit monitoring products by any of

4    those companies ever told you that Mr. Perez was

5    using your Social Security number; isn't that

6    correct?

7        A.   Yes.

8        Q.   Did you continue to believe, however,

9    that some day Truelink was going to provide that

10   information to you?

11       A.   Well, they shouldn't -- they shouldn't

12   advertise that they'd protect me from identity

13   theft, they just protect with name theft and

14   credit card.

15                    MR. O'NEIL:  Could you restate

16   the question for Mr. Millett?  I'll ask you to

17   answer the question.

18                    (Whereupon, the requested portion

19   of the record was read by the reporter.)

20       A.   Through their credit monitoring?

21       Q.   (BY MR. O'NEIL) Yes.

22       A.   No.

23       Q.   You realized you weren't going to get

24   that information through any credit monitoring

25   service, right?

1    A.   Okay.

2    Q.   Is it your belief, and I'm asking you

3  as you sit here today under oath, is it your

4  belief that you could not get credit because of

5  the conduct of Truelink as alleged in your

6  complaint?

7    A.   I'd have to answer it's a mixture of

8  things.

9    Q.   So, it's you couldn't get credit

10 because of things other than the conduct of

11 Truelink?

12   A.   I'd say it's all one big mess.

13   Q.   What conduct of Truelink made it

14 impossible for you to get credit?

15   A.   I can't -- I don't know.  I can't

16 answer that.

17   Q.   Were you ever denied credit?

18   A.   I couldn't get some credit cards I

19 think.

20   Q.   You think?  What credit cards could you

21 not get?

22   A.   I can't remember specifically which

23 ones they were.

24   Q.   Was this prior to August of 2003 that

25 you couldn't get credit?

1      A.    I don't remember when.

2      Q.    What conduct of Truelink contributed to

3  you not being able to get a credit card?

4      A.    I don't know.

5      Q.    Your answer also says, "We had to pay

6  extra money for insurance, too."  What insurance

7  did you have to pay extra money for?

8      A.    I think, I can't remember if it was All

9  State.

10     Q.    What kind of insurance is that, sir?

11     A.    It's for the cars and the house.

12     Q.    Okay.  And why couldn't -- why did you

13 have to pay extra money for insurance with All

14 State?

15     A.    Because my credit score wasn't as high

16 as it should be.

17     Q.    Okay.  And was that because you didn't

18 have many credit accounts?

19     A.    No, I believe because of this Abundio.

20     Q.    Do you have any evidence of that,

21 Mr. Millett?

22     A.    No, that's what I believe.

23     Q.    What's the reason why you believe that

24 Mr. Perez's conduct made your All State

25 insurance more expensive?

1    A.    Because I feel like he lowered my

2  credit score because he's out there charging

3  stuff.

4    Q.    Is that your complete answer?

5    A.    Yeah, I guess so.  Yeah.

6    Q.    Do you think the conduct of Truelink

7  somehow contributed to --

8    A.    I don't know.

9    Q.    Let me finish my question.  Do you

10  think that the conduct of Truelink made your All

11  State insurance more expensive?

12    A.    I don't know.  I can't answer that.

13    Q.    Well, actually, you did answer it and

14  you said, yes.  You said that, yes, conduct of

15  Truelink made you have to spend a lot more money

16  to get insurance.  Are you withdrawing that

17  statement now, sir?

18    A.    I think it all contributed.

19    Q.    You also state that you had to borrow

20  money for your home from the family trust.  Do

21  you see that, sir?

22    A.    Yes, sir.

23    Q.    Was the alleged failure of Truelink to

24  deliver a credit monitoring product that you

25  think they promised somehow require you to

1    borrow money from a family trust?

2        A.    Can you repeat the question?

3        Q.    Do you think that somehow Truelink's

4    alleged failure to deliver a credit monitoring

5    product that it allegedly promised, somehow

6    required you to borrow money from your family

7    trust?

8        A.    I'd say yeah.

9        Q.    And how did that -- why do you think

10   that those two things are connected?

11       A.    I think it's all connected.

12       Q.    Sir, I'm not asking about all.  I'm

13   asking about the conduct alleged by Truelink.

14   The failure of Truelink to deliver the product

15   that you think it promised, how did that

16   contribute to you having to spend -- you having

17   to borrow money from a family trust?

18       A.    Because I couldn't get a mortgage rate.

19       Q.    And you think that that was because of

20   some conduct by Truelink?

