# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

STEVEN G. MILLETT, MELODY J. MILLETT,    )
On Behalf of Themselves and All Others    )
Similarly Situated,    )
                Plaintiffs,    )
    )    Case No. 05-599-SLR
v.    )
    )
TRUELINK, INC.,    )
A Trans Union Company,    )
    )
                Defendant.    )

## <u>PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

### <u>REDACTED COPY</u>

ERISMAN & CURTIN

<u>/s/ Christopher J. Curtin</u>
Christopher J. Curtin
DE Bar Id. No. 0226
Erisman & Curtin
629 Mount Lebanon road
Wilmington, Delaware 19803
Phone: (302) 478-5577
Facsimile: (302) 478-5494
Email: ccurtin659@aol.com

DATE:  October 29, 2007

PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANT TRUELINK, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Additional Facts ................................................................................................................... 3

Facts in Dispute ................................................................................................................... 6

Legal Argument ................................................................................................................. 14

Argument Section B. (Defendant's Memorandum beginning page 13) ......................... 14

Argument Section Ms. Millett (Defendant's Motion beginning page 16) ...................... 17

Argument Section  Damages (Defendant's Memorandum beginning on page 19) ..................... 21

C. Breach of Contract (Defendant's Memorandum beginning p. 29) ........................... 23

Argument Section Contract interpretation (Defendant's memorandum beginning p. 33) ........... 25

Argument Section Damages from breach of contract (Defendant's Memorandum beginning page 37) ...... 29

Conclusion ......................................................................................................................... 31

## TABLE OF AUTHORITIES

**Federal Cases**

Green v. Kansas City Power & Light Co., 281 B.R. 699 (D. Kan. 2002) ...................................................... 22

Gulbenkian v. Gulbenkian, 147 F.3d 73 (2nd Cir. 1945) .............................................................................. 27

Lewis v. Ohio Professional Electronic Network LLC, 190 F.Supp.2d 1049, 1056, 1058-64
(S.D. Ohio 2002) ............................................................................................................................................ 9

MBIA Ins. Corp. v. Royal Indemnity Co., 426 F.3d 204, 215-19 (3rd Cir. 2005) ..................................... 27-29

O'Toole v. Genmar Holdings, Inc., 387 F.3d 1188, 1195-97 (10th Cir. 2004) .............................................. 26

Pound v. Airosol Co., 368 F.Suipp.2d 1210 (D. Kan. 2005) .......................................................................... 16

Vigortone AG Products, Inc. v. AG Products, Inc., 316 F.3d 641 (7th Cir. 2002) ........................................ 23


**Federal Statutes**

15 U.S.C. 1681e ............................................................................................................................................. 9


**State Cases**

Baldwin v. Priem's Pride Motel, Inc., 580 P.2d 1326 (Kan. 1978) ................................................................ 22

Interim Healthcare Inc. v. Spherion Corp, 884 A.2d 513 (Del. Super. Ct. 2005) .................................... 23, 24

Haveg Corp. v. Guyer, 226 A.2d 231 (Del. 1967) .................................................................... 24, 25, 27

McClellan v. Raines, 140 P.3d 1034 (Kan.App. 2006) .................................................................................. 24

PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANT TRUELINK, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In response to Defendant's Motion for Partial Summary Judgment (D.I. 155/146), Plaintiffs state, in opposition, that Defendant failed to satisfy its burden to demonstrate that it is entitled to judgment. Defendant has not adequately supported its motion. Defendant's motion for summary judgment as to Plaintiffs' class claims for relief pursuant to the Kansas Consumer Protection Act should be denied. Issues of fact and law remain as to Plaintiffs' class claims for relief for the breach of contract count. Because factual and legal issues remain as to Defendant's breach of contract, Defendant's motion for summary judgment must be denied.

<u>Introduction</u>

Defendant attempts to recast Plaintiffs' claims and minimize the breadth of the claims throughout its motion and memorandum in support. Defendant, recasting Plaintiffs' claims as if speaking for Plaintiffs, then feels free to argue that the opinion of a California Court, an opinion which is being appealed to the Ninth Circuit Court of Appeals, should be persuasive authority for this Court. Defendant fails to mention to this Court that the opinion of the California Court involved different statutes, different parties, a different procedural posture, different contracts, differing representations by the vendor, different facts, and an incomplete finding.

Defendant engaged in national, uniform marketing of a product. (D.I. 150, Ex. V) The product offered identity theft "protection," "detection," and "prevention," as well as fraud "detection", "prevention" and "protection". (D.I. 126, Ex. O; D.I. 150, Ex. V; Ex. 3) Plaintiffs alleged and demonstrated to Defendant that its product did not and cannot work. Defendants response is that it would have to monitor the credit files of others in order to provide the type of product it represented it would provide. A change in the product would be required, Defendant stated, in order for Defendant to provide a product that served to detect the information needed about credit identifiers of Defendant's subscribers. In order to detect, for itself, the information which is indicative of identity theft, Defendant would have to monitor more information than it does. Defendant argues

that in order to perform as it said it would, Defendant would have to provide more than the "credit report" it was ordering from its parent, Trans Union, LLC ("Trans Union").

Defendant's Motion for Summary Judgment is an indictment of its representations.  If, in order to provide the service of detecting, preventing, and protecting against identity theft, Defendant would have to monitor information which it does not monitor, such as the credit information of others, then Defendant has violated the Kansas Consumer Protection Act ("KCPA") and, in addition, breached its contract to provide web portal, for a fee, which would enable the consumer to access the information from a "credit report" which is sufficiently complete to serve as a tool to detect, prevent, and protect against identity theft.

Defendant incorrectly construes Plaintiffs' claims and conjures a statement that Plaintiffs were demanding that the "credit files" or "credit reports" of others should be monitored.  (D.I. 145/146)  The Milletts assert instead, among other claims, that the Defendant knew its "credit report" could not be an effective tool to detect identity theft.  The Defendant's assertion that, in order to detect identity theft, it would have to monitor the credit files of others actually supports a portion of Plaintiffs' claims and actually defeats Defendant's motion.   As Defendant concedes by making this argument, if the Defendant would have to monitor the "credit files" of others in order to provide sufficiently complete and accurate information about the subscribers' credit to the subscribers, Defendant's motion for summary judgment cannot be granted.

If the "credit report" provided to Defendant's subscribers cannot be complete and accurate information to consumers without additional action by Defendant, then the actions being taken by Defendant are inadequate to provide sufficiently complete information to subscribers about their credit.  If Defendant did not provide sufficiently complete information to its subscribers about their credit, then Defendant breached its contract to provide this information and violated the provisions of the KCPA as well.

## Additional Facts

A.  Defendant sells the "credit reports" of Trans Union to those who want to order a credit report through the internet.  ( D.I. 150, Ex. C and Ex. V; Ex. 3)  Ms. Millett and Mr. Millett attempted to monitor the information about Mr. Millett's credit records at Trans Union.   ( Ex. 1 attached)

B.  Defendant sells credit monitoring as a tool to detect, prevent, and monitor "identity theft" and "fraud". (D.I. 150, Ex. C and Ex. K; Ex. 3 attached)

C.  Defendant previously sold a credit monitoring product which allowed access to a specified number of Trans Union "credit reports".  (D.I. 126, Ex. O)  For this service, Defendant charged a fee.  At enrollment, Trans Union determined which "credit file" to monitor and a "watch" was set for that "file". (D.I. 150,  Ex. D)   A "credit report" was generated.  The "credit report" did not contain all of the information in Trans Union's "credit file" pertaining to Defendant's customer.   (D.I. 126, Exhibits E, H and L; D.I. 150, Ex. P)

D.  Periodically thereafter, Trans Union "scanned" its "credit file" which had been attributed to Defendant's customer in order to detect certain new information.  Trans Union determined which information would be scanned by computers.  (D.I. 150,  Ex. K )  If there was no change to the "credit report" of the customer, an email was generated by computers which was sent to the customer.  (D.I. 150,  Exhibits C, K and S; Ex. 2 attached)  That email notice told the customer to rest assured because they had adequate and up-to-date information about their "credit report."  (D.I. 150, Ex. S; Ex. 2 attached)

E.  Defendant now sells the "credit reports" of Trans Union, Equifax Credit Information Services ("Equifax"), and Experian Information Solutions, Inc.  ("Experian").  (D.I. 150, Ex. D)   Defendant, will, for a fee, now provide "unlimited" monitoring which allows a customer internet access to an unlimited number of "credit reports" from one or more of these three credit reporting agencies.  (D.I. 126, Ex. D;  D.I. 150, Ex. D; Exhibits 4, 5, and 7 attached)

