IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STEVEN G. MILLETT, MELODY J. MILLETT, On Behalf Of Themselves and All Others Similarly Situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 05-599-SLR |
| v. | ) ) | |
| TRUELINK, INC., A Trans Union Company, | ) ) ) | **REDACTED VERSION** |
| Defendant. | ) ) ) | |

**DEFENDANT TRUELINK, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO
STRIKE TESTIMONY OF RONALD DIMBERT**

William M. Lafferty (#2755)
Jay N. Moffitt (#4742)
**Morris, Nichols, Arsht & Tunnell LLP**
1201 N. Market Street
Wilmington, DE 19899
Phone: (302) 658-9200
Fax: (302) 658-3989

OF COUNSEL:
Michael O'Neil
Paula D. Friedman
**DLA Piper US LLP**
203 North LaSalle Street, Suite 1900
Chicago, IL 60601-1293
Phone: (312) 368-4000
Fax:  (312) 236-7516

Counsel for Defendant

October 29, 2007

## TABLE OF CONTENTS

Page

I. BACKGROUND ............................................................................................................ 2

II. ARGUMENT ................................................................................................................. 5

    A. Dimbert Designed The Wrong Study And Therefore Asked The Wrong Questions ........................................................................................................... 5

    B. Dimbert's Survey Does Not Inform This Court As To The Beliefs Or Attitudes Of The Members Of Either Of The Putative Classes ........................... 9

    C. Other Serious Flaws In Dimbert's Methodology ............................................. 13

        1. The Lack of a Control Group ............................................................... 13

        2. The Questions Purporting to Measure the Consumer's Response to the Survey Were Actually "Reading Tests" ........................................ 14

        3. Dimbert Used Bad Question Forms ...................................................... 15

        4. Dimbert Did Not Simulate a Consumer's Real Life Experience With the TrueCredit Page ..................................................................... 15

III. CONCLUSION ............................................................................................................ 16

...

# TABLE OF AUTHORITIES

## FEDERAL CASES

Citizens Financial Group, Inc. v. Citizens National Bank of Evans City, 383 F.3d 110 .................................................................................................................. 12

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 ................................. 1, 5, 6

J & J Snack Foods, Corp. v. Earthgrains Co., 220 F.Supp.2d 358 ............................ 1, 9

Jackson v. National Action Financial Services, 441 F.Supp.2d 877 ........................... 12

Kumo Tire Co., Ltd. v. Carmichael, 526 U.S. 137 ........................................................ 1

United States v. Downing, 233 F.2d 1224 ..................................................................... 5

Wells Fargo & Company v. Whenu.com, Inc., 293 F.Supp.2d 734 ........................... 14

## FEDERAL STATUTES

Fed. R. Evid. 402 ............................................................................................................. 1

Fed. R. Evid. 702 ............................................................................................................. 1

## STATE STATUTES

California Consumers Legal Remedies Act, Cal. Civ. Code §§1750-85 ....................... 7

Plaintiffs Steven and Melody Millett (the "Milletts") have submitted to this Court an expert report (the "Dimbert Report") prepared by Ronald Dimbert ("Dimbert") in support of both their Motion for Class Certification ("Class Cert. Motion") and Plaintiffs' Motion for Partial Summary Judgment ("Sum. Judgment Motion"). The Dimbert Report purports to present the results of a survey designed and conducted by Dimbert to "understand how Kansas consumers define identity theft and specifically what they believe the TrueCredit product would provide in the way of identity theft protection relative to the extent of the protection, notification regarding potential problems and access to assistance in recovering losses due to identity theft."

For the reasons discussed in this brief, it is apparent that Dimbert's report is flawed in that it does not meet the standards set under Rule 702 of the Federal Rules of Evidence because his purported testimony is not based upon sufficient facts or data, the testimony is not the product of reliable principles and methods and Dimbert did not apply the principles and methods reliably to the facts of this case. Further, his research delves into areas that are irrelevant and not admissible under the standards set by Rule 402 of the Federal Rules of Evidence.

