# EXHIBIT E



LEO J. SHAPIRO & ASSOCIATES L.L.C.

**STEVEN G. MILLETT AND MELODY J. MILLETT**

**VS.**

**TRUELINK INC.**

**AN ANALYSIS OF THE DIMBERT STUDY**

August 2007

153 WEST OHIO STREET  SUITE 300    CHICAGO IL 60610    312.321.8111    WWW.LJS.COM

## DECLARATION OF PHILIP JOHNSON

I, Philip Johnson, state as follows:

## I. BACKGROUND

1.    I am Chief Executive Officer of Leo J. Shapiro and Associates, Inc., a Chicago-based market research and consulting firm that conducts surveys.

2.    I have been with this firm since 1971. Over the past 36 years, I have designed and supervised hundreds of surveys measuring consumer behavior, opinion, and beliefs concerning brands and products, employing a wide range of research techniques. I have given lectures before the American Bar Association (ABA), the Practising Law Institute (PLI), the American Intellectual Property Law Association (AIPLA), and the International Trademark Association (INTA) on the use of survey research in litigation. I am a member of the American Marketing Association (AMA), the American Association for Public Opinion Research (AAPOR), and the International Trademark Association (INTA). I have a B.S. degree in Psychology from Loyola University and an M.B.A. degree from the University of Chicago. A description of my background and a list of cases where I have offered survey evidence during the past four years are attached to the Appendix of this declaration.

## II. INTRODUCTION

3.      During August 2007, I was contacted by counsel from the law firm, DLA Piper US LLP, on behalf of its client, TrueLink Inc.  Counsel informed me of a dispute that has arisen between TrueLink and the Milletts with respect to whether any false or misleading claims were used in TrueLink's consumer advertising in the state of Kansas.

4.      Counsel further informed me of a market research survey that was designed and conducted by Ronald L. Dimbert which has been offered as evidence in this dispute. Counsel provided me with a copy of Mr. Dimbert's report and all of the underlying materials which counsel has received to date. Counsel asked me to review this study and determine whether or not it was conducted in accordance with generally accepted survey principles as well as what conclusions, if any, can be reached based on this research.  I have reviewed these materials and reached a number of conclusions and observations regarding the opinions expressed by Mr. Dimbert and the results of the survey he designed and conducted.  I may have additional observations and opinions if further materials underlying the Dimbert report and/or his observations are made available to me.

## III.  DISCUSSION

5.      Based on my review, it is evident that the Dimbert survey was not designed and

conducted in accordance with any of the generally accepted principles relating to market

research studies.  Given its defective design, no valid conclusions can be drawn from the

results of this survey research.  Some of the specific design flaws in the Dimbert survey

include the following:

- Incorrect survey universe
- Fails to simulate an actual purchasing situation
- Employs excessively structured and leading questions and fails to ask consumers what the ad conveyed to them in their own words in an open-ended fashion
- Lack of a control group of respondents or control questions

In sum, the survey has no value in making any determination of what a typical consumer

of financial protection products might believe based on TrueCredit's advertising

materials.

6.      While Dimbert stated that the purpose of his study was to "understand how Kansas

consumers define identity theft and, specifically, what they believe the TrueCredit

product would provide in the way of identity theft protection…," he never asked any of

the respondents whether they had even heard of "identity theft" let alone define what

"identity theft" means.  Dimbert also never asked them what message or messages they

received from the TrueCredit web page they were shown during the survey.  Instead, he

presented them with a list of fixed choice, leading questions without asking them what

they believe and why they believe it.  Further, it is my understanding that the primary

issue in this case is whether a consumer purchasing the credit monitoring product would

4

be likely to believe that they would be getting a product alerting them to information outside of their credit report. However, the questions that Dimbert asked in his survey do not address this primary issue.

7.    The type of survey that is generally used to assess advertising communications identifies the universe of consumers who are the relevant population for a particular product or service category, and then exposes a portion of this relevant universe to a representative sample advertisement bearing the promises, claims, or implied benefits that are at issue. This exposure is done in as natural a way as possible to recreate an actual consumer experience. The respondent is subsequently asked a series of open-ended questions as to what messages they received from the advertising. Any structured but non-leading questions, which are used to further clarify responses, require a control group or an equivalent control question to remove bias from the study. The Dimbert study diverges in all respects from the type of survey which is properly utilized in such types of issues.

