## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

STEVEN G. MILLETT, MELODY J. MILLETT,  )
On Behalf Of Themselves and All Others  )
Similarly Situated,                     )
                                        )
            Plaintiffs,                 )
                                        )    Case No. 05-599-SLR
v.                                      )
                                        )
TRUELINK, INC.,                         )    **REDACTED VERSION**
A Trans Union Company,                  )
                                        )
            Defendant.                  )

## DEFENDANT TRUELINK INC.'S RESPONSE
## TO PLAINTIFFS' PURPORTED FACTUAL STATEMENT

William M. Lafferty (#2755)
**Morris, Nichols, Arsht & Tunnell LLP**
1201 N. Market Street
Wilmington, DE 19899
Phone: (302) 658-9200
Fax: (302) 658-3989

Of Counsel:
Michael O'Neil
Paula D. Friedman
**DLA Piper US LLP**
203 North LaSalle Street, Suite 1900
Chicago, IL 60601-1293
Phone: (312) 368-4000
Fax:   (312) 236-7516

Counsel for Defendant

Original Filing Date: October 29, 2007
Redacted Date: November 5, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| STEVEN G. MILLETT, MELODY J. MILLETT, | ) | |
| On Behalf Of Themselves and All Others | ) | |
| Similarly Situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 05-599-SLR |
| v. | ) | |
| | ) | |
| TRUELINK, INC., | ) | |
| A Trans Union Company, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT TRUELINK INC.'S RESPONSE
TO PLAINTIFFS' PURPORTED FACTUAL STATEMENT**

Defendant TrueLink, Inc., now known as Trans Union Interactive, Inc. ("TrueLink"), by its attorneys, submits this Response to Plaintiffs' Purported Factual Statement and states as follows:

Plaintiffs' Motion for Partial Summary Judgment ("Motion") (and not their corresponding Brief in Support) includes a 14-page so-called "Factual Statement." These "facts" are essentially listed in more than 90 separate, but un-numbered paragraphs, citing what purports to be evidence supporting each factual assertion.

Upon review of the evidence cited, it is clear that plaintiffs have, at a minimum, taken significant liberties in characterizing the record evidence, frequently mischaracterizing it. In other instances, Plaintiffs have referenced lengthy excerpts of deposition transcripts or group exhibits without identifying the particular page on which the document relied. In still other instances, with all due respect, Plaintiffs have misdescribed the record. For the convenience of this Court, and in order to identify the factual assertions made by the Plaintiffs that are unsupported by the cited record or are otherwise disputed, Plaintiffs have undertaken to number

in handwriting each paragraph of Plaintiffs' Factual Statement included in Plaintiffs' Motion. A copy of the version with consecutively-numbered paragraphs is attached hereto as Attachment 1.

Set forth below, with citations to the newly-numbered paragraphs of Plaintiffs' Factual Statement, are TrueLink's responses to Plaintiffs' various assertions of "fact," which TrueLink contests, clarifies and/or disputes for purposes of Plaintiffs' Motion for Partial Summary Judgment.[1]

A.    **Plaintiff Melody Millett was a Sophisticated Purchaser of Credit Monitoring Products Who Understood that TrueLink's Credit Monitoring Product Would Not Monitor Information Not Found in Mr. Millett's Credit Report.**

1.    The Milletts' primary complaint in this action is that TrueLink's credit monitoring failed to provide "complete identity theft protection" as allegedly advertised because it did not alert the Milletts to the prior misuse of Mr. Millett's social security number ("SSN"). (Pl.'s Factual Stmt., ¶¶11-12, 26, 28, 34-37, 46; Deposition of Melody Millett ("M. Millett Dep.") a true and correct copy of which is attached hereto as Exhibit A, 246:7-247:25).

2.    Ms. Millett, however, was a sophisticated purchaser of credit monitoring well before she purchased TrueLink's product on behalf of her husband on August 6, 2003 and she knew that the product would not monitor information outside of the purchaser's Trans Union credit report, such as the use of a purchaser's SSN by another. Shortly after the Milletts first discovered in August 2002 that an individual by the name of Abundio Perez or Abundio Cuatle Perez ("Mr. Perez") had misused Mr. Millett's SSN, Ms. Millett contacted the three major credit bureaus – Equifax, Experian and Trans Union, LLC ("Trans Union") – requesting Mr. Millett's credit report. (Deposition of Steven Millett ("S. Millett Dep."), a true and correct copy of which

---

[1] TrueLink hereby incorporates its Statement of Facts set forth in its Motion for Partial Summary Judgment filed with this Court on October 1, 2007, as well as the separate motions to strike the report of Plaintiffs' opinion witness Mr. Dimbert and the Motion to Strike plaintiff Melody Millett's affidavit.

is attached hereto as Exhibit B, 82:17-83:18).  Notably, none of the credit reports contained information relating to any other individual, including Mr. Perez.  (Id. at 83:7-22).

