# EXHIBIT A

1

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3

4    STEVEN G. MILLETT,

5    MELODY, J. MILLETT,

6    On Behalf of themselves

7    And all others similarly situated,

8                    Plaintiffs,

9    vs.                    No. 05-599-SLR

10    TRUELINK, INC.,

11    A Trans Union Company,

12                    Defendant.

13

14

15            VOLUME I

16

17        DEPOSITION OF MELODY J. MILLETT, a

18    Plaintiff, taken on behalf of the Defendant

19    before Nissa M. Sharp, CSR, CCR #528, pursuant

20    to Notice on the 3rd of May, 2007, at the

21    offices of CLOON LAW FIRM, One Hallbrook Place,

22    11150 Overbrook Road, Suite 350, Leawood,

23    Kansas.

24

25



**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

2

```
1                    APPEARANCES
2          Appearing for the Plaintiffs was MS. B.
3    JOYCE YEAGER of YEAGER LAW FIRM, LLC, City
4    Center Square, 26th Floor, 1100 Main Street,
5    Kansas City, Missouri 64105.
6          Also appearing for the Plaintiffs was
7    MR. BRYSON R. CLOON of CLOON LAW FIRM, One
8    Hallbrook Place, 11150 Overbrook Road, Suite
9    350, Leawood, Kansas 66211.
10         Appearing for the Defendant were
11   MR. MICHAEL O'NEIL and MS. HEATHER SCHUMAN of
12   DLA PIPER US, LLP, 203 North LaSalle Street,
13   Suite 1900, Chicago, Illinois 60601-1293.
14         Also present was Leda Gipson of MCR
15   VIDEO.
16                    INDEX
17   WITNESS:                          PAGE:
18     MELODY J. MILLETT
19       Examination by Mr. O'Neil        4
20
21
22
23
24
25
```



9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

32

1    conduct an identity theft investigation.

2         Q.    And who did you retain at that point?

3         A.    That was when we retained Adler in

4    2003, and that wasn't until March I believe.

5         Q.    And how much did you pay Mr. Adler for

6    his services?

7         A.    I believe it was approximately $2,000.

8         Q.    And what did Mr. Adler do for you?

9         A.    Mr. Adler was specifically retained to

10   write letters to the credit bureaus, Bank of

11   America and Ford Motor Credit so that they would

12   appear to come from the law offices of.  Because

13   I was not getting any response out of any of the

14   three credit bureaus, Ford Motor or Bank of

15   America, on our identity theft issues.  And I

16   felt that at this point in time I needed to

17   start documenting the fact that no one would

18   help me and no one work on any of our issues.

19        Q.    Did Mr. Adler ever correspond with the

20   defendants that you had later sued?

21        A.    He corresponded with all of the

22   defendants that we later sued, with the

23   exception of I believe Fair Isaac, which was the

24   credit scoring piece.  And I believe that Adler

25   did not correspond directly with TrueLink.  I

33

1    think he was talking or communicating with

2    TransUnion and Experian and Equifax.  And the

3    same thing would hold true with like Equifax

4    with EIS versus ECS, or Experian which is now

5    consumerinfo.com.

6        Q.    Uh-huh.  Were you satisfied with

7    Mr. Adler's services?

8        A.    Well, at the time, yes, I sure was.

9        Q.    Are you satisfied today?

10       A.    I'm satisfied with the services that he

11   has provided, the services that he was

12   contracted to provide.

13       Q.    At some point, did you decide that you

14   were going to start suing companies?

15       A.    I'm sorry?

16       Q.    Well, did there come a point in time

17   when you decided that you were going to start

18   suing companies?

19       A.    Yeah, that would be late 2003.

20       Q.    Okay.  And why did you decide to sue

21   companies at that point?

22       A.    Because we had no other choice.  There

23   was no way we were going to get our lives back

24   unless we started suing people because nobody

25   was listening.



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

34

1        When you write repeated letters and you

2   make repeated phone calls, and then your lawyer

3   makes repeated letters -- writes repeated

4   letters, makes repeated phone calls, and then a

5   second sets of lawyers starts making and writing

6   letters and making repeated phone calls and

7   nobody wants to fix your problem and your life

8   is being adversely impacted, you get to the

9   point where you are backed in the corner and you

10  are left with no alternative but to avail

11  yourself of the system of government we have

12  here in the United States.

13      Q.   So, in late 2003, what was your

14  complaint with TransUnion that lead you to sue

15  them?

16      A.   Well, because at that point in time I

17  believed that the product that we had purchased

18  was being produced by TransUnion.

19      Q.   And what product is that, ma'am?

20      A.   That would be the True Credit product.

21      Q.   Well, is that the credit monitoring

22  product?

23      A.   Yes, True Credit is the credit

24  monitoring product brought to you by TransUnion.

25      Q.   Did you have complaints about any other

80

1      under California statute or Delaware statute or

2      Kansas statute, have you?

3          A.    No, we don't have that kind of

4      conversation.  But I'm sure my lawyer has called

5      me up and said these are your available options,

6      you know, we would recommend that you pursue

7      this option.  So, then I either agree or I don't

8      agree or we agree or we don't agree and then we

9      go forward.

10         Q.    Are you aware that there is a provision

11     in the contract between TrueLink and your

12     husband that says what law governs any claims

13     that might arise from that contract?

14         A.    Yes, I am aware of that now, yeah.

15         Q.    Okay.  When did you first become aware

16     of that?

17         A.    I think it was after that -- we were

18     putting a lawsuit together that that, you know,

19     it's in the fine print.  I mean, that agreement

20     is how many paragraphs long, I think, you know,

21     20, 30, I don't know.

22         Q.    Did you ever read that agreement?

23         A.    Yeah, I skimmed it.

24         Q.    Okay.

25         A.    I mean, do you read every single



**Metropolitan**
C O U R T   R E P O R T E R S

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

1    agreement that you get for every single piece of

2    software you ever install from top to bottom?

3        Q.   I don't generally answer questions in a

4    deposition, but I'll tell you no.   I don't.   But

5    you know what, if I'm going to sue somebody on a

6    class-wide basis for it, yeah, I'm going to read

7    it.

8                    MS. YEAGER:   I'm going to object

9    to the --

10       Q.   (BY MR. O'NEIL) Are you seeking any

11   money for you and your husband as part of this

12   settlement?

13       A.   Well, I believe there would be

14   statutory relief under the Kansas Consumer

15   Protect Act, and I believe there would be the

16   matter of the contract breach and the fees paid

17   on behalf for the product that is the subject of

18   the breach.

19       Q.   So, you want the money back that you

20   paid for the products that you're not satisfied

21   with; is that right?

22       A.   Yes.

23       Q.   Do you want all the money back?

24       A.   Well, yeah.   For the class, yes, of

25   course.



1    that that information was still not presenting

2    in the product.  The fact that we had had false

3    alert triggers on and off throughout 2005, I

4    believe was the year that those were occurring

5    in.  That it serves no purpose, so I just

6    discontinued it.

7         Q.    Prior to November of 2006, you

8    discontinued it?

9         A.    No.  I didn't renew -- the last charge

10   was in November of 2006, and I've not placed a

11   new credit card in there.