21       A.    I can answer it this way, I think it's

22   -- I think so, yeah.

23       Q.    Okay.

24             MR. O'NEIL:  We apparently have

25   to change the tape, so let's go off the record.

 1                      VIDEOGRAPHER:  We are now going

 2    off the record at 2:15 PM.

 3                      (Recess.)

 4                      VIDEOGRAPHER:  It is now 2:17 PM

 5    and we are back on the record.  You may

 6    continue.

 7                      MR. CLOON:  For the record, I

 8    have a statement.  Off the record, I advised

 9    counsel that we have amended or supplemented

10    these answers to Interrogatories 7, 8, 9 and 10,

11    and basically withdrew the damages as set out in

12    the original answer to Interrogatories 7, 8, 9

13    and 10.  But if you wish to inquire, I'm going

14    to object that it's no longer relevant to that

15    line of questioning.

16                      MR. O'NEIL:  Well, I don't want

17    to get into debate, but you did mischaracterize

18    the supplement to the interrogatory responses,

19    and I sure as hell don't want to waste

20    Mr. Millett's time having you and I debate the

21    relevance of this line of questioning.  Your

22    relevance objection is noted, and we'll just

23    move on.

24                      MR. CLOON:  Thank you.

25        Q.    (BY MR. O'NEIL) Mr. Millett, that same

1    that Mr. Perez has been misusing your Social

2    Security number, right?

3        A.    Yes, sir.

4        Q.    You're not stressed out because you

5    misunderstood what the Truelink product was

6    going to deliver to you, are you?

7        A.    I'm not happy about any of this.

8        Q.    I understand you're not happy about the

9    Truelink product.  But did your unhappiness

10   about the Truelink product create you so much

11   stress that it created physical affects from the

12   stress?

13       A.    I'd say yeah.

14       Q.    Okay.  Are you able to separate out the

15   physical affects of the stress caused by

16   Truelink from the stress caused by Experian,

17   Equifax, Mr. Perez?  Are you able to distinguish

18   that?

19       A.    I mean, it's all stress to me.  I

20   mean...

21       Q.    Yeah.  It's hard for you to separate

22   out, right?

23       A.    Yes, sir.

24       Q.    Yeah.  Is it fair to say that Mr. Perez

25   has caused you a lot more stress than Truelink?

1    in these lawsuits?

2        A.    I've told her I haven't been happy with

3    all this.

4        Q.    With the lawsuits?

5        A.    With the lawsuits.

6        Q.    But you didn't feel like you could tell

7    her that you'd like to stop the lawsuits, right?

8        A.    That's -- that, I don't feel that's an

9    option.

10        Q.    That's why you felt that you couldn't

11    tell her that, right?

12        A.    Well, yeah.

13        Q.    A few pages later, Mr. Millett, there's

14    a page that has Interrogatory No. 14 on it.  Do

15    you see that, sir?

16        A.    Yes, sir.

17        Q.    And up above, there's an answer to the

18    prior interrogatory.  Do you see that?

19        A.    Yes.

20        Q.    And your answer is, "I delegated these

21    matters to my wife who handles the finances for

22    our family."  Right?  Do you see that?

23        A.    Yes.

24        Q.    It goes on to say, "She has a lot more

25    information about this."  Right?

1       A.    Yes.

2       Q.    But it was Mrs. Millett who was

3    providing these interrogatory responses, wasn't

4    it?

5       A.    She was helping me.

6       Q.    Oh, she's helping you now?  When she

7    was helping you, did you say, well, rather than

8    saying that you have a lot more information, why

9    don't we just give it to them?  Did you suggest

10   that to your wife?

11      A.    I don't understand the question.

12      Q.    Well, you told us earlier that your

13   wife wrote the responses.  Do you recall that?

14      A.    Right.

15      Q.    Okay.  But now you're kind of stepping

16   back from that and now you're kind of saying

17   that she helped you, right?

18      A.    You got me all confused.

19      Q.    Okay.  Who wrote the responses?

20      A.    My wife did.

21      Q.    Okay.  And when you reviewed them, did

22   you read them?  Did you read each response?

23      A.    Yes.

24      Q.    And when you read this one, my question

25   is, did you wonder since she's providing the

1   dismissed came through lawyers in Georgia.  So,

2   why are you entitled to ask him any of that?

3                    MR. O'NEIL:  I don't think I've

4   ever asked him one question about discussions

5   with lawyers, regardless of where they live.