3

F.  If a change was detected by Trans Union on new, selected components of a "credit report", a Trans Union computer sent an alert to Defendant's computer.  Defendant's computer sent an electronic mail to its customer telling the customer to access the notice which had been posted and generated by Trans Union computers.  (D.I. 126, Ex. C; D.I. 150, Exhibits D and S)

G.  The information which Trans Union monitored changed over time.  It included such items as a change of address reported which appeared on the "credit report", a new account which appeared on a "credit report", a new inquiry which appeared on a "credit report" or other items.  (D.I. 150, Ex. K)  Defendant now identifies these items, in its advertising, as "critical changes".  (Ex. 3 attached)

H.  Information which is on a Trans Union "credit report" does not include all information available to Trans Union about a consumer.  Information on an Equifax "credit report" does not contain all of the information available to Equifax about a consumer.    Information on an Experian "credit report" does not contain all of the information available to Experian about a consumer.  (D.I. 126, Ex. H; D.I. 150, Ex. P)

I.  Trans Union's computers do not monitor the use of Defendant's customers' Social Security numbers.  (D.I. 150, Ex. K)  Trans Union allows more than one credit file to be maintained with the same Social Security number.  (D.I. 150, Ex. P)

J.  Credit monitoring programs only scan for new information added to a "credit report".  (D.I. 150, Ex. K)

K.  The credit monitoring product works in an identical manner for all customers.  All customers who access the website of Defendant or its parent at any given time will view the same information, advertisement, and enter into the same contract.  (D.I. 126, Exhibits C and O; D.I. 150, Ex. D)

L.  The Defendant's contract is not revised or negotiated for an individual purchaser.  It indicates that Defendant and its affiliates will in no manner be responsible for any damages beyond that which was paid by the customer to purchase the product.  (D.I. 126, Exhibits N and O)

M.  After Defendant receives credit data from a credit reporting agency, it formats the report so that it can be read.  (Ex. 4 attached)

4

N.  When the consumer wishes to view a credit score, Defendant scores the data     [redacted]     scoring

model and not that of Equifax and Experian.  The score is generated for the purchaser.  (D.I. 150, Ex. Y)

O.  Defendant retrieves and manipulates data from credit reporting agencies for a fee.  (Ex. 4 attached; Ex.

5 attached)

P.  Plaintiffs learned, after some fraudulent data was no longer associated with them as a result of litigation,

and not because they viewed the credit monitoring "credit report", that they paid excessive amounts of

insurance.  (Ex. 6 attached)

Q.  Plaintiffs learned in litigation, and not because they viewed the credit monitoring "credit report", that

Trans Union, Defendant's parent, was aware that accounts had been relabeled with Plaintiffs'

identification information and that Trans Union had retained inaccurate information about Plaintiffs.

(D.I. 150, Ex. P; Ex. 8 attached; Ex. 9 attached)

R.  Plaintiffs were told that they should be alert when police repossessed someone's car.  This use of

personal identification information by another to obtain a car loan was not disclosed in credit monitoring

"credit reports" but Trans Union learned of it and spoke, not with Plaintiffs or Defendant, but with the car

loan creditor.   The resulting judgment was revealed to Plaintiffs in litigation and not because they

viewed the credit monitoring "credit report".  (D.I. 150, Ex. P, Ex. 6 attached )

S.  When an identity thief became obligated on a mortgage by utilizing Mr. Millett's identifiers, Plaintiffs

learned of it through a Lexis Nexis search of the Social Security number and not because they viewed

the credit monitoring "credit report".   (D.I. 150, Ex. P;  Ex. 1 attached)

T.  The product "watch" failure was discovered because Plaintiffs insisted upon the production of

documents in this matter and not because Defendant made them aware of it.  When Plaintiffs were told

to apply for credit by counsel of Trans Union because the data of an identity thief had been successfully

"segregated" from Mr. Millett's "credit report", Plaintiffs learned that they were still unable to obtain

credit.   (D.I. 150, Exhibits A, J and P)  They did not ascertain this problem remained for them as a result of viewing the credit monitoring "credit report".   (D.I. 150, Ex. P; Ex. 8 attached; Ex. 9 attached)

<u>Facts in Dispute</u>

Def. para. 1.  Plaintiffs dispute the facts in paragraph 1.  Plaintiffs' claims are not, as Plaintiffs have described in their introductory paragraphs, limited to an assertion that Defendant could provide an adequate product if only Defendant would monitor the credit files of another.  This is a misstatement of Plaintiffs' claims. In addition, Defendant inadequately addresses facts which support the class claim.  Defendant's actions as to the class members support the class relief for each class member.  (D.I. 147; D.I. 150; D.I. 156)

Def. para. 2.  The facts stated in paragraph 2 are disputed in part.  Plaintiffs did not discover, in August 2002, that an individual was reporting the Social Security number issued to Steven Millett.  Plaintiffs were told in August 2002 by their bank that a banking error would be corrected, a banking error which allowed more than one individual to maintain accounts at that bank with Steven Millett's Social Security number.  It was only later, when Plaintiffs were unable to enroll in online bill payment with their automotive lender, that Plaintiffs were able to discover sufficient information to ascertain that the same person was reporting Mr. Millett's Social Security number as his own.  (D.I. 126, Exhibits R and S; D.I. 150, Exhibits J and G)

As to the class, Plaintiffs allege that the personal identifying information of the members of the class is similarly received, classified, categorized, reported, manipulated, and formatted by the Defendant, its parent, and the credit reporting agencies.  The credit reporting agencies have disclosed this to the Federal Trade Commission ("FTC").   (D.I.126, Ex. H; D.I. 148)

Def. para. 3.  Plaintiffs dispute the facts in paragraph 3.  Plaintiffs <u>do</u> contend that others utilized the identifying information belonging to Plaintiff Steven Millett.  See Plaintiffs' Motion for Partial Summary Judgment and the Memorandum in Support (D.I. 147; D.I. 150, Ex. P)   Plaintiffs' address was utilized by lenders other than its own as well.  (D.I. 150, Ex. P)   As to the class, Plaintiffs assert that the personal identification

6

information of others, including members of the class, is similarly received, classified, categorized, reported, manipulated, and formatted by the Defendant, its parent, and the credit reporting agencies. (D.I. 126, Ex. E and Ex. H)

The "credit reports" provided to Plaintiffs do not contain the information relating to an identity thief. (D.I. 155; D.I. 150, Ex. P)  The "credit reports" which have been made available to lenders or potential creditors is largely undiscoverable unless Trans Union elects to produce, or is compelled by this Court to produce, any data available to it about the information it received or reported to creditors or potential creditors. (D.I. 121; D.I. 127; D.I. 150, Ex.P; Ex. 6 attached; Ex. 8 attached; Ex. 9 attached)

This is true as to the class members as well.  It is unknown to Plaintiffs, despite years of extensive discovery and numerous lawsuits, whether any information about a thief appeared on a "credit report" given a *creditor* by Trans Union. (D.I. 126, Ex. G)

Defendant does not supply the "credit reports" but purchases this information from Trans Union, Equifax and Experian.  This is true for the class members as well. (Ex. 4 attached; Ex. 5 attached)

Plaintiffs have discovered that they have been victimized by the ongoing use of Plaintiffs' personal identification information by an identity thief and that use continued since the purchase of Defendant's product and since the time Trans Union was made aware of the inaccuracy of its databases. (D.I. 150, Ex. P; D.I. 38; D.I. 147; Ex. 8 attached; Ex. 9 attached; Ex. 1 attached)   In addition to the incidents discussed in Plaintiffs' Motion for Partial Summary Judgment, other incidents have occurred.  For example, both Defendant and at least one other identity thief have obtained insurance from the same insurance company.  After years of litigation, Plaintiffs were able to discuss this with the insurance company and discuss the data error.  After Plaintiffs were able to notify the insurance company and others of the data errors, Plaintiffs' insurance policy premium was reduced by $400. (Ex. 6 attached; Ex. 1 attached)  Plaintiffs allege that the class members' data would be similarly handled by companies operating nationally and by the credit reporting agencies. ( D.I. 126, Ex. H; Ex. 4 attached; Ex. 5 attached; Ex. 7 attached)

Def. para. 4.  Plaintiffs dispute the factual allegations in paragraph 4.  Plaintiffs purchased one credit monitoring product prior to August of 2003 in an attempt to learn of additional use of their personal information.  In August of 2003, Plaintiffs purchased the products of Trans Union and Experian.  As to all of the class members, it is not important for purposes of this lawsuit whether they purchased more than one credit monitoring product.