The United States Supreme Court has charged the trial court to act as the gatekeeper to determine the admissibility of a proposed expert's testimony. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 US 579 (1993); Kumo Tire Co., Ltd. v. Carmichael, 526 US 137 (1999). The principles set out in these cases apply with respect to the admissibility of survey evidence which must adhere to established procedures for determining and interpreting opinion data as well as directing itself to relevant areas of inquiry based on the facts and issues of the case to be admitted. See J & J Snack Foods, Corp. v. Earthgrains Co., 220 F.Supp.2d 358, 367 (D.N.J. 2002).

As an initial matter, it is not clear what relevance the Dimbert Report has to either of the current motions brought by the Milletts. First, the Dimbert Report, which purports to summarize the beliefs of Kansas residents, has no relevance to the Plaintiffs' Sum. Judgment Motion. The issues for which they seek summary judgment relate to what the Milletts believed and what harm, if any, they suffered. Evidence of what others may believe has no bearing on these issues. Even conceding as a general matter that the opinions of others might be relevant to the Class Cert. Motion, the Dimbert Report is flawed because it is based on a fundamental misunderstanding of the facts of this case and therefore does not correctly address the relevant issues. Further, it does not provide useful information for either of the putative classes as defined by the Milletts, again making it irrelevant for these class certification proceedings. Finally, the survey results are unreliable because they were obtained by using flawed or incorrectly applied methodologies.

## BACKGROUND

This case involves the sale of credit monitoring products through TrueLink's TrueCredit website. Consumers visiting this website, whether directed there through the results of a search engine, the use of a TrueCredit domain name, or through links from another site, land on a homepage or landing page from which they can select a variety of information and products. (Exhibit A, attached hereto, Declaration of Lucy Duni ("Duni Decl.") ¶ 8). The web page which is the subject of the Dimbert Report is one that is at least two pages into the website, meaning that any consumer visiting this page would have to first land on the homepage or landing page and click through one or more links to arrive at the page which Dimbert examined. (Duni Decl. ¶ 10). In addition, the page that is the subject of the Dimbert Report has many active links, including those which invite the consumer to "Learn More." (Duni Decl. ¶ 11). The page offers three products, a credit monitoring product, a credit score monitoring product and a debt

monitoring product. (See Exhibit B, attached hereto, TrueCredit webpage studied by Dimbert (the "TrueCredit Page")).

**REDACTED**

He qualified survey participants using ten questions to screen for adult Kansas residents who were the head of the household, who had an internet connection at home

which they used at least once a week and on which they browsed or shopped at least twice a month. He designed a survey to have at least 25% of respondents who did on-line banking. (See Exhibit D, Dimbert Report, Appendix C). Dimbert did not screen his survey participants for consumers who had purchased nor were potential purchasers of credit monitoring products.

**REDACTED**

In all, it took nine days to complete the survey and the results were tabulated and included in the report Dimbert provided to Milletts' attorneys. (See Dimbert Report).

The Dimbert Report was reviewed by an expert retained by TrueLink, Philip Johnson, the Chief Executive Officer of Leo J. Shapiro & Associates, a Chicago-based market research and consulting firm, who has worked in the field of consumer surveys for over 36 years. Johnson prepared a report identifying those areas of the Dimbert Report which were not conducted in accordance with generally accepted survey principles or which, due to the methodology used, did

not support the reported results. (See Exhibit E, An analysis of the Dimbert Study dated August 2007 by Philip Johnson (the "Johnson Report"))[1].

## ARGUMENT

It is obvious; both from the comments contained in the Johnson Report's critique of the methodology of the Dimbert survey, as well as comments found in relevant case law, that the Dimbert Report contains three major flaws. First, it does not include the relevant questions but instead provides information which, at best, is prejudicial and, at worst, is misleading. Second, the survey does not sample the proper universe of participants because the information contained in the Dimbert Report does not relate to the members of the putative classes as defined by the Milletts. Third, there are several major flaws in methodology which cause the survey results to be unreliable. As a result, no valid conclusions can be drawn from the results of this survey research with respect to the issues in the present case.