8.    The Federal Judicial Center's Manual for Complex Litigation sets out a seven factor framework for litigation research[1]. The seven factors are as follows:

1.    The population was properly chosen and defined.
2.    The sample chosen was representative of that population.
3.    The questions asked were clear and not leading.
4.    The survey was conducted by qualified people following proper interviewing procedures.
5.    The data gathered were accurately reported.
6.    The data were analyzed in accordance with accepted statistical principles.
7.    The process was conducted so as to insure objectivity.

---

[1] Federal Judicial Center's *Manual for Complex Litigation, Third,* Section 21.493, Page 102; 1995.

**The population was not properly chosen and defined.  The sample chosen was not representative of the relevant population.**

9.    Dimbert did not properly choose and define his survey population.  Respondents were those individuals between 18 and 74 years of age, who accessed the Internet at home, were on the Internet at least once a week, and surfed/ browsed or shopped online at least twice a month.  In addition, one fourth of his survey respondents had to conduct online banking.  However, to be relevant to the inquiry at issue, the survey population should have consisted of Kansas consumers who have purchased or intend to purchase credit security products and are likely to use the Internet to search for such products.

10.    Mr. Dimbert "intercepted" shoppers at one shopping mall location in Kansas City and offered them five dollars to participate in a survey about Internet usage.  While convenience samples are generally accepted in situations that require showing the respondent a survey stimulus in person, it is inappropriate to use a single sample spot (mall location) given the enormous sampling error and variability that occurs in convenience samples.

**The questions asked were leading.**

11.    The questions in the survey were all leading, biased questions with strong "yea saying" form.  They did not use a balanced question structure and were compound and leading in nature[2].  Most of the responses in the Dimbert study were simply a "yes" agreement with the leading question that was posed during the interview.  For example, one of Dimbert's key questions (Question 3) was structured as follows, "If someone uses your social

---

[2] Norman M. Bradburn, *Handbook of Survey Research*, 1983.

security number with a different name and address to obtain credit or employment, is that identity theft?"  This type of question encourages a "yea saying" bias given its leading and suggestive construction.  The fact that it is also compound makes it difficult to determine what exactly respondents are agreeing with.  Moreover, it is stated dogmatically and has no context that bears upon the advertising materials as compared to any pre-existing or general beliefs the consumer may have had prior to the interview.  Further, Dimbert did not ask any open-ended questions to allow respondents to state what they believe in their own words.

12.     Dr. Shari Diamond states that, "Every measure of opinion or belief in a survey reflects some degree of error.  Control groups and control questions are the most reliable means for assessing response levels against the baseline level of error associated with a particular question.[3]"  The Dimbert survey neither included any control questions (i.e., questions that do not directly pertain to the topics listed on the website), nor did it include a control group of respondents who were exposed to a neutral stimulus (i.e., a web-page with any potential misleading language removed) to gauge the impact of the leading methodology.

**The survey was not conducted by qualified people following proper interviewing procedures.**

13.     Mr. Dimbert states that he has not testified in the past four years, and there is no indication that Mr. Dimbert has ever designed and conducted a survey that has been

---

[3] "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Federal Judicial Center 2000,* Pg. 252.

7

accepted in a state or federal court. In addition, Dimbert conducted interviewing in only one mall location under the direction of his own company, FieldHouse Marketing Research (FHMR). Dr. Shari Diamond states that, "To ensure objectivity in the administration of a survey, it is standard interview practice to conduct double-blind research whenever possible: both the interviewer and the respondent are blind to the sponsor of the survey and its purpose.[4]" There is no evidence that Dimbert's research was conducted double blind such that neither the interviewers nor the respondents were aware of the purpose or sponsor of the study. Moreover, there is no indication that survey results were validated, a standard practice employed to determine the authenticity of a survey record.