[REDACTED]

For nearly one year before purchasing TrueLink's credit monitoring, she also purchased credit monitorings from Equifax (on August 29, 2002) and Experian (on August 5, 2003).  (M. Millett Dep., 243:14-245:14; Millett00765, a true and correct copy of which is attached hereto as Exhibit C; Millett00869-70, a true and correct copy of which is attached hereto as Exhibit D).

[REDACTED]

(M. Millett Dep., 32:9-33:5, 33:20-34:12).  Ms. Millett was not satisfied with the bureaus' refusal to provide the information.


[REDACTED]

(M. Millett Dep., 146:17-19)



3.    After purchasing credit monitoring products from both Equifax and Experian, and knowing that "Trans Union might have information which Equifax and Experian did not have. . . because the three bureaus have three separate databases," Ms. Millett was intent upon buying a credit monitoring that would monitor Trans Union's credit report.  (M. Millett Dep., 230:10-19; 328:18-329:11; Pl's Resp. to Interrogatory No. 6, a true and correct copy of which is attached hereto as Exhibit E).         [REDACTED]

, on August 6, 2003, Ms. Millett visited

TrueLink's TrueCredit website and purchased TrueLink's Credit monitoring on her husband's behalf. (Millett00882, a true and correct copy of which is attached hereto as Exhibit F).

**B.    TrueLink Markets Its Credit Monitoring Product as Monitoring Information in the Purchaser's Trans Union Credit Report.**

4.    The Milletts allege that TrueLink advertised that its credit monitoring would protect against general identity theft or fraud and provide "complete identity theft protection." (Plaintiffs' Factual Stmt., ¶¶11-12, 20, 26, 34-37, 46), and that these advertisements were incorporated into TrueLink's terms of the contract (Plaintiffs' Factual Stmt., ¶¶9, 19).    As an initial matter, visitors to TrueLink's TrueCredit website are free to view the pages of TrueLink's website as well as the terms of the contract before making a purchase.  (Danaher Dep., 173074; Duni Dep., 114).  The terms of the contract at issue do not incorporate the advertisements on TrueLink's web pages into the contract, but simply state that the website describes the services available through TrueLink.  (D.I. 126, Ex. N).

5.    The advertising viewed by Ms. Millett on August 6, 2003, explicitly stated that the product monitors only the information included in that purchaser's Trans Union credit report, and nothing more.  (Millett00871, a true and correct copy of which is attached hereto as Exhibit G).  Trans Union -- but not TrueLink – is a "consumer reporting agency" which may not disclose credit history information except as permitted by the Fair Credit Reporting Act, 15 U.S.C. §1681 et seq ("FCRA").  Because the FCRA permits consumers to review their own credit information maintained by credit bureaus, TrueLink is permitted to obtain Mr. Millett's information – and only Mr. Millett's information - for his review and upon his request.  15 U.S.C. §1681b(a)(2) (permitting disclosure as directed by the consumer).  Notably, Trans Union is not permitted to disclose information from Mr. Perez's credit file without his written instruction, or some other "permissible purpose."  See id. §1681b(a).

6.      The Milletts' claims arise from the representations on TrueLink's webpage viewed by Ms. Millett on August 6, 2003 and which allegedly prompted her to subscribe to credit monitoring on behalf of her husband. (See Ex. G). This webpage produced by the Milletts states, in pertinent part, as follows:

> Protection: Complete identity theft protection with weekly fraud-watch emails.
>
> \*      \*      \*
>
> As a member, you'll receive ALL THIS –
>
> > **Weekly Fraud-Watch Emails**                    Learn More
> > • Receive weekly email alerts to changes in your report
> > • Immediately find out about credit report changes including fraudulent activity, new inquiries, new accounts, late payments and more

(Id.) (emphasis added).    Thus, the phrase "complete identity theft protection" was clearly presented with reference to the weekly fraud-watch emails.  The webpage made clear that those weekly fraud-watch emails alert the customer only to "changes in your report." (Emphasis added).  The language used to market TrueLink's Credit monitoring stresses that the product monitors only the credit report of the purchaser and not that of other individuals.

7.      In support of their allegations that TrueLink represented that its monitoring product would provide "complete identity theft protection," the Milletts cite to numerous pages of advertisements which include the following statements:

> • "You'll always be up-to-date about credit report changes and early warning signs of identity fraud."
> • "With Credit Monitoring you'll be up-to-date with your credit, informed about any fraudulent activity, and certain about your credit standing."
> • "You can secure your credit, your identity, & your peace of mind for just $9.95/year with the Web's most affordable credit monitoring service – weekly Credit Alerts.  Stay informed about your credit and your identity – without even lifting a finger."
> • "You can secure your credit, your identity, & your peace of mind for just 12 cents a day with TrueCredit's award-winning Credit Monitoring services."