12        Q.    Was November 2006 when you came to the

13   conclusion that there was no purpose for

14   purchasing the credit monitoring service?

15        A.    No.  It was when I made the conscious

16   decision to go in there and end it.  TrueLink's

17   monitoring service is a negative opt-in.  You

18   must specifically opt out or the subscription

19   continues automatically through no interference

20   or whatever of your own.

21        Q.    Did you ever cancel it affirmatively?

22        A.    What do you mean affirmatively?

23        Q.    Meaning what you just said, that you

24   called TrueLink and said cancel it?

25        A.    I already answered that, and I said no.



**Metropolitan**
C O U R T  R E P O R T E R S

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

86

1    I allowed the subscription to lapse by not

2    giving them a new credit card number with the

3    correct expiration date.

4        Q.    Because you told the "New York Times"

5    reporter that there was some value to credit

6    monitoring, right?

7        A.    I told the "New York Times" reporter

8    that it was the best tool available, but it was

9    not as advertised.

10       Q.    Right.  And that you had continued to

11   purchase the product, right?

12       A.    Well, you still have to be able to look

13   at your credit report, sir.

14       Q.    Okay.  So, when you had the

15   conversation with the reporter for the "New York

16   Times", you still thought that there was value

17   in the credit monitoring service, right?

18       A.    Not the monitoring service.  There is

19   value in having access to your credit report on

20   an ongoing basis, especially when you already

21   know you're a victim of identity theft.

22   However, it is not complete identity theft

23   protection as is advertised.

24       Q.    Is that what TrueLink advertises?

25       A.    I believe that's what was on their



Metropolitan
C O U R T   R E P O R T E R S

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

# EXHIBIT A
# PAGES 90-91 REDACTED

99

1        Q.    You didn't send it, right?

2        A.    No, I did not.

3        Q.    Okay.  And you never called TrueLink

4    and said I was expecting to see accounts

5    relating to Mr. Perez on my husband's credit

6    file and I didn't see it?  You never made that

7    call to TrueLink, did you?

8        A.    No, I didn't.

9        Q.    Did you -- strike that.

10             I'm going to show you an exhibit,

11   Mrs. Millett.

12                  (M. Millett Exhibit 9 was marked

13   for identification by the reporter.)

14       Q.    (BY MR. O'NEIL) Mrs. Millett, I'm

15   showing you what's been marked Exhibit No. 9,

16   which I -- which I'll represent to you is the

17   complaint that was filed in the district -- in

18   the federal court in the District of Kansas on

19   behalf of you and your husband suing the seven

20   companies that you identified previously.

21       A.    Yes.

22       Q.    And you saw this before it was filed,

23   right?

24       A.    Oh, yes.

25       Q.    And you made sure that it was accurate,



# EXHIBIT A
# PAGES 121–122 REDACTED

123

1      A.   No.

2      Q.   Oh, okay.

3      A.   The information was somewhat helpful,

4  but, you know, I don't -- you're trying to

5  characterize it as, you know, TransUnion is

6  being altruistically helpful, and they're just

7  giving this information to me of their own free

8  will, and I don't see it that way.

9      Q.   I don't think that's what I asked you,

10  but.  Let me make sure I understand.  The

11  information was helpful in investigating

12  Mr. Perez's misuse of your Social Security

13  number; isn't that correct?

14      A.   Yes, the information was somewhat

15  helpful, yes.

16      Q.   And TransUnion didn't charge you

17  anything for that information; isn't that

18  correct?

19      A.   TransUnion didn't charge me anything

20  for the information?

21      Q.   Right.

22      A.   No, TransUnion did not charge me

23  anything to send that letter, but it cost me

24  money.

25      Q.   The letter cost you money?

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

# EXHIBIT A
# PAGE 124 REDACTED

# EXHIBIT A
# PAGES 144-147 REDACTED

# EXHIBIT A
# PAGES 149-150 REDACTED

# EXHIBIT A
# PAGE 154 REDACTED

1    for any denial of credit that you or your

2    husband may have suffered?

3         A.   Well, to the extent that I guess

4    TrueLink is not a credit reporting agency, how

5    could they be responsible for a denial of

6    credit?  I don't understand that.

7         Q.   So the answer is no, right?

8         A.   Well, the answer is no, but I don't

9    agree with that premise necessarily.

10        Q.   What premise?  Was there a premise in

11   my question?

12        A.   No.  There's a premise in your

13   contract.  TrueLink asserts in its contract that

14   it's not a credit reporting agency, and that

15   their documents do not -- their reports do not

16   have to be Fair Credit Reporting Act compliant

17   because they're not a credit reporting agency.

18        Q.   Well, the issue, Mrs. Millett isn't

19   whether or not they're a credit reporting

20   agency, the issues is -- to your knowledge,

21   TrueLink has never disclosed information

22   regarding your husband to anybody other than you

23   and your husband, right?

24        A.   Well, I don't know who TrueLink sells

25   data to.  So, I couldn't answer that question.



# EXHIBIT A
# PAGE 157 REDACTED

# EXHIBIT A
# PAGES 173-175 REDACTED

230

1      A.   What do you mean?  I mean, if I had the

2  -- any notes that I have, have already been

3  produced.

4      Q.   Well, we don't have any -- we haven't

5  seen any notes of any conversations you had with

6  people from TrueLink.  So, would that suggest to

7  you that there are no such notes?

8      A.   That would be probably a fairly

9  accurate assumption.

10     Q.   Okay.  Why did you decide to buy

11 products from TrueLink on behalf of your husband

12 in August of 2003?

13     A.   Because at that time we were only

14 monitoring one bureau.

15     Q.   And that was Equifax, right?

16     A.   That was Equifax.

17     Q.   So you wanted to monitor Mr. Millett's

18 file at TransUnion?

19     A.   Yes, and Experian.

20     Q.   Okay.  And what were you, specifically,

21 were you hoping to learn of as part of buying

22 that service?

23     A.   Any future activity that would occur

24 with Mr. Millett's Social Security number, or

25 any of the fraudulent accounts, or any



238

```
 1        more than just tell you how much you owed,

 2        right?  I mean, for example, the very first page

 3        of Exhibit 15.  That doesn't tell you how much

 4        you're going to have to pay, does it?

 5            A.    10.95 per quarter.

 6            Q.    Okay.  Did you read the text on the

 7        first page of Exhibit 15 prior to deciding to

 8        purchase the product?

 9            A.    Yes.

10            Q.    Did you read all of it?

11            A.    I read a lot of this, yes.

12            Q.    Directing your attention to the very

13        first page, did you read all of the text on that

14        first page before you decided to buy the

15        product?

16            A.    Well, like I probably didn't read this

17        little box down here where it says "example

18        credit trending."  I mean, you know, I read the

19        basic text that's on the page.

20            Q.    Well, on the right-hand side of the

21        page, it tells you what you're going to get as

22        part of the product, right?

23            A.    Yes.

24            Q.    Did you read that part?

25            A.    Oh, yeah.
```



239

```
 1        Q.   Oh okay.  And then on the far right of
 2   each of those four categories, it says, says
 3   "learn M" but I'll represent to you it says
 4   "learn more."  Okay?
 5        A.   It probably was cut off because this is
 6   one of those elongated pages that --
 7        Q.   Sure.
 8        A.   -- didn't want to print right.
 9        Q.   Do you recall, did you click on these
10   "learn more" links to learn more about the
11   characteristics of the product that you were
12   about to buy?
13        A.   I probably read all of this and then
14   read -- clicked the "yes keep me informed"
15   button.
16        Q.   So, then is it your testimony that you
17   did not click on the "learn more" links
18   associated with each of the four categories of
19   information?
20        A.   No, that's not what I'm representing to
21   you.
22        Q.   Okay.  That's my question, that's
23   why --
24        A.   I can't say that before I signed up for
25   the product I clicked the "learn more" buttons,
```



**Metropolitan**
COURT ▮ REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

1    because I may not have.  But I may have done so

2    at a later date.