6   I'm asking about his belief, his understanding,

7   his decision making in deciding to dismiss the

8   claims against Equifax.

9                    MR. CLOON:  Okay.

10                   MR. O'NEIL:  Given that those

11  claims are identical to the claims against

12  Truelink, I think it's relevant.  And given that

13  he wants to represent millions of people in a

14  case against Truelink, I think it's relevant.

15      Q.   (BY MR. O'NEIL) I don't want you to

16  tell me anything that you know solely because

17  your attorneys told you.  Okay?  And if you're

18  going to tell me that it was your lawyers who

19  made the decision to settle the case, then fine,

20  tell me that and we'll move on.

21          But to the extent that you decided to

22  accept whatever settlement Equifax offered you,

23  dismiss your claims, not get anything for the

24  class, I'd like to understand what those reasons

25  are.

```
1                      MR. CLOON:  I'm going to object
2      to the form of that question.  It misstates the
3      facts.
4                      MR. O'NEIL:  I would love to have
5      you prove me wrong on that one.
6                      MR. CLOON:  If you get the
7      consent, I think we can.
8                      MR. O'NEIL:  Why don't you try to
9      get the consent so you can prove me wrong?
10                     MR. CLOON:  Why would I want to
11     do that?
12                     MR. O'NEIL:  Yeah, good point.
13     You can't have it both ways.  You can't say it
14     misstates the facts and then make no effort to
15     prove that I'm misstating the facts.
16                     MR. CLOON:  I'm just clarifying
17     the record, Mike.
18                     MR. O'NEIL:  Fair enough.
19     Q.    (BY MR. O'NEIL) Do you have any idea
20     why you decided to dismiss the case against
21     Equifax?  Just yes or no.
22     A.    I don't know if I can answer that.
23     Q.    It's -- the question is, and if you
24     can't answer it, Mr. Cloon will surely jump in.
25     It's a yes or no answer.  Do you have any idea
```

 1   why you decided to dismiss your claims against

 2   Equifax?

 3        A.    That's what they came up with.

 4        Q.    Who's "they"?

 5        A.    My lawyers.

 6        Q.    Is this another situation where you

 7   felt like you didn't -- you couldn't disagree?

 8        A.    I don't -- can -- I'm not understanding

 9   you.

10        Q.    Well, earlier I asked you about the

11   hassles of the litigation and how you really

12   wished in retrospect that all this litigation

13   wasn't going on and it was consuming all of your

14   time and creating all this stress.  Do you

15   recall that conversation?

16        A.    Yes.

17        Q.    And you said but you felt like you

18   couldn't change the decision.  Do you recall

19   that, sir?

20        A.    Yes.

21        Q.    Okay.  So, when your lawyers suggested

22   that you settle with Equifax, was it another

23   situation where you felt like you couldn't

24   change the decision?

25                  MR. CLOON:  I'm going to object

1  to that.  I don't even see any of the relevance

2  to the issues in this case.

3      Q.   (BY MR. O'NEIL) You can answer.

4      A.   That's -- that's -- I mean, they're my

5  lawyers.  They say that's what I should do,

6  that's -- then I should strongly do that.

7  That's the way I believe.

8              MR. O'NEIL:  Let's take a short

9  break, I think I'm just about done.

10             THE WITNESS:  Okay.

11             MR. O'NEIL:  Just go over my

12  notes.

13             VIDEOGRAPHER:  We are now going

14  off the record at 2:48 PM.

15             (Recess.)

16             VIDEOGRAPHER:  It is 2:55 PM and

17  we are back on the record.  You may continue.

18     Q.   (BY MR. O'NEIL) Mr. Millett, do you

19  have, do you and your wife have an agreement

20  with your lawyers regarding the payment of their

21  fees in the Truelink case?