Mr. Millett did view a webpage screen about the credit monitoring product.  ( Ex. 1 attached {p. 36})  Other class members had to view web page advertising and/or product description page or pages before enrolling.  (D.I. 126, Exhibits B and C and J; D.I. 150, Ex. D)

Mr. Millett's knowledge about the name of the company who provided the product is an example of consumer confusion.  Mr. Millett did not know the name of the company which supplied the product because, Plaintiffs allege, the information is not clearly conveyed to consumers.  (D.I. 147;  D.I. 149)

This would be applicable for all members of the class. The Trans Union name is on the web site and the contract references other parties.  (D.I. 150, Ex. V; Ex. 7 attached)  Consumer confusion is demonstrated in a consumer survey.  (D.I. 126, Ex. F; D.I. 150, Ex. W; Defendant's MSJ Ex. J)

Def. para. 5.  Plaintiffs dispute, in part, the factual allegations in paragraph 5.  The "credit file" is not monitored.  Instead, Trans Union's computers select which new, incoming information will be attributed to a consumer. (D.I. 126, Exhibits B, C, H and J; D.I. 150, Ex. D)  That new information, if a "watch" has been properly "set" and maintained, allegedly triggers certain data flags if certain types of newly incoming information should be sent to a subscriber's "credit file" by Trans Union.  (Id.)  The flags which are triggered allegedly cause a computer generated notice to be sent to Defendant.  Defendant's computers then allegedly notify its customer to check for information.  Once the consumer receives a notice, it views the "credit report" either by purchasing it, in the event the consumer has already viewed the allotment of free views, or by ordering the report be generated by Trans Union.  (Id.; D.I. 126, Exhibits O and Q)  These facts would be applicable to all class members.

Def. para. 6.  Plaintiffs dispute the legal assertions or conclusions in paragraph 6.  Factual issues are raised by the legal assertions or conclusions.  Defendant orders and sells the credit reports of other credit reporting agencies.  (Defendant's statement of facts paragraph 5)  It is Defendant who orders, generates, and resells the "credit reports" of Trans Union, Equifax and Experian. (Ex. 4 attached; Ex. 5 attached; Ex. 7 attached)   Defendant is a purchaser and seller of credit information which is used for the purpose of determining creditworthiness about a consumer. (Ex. 4 attached; Ex. 5 attached; Ex. 7 attached, D.I. 150, Ex. V) Defendant scores the information from the "credit reports" of its parent, Equifax and Experian with

. It then resells these reports and scores to customers of others

[redacted]

Defendant is, then, a reseller of credit information.  15 U.S.C. 1681e.  Lewis v. Ohio Professional Electronic Network LLC, 190 F.Supp.2d 1049, 1056, 1058-64 (S.D. Ohio 2002).   Resellers are subject to certain provisions of the Fair Credit Reporting Act, 15 U.S.C. Section 1681, et seq. ("FCRA").[1]  `These facts would be applicable to all consumers.   Use of a Social Security number in connection with another can create liability for resellers and "the wisdom of the jury" should be employed to determine whether communications by one who resells consumer information is "shielded" by the FCRA definitions pertaining to the use of "credit reports".   See, Lewis, 190 F.Supp.2d 1049 (allowing jury trial on liability for credit reports pertaining to arrest records used by others to gain information).

Def. para. 7.  Plaintiffs dispute the legal conclusions asserted in paragraph 7.

[1]  See  Plaintiffs' legal argument.  The fact that Defendant is and was aware that Trans Union cannot disclose information about a known identity thief to the known identity theft victim demonstrates that Defendant  sold the access to "credit reports" as a tool to detect "identity theft" and "credit fraud" knowing that the "credit report" was not a useful tool to detect theft or fraud.   The failure to notify subscribers of this information about identity theft is a breach of the agreement to provide a portal which operates as an effective tool.

Def. para. 8.  Plaintiffs' dispute, in part, the facts alleged in paragraph 8.  Other portions of Plaintiffs' class action complaint and discovery responses are more descriptive than the single quotation taken in isolation by defense counsel.  Plaintiffs have disputed that the advertising language referenced in the Plaintiffs' complaints was clear.  (D.I. 147 through D.I. 150)  This factual issue would pertain to the class claims as well.

Defense para. 9.  Plaintiffs dispute, in part, the facts alleged in paragraph 9.  The testimony cited is isolated by defense counsel.  In their own exhibit, Exhibit C, containing testimony purported to establish their defense, Mr. Millett also testified on page 115:

> "I'm saying that if they would have said what this product does and doesn't do, then, I mean, we might have bought it and we might not have bought it.  If it was all spelled up instead of with the broad statement, well, this is - we protect you from identity theft."

Plaintiffs dispute that they or class members, when they purchased the product, understood the limited protection or limits to detection provided by accessing what Defendant sold as a "credit report".  (D.I. 147 through D.I. 150)  In addition, Defendant, in its factual paragraph 5 indicates that it was the "credit file" which is monitored and not the "credit report".  Defendant made the same fine distinctions as pertains to the product performance, as to all class members, in the depositions provided by its corporate officers.  (D.I. 126, Exhibits B, C, D, J, K; Ex. 7 {pages 128-29}; D.I. 150, Exhibits C, D, E, and K)

Defense para. 10.  Plaintiffs dispute, in part, the factual allegations in paragraph 10.  Ms. Millet and Mr. Millett were questioned at length.  Ms. Millett testified that she bought the products to detect new aliases.  (Ex. 1 attached {pp. 359, 396-99}).  Mr. Millett and Ms. Millett testified that they expected to find information about the person or persons reporting Mr. Millett's Social Security number.  (Ex. 1 attached {Mr. Millett pp. 8-9, 37, 104-05, 113-15, 119-19, 147}{Ms. Millett pp. 408-10, 549-52})  Once Plaintiffs realized the product's limitations, no additional purchases were made.  (Ex. 1 attached {Mr. Millett pp. 147-48, 154-55})

Defense para. 11.  Plaintiffs dispute the factual allegations in paragraph 11.  Plaintiffs dispute the legal characterization of the factual allegations included in paragraph 11.

Plaintiffs purchased the product so that they could monitor for the types of fraud which the product might detect if the "watch" had not failed, fraud such as direct account takeover or new inquiries. (Id.) Plaintiffs understood that the product could provide these limited services and continued to purchase the product because, as Ms. Millett told reporters, it was the best product Plaintiffs knew to be available to them at that time. (Defendant's Exhibit J) Plaintiffs were aware that some information was obtained in some "credit file" of Trans Union which Trans Union would not show them. (Ex. 1 attached {Mr. Millett pp. 8-9, 37, 104-05, 113-15, 118-19, 147}{Ms. Millett pp. 408-10, 549-52}; D.I. 150, Ex. P) Plaintiffs attempted, however, to purchase those functions which could be purchased and did so, in part, because they were aware that Trans Union maintained such data. (D.I. 150, Ex. P) Plaintiffs purchased the product for its limited benefits and, during litigation discovery, stopped purchasing the product altogether. (Ex. 1 attached {Mr. Millett pp. 6, 8-9, 37, 104-05, 113-15, 118-19, 147}{Ms. Millett pp. 408-10, 549-52}; D.I. 150, Ex. P) This is not an admission that the product works effectively or works as represented.

All consumers who purchased the product expected to obtain a service or product or there would not have been a purchase made. They expected to obtain a product or service which worked as they were told it would work. Defendant sold a product or service to alert its subscribers to "identity theft" and "credit fraud". (D.I.150, Ex. V) Defendant's chief officer acknowledges as much. (D.I. 150, Ex. K)

Defendant argues it had some lesser responsibility to the Milletts because the Milletts were identity theft victims. Plaintiffs dispute Defendant's conclusion. Simply because a Plaintiff might purchase the Defendant's product while in possession of more information than the average consumer about past identity theft and Trans Union's "credit files", Defendant would not have some lessened obligation to be truthful about what can be accomplished with purchase of a "credit report" as a detection tool. (Defendant's Memorandum pages 17-18, 20, 28, 33, 38; Ex. 7 attached {pp. 138-39})

The contract promises to provide, for a fee, an internet portal which will access credit information. The contract incorporates the advertisements. (D.I. 150, Ex. D) The advertisements describe this service as a tool

11

to detect, prevent, and protect from identity theft and credit fraud.   (D.I. 150, Ex. V; Ex. 3 attached)  Plaintiffs

expected new information about new uses.  Defendant's own briefing asserts that Defendant was to monitor

"credit files".  (Defendant's Memorandum pp.5-6)  Defense counsel concedes that the class member

purchasers expected, at a minimum, information about "credit reports".  (Defendant's Memorandum pp. 7,9, 17,

26-28, 35, 38)  Defendant contends that it provides this service and continues to maintain its assertion that the

"credit report" is a tool even though litigation discovery has established Plaintiffs' claim that it does not.   (Ex. 7

attached {pp. 40-41, 127-29}; D.I. 150, Exhibits P and V)  These facts pertain to all class members.