    A.    Dimbert Designed The Wrong Study And Therefore Asked The Wrong Questions.

Among the determinations that the Court must make in considering the admissibility of opinion testimony is whether the testimony "fits", that is, "whether the expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid ... in resolving a factual issue." Daubert, 509 U.S. at 591 (citing United States v. Downing, 233 F.2d 1224, 1242 (3d Cir. 1985)). In this case, Dimbert designed a study which took the TrueCredit Page completely out of context and without reference to the specific product that is offered for sale, that is, credit monitoring comprised of access to information on the consumer's credit report.

**REDACTED**

---

[1] Some of the errors attributed by Johnson to the Dimbert Report were clarified at Dimbert's deposition where he testified that he followed certain procedures (such as not disclosing to either

**REDACTED**   By simply asking the participants if they would agree with statements that repeated some of the words from the TrueCredit Page, Dimbert does not provide any insight as to what information a consumer would expect to receive based on the language in the TrueCredit Page from the credit monitoring product that was not included in the consumer's credit report.

The type of study that Dimbert wanted to conduct, had it been properly designed and executed (which his was not, see Johnson Report p. 5) may have validity if the need were to study consumer acceptance of an advertising piece or if the page being examined came to consumers as a pop up without the consumer ever receiving any other relevant information about the product being offered. However, in determining "fit" the U.S. Supreme Court noted that "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. Daubert, 509 U.S. at 591. Here the issue is whether TrueLink knowingly misrepresented its product to consumers, that is, in buying the credit monitoring product that is clearly described as access to the consumer's credit report and notification of certain types of changes to it, could the consumer reasonably read the TrueCredit Page as promising that he or she would also get information that does not appear in his or her credit report.

It is quite surprising that Dimbert avoids the relevant issue in this case, particularly as one court clearly spelled out the issue for the Milletts. In the case of Millett v. Experian Information Solutions, Inc., Case No. SACV05-879JVS (RNBx) (the "Experian Action") the Milletts claimed that statements such as "guard against fraud and identity theft" and "peace of mind" promised that the Experian credit monitoring product which provided access to the consumer's Experian credit report would alert them to all instances in which someone used their personal information

---

the questioner or respondent the proponent of the survey) even though he did not disclose such

even if such instances were not contained on their credit reports. (Exhibit F, Order Granting in part and denying in part Motion for Summary Judgment of December 18, 2006 ("Experian Order") in the Experian Action p. 6). They brought their action under the California Consumers Legal Remedies Act, Cal. Civ. Code §§1750-85 which contains provisions against deceptive marketing similar to the Kansas Consumer Protection Act, K.A.S. § 50-623 et seq., the statute under which the Milletts bring their action against TrueLink. In the Experian Order, the court found that there was "no offer to search for information that would not appear on a purchaser's credit report." (Experian Order p. 4). The court held that the Milletts' view as to how Experian's credit monitoring product should perform were "impractical and undesirable." (Id.) The court concluded that no reasonable person could read the statements and conclude that Experian's credit monitoring product "somehow acts as an all-knowing private investigator, relaying any information relevant to identity theft to the purchaser." (Experian Order p. 6).

Plaintiffs complain here, as they did in the Experian Action, that the TrueLink product only pertains to information regarding the subscriber's own credit report. Hence, the relevant area of study for any survey conducted in this case would be to determine whether a consumer purchasing the credit monitoring product would likely believe that they would be getting a product alerting them to information outside of their own credit report. (See Johnson Report pp 4-5).

**REDACTED**

---

procedures in his report.

**REDACTED**

participants' agreement with several examples, but never asks the participant to make a connection between these examples and what the consumer actually expects to appear on their credit reports. (Dimbert Report, Appendix C, Interview Question 2). In short, the study does not answer whether or not the language on the TrueCredit Page caused consumers to expect that they would receive more than their own credit reports and notices of changes to those reports.