**The data gathered were not accurately reported. The data were not analyzed in accordance with accepted statistical principles.**

14.     There is no indication that any basic quality control measures were utilized in this study. For instance, the lack of survey validation, failure to maintain double blind research, and the use of a single sample spot suggest little concern with data integrity. Dimbert's failure to ask any open ended questions that would allow respondents to mention other problems (e.g., "I couldn't read the screen," "I don't understand the question," etc.) further complicates any assessment of accuracy.

15.     The Dimbert study has no known measure of sampling error given its use of a single sample spot. Dr. Seymour Sudman states, "If one observes the same results in several

---

[4] "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Federal Judicial Center 2000.*

8

locations with widely different populations, however, one has a great deal more confidence in their generality than if the sample is only of a single location.[5]"

**The process was not conducted so as to insure objectivity.**

16.     Dimbert exposed respondents to a web page describing the TrueCredit product without any consideration of how they might actually encounter such a page.  Professor McCarthy summarized this view when he states, "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results.[6]"  However, Dimbert did not allow respondents to experience the natural search process that would lead them to this particular web page. He took the web page out of context, isolated it, and asked respondents to focus on it. Further, he presented the web page in a static format not as an interactive medium that consumers would normally encounter in an online experience where they can "drill down" to learn more about features of an offer.

17.     Dimbert asked respondents to read the web page but did not put them into a buying frame of mind.  He also allowed respondents to have the web page up on the screen such that they could refer to it during the course of the interview.  In effect, respondents could have very easily looked up the "correct" answers to the survey questions.  Dimbert's survey was not conducted to maintain objectivity such that it employed the wrong universe, depended solely on leading questions, had no open ended response opportunities, no

---

[5] Seymour Sudman, *Applied Sampling*, 1976.
[6] J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, 32:163: October 2000 (though McCarthy was speaking of trademark surveys the principle applies to advertising communications surveys as well).

balanced questions, no control group of respondents or control questions, was not validated, and was not double blind.

18.    Overall, it is clear that the Dimbert study has no value whatsoever in assessing the impact of TrueCredit's advertising on consumers who would search the Internet for information about TrueCredit products and services.

Pursuant to 28 U.S.C., Section 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on August 30, 2007 in Chicago, Illinois.

_____

Philip Johnson

10

## **APPENDIX**

- Philip Johnson Curriculum Vitae

- Recent Cases Where Philip Johnson Testified



LEO J. SHAPIRO & ASSOCIATES LLC.

# PHILIP JOHNSON

## CURRICULUM VITAE

Philip Johnson is the Chief Executive Officer of Leo J. Shapiro and Associates, a Chicago-based market research and behavioral consulting company. Mr. Johnson has been with this firm since 1971 and has held a number of positions. In recent years, he has concentrated his efforts in the areas of study design and the development of innovative research techniques.

Over the past years, Mr. Johnson has designed and supervised hundreds of surveys measuring consumer behavior and opinion, employing a wide range of research techniques. His area of expertise is in the use of survey research as a tool in litigation, including jury selection and trademark disputes.

Mr. Johnson has offered testimony regarding survey evidence on over fifty occasions in both Federal and State courts. In addition, he has offered survey research in matters before the Federal Trade Commission, The Food and Drug Administration, the Patent and Trademark Office, and the Trademark Trial and Appeal Board. Mr. Johnson has designed, conducted, and reported survey evidence on behalf of both plaintiffs and defendants in various cases. The topics covered in these litigation related surveys include matters related to likelihood of confusion, secondary meaning, genericness, dilution, false advertising, change of venue, and unfair competition.

2

Part of Mr. Johnson's training has been through working with Dr. Leo J. Shapiro, the Founder of the company; the late Dr. Philip M. Hauser, a former Director of the U. S. Census Bureau; and the late Dr. Hans Zeisel, who made significant contributions in the application of social science to the solution of legal questions.

Mr. Johnson has given lectures before the American Bar Association (ABA) and the Practising Law Institute (PLI) on the use of survey research in litigation.  He is a member of the American Marketing Association (AMA), the American Association for Public Opinion Research (AAPOR), and the International Trademark Association (INTA).