> • "You have anti-theft & protection devices for your home. . . and
> your car. . . But what about your identity? Now you can secure
> your credit, your identity, & your peace of mind for less than 3 cents
> a day."

(Pl.'s Factual Stmt., ¶¶11, 12, 26; Pl.'s Memo. p. 9) (emphasis added). These pages relied upon by the Milletts are a hodgepodge of non-sequential, partial, undated documents. Notably, the text of first page cited by the Millett's states that the customer will be "up-to-date about <u>credit report changes</u>," further supporting TrueLink's position that it clearly advised that the product would monitor only the information in Steven Millett's Trans Union credit report. Perhaps most importantly, the Milletts fail to cite to a single piece of evidence in the record – because there is none - that they ever viewed any of these advertisements or relied upon them in purchasing TrueLink's Credit monitoring.

## C.    TrueLink's Contractual Disclaimers Were Necessitated by Industry Norms and Were Common in the Industry.

### i.    TrueLink Limits its Liability as to the Accuracy of Information Contained In Its Product.

8.    The Milletts allege that TrueLink improperly limits the implied warranties of merchantability and fitness for a particular purpose by disclaiming all warranties in its contracts for the purchase of the Credit monitoring. (Pl's Factual Stmt. ¶¶49-50). Disclaimers such as the ones included in TrueLink's contracts, however, are not only common in the direct-to-consumer credit reporting industry, but are necessary.

9.    Prior to purchasing Truelink's Credit monitoring from the TrueCredit website, the purchaser must first agree to the terms and conditions of the Credit Monitoring Member Agreement. TrueLink's Credit Monitoring Member Agreement includes the following disclaimer:

> OUR SITE, INCLUDING ALL CONTENT, MEMBERSHIPS,
> PRODUCTS AND SERVICES MADE AVAILABLE ON OR

ACCESSED THROUGH THIS SITE, IS PROVIDED TO YOU
"AS IS." TO THE FULLEST EXTENT PERMISSIBLE UNDER
APPLICABLE LAW, NEITHER TRUELINK NOR ITS
AFFILIATES MAKE ANY REPRESENTATION OR
WARRANTIES OF ANY KIND WHATSOEVER AS TO THE
CONTENT, MEMBERSHIPS, PRODUCTS OR SERVICES
AVAILABLE ON OR ACCESSED THROUGH THIS SITE OR
THAT THE PRODUCT OR SERVICES WILL BE ERROR-FREE.
IN ADDITION, TRUELINK AND ITS AFFILIATES DISCLAIM
ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING
TITLE, MERCHANTABILITY, AND FITNESS FOR A
PARTICULAR PURPOSE, NON-INFRINGEMENT AND
INFORMAL CONTENT.

(D.I. 126, Ex. N, p.2). Truelink's Credit Monitoring Member Agreement also includes a section

entitled "Fair Credit Reporting Act," advising the purchaser before they buy the product that, if

they would like to obtain a "full disclosure of information in [their] file," they must obtain that

disclosure directly from the credit reporting agency:

> The Fair Credit Reporting Act allows you to obtain a disclosure
> from every credit reporting agency of the nature and substance of all
> information in your file at the time of the request. Full disclosure of
> information in your file at a credit reporting agency must be
> obtained directly from such credit reporting agency. The credit
> reports provided or requested through our site are not intended to
> constitute the disclosure of information by a credit reporting agency
> as required by the Fair Credit Reporting Act or similar laws…

(Id. at 5) (emphasis added). Even the Privacy Policy that Ms. Millett viewed prior to purchasing

the Credit monitoring on her husband's behalf included the following statement, necessarily

disclaiming the accuracy of the information in a purchaser's credit report:

> TrueCredit is not responsible for and cannot amend the information in your
> credit report, which is produced by one or more credit reporting agencies.

(Millett00875, a true and correct copy of which is attached hereto as Exhibit H) (emphasis

added). This document also advises the potential purchaser of how to correct any inaccuracies in

his credit report.