3         Q.    Okay.

4         A.    And so I may have a copy in here of the

5    "learn more" and I may have actually read those

6    pages.

7         Q.    All right.

8         A.    But I can't recall in what order I

9    might have viewed that information, only that

10   I've probably viewed every page that's out there

11   on the TU site at some point in time or other

12   now.

13        Q.    The TU site?

14        A.    The TU, TrueLink, whoever it is now.

15        Q.    Okay.  Well, I think it's important

16   that we understand what site we're talking

17   about, wouldn't you agree?

18        A.    Well, as I sit here, it still says

19   "TransUnion" at the top.

20        Q.    Okay.  Let me go back to the question I

21   asked some time ago.

22        A.    Okay.

23        Q.    Do you know if you ever clicked on the

24   "learn more" hyperlinks which is reflected on

25   the first page of Exhibit 15?



241

1          A.    I couldn't answer that one way or the

2      other.

3          Q.    Okay.  Because you don't know, right?

4          A.    I don't know for sure, no.  I could

5      have and I also could not have.

6          Q.    The top of the page says "Knowledge,

7      protection, convenience."  Do you see that,

8      ma'am?

9          A.    Yes.

10          Q.    Says, "Knowledge, quarterly access to

11      your credit report with the analytical tools,"

12      right?

13          A.    Yes.

14          Q.    Okay.  Did you read that?

15               MS. YEAGER:  I'm so to interrupt.

16      What page are we on?

17               MR. O'NEIL:  First page.

18               THE WITNESS:  We're on the first

19      page.

20          A.    Yes, I read that.

21          Q.    (BY MR. O'NEIL) Okay.  And then going

22      down in the right-hand side, it describes your

23      weekly fraud watch e-mails.  I mean, that was

24      the main thing that you were getting as part of

25      the credit monitoring service, right?

# EXHIBIT A
# PAGES 243-245 REDACTED

246

1    the letter.

2        Q.    According to you, according to your

3    testimony this morning, they only did it after

4    your lawyer threatened litigation.  Do you

5    recall that testimony?

6        A.    That is correct.

7        Q.    Okay.  So, you thought that even though

8    you weren't threatening TrueLink with litigation

9    on August 6, 2003, and everything that you knew

10   -- and I'm not going to go through it now

11   because our record's pretty clear about what you

12   knew and what your dealings were with TransUnion

13   prior to August 6, 2003, the record is what it

14   is -- are you telling me that on August 6, 2003,

15   you honestly believed that TrueLink was going to

16   give you information that TransUnion wouldn't?

17   Is that your testimony?

18       A.    It is my -- yes, it is my testimony.

19   It's my testimony that they were going to give

20   me information relating to my husband's Social

21   Security number, yes, it is.  Because they're

22   advertising complete identity theft protection.

23       Q.    I'm going to answer -- ask the question

24   again.  Is it your testimony that on August 6,

25   2003, you thought you can get information from



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

247

1    TransUnion through TrueLink that TransUnion

2    itself wouldn't give you?

3        A.    Yes, that's correct.

4        Q.    And the reason why you thought that,

5    ma'am?

6        A.    Because their marketing material

7    advertises complete identity theft protection,

8    so I thought that they would be getting

9    information relating to protecting someone from

10   identity theft and the fraudulent use of Social

11   Security number in the future from the data

12   product purchase.  That's what I thought, yes.

13       Q.    Even though it says the weekly e-mail

14   alerts would only alert you to changes in

15   Mr. Millett's report?

16                MS. YEAGER:  Objection.

17   Foundation.

18       A.    I'm sorry?

19       Q.    (BY MR. O'NEIL) You thought that even

20   though you were expressly advised that the

21   weekly fraud watch e-mails would only alert you

22   to changes in Mr. Millett's report?  You thought

23   that?

24       A.    Well, we've already -- yes, I still

25   thought that.



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

1          A.    I thought this was it.

2          Q.    Okay.  That's your understanding?

3          A.    I thought this was it.

4          Q.    Okay.  Do you recall having to click "I

5     agree" to a contract before you could get the

6     services from TrueLink?  I'll tell you it's not

7     in there, so you can look all you want.

8          A.    No, I'm looking for the part in the

9     paragraph where it says you have to click "I

10    agree".

11         Q.    It's -- what I'm telling you, ma'am,

12    it's not in there.  You can look all you want,

13    but it's not in there.  That's why I asked you

14    the question, which is really separate and apart

15    from what you're looking at.  As you sit here

16    today, do you recall reading the credit

17    monitoring membership agreement on the

18    TransUnion website when you were establishing

19    the account on behalf of your husband?

20                    MS. YEAGER:  Objection.

21    Foundation.

22         A.    Well, I read parts of it, because there

23    is it is right there.

24         Q.    (BY MR. O'NEIL) Okay.  Do you remember

25    this morning joking about how it's got 20



**Metropolitan**
COURT ▮ REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

258

1    paragraphs and it's so long and who reads that

2    stuff?  Do you remember that?

3        A.    Yes.

4        Q.    Okay.   What's your recollection?   Did

5    you read the first sentence?   Did you read none

6    of it?  Did you skim it?  I think you said you

7    skimmed it this morning?

8        A.    Yep.

9        Q.    Okay.   Do you recall when you skimmed

10   the membership agreement in August of 2003, did

11   it have any reference to the fraud resolution

12   services?

13       A.    Yes.

14       Q.    You do recall that?

15       A.    I do recall some of it.

16       Q.    Okay.

17       A.    Yeah.

18       Q.    And did it tell you that they'd be

19   presented by Promise Mark?

20       A.    Well, the advertisement on the page

21   represented that, so I don't know that I

22   remember that the agreement specifically says

23   that, but it is part of my recollection.

24       Q.    Were you acting as an agent for your

25   husband when you clicked "I agree" to the credit



**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

# EXHIBIT A
# PAGE 259 REDACTED

# EXHIBIT A
# PAGE 261 REDACTED

# EXHIBIT A
# PAGE 266 REDACTED

318

1    the best tool available at this time."

2        A.    And what's the rest of sentence?

3        Q.    "It is not ideal, it is broken and it

4    is not as advertised."   Is that an accurate

5    statement?

6        A.    That's the statement, yes.

7        Q.    Okay.  So, it's still valuable enough

8    for you to continue using it and continue buying

9    it; isn't that correct?

10        A.    Well, I'm not buying it anymore, am I?

11        Q.    Well, you did for years and years and

12    years after you claimed that it didn't work?