22     A.   I think we do.

23     Q.   Okay.  Have you ever seen it?

24     A.   I don't remember it.  No.

25     Q.   Did you ever sign, sign it?

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF KANSAS
 2

   STEVEN G. MILLETT and            )
 3 MELODY J. MILLETT,               )
                                    )
 4              Plaintiffs,         )
   vs.                              )  No. 04-2450-CM
 5                                  )
   FORD MOTOR CREDIT COMPANY,       )
 6                                  )
                Defendant.          )
 7         _____

 8         VIDEOTAPED DEPOSITION OF STEVEN G. MILLETT,
   produced, sworn and examined on Wednesday, the 28th day
 9 of September, 2005, between the hours of 8 a.m. and 6
   p.m. of said day, at the law offices of Yeager Law Firm,
10 7270 West 98th Terrace, Building 7, Suite 220, Overland
   Park, Kansas, before:
11
                      DEANNA KERR,
12
   Notary Public within and for the State of Kansas, in a
13 certain cause now pending in the United States District
   Court for the District of Kansas, wherein STEVEN G.
14 MILLETT and MELODY J. MILLETT are Plaintiffs and FORD
   MOTOR CREDIT COMPANY is Defendant.
15
           Taken on behalf of the Defendant.
16
             A P P E A R A N C E S:
17
           For the Plaintiffs:
18             Ms. B. Joyce Yeager
               YEAGER LAW FIRM, LLC
19             7270 West 98th Terrace, Suite 220
               Overland Park, Kansas 66212
20
           For the Defendant:
21             Mr. Jeffrey A. Befort
               STINSON MORRISON HECKER, LLP
22             1201 Walnut, Suite 2600
               Kansas City, Missouri 64106
23
           Also Present:  Ms. Melody J. Millett
24                         Mr. Brian Cain,
                           TBC Video Technician
25
```

**98**

1    Q.   Just to follow up and finish off the response with

2         respect to the damages interrogatory, other than

3         what's listed in response to Interrogatory No. 5 and

4         your testimony here today, are you aware of any

5         other way that you've been damaged by Ford Credit in

6         this case?

7    A.   Just monetary or?

8    Q.   Yes, just monetarily.

9    A.   No, sir.

10   Q.   Now, setting aside the monetary, is there some other

11        way that you feel Ford Credit has damaged you in

12        this case other than monetary?

13   A.   I don't want to be associated with somebody using my

14        Social Security number and buying things and buying

15        cars and whatever he wants to buy and I could be

16        liable for his debt.

17   Q.   Is it your understanding just because he uses your

18        Social Security number that you're liable for that

19        debt?

20   A.   Yes.

21   Q.   In what way?

22   A.   Well, Ford Motor talked to my wife trying to collect

23        on two cars I believe.

24   Q.   We can talk about that later.  With respect to

25        responsibility for debt, do you understand that in

7e9d8238-938a-4763-ad76-382c9462c968

1      order for you to be responsible for a debt you need

2      to actually sign up for that debt?

3                  MS. YEAGER:  Objection.  Calls for a

4            legal conclusion.

5   Q.  (By Mr. Befort)  Did anybody at Ford Motor Credit

6       Company ever tell you that you, Steven Millett, were

7       responsible for a debt that you didn't sign up for?

8   A.  Anybody at Ford Motor, no, sir.

9   Q.  That's all the questions I have.

10  EXAMINATION BY MS. YEAGER:

11  Q.  Do you know what a trust corpus is?

12  A.  No.

13  Q.  Is there -- do you know where the money that was

14      lent -- okay.  You financed a house through the

15      trust; is that correct?

16  A.  Yes.

17  Q.  And is that money that was used to purchase the

18      house available to earn interest for the trust?

19  A.  I don't know how my parents have their trust set up

20      so I can't answer that.

21  Q.  That's fine.  Did you want Ford Motor Credit to

22      delete the trade lines that Abundio Perez had which

23      were reported with your Social Security number?

24  A.  Can you restate the question?

25  Q.  Did you want Ford Motor Credit to delete Abundio

7e9d8238-938a-4763-ad76-382c9462c968

1      Perez' trade lines?

2   A.   I wanted them to remove my Social Security number

3        from his report.

4   Q.   And why did you want that to happen?

5   A.   Because I don't want to be associated with this

6        person.

7   Q.   Is it your understanding that there are legal

8        consequences because you're associated with him?

9   A.   To my best -- yes, to my understanding, yes.

10  Q.   Did you understand that there are financial

11       consequences to being associated with him?

12  A.   Could be, yes.

13  Q.   That's all I have.

14              MR. BEFORT:  No further questions.

15                   * * * * *

16

17

18       _____
         STEVEN G. MILLETT

19

     Subscribed and sworn to before me this _____ day of
20
     _____, 20___.
21

22                        .

23       _____
         Notary Public

24  IN RE:  MILLETT VS. FORD MOTOR CREDIT

25

7e9d8238-938a-4763-ad76-382c9462c968