Defense para. 12.  Plaintiffs dispute the factual allegations in Paragraph 12.  See Response to Defense

paragraph 10 incorporated by reference herein.  When the Milletts became aware that the product could not

work as represented, they pursued this enforcement action as private attorneys general.   (D.I. 1)

Alerts were sent to Plaintiffs telling them that there were no changes to their "credit report" even during

the time period when the "credit report" was not being monitored because the "watch" set failed.   (D.I.150,

Exhibits I, P, R, S)  These facts pertain to the manner in which Defendant performed the contracts for all class

members.

Defense para. 13.  Plaintiffs dispute, in part, the factual assertions in paragraph 13.  The Milletts initiated

an action on behalf of all class members to demand restitution for all those whose contract was breached and

for all Kansans who were the subject of the misrepresentations.   (D.I. 1, 38)   Plaintiffs incorporate their factual

contentions in Plaintiffs' Motion for Partial Summary Judgment.   (D.I. 147)   As Mr. Millett discussed in his

deposition, other class members might be unaware of the manner in which the Defendant performs its contracts.

(D.I. 150, Ex. G; Exhibit 1 attached)  These facts pertain to the members of the class, as well.

Defense para. 14.  Plaintiffs dispute, in part, the legal conclusions asserted in paragraph 14.  These

legal conclusions raise issues of fact.  The factual situation and discovery status and elements of breach and

elements of consumer fraud differ between "the Experian Action" and this one.  (D.I. 1. in Experian: D.I. 150, Ex.

A)  Whether or not the Ninth Circuit will remand the matter for trial in the California federal court is not material to this matter and not material to the class members.

Defense para. 15.  Plaintiffs dispute the legal conclusions asserted in paragraph 15.  These legal conclusions raise issues of fact.  The legal issues decided, Plaintiffs assert, were not all of the legal issues raised.  The Court did not consider other issues raised.   Plaintiffs contend that the unaddressed legal issues, had they been considered, would have led to another result.   The judgment in the Experian Action is now being appealed.    Whether or not the Ninth Circuit will remand the matter for trial in the California federal court is not material to this matter and not material to the class members.

Defense para. 16.  Plaintiffs dispute the legal conclusions asserted in paragraph 16.  These legal conclusions raise issues of fact.  The legal issues decided, Plaintiffs assert, were not all of the legal issues raised.  Because of the status of discovery in the Experian Action, Plaintiffs did not yet obtain judicial review of, for example, whether the "credit report" is a tool suitable to detect "identity theft" and "credit fraud".   Whether or not the Ninth Circuit will remand the matter for trial in the California federal court is not material to this matter and not material to the class members.

Defense para. 17.  Plaintiffs dispute the legal conclusions asserted in paragraph 17.  These legal conclusions raise issues of fact.  The legal issues decided, Plaintiffs assert, were not all of the legal issues raised.  Because of the status of discovery in the Experian Action, Plaintiffs did not yet obtain judicial review of, for example, whether the "credit report" is a tool suitable to detect "identity theft" and "credit fraud".   Whether or not the Ninth Circuit will remand the matter for trial in the California federal court is not material to this matter and not material to the class members.

Defense para. 18.  Plaintiffs do not dispute the factual allegations in paragraph 18.

Defense para. 19.  Plaintiffs dispute the factual allegations in paragraph 19.   There are losses associated with identity theft.  (Ex. 1; D.I. 126, Exhibits G and H)   Plaintiffs experienced losses associated with

identity theft.   Plaintiffs dispute the fact that the deposition pages cited by defense counsel support the factual

statement made.

<u>Legal Argument</u>

Argument Section B. (Defendant's Memorandum beginning page 13)

Plaintiffs have suffered loss as a result of the misrepresentations of Defendant.  Plaintiffs believed,

when they purchased the product, that the product would provide notice of some types of fraud.  (Response to

Defendant's para. 10)   Now that Plaintiffs have obtained documents in discovery, Plaintiffs know that not to be

true and they no longer purchase credit monitoring. <u>Id.</u>  Plaintiffs were denied a credit card when the credit

report from Trans Union was accessed by a lender.  (D.I. 150, Ex. P; D.I. 148, pp. 7-10)  Now that documents

have been produced from those who provide credit information about Plaintiffs to Trans Union, Plaintiffs can see

that an account by one department store reflected, in the year 2005, after the litigation began, that there was a

large available balance being reported by the department store with the same Social Security number which had

been issued to Mr. Millett.  (Ex. 8 attached)

Plaintiffs have suffered a loss.  Plaintiffs learned, after some fraudulent data was no longer associated

with them as a result of litigation, and not because they viewed the credit monitoring "credit report", that they

paid excessive amounts of insurance.  (Ex. 6 attached)  Plaintiffs learned in litigation, and not because they

viewed the credit monitoring "credit report", that Trans Union, Defendant's parent, was aware that accounts had

been relabeled with Plaintiffs' identification information and that Trans Union had retained inaccurate information

about Plaintiffs.   (D.I. 150, Ex. P)   Plaintiffs were told that they should be alert when police repossessed the

fraud perpetrator's car.  This use of personal identification information by another to obtain a car loan was not

disclosed in credit monitoring "credit reports" but Trans Union learned of it and spoke, not with Plaintiffs or

Defendant, but with the car loan creditor.   The resulting judgment was revealed to Plaintiffs in litigation and not

in the credit monitoring "credit report".   (D.I. 150, Ex. J; D.I. 150, Ex. P; Ex. 1 attached)   When an identity thief

became obligated on a mortgage by utilizing Mr. Millett's identifiers, Plaintiffs learned of it through a Lexis Nexis

14

search of the Social Security number and not because they viewed the credit monitoring "credit report".   (D.I. 150, Ex. P; Ex. 1 attached)  The product "watch" failure was discovered because Plaintiffs insisted upon the production of documents in this matter and not because Defendant made them aware of it.  When Plaintiffs were told to apply for credit by counsel of Trans Union because the data of an identity thief had been successfully "segregated" from Mr. Millett's "credit report", Plaintiffs learned that they were still unable to obtain credit.   (D.I. Exhibits A and J)  They did not ascertain this problem remained for them as a result of viewing the credit monitoring "credit report".   (D.I. 150, Ex. P)

These and other instances establish that these Plaintiffs are not only "aggrieved", they have been damaged in a manner which reflects intentional, reckless blindness to consumers.  Defendant has engaged in more than puffing.  Defendant has sliced off pieces of its advertising and contract language in this litigation to excuse the fact that its managers and officers knowingly sold "credit reports" as an identity theft protection tool while fully aware of the limitations of the "credit report" as an effective tool.   (D.I. 126, Exhibits B, C,  D and J; D.I. 150, Ex. P; Ex. 7 attached)  These issues cannot be excused as  "puffery".

Not only have Plaintiffs stated a claim that they are aggrieved, they have established that the class members are aggrieved.  All of the purchasers were sold a product based upon these representations.   (D.I. 150, Exhibits D and V; Ex. 3 attached)  None of the purchasers was supplied with the type of information that would detect identity theft.  The "credit report" is not an effective tool to detect identity theft.  The "credit report" is generated after Trans Union has attributed data correctly or incorrectly to a credit file.   (D.I. 126, Ex. H)  The "credit report" does not reflect all data available to a credit reporting agency about a consumer.   (D.I. 126, Ex. H; D.I. 150, Ex. P)  The "credit report" is based upon information in "credit files" which is often inaccurate.   (D.I. 126, Ex. H)  The class members received alerts telling them that they could have peace of mind or that there was no information in their "credit report" indicative of fraudulent activity.   (D.I. 150; Ex. S)  All purchasers of the credit scores provided with credit monitoring received scores based upon the scoring model of Defendant and not the scoring models of Equifax and Experian.   (D.I. 150, Exhibits N and Y)  All of the purchasers were

15

subjected to the same operational system "bugs" and "watch" issues and unreliable notice issues.   (D.I. 126, Exhibits C and K; D.I. 150, Exhibits E, M and O)  Everyone who purchased the product is aggrieved.  These issues cannot be excused as "puffery."