**REDACTED**

8

**REDACTED**

Such questioning does not lead to valid survey results. For example, in the case of J & J Snack Food Corp., 220 F.Supp.2d at 372-80, the purpose of the survey was to determine whether the words "Break & Bake" were descriptive of the frozen cookie dough product with which they were used or merely suggestive. In that case the court rejected a survey conducted in a shopping mall with customers who were asked to answer questions without being informed as to the product with which the words were used. The court noted, "the improper sampling universe is further compounded by the survey's design flaw of failing to disclose to respondents the context of the product with which the mark is connected. The Rappeport Report instead asked shopping mall customers to guess about this context." Id. at 372. Similarly, by not providing the product, or any real life context in which the TrueCredit Page would be encountered by consumers, the Dimbert Report only records the participants' guesses as to the meaning of the select words without probing to determine what participants would understand if they encountered these words in the context of credit reports and weekly email alerts to changes in those reports. (See Dimbert Report).

B.   Dimbert's Survey Does Not Inform This Court As To The Beliefs Or Attitudes Of The Members Of Either Of The Putative Classes.

The Milletts have asked this Court to certify a class defined as "all persons who have purchased credit monitoring services from TrueLink or its predecessors or successors-in-interest on or after September 9, 2001 pursuant to a contract for credit monitoring services that was provided by TrueLink or its predecessors or successors-in-interest for the purpose of such sale." (Class Cert. Motion pp. 1-2). The second class which the Milletts seek to certify concerning violations of the KCPA is defined as "all persons who have purchased credit monitoring services from TrueLink or its predecessors or successors-in-interest on or after September 9, 2001."[2] (Class Cert. Motion p. 2). Mr. Dimbert's study does not provide the basis for valid conclusions as to the opinions of the members of either of these classes.

**REDACTED**

**REDACTED**

Though he asked a qualifying question to determine whether or not a respondent had already subscribed to a credit monitoring product, less than 50 respondents fell into this category. (See Dimbert Report, Appendix B, Table 1, "Total Respondents" under "Subscribe to Credit Monitoring").

**REDACTED**

In fact, there were only 42 respondents who claimed to have purchased any type of credit monitoring product and Dimbert made no effort to determine whether these products were those of TrueLink or even comparable to those offered by TrueLink. (See Dimbert Report Appendix B, Table 1).

**REDACTED**

---

[2] Though the Class Cert. Motion contains this definition, it is apparent from reading the brief in support thereof that they intended the second class to be limited to residents of Kansas.

As noted by Johnson, "to be relevant to the inquiry at issue, the survey population should have consisted of Kansas consumers who have purchased or intend to purchase credit security products and are likely to use the internet to search for such products." (Johnson Report p. 6). Dimbert did not prescreen his survey participants on these criteria. (See Dimbert Report, Appendix C). Indeed, the Federal Judicial Center counsels against admitting survey evidence where the population was not properly chosen and defined. (See Federal Judicial Center, *Manual for Complex Litigation, Third*, § 21.493, p. 102 (1995)).

Courts have stricken survey evidence which uses an inappropriate universe for sampling. See, e.g., Citizens Financial Group, Inc. v. Citizens National Bank of Evans City, 383 F.3d 110 (3d Cir. 2004) The court in Citizens Financial stated concerns about the propriety and trustworthiness of a survey where the universe reflected a segment of the population whose perceptions and state of mind were irrelevant to the issues in the case. As a result, a survey that measured instances of confusion outside of the junior user's market area in a reverse confusion case measured the wrong universe and the expert's report was stricken. See also, Jackson v. National Action Financial Services, 441 F.Supp.2d 877 (N.D. Ill. 2006) (the Court determined the survey at issue to be insufficiently reliable because it failed to properly identify unsophisticated consumers when addressing issues related to the Fair Debt Collection Practices Act).

**REDACTED**

**REDACTED**

Even if he could explain these flaws, his study still did not provide reliable information about members of the putative class. Therefore, his conclusions are not relevant and should be stricken.