Mr. Johnson has a B.S. degree in Psychology from Loyola University and an M.B.A. degree from the University of Chicago.



LEO J. SHAPIRO & ASSOCIATES LLC.

**RECENT CASES WHERE PHILIP JOHNSON
TESTIFIED OR OFFERED SURVEY EVIDENCE...**

APRIL 2007            NIKE, INC. VS. NIKEPAL INTERNATIONAL, INC.
                      United States District Court for the
                      Eastern District of California
                              Likelihood of Initial Interest Confusion and Dilution

FEBRUARY 2007         JOHNSON & JOHNSON VISION CARE, INC. VS. CIBA VISION
                      CORPORATION
                      United States District Court for the
                      Southern District of New York
                              False Advertising

NOVEMBER 2006         HASBRO, INC. VS. MGA ENTERTAINMENT, INC.
                      United States District Court for the
                      District of Rhode Island
                              Secondary Meaning

OCTOBER 2006          CLASSIC FOODS INTERNATIONAL CORPORATION VS. KETTLE
                      FOODS, INC.
                      United States District Court for the
                      Central District of California (Southern Division)
                              Likelihood of Confusion

JUNE 2006             GROCERY OUTLET INC. VS. ALBERTSON'S, INC., AMERICAN
                      STORES COMPANY, L.L.C., AND LUCKY STORES, INC.
                      United States District Court for the
                      Northern District of California (San Francisco Division)
                              Likelihood of Confusion and Fame

JUNE 2006             DE BEERS LV TRADEMARK LTD. AND DE BEERS LV LTD. VS.
                      DEBEERS DIAMOND SYNDICATE INC. AND MARVIN
                      ROSENBLATT
                      United States District Court for the
                      Southern District of New York
                              Awareness

APRIL 2006            24 HOUR FITNESS USA, INC. VS. 24/7 TRIBECA FITNESS, L.L.C.,
                      24/7 GYM, L.L.C., ET AL.
                      United States District Court for the
                      Southern District of New York
                              Likelihood of Confusion

2

| | |
|---|---|
| APRIL 2006 | JUICY COUTURE, INC. AND L.C. LICENSING, INC. VS. LANCÔME PARFUMS ET BEAUTE & CIE AND LUXURY PRODUCTS, L.L.C. <br> United States District Court for the <br> Southern District of New York <br>      Likelihood of Confusion |
| JANUARY 2006 | WHIRLPOOL PROPERTIES, INC., ET AL., VS. LG ELECTRONICS U.S.A., INC., ET AL. <br> United States District Court for the <br> Western District of Michigan (Southern Division) <br>      Likelihood of Confusion |
| OCTOBER 2005 | PRL USA HOLDINGS, INC. VS. UNITED STATES POLO ASSOCIATION, ET AL. <br> United States District Court for the <br> Southern District of New York <br>      Likelihood of Confusion |
| SEPTEMBER 2005 | HILL'S PET NUTRITION, INC. VS. NUTRO PRODUCTS, INC. AND JOHN DOES #1-20 <br> United States District Court for the <br> Central District of California (Western Division) <br>      False Advertising |
| SEPTEMBER 2005 | PERFUMEBAY.COM, INC. VS. EBAY, INC. <br> United States District Court for the <br> Central District of California (Western Division) <br>      Likelihood of Dilution and Initial Interest Confusion |
| JUNE 2005 | METROPOLITAN LIFE INSURANCE CORPORATION VS. METBANK <br> United States District Court for the <br> Southern District of New York <br>      Likelihood of Confusion |
| MARCH 2005 | PACIFIC MARKET INTERNATIONAL VS. THERMOS L.L.C. <br> United States District Court for the <br> Western District of Washington (Seattle Division) <br>      Likelihood of Confusion |
| MARCH 2005 | JADA TOYS, INC. VS. MATTEL, INC. <br> United States District Court for the <br> Central District of California <br>      Likelihood of Confusion |
| AUGUST 2004 | VERIZON DIRECTORIES CORP. VS. YELLOW BOOK USA, INC. <br> United States District Court for the <br> Eastern District of New York <br>      False Advertising |