**ii.    Disclaimers Such as Those Utilized by TrueLink are Standard in the Direct-to-Consumer Credit Reporting Business Because of the Nature of the Industry.**

10.    As the Milletts recognize, the credit reporting industry cannot absolutely ensure that all information provided by data furnishers to credit reporting agencies and set forth in credit reports are absolutely accurate. (Pl.'s Factual Stmt., ¶¶15, 37, 73, 88). According to the Federal Trade Commission, the credit reporting industry relies on data furnished by tens of thousands of data furnishers, necessitating the inclusion of disclaimers in credit monitoring member agreements and the Milletts' own documents support the fact that such disclaimers are necessary. (Report to Congress under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003, Ex. H to D.I. 126, pp.8-16). Errors are inevitable, as the entire industry is based upon the sharing of information without confirming its validity and, as Ms. Millett recognized before she purchased TrueLink's Credit monitoring, not all data furnishers even report information to all three of the major credit bureaus. (Id. at 12). Errors may result because a data furnisher provided a credit reporting agency – such as Trans Union – with incorrect or incomplete information, or no information at all about a consumer. (Id.)

11.    The FCRA does not require accuracy in the information delivered by consumer reporting agencies like Trans Union; it requires only that the agencies follow "reasonable procedures to assure maximum possible accuracy of the information" that they report. (Id. at 17). According to the FTC report relied upon by the Milletts, the very terms used by Congress in the FCRA - "reasonable procedures"  and "maximum possible accuracy" - recognize that absolute accuracy is impossible as practical matter. (Id. at 17, n.53, citing FCRA § 607(b), 15 U.S.C. § 1681e(b)).

      **iii.    Disclaimers Such as Those At Issue Here are Also Used by TrueLink's Competitors as well as the Credit Reporting Agencies.**

12.    As evidenced by the documents produced by the Milletts in this lawsuit, both Experian and Equifax include substantively identical disclaimers as those used by TrueLink in their terms and conditions of use applicable to credit monitorings.  (A true and correct copy of Experian's and Equifax's Terms of Use are attached hereto, respectively, as Exhibits I and J).

13.

[REDACTED]

**D.    Melody Millett's Alleged Belief that the Product Would Monitor Information Outside of Steven Millett's Trans Union Credit Report is Based On the Phrase "Complete Identity Theft Protection."**

14.    The Milletts base their belief that TrueLink's Credit monitoring would monitor Steven Millett's SSN on the phrase "complete identity theft protection" taken out of the context in which it appeared on TrueLink's advertisement viewed by Ms. Millett on August 6, 2003.  (M. Millett Dep., 241:6-243:13; 550:17-551:11 (testifying that she believed the product would provide "complete identity theft protection" for all types of identity fraud); see also, Ex.  E,

Resp. to Interrogatory Nos. 12, 15).

[REDACTED]        Ms. Millett stated that "[i]t's my testimony that [TrueLink was] going to give me information relating to my husband's social security number. . . because they are advertising complete identity theft protection." (M. Millett Dep., 246:7-247:25)(emphasis added).    Ms. Millett's reading of TrueLink's advertisement completely ignores the remainder of the advertising present on that same webpage, i.e., "with weekly fraud-watch emails" that alert the purchaser to "changes in your report." (M. Millett Dep., 247:13-25).    Mr. Millett also believed that TrueLink's Credit monitoring didn't work because "[i]t doesn't tell you if someone is using your social security number" and "it said it could protect me from identity theft." (S. Millett Dep., 50:19-51:8, 112:2-17).

15.    Ms. Millett, however, separately recognizes that TrueLink could not be understood as promising "complete identity theft protection" when she explicitly states that "no reasonable person" would expect TrueLink's Credit monitoring to advise the purchaser of when another individual uses that purchaser's SSN on an employment application, but the employer never contacts Trans Union. (409:1-410:25).[2]

**E.    Ms. Millett Understood that TrueLink's Credit Monitoring Product Would Not Monitor Information Outside of Mr. Millett's Trans Union Credit Report.**

16.    The Milletts allege that TrueLink admits that the phrase "complete protection from identity theft" is vague and ambiguous and that credit monitoring cannot protect consumers from identity theft. (Pl.'s Factual Stmt., ¶¶20-22).    The Milletts however deceptively mix the meanings of terms used in their written discovery requests -- which the Milletts' counsel defined

---

[2] The Milletts also allege that TrueLink advised customers to "relax and have 'peace of mind' because credit monitoring had been paid for." ((Pl.'s Factual Stmt. ¶92).    The Milletts attempt to support this nonsensical statement with a citation to advertising on an unknown date and upon

-- with the terms used on the TrueLink website. (Pl.'s Memo. p. 9-10). As an initial matter, and contrary to the plaintiffs' assertions in their brief, Truelink did not admit that "from 2001 until 2006, the advertising on some or all web pages stated that credit monitoring offered by defendant, or its successors or predecessors in interest, contained a statement that "complete identity theft protection" was available. (Id. at 9). To the contrary,

[REDACTED]

TrueLink explicitly denied that the phrase "complete identity theft protection" was used in advertisements for credit monitoring during calendar year 2006. (Id. at Response to Request No. 17).