13        A.    And I don't deny that.

14        Q.    Okay.  And the only reason why you're

15    not buying it today is because your credit card

16    changed and you didn't give the company a new

17    credit card?

18            MS. YEAGER:   Objection.

19    Misstates --

20        Q.    (BY MR. O'NEIL) Isn't that right?

21            MS. YEAGER:   -- the testimony.

22        A.    No.   I just -- I elected not to go in

23    there and put in a new credit card when it

24    arrived.  So, to that extent that's why it's no

25    longer going on.

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

328

1      Q.    Did your lawyers change the text of the

2      answers that you provided to them before they

3      finalized it and sent it to counsel for

4      TrueLink?

5      A.    I believe they went back and forth

6      several times.

7      Q.    Between you and the lawyers?

8      A.    Uh-huh.

9      Q.    Okay.  So they made some changes and

10     you made some changes, is that how it worked?

11     A.    Yeah.

12     Q.    Okay.  Now, there's several places --

13     well, let's just -- response to Interrogatory

14     No. 6, and I apologize these pages are not

15     numbered, but if you look at Interrogatory No.

16     6.

17     A.    Uh-huh.

18     Q.    The interrogatories there describe in

19     detail all instances in which plaintiff has

20     purchased credit report, etc.  Do you see that,

21     ma'am?

22     A.    Yeah.

23     Q.    And then the answer -- and then there's

24     a lot of objections, but the real answer comes

25     in the next page.  It says here, "We knew that



# EXHIBIT A
# PAGE 329 REDACTED

348

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF DELAWARE

3

4      STEVEN G. MILLETT,

5      MELODY J. MILLETT,

6      On Behalf of themselves

7      And all others similarly situated,

8                     Plaintiffs,

9      vs.                     No. 05-599-SLR

10     TRUELINK, INC.,

11     A Trans Union Company,

12                    Defendant.

13

14

15                    VOLUME II

16

17         CONTINUED DEPOSITION OF MELODY J.

18     MILLETT, a Plaintiff, taken on behalf of the

19     Defendant before Nissa M. Sharp, CSR, CCR #528,

20     pursuant to Notice on the 13th of July, 2007, at

21     the offices of CLOON LAW FIRM, One Hallbrook

22     Place, 11150 Overbrook Road, Suite 350, Leawood,

23     Kansas.

24                                        

25



9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

349

1                          APPEARANCES

2              Appearing for the Plaintiffs was MS. B.

3    JOYCE YEAGER of YEAGER LAW FIRM, LLC, City

4    Center Square, 26th Floor, 1100 Main Street,

5    Kansas City, Missouri 64105.

6              Also appearing for the Plaintiffs was

7    MR. BRYSON R. CLOON of CLOON LAW FIRM, One

8    Hallbrook Place, 11150 Overbrook Road, Suite

9    350, Leawood, Kansas 66211.

10             Appearing for the Defendant were

11   MR. MICHAEL O'NEIL and MS. HEATHER SCHUMAN of

12   DLA PIPER US, LLP, 203 North LaSalle Street,

13   Suite 1900, Chicago, Illinois 60601-1293.

14             Also present was Lisa Hargis of MCR

15   VIDEO.

16                            INDEX

17   WITNESS:                              PAGE:

18     MELODY J. MILLETT

19       Continued Examination

20       By Mr. O'Neil                       351

21       Examination by Ms. Yeager           554

22       Examination by Mr. O'Neil           571

23

24

25



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

399

1        Q.    And this is the report that you

2    referred to earlier and that was referenced in

3    Exhibit 25, right?

4        A.    Right.

5        Q.    Okay.  And you've read this, haven't

6    you?

7        A.    Yeah, uh-huh.

8        Q.    And --

9        A.    I'm fairly familiar with this, yes.

10       Q.    Okay, let me turn your attention to

11    Page 5.

12       A.    Uh-huh.

13       Q.    And here the Identity Theft Resource

14    Center is identifying three main forms of

15    identity theft, right?

16       A.    Yes.

17       Q.    And you've seen this before, haven't

18    you?

19       A.    Uh-huh.

20       Q.    Okay.  And your husband didn't suffer

21    any of these forms of identity theft, did he?

22       A.    Actually, that would be the financial

23    identity theft paragraph where it says, "theft

24    involves impostor's use of personal identifying

25    information, primarily the Social Security

**Metropolitan**
COURT REPORTERS    9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

400

1    number."

2        Q.    Okay.  So, of the three forms of

3    identity theft that the Identity Theft Resource

4    Center has identified, you believe that

5    Mr. Millett suffered the first form?

6        A.    He would be included in the first form,

7    yes.

8        Q.    Okay.  Well, let's read the whole

9    sentence that you quoted from.  It says,

10   "Financial identity theft involves the

11   impostor's use of personal identifying

12   information, primarily the Social Security

13   number, to establish new credit lines in the

14   name of the victim."  Do you see that?

15       A.    Uh-huh.  Right.

16       Q.    I mean, Mr. Abundio, or whatever his

17   name is, never established credit lines in the

18   name Steven Millett, did he?

19       A.    No, he did not.

20       Q.    Okay.  I think we --

21            MR. O'NEIL:  How much time do we

22   have left on the tape?

23            VIDEOGRAPHER:  Four.

24            MR. O'NEIL:  Four, okay, well,

25   let's keep going then.



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

401

1    Q.    (BY MR. O'NEIL) Let me direct your

2    attention to Page 11, Mrs. Millett.

3    A.    Yes.

4    Q.    And there is a heading "Financial

5    Identity Theft," which is the type of identity

6    theft that you believe your husband suffered,

7    right?

8    A.    Well, no, I don't believe my husband

9    suffered.  In 2003, Social Security number fraud

10   and true name fraud were all aggregated under

11   the same type of identity theft.  The types of

12   identity theft have been evolving since this

13   original survey was done in 2003, so.

14   Q.    So, Social Security number identity

15   theft did not exist in 2003?

16   A.    Well, it didn't exist as a separate

17   category.

18   Q.    Oh.  Has the Identity Theft Resource

19   Center now issued something that says there's

20   another type of identity theft called "Social

21   Security number identity theft"?

22   A.    The people, the people who control the

23   definitions of identity theft are the FTC, the

24   Federal Trade Commission.

25   Q.    Okay.

1          You testified earlier that you recall

2    in August of 2003 you thought TrueLink was

3    promising your husband complete identity theft

4    approximately.  Do you recall that testimony?

5          A.    Yes.

6          Q.    Okay.  So, in August of 2003, did you

7    believe that TrueLink could prevent somebody

8    from using your husband's Social Security number

9    on an employment application?

10          A.    If true -- if TransUnion was contacted

11    for the background check, then, yeah, that

12    should be the case.

13          Q.    Okay.  So, you recognize that it

14    wouldn't provide complete identity theft

15    protection under all circumstances?

16          A.    Well, only as it would relate to

17    TransUnion's data.

18          Q.    So, if Mr. Abundio Perez used your

19    husband's Social Security number on a job

20    application, but the employer never sought data

21    from TransUnion, that would still be identity

22    theft, right?

23          A.    Oh, yes, it would still be identity

24    theft.

25          Q.    Okay.  But you never thought that

1    TrueLink would prevent that type of identity

2    theft, right?