All consumers who purchased the product are aggrieved and the restitution, damages and injunctive relief provided by the Kansas Consumer Protection Act should be awarded Kansas consumers and Plaintiffs. (D.I. 147)  Defendant acknowledges that this Court may determine, at this stage, that Defendants engaged in unconscionable conduct.  (Defendant's Memorandum, page 14)  All purchasers are aggrieved by the unconscionable conduct.  All purchasers are impacted because they paid for a defective product.   (D.I. 147; Ex. 7 attached)

Defendant caused purchasers to believe that the "credit report" was an effective tool for detecting, preventing, and protecting from identity theft.  (Ex. 3 attached)  Defendant assured consumers that the purchase of the product to monitor their "credit report" for information about their credit worthiness and their "credit" would detect, prevent and protect.  Defendant caused consumers to understand that identity theft was a serious crime and that the product was a necessary step to preventing it or detecting it.  (Ex. 3 attached; D.I. 150, Exhibits C and V)  When consumers subscribed to the product, they were subjected to identical treatment.  (D.I. 126, Ex. C; D.I. 150, Exhibits K and E)  Each suffered a loss, the amount paid for the product, as a result.

Although there might be some limited benefits which Plaintiffs and others might have received had the product operated efficiently and produced sufficiently complete information,  this does not preclude KCPA damages.  For example, Defendant's reliance on *Pound* is misplaced.  The Plaintiff in *Pound* was claiming damages pursuant to the consumer statute and claiming damages as a competitor as well.  Pound v. Airosol Co., 368 F.Suipp.2d 1210 (D. Kan. 2005).  His losses were related to competitive losses and not to ineffective functioning of the product.  The holding has no application to these facts.

In addition, any potential for benefit from the product would have to be considered in light of the instances in which

[redacted]

in which the advertising or electronic mail or "credit report" resulted in peace of mind or failure to take action about some suspicion harbored, instances in which a consumer renewed because of Defendant's reassurances about the "credit report", and instances when advertisements or marketing or electronic contact caused subscribers to purchase more product or to renew.

The injuries compensable as to the Kansas Consumer Protection Act violations are a result of a misrepresentation before, during, or after the purchase.   (D.I.  147)  All consumers were aggrieved prior to the purchase because they wanted information about scores and credit.  Defendant admits this.   (D.I. 150, Ex. K) Defendant marketed the product to reach these individuals.  (D.I. 150, Exhibits J, K and V; Ex. 3 attached)   All consumers were aggrieved during the purchase because they were subjected to unconscionable acts of Defendant.  Defendant engaged in unconscionable acts when it attempted, for example, to induce the purchasers to rely upon the "credit report" as an effective tool and when it attempted to limit the contract warranties.  (D.I. 147 through 150)

In addition, each purchaser was harmed by Defendant's ongoing attempts to deny consumers relief after notice of the Act violation was received.  (D.I.  147)  Additional "losses" are not, as Defendant argues, required.   (D.I. 147 through 150)  Purchasers expended funds for a product which was to provide scores and "credit reports" to determine creditworthiness.  Losses resulting from actual identity theft need not be established.  (See discussion herein regarding Plaintiffs' losses)

B.1.a. Ms. Millett (Defendant's Motion beginning page 16)

In addition, Defendant claims, beginning on page 16 of its Memorandum, that Ms. Millett has no standing because she is not aggrieved.  It was Ms. Millett who expended the effort to monitor the Social Security number utilized for reporting her children's trusts.  It was she who acted when information was made available

17

about the personal identifier.  Her identification information, her home address, was utilized with an account not associated with her or her husband.  (D.I. 147)  She was told to be cautious by the Los Angeles police when cars were repossessed because she had reported the fraudulent car loans, loans which she learned about after the car lender's employee asked her whether she was Mrs. Perez.  (D.I. 147)  It was her bank card which was used to make the purchase for family use.  (D.I. 147)  Ms. Millett need not be a named subscriber to be aggrieved under the Kansas Consumer Protection Act.  (D.I. 147; D.I. 149)  Ms. Millett has suffered injury.  She is aggrieved.  (D.I. 150, Ex. P)

Similarly, class members are aggrieved.  Defendant's credit monitoring product operated in the same basic manner the entire time it was offered.  (D.I. 150, Ex. D)

B.1.b.  Loss (Defendant's Motion beginning page 17)

There is also actionable conduct violative of the KCPA which occurred after the purchase.  (D.I. 147; Ex. 6 attached; Ex. 8 attached; D.I. 150, Ex. P)  Defendant does not address these issues but returns, instead, to its argument that there must have been a loss as a result of incorrect data on the "credit report" in order for Plaintiffs to be aggrieved under the KCPA.  (Defendant's Memorandum pp. 17-19)  This is not the law.  (D.I. 147)

Defendant incorrectly argues that there can be no standing because Plaintiffs were already victims of identity theft.  As Plaintiffs set out fully elsewhere herein, Plaintiffs are aggrieved and actionable conduct relating to the "credit report" occurred after the purchase.  Defendant even accepted funds in payment for the product while the "watch" status was not set.  (D.I. 150, Exhibits I, M, P, R, and S)  These ongoing violations warrant a calculation by this Court for the KCPA damages allowed for willful violations of an ongoing nature.  (D.I. 147)

Defendant refers to its web page descriptions as "detailed" on pages 6 to 7 and on page 9 of its Memorandum.  The language used does nothing to negate the facts that misrepresentations occurred.  Additional language, simply because there is additional language, is not more clear language.  Additional language that Defendant now asserts to be some form of qualifier, for the purpose of adding clarity, hardly

serves to address the fact that the "clarifying language" remains misleading.    (D.I. 150, Ex. P; Ex. 2 attached)

Some items in the sample email referred to "credit reports" and some items did not.  (Defendant's Memorandum

p. 9 {"No one has applied for credit in your name."  "No one has opened an account in your name."})  In addition,

if clarification is required, Defendant's representations were misleading.

Incredibly, Defendant argues that because it did not alert Mr. Millett to any changes in his "credit report"

or otherwise tell him about use of his identifiers, Mr. Millett cannot establish harm.  (Defendant's Memorandum

pp. 17-19)  It is the failure of Defendant to notify Mr. Millett about information in his "credit file" that prevents him

from ascertaining information necessary to stop identity theft.  (D.I. 150, Exhibits G and P; Ex. 1 attached; Ex. 8

attached; Ex. 9 attached)  This  argument demonstrates clearly why ongoing enhanced damages are a

necessary and appropriate remedy for this Defendant.   (D.I. 147)

In addition to offering this argument, Defendant cites, as support, selected lines from the Plaintiffs'

depositions.  The deposition of Mr. Millett states that he not aware of additional uses by others which should be

demonstrated on the "credit reports".  (Defendant's Ex. C, pp. 37, 51, 70. 71, 82-83)  Mr. Millett was not

discussing, however, during the line of questioning cited by defense counsel in the Memorandum, what

information was learned during litigation.  (Response to Defendant's para. 10)

Similarly, Ms. Millett's deposition pages cited by defense counsel in the Memorandum refer to a lack of

new accounts opened but not to the instances of relabeling.  She also discusses, in her deposition, ongoing use

of accounts which could not be closed, judgments obtained, relabeling, the incorrect assurances of defense

counsel, the inability to obtain credit, the false alerts she received which caused Plaintiffs to purchase reports

which were not in fact changed, and the fact that the "credit report" cannot detect all forms of identity theft.   (D.I.

147; D.I. 150, Exhibits G and J; Ex. 1)  For example, it is important not to discount what she learned of the

mortgage which incorrectly reflects Mr. Millett's identification information.  Ms. Millett indicated that it could not

be ascertained, at this time, whether the Social Security number might have been added to that line of credit

after the account was opened when, for example, the identity thief was added as a co-signer, or whether a

mortgagee utilized the number fraudulently initially.  (Ex. 1 attached; Ex. 9 attached)  If a co-borrower committed fraud after the loan was first made, the mortgage would not be a "new account".  Defense counsel limited his questioning to "new accounts".  (Defendant's Exhibit B, 171-72)  This is, in fact, an example of the manner in which the "credit report" is not an effective detection tool.  Subscribing to credit monitoring also did not prevent the mixing of data because information about the mixing was not disclosed and would not be disclosed to any class member.  (D.I. 150, Ex. P; Ex. 7 attached; D.I. 147, Ex. K)  Plaintiffs were then unable to close the Sears account, for example.  (Ex. 8 attached; D.I. 150, Ex. P)  Ms. Millett discussed other credit events which occurred after the purchase.