C.  Other Serious Flaws In Dimbert's Methodology.

1.  *The Lack of a Control Group.*

Johnson notes that one of the failings of the Dimbert Report is that Dimbert did not employ a control group or control questions. (Johnson Report pp. 5 and 7). The Dimbert Report purports to reflect the participants' view about such topics as "credit reports" and "identify theft" without determining whether or not a participant had any understanding of these terms before participating in the survey or whether such preconceptions contributed in any way to their responses separate and apart from their reaction to the information conveyed by the TrueCredit Page.

**REDACTED**

In instances such as the present, where consumers are likely to have preconceived notions, whether true or untrue, about the subject matter implicated in the survey, in order to determine whether or not the responses received are measuring the results of the advertisement which is the subject of the survey, or the effects of preconceived notions, the control group should be used in which the same questions are asked to a group of respondents without subjecting them to the stimulus which is being measured. As at least one court has noted, "unless a control group is used to account for the effects of 'noise', i.e., extrinsic factors such as

preexisting beliefs other than the stimulus at issue that could contribute to a survey's results, the survey's results are uninterpretable." See Wells Fargo & Company v. Whenu.com, Inc., 293 F.Supp.2d 734, 754 (E.D. Mich. 2003) (citing with approval the opinion of Dr. Jacoby who criticized a survey conducted without a control group); (see also Johnson Report p. 5).

   2. *The Questions Purporting to Measure the Consumer's Response to the Survey Were Actually "Reading Tests."*

**REDACTED**

In each of the subparts of Interview Question No. 1, where Dimbert purports to determine what the consumer believes was being promised by the ad, he uses words that were selectively taken verbatim from the ad. (Compare, Dimbert Report, Appendix C with TrueCredit Page). Because the stimulus was left on the screen during the questioning, a consumer who may have initially felt differently, or who was undecided, but who nonetheless wanted to get the "right answer," could look on the screen to see whether the words from the question appeared there. Further compounding the bias to agree, Dimbert only used questions that were worded with a strong "yea saying" tendency. (Johnson Report p. 6).[3]

**REDACTED**

This form of questioning is highly suggestive, if not actually leading. (See Johnson Report p. 6).

---

[3] In the six parts to Interview Question No. 1, there is not one question that was designed to ensure that the participant would say "No." With this form of questions, there is a bias both toward repeating the affirmative and appearing to agree with the interviewer.

14

**REDACTED**

    3.    *Dimbert Used Bad Question Forms.*

Other questions used in the survey produced uncertain responses because the form of the question was flawed.

**REDACTED**

While purporting to measure how Kansas consumers define identity theft, he never specifically asked any of the respondents if they were familiar with the term "identity theft" nor did he ask them an open-ended question to elicit from them a definition of the term. (See Johnson Report p. 4). Instead he presented each question with a closed list of choices.

**REDACTED**

; (Johnson Report pp. 6-7).

    4.    *Dimbert Did Not Simulate a Consumer's Real Life Experience With the TrueCredit Page.*

**REDACTED**

15

**REDACTED**

As noted by Mr. Johnson, this failing also undercuts any possible validity of the Dimbert survey results. (Johnson Report p. 9).

## CONCLUSION

The Dimbert Report does not meet the required standards of relevance and reliability. First, it does not include the relevant questions about what information from outside their credit reports the consumers believe that they would receive. Second, it does not survey a universe that can be validly interpreted as representing the opinions of the members of either of the putative classes proposed by the Milletts or any group of past or prospective buyers of credit monitoring products. Third, there are numerous major errors in the Dimbert methodology which cause the survey results to be completely unreliable. As a result, no valid conclusions can be drawn from the results of this survey research with respect to the issues in the present case and the Dimbert Report should be excluded.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

By: /s/ Jay N. Moffitt
William M. Lafferty (#2755)
Jay N. Moffitt (#4742)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200

OF COUNSEL:

Michael O'Neil
Paula D. Friedman
DLA Piper US LLP
203 North LaSalle Street, Suite 1800
Chicago, Illinois 60601
(312) 368-4000

October 29, 2007

16