3

APRIL 2004                       DAVID'S BRIDAL, INC. VS. MITCH YEH ET AL.
United States District Court for the
Southern District of Texas (Houston Division)
       Likelihood of Confusion

FEBRUARY 2004          MERISANT VS. JOHNSON AND JOHNSON/MCNEIL
LABORATORIES
United States District Court for the
District of Puerto Rico
       Likelihood of Confusion

OCTOBER 2003          THE MAY DEPARTMENT STORES COMPANY VS.
VICTORIA'S SECRET STORES, INC. & MARK WEIKEL
In the Circuit Court of the County of St. Louis
State of Missouri
       A Study of Cross Shopping

JULY 2003              STAR INDUSTRIES, INC. VS. BACARDI & COMPANY LIMITED,
BACARDI U.S.A., INC. AND ANHEUSER-BUSCH, INCORPORATED
United States District Court for the
Southern District of New York
       Likelihood of Confusion

FEBRUARY 2003         GATEWAY, INC. VS. COMPANION PRODUCTS, INC.
United States District Court for the
District of South Dakota (Southern Division)
       Likelihood of Confusion

# EXHIBIT F

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | SACV 05-879 JVS (RNBx) | Date | December 18, 2006 |

Title    Steven G. Millet et al. v. Experian Information Solutions, Inc., et al.

Present: The Honorable    James V. Selna

| Karla J. Tunis | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

Attorneys Present for Plaintiffs:    Attorneys Present for Defendant

Not Present    Not Present

Proceedings:    (In Chambers)    Order Granting in part and Denying in part Motion for Summary Judgment

## I.    INTRODUCTION

Defendants Experian Information Solutions, Inc., *et al.* (collectively, "Experian") seek summary judgment or, alternatively, partial summary judgment with respect to claims asserted by Plaintiffs Steven G. Millet, *et al.* (collectively, "the Millet Plaintiffs").

## II.    BACKGROUND

The Millet Plaintiffs bring the instant action alleging claims for breach of contract and for violations of the California Consumers Legal Remedies Act ("CLRA"). Their claims arise from the sale and advertisement of the Credit Manager product.

Credit Manager is an online product offering to assist consumers in avoiding identity theft. (Williams Decl., Ex. B.) The web pages seen by a potential purchaser of Credit Manager repeatedly specify that the services offered relate to information on the purchaser's Experian credit report. The website states that Credit Manager offers "constant monitoring of your credit report to alert you of potential fraudulent activity" (Williams Decl., Ex. B at EXP 00001); "daily email alerts of significant changes to your credit report" (id. at EXP 00003); "peace of mind by scanning your credit report daily and alerting you to potential fraudulent items and other critical changes in your credit report" (id. at EXP 00005). It is clear by the representations made on the web pages that the credit report in question is generated by Experian. (Williams Dec., Ex. B.)

Before purchasing the Credit Manager service on her husband's behalf, Ms.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 05-879 JVS (RNBx) | Date | December 18, 2006 |

Title     Steven G. Millet et al. v. Experian Information Solutions, Inc., et al.

Millett clicked a box on the online order form stating that she had "reviewed the CreditExpert terms and conditions and agree[d] to them." (Defendants' Statement of Uncontroverted Facts ¶ 5.) Ms. Millet had the opportunity at that moment to read the Terms and Conditions, which claim to "constitute the entire agreement between CreditExpert and you in connection with your use of this Web Site, the Services, and the Content." (Williams Decl., Ex. A at EXP 00016.) The terms and conditions specifies that "Credit Expert has used reasonable efforts in collecting, preparing and providing quality information and material, but makes no warranty or guarantee about the accuracy, completeness, or adequacy of the information contained in this Web Site." (Id. at EXP 00013.)

III.    **DISCUSSION**

    A.     Legal standards

     Summary judgment is appropriate only where the record, read in the light most favorable to the non-moving party, indicates that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Material facts are those necessary to the proof or defense of a claim, and are determined by reference to substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." (Id. at 248.) In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." (Id. at 255.)