17.    In its Response to Plaintiffs' First Requests For Admission, Truelink also objected to the plaintiffs' definition of "Identity Theft" as vague and ambiguous. (Id. at p. 2). Truelink further objected to the plaintiffs' definition as unclear because the term "identity theft" referenced in certain requests for admission was not clearly included or intended to refer to the term "Identity Theft." (Id.) In its Response to Request for Admission No. 1, Truelink expressly premised its admission on the definition created and provided by the Milletts. (Id. at p. 3).

18.    As noted above, Ms. Millett testified that "no reasonable person" would read TrueLink's use of the phrase "complete identity theft protection" and believe that TrueLink's Credit monitoring would protect against the use of an individual's SSN where such use was never reported to Trans Union. (M. Millett Dep., 409:1-410:25).

---

which Ms. Millett did not rely when purchasing the product (D.I. 126, Ex. M), as well as a TrueLink training manual. (Millett Appx., Ex M).

19.

[REDACTED]                                    (M. Millett

Dep., pp. 121-24, 144-46, 149-50, 173-75, 261).

[REDACTED]                If the Milletts truly expected

TrueLink's product to alert them to the existence of <u>all</u> accounts associated with Steven Millett's

SSN (even those that do not appear on his credit report),

20.    The Milletts also allege that TrueLink sent "electronic mail to consumers telling

those consumers that there was no need to be concerned about their credit." (Factual Stmt., ¶84).

The Milletts, however, fail to support their allegation with anything more than a reference to a

document setting forth the watch interactions and the Affidavit of Melody Millett, neither of

which support such a statement.  In fact, the record evidence shows that the Milletts received no

such email.  (TrueLink 9/5/03 E-mail, a true and correct copy of which is attached hereto as

Exhibit K).  Without question, in its first (and subsequent) email alerts, TrueLink advised the

Millett's that its Credit monitoring monitored only the subscriber's credit report, and nothing

more.

[REDACTED]

(TrueLink 9/5/03 E-mail, a true and correct copy of which is attached to TrueLink's Motion for Partial Summary Judgment as Exhibit G).

[REDACTED]

21.

. Mr. Millett testified he realized at that point that TrueLink would not advise of activity occurring outside his credit report, and he advised his wife of that conclusion. He also realized then that his wife's assumption as to what the product would do was wrong. (S. Millett Dep., pp. 144-51).

22.    The Milletts never called TrueLink's customer service to question

[REDACTED]

(M. Millett Dep. p. 99). Nor did the Milletts ever request (as they do in this Court) a refund from TrueLink for their purchase of a credit monitoring which, they now contend, was not what was expected. (S. Millett Dep. p. 39). Instead, for more than three (3) years the Milletts paid for the product, and never even affirmatively canceled their subscription, but merely permitted the subscription to lapse in November, 2006 by not providing TrueLink with a new debit card number when their previous debit card expired. (M. Millett Dep. pp. 85-86). It is undisputed that the Milletts found value in the product. In fact, Ms. Millett stated in an interview with the New York Times newspaper that the Milletts "still have [TrueLink's TrueCredit] credit monitoring because of the simple fact that it is the best tool available at this time." (S. Millett Dep., p. 44; M. Millett Dep. P. 318).

**F.    The Milletts Did Not Rely on TrueLink's Advertising When They Decided to Purchase the Product.**

23.    The Milletts knew that they were going to purchase a credit monitoring that would monitor their Trans Union credit report before they went to the TrueLink TrueCredit website on August 6, 2003.    As noted above, the Milletts had already purchased credit monitorings that monitored Steven Millett's Equifax and Experian credit reports and wanted to monitor his Trans Union report as well.    Furthermore, even after having received the emails from TrueLink reaffirming the fact that the product monitored only the credit report of the subscriber, the Milletts continued to purchase the product and never affirmatively cancelled, but simply let lapse, their subscription.    What is more, in July 2004, Ms. Millett posted on her Creditmonitoringsucks blog that she was aware of two types of identity theft, "True Name Fraud" and "SSN Only Fraud" and she knew at that time that the credit monitoring would provide notice of "True Name Fraud" (M. Millett Dep., 546:13-24, 547:21-548:16 See also July 2004 blog of M. Millett, a true and correct copy of which is attached hereto as Exhibit T). Finally, Mr. Millett even acknowledged that if TrueLink had told him that that the product would only alert him to changes in his credit report – even after testifying that he understood that the product would "be checking to see if there was activity on my credit report" - before he purchased the product, "he might have bought [the product]" anyway.    (S. Millett Dep., 115:7-16, 119:14-18).