3        A.    I'm sorry?

4        Q.    You never thought that -- and, well,

5    no, in August of 2003, you didn't think that

6    that type of identity theft would be prevented

7    by buying credit monitoring from True Credit,

8    right?

9        A.    Only to the extent that the background

10   check used for the employment was pulled from

11   one of your subsidiaries, yeah.

12       Q.    Okay.  Well, I'll go back to my

13   original question because that was my

14   hypothetical.

15       A.    Uh-huh.

16       Q.    Mr. Perez uses your husband's Social

17   Security number on an employment application but

18   the employer never contacts TransUnion.  You

19   never thought that your husband would be

20   protected by that type of identity theft by

21   buying credit monitoring, right?

22       A.    No, and no reasonable person would.

23       Q.    Because you have to read those types of

24   things reasonably, right?

25       A.    Yes.



546

1       Q.    I'm sorry?

2       A.    I said it's got the Experian exhibit

3    number on the corner.

4       Q.    Yeah.  Is this a printout from a blog?

5       A.    No, this is a printout from a forum.

6       Q.    I thought you said Fight Back was a

7    blog?

8       A.    She has a blog page, but this is the

9    forums.

10       Q.    Got it.  So, it's a printout from a

11    forum on a blog?

12       A.    Right.

13       Q.    The first posting, is that by someone

14    who goes by the name "creditmonitoringsucks"?

15       A.    Yes.

16       Q.    Okay, is that you?

17       A.    Yes.

18       Q.    Okay.  And so the verbiage on -- wow --

19    so, all of the verbiage on this forum is all

20    written by you; is that right?  On this exhibit

21    at least.

22       A.    On this posting, yes.  This is an

23    individual single posting.  Notice it says "Post

24    No. 1."

25       Q.    So what does that mean?


**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511. • 913.317.8800 • FAX 913.317.8850

547

1      A.    That's the first posting in the thread.

2  Somebody else could come in behind me and make

3  additional postings.  And as I testified in the

4  Experian case, there was one thread that they

5  produced where other people were responding and

6  they -- I had to tell them that that was not me

7  because that was additional posters.

8      Q.    Lawyers don't know this stuff.

9      A.    Right, I understand that and I'm a

10  technical person, so I'm just explaining it.  So

11  this is Post No. 1.

12      Q.    You do better with the appellate

13  process than I do with postings, so I guess you

14  got me there.  And so this is the first posting

15  that people can respond to.  However, you also

16  responded to other people's postings, right?

17      A.    Some, but not much.  Mostly I posted

18  stuff for people to --

19      Q.    Uh-huh.

20      A.    -- have as reference material.

21      Q.    Now, on the first page, you identify

22  two types of identity theft, right?

23      A.    Yes.

24      Q.    Okay.  And those are the only two types

25  of identity theft that you discuss, right?



**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

```
 1          A.    At that time, yes.

 2          Q.    Okay.

 3          A.    Uh-huh.

 4          Q.    And then you define "true name fraud."

 5          A.    Uh-huh.

 6          Q.    And then you refer to something called

 7    "SSN only fraud"?

 8          A.    Correct.

 9          Q.    And it said, you say, "They say it is

10    the fastest growing."  Who's "they"?

11          A.    Well, I mean, like for example, the FTC

12    had sent out a -- when this was posted, there

13    was some kind of like news article or something

14    where they were talking about SSN fraud as being

15    the fastest form of identity theft.  So, it's

16    topical at that time period.

17          Q.    So, your recollection is that the FTC

18    identified SSN only fraud as the fastest growing

19    type of --

20          A.    It was a news article.  I don't

21    recall --

22          Q.    Okay.

23          A.    -- if it was the FTC or what entity is

24    the one that said it, but I think it was

25    somebody in the government because they're the
```

1    Q.    Okay.  So, in August of 2003, you

2    didn't understand that there were different

3    types of identity theft; is that right?

4    A.    Identity, I mean, to me identity theft

5    was identity theft.  I mean, we knew that our

6    identity theft involved the use of my husband's

7    Social Security number.  But, for example, I

8    didn't know about synthetic identity fraud, I

9    didn't know about mortgage fraud with the FHA.

10    I mean, there's so many different forms

11    of identity theft now that are out there that at

12    that point in time I wasn't necessarily aware of

13    all of them.

14    Q.    But my question was, were you aware

15    that there was more than -- there were types of

16    identity theft?

17    A.    Yeah, there were types of identity

18    theft and I knew that in August of 2003.

19    Q.    Okay.  And did you think that the

20    credit monitoring product that you purchased

21    from TrueLink would protect you and your husband

22    against all those types of identity theft?

23    A.    Well, it was advertising complete

24    identity theft protection.

25    Q.    Ma'am, can I just please have you



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8880

551

1      answer my question?  Rather than tell me

2      something else.  I was asking what you thought.

3           A.   Yes.

4           Q.   Okay.  So, just so the record's clear,

5      you thought in August of 2003 -- you were aware

6      that there were different types of identity

7      theft and you thought that the product that you

8      purchased on behalf of your husband would

9      protect against all of it?

10          A.   All of the ones that I knew about at

11     that point.

12          Q.   Okay.  Page 2 of Exhibit 37,

13     Mrs. Millett.

14          A.   Uh-huh.

15          Q.   Like the third paragraph down, there's

16     a paragraph that begins, "I know they exist, I

17     have personally seen them," do you see that?

18          A.   Yep.

19          Q.   Says, "I have copies of the TransUnion

20     sub file accounts from TransUnion."

21          A.   Yep.

22          Q.   What's that in reference to?

23          A.   That's a reference to the TU letter.

24     Has all the sub file accounts on it.  The

25     accounts that are on Abundio Perez's file.



# EXHIBIT B

1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF DELAWARE

3

4        STEVEN G. MILLETT,

5        MELODY J. MILLETT,

6        On Behalf of Themselves and

7        All Others Similarly Situated,

8                              Plaintiffs,

9        vs.                       C.A. No. 05-599-SLR

10       TRUELINK, INC.,           Class Action

11       a Trans Union Company,    Jury Trial Demanded

12                           Defendant.

13

14

15

16

17            VIDEOTAPED DEPOSITION OF STEVEN G.

18       MILLETT, a Plaintiff, taken on behalf of the

19       Defendant before Nissa M. Sharp, CSR, CCR #528,

20       pursuant to Notice on the 30th of March, 2007,

21       at the offices of THE CLOON LAW FIRM, 11350

22       Tomahawk Creek Parkway, Suite 100, Leawood,

23       Kansas.

24

25



**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

COPY

2

1                    APPEARANCES

2          Appearing for the Plaintiffs was

3    MR. BRYSON R. CLOON of THE CLOON LAW FIRM, 11150

4    Overbrook Road, Suite 350, Leawood, Kansas

5    66211.

6          Also appearing for the Plaintiffs was

7    MR. BARRY R. GRISSOM, 7270 West 98th Terrace,

8    Building 7, Suite 220, Overland Park, Kansas

9    66212.