Defendant promised that the "credit report" would provide the information about all new accounts.  (D.I. 150, Ex. V; Ex. 3 attached)  As Defendant states, in its fact paragraphs numbered 5 and 6, it cannot disclose more than that which Trans Union would attribute to a consumer.  Ms. Millett now knows that information about a "new account" might not appear on the "credit report" purchased.  (Ex. 1 attached; Response to Defendant's para. 10)

Defendant would erect three very high hurdles for Plaintiffs.  (Memorandum pages 18-19)  Defendant advertised that the "credit report" is a source of information about identity theft. Defendant would now require Plaintiffs to establish the manner in which Defendant's advertisements were misleading by asking Plaintiffs to establish the very information which Defendant did not display on the "credit report" or about the "credit report".  Defendant would also require Plaintiffs to segregate monetary losses which can be attributed solely to the fact that Defendant failed to reveal the information initially.  (Defendant's Memorandum pp. 37-40)

As discussed herein, Plaintiffs have suffered damages and are aggrieved.  As Mr. Millett noted, he received electronic mail which told everything was "hunkey dorey" with his credit.  (D.I. 150, Ex. G) and he received such mail during the time when his information was being associated on the files with a known thief, when creditors were attributing files to him, as well as when            redacted]                 .  (D.I. 150, Exhibits I, M, and S; Ex. 1 attached)  The fact that credit information of others was associated with Mr. Millett's

Social Security number and name as well as with the Plaintiffs' address demonstrates that the "credit report" is not a useful tool to detect identify theft.  (D.I. 147)

2.1.c.  Damages (Defendant's Memorandum beginning on page 19)

Defendant speculates that Plaintiffs must seek restitution amounts as damages because Plaintiffs have no real damages.  (Defendant's Memorandum p. 19)  This is a variation of the argument that only an identity theft victim with segregated damages should be able to assert that the product is not what Defendant represented it to be.  For the reasons stated herein and in Defendant's Motion for Partial Summary Judgment, this argument can be rejected and should be rejected.  (D.I. 147; D.I. 149)   As set out herein and in Plaintiffs' Motion for Partial Summary Judgment, the electronic mail assurances were sent at a time when        [redacted]                                        , the electronic mail did not clarify the information which could not be disclosed on a "credit report", and that mail did not disclose that information was available to Trans Union which was not provided to subscribers.  (Ex. 2 attached; D.I. 150, Ex. S)

Defense counsel, in support of its argument that the product has some value, again isolates a single, partial quotation.  The entire statement by Ms. Millett made in the article is that the product does not perform as represented and it is not as advertised.  (Defendant's Ex. J, final paragraph)  As discussed herein, the understanding of Plaintiffs about the value of the product for detection of even some forms of identity theft has evolved as information has been discovered by these Named Class Plaintiffs.   As discussed in Plaintiffs' Reply to Defendant's Answering Brief in Opposition to Plaintiffs' Motion for Class Certification, return of the goods or services is not a prerequisite in all instances before restitution can be considered a valid measure of damages. (D.I. 149)

Damages available pursuant to the KCPA are set forth in the statute.  Plaintiffs seek damages allowed by the KCPA .  (D.I. 147)   There is no need to offset any value allegedly received for a product in order to recover these KCPA damages.  Defendant cites no applicable legal authority for any such proposition.

1.B.2. Puffing (Defendant's Memorandum beginning page 22)

Defendant asserts that it has no responsibility for its actions because it merely engaged in puffery.  It relies upon <u>Baldwin v. Priem's Pride Motel, Inc.</u>, 580 P.2d 1326 (Kan. 1978).  Plaintiff in that matter knew of the defects, and the representation that a solid, visible object which can be inspected is in good condition is dissimilar to claims made by Defendant.  (D.I. 147 through 150; D.I. 126, Ex. G)

Just as this Court held in *Green*, when defects are disputed, they must be construed against the moving party.  <u>Green v. Kansas City Power & Light Co.</u>, 281 B.R. 699 (D. Kan. 2002).  In *Green*, the plaintiff was aware of the defects as well as uncorrected defects which he did not discuss with Defendants.  Unlike *Green*, Defendant warranted a fact or circumstance other than puffing about condition.  Defendant warranted that the "credit report" was a proper tool for the purpose cited.  For the reasons stated herein and in Defendant's Motion for Partial Summary Judgment, the advertising and actions of Defendant are not mere puffery.

For the reasons stated herein and in Plaintiffs' Reply to Defendant's Answering Brief in Opposition to Plaintiffs' Motion for Class Certification, the holding of the Court in "the Experian Action" has little or no application in this matter.  (D.I. 150, Ex. A)   Defendant's actions went beyond mere puffery.  The California Court considered no such actions.   Defendant engaged in the same conduct as to all consumers.

1.B.3.  Reliance (Defendant's Memorandum beginning on page 25)

For the reasons set forth herein, Plaintiffs have an actionable claim as to the KCPA.  In addition, as Plaintiffs set forth in their Motion for Partial Summary Judgment, more conduct is actionable here than the conduct pertaining to the contents of any "credit report" or material omitted from any "credit report".  (D.I. 147) Plaintiffs relied on Defendant for new uses of information by credit fraud perpetrators and for information about other individuals who might elect to use their personal identifiers.  (Response to Defendant's para. 10)

The Named Class Plaintiffs brought this action because they knew that the products of Defendant did not work as represented.  They knew they would have to litigate to obtain all of the information required for themselves and others because their attorneys' letters and requests for relief were rebuffed.   Plaintiffs did act and were not dilatory in securing assistance of counsel.  After they filed suit, defense counsel told them not to

worry.   They were subsequently denied credit.   It is inconceivable that they should have been required to do more to notify Defendant that its product was defective.  Plaintiffs have stated a claim and have established violations of the act.  (D.I. 124; D.I. 149)

The courts do not require plaintiffs to prove that they were completely justified in relying upon representations and warranties in the agreement.  Interim Healthcare Inc. v. Spherion Corp, 884 A.2d 513 (Del. Super. Ct. 2005) .  The extent or quality of due diligence to verify the performance under a contract is not determinative of whether or not there has been a breach.  Id.   When a party warrants a circumstance or fact to be true, contracting parties are entitled to rely upon the accuracy of the representation irregardless of what any investigation or due diligence might have revealed.  Id.

A party to a contract can enforce a contract warranty whether or not the mishap warranted occurred.  Vigortone AG Products, Inc. v. AG Products, Inc., 316 F.3d 641 (7th Cir. 2002)(addressing express warranty).  "Suppose one buys an automobile and the contract of sale contains a warranty that it is a new car.  The condition of the car is such that the buyer is sure [it is] a used car, and a few days after the purchase he discovers proof that he was right.  He can still enforce the warranty."  Id.  One can make an enforceable promise to do the impossible and the party making the promise either performs or pays damages if it fails to perform.  Id. (addressing insurance claims).  These principles are applicable here because Defendant promised to provide a level of protection it knew was impossible to provide.

## C. Breach of Contract (Defendant's Memorandum beginning p. 29)

Defendant alleges that the contract in question can be subject to one interpretation.  (Defendant's Memorandum page 31)  Defendant, nevertheless, acknowledges, for purposes of this motion, that the contract incorporates the language from the advertising.  (Defendant's Memorandum page 30)  Ironically, Defendant later states that there is reason to grant summary judgment in its favor because the advertising varied over time. (Defendant's Memorandum Ex. F)  Whether or not the Court is able to harmonize these varied positions, it is clear that the contract incorporates material from outside the contract.  Because material from outside the

23

contract is incorporated, the contract cannot be subject to a single interpretation.  It cannot be construed to support Defendant's motion.  Interim Healthcare, 884 A.2d 513.

Ms. Millett's status as an agent was disclosed to Defendant.  Defendant utilized her debit card to retrieve family funds.  (Defendant's Memorandum at page 32)  Defendant knew that more than one computer was utilized to access the product information provided because Defendant tracked the "IP addresses" of the computer internet access points.  Defendant knew that Ms. Millett was a Plaintiff when the product renewed and that she accessed the information provided by Defendant.  (D.I. 124;  D.I. 149)  Counsel was aware that Ms. Millett was assisting with the purchase, with monitoring, and with litigation when it met with Ms. Millett to assure her that the credit files of the known identity thief were segregated.   (D.I. 124; D.I. 149)  After learning this information, Defendant did not require Mr. Millett to proceed without assistance from his spouse.  Defendant acknowledges that it allowed Ms. Millett to proceed as an agent.  (Defendant's Memorandum p. 32)  Even if Ms. Millett is not a party to the contract, she can proceed as a Plaintiff to enforce the terms of the contract.  _See_, e.g., Haveg Corp. v. Guyer, 226 A.2d 231 (Delaware 1967)(finding that change of position based upon negotiation with agents and resulting acts can result in finding of acquiescence and raise issues such as estoppel).