     The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If and only if the moving party meets its burden, then the non-moving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. (See id. at 322-23.) If the non-moving party meets this burden, then the motion will be denied. Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc., 210 F.3d 1099, 1103 (9th Cir. 2000).

    B.     Contract claims

     Experian argues that the Millet Plaintiffs lack sufficient evidence to create a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | SACV 05-879 JVS (RNBx) | Date | December 18, 2006 |

| | |
|---|---|
| Title | Steven G. Millet et al. v. Experian Information Solutions, Inc., et al. |

genuine issue of material fact with respect to breach and damages. (Opening Br. 13-19.) In addition, Experian argues that any claim for breach of contract is barred by warranty disclaimer language reviewed and accepted upon purchase of Credit Manager. (Id.)

Experian contends that the Millet Plaintiffs cannot show any of four separate bases for breach: (1) failure to provide email notifications; (2) failure to provide access to Millett's Experian Credit Report; (3) failure to provide quality information; and (4) failure to provide advanced notification of renewal. Plaintiffs have abandoned the second basis for breach (Opp'n 1), and so the Court will not address it.

I.    Email Notifications

Experian contends that it was only under a contractual duty to provide an email alert if any of the following changes occur to a subscriber's Experian credit report: a new account, a new delinquency, a new inquiry, a new judgment, or a new or changed address. (Opening Br. 13-14; Williams Decl. ¶¶ 5, 9.) Because the Millet Plaintiffs have not provided evidence that any of the five triggering events occurred, Experian maintains that they cannot show breach for failing to send email notifications. (Opening Br. 14.)

The Millet Plaintiffs concede that none of the triggering items occurred to Mr. Millet's credit report (Plaintiffs' Statement of Genuine Issues ¶ 13), but argue that, nonetheless, Experian was under a contractual duty to provide email notification of other events, such as when another individual allegedly used Mr. Millet's social security number to open a new account. (Id.; Opp'n Br. 18.) Specifically, the Millet Plaintiffs claim that the Credit Manager product fails to "associate all data that would indicate identity theft with the particular consumer who would find that information useful," and fails "to monitor the information that is matched to a particular consumer for all incidents that could indicate identity theft." (Opp'n Br. 4-5.)

The Millet Plaintiffs' argument is essentially that, though defendants "could do more to protect consumers from identity theft, they simply choose not to." (Opp'n Br. 6.) Whether the Defendants could conceivably do more is irrelevant to whether defendants agreed to perform a certain service. The relevant question is whether Experian had a contractual obligation to provide Credit Manager customers with information that does not appear on a subscribing customer's Experian credit report. The Court finds that Experian was under no such obligation.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 05-879 JVS (RNBx) | Date | December 18, 2006 |

| | |
|---|---|
| Title | Steven G. Millet et al. v. Experian Information Solutions, Inc., et al. |

Credit Manager is a product which verifies, on a daily basis, whether a purchaser's Experian credit report has changed in five specific ways commonly associated with identity theft. (Williams Decl. ¶ 5.) There may be some ambiguity as to what precisely Credit Manager promises to examine, but it is clear that there was no offer to search for information that would not appear on a purchaser's credit report.

The Millett Plaintiffs fail to allege a basis for breach. There is no allegation that Credit Manager failed to convey information indicative of identity theft which appeared on the credit report. Rather, the allegations pertain to specific conduct of a Mr. Perez that was never reflected in Mr. Millet's credit report, and to general aspirations of what Credit Manager could do to protect purchasers from fraudulent activity. The Court agrees with Experian that, in order to show breach, the Millett Plaintiffs must demonstrate that Mr. Perez's conduct was reflected in Mr. Millett's Experian credit report. Plaintiffs have made no such allegations. The Court additionally agrees with Experian that the ways in which the Millett Plaintiffs believe Credit Manager ought to perform appear to be impractical and undesirable. (See Reply 7-11.)