**G.    The Milletts Allegations' Relating to Alleged Product Failures.**

**i.    Allegations Relating to a "Watch Set Failure."**

24.    The Milletts allege that TrueLink was aware that the "watch" status of a customer could change so that the subscriber was no longer receiving alerts and that, "on several

occasions," the "watch" was not in place on Mr. Millett's credit file although Mr. Millett was being charged for the subscription. (Pl.'s Factual Stmt. ¶¶31-32, 78-83, 93).

25.

[REDACTED]

26.

[REDACTED]

27.

[REDACTED]

28.

[REDACTED]

29.    At the time that Ms. Millett purchased TrueLink's credit monitoring on behalf of her husband, subscribers to the product were charged quarterly for their subscription by an automatic credit card payment. (Anderson Aff., ¶12).

[REDACTED]

30.

31.

32.

33.

34.

35.

36.

ii.    **Allegations Relating to Blank Alerts.**

37.    The Milletts also allege that some consumers received alerts informing them that a change had occurred in their credit report, but no such change had, in fact, occurred or the alert was blank.  (Pl.'s Factual Stmt. ¶33).

38.

[REDACTED]

iii.    **Allegations Relating to "CoreFail."**

39.    The Milletts allege that TrueLink did not tell consumers the reasons why a "CoreFail" may have occurred and allege that a "CoreFail" is the reason why "monitoring could not be activated." (Pl.'s Factual Stmt., ¶¶41-43, 47).

40.

41.

42.

43.

44.    A CoreFail never occurred with Mr. Millett's subscription. (Anderson Aff., ¶28).

**H.    The Milletts Allegations Relating to Credit Denials are Irrelevant and Have Been Withdrawn.**

45.    The Milletts allege in conclusory fashion that they suffered credit denials without providing any evidence as to why they believe TrueLink is responsible for such denials or how the alleged failures of TrueLink's credit monitoring resulted in those credit denials.    (Pl.'s Factual Stmt., ¶¶56-58).    The Milletts never explain how these alleged denials of credit are relevant to their claims against TrueLink here.

46.    In fact, both Ms. Millett and the Plaintiffs' Counsel have explicitly stated that they are irrelevant and that discovery relating to the credit denials was irrelevant as well.    (M. Millett Dep., 154:25-155:6; S. Millett Dep., 157:7-15).    Specifically, when asked at her deposition whether she holds TrueLink responsible for any denial of credit that either she or her husband may have suffered, Ms. Millett said no, and rhetorically noted "TrueLink is not a credit reporting agency, how could they be responsible for a denial of credit?"    (M. Millett Dep., 154:25-155:9).    As alleged in the Fourth Amended Complaint, the credit denials related to the plaintiffs' claims under the FCRA have also been voluntarily dismissed by the Milletts, rendering their allegations relating to the credit denials entirely irrelevant.    (Pl.'s Resp. to Truelink's First Request for Production, Resp. to Request No. 35 a true and correct copy of which is attached hereto as Exhibit S).

**I.    The Milletts' Allegations Relating to a Home Depot, JC Penny and Monogram Bank of Georgia Credit Account Are Unsupported by the Factual Record.**

47.

[REDACTED]

Contemporaneously with the filing of its opposition to the Milletts' Rule 56 motion,

TrueLink is filing its Motion to Strike the Affidavit of Melody Millett (which is incorporated herein by references) because it fails to meet requirements set forth in Rule 56 of the Federal Rules of Civil Procedure, as Ms. Millett provides absolutely no factual support for the conclusory statements made in her affidavit.[3]  Aside from the Affidavit of Melody Millett, the Milletts fail to cite to a single piece of evidence in the record that would support – or even explain – the meaning or relevance of the assertion that unspecified data in the possession of unspecified persons was "mixed."

[REDACTED]

**J.    The Only Facts Relevant Before to the Milletts' Motion Are Those Relating to the Advertisements Viewed By Ms. Millett and the Contract Entered Into By Mr. Millett Before Purchasing TrueLink's Credit Monitoring Product.**

48.    The Milletts make numerous allegations in their Factual Statement that are irrelevant to their Motion for Partial Summary Judgment.  For example, the Milletts make broad generalizations regarding Kansas consumers that are immaterial to their Motion, such as: "it is important to Kansas consumers to know whether or not someone else is reporting the consumer's personal information," (Factual Stmt., ¶8), and that Kansas consumers believe that the use of an individual's SSN by another is a form of identity theft.  (Factual Stmt., ¶44).  Not only are these statements immaterial and completely irrelevant, but also, they rely solely on the opinions of Mr. Dimbert, as derived from his random questioning of nonparties in a Kansas shopping mall.  For

---

[3] The Milletts also cite to the Affidavit of Melody Millett in support of their allegations in paragraph's 62-65.  (Pl.'s Factual Stmt., ¶¶62-65).  The Milletts have failed to show that no genuine issue of material fact exists with regard to all allegations citing to Ms. Millett's Affidavit because Ms. Millett provides no factual support for the statements she makes in that Affidavit.

the reasons set forth in Truelink's Motion to Strike Expert Report of Ronald Dimbert, filed contemporaneously herewith, this Court should ignore these allegations.