10         Appearing for the Defendant was

11   MR. MICHAEL O'NEIL of DLA PIPER US, LLP, 203

12   North LaSalle Street, Suite 1900, Chicago,

13   Illinois 60601-1293.

14         Also present was Heather Schuman of DLA

15   Piper.

16                    INDEX

17   WITNESS:                        PAGE:

18      STEVEN G. MILLETT

19      Examination by Mr. O'Neil         4

20

21

22

23

24

25



33

1      A.   I think I should be reimbursed my

2  money, and everybody who bought the product get

3  their money back, Kansas Protection Act and

4  injunctive relief and my lawyers' fees paid.

5      Q.   How much in lawyers' fees have you

6  paid?

7                MR. CLOON:  I'm going to object

8  to the form of the question.  Lacks foundation.

9  Calls for speculation.  He has not idea what

10  hours we spent in this case.

11      Q.   (BY MR. O'NEIL) You can answer.

12      A.   I don't know.

13      Q.   Have you paid any money to your

14  lawyers?

15      A.   Yes.

16      Q.   How much?

17      A.   I've paid -- including my first lawyer?

18  Adler?

19      Q.   Are you seeking his fees in this case?

20      A.   Well, I've spent $12,000 on lawyer

21  fees.

22      Q.   Are all those $12,000 in connection

23  with the lawsuit that you brought against Trans

24  Union?

25      A.   I'm not understanding the question.

**Metropolitan**
C O U R T   R E P O R T E R S

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

34

1      Q.    Well, I'm asking you -- I've asked you

2   what do you want the Court to do, and you said

3   one of them is to pay your lawyers' fees, right?

4      A.    Right.

5      Q.    I'm asking what lawyers' fees do you

6   want them to pay?  You said $12,000, does that

7   include money spent for suing other people?

8      A.    I don't know.

9      Q.    Okay.

10      A.    Whatever they're asking, I guess.

11      Q.    I'm sorry?

12      A.    Whatever they're asking.

13      Q.    Who's asking?

14      A.    What -- I don't know what my lawyer

15   fees are.

16      Q.    Okay.  You also mentioned something

17   called injunctive relief?  What's that?

18      A.    Well, you're marketing is deceptive,

19   like disclaimers, and they're saying exactly

20   what this product does and does not do.

21      Q.    So what do you want the Court to do?

22      A.    Change you guy's marketing.

23      Q.    Okay.  Have you ever seen the marketing

24   our guy's marketing?

25      A.    I think when she first bought it, yeah.

35

1    I saw it online.

2         Q.    So, when your wife first bought the

3    Trans Union credit monitoring product --

4                    MR. CLOON:  I'm going to object

5    to the form of the question.  That misstates the

6    evidence.  You've maintained that it's not Trans

7    Union's product, it's Truelink's product.

8                    MR. O'NEIL:  I haven't maintained

9    anything.  I'm just asking the question.

10                   MR. CLOON:  Well, that's what the

11   pleadings state.

12                   MR. O'NEIL:  You know what, I

13   would rather -- if you're going to try to remind

14   your client of what the facts are, let's take a

15   break and you can do it there.  Let's not do it

16   here on the record.  I'm just --

17                   MR. CLOON:  Mike, I objected to

18   the form of the question because it misstated

19   the evidence.

20                   MR. O'NEIL:  Well, actually, I

21   didn't even get my question out before you

22   started objecting.  I'll withdraw it.

23                   MR. CLOON:  Because you used the

24   term "Trans Union".  You said "Trans Union's

25   product", and you've maintained in the pleadings



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

36

1    that it's not Trans Union's product, it's

2    Truelink's product.  Am I mistaken about that?

3              MR. O'NEIL:  I'm asking your

4    client about his knowledge.  He told me it was a

5    Trans Union product.

6              MR. CLOON:  But you've misled him

7    by saying it is a Trans Union product.  He's

8    stated on the record that he's got them all

9    confused.  He thinks Trans Union is a part of

10   Truelink.

11             MR. O'NEIL:  Okay.  I'll withdraw

12   the question, you know what, because it's a

13   waste of time.

14        Q.   (BY MR. O'NEIL) At some point in time,

15   your wife went online and bought a credit

16   monitoring product from either Trans Union or

17   Truelink, right?

18        A.   Correct.

19        Q.   Okay.  At that time, did you actually

20   see the website pages she was looking at?

21        A.   Yeah, I think it said protect me from

22   identity theft.

23        Q.   Uh-huh.  What else did it say?

24        A.   I can't recall.

25        Q.   Okay.



37

1     A.   I mean, that's the gist of it.

2     Q.   And so when you and your wife read

3  that, did you think, great, this product will

4  protect us from identity theft?

5     A.   Yes, sir.

6     Q.   Okay.  Of course, you were already a

7  victim office identify theft, that's your

8  position, right?

9     A.   Yes, sir.

10     Q.   Okay.  Has anybody else stolen your

11  identity since Mr. Perez did?

12     A.   As far as I know, no.

13     Q.   And, to your knowledge, has Mr. Perez

14  opened up any other accounts since you first

15  bought the product from Trans Union or Truelink?

16     A.   I can't answer that, I don't know.

17     Q.   Okay.  So, as you sit here now, you

18  don't have any evidence that there was any

19  additional misuse of your Social Security number

20  after your wife first bought the product?

21          MR. CLOON:  I'm going to object

22  to the form of the question.  Lacks foundation.

23  Calls for speculation.

24     A.   Can you repeat the question?

25     Q.   (BY MR. O'NEIL) I'll ask the court



**Metropolitan**  COURT REPORTERS  9200 INDIAN CREEK PARKWAY, SUITE 205  OVERLAND PARK, KANSAS 66210  1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

38

1       reporter to repeat the question for you,

2       Mr. Millett.

3                      (Whereupon, the requested portion

4       of the record was read by the reporter.)

5                      MR. CLOON:  Same objection.

6              A.     Correct.

7              Q.     (BY MR. O'NEIL) Okay.  You also

8       mentioned something about the KCPA.  Do you

9       recall saying that this morning?

10             A.     Who?

11             Q.     You also mentioned the Kansas Consumer

12      Protection Act?

13             A.     Right.  Right.

14             Q.     What's that?

15             A.     It's a law.

16             Q.     Do you know anything more about it?

17             A.     Well -- it's the Consumer Protection

18      Act, that's about all I know.

19             Q.     Okay.  You also said that you wanted to

20      have your money returned?

21             A.     Right.

22             Q.     What money do you want to have returned

23      to you?

24             A.     What we paid for the product.

25             Q.     The full amount that you paid for the



1   product you want returned to you?

2     A.   Well, it doesn't work, so we want our

3   money back.

4     Q.   Did you ever ask Trans Union or

5   Truelink for a refund?

6     A.   Not me personally, no.

7     Q.   Has somebody else?

8     A.   Well, my wife has.

9     Q.   Really?  When did she do that?

10     A.   Well, I think she's did that.  I

11   can't --

12     Q.   Okay, well, your lawyer a couple times

13   this morning said calls for speculation, I don't

14   want you to speculate.  I'm asking, do you have

15   any knowledge that anybody --

16     A.   My wife handled that.

17     Q.   So you don't have any knowledge then?

18     A.   Yes, sir.

19     Q.   Okay.  So, as far as you know, you've

20   never asked Trans Union or Truelink for a

21   refund, right?

22     A.   Correct.

23     Q.   And at some point in time, you and your

24   wife decided that this product doesn't -- it

25   doesn't work, right?