Defendant asserts that Plaintiffs had notice of identity theft from the past and cannot bring an action now for things that transpired subsequent to the initial discovery of identity theft.  _McClellan_, is hardly applicable, however.  McClellan v. Raines, 140 P.3d 1034 (Kan.App. 2006).  Although recovery for obvious damages which might have been foreseen upon inspection might not be recoverable, as was the case in _McClellan_, no consumer in this instance could foresee whether or not Defendant or Trans Union possessed information which should have been disclosed.  The information was available to consumers only if it was disclosed.   Trans Union and/or Defendant controlled whether or not the information a consumer viewed indicated that a consumer should explore further whether they were a victim of theft or fraud.  In such an instance, the recovery of payment is not so remote as was the case with the parties in _McClellan_.  Because the consumer cannot recover the loss

24

of their information, any argument that it is inappropriate that a consumer recover the value of the amount paid to Defendant for monitoring should be rejected. The question as to the requirements of the contract is a jury question. *See*, Haveg Corp. v. Guyer, 226 A.2d 231 (Delaware 1967).

C.1.2 Contract interpretation (Defendant's memorandum beginning p. 33)

Defendant mischaracterizes one single breach of the Plaintiffs' claims as the Plaintiffs' "main contention". This is an inappropriate characterization. There are several elements to the breach of contract claim. These include the items defense counsel discusses in Defendant's Memorandum relating to paragraph 16 of the Fourth Amended Complaint. These also include other claims. ( D.I. 124; D.I. 147)

Defense counsel's argument on page 33 actually serves to establish Plaintiffs' claim rather than to provide support for any argument for summary judgment Defendant makes. Defendant, defense counsel argues, did not promise to monitor the credit information of others. Defendant agreed to provide an internet portal to access information. The information accessed would notify those individuals who paid the purchase price for the service or product about credit information related to identity theft and credit fraud. The information was, allegedly, a tool to alert the consumer to identity theft or credit fraud. (D.I. 150, Ex. V; Ex. 3 attached) The tool which Defendant represented would be appropriate for such use was the "credit report" it obtained. (Id.) Purchasers would receive periodic or instant updates about their credit information. Purchasers, instead, received information filtered and selected by another, maintained by another, reported by third parties, and maintained in such a manner that those engaging in credit fraud or the use of another's identifiers could continue to do so. (D.I. 126, Ex. H; D.I. 150, Ex. P; Ex. 8 attached) As defense counsel noted in its footnote 11 to the Memorandum, the identity theft perpetrator or perpetrator of credit fraud may, by mere use of another's identifiers, take advantage of privacy rights provided by the Fair Credit Reporting Act in order to continue unfettered, fraudulent use of the identifiers of another. Id. Defendant would oppose any effort to allow Plaintiffs to obtain adequate information which remains unavailable to them. (D.I. 121, 127)

25

Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract. O'Toole v. Genmar Holdings, Inc., 387 F.3d 1188, 1195-97 (10th Cir. 2004).   A party to a contact makes an implied covenant to interpret and act reasonably so as to make the contract language reasonable.  Id.  When there is bad faith in performance of the agreement, the conduct is an evasion of the spirit of the bargain. Defendant engaged in willful rendering of imperfect performance and in abuse of power to specify terms.  Id.  As a result, compensation is appropriate for an amount to place the parties in the same position as if the agreement had been performed, and the measure of damages is the loss sustained.  Id.  Defendant made no good faith effort to provide detection, prevent or prevention.  Defendant willfully rendered imperfect performance and has continually reinterpreted the terms of the advertising and agreements.  (D.I. 126, Exhibits B, C, E, J, K, L, and Q; D.I. 150, Exhibits C, D, E, and K; Ex. 7 attached)

Defendant was to provide an internet portal to access information pertaining to use of credit information. The "credit report" selected by Defendant as a tool to communicate this information is not an effective tool. Defendant knew that the tool was not adequate but continued to sell it.  Defendant agreed, in each contract and at each renewal, to provide an internet portal to access information to detect, prevent and protect against identity theft and fraud.  Defendant did not do so.

Defendant did not even attempt to define terms utilized in its contract so that the consumer could understand the limitations Defendant intended.  There are several examples of ambiguous language contained in the contracts:

TLM 18057-58 (PromiseMark terms sandwiched between remainder of the contract);

TLM18082 ("Fraud Resolution Services" definition);

TLM 18083 (use of: Membership programs, products, services and affiliate program);

TLM 18054 ("your file");

TLM 18084 ("consumer credit report"); and

TLM18056 ("affiliates").

26

(D.I. 126, Ex. O)  Some of Defendant's contracts specifically refer to "Identity Fraud" and define it as documented financial losses resulting from illegal use of information.  (TLM 18057, D.I. 126, Ex. O)

Defendant concedes that it did not intend to provide services or a product which would provide subscribers with notification of the information of others.  (Ex. 7 attached)   Defendant asserts that an "objectively reasonable person" would not interpret the contract in such a manner that there would be uncertainty as to "the positions of the parties".  (Defendant's Memorandum at page 34)  Given the lack of defined terms in the contract, the varied uses of the terms utilized, and the manner in which Defendant used language incorporated into the contract from advertising, there can be no summary judgment granted Defendant based upon an assertion that the contract is clear and unambiguous.

Defendant's reliance upon *MBIA* is misplaced.  In *MBIA*, the *mitigation* provisions at issue had been interpreted three times.  MBIA Ins. Corp. v. Royal Indemnity Co., 426 F.3d 204 (3d Cir. 2005).  A reasonable person in the position of those contracting with Defendant would not be considered unreasonable to assume that the information in a "credit report" offered by "a Trans Union company" would notify if Trans Union was aware of fraud information.  This issue was not addressed in the Experian Action.  To the extent a question of fact remains about the multiple meanings of what information would be contained in a "credit report",  the trier of fact must resolve the issue in light of the evidence offered.

Even if Defendant's agreement to perform was indefinite, an agreement may still be enforced.  It has always been a contract maxim that even if an agreement may be too indefinite to constitute a valid contract it may still constitute "a valid contract for breach of which damages may be recovered."   Gulbenkian v. Gulbenkian, 147 F.3d 73 (2nd Cir. 1945).   As Defendant would do here, to provide neither performance nor damages is an "unjust advantage" which is compensable.  Id.

A contract is enforceable or damages are awarded in those instances when a contracting party changes its position through the expenditure of money.  Haveg v. Guyer, 226 A.2d 221 (Dela. 1967).  If a contracting party was left with the impression that that the contracting party had authority to bind and perform, those who

27

make the representations are bound to perform. Id. (addressing apparent authority of officers of contracting party corporation). A breach can result. Id. Defendant made a representation that, for payment made, adequate information would be provided. It was not. In fact, Defendant's inability to "protect" or "prevent" or even "detect" demonstrates a breach because, knowing that the "credit report" was not the information in a "credit file", Defendant represented it would be adequate, nevertheless, as a tool. Defendant's representations procured the agreement of the subscribers to pay money. If the scope and extent of any resulting losses are questionable, the issue is one for trial, not summary judgment. MBIA Ins. Corp. v. Royal Indemnity Co., 426 F.3d 204, 215-19 (3rd Cir. 2005) (discussing fraud in the factum).

Defendant relies upon the holding in "the Experian Action" to bolster its argument. Plaintiffs note that the opinion cited specifically addressed only a narrow part of Plaintiffs' claims in that action. Plaintiffs, in this action, identify a number of contract breaches. (D.I. 147) In addition, Plaintiffs note that there would be a contract breach for each consumer whose          [redacted]

                                                                                                    of the
Defendant. (D.I. 150)

In addition, another breach exists. Defendant promised to provide fraud resolution services. (D.I. 126, Ex. O) Defendant, if a consumer suspected fraudulent activity, directed the consumer to contact a credit reporting agency and file a police report. (D.I. 150, Ex. L) Because Defendant was not a "credit reporting agency", it could not do anything other than direct a purchaser to the creditor that was reporting inaccurate information or to the credit reporting agencies. (D.I. 150, Ex. L)

Defendant's "experts" to assist the consumers provided only information readily available to the public. (Ex. 7 attached) These experts were the service representatives. (D.I. 126, Ex. C; D.I. 150, Ex. D) A factual issue remains about whether or not meaningful fraud resolution services were provided. If Defendant procured the contracts and payment because consumers were unable to know the true elements and nature of the

contract, attempts to limit performance and warranties can amount to fraud.  Contracts incorporating Delaware law contain implied warranties of merchantability and fitness for a particular purpose and those who attempt to avoid performance based upon the language in a contract agreement must do so only when the disclaimer of warranties is clear.  *E.g.*, <u>MBIA</u>, 426 F.3d at 215-19.