2.    Failure to provide quality information

The Millett Plaintiffs also allege that the performance of Credit Manager violates the promise to use "reasonable efforts" to collect, prepare, and provide "quality information." (Williams Decl., Ex. A at EXP 00013.) These terms pertain to the function of the product within the universe of examining the credit report. Experian has fulfilled its burden in demonstrating that there is no genuine issue of material fact as to whether it exerted reasonable efforts to provide quality information. There is no dispute that Credit Manager does indeed check daily to ensure that a purchaser's Experian credit report has not changed in ways commonly associated with identity theft.

The Millett Plaintiffs argue that a genuine issue of material fact exists as to whether it was unreasonable for the Credit Manager product to fail to inform purchasers of information in its possession indicative of identity theft. In order to meet their burden, the allegations must identify a failure in how Credit Manager examines the purchaser's credit report. Instead, the allegations pertain only to information that never impacted Mr. Millett's credit report. Plaintiffs therefore fail to meet their burden.

3.    Failure to provide advanced notification of renewal

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Case No.    SACV 05-879 JVS (RNBx)                     Date    December 18, 2006

Title    Steven G. Millet et al. v. Experian Information Solutions, Inc., et al.

Experian does not dispute that it did not provide the Millett Plaintiffs with notification thirty days prior to automatic renewal of the contract, as the contract provides. (Reply 19.) Rather, Experian argues that the Milletts lack standing to sue for damages, because they received a full refund following a phone call Ms. Millett placed shortly after being charged the membership fee; Ms. Millett has dismissed her breach of contract claims; and Mr. Millett lacks standing to sue on behalf of his wife's "petty inconveniences." (Reply 19.) Experian argues in the alternative that "this minor issue would fall well within the scope of the liability disclaimer contained in the Credit Manager contract." (Reply 19.)

If Experian indeed failed to give proper notice to Mr. Millett before renewing his contract, the fact that his damages may be slight or nonexistent is immaterial to the question of breach. See Sweet v. Johnson, 169 Cal.App.2d 630, 632-33 (1959) ("the maxim that the law will not be concerned with trifles does not, ordinarily, apply to violation of a contractual right"); Restatement (Second) of Contracts § 346(2) ("if the breach caused no loss or if the amount of the loss is not proved . . . , a small sum fixed without regard to the amount of loss will be awarded as nominal damages"); California Civil Code § 3360 ("[w]hen a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages.")

With respect to the liability disclaimer, the Court finds no language relevant to the advanced notification provisions, and Experian has cited to none.

Accordingly, Experian fails to carry its Celotex burden regarding its alleged failure to provide advance notification of renewal.

C.    CLRA claims

In determining whether conduct is deceptive under the CLRA, the Court applies a reasonable consumer standard. Consumer Advocates v. Echostar Satellite Corp., 113 Cal. App. 4th 1351, 1360 (2003). The Millett Plaintiffs contend that their burden is satisfied by the fact the Mr. and Ms. Millett claim to have been misled. (Opp'n Br. 7.) This argument fails. The test is not whether the *plaintiff in suit* was misled, but rather whether the *public* was likely misled, judged by a hypothetical ordinary consumer acting reasonably under the circumstances. Colgan v. Leatherman Tool Group, Inc., 135

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Case No.    SACV 05-879 JVS (RNB)                    Date    December 18, 2006

Title    Steven G. Millet et al. v. Experian Information Solutions, Inc., et al.

Cal.App.4th 663, 682 (2006).

       1.    Claims concerning how Credit Manager functions

The Millett Plaintiffs claim that Experian deceptively represented what Credit Manager does. Specifically, that it deceptively promises broad forms of identity theft protection and that it scans the purchaser's credit report daily.

The Millett Plaintiff claim that a reasonable consumer would believe that the Credit Manager product provides "broad protection against identity theft," such that any information that would assist the purchaser in detecting incidents of identity theft would be relayed to them. However, for the same reasons described above (section II.B.1 and 2, supra), a reasonable consumer would interpret the Credit Manager product as providing information relevant to detecting identity theft in the context of his or her Experian credit report. It is unreasonable to read the representations on the web pages leading to the purchase page and believe that Credit Manager somehow acts as an all-knowing private investigator, relaying any information relevant to identity theft to the purchaser. The Millett Plaintiffs refer to statements promising that Credit Manager will "guard against fraud and identity theft," and that the product will provide "peace of mind." (Opp'n 9.) However, the web pages also promise "the best things in life." (Williams Decl., Ex. B at EXP 00005.) No reasonable person would read these statements and take them literally and absolutely. It would be clear to any reasonable consumer that the product offers to convey information indicative of identity theft, but only if it appears in the purchaser's Experian credit report.