49.    The Milletts' allegations relating to TrueLink's use of "uniform contracts" in the sale of its credit monitoring are also immaterial to their Motion. (Factual Stmt., ¶¶ 7, 10, 16, 17). Relatedly, and as noted above, the Milletts' allegations that TrueLink used the phrase "complete identity theft protection" in its advertisements from 2001-2006 is not only a mischaracterization of the factual record for the reasons set forth in Section E above, but is also immaterial to the Motion before this Court. (Factual Stmt., ¶¶ 20, 21, 23).

**K.    The Milletts Mischaracterize TrueLink's Discovery Responses.**

50.    In addition to the mischaracterizations of TrueLink's written discovery responses set forth in Section E above, the Milletts deceptively misstate TrueLink's position at numerous points throughout their Factual Statement.    For example, the Milletts make the following misstatements:

- The Milletts allege that TrueLink is "unaware of information that is available in a consumer's credit report or its credit file maintained by Trans Union or any other credit reporting agency. (Pl.'s Factual Stmt., ¶13).    Interrogatory No. 19, however, requested information "which is <u>not</u> contained in the credit reports or consumer statements or information statements or information statements that you provide to the purchasers of Credit Monitoring." (D.I. 126, Ex. I, p. 11) (emphasis added).

- The Milletts cite to TrueLink's Response to Plaintiffs' First Requests for Admission, Nos. 8 and 9, for the allegation that "[u]nauthorized use of another person's Social Security number constitutes identity theft. (Pl.'s Factual Stmt., ¶25). TrueLink, however, never admitted such a statement and, in fact, explicitly denies it and only admits in Response No. 9 that "in light of Plaintiffs' offered definition of "Identity Theft" that "use by one person of another person's <u>name, address and Social Security number to open a credit account constitutes identity theft</u>." (D.I. 126, Ex. L, p. 4).

- The Milletts cite to TrueLink's Response to Plaintiffs' First Requests for Admission, No. 35, in support of their allegation that "[t]he information contained on a 'credit report,' as that term is utilized in Defendant's advertising, would not provide all of the information that a person would need to detect all forms of identity theft." (Pl.'s Factual Stmt., ¶28).    TrueLink's admission, however, is expressly based upon the

Milletts' definition of "Identity Theft," which compelled the "Admission." (D.I. 126, Ex. L, p. 12).

**L.     The Milletts Mischaracterize Deposition Testimony or Fail To Attach the Relevant Cited Pages.**

51.     Throughout their Factual Statement, the Milletts either misstate deposition testimony in support of their allegations, or simply fail to attach the cited pages. For example, the Millett's misstate or fail to attach deposition testimony in support of the following allegations:

- Defendant's corporate officers take the position that identity theft is limited to that information shown on one's 'credit report' and that there is economic harm when the consumer's credit is adversely affected by the false attribution of credit data to the consumer's 'credit file.' (Factual Stmt., ¶14).
  In support, the Milletts cite to pages 106-107 of Mr. Danaher's deposition, neither of which even address economic harm. The Milletts also cite to pages 20, 183-184 of Ms. Anderson's deposition, which also do not mention economic harm.

- "Defendant's own employee, Brian Matis, admits that protecting Defendant's customers from identity theft would be impossible because it would be akin to protecting oneself from being involved in an automobile accident." (Pl.'s Factual Stmt., ¶27).
  In support, the Milletts, cite to pages 79-80 of Mr. Matis' deposition. They, however, fail to state that the question to which Mr. Matis was responding was "can one of your customers completely protect themselves from identity theft" and not whether TrueLink's credit monitoring – which monitors only the subscriber's credit report - can protect subscribers.

- "Defendant represented that purchase of credit monitoring would protect a purchaser from identity theft. By supplying a purchaser with unlimited or frequent access to one's credit report, a consumer was, allegedly, protected from identity theft." (Pl.'s Factual Stmt., ¶34).
  In support, the Milletts cite to pages 24-25, 122-23 of Mr. Danaher's deposition. They, however, fail to attach pages 24-25 and 122, and the sole attached page does not support the contention.

- "The 'credit report' was represented to be the tool by which a consumer could obtain the information necessary to protect herself from identity theft or be alerted to ongoing identity theft." (Pl.'s Factual Stmt., ¶35).
  In support, the Milletts cite to pages 15-16 and 183 of Ms. Anderson's deposition, which do not support this allegation.