44

1    wife in your home?

2       A.    Right.

3       Q.    And are you aware that your wife made

4    statements about the lawsuits that you filed?

5       A.    I'm not aware exactly what she talked

6    about.

7       Q.    That wasn't my question, sir.  Are you

8    aware that your wife made statements about the

9    lawsuits that you have filed?

10      A.    Okay, yes.

11      Q.    Are you aware that she made statements

12   about the products which are the subject of the

13   lawsuits?

14      A.    I'm aware she talked about the

15   products.

16      Q.    Did you ever read that article that

17   featured your picture of you and your wife in

18   your home?

19      A.    No, I never read it.

20      Q.    Okay.  So, you're not aware that

21   Mrs. Millett said, quote, "I still have credit

22   monitoring because of the simple fact that it is

23   the best tool available at this time"?  You're

24   not aware she said that?

25      A.    No.


Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

1        A.    I think maybe I saw one.  Everything is

2    honky-dory.

3        Q.    Do you know how often your wife

4    received those e-mails?

5        A.    No, I can't answer that, I don't know.

6        Q.    Did you ever ask her, ask your wife, if

7    she ever got more than one e-mail from Truelink?

8        A.    No.  I don't recall asking her that.

9        Q.    Do you know when you purchased the

10   credit monitoring service from Truelink?

11       A.    I can't give you exact date.

12       Q.    Can you give me a rough date?

13       A.    I think it was like after the police

14   report or some time around there.

15       Q.    Okay.

16       A.    In general.

17       Q.    Do you know what year that was?

18       A.    I think it was 2003, I think.

19       Q.    And you told us today that you think

20   the product that Truelink sold to you doesn't

21   work, right?

22       A.    Yes, sir.

23       Q.    And could you tell me in what ways the

24   product doesn't work?

25       A.    Doesn't tell you if somebody's using

Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

51

1    your Social Security number.

2        Q.    Any other problems that you have with

3    the product?

4        A.    Well, it says it's supposed to protect

5    me from identity theft, I'm not even sure it

6    does that.

7        Q.    So you don't know?  It may, but you

8    don't know; is that right?

9        A.    Yes, sir.

10       Q.    Okay.  And to your knowledge, you

11   haven't been the victim of identity theft, other

12   than this use by Mr. Perez of your Social

13   Security number, right?

14       A.    That's correct.

15       Q.    Okay.  Any other problems that you have

16   with the Truelink credit monitoring service?

17       A.    I think you should change your

18   advertising.

19       Q.    So, you're not happy with the

20   advertising, right?

21       A.    Correct.

22       Q.    Okay.  But you haven't seen the

23   advertising since that very first day in 2003

24   since you looked at it, right?

25       A.    Correct.



82

1    this misuse of your Social Security number?

2        A.    I can't remember.

3        Q.    Well, did you do anything yourself to

4    investigate?

5        A.    I think I turned it all over to my

6    wife.

7        Q.    Why did you do that?

8        A.    Because she's better at numbers,

9    remembering.

10       Q.    Were you concerned when you discovered

11   that this gentleman was using your Social

12   Security number?

13       A.    Yes, sir.

14       Q.    And what were you concerned about?

15       A.    He was just out there buying up the

16   world.

17       Q.    Do you recall that you and your wife

18   decided you had to look at your credit reports

19   now that you've learned somebody was using your

20   Social Security number?

21       A.    Right.

22       Q.    Okay.  And did you do that?

23       A.    I think my wife did.

24       Q.    Okay.  And she got credit reports from

25   each of the three major credit bureaus, right?



**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

1      A.    Right.

2      Q.    Okay.  Did you ever look at those

3 credit reports?

4      A.    I, yeah, I -- I don't see anything,

5 remember anything specific, but I think I looked

6 at them.

7      Q.    And what was your purpose in looking at

8 those credit reports?

9      A.    I was just seeing if there was Abundio

10 Perez anywhere.

11      Q.    Was there?

12      A.    No, not that I recall, no.

13      Q.    So you got credit reports from Trans

14 Union, Experian and Equifax, right?

15      A.    Right.

16      Q.    Okay.  And none of those credit reports

17 had any mention of Mr. Perez, right?

18      A.    As far as I know, right.

19      Q.    And none of those credit reports had on

20 them credit accounts that were Mr. Perez's,

21 right?

22      A.    As far as I know, yes.

23      Q.    And none of those credit reports

24 indicated that your credit report had been

25 accessed by somebody who was considering giving



100

1    earlier, Mr. Millett, that when your wife first

2    purchased the credit monitoring product from

3    Truelink, that you were kind of -- you looked at

4    some of the marketing that was on the website at

5    that time?  Or maybe I'm wrong.  You know --

6    strike.

7        A.    I think --

8        Q.    Go ahead.

9        A.    Yeah, I think I said that.

10       Q.    Okay.  So, she, Mrs. Millett, purchased

11   the product over the internet, right?

12       A.    Correct.

13       Q.    And did she do it from her computer at

14   home?

15       A.    Right.

16       Q.    And were you sitting there with her in

17   front of the computer at the time?

18       A.    I was sitting behind her.

19       Q.    Okay.  Why was it that you were sitting

20   with her while she was buying the product?

21       A.    Because I was on my computer.

22       Q.    Oh, I see.  So you were in the same

23   room, but you were doing stuff on your own

24   computer?

25       A.    Right.



101

1       Q.   I see.  So, you weren't really watching

2  her go through each step of purchasing the

3  product, were you?

4       A.   No.

5       Q.   Okay.  Were you even looking at what

6  she was doing at that time?

7       A.   Well, I just kind of glanced over there

8  and read some stuff, and then I walked back to

9  my computer.

10      Q.   What were you reading?

11      A.   The -- what your opening statements

12  were.

13      Q.   You mean the statements on the website?

14      A.   Well, telling what about what the

15  product was, yeah.

16      Q.   Okay.  And why were you interested in

17  looking at that?

18      A.   Just to see what -- if you had any

19  disclaimers in there what you did and didn't do.

20      Q.   So, when you -- when your wife was

21  purchasing the product for you, you were

22  particularly interested in --

23      A.   Oh, I was just reading the activity

24  advertisement just seeing what you had in there.

25      Q.   Okay.  But you and your wife had

**Metropolitan**
C O U R T   R E P O R T E R S

102

1    already purchased credit monitoring products

2    from other companies, right?

3        A.    Right.

4        Q.    And so you were familiar with what the

5    product was, right?

6        A.    In general.

7        Q.    Okay.  And when your wife purchased the

8    products from the other companies prior to

9    purchasing it from Truelink, were you sitting

10    looking at the information on the website during

11    those earlier purchases?

12        A.    I don't think so.

13        Q.    Okay.  What were you doing on the

14    computer while your wife was purchasing the

15    product?

16        A.    I think I was playing some video game

17    or something.

18        Q.    Is there a reason why your wife was

19    purchasing the product instead of you?

20        A.    Why she was doing it?

21        Q.    Right.

22        A.    I just -- I think she was looking at it

23    and she said it was -- it could help us.

24        Q.    And do you recall that she provided her

25    e-mail address instead of yours?