C.4.  Damages from breach of contract (Defendant's Memorandum beginning page 37)

Defendant alleges that the Milletts can establish no harm.  In response, Plaintiffs incorporate their discussion on damages herein.  As to Plaintiffs' damages, Plaintiffs noted that they are unable to obtain an "FHA mortgage" because the FHA records reflect that a first-time buyer mortgage has been issued to another individual associated with Mr. Millett's Social Security number.  (Ex. 1 attached; Ex. 9 attached)  Plaintiffs are unable to obtain credit from that family of companies which has or had mixed date because that family of companies cannot verify the Social Security number of Mr. Millett.  (D.I. 150, Ex. P;  Ex. 8 attached)  Trans Union was aware such mixed data existed, was aware of it during the time Plaintiffs subscribed to credit monitoring, and yet Plaintiffs received no notice.  (D.I. 150, Ex. P; D.I. 150, Ex. S)  The "watch" status of Plaintiffs failed.  (D.I. 147)   Plaintiffs have established harm and damages.

Plaintiffs are entitled to restitutionary damages as are members of the class. For the reasons discussed herein and in Plaintiffs' Reply to the Answering Brief of Defendant in Opposition to Plaintiffs' Motion for Class Certification, restitution can be awarded even in instances where the product or service cannot be returned. (D.I. 149) Plaintiffs could not return a service provided.  Plaintiffs could not return the product provided.  The contract contemplates that damages would include the cost of the product.  (D.I. 126, Ex. O)

D. Punitive Damages (Defendant's Memorandum beginning page 39)

Defendant alleges that "punitive damages" are not available for claims brought pursuant to the KCPA. (Memorandum page 39)  Plaintiffs seek, at this summary judgment stage of the proceedings, those damages described in Plaintiffs' Motion for Partial Summary Judgment.  (D.I. 147)  These damages include enhanced statutory damages for willful conduct and the damages available for each day of an ongoing violation.  Plaintiffs

requested hearing on these issues.  At this hearing, Plaintiffs will establish which breaches are ongoing

violations and the date of those violations.  Plaintiffs will establish which violations which are so outrageous that

enhanced damages should be awarded.   Plaintiffs will establish that injunctive relief can be sufficiently narrowly

tailored but also provide consumers with adequate protection from future violations.  Plaintiffs' contract damages

and the damages of the class are also established herein.

Defendant acted willfully and knowingly.  Defendant knew the  [redacted]              product would fail.

Defendant continued to market the product and to accept payments for renewals.   (D.I. 147)   Defendant knew

that there      [redacted]                   inhibited the performance of the product and caused subscribers to incur

additional expenses.  (D.I. 147)  Defendant was aware that it promised consumers complete protection and that

the "credit report" did not contain all of the information in the "credit file" of a credit reporting agency.  (D.I. 147)

Defendant knew that some consumers would be unable to purchase the product because there was a problem

with the manner in which [redacted]                                    the information provided Defendant.   (D.I.

147)  Although Defendant knew this information and was aware        [redacted]         occurred because

another "credit file" existed for the individual attempting to subscribe, Defendant did not tell these individuals

about the problem.   (D.I. 147)  Defendant knew that consumers purchased its product 1) when they needed to

make a major purchase and wanted to time that purchase;  or 2) when consumers wanted to monitor their credit

information for fraudulent data or identity theft.  (D.I. 150, Ex. K)  Knowing this, Defendant advertised extensively

that there were three credit scores from each of the three credit reporting agencies.  (D.I. 150, Ex. Y)  Defendant

then provided a product which scored the data from the agencies not with a score provided by those agencies

but with its  [redacted]                   .  (D.I.150, Ex. Y)  Corporate officers knew the contents of the

advertisements. (D.I. 126; D.I. 150, Exhibits C, D and K)   Defendant knew that it would only monitor the "credit

file" of a subscriber.

As is stated in the very article Defendant cites in Exhibit J, consumers do not know whether the

consumer monitoring being purchased provides prevention or detection.  (Defendant's Exhibit J)  Defendant's

parent was aware that more than one consumer had a "credit report" with the same Social Security number. (D.I. 150, Ex. P)  Defendant's parent, for a fee, would supply this information to creditors or to potential creditors but not to Defendant's subscribers.  (D.I. 150; Ex. P; Ex. 4 attached)

Finally, Defendant asserts in the motion that it does not market and does not sell credit monitoring products in order to alert a subscriber to use by another consumer of the subscriber's identifying information. This is simply not true.  Defendant's credit monitoring products are supplied by Defendant in those instances in which there has been a security breach, including a breach of its own information.  (Ex. 10 attached) Defendant's products are sold to those whose personal identification information or credit information was contained on a database that was breached.  (Ex. 10 attached)  In such instances, the subscriber being supplied the product is being given access to monitoring so that the subscriber can ascertain whether their personal identifiers, contained within the breached system, are being used by others.  (Ex. 10 attached)  TransUnion Canada even markets credit monitoring as a solution to data breaches.  (Ex. 10 attached)  If the product is being provided or sold by Defendant or its parent or related Trans Union companies in such instances as a tool to detect the unauthorized use by others of a subscriber's identifiers or credit information, then the assertions in the Motion must be examined carefully.

## CONCLUSION

Plaintiffs have stated a claim for violations of the Kansas Consumer Protection Act and for breach of contract.  These claims have been substantiated.  Defendant's motion for summary judgment as to any issue it raised must be denied.

31

**Respectfully submitted**,

Erisman & Curtin
  /s/ Christopher J. Curtin
Christopher J. Curtin
DE Bar Id. No. 0226
Erisman & Curtin
629 Mount Lebanon Road
Wilmington, Delaware 19803
Phone: (302) 478-5577
Facsimile: (302) 478-5494
Email: ccurtin659@aol.com

Barry R. Grissom, Esq., *pro hac vice*
KS Bar. Id. No. 10866
10990 Quivira, Ste. 200
Overland Park, Kansas 66210
Phone: (913) 341-6616

Bryson R. Cloon, *pro hac vice*
KS Bar. Id. No. 08660, MO Bar. Id. No. 36843
Cloon Law Firm
11150 Overbrook Road
Leawood, KS 66211
Phone: (913) 661-9600
Facsimile: (913) 661-9614

Yeager Law Firm
  /s/  B. Joyce Yeager
B. Joyce Yeager, *pro hac vice*
KS Bar No.  18932, MO Bar No. 46013
P.O. Box 2469
Mission, KS  66201-2469
(913) 648-6673
Facsimile (773) 326-3538

Michael W. Blanton, *pro hac vice*
MO Bar. Id. No. 46490
Swanson Midgley, LLC
2420 Pershing Road, Ste. 400
Kansas City, Missouri 64108
Phone: (816) 842-6100
**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I, Christopher J. Curtin, Esq., hereby certify that on October 29, 2007, I served a copy of the foregoing

Plaintiffs' Answering Brief in Opposition to Defendant's Motion for Partial Summary Judgment by depositing the

same in the United States Mail, postage prepaid to:

William M. Lafferty, Esq.
Jay N. Moffitt., Esq.
Morris Nichols Arsht & Tunnell
1201 N. Market St.
Wilmington, DE 19801
wlafferty@mnat.com

and that I served a copy electronically this day to the following:

Michael C. O'Neil
Paula D. Friedman
DLA Piper US LLP
203 N. LaSalle St., Ste. 1900
Chicago, IL  60601-1293
michael.Oneil@dlapiper.com
paula.friedman@dlapiper.com

ERISMAN & CURTIN

/s/ Christopher J. Curtin
Christopher J. Curtin
DE Bar Id. No. 0226
Erisman & Curtin
629 Mount Lebanon road
Wilmington, Delaware 19803
Phone: (302) 478-5577
Facsimile: (302) 478-5494
Email: ccurtin659@aol.com

DATE: October 29, 2007