In addition, the Millett Plaintiffs claim that the web pages deceptively promise to scan the purchaser's credit report, when in fact the product only reviews information used to compile the credit report. (Opp'n 13-14.) The difference is irrelevant. There is no dispute that Credit Manager, every day, reviews information that would appear on a purchaser's Experian credit report for indications of identity theft. It is immaterial if an employee, for example, does not print out the report and literally "scans" it, if the product performs a search of data that would appear on the credit report on a daily basis. The difference would be irrelevant to a reasonable consumer, and so cannot be the basis of a CLRA claim.

    Deceptive corporate affiliation claims

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | SACV 05-879 JVS (RNBx) | Date | December 18, 2006 |

Title | Steven G. Millet et al. v. Experian Information Solutions, Inc., et al.

The Millett Plaintiffs also contend that the web pages falsely misrepresents the source of the services provided and the affiliations of the companies providing them. (Opp'n Br. 8-9.) The company and co-defendant that sells the Credit Manager product is Consumerinfo.com, Inc. Several advertisements on its website convey instead, according to the Millett Plaintiffs, that Experian Information Solutions, Inc. is the provider of Credit Manager. (Opp'n 8.) However, Experian Information Solutions and Consumerinfo.com are wholly-owned subsidiaries of the same corporate parent: Experian North America. (Brown Decl. ¶ 3.) It is uncontroverted that the Experian Trademark pertains to the collection of companies under Experian North America, and not to the specific company Experian Information Solutions. (Id.) Therefore, the Court agrees with Experian that the presence of the Experian trademark is not deceptive because it truthfully reflects that the company in question, Consumerinfo.com, is a wholly-owned subsidiary.

D.    Requests for punitive damages

In order to receive punitive damages, the Millett Plaintiffs must demonstrate "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294. The California Civil Code defines "oppression," "fraud," and "malice" as including a state of mind requirement. Cal. Civ. Code § 3294(c)(1) (defining "malice" as conduct "intended to by the defendant to cause injury" or ". . . carried on by defendant with a willful and conscious disregard of the rights or safety of others"); Cal. Civ. Code § 3294(c)(2) (defining "oppression" as "conduct . . . in conscious disregard of that person's rights"); and Cal. Civ. Code § 3294(c)(3) (defining "fraud" as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury").

Experian has satisfied its burden by asserting that there is no evidence as to the state of mind of the Defendants. To survive summary judgment, the Millett Plaintiffs must show actual malice through clear and convincing evidence. Basich v. Allstate Ins. Co., 87 Cal.App.4th 112, 119 (2001). The Millett Plaintiffs cite to no evidence whatever showing that Experian acted with the requisite state of mind. Accordingly, the Millett Plaintiffs fail to meet their burden.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | SACV 05-879 JVS (RNBX) | Date | December 18, 2006 |

Title    Steven G. Millet et al. v. Experian Information Solutions, Inc., et al.

F.    Whether Ms. Millett may bring a CLRA claim

Because the Court grants summary judgment with respect to all of the Millett Plaintiffs' claims under the CLRA, the Court need not examine whether Ms. Millett has standing to bring a CLRA claim.

G.    Whether Experian Information Solutions, Inc. is a party to the contract

The Millett Plaintiffs "have decided to abandon their assertion that Experian Information Solutions, Inc. is a party to the contract." (Opp'n Br. 1.) Accordingly, the Court dismisses all contract claims against Experian Information Solutions, Inc.

IV.    <u>CONCLUSION</u>

Based on the foregoing, the Court grants Experian's Motion for Summary Judgment, except as to the alleged failure to provide notification of renewal. That portion of the Motion is denied.

Initials of Preparer