- "Defendant's chief executive officer was aware that Defendant's customers purchased credit monitoring when they were about to make a major purchase; the customer required information about an accurate credit score or scores. Defendant's chief executive officer was also aware that customers purchased credit monitoring when the purchaser was concerned about identity theft." (Pl.'s Factual Stmt.,¶51).

   In support, the Milletts cite to pages 23-24 of Mr. Danaher's deposition, which do not support this allegation.

- "The only notification a consumer would receive from TrueLink is for a specific, limited type of credit fraud." (Pl.'s Factual Stmt., ¶52).
   In support, the Milletts cite to pages 117-118 of Mr. Danaher's deposition, and page 184 of Ms. Anderson's deposition, none of which support this allegation. The Milletts also cite to, but do not attach, pages 35-36 of Ms. Duni's deposition.

- "The defendant's chief executive officer was aware that purchasers made their decision to purchase the product because they were concerned about identity theft." (Pl.'s Factual Stmt., ¶53). In support, the Milletts cite to pages 2103-2106 of Mr. Danaher's deposition, which do not exist.

- The Milletts cite to the various deposition testimony to support their allegations that credit files were not always able to be matched, that more than one person could be reporting credit information about Defendant's purchasers and that more than one person "is" reported to a credit reporting agency with the same SSN. (Pl.'s Factual Stmt., ¶¶73-75). The deposition testimony cited, however does not support these allegations.

## M.    In Addition to the Instances Cited Above, The Milletts Mischaracterize Additional Facts in the Record.

52.    In addition to the instances noted above, the Milletts also misstate facts in the record as follows:

- "Defendant could only access and supply that information posted for its customers which Defendant's parent corporation, Trans Union, supplied" and "this information does not include all the information in a consumer disclosure . . . or Trans Union credit file.". (Factual Stmt., ¶¶15, 72).
   The Milletts rely on  pages 25-28 of Mr. Danaher's deposition, which actually <u>refutes</u> the very allegation for which the Milletts cite it. Mr. Danaher testifies that TrueLink could access information from all three credit bureaus. (Millett Appx., Ex. K, 27:4-14). While it is unclear what the Milletts mean by the term "credit file," TrueLink specifically informs consumers that the consumer disclosure may contain other additional information in its Credit Monitoring Member Agreement. (D.I. 126, Ex. N, p. 5).

- "Plaintiff Steven Millett, through his spouse and agent, decided to have her physically enroll him online for the credit monitoring and other products of Defendant because he thought it would help them. (Factual Stmt., ¶54). The Plaintiff cite to the entire deposition transcript of Mr. Millett and fail to point to any specific statement where he makes such an assertion.

- "Defendant was notified before August 11, 2004, that it was in violation of the Kansas Consumer Protection Act." (Factual Stmt., ¶89).
  In support of this allegation, the Milletts cite to the Waiver of Summons signed by Counsel for Trans Union (Millett Appx., Ex. T). This allegation, however, is completely baseless because Trans Union, and <u>not</u> TrueLink was the named defendant at the time that the Waiver of Summons was signed.

- "Defendant, the wholly owned subsidiary of Trans Union, LLC, a credit reporting agency, produced a report to Named Plaintiffs that it had gross net profits as high as 65%. . . [note-ck this number]." (Factual Stmt., ¶90).
  This statement makes little sense, as TrueLink cannot understand how a profit can be both gross and net at the same time. Further, the nonsensical nature of the statement is further supported by the Milletts' counsels' own internal annotation to "ck this number." Counsel apparently never "checked" this assertion, as TrueLink found no reference to a 65% figure in the document cited by the Milletts.

- "Defendant, at any time during the terms of the contract, could elect to stop providing some facet of its service. (Factual Stmt., ¶ 30)
  As an initial matter, the cited contracts do not support the contention. In any event, TrueLink never elected to stop providing services to Mr. Millett.

While there are many other factual misstatements in the Millett's purported Factual Statement, TrueLink addresses the above material facts simply to highlight the failure of the Milletts' submissions (and their credibility before this Court).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


By: /s/ Jay N. Moffitt
          William M. Lafferty (#2755)
          Jay N. Moffitt (#4742)
          1201 N. Market Street
          Wilmington, DE 19899
          Phone:  (302) 658-9200
          Fax:  (302) 658-3989

OF COUNSEL:
Michael O'Neil
Paula D. Friedman
DLA PIPER US LLP
203 North LaSalle Street, Suite 1900
Chicago, IL 60601-1293
Phone: (312) 368-4000
Fax:    (312) 236-7516

October 29, 2007