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

107

1          A.    You'd have to ask her that.

2          Q.    Well, actually, I'm asking about your

3    knowledge.  To your knowledge, has she ever --

4          A.    No, I never physically saw her push the

5    buttons on the phone and called Truelink.

6          Q.    Okay.  Did she ever tell you that she

7    called Truelink?

8          A.    I don't remember.

9          Q.    Even if you hadn't seen her push the

10   buttons?  Did she ever tell you that she called

11   Truelink?

12         A.    She called a lot of people, I don't

13   remember who all she called.

14         Q.    Did she ever tell you that she called

15   Truelink?

16         A.    I don't think she ever said that, no.

17         Q.    Did she ever tell you that she was

18   unhappy with the products that were purchased

19   from Truelink?

20         A.    I don't ever recall her saying that

21   specifically, no.

22         Q.    Did you understand that in order to

23   purchase the product from Truelink, you had to

24   agree to the terms of the contract between you

25   and Truelink?

**Metropolitan**
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

# EXHIBIT B
# PAGE 108 REDACTED

# EXHIBIT B
# PAGE 112 REDACTED

115

1    Q.    Okay.  And do you understand that that

2    was the basis, one of the bases for the Court in

3    California dismissing some of the claims you

4    brought against Experian?

5    A.    Okay.

6    Q.    Okay.  So, go back to my original

7    question.  Are you saying that if you had been

8    told by Truelink that we're only going to alert

9    you to changes in your credit report, that you

10   would not have bought the product?

11   A.    I'm saying that if they would have said

12   what this product does and doesn't do, then, I

13   mean, we might have bought it and we might not

14   have bought it.  If it was all spelled up

15   instead of with the broad statement, well, this

16   is -- we protect you from identify theft.

17   Q.    With all due respect, sir, you don't

18   know what Truelink told you in August of 2003

19   about their product, isn't that correct, because

20   you didn't look at it?

21                  MR. CLOON:  I'm going to object.

22   That's argumentative.

23   Q.    (BY MR. O'NEIL) You can answer.

24   A.    Can you ask that question again?

25   Q.    With the exception of -- somehow this



119

1          Q.    Meaning three credit bureaus, right?

2     When you say "three in one", are you referring

3     to three credit bureaus?

4          A.    Right.

5          Q.    Okay.  I mean, you understand there's a

6     company called Trans Union?

7          A.    Right.

8          Q.    And that's a credit bureau?  Is that

9     your understanding?

10         A.    Right.

11         Q.    Do you have an understanding of the

12    business of Truelink?

13         A.    It's the credit monitoring.

14         Q.    What was your understanding back in

15    August of 2003 of what a credit monitoring

16    product is?

17         A.    It would be checking to see if there

18    was activity on my credit report.

19         Q.    Trans Union identified for you the

20    credit accounts for which Mr. Perez was using

21    the Social Security number; isn't that correct?

22         A.    Yes.

23         Q.    Was there some additional information

24    you wanted from Trans Union regarding those

25    accounts?

144

1          MR. O'NEIL:  Sure.

2          VIDEOGRAPHER:  We are now going

3     off the record at 1:46 PM.

4          (Recess.)

5          VIDEOGRAPHER:  One moment please.

6     It is now 1:54 PM and we are back on the record.

7     You may continue.

8     Q.    (BY MR. O'NEIL) Mr. Millett, do you

9     recall testifying this morning that you believed

10    you did see one of the e-mails that Truelink

11    sent to your wife?

12    A.    I think so.

13    Q.    And I think you said that it indicated

14    that everything was honky-dory.  Do you remember

15    that?

16    A.    Yes, sir.

17    Q.    Okay.

18          (Millett Exhibit 7 was marked for

19    identification by the reporter.)

20    Q.    (BY MR. O'NEIL) Let me show you what's

21    been marked Exhibit No. 7, which I'll represent

22    to you are some pages that were produced by your

23    lawyers in this case.  And, for the record, it

24    seems to be an e-mail from True Credit sent on

25    October 5, 2003.  Do you recall, is -- have you

## Metropolitan
COURT  REPORTERS

# EXHIBIT B
# PAGES 145–148 REDACTED

149

1      Q.   Did you tell her, you know, Melody, I'm

2   thinking that maybe this credit monitoring

3   service only tells me about my credit report and

4   not Mr. Perez's credit report?

5             MR. CLOON:   Object to form.

6   Leading and suggestive.

7      Q.   (BY MR. O'NEIL) You can answer.

8      A.   Can you repeat that, sir?

9      Q.   Sure, I'll rephrase it.  Did you

10  suggest to your wife that if what you say is

11  true, you were both mistaken in believing that

12  the credit monitoring service would alert you to

13  changes outside of your own credit report?

14     A.   I think we were thinking that we'd see

15  something on my credit report that he's out

16  there charging stuff, that's what my assumption

17  was.

18     Q.   And you never saw those?

19     A.   Right.  Correct.

20     Q.   So, your assumption was wrong, right?

21     A.   Right.

22     Q.   And you knew that pretty early on,

23  didn't you?

24     A.   We were just trying to compare

25  information between the three credit



Metropolitan
COURT REPORTERS

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

150

1    monitorings.

2        Q.    And they were all the same, no -- none

3    of those credit monitoring products by any of

4    those companies ever told you that Mr. Perez was

5    using your Social Security number; isn't that

6    correct?

7        A.    Yes.

8        Q.    Did you continue to believe, however,

9    that some day Truelink was going to provide that

10    information to you?

11        A.    Well, they shouldn't -- they shouldn't

12    advertise that they'd protect me from identity

13    theft, they just protect with name theft and

14    credit card.

15                    MR. O'NEIL:  Could you restate

16    the question for Mr. Millett?  I'll ask you to

17    answer the question.

18                    (Whereupon, the requested portion

19    of the record was read by the reporter.)

20        A.    Through their credit monitoring?

21        Q.    (BY MR. O'NEIL) Yes.

22        A.    No.

23        Q.    You realized you weren't going to get

24    that information through any credit monitoring

25    service, right?



Metropolitan
C O U R T  ▮  R E P O R T E R S

9200 INDIAN CREEK PARKWAY, SUITE 205
OVERLAND PARK, KANSAS 66210
1.800.748.7511 • 913.317.8800 • FAX 913.317.8850

1    A.    Correct.

2    Q.    And you realized that if you or your

3    wife in fact had actually believed that that was

4    what these services did, that you were wrong,

5    right?

6    A.    Yes, sir.

7    Q.    When you saw that one e-mail that your

8    wife got from True Credit, did you click on the

9    link to get the more information that was behind

10   the e-mail?

11   A.    No, sir.

12   Q.    Let me go back to your interrogatory

13   answers, which is Exhibit No. 6, Mr. Millett.

14   If you could take a look at that.  And, again, I

15   apologize these pages don't seem to be numbered,

16   but if you can go to the sixth page --

17   A.    Just put me in the right spot.

18   Q.    Yeah, the sixth page, Mr. Millett.

19   Actually, I want to ask you to go back one page

20   to Interrogatory No. 7, on the bottom of the

21   prior page.

22   A.    Okay.

23   Q.    Here you are asked if you claim to have

24   suffered any economic loss as a result of the

25   conduct of Truelink alleged in the fourth

