# EXHIBIT N



# IDENTITY THEFT: THE AFTERMATH 2003

## A comprehensive study –
## to understand the impact of identity theft on known victims as well as recommendations for reform

### Conducted by the
### Identity Theft Resource Center,
### Summer 2003



m Mullett

EXHIBIT NO. 26
071307          nm s
**Metropolitan**
COURT REPORTERS



# IDENTITY THEFT:  THE AFTERMATH 2003
## A comprehensive study
## to understand the impact of identity theft on known victims

Conducted by:   **Identity Theft Resource Center,**
                           **Linda and Jay Foley, Exec. Directors**

Analysis done by: **Identity Theft Resource Center staff and**
                           **Dr. Dale Pletcher,[i] California State University, Sacramento**

Assisted by:       **Debra Miranda, California State University, Sacramento**
                           **Paul Colins,[ii] Colins Consulting (Business Strategist)**
                           **Dr. Charles Nelson, Psychologist;**
                                 **Founder and Director: The Crime and Trauma Recovery Program and The Family Treatment Institute[iii]**

Release Date:     September 23, 2003

Conducted:       July 1, 2003 – Sept. 1, 2003

Copyright:        Sept. 2003. For reprint permission, contact Linda Foley
                          Email: itrc@idtheftcenter.org or 858-693-7935



# IDENTITY THEFT:  THE AFTERMATH - 2003

**TABLE OF CONTENTS:**                                                             **Page #**
1.  General Study Introduction                                                     4
2.  Study Format                                                                   5
3.  Introduction to Identity Theft                                                 5 - 6
4.  A Victim's Journey                                                             6 - 7
5.  "The Aftermath" – A Comparison to Other Studies                               8
6.  Itemized Evaluation of "The Aftermath" – Overview                             8
7.  The Study Group                                                               8 - 9
8.  Use of Stolen Information                                                      10
    a.  Financial Theft                                                           11 - 12
    b.  Criminal ID Theft                                                         12 - 13
    c.  Cloning                                                                   13 - 14
9.  Discovery of Crime – "Moment of Discovery"                                     14 - 16
10. Time Difference Between Information Theft and Discovery                        17
11. How Information Was Stolen                                                     17 - 18
12. The Imposter's Time Involvement with Victim                                    18 - 21
13. Imposter Relationship with Victim                                             21 - 22
14. Time and Financial Impact on Victims                                           23 - 26
15. Financial Impact on Businesses                                                 26 - 28
16. General Responsiveness Towards Victims                                         29 - 30
17. Responsiveness by Credit Issuers, Utility/Cell Co., Financial Inst.           30 - 31
18. Responsiveness Towards Victims by the Credit Bureaus                          32
19. Responsiveness Towards Victims by Collection Agencies                         32 - 33
20. Responsiveness Towards Victims by the Police                                  33 - 34
21. Emotional Impact on Victims                                                    35 - 39
22. Victim Frustrations                                                           39 - 43
23. ITRC Recommendations                                                          44 - 46
24. In Conclusion                                                                 46 - 47

Addendums
    a.  Methodology                                                               48
    b.  Other Studies                                                             49 - 51
    c.  Pearls of Wisdom- From One Victim to the Next                             51 - 53
    d.  Chart with Responses to Question #9,
        "Estimate of Fraudulent Charges on All Accounts"                         53 - 57
    e.  Endnotes                                                                  58

*This report is dedicated to the millions of victims of identity theft. We sincerely thank those who volunteered to relive their crime one more time and answer our questions.*

## 1. General Study Introduction

Studies done in July 2003 by both Gartner Research and Harris Interactive indicated that in the last 12 months, approximately seven million people were victims of identity theft. The Identity Theft Resource Center (ITRC), along with many other groups that study this crime are frequently asked statistics about particular aspects of identity theft.

In July 2003, ITRC sent a survey to victims of this crime to study not only areas that have been previously explored by the Federal Trade Commission, GAO and other consumer groups, but to also quantify areas that have never been tested. These included:

- The time, dollar cost, and emotional impact sustained by victims enabling this study to quantify victim impact, for the first time ever.
- Responsiveness by the various entities with which most victims must interact
- The differences between moment of discovery victims (most FTC and GAO studies) and long-term victims
- Any differences in long-term victim response between the information gathered three years ago by CalPIRG and Privacy Rights Clearinghouse (Nowhere to Turn)[iv] and "Identity Theft: The Aftermath - 2003"
- The state of identity theft today -- in terms of crime trends, victim recovery issues, victim issues, and to see if changes in the systems that victims encounter have assisted or hindered the process of recovery

Statistical numbers generated from the survey will be used to educate victim counselors, legislators, law enforcement agencies, and the business community about the impact of identity theft on its victims. Although past studies have studied victim impact, this study is unique in that it goes "deeper" in analyzing all facets of victim impact, including emotional impact as part of the analysis.

The analysis of survey material was done by Linda Foley and Jay Foley (ITRC Exec. Directors), Dr. Dale Pletcher, Debra Miranda, Paul Colins, Dr. Charles Nelson and several ITRC staff members.

Study highlights include:
- Fraudulent charges now average more than $90,000 per name used.
- Nearly 85% of all victims find out about their identity theft case in a negative manner. Only 15% of victims find out due to a proactive action taken by a business.
- The average time spent by victims is about 600 hours, an increase of more than 247% over previous studies.
- While victims are finding out about their cases earlier, it is taking far longer now than before to eliminate negative information from credit reports.
- A large majority of respondents indicates the opening of a credit card (73%) or takeover of a card account (27%) to be among crimes committed.
- The emotional impact of identity theft has been found to parallel that of victims of violent crime.
- The responsiveness toward victims by the various entities with which they must interact continues to be lacking in sensitivity in most cases and has not improved since studies released in 2000 (Nowhere to Turn).

## 2. Study Format

For reading ease, information will be presented in both narrative and graph format. Some recommendations will be included in each section and a more extensive list will included in the ITRC Recommendations.

Please note: quotations will be *italicized* throughout the report.

## 3. Introduction to Identity Theft

There are three main forms of identity theft:

- Financial identity theft involves the imposter's use of personal identifying information, primarily the Social Security number, to establish new credit lines in the name of the victim. This person may apply for telephone service, credit cards or loans, buy merchandise, or lease cars and apartments. Subcategories of this crime include credit and checking account fraud or takeover.

- Criminal identity theft occurs when a criminal gives another person's personal identifying information in place of his or her own to law enforcement. For example, Susan is stopped by the police for running a red light. She says she does not have her license with her and gives her sister's information in place of her own. This information is placed on the citation. When Susan fails to appear in court, a warrant is issued for her sister (the name on the ticket).

- Identity cloning is the third category in which the imposter uses the victim's information to establish a new life. He or she actually lives and works as you. This crime may also involve financial and criminal identity theft as well. Types of people who may try this fraud include undocumented immigrants, wanted felons, people who do not want to be tracked (i.e. getting out of paying child support or escaping from an abusive situation), and those who wish to leave behind a poor work and financial history and "start over."

No one is immune, from birth to beyond death. Identity theft is a dual crime. There are at least two sets of victims in each case: the person whose information was used (consumer victim, to be referred to as victim from this point forward) and the merchant or commercial victim who has lost services or merchandise. Unfortunately, many commercial victims do not report the crime to law enforcement, considering it more fiscally advantageous to "write off the loss."

While victims are not usually held liable for the bills accumulated by the imposters once they prove their victim status, many do suffer significant financial and emotional harm from this crime. Expenses include notarizing, postage, telephone, travel, photocopying, time lost from work and the wages that are associated with that lost time, costs involved in getting police reports and fingerprints, and resource materials. Some victims never truly regain their financial health and find credit issuers and even potential employers reluctant to deal with someone with "baggage."

The emotional impact of identity theft can be extremely traumatic and prolonged due to the extensive amount of time it can take to clear one's name. Some victims feel like the imposter has become a permanent fixture in their lives, a statement that may be very accurate.

Confirming anecdotal information, this study will show that many victims feel stonewalled by the very people they turn to for help – law enforcement and credit issuers.

Identity theft is a high profit, low risk, low penalty crime. This study will show the criminals' relative ease in stealing and using information.

First, credit applications may be submitted by Internet, telephone or in person. Even those who appear in person do so with the relative assurance that by the time the crime is discovered, they will not be remembered and any video surveillance will be taped over. Identity criminals are also quite clever at finding ways to receive deliveries at locations other than at home. Many use drop spots or private postal boxes, frequently switching from store to store.

Second, we have a problem in that identity thieves take advantage of system that is basically flawed, often due to poor information handling practices by those who collect information or issue credit. In the area of criminal identity theft, it is still possible to have a citation issued to an individual without an identifying document – with the information recorded as given by the criminal.

Third, law enforcement often finds this a frustrating crime to investigate. One financial crimes task force representative reports that an easy case of identity theft may take about 100 hours of investigative time, a difficult case can take in excess of 500 hours.

Why? There are many obstructions to investigating these crimes for both victims and law enforcement. After reporting the crime to credit issuers, victims frequently hear: *If you are not the person who opened the account, we can't provide information to you.* Yet, these same victims are held financially responsible for the bill until they prove their innocence.

Our final challenge is time. The impersonator can steal thousands of dollars or collect numerous citations in the victim's name without the victim knowing about it for months or even years.

Based on anecdotal information from law enforcement agencies and from this study, it is clear that criminals are getting better at what they do, that the crimes themselves are more complex and that the financial impact to the victims, business community and taxpayers is more profound.

## 4. A Victim's Journey

In financial identity theft, the victim usually begins by assessing the damage. To do this he or she must contact the three major credit reporting agencies (Equifax, Experian and TransUnion). During this computerized first call, the victim typically requests fraud alert placement and copy of a credit report. Once the victim obtains copies of the credit reports, that person must then sort through all the information, separating out fraudulent or inaccurate information from information that should be on the report.

The next step is to report the crime to the police. In many situations, as this survey will show, that is a difficult process and may require numerous calls to find someone who will take a report. This is critical because without a police report, victims are not usually taken seriously by credit issuers.

In some cases, victims will be told they are not the "true victims" and that only the business may report the crime because they have a greater monetary loss. Unfortunately for the victim, the creditor may not be willing to cooperate because it is not cost effective for them to spend the time and energy to assist the police. The fraud loss is viewed as a cost of doing business. This situation adds to the time and cost required for the victim to resolve his case.

Next, letters must be written to all three reporting agencies to request a seven-year alert and to notify them of any errors on the report. Then in most states the victim proceeds to contact each of the fraudulent account issuers or collection agencies by phone and then in writing to notify them of the theft. Each letter must include a declaration of fraud, supporting documentation, proof of identity and a police statement if available – and must be sent certified, return receipt requested.

Debt collectors may attempt to require the victim to pay the unpaid bills. The victim will have to spend time to communicate that he or she has been a victim of identity theft and is not responsible for fraudulent charges. More time is spent filling out either fraud affidavits or written explanations to debt collectors. Depending on the victim's individual case, he may spend additional time contacting the bank regarding stolen checks and ATM cards, the U.S. Postal Service, the Social Security Administration (SSA), and the Department of Motor Vehicles.

In a case of criminal identity theft, the victim must begin by proving that he or she was not the person issued the citation or wanted currently by a law enforcement agency. Time is essential for those with commercial driver's licenses that have been compromised by a thief. The victim's livelihood depends on that license. It may involve numerous calls to law enforcement, assistant district attorneys and even travel to that jurisdiction to speak to a judge on a trial date, with an attorney in tow.

In the words of one victim: *This affected my ability to work because my license was suspended.*

Identity Cloning cases may require interaction with various governmental agencies including the IRS Taxpayers Advocates, Office of Inspector General for the SSA, FBI, Postal Inspectors as well as many of the steps already itemized above.

The complexity of the case will dictate the total cost and time required to resolve the case.

Experts recommend that victims keep a log of everything spent. Typical categories of expenses include: telephone calls, postage, miles, time lost from work, legal assistance, child care (for young mothers), secretarial services for those who are disabled, translation costs if the victim does not speak English, notarizing, and court costs for documentation. Some cases may require hiring an accountant or attorney. Many victims suffer from emotional trauma; therefore, costs for any self-help materials, doctor visits, psychological counseling, and medication would also be included.

## 5. "The Aftermath" – A Comparison to Other Studies

This study demonstrates that the information reported in 2000 differs significantly in specific areas from victim responses in 2003.

| Study | 2000* | ITRC 2003 | % of change |
|---|---|---|---|
| Avg. # of months between occurrence and discovery | 12-18 months | 1-6 months | |
| % of victims who consider the case solved | 45% | 60% | |
| Avg. # of months to resolve them, if resolved | 23 months | 3-6 months | |
| % of victims who consider case unresolved | 55 % | 65% | |
| $ of Fraud charges | $18,000 | $92,893 | 416% |
| Time spent by victims resolving case- average | 175 hours | 607 | 247% |
| Expenses reported- | $808 (out-of-pocket only) | $1,495 out-of-pocket, $16,000 (includes lost wages) | 85% |

\* From "Nowhere to Turn"
NA= not available

## 6. An Itemized Evaluation of "Identity Theft: The Aftermath - 2003"- An Overview

Identity theft is a widely misunderstood crime. Frequently, in talking with media, ITRC staff members and other consumer groups are asked, "What is the actual cost to the victims?" The answer they seek concerns out-of-pocket expenses. In their defense, the media, like many consumers and businesses, thinks of identity theft as a minor inconvenience.

The point of this survey is to quantify many items already known to law enforcement, consumer groups, victims and business fraud investigators. It will also help to illuminate many challenges faced by all of us in combating this crime. It will prove conclusively that identity theft is not a minor inconvenience but a potentially life-altering event that has the power to impact a victim's life for many years after the theft and the original use of the information.

The questions asked were worded carefully to avoid a biased perspective. To help readers truly understand the nature of this crime, the actual questions and the data submitted by the respondents are included in the body of the report.

## 7. The Study Group

The study group consisted of those victims who had contacted ITRC since late 2001 and for whom we had email addresses. Approximately 2,000 emails were sent out. About 500 of them were returned as undeliverable. 173 individuals responded to the study by September 1, 2003 (the final date information was examined for inclusion). This represents about a 12% response rate, somewhat higher than most studies.

While 173 responses may not seem a large amount, ITRC believes this to be the largest long-term victim survey group yet extensively questioned. In 2000, the still widely quoted "Nowhere to Turn" was based on 65 responses. The GAO study discussed in the addendum included only 10 people.

The FTC study released early September represented only 60 true victims of identity theft ("1.5% of 4000 interviewees were victims in the last year"). Even if account misuse was included (2.4%), the total victim population for the September FTC study of verified victims from 2002 only totals 156 individuals for the last year. ITRC also believes that in studying the questions asked of victims that there was room for misunderstanding, especially given that the interviewers may not have given victims time to seriously consider their responses and may not have understood the nuances of this crime.

Geographically, the study group included responses from people who lived in 34 states. The most responses came from (in order): California, Florida, Texas, Virginia, Illinois, Michigan, New York, Pennsylvania and Washington state. ITRC concludes that there were several reasons for this.

- In most cases, these are same states that have the highest number of victims per capita per the FTC 2002 report [v]
- A high level of ITRC visibility due to extensive media exposure in these states
- ITRC's higher visibility due to ITRC volunteer efforts in these states

The study group included 15 military members or military dependants, 17 students, and eight senior citizens – all people who are required to carry a card in their wallets that includes their Social Security number as an identification number. The study group also includes three parents dealing with the theft of their child's identity.

The methodology used for the evaluation of the study will be discussed in the addendum section of the report. It should be noted that not all participants chose to answer all survey items, which accounts for a slight variation in total counts for some questions.

Finally, ITRC realizes that the respondents are a "self-selected group" and that some of the statistical information in this guide probably cannot be applied to the general population as an indicator of crime trends and numbers.

Having said that, ITRC stands by the emotional impact and victim responsiveness sections and believes that those answers may well reflect the attitudes of identity theft victims everywhere.

While many of the victims referred to ITRC are dealing with difficult cases, our organization's caseload includes victims dealing with all types of identity theft cases. Unfortunately, based on law enforcement evaluation of crime trends, ITRC expects to see more and more difficult cases as time progresses due to the increased skills of criminals who. It is possible that the numbers you will see in this report will soon represent the norm and not a "select group of individuals."

## 8. Use Of Stolen Information:

Victims were asked how the imposters used the obtained information. The majority of the cases involved financial identity theft with just a few indicating that their cases were exclusively criminal. However, there were a significant number of individuals whose imposters crossed into other identity theft-related crimes. This occurred most prevalently in the combination of financial and criminal identity theft due to the acquisition of a driver's license. This is a critical step in checking account takeover and fraud since many banks and merchants demand to see "valid" ID. ITRC concluded from this question, and this is confirmed by anecdotal information from law enforcement and district attorney case history records – that in many instances criminals are not limiting themselves to one category of identity theft.

(Key: Financial = F, Criminal = C, Cloning = CL)



Financial only= 88        Criminal only = 4        Cloning only = 6
F/Criminal = 38          F/Cloning= 17            Crim/Cloning= 2
All 3 forms = 16

## 8a. Financial Identity Theft

The survey addressed how stolen information was used in the area of financial identity theft. Results show that imposters used ill-gotten information in numerous ways, with victims checking an average of four answers each.

| Part A: My personal information was used to: | Number of Responses | Response Ratio |
|---|---|---|
| open new credit account(s) in my name | 112 | 73% |
| make charges on an existing credit card account(s) | 41 | 27% |
| purchase/get new cellular phone service | 57 | 37% |
| purchase/get a new cable TV or energy utility account | 16 | 10% |
| purchase/get new home telephone service | 22 | 14% |
| takeover/add service to an existing cell phone account | 11 | 7% |
| takeover/add service to an existing cable or energy account | 4 | 3% |
| takeover/add service to an existing home telephone account | 9 | 6% |
| open Internet service | 15 | 10% |
| make charges over the Internet for goods/services | 35 | 23% |
| access my existing online banking account | 8 | 5% |
| takeover my existing checking accl via theft or check-washing | 29 | 19% |
| open a new checking or savings account | 29 | 19% |
| create checks using my name/address, with false acct. info | 29 | 19% |

| Part B: Using my information, someone: | | Number of Responses | Response Ratio |
|---|---|---|---|
| obtained a student loan | | 4 | 8% |
| obtained an auto loan | | 18 | 38% |
| filed bankruptcy | | 5 | 10% |
| obtained a mortgage | | 9 | 19% |
| obtained a personal loan (other than above) | | 31 | 65% |
| obtained a business loan (other than above) | | 11 | 23% |

An analysis of criminal activity by business analyst Paul Colins concluded:

> *A large majority of respondents indicate the opening of a credit card (73%) or takeover of a card account (27%) to be among crimes committed. This is highly consistent with other victim surveys. One in three individuals report cell phone service being established which is often a precursor for other crimes. A very low percentage indicates their on-line bank accounts were compromised, especially when compared to account takeover of bank accounts (5% vs. 20%) which should help to dispel widespread fears by consumers of on-line banking.*

This study also confirmed many members of law enforcement's evaluation of identity theft crime trends. Thieves are very interested in purchasing Internet service and phone service, an easy way to order merchandise using either new credit cards or via account takeover. The study also shows a disturbing number of personal loans (for example, auto, mortgage or college funding) secured by thieves using the identifying information of victims.

## 8b. Criminal Identity Theft

The number of driver's licenses issued (39%) and creation of fake licenses using the information (50%) has profound implications for national security as well as to the crime of identity theft and check fraud.

> *"Checking IDs at airports does little to prevent potential terrorists boarding planes if they are so easily able to assume someone else's identity,"* responded Paul Colins upon viewing the responses to this section of the survey. *"If drivers' licenses are to continue being used as a primary source ID carried by Americans (which was not their intent) there will need to be an overhaul of the system to standardize the process, close loopholes and to reduce counterfeiting."*

In the area of financial identity theft, checking account takeover or the issuing of counterfeit checks is the main reason that thieves are interested in driver's licenses. Merchants require "valid ID"

before accepting checks. Unfortunately, few retailers or cashiers have been well trained in how to recognize a valid license.

It would also seem logical that these licenses may also account for the number of loans allowed as well as the problem of identity cloning, again because the loan officer believes he/she knows the identity of the applicant.

Paul Colins adds: *The ability to commit this type of crime is surprising given strict underwriting processes -- that even eight respondents were victims of mortgage fraud is evidence of the sophistication of the criminal element.*

Finally, we have to look at the number of victims who have been accused falsely of a crime due to the actions of another – either via the citation process outlined in the original example of criminal identity theft used in Section 3 or in warrants issued for passing bad checks. These victims face multiple hours of work, incur significant legal fees and may even sit in jail for days or weeks while others attempt to restore their good names.

ITRC would like to make one point clear in discussing criminal identity theft. Our main problem is the issuance of any identity card. Most decisions are based on the presentation of a birth certificate and Social Security card. Neither physically helps to verify one's identity. Driver's licenses were never meant to be an identification card, rather an indictor that one has passed a set of tests to determine the ability to drive safely. This is a problem that we will continue to encounter as long as this country seeks a "national identification card" that is based on non-identifying information.

| Using my information, someone: | Number of Responses | Response Ratio |
|---|---|---|
| committed a non-financial crime and gave my information to the arresting officer | 16 | 27% |
| got a driver's license. | 23 | 39% |
| person created/bought a counterfeit driver's license | 30 | 51% |
| wrote bad checks or committed other financial frauds that resulted in warrants issued in my name | 27 | 46% |

## 8c. Identity Cloning

By far identity cloning is the most complex identity theft crime for victims to recover from. This person is living and working as "you." Stories from victims seem unbelievable. One woman was forced to undergo a physical examination to prove she had not just given birth to a crack baby (abandoned by her imposter who used the victim's stolen insurance card). Another woman is afraid

to get married because her imposter got married using her name. She is afraid of being accused of bigamy.

One military officer almost lost his career due to the effect of this crime on his security clearance. Many victims contact ITRC trying to understand how their tax returns went to another person or with questions on how to convince the IRS that they don't have two jobs, 1500 miles apart.

In trying to identify identity theft scenarios, one might argue that items could be categorized differently. Obtaining housing and the filing of bankruptcies could more closely fall into category of financial identity theft. One thing is abundantly clear, however: severe identity theft cases are devastating and may result in a victim being forced to change his or her SSN, a step that separates the victim from his or her past. (More information on this extreme step can be found in the ITRC victim guide: "Should I Change My SSN?"- www.idtheftcenter.org )

| Using my information, someone: | Number of Responses | Response Ratio |
|---|---|---|
| got employment in my name | 15 | 15% |
| filed taxes or got my tax refund (IRS involvement) | 9 | 9% |
| got government assistance/benefits (such as unemployment or welfare) | 6 | 6% |
| obtained medical services | 13 | 13% |
| used my auto insurance information when involved in an accident | 2 | 2% |
| got an apartment | 15 | 15% |
| Other | 83 | 83% |

In looking at the individual surveys, ITRC staff members who have worked on many of these cases concluded that the category of "Other" was either used in place of an item already listed (and missed by the respondent) or misused. However, in a few cases "Other" was found to be used appropriately, often indicting mail theft/fraud – a category that was mistakenly left out of criminal identity theft category.

## 9. Discovery of Crime – "Moment of Discovery"

Victims find out about a case of identity theft in one of three ways:

- At a critical point in their lives – applying for a job, purchasing of a home or car, or applying for an apartment or credit card
- Via negative notification in the form of credit denial, collection notice, receipt of bills or cards not applied for, failure to get employment or a promotion, or notification by law

enforcement or a government agency (either that their information is part of a large case or that they are being arrested).

- By companies or consumers taking a proactive stance. This category needs to be divided again – into notification of existing account takeover and notification of new account activity.

Only 56 responses indicated a proactive nature by business (starred**). **Based on the total number of responses, approximately 85% of all respondents found out that they were victims of identity theft from a source other than a proactive measure by a business.**

This is a sad statement and one that must change. It is the business community that sees the first indication of a fraud, especially in financial cases. There are business solutions that can be used to help verify applications and to assist credit issuers in assessing risk prior to issuing credit.

It is critical that this 85:15 ratio be reduced drastically and as rapidly as possible. While we cannot completely stop the thieves from gaining access to information, it is possible with business solutions becoming available to stop the damage created to both the business community and the consumer victim by preventing the issuance of credit cards to imposters.

| How did you find out that your identity was stolen? (check all that apply) | Number of Responses | Response Ratio |
|---|---|---|
| **One of my creditors called to ask me if I had moved | 9 | 5% |
| A creditor demanded payment on a late bill/etc. | 49 | 28% |
| I was contacted by a debt collection agency about unpaid bills | 52 | 30% |
| I noticed unauthorized charges on my credit card bill | 27 | 16% |
| **A credit card company contacted me; they noticed unusual activity/a suspicious application, etc. | 47 | 27% |
| A new credit card or new checks were not received | 12 | 7% |
| I received credit cards I didn't order | 15 | 9% |
| I noticed funds missing from my bank account | 31 | 18% |
| My mail service was disrupted | 17 | 10% |
| My phone service was disrupted | 10 | 6% |
| I got credit cards/bills for another person at my address | 15 | 9% |

| | | |
|---|---|---|
| Auto insurance rates increased | 7 | 4% |
| I was denied a driver's license | 5 | 3% |
| I was denied credit or a loan | 45 | 26% |
| I was not allowed to open a bank account | 12 | 7% |
| I was denied a job or promotion | 13 | 7% |
| I noticed something unusual on my credit report | 56 | 32% |
| The police notified me | 7 | 4% |
| The IRS notified me | 9 | 5% |
| A Postal Inspector notified me | 4 | 2% |
| The Social Security Administration notified me | 6 | 3% |
| I was notified by another governmental agency | 7 | 4% |
| I was notified that there is a warrant in my name | 10 | 6% |
| I was arrested due to warrants under "my name" for crimes committed by the thief | 7 | 4% |
| Other | 51 | 29% |

Study inconsistencies:  Some victims find out about the crime in several ways which is the reason why there were more responses than participants. There is also some question as to the interpretation of "monitoring credit reports." It is unclear (due to the phrasing of the question) whether the credit report was ordered due to the concerns or hints of possible criminal activities or whether these individuals order credit reports regularly or use monitoring services.

**Computer Breaches:**  ITRC also explored the topic of computer breaches. With just 16 respondents answering, the answers are far from conclusive but may indicate a trend that needs further study.

Two questions were asked:
How soon did you hear about the breach?  Nine heard within two months, one within four months, two within six months and four didn't hear until more than six months after the breach.

We also asked how they heard about the breach. Only a few heard about the breach from the database owner. The others heard from law enforcement or federal agencies investigating the case. Unfortunately, it appears that more than half heard from a collection agency or were alerted via an adverse action taken due to negative information on a credit report.

## 10.  Time Difference Between Information Theft and Discovery

Based on this study, it would seem that victims are finding out more quickly than reported in previous studies. Approximately half of the total group discovered the problem within the first 3 months, about 60% of the victims found out within the first 6 months of activity, However, 24% of the total group did not find out about the crime for more than two years after the original use of the information. ITRC attributes this to the fact that only 15% of all victims find out in a proactive manner. Apparently, these 24% of respondents had not initiated any activity where an adverse notice would have been generated. As seen in the quote below, the lag time between moment of discovery and original occurrence of crime is critically important.

Per Paul Colins: *The time period it takes victims to realize they have become victims has a long tail. In some cases the time to resolve the case once discovered was in excess of six months. This period of time is longer than institutions generally take to charge-off debt as a credit loss before passing the debt on to collection agencies. This explains why so many victims first experience is with a debt collector. It follows that institutions probably are underreporting the level of fraud within their systems.*

| What were the total number of months between the first incident and when you found out? | Number of Responses | Response Ratio |
|---|---|---|
| 1-3 months | 82 | 48% |
| 3-6 months | 21 | 12% |
| 6-12 months | 22 | 13% |
| 12-18 months | 14 | 8% |
| 18-24 months | 7 | 4% |
| 2-3 years | 9 | 5% |
| 3-4 years | 6 | 4% |
| More than 4 years | 9 | 5% |
| **Total** | 170 | 100% |

## 11.  The Theft of the Information

It is clear from the information provided by respondents that 62% of the victims (100 individuals) do not know how their information was stolen.

Since ITRC interviews hundreds of victims, it also knows some of the 37% of victims who believe they know how their identity was originally stolen may be basing this conclusion on false assumptions. Victims may be basing their "knowledge" on information on credit reports, coincidences in timelines, and falsified application information that may not be true. This human need to assign blame and to solve a puzzle despite false or incomplete evidence trails also is

reflected in victims' frustrations with law enforcement's apparent inactivity. Unfortunately, red herrings and false information is the nature of identity theft more often than not.

It is also clear that in the majority of identity theft situations victims were not responsible for the loss. Most of these situations started because a business or governmental entity allowed the thief access either directly or indirectly to personal identifying information. This includes databases, cards carried in wallets that included one's SSN or via items mailed to victims with account or SSN information (allowing access through mail theft, dumpster diving or theft), or unsafe information gathering or handling practices. The reality is there are only two things that a victim can do to directly facilitate identity theft: carry a Social Security card in one's wallet or fall victim to a telephone or Internet scam. In all other situations direct links to a business entity can be drawn.

| My personal information was originally stolen: (total responses 162) | Number of Responses | Response Ratio |
|---|---|---|
| From my university/college records | 4 | 2% |
| From the trash | 1 | 1% |
| Over the Internet | 6 | 4% |
| From my home or car by a thief | 16 | 10% |
| Where I worked | 5 | 3% |
| From a stolen/lost wallet, palm pilot or planner | 12 | 7% |
| From my mail or via a fraudulent address change | 10 | 6% |
| Via overhearing a conversation or by shoulder surfing | 1 | 1% |
| From being a victim of a scam | 7 | 4% |
| Other / unknown | 100 | 62% |

## 12. The Imposter's Time Involvement with Victim

Originally the goal of the first two charts was to separate victims into cases that were closed and cases where activity continued. However, since the total number of answers exceeded the number of respondents, clearly some victims answered YES to both questions.

In further questioning individual respondents and reexamining the answers provided, ITRC staff members discovered that some participants answered yes- their case was over (closed by the police and the imposter had stopped trying to open accounts), BUT they also answered yes to the second question because the situation still has a significant impact on their lives, financially and emotionally.

In one case, the imposter was jailed within one month of the victim's discovery of the case. However, five months after the perpetrator was sentenced the victim lost his job due to the loss of productivity (lost time from work and severe depression). He is still dealing with creditors and collection agencies that insist that he pay them and has spent six months trying to find a job, made more difficult by the fact that his financial history is a mess and there may be a possible criminal history blending with that of the perpetrator. It is important to note that this same victim received a raise and commendation for outstanding productivity – within four months of being fired.

Therefore, these two questions must be considered separately and not compared.

In terms of time involvement:  It is dramatically clear that the total amount of time that victims must deal with a case of identity theft is not insignificant. In closed cases, half of the respondents took more than one year of time to disentangle themselves from the situation. Seventeen individuals were involved for three or more years.

In "open" cases, 62% are still actively involved in trying to clear records after one year. Forty-four individuals are still involved more than two years after the case began, 28 are still fighting by the 3rd year and 14 have been condemned to continue to battle more than five years after the first notification.

Finally, the last two charts help us to understand the added insult to injury. In 19 cases, criminals continued to use and abuse their victims' information after arrest and 10 continued after being sentenced.

It is not surprising that some victims feel that "this criminal has become a permanent part of my life and this crime will never be over." The emotional impact questions in Section 21 further illuminate the victims' feelings about the continued assault on their good names and the affect this crime has had on their lives.

Perhaps these two victims summarize it best:

*Victim One: I was denied housing and do not know if I will be able to get housing when this lease that my family member signed for me is up. I cannot get a mortgage or to better my financial situation and as a result my life is paralyzed.*

Victim Two: *Discover card told me I was now a credit risk since my information was out there and cancelled my perfectly paid platinum card without any notice (I was trying to use it at a store when I figured out) and were nasty to me blaming me for the ID theft.*

Considering that of the few imposters that are actually arrested, many get nothing more than probation or a few months of jail time, it is easy to understand the frustration and rage felt by victims who must suffer while the criminals appear to get little or no punishment at all.

From the business perspective (Paul Colins):

*Given that credit card companies charge-off bad debt at the 6-month mark, these questions get at the root cause of why card companies underestimate the volume of ID theft in their systems. The time taken to resolve cases is excessive. This presents problems for debt collection agencies often untrained at being able to distinguish a true victim from a debtor and in turn leads to confrontational situations and unnecessary anguish for victims. Creating adequate processes to separate out victims and sizing the problem should be a priority for card issuers.*

| I consider my case closed. The total number of months that you were involved in dealing with the case were: | Number of Responses | Response Ratio |
|---|---|---|
| less than 3 months | 9 | 9% |
| 3-6 months | 19 | 19% |
| 6-12 months | 23 | 23% |
| 12-18 months | 14 | 14% |
| 18-24 months | 11 | 11% |
| 2-3 years | 9 | 9% |
| 3-4 years | 7 | 7% |
| more than 4 years | 10 | 10% |
| Total | 102 | 100% |

| involved in dealing with the case since finding out about the case are: | Number of Responses | Response Ratio |
|---|---|---|
| less than 3 months | 6 | 5% |
| 3-6 months | 16 | 14% |
| 6-9 months | 9 | 8% |
| 9-12 months | 12 | 11% |
| 12-18 months | 16 | 14% |
| 18-24 months | 9 | 8% |
| 2-3 years | 16 | 14% |
| 3-5 years | 14 | 13% |
| 5-8 years | 7 | 6% |
| 8-10 years | 3 | 3% |
| in excess of 10 years | 4 | 4% |
| Total | 112 | 100% |

| My imposter continued to use my information after he/she was arrested. | Number of Responses | Response Ratio |
|---|---|---|
| Yes | 19 | 23% |
| No | 63 | 77% |

| My imposter continued to use my information after he/she was sentenced and either jailed or put on probation. | Number of Responses | Response Ratio |
|---|---|---|
| Yes | 10 | 14% |
| No | 61 | 86% |

### 13. Imposter Relationship with Victim

Most studies on identity theft have explored the relationship between victim and imposter. While the numbers vary slightly, most have indicated that the majority of victims did not know their perpetrators. In PRC/Calpirg's "Nowhere to Turn" about 17% of victims replied that the imposter was a relative, friend, co-worker or acquaintance (also known in some circles as friendly fraud).

Given the evolving nature of this crime, ITRC wanted to more deeply explore the relationship of the perpetrator since last reported in 2000. Since we allowed victims to "check all that apply," some victims have clearly indicated that the imposter was active in more than one part of the victims' lives. For example, a relative could also be a caregiver, a co-worker may also be a friend.

What is significant and indicates a higher percentage than seen in previous studies is the number of victims who were able to track the criminal back to a business with which they had a relationship. The study also continues to show that criminals are taking advantage of close relationships with trusting victims who have allowed personal identifying information to be accessed by those with whom they live or work.

Finally, ITRC has seen a disturbing trend, not clearly seen yet in this study (perhaps due to victim's reluctance to relive the situation) of identity theft being used as a way to abuse and manipulate a former lover, spouse or friend.

Paul Colins, in analyzing this question from a business perspective commented:

*This study is consistent with my own observations. The vast majority of victims do not know who stole their identity. Both this study and my observations contradict some conventional wisdom that purports most identity theft to be from friendly fraud.*

*Furthermore, friendly fraud is not only easier to detect, it also provides lenders with some recourse to recover some losses incurred. As a result many lenders will have a high percentage of reported friendly fraud incidents as other cases fall through the cracks (thus distorting the reality).*

| Do you know who took or used your information? (check all that apply) | Number of Responses totals 195 | Response Ratio based on # of respondents |
|---|---|---|
| A relative | 19 | 11% |
| A neighbor | 2 | 1% |
| A friend or roommate (either current or former) | 17 | 10% |
| The caregiver of an elderly/disabled person | 3 | 2% |
| My ex-spouse or ex-significant other | 7 | 4% |
| A co-worker | 8 | 5% |
| An employee of a business that had my information | 21 | 13% |
| An individual unknown to me | 118 | 70% |

## 14.  Financial Impact on Victims

ITRC asked Dr. Dale Pletcher to examine and comment upon the financial impact of identity theft on victims. The information in Sections 14 and 15 are a result of his work.

*Note:* Due to the time involved in calculating these results, Dr. Pletcher chose to start his work while participants were still responding. This section is based on the answers of 161 respondents. The rest of this report is based on 172 responses.

Dale D. Pletcher, D.B.A. has developed the concept of "involuntary tax." According to Dr. Pletcher, "We have all experienced disputes over billing for goods or services. Others of us have been unjustly sued, been subjected to an IRS audit, or even to identity theft. These types of events that cost consumers time and money through no fault of their own are what I refer to as an involuntary tax."

Identity theft is the second type of involuntary tax to be researched. IRS audits have already been researched, and plans are being made to research additional types of involuntary tax. In the future, Dr. Pletcher plans to use the involuntary tax research as basis for a secondary study detailing the impact of involuntary taxes on the American economy.

Victims sustain two quantifiable types of impact: time lost and dollars spent defending their cases. Although victims are usually not held accountable, the dollars of fraudulent charges have also been included. These charges not only show the enormity of the crime, they demonstrate the secondary impact on our economy as businesses consider these losses a "cost of doing business" that they pass on to all consumers. The following statistics quantify victim impact along the lines of time and cost.

**Time Analysis:**

The average active hours spent by victims is based on 135 responses that ranged from a low of two hours (most likely in the initial stages of the case) to a high of 11,520 hours. In this case, the victim is still clearing records 12 years after initial theft. The imposter opens new cards each time she clears her records.

Fourteen respondents reported time spent in excess of 1,000 hours, an additional five respondents reported time spent in excess of 2,000 hours, and an additional two respondents reported time spent in excess of 10,000 hours. The median (middle value or center of the distribution of responses) was 120 hours. .

The statistics for active hours spent may actually be much higher. Many respondents were unable to calculate a total number of hours spent. Responses such as, "I have no idea. It has consumed my life," "Can't begin to estimate," and "I don't even know – a lot!!" are not quantifiable, but demonstrate the large impact identity theft has on its victims. It should be noted here that since approximately half of those surveyed report the imposter is still active, time spent for these respondents does not represent the total time impact to these victims – only the impact through the date the survey was taken.

**Table 1- Time Analysis:  Overall Time Period of Case**

|  | % of Victims - Case Closed | % of Victims - Case Open |
|---|---|---|
| Less than 3 months | 9% | 6% |
| 3-6 months | 19% | 15% |
| 6-12 months | 22% | 17% |
| 12-18 months | 14% | 14% |
| 18-24 months | 11% | 8% |
| 2-3 years | 8% | 14% |
| 3-4 years | 6% | Combined into 3-5 yr. |
| More than 4 years | 10% | Combined into 3-5 yr. |
| 3-5 years | Not asked | 13% |
| 5-8 years | Not asked | 6% |
| 8-10 years | Not asked | 4% |
| In excess of 10 years | Not asked | 4% |

According to these figures, approximately 41% of all victims are still dealing with the problem more than two years after the crime was discovered, 27% after three years. That significantly affects these individuals' ability to recover both financially and emotionally.

**Time vs. Cost of Time to Resolve:**  Victims were asked to estimate the dollar value of their lost time, based on their respective average salaries. **The average associated dollar value for lost time**

was $16,971. Responses ranged from a low of $100 to a high of $250,000. The median response was $4,000.  Table 3 shows the distribution of these responses:

**Table 2– Total Active Time Spent by Victim**
**to Resolve Case and Dollars Associated to Time Spent**

|  | Active Hours | Dollar Cost Associated with Time Spent |
|---|---|---|
| Average | 607 | $16,971 |
| Median | 120 | $4,000 |
| Range | 2- 11,518 | $100 - $249,900 |
| # of quantified responses | 135 | 128 |

Definitions:
Average: Total of the responses divided by number of participants
Median: Middle value or center of the distribution of responses

**Table 3 – Distribution of Dollar Cost (Income) Associated with Time Spent**

|  | Number of responses | % of total responses |
|---|---|---|
| <$1,000 | 22 | 17% |
| $1,000-$4,999 | 47 | 37% |
| $5,000-$9,999 | 18 | 14% |
| $10,000-$19,999 | 13 | 10% |
| $20,000-$39,999 | 17 | 13% |
| $40,000-$99,999 | 4 | 3% |
| $100,000-$199,999 | 4 | 3% |
| $200,000-$250,000 | 3 | 3% |
| Total | 128 | 100% |

**Additional Costs:**  Those surveyed were also asked how many related hours of missed worked occurred. 82 respondents or approximately 49% of those surveyed reported hours of **missed work** due to the problem. Although the average reported missed hours was 389 hours, the median was 35 hours. The large range in responses, from a low of 1 hour to a high of 12,800 hours, impacts the average. Seven respondents reported missing over 200 hours and an additional four respondents reported missing from 1,440 to 12,800 hours. Although not quantifiable, three respondents reported that they lost their jobs due to the theft.

In addition, 63 respondents or 37% report using up **vacation time/personal leave time** due to the problem. The average leave time taken was 74 hours, with a median of 30 hours taken. Answers ranged from a low of two hours to a high of 1,000 hours of leave time used.

Finally, respondents were asked to estimate the number of hours spent seeking **medical services**, if needed. 36 respondents or approximately 21% reported time lost due to seeking related medical

services. While the average reported time loss was 384 hours the median was 35 hours. The range spread from a low of two hours to a high of 10,000 hours. Eleven respondents reported between 100 and 1,000 hours spent seeking medical services; an additional one respondent reported 10,000 hours spent. Many of those that responded to this question appear to still be in treatment. Therefore, the data only represents time lost due to medical services through the date the survey was taken.

### Table 4 – Time Spent on Case

|  | Time taken from Work | Lost Vacation or Leave Time | Medical Time Used |
|---|---|---|---|
| Average hours | 389 | 74 | 384 |
| Median hours | 35 | 30 | 35 |
| Range | 1-12,800 hours | 2-1,000 hours | 100- 1,000 hours |
| Represent __ % of respondents | 49% | 37% | 21%, some still in treatment |

**Additional Expenses:** In proving one's innocence, the burden lies solely on the victim. Out-of-pocket expenses while not extensive, can perhaps be recovered if the perpetrator is arrested and sentenced. That may be significant to those on limited incomes. It also adds insult to injury since most victims will not be able to recover the loss. These costs include but are not limited to: certified return receipt mail (recommended and required in many situations), notarizing, telephone calls, court documents, travel expenses, photocopying, court transcript purchases, police reports, fingerprinting and Lifescans (photos and 10 print cards).

### Table 5 – Total Out-of-Pocket Dollars Spent by Victims

|  | Out-of-Pockets Dollars |
|---|---|
| Average | $1,495 |
| Median | $200 |
| Range | $4 - $29,996 |
| Number of Responses | 113 |

Approximately 67% (or 113 of those surveyed) reported dollar losses ranging from a low of $4 to a high of $30,000. As is the case with time, the out-of-pocket dollars spent by victims may actually be higher. Many surveyed were unable or unwilling to estimate the dollars spent due to the crime. Responses that were not quantifiable included, "un-tallied, still spending, unknown, don't remember, and have never totaled it." 108 responses (96%) fell smoothly between $4 and $6,000. One respondent reported $8,000, two respondents reported $15,000, one respondent reported $20,000, and one respondent reported $30,000. Some of the higher dollar amounts may be due to the addition of attorney fees or high travel expenses. For instance, in a criminal case it may be necessary to gather documents and travel to another state to prove one's innocence. In a financial case, victims may feel more comfortable hiring an attorney to stop a court action to attach to property or bank accounts or to evict them from their homes.

**Medical Expenses:** Thirty-seven victims (approximately 22% of those surveyed) report a dollar loss due to seeking related medical services and prescriptions. Although the average reported

dollars spent is $4,471, the median figure is $1,000. Responses ranged from a low of $15 to a high of $60,000. Thirty-one responses (84%) fell between $15 and $4,500. Three respondents reported $5,000, one respondent reported $10,000, another reported $50,000, and one even reported $60,000. This is a confirmed number and was due to the severity of the emotional impact of the case. As is the case with time lost due to medical treatment, some respondents report that they are still spending money for medical services.

## Benchmarking

In May 2000, Privacy Rights Clearinghouse and CALPIRG published <u>Nowhere to Turn: Victims Speak Out on Identity Theft</u>. It is the most widely cited survey quoted to quantify victim impact. The following Tables benchmark its findings with the findings from this survey:

#### Table 6– Average Active Time Spent by Victims Resolving Case

|  | 2000 | 2003 | % Increase |
|---|---|---|---|
| Average active time spent resolving case | 175 hours* | 607 hours | 247% |

*Seven of the 66 respondents reported spending between 500 and 1,500 hours.

#### Table 7 – Average Out-of-Pocket Dollars Spent by Victims

|  | 2000 | 2003 | % Increase |
|---|---|---|---|
| Average dollars spent resolving case | $808** | $1,495 | 85% |
| Minimum-Maximum | $30 - $2,000 | $4 - $30,000 | |

**. This figure does not include lawyers' fees. Forty-nine percent (49%) of 66 surveyed hired an attorney. Fees ranged from $800 to $40,000.

## 15. Financial Impact on Business

**Impact on Tourism and Hospitality Industry:** The amount of hours that a victim must spend on recovery undoubtedly has a profound affect on the hospitality and tourism industry. If we consider only time spent including vacation time and personal leave time invested in resolving identity theft (74 hours versus 607 hours total time spent), the impact on reduced vacation time is considerable. That number translates into nearly 2 weeks of lost vacation time per victim.

Add to that figure the average out-of-pocket cost to resolve identity theft ($1,495). The total result is less discretionary income and time which results in directly impact the hospitality and tourism industry. From our survey results, we found that 37% of identity theft victims used vacation and leave time to resolve the problems. By applying that 37% figure to the total victim population of 7 million, we estimate that 2,590,000 people spent time away from family and lost vacation time. That translates to approximately 5 million fewer vacation weeks booked and a loss of nearly $4 billion in lost vacation expenditures.

**Business Costs:**  Perhaps the area of greatest discussion in the Identity Theft debate is the total cost to the business community. Until this study, ITRC multiplied the total number of victims (7 million) by $17,000 (from the Florida Grand Jury Study), resulting in a total of $119 billion per year in fraud costs to businesses as a result of identity theft. The Federal Trade Commission estimated business losses at $48 billion for 2002.

According to our findings, those figures may be too low. Our findings show average per victim total fraudulent dollars charged equals $92,893 (vs. the $17,000 from other studies). Even if we eliminate the one large loss figure of $7 million from our study, the average loss figure is $39,863. That translates into total business losses of $279 billion. That figure does not include any expenditure by businesses for attempted recovery.

The charts below show the results of the latest ITRC study. However, due to the number of victims who were unable to quantify the total charges (case still in process or other reasons), this part of the study must be considered incomplete and needing of further study. Due to this, ITRC will conduct another survey in the future and focus "Identity Theft: The Aftermath -2003" on victim impact rather than business impact.

Nonetheless, ITRC hopes that the business community will consider the numbers presented as significant and part of a growing trend.

### Table 8 – Total Fraudulent Dollars Charged on Accounts

|  | Fraudulent Dollars Charged on Accounts per Victim |
|---|---|
| Average | $92,893 |
| Median | $10,000 |
| Range | $4- $6,999,996 |
| Number of Responses | 132 |

Approximately 78% of respondents (132 victims) reported fraudulent charges on accounts. Responses ranged from a low of $4 to a high of $7,000,000. Survey respondents reported a total of $12,261,923 in fraudulent charges. See the chart in the Addendum section to view individual answers. High numbers were confirmed with ITRC staff who worked with these individual victims.

The actual figure is most likely higher. Many respondents report being unable to estimate total fraudulent charges or that the figure continues to rise. One respondent reported having stocks and

copyrights stolen. Others are unable to place a dollar value on what was accumulated by the thief due to inadequate information from credit issuers who refuse to share account information.

**Table 9 – Distribution of Fraudulent Dollars Charged on Accounts**

|  | Number of Responses | % of Total |
|---|---|---|
| <$4,999 | 43 | 32% |
| $5,000-$19,999 | 38 | 29% |
| $20,000-$49,999 | 27 | 20% |
| $50,000-$99,999 | 13 | 10% |
| $100,000-$199,999 | 5 | 4% |
| $200,000-$1,000,000 | 5 | 4% |
| $7,000,000 | 1 | 1% |
| Total | 132 | 100% |

Ten percent of respondents had fraudulent charges in excess of $50,000 and an additional 9% had fraudulent charges in excess of $100,000. One respondent actually reported $7,000,000 in fraudulent charges. ITRC has worked with this victim. This person's name was used to buy cars, several parcels of property, declare bankruptcy, open in excess of 20 credit cards, obtain numerous loans as well as medical services, rent an apartment and more.

**Table 10 – Number of Credit Card Applications or Checks Written**

|  | Total # of Credit Card Applications | In Person | By Internet | By Telephone | Total # of Checks Written |
|---|---|---|---|---|---|
| Average | 8.4 | 4.8 | 3.3 | 3.5 | 74.55 |
| Median | 5 | 2 | 2 | 2 | 8 |
| Highest | 99 | 24 | 9 | 9 | Up to 999 |
| Minimum | 1 | 1 | 1 | 1 | 1 |
| Maximum | 100 | 25 | 10 | 10 | 1,000 |
| Number of Responses | 84 | 41 | 33 | 23 | 29 |

**Benchmarking**

In May 2000, Privacy Rights Clearinghouse and CALPIRG published <u>Nowhere to Turn: Victims Speak Out on Identity Theft</u>. [vi] It is the most widely cited survey quoted to quantify victim impact. The following tables benchmark that study's findings with the findings from ITRC's survey:

**Table 11 – Average Fraudulent Charges on Accounts**

|  | 2000 | 2003 | % Increase |
|---|---|---|---|
| Average fraudulent charges on accounts | $18,000 | $92,893 | 416% |
| Minimum-Maximum | $250 - $200,000 | $4 - $7,000,000 |  |

## 16. General Responsiveness Toward Victims

It is clear from this study that in many cases the entire system that victims must work with – law enforcement, credit issuers, financial institutions, and credit bureaus – are not doing enough to support and assist victims.

Satisfaction scores are very low in comparison to the levels of service institutions would expect of themselves. Collection agencies in particular rank very low for accessibility, providing the right information and resolving the problem. While consumer awareness of the issue of identity theft is high, it seems the system they must work with in the recovery process has a long way to go.

The lack of apparent responsiveness, the need to repeatedly contact the same entities, send numerous letters, deal with lost or misplaced fraud forms, the reselling of collection accounts after resolution add to the battering a victim must suffer. In the Emotional Impact, it is clear that many victims suffer from symptoms associated with Post Traumatic Stress Disorder and Repeated Abuse. Indeed, victims often complain of feeling "battered by the system" and "betrayed by those they thought were there to help."

After reviewing this new study, Beth Givens[vii], the Director of Privacy Rights Clearinghouse and a co-author of the 2000 study entitled "Nowhere to Turn", expressed her dismay with the "Responsiveness to Victims" questions.

*I don't see any significant changes in the attitudes of the entities with whom the victim must interact since our original study. I had hoped that the massive education campaigns and media attention to this topic would have brought more enlightenment to the business community, law enforcement and governmental agencies.*

The following victim summarizes the complexity that some victims must face.

*The police department didn't want to help unless the amount was over $50k or $100k or unless it is high tech related. To this day, they have not helped. The imposter kept reconnecting utility service at a known address in my name for a month after I found out about the fraud. The utility co. & cable co. did not seem to have a fraud department or know how to deal with this crime. There was never anyone I could meet with and talk to. My attorney general's office told me to go to police department who then told me to talk with the attorney general's office. I didn't know if I was taking the correct steps or who to contact.*

*The Postmaster and the Inspector General (SSA) still has not contacted me or returned calls pertaining to report I filed. I want all mail with my name on it forwarded to my current address from the fraud address. However I was told that unless I had something showing the person forged my signature they could not do so. Credit companies asked for my marriage and birth certificates, my husband's SS# & Driver's license # when the fraud occurred several years before I was married and does not concern him. It took 3 YEARS for some of the fraud to appear on my credit report. This person is probably using several different identities & is still at large. I still don't know how*

*they got my information or how to stop them. No one cares. I can't fight this anymore, maybe I should just give up.*

Business analysis (P. Colins):  *Credit cards appear to be the overwhelming choice for thieves, probably because of easy access this provides to cash. It is clearly expensive for institutions to have to deal with repeated customer contacts and obviously a frustrating and emotional experience for the victims. It indicates many organizations do not have standard procedures in place on how to handle the problem. The fact that less than half spoke with a professional investigator indicates institutions are either not investing in these types of personnel or do not have procedures to get the complaint to them. Satisfaction ratings for the process are clearly far below what any organization would view as being satisfactory for a consumer experience.*

The following responses to the next question speak volumes. One third of all victims have been unable to clear negative items from credit reports and/or criminal records. This reflects on their ability to get credit, jobs, tenancy, make purchases and provide for their families.

| I have not been able to eliminate all the negative items from my credit reports and/or criminal records. | Number of Responses | Response Ratio |
|---|---|---|
| Yes | 88 | 66% |
| No | 46 | 34% |

## 17. Responsiveness of Credit Issuers, Financial Institutions and Utility/Cellular Companies

While the credit issuers appear to perform worse, that may be in part because credit cards appear to be the overwhelming choice for thieves, probably because of easy access to cash and merchandise. Victims frequently reported frustration that the thief was able to open a credit card without question while they went through months of "proving their innocence."

ITRC did not ask if fraud alerts (placed with the CRAs) were ignored. Anecdotally, many victims complain of this problem. However, since the credit issuers complain that they do not always see fraud alerts, in that there is a lag time between the opening of an account and the notice to the CRA and that some companies do not place an account on a credit report until it goes to collection, this question will be held for a future study.

One victim summarized her experience:  *The credit bureaus insisted in including information in my files with no proof; they refused to remove the information even when provided evidence of the debts not being mine. Please also note that the thief was an employee of the Federal Government who used government files to obtain information about me.*

**Victim Response:**



Finally, the banks were asked two additional questions, primarily because of the issue of checking accounts.

**Question #1:** The bank helped me deal with merchants who had accepted bad checks – only 11 answered yes.

**Question #2:** After a 2-month period of time, at least one merchant/company is still trying to collect money from you -- 14 people responded yes.

## 18.  Responsiveness of Credit Bureaus (CRAs) - Equifax, TransUnion and Experian

Victims were asked the same series of questions about each of credit reporting agencies. For the most part, there were only a few percentage points difference between the answers. Any significant differences will be noted as part of this analysis.

The first set of questions addressed the ease in understanding the report once received. On average, only 44% of all respondents said they "easily understood the information in the format provided." That means that more than half of all recipients do not easily understand the information being sent out.

The most difficult section for all respondents was the inquiries section. The question asked was: "It was not clear which were inquiries due to applications vs. promotional offers." Approximately one in five people said they could not figure out that section of the report. Experian fared slightly worse than the other two CRAs, however the respondents also rated Experian as being the clearest to understand in the personal information section.

The second section discussed how well the bureaus educated consumers/victims once they received a report. Consistently all three bureaus did a very poor job of educating the public about fraud alerts and in helping people who called in for assistance. On average only one in five people found it easy to speak with or reach a person AFTER receiving a report. Once they did reach a fraud/customer service person, only 16% found the person "helpful and answered most, if not all, of my questions."

Finally, the survey addressed the bureaus response to disputes. ITRC found that only 17% of the respondents had success in getting misinformation or errors removed from the report after the first request. Sixty-six percent of all respondents needed to send dispute information repeatedly.

## 19.  Responsiveness of Collection Agencies

While ITRC has been working in conjunction with the California Collectors Association, it is clear that of all the groups that victims must encounter, collection agencies top the list as the most irritating, least cooperative and least flexible group.

Part of the problem is in the wording of the Fair Debt Collection Practices Act in that it does not address the problem of identity theft. This is a complaint voiced by honest collection agencies across the nation.

However, it does not excuse the fact that only 14% of all victims report being treated with respect. One third report being sent around in circles, bounced between collection agencies and credit issuers. Those who don't speak English have an even more difficult time. It is ITRC's observation that they are treated with even less respect; in these cases, victim's rights are all but ignored.

All analysts who have looked at this report agree that it is consistent with other victim surveys and anecdotal data. There is considerable room here for collection agencies to improve - by taking simple steps such as better training to improve their image and thereby alleviate some of the victim pain.

It is also imperative that the federal government take a hard look at the FDCPA to amend it to account for identity theft case resolution.

| About collection agencies: Regarding the majority of the agencies- (click all that apply) | Number of Responses | Response Ratio |
|---|---|---|
| I was easily able to find a contact telephone number | 23 | 24% |
| The agency told me to call the credit issuer who in turn told me to call the collector. | 34 | 36% |
| The person I worked with at the collection agency treated me with respect | 13 | 14% |
| It took more than 3 contacts to clear my records | 37 | 39% |
| It took more than 3 months to settle this issue | 49 | 52% |
| At least one collector lost documents I sent certified, return receipt mail | 19 | 20% |
| At least one company promised (promises) to clear my records but the notice continued to remain on my credit report for more than 2 months | 43 | 46% |
| At least one company refused (refuses) to clear my account despite supporting evidence | 42 | 45% |
| At least one company refuses to send me a "letter of clearance" upon my request | 36 | 38% |

## 20. Responsiveness of Police

Given the growing number of members of law enforcement that have contacted the ITRC office for information to help victims, the results of this study were disappointing yet also were consistent with an informal study currently on the ITRC website.

When asked about their "biggest frustration" a good number of victims complained of the apparent unwillingness of the police to take a police report. This was also reflected in the survey questions below. Approximately 87% of all respondents contacted the police in the jurisdiction where they lived. However, only 50% were able to get a report taken during the first contact. An additional 21% of all victims finally got a report taken after multiple contacts. Fifty-three percent needed to contact more than one police agency and 56% of all respondents "felt bounced from one agency to another with no one willing to help." Unfortunately, 27% also replied that they never were able to make a police report.

A cross tabulation of police responsiveness and states indicated that with the exception of a few states, the results were consistent across the nation. This was true even in California that has had a law since 2000 (PC 530.6) stating the police must take a report in the jurisdiction where the victim lives. In that state 58% of victims felt bounced about, 30% had to call more than once to get a report taken and 23% of them were unable to get a report taken. Due to survey limitations, ITRC was unable to determine whether all the cases took place prior to the law enactment.

Without a police report, victims have a more difficult time clearing their names with credit issuers. Clearly, the above statistics show that victims are struggling to be heard and are feeling victimized by the very people that they feel should be protecting and assisting them. In fact, in the emotional impact section of this survey, as many as 64% of respondents reported a "change in feeling that you are protected by law enforcement or the law."

Their distress and change in attitude toward law enforcement is summarized in this victim's statement:  *The POLICE DEPT claims they get Identity Theft cases everyday yet they don't have a system to deal with even the simplest calls. They are supposed to protect and serve -but instead are protecting the criminals. Their everyday failures had amplified the severity and trauma of this experience for me.*

ITRC recognizes that law enforcement is staff and budget challenged, however, this findings of this survey must be taken into account when budget and staffing is being considered.

| THE POLICE: | | Number of Responses | Response Ratio |
|---|---|---|---|
| I contacted the police in the jurisdiction where I live. | | 141 | 88% |
| They took a report during my first contact. | | 82 | 51% |
| I had to contact them more than once to get a report taken. | | 33 | 21% |
| They never took a report. | | 42 | 26% |
| I received a written report from them. | | 46 | 29% |
| A detective was assigned to my case. | | 63 | 39% |
| Someone kept me informed about my case at least monthly, while it was active. | | 13 | 8% |
| I contacted more than one police department about my case | | 87 | 54% |
| I felt bounced from one agency to another with no one willing to help. | | 89 | 56% |

21. <u>Emotional Impact on Victim</u>

In the words of Paul Colins: *The range of emotions is wide and rather painful to read. Three-fourths of victims were left with a feeling of financial insecurity, 88% experienced anger, and 75% expressed a feeling of helplessness. While these feelings do appear to subside a little over time, the survey clearly shows for many victims the feelings linger on. While most surveys have focused on the financial costs to victims, these psychological impacts are generally unreported. They may, however, have far worse consequences for victims.*

As one victim put it: *My greatest frustration was lack of control of my financial destiny. I had always naively thought that my financial viability would be directly related to my own acts or omissions, and NOT contingent upon the arbitrary actions of some in the financial community. Was I greatly mistaken!*

Another said: *That I could never resolve the social mark against my name, thus repeated financial harm and shame and embarrassment became the way of life. It destroyed us and no one cared and we were not protected under law.*

ITRC believes the study questions speak for themselves. It is clear that the emotional impact on victims has been severely underrated. ITRC asked a psychologist who has worked extensively with crime victims to look over these results.

Dr. Charles Nelson summarizes the survey succinctly:

*Identity theft has been classified in many realms as a victimless crime. This survey was designed to test the emotional impact of identity theft and to discover if sufferers of this crime exhibit similar responses as those of more commonly recognized victims including rape, repeated abuse, and violent assault victims. Many of the listed symptoms are classic examples of Post Traumatic Stress Disorder and secondary PTSD (from secondary wounding).*

*While each crime has its own specific triggers and emotional responses, upon examination of these results, this study clearly proves that the impact of identity theft on its victims leaves similar scars and long- term impact as demonstrated by victims of violent crime. This comes as no surprise to victims of identity theft. Although there is no direct physical injury in this crime, identity theft victims know all too well the psychological, emotional, and social destructive swath of pain that has been cut through their lives.*

*Furthermore, it is clear that this crime has a ripple effect on the relationships in the victims' lives. This study found that numerous victims of this crime suffered a significant strain in the relationship with their significant other. Anecdotally, during ITRC focus groups victims have shared that this crime was a major contributing factor in a divorce due to the intense strain on one or both of the partners.*

*In family identity theft, some of the victims have gone through a process that resembles the struggle felt by those who are physically and repeated abused by family members. The conflicts are classic: We hear, "Any parent is better than no parent" and "I would be a bad person if I turned a relative*

*over to the police." In this situation, those individuals who are struggling with such decisions have put their own safety and self-esteem second to a perpetrator who doesn't care about hurting the victim. This conflict has the potential to impact the victim's ability to build loving and enduring relationships. Therapy is indicated in most of these cases.*

*Finally, I feel a need to comment on the number of victims who report feeling "dirty or defiled, guilty, ashamed or embarrassed, being an outcast, undeserving of assistance or having brought this crime upon myself." I believe this to be a myth similar to the ones we saw after an extensive media information campaign on rape and sexual assault prevention. Consumers are being told that they are the responsible party, if a crime occurs. "Top ten lists" of how to avoid victimization add to this perception.*

*In my professional opinion, for the self-blaming response to stop, victims need to learn that they are not the responsible party for this crime. Victims are victims, each with his or her own fingerprint of painful responses to the crimes committed. There are commonalities within the victimization responses found in each category of crime victims. This study discovered that there are also far more response similarities that identity theft victims share with ALL victims than previously realized.*

Please remember: This study group numbered approximately 170 individuals. The percentages indicated equal the number of responses compared to the number in the study group.

| Can you tell us about your emotional state? Since this began, have you experienced: (Check all that apply.)  ITRC also asked: Have you continued to feel symptoms beyond 2 months or to a severity that concerned you? (Check all that apply.) That number is shown in the 2nd column. | % of responses | "Long-term or severe"- % of responses. |
|---|---|---|
| Denial or disbelief | 48% | 14% |
| A feeling of being defiled or dirty | ██% | ██% |
| Rage or anger | 89% | 42% |
| Isolation | 42% | 18% |
| Feelings of betrayal | 57% | 31% |
| Feelings of guilt that you caused this to happen or did something wrong | ██% | █% |
| Change in feeling that you are protected by law enforcement or the law | 65% | 37% |
| Shame or embarrassment | ██% | ██% |
| Deep fears regarding personal financial security | 76% | 40% |
| Fears for the physical | 29% | 17% |



| | | |
|---|---|---|
| safety of family members | | |
| Fears for the financial safety of family members | 44% | 22% |
| Fear that you may never trust again | 45% | 22% |
| A loss of innocence | 33% | 11% |
| A sense of powerlessness or helplessness | 76% | 29% |
| Overwhelming sadness | 37% | 15% |
| Loss of sense of humor | 27% | 11% |
| An inability to concentrate | 40% | 18% |
| Misplaced anger on others | 41% | 15% |
| Deep need to withdraw from everyone | 29% | 16% |
| Start or restart unhealthy habits (i.e., alcohol, drugs, smoking, overeating) | 22% | 9% |
| A sense you were grieving | 30% | 10% |
| New physical illnesses or renewed illnesses that were under control | 25% | 16% |
| Sleep disturbances (unable to sleep, oversleeping, nightmares) | 54% | 26% |
| A sense of being a fool | 19% | 9% |
| A sense you are undeserving of help | 19% | 9% |

**Crime Affect on Victim Relationships:** During a focus group last year, one of the topics of discussion became the relationships in a victim's life. ITRC was taken aback by the number of victims whose relationships became negatively affected by the crime. The following question helps to understand the impact of this crime - not only on the victim but also on those on whom they depend.

| How has this affected the important relationships in your life? (Check all that apply) | Number of Responses | Response Ratio |
|---|---|---|
| My significant other left the relationship | 12 | 8% |
| My significant other is considering breaking off the relationship | 5 | 3% |

| | | |
|---|---|---|
| My significant other is considering breaking off the relationship | 5 | 3% |
| My family doesn't understand why I am feeling like I do | 49 | 34% |
| My family is not supportive | 14 | 10% |
| My significant other/family is emotionally supportive | 83 | 57% |
| My significant other took over many of the tasks to clear up this mess | 25 | 17% |
| My family life is stressed, perhaps due to my displaced anger and frustration | 77 | 53% |
| I feel betrayed by those close to me who don't want to understand my feelings. | 51 | 35% |
| This has affected my children who are aware of the situation. | 44 | 30% |

**Identity theft against family members, children and used as domestic abuse is** rarely talked about in public. There are many issues that victims deal with beyond the crime, including the impact of turning the perpetrator's name over to the police. Identity theft has been used for years as a way to continue to harass and abuse an individual. It is an extension of physical abuse and victim groups consist of both male and female individuals.

In terms of child identity theft, society must put a stop to this and recognize this as the crime that it is – child abuse.

*The legal system has a gaping hole in it when it comes to spouses committing crimes against other spouses. My father would have gone to jail for what my ex did; she walked scot-free.*

*Since the perpetrator was a relative, the credit issuers and police view it as "your problem." As if I created and facilitated the theft and thus deserve it.*

*This has been extremely difficult and frustrating. First, that it was my own mother who did this to me. That betrayal is overwhelming. Then the credit companies assume you are lying to get out of your debt to them and refuse to go out of their way to help you with your case.*

| If this is a case of family identity theft, where the imposter is a family member or from a former relationship: (Check all that apply) | Number of Responses | Response Ratio |
|---|---|---|
| The imposter has a history of needing money due to narcotics, alcohol, shopping or gambling | 19 | 53% |
| The same imposter has committed other types of crime. | 29 | 81% |
| The same imposter has done this to other family members. | 13 | 36% |
| I am torn about what to do. | 8 | 22% |
| I don't feel right about filing a police report on a family member | 5 | 14% |
| My family is assisting me in trying to force the imposter to accept responsibility for the actions. | 4 | 11% |
| My family has encouraged me to report this to the police | 9 | 25% |
| My family wants me to drop all charges and just pay the bills. | 5 | 14% |
| My family is torn about what to do | 7 | 19% |
| My family is ashamed or remains in denial | 8 | 22% |
| My family will turn against me if I take any action against this person | 5 | 14% |
| This person is destroying me by using identity theft to ruin my reputation | 19 | 53% |

## 22. Victim Frustrations

ITRC would like you to hear from the victims themselves. These comments have been taken from the survey directly. This is their last opportunity to be heard via this survey. Keep in mind that these comments reflect the victim's PERCEPTION and the reality of the life they have been forced to live based on the responsiveness and attitudes they have encountered. In some cases, ITRC believes that the "failure to communicate effectively" is a major problem of identity theft.

You will see repetition, rage, and frustration in their words. They have <u>earned</u> the right to speak thusly, and we ask that you listen with an open mind. Despite a long survey, 162 individuals took additional time to answer the question: "What is your greatest frustration?" Clearly, they still had a lot to say.

For ease in reading, we have tried to categorize comments whenever possible.

**Police and Courts:** Despite the questions already asked, almost 1/3 of the victims felt a need to further comment on the courts, police and criminal justice system. Many repeated the feeling that the police didn't care, that they were told they were not victims or a lack of follow-up despite substantiating evidence. Again, we urge you to consider – this is the perception of the victim. ITRC understands that not all cases end in an arrest. We believe that many of the below issues stem from a lack of good communication skills. This is why the ITRC has joined with law enforcement officers to create communication guidelines that are freely available on our website (www.idtheftcenter.org). It was designed to help alleviate this communication gap.

Sampling of comments included: (edited for brevity and grammar)

- *The police and authorities inability to care*
- *No help at all from the Los Angeles Police. Non- compliance of law from credit issuer MBNA America*
- *I don't think law enforcement is taking this seriously*
- *No process to follow. – NO support from law enforcement in my area*
- *That with all of the letters and proof that was presented on my behalf and the letters back from the different state agencies that after all was said and done they did NOTHING -- Never even brought my brother up on charges even to scare him.*
- *Not being able to clear the charges from my name. The police know I didn't do the crimes; however, it remains on my record.*
- *The biggest frustration was the police were trying to protect the criminal and said, "Well, you have to live with this the rest of your life and have it on your record." The police do not have a set of standard procedures or officers who know anything about identity theft. You are victimized three or four or more times before it is over with.*
- *The police – they had better things to do with their time besides my "miniscule" case*
- *Being forced to do my own investigation. NOT being informed by the police that the perp was arrested using my name – after they identified the false identity*
- *The court system. The message they are giving is that it's only "white collar" crime. The crooks know this and are working the system. We get victimized twice. We found the guy, and he already was serving two probations. He never should have been able to bail out but 1 year later he's still free and I'm very sure doing the same thing to others. We hired a private investigator and he found that he has hit as many as 62 people. What does it take?*

**Business Community, CRAs and Collection Agencies:** The business community including credit issuers, CRAs, utility/cellular companies and financial institutions did not fare much better. Again, victims felt moved to reemphasize their answers. Samplings included:

General frustration and attitude:

- *I wanted the creditors to treat me as a victim, to treat me with respect and, of course, they were rude. My biggest frustration was dealing with creditors is how they made me feel.*
- *I feel more victimized from the credit reporting agencies and the financial industry than the thieves*
- *Law enforcement and the businesses will not help you. Give me the $30,000 worth of merchandise that was purchased in my name – because the companies wrote it off anyway.*
- *My bank was where my information was stolen. They were less than honest even after.*
- *No one believed my story – creditors didn't want to help. I was bounced around, asked to mail in requested proof and it still stayed unresolved. I still get phone calls harassing me for payments.*
- *I had collection agencies calling me, very rude I might add, re: my overdue Wal-Mart acct. I told them I didn't have one and they hung up. It wasn't till a man called and verified my SSN that I became aware I was a victim. I could have got it cleared up months prior.*
- *Voice menus and not being able to reach anyone who cared to correct the information.*
- *I got treated like the thief. He got away. I still don't know what information he used so I can protect myself now. I have fewer rights than he does.*
- *Having to prove my identity when someone else was able to claim to be me with little or no proof.*
- *Being told repeatedly that I wasn't a victim – the bank, credit card companies, retailers, etc. were the victims, but not me! I doubt they lost sleep for nights on end because of my identity theft!*

Inactivity and resolution issues:

- *The banks. They wasted countless hours and treated me like I was a liar. They hung up on me occasionally and I threw my hands in the air and gave up. I had to let my credit be destroyed and then the problem stopped.*
- *The credit card and credit reporting agencies expect a lot of action on the victim's part. They do not do much work of their own. Do they really have a fraud investigation unit? If they do, what do they do? They require us to do all the work. Also, the imposter moves on and the victim is left to clean up the mess and left with the scars (bad credit).*
- *The disinterest of creditors to help and the willingness to close accounts I had in good standing without explanation although they were aware of the theft.*
- *Companies consistently refuse to act and remove erroneous items after all information they requested had been submitted to them. Documents consistently 'lost or misplaced' required re-sending and persistent delays.*
- *Having to repeatedly send the same letters to EVERYONE---several times.*
- *Companies not removing information from credit report when they promised to do so. Often meant starting the process all over again with that creditor.*
- *Washington Mutual had an absurd policy and terrible services. I called them hours after money was taken, and their rep. Said, "Oh usually it's just that people forget that they made the withdrawal." They would not close my account immediately because "We can't close an account with a pending fraud claim until the claim is resolved." I replied, "You mean I*

*can't be protected from further fraud because I am claiming fraud? They said, "Yes, that's right."*

- *My (then) bank, Wells Fargo was unable and unwilling to help me or stop it. They said they could not. As they credited money back into my account (daily) they suggested getting to the bank to withdraw it BEFORE it was taken out of my account again by the thieves. This was their solution.*
- *My inability to stop these people from continuing to apply for accounts in my name even after I produced a police report to the Credit Reporting Agencies. And the fact that there were arrests, a case number assigned and yet no one is doing anything. They're as free as I am, convincing me that there is no such thing as justice.*
- *One can never seem to get things cleared up. It keeps showing up time and time again.*

Enabling imposters:

- *Cell phone companies accepted information from the stolen check forms to pay old bills on various accounts. This was for hundreds of dollars. They encourage additional identity theft and fraud on themselves by refusing to turn in police reports. Same for some merchants who received forged checks from those presenting them in person who refused to make a police report. Cell phone carriers expect to be treated with credibility when they want something from the government (such as the FCC or maybe State PUCs) but refuse to make police reports on forgery, fraud, & identity theft.*
- *That the credit card was issued with just a version of my name and social, all over the phone, without the requirement to present personally positive picture ID, a signature, or a fingerprint. The card was then sent to an address that could not be verified on my credit report, and a second card issued at the same time under another surname. Sears Gold Master Card gave the police nothing to work with.*
- *They protected information about the thief from me that might have helped me clear myself. This guy was supposed to be me but they wouldn't tell me how he proved he was me.*
- *That despite placing warnings and allowing no instant credit notifications on my credit report that it is still being used to get cell phone service after two years.*
- *DFS called me pursuant to my fraud alert, was told the application was fraudulent, and then extended credit in my name to the imposter anyway.*
- *The loan companies giving bad loans without checking all information on such large amounts.*

**Governmental Agencies**

- *Knowing after 2 years that I have IRS money pending and it was not me and they were making me pay it. All the time I have spend to clear this up.*
- *When I was told by one of the governmental agencies that they could not help me unless I was in jail. The run around by California authorities.*
- *I even had the Attorney General' office of Dallas on the phone and they didn't know as much about the process as I did.*
- *The Federal Gov./ Secret Service had no time for my $200,000 Identity theft issue! It was left to local police and never prosecuted.*
- *That I received absolutely no help. My case was a government issue and no one would provide any information beyond the initial notification. To this day I have no idea who did*

*this to me, why or how they got my information. Not to mention that they were never convicted. I have had no recourse.*

## Military/Students

- *As a military member, it was very difficult to get someone to take a police report. Additionally, if this were to happen while deployed overseas, it would be virtually impossible to stop or clear up until I returned home. For those who have security clearances, ID theft or mistakes by credit reporting agencies can end a military career.*
- *When I called the collection agency—I gave them my SSN and they said my name. My mouth dropped and I started crying. I am only 18 years old. I don't owe anyone anything. It hurts. And it scares me!!*

## General and Emotional Impact

- *That she is a repeat offender who continues to abuse others in this same manner. I cannot stop her from hurting other people no matter how much I want to. It is like watching her rape again and again.*
- *I felt like I was the criminal rather than the victim. There were handwriting analysis papers and an affidavit that had to be done. It was really demeaning.*
- *Not knowing who is using the info, how they got the info and exactly what info they have. Also, feeling that everyone listens and is sympathetic but no one is prepared to investigate the matter.*
- *Law enforcement will not help you. If you want companies to be charged with crimes they committed and are on the books, you must file a civil suit. People will treat you like it is your fault.*
- *To be accused of something I did not do and still having to go through today until the next court date.*
- *The time it took to make all the phone calls and all the follow up calls. The underlying sense that "they" could still be out there with my "information!"*
- *Not knowing who & why.*
- *Wanting to talk about it, and no one really wants to hear it.*
- *It only took a few experiences of telling my Identity Theft charges to recognize what I would come to eventually dread: I was treated as though half-looped or crazy and therefore my believability suffered. I might as well have been reporting having seen little green men.*
- *I can't do anything about what happened. No one can help. Very frustrating having no bank account, no credit, just sitting and waiting for something bad to happen.*
- *Being treated like I was a criminal, as if I had caused the whole mess.*
- *No one believes you and they won't help.*
- *Being told that you can't have a job because of an arrest record. Or the gender doesn't match and people look at you strange and treat you less than human because they think you're something other than what you are.*
- *No one would listen or help. The law seems to HELP these people...no one is really clear on what my rights were. I didn't know what kind of remedies I had.*
- *I feel "swept under the rug."*

23. <u>ITRC Recommendations</u> – **Category by category**

A. **Law Enforcement:**
1. Increase sensitivity training on how to take a report, respond initially to a victim and on what information to provide during the initial identity theft crisis.
2. Take police reports on every case of reported identity theft crime in your OWN jurisdiction the FIRST time the victim calls and make those reports available to the victim.
3. The reality is that you may only be taking a courtesy report and then forwarding it to the agency that has the ability (budget, staff and crime focus) to deal with the case. However, the victim needs this report to clear their financial records.
4. Keep track of crime statistics. Law enforcement will ultimately give us the best statistics as to the nature of this crime.
5. Ultimately, the FBI must keep track of identity theft as they do other crimes. This crime needs to be broken into a number of sections: financial, criminal, cloning, mail fraud, etc.
6. Provide some follow-up help for victims. After an initial report, one person needs to talk with the victim and help them understand the case through the eyes of a detective. In interviewing the victim, you may find additional information that will result in an arrest. This will cut down on the victim's perception that "you don't care."
7. Commit to stopping this crime by providing the budget, staffing and training your force needs to be effective.
8. Find other local and federal law enforcement agencies to taskforce with and work smart.
9. Criminal cases- when issuing a citation to an individual without proper identification (driver's license), ask to have the individual place a thumbprint on the citation for possible comparison to the victim who contends this is a case of criminal identity theft.

B. **Credit issuers, CRAs, financial institutions, utility and cellular phone companies**
1. Establish procedures for in-house processing of identity theft complaints.
2. Investigate all possible options for better processing of applications including many of the business solutions that are becoming widely available.
3. Order header information along with credit scores and check for any inconsistencies. Individuals do not misspell their last names or forget their birth dates.
4. When an application is submitted in person, ask and photocopy identifying information. This will help in investigations of fraud.
5. Work with legislators across the country to enact a law that allows confirmed victims access to copies of application and transaction information for any fraudulent account created in their name. This should be done to provide you with a release of liability for providing information in the event an individual misuses it.
6. Observe security and fraud alerts on credit reports – to the letter!

7. Prosecute thieves whenever possible and cooperate with law enforcement in sting operations.
8. Provide a letter of clearance to the victim in case of future problems or to assist in other case resolution.
9. Treat all customers with respect, even those who declare themselves a victim of identity theft. This person will either become your worst public relations nightmare or most loyal customer. The choice is yours.

## C. Collection Agencies:

1. Work with your state and national Collections Association in finding better ways to communicate with identity theft victims.
2. Appoint a special customer service or fraud specialist to all identity theft cases. This person should be well versed in this crime. Ideally, this person should handle all ID theft cases for the firm/company.
3. Again there needs to be sensitivity training about the problem of identity theft. Each person who answers your phones needs to have a broad understanding of this crime and have the ability to keep an open mind as to the possibility that they are speaking with a victim and not a person who owes money. Too many victims are just being told - "We don't care who opened the account. Send us the money."
4. Cooperate with victims seeking information on the account. If the burden of proving innocence rests on the victim, they must have access to transaction and application information.
5. Once a case is confirmed as fraud or identity theft, it needs to be CLEARLY marked as such and never sold, traded, transferred or given to another company.
6. The clearance of the account needs to be provided in writing to the victim and to the original granter.
7. Follow-up and help that victim remove the record from credit reports including the original account and the original inquiry.
8. Move quickly on cases with time constraints, especially for those victims dealing with loan issues.
9. If judgments have been filed or cases have been turned over for criminal consideration, immediately reverse those actions.

## D. Dealing with a diverse population – language barriers

1. Today it is impossible for someone who speaks a language other than English to place a request for a credit report or fraud alert with the Credit Reporting Agencies. The CRAs need to provide a Spanish option on the computerized phone systems and to have a Spanish guide to assist in reading one's credit report.
2. Other language groups also need consideration, perhaps depending on U.S. Census records to determine the top 10 languages most prevalent in the United States.
3. We must also consider the needs of the deaf population in a similar manner.
4. All other entities that deal with victim populations must have translators available to assist those who do not speak English.

5. Not speaking English is not an excuse to deprive an individual of his or her rights during credit or collection processes.

## E. Business Community

1. ITRC believes the only way to combat this crime is to limit a criminal's access to identifying information.
2. It is critical that any information you desire to collect be assessed for actual need.
3. Information obtained must be treated as highly confidential, protected to the best of your ability and disposed of in a safe and secure method.
4. Should the information be breached, the affected individuals need to be notified in a timely manner (sometimes dictated by law enforcement) with information on what to do, who to contact for additional information, and with assistance provided as necessary.

## 24. In Conclusion

This survey was painful to read and to summarize, especially by victims who have lived through this situation. Perhaps the emotions of many can be summarized by this victim's final thoughts:

*It cannot be undone once someone has your info. They have it, period. I am at my worst enemy's mercy for the rest of my life and he has no mercy. The police, the courts, the credit agencies, and Social Security all were completely worthless and of no help. I have no faith in the law protecting me anymore. It has failed me so many times.*

Identity Theft is increasing in numbers and the impact on its victims is also increasing. Survey findings overwhelming point to evidence that victims are losing an increasing amount of time and money to solve their cases.

From the survey, we now have a dollar estimate for victim's lost time. We also have an estimate of victim impact relating to employment, leave time, and medical services. The range of victim impact is increasing, with a consistent percentage of victims experiencing high-end time and cost impact. Fraudulent dollar charges on accounts are dramatically increasing. Finally, we are now able to benchmark statistics against a 2000 survey.

This survey also tested the responsiveness of the various entities that victims must deal with on a regular basis. Many were found to be severely lacking in dealing with individuals in an effective and respectful manner. We must remember that these people are humans that have been victimized once already. It is criminal for the very systems they need to interact with to continue the battering.

Decreasing victim impact begins with decreasing identity theft numbers. Consumers have not been the primary source in imposters gaining access to information. Businesses must begin to adopt a different approach to business practices and be willing to invest upfront dollars in new processes and business solutions that protect consumers from identity theft.

Ed Mierzwinski, consumer advocate at U.S. PIRG. He is the author of several articles on identity theft and co-writer of "Nowhere to Turn" adds: *ITRC's comprehensive findings that victims, not*

*banks, pay the real price of identity theft should serve as a wakeup call to the Congress not to take away state authority to fight identity theft. States have long been the leaders in fighting identity theft, while Congress ignored the problem, but now that Congress has finally gotten involved, it's more concerned with eliminating state authority than any other actual solutions, because that's what the banks want. Congress this year has listened too much to the incompetent banks and credit bureaus, whose sloppy practices lead to identity theft. Unless citizens and victims call now, Congress is poised to pass a law that will prevent states from fighting identity theft.*

Legislators must pass laws that assist in victim recovery and enforce safe information handling practices. Unfortunately, until the last few weeks (as of Sept 03), Congress has remained almost completely mute on the problem of identity theft. Bills that have been introduced years ago have not seen the light of day. We have been promised "strong national laws to combat this problem." That remains to be seen. The National Association of Attorney Generals, law enforcement and consumer groups including ITRC remain dedicated to maintaining state rights in dealing with identity theft. State legislative groups have been responsive and we must protect their ability to continue to help consumers.

Finally, we need to recognize identity theft has long-term impacts on its victims and treat them with respect, consideration and empathy. Identity theft is not a minor irritation or a few hours of aggravation.

The victims have spoken and their message is a sad tale of frustration and distrust for those they thought would protect them. When asked what advice they would give to other victims, some are unable to reply -- "I am devastated" and "I have no advice to give." They have lost hope and that is the most painful part of being a victim advocate.

The survey findings have quantified victim impact in detail, perhaps for the first time ever. Legislators, law enforcement agencies, and the business community -- please listen. Based on the Gartner Study, 899 people each hour are becoming victims of this crime. How will you treat them? How will you answer their questions? Will they finally be respected as victims and not re-battered by your system?

Thank you for your time and attention. Identity theft is the pollution of the information age. Let us not wait until the damage is irreversible, as we have come so close to doing with the environment. The time to make changes is now, and as a team we can accomplish "the impossible."

A few last words from Linda Foley, ITRC's executive director:

*"In 1997 I became a victim of this crime. In my frustration to understand and to regain some power back into my life, my husband aided me in starting the ITRC. I knew my life had been forever altered by this crime but I had not realized at that time how easy my case had been.*

*Writing this report has been heartbreaking. For each person who shared their experiences with us, I know there are thousands who still remain voiceless – ashamed to come forward, too battered to try, too frustrated to reach out for help and too angry to dare to let the words come to the surface. These are our brothers, sisters, parents and children. Hillary Clinton said that it takes a village to raise a child. It will take all of us to control this crime and help to heal its victims."*

Addendums
A. Survey Methodology

During June 2003, ITRC developed an online survey to distribute to approximately 2,000 victims that had contacted the ITRC between September 2001 and July 2003 via email or for whom we had an email address. An agreement was reached between Dr. Dale Pletcher (and his students) and ITRC to work together to bring the findings to fruition in a complete report detailing the economic and emotional impact of identity theft on victims.

On July 24, 2003, ITRC staff emailed a letter entitled "Identity Theft: The Aftermath – 2003: A Study to illuminate the long-term victim impact of this crime" inviting victims to participate by completing an online survey. The study's objectives were clearly outlined with these words, "We know your anger, frustration and angst in dealing with this crime and we have tried to make those feelings known when we talk about victimization. However, government groups and legislators want to see numbers and charts so we need to "quantify" how this crime affected you. They need to understand and see the impact this crime has."

Survey questions addressed the following topics: the type of identity theft sustained, how the identity was stolen and what it was used for, the dollars in fraudulent charges, the number of months the victim spent (or is spending) trying to close his/her case, whether or not the theft was the result of a computer breach, and the experienced level of ease in dealing with collection agencies, financial institutions, the three credit reporting agencies, and the police. All facets of victim impact are addressed in length, and include questions such as the types of post problems sustained (i.e. denied credit, negative impact on credit report, lost job, criminal investigation, etc.). Questions that quantify economic and emotional impact, such as the amount of out-of-pocket time and cost spent by victims have been included, allowing the impact of this crime to be quantified. Finally, victims are asked what actions and/or laws would decrease the time and cost spent by victims.

Out of the 2,000 surveys sent, approximately 25% were returned as undeliverable. According to Linda Foley, victims tend to change methods of contact to avoid harassment from bill collectors. Thus, the population of surveys decreased to 1,500. Any surveys submitted after Sept 1, 2003 (172 completed) were not included in this survey. The financial statistics were done at the end of August and included the first 169 surveys. The total responses represent about 12% of the total group, a slightly higher than normal response rate for similar studies.

It was expected that many victims would not respond due the unwillingness to discuss or relive the case. This is not unusual for identity theft victims, due to the intense emotional impact of this crime. More than 95% of the victims that ITRC deals with refuse to go public, speak with media or attend support group programs.

Finally, as in many studies there were inconsistencies in answers and a failure to anticipate answers. Using the survey program, ITRC staff members were able to view each individual's answers and try to account for answers that didn't make sense. These problems were rectified to the best of our ability but will account for a slight error rate, a problem that is symptomatic of all studies.

b. **Other Studies:**

CALPIRG and Privacy Rights Clearinghouse

The California Public Interest Research Group (CalPIRG)[viii] and Privacy Rights Clearinghouse (PRC) have been helping victims of identity theft for years through advocacy, free guides, and hotlines. Along with the Identity Theft Resource Center (ITRC), consumer groups have talked to thousands of victims over the phone, through letters and e-mail, and in person. In fact, ITRC began as a splinter program of PRC in December 1999.

In May 2000, CalPIRG and PRC published the landmark "Nowhere to Turn: Victims Speak Out on Identity Theft – A Survey of Identity Theft Victims and Recommendations for Reform." This report was the first in-depth survey of victim impact. It summarizes key findings from 66 identity theft victims during Spring 2000. The highlights included:

- 45% of the victims considered their cases to be solved; and it took them an average of 23 months to resolve them. Victims (55%) whose cases remained unsolved, reported that their cases had already been open for an average of 44 months.
- 76% were victims of "true name fraud." Thieves opened an average of six new fraudulent accounts.
- The average total fraudulent charges were $18,000, with reported charges ranging from $250 to $200,000.
- The victims spent an average of 175 hours actively trying to resolve the problems caused by their identity theft. The average loss from out-of-pocket costs was $808. Forty-nine percent of the victims contacted an attorney. While many received free advice from public interest law firms, fees ranged from ranged from $800 to $40,000 for victims that paid for services.
- Victims reported that it was difficult to reach the credit bureaus (especially Equifax), less than two-thirds believed that the credit bureaus were effective in removing the fraudulent accounts or placing a fraud alert on their reports, and 46% of the victims' fraud recurred after placing a fraud alert on their credit report.
- The most common problem experienced by victims was lost time. Other reported consequences were: long-term negative impact on credit reports, being denied credit or a loan, and even being subjected to criminal investigations (12%).

CALPIRG and Privacy Rights Clearinghouse concluded that although the surveyed victims had financial fraud committed against them that totaled as much as $200,000, the common theme was that "stress, emotional trauma, time lost, and damaged credit reputation – not the financial aspect of the fraud – were the most difficult problems. Victims report that they feel violated, helpless, and angry." [ix]

Federal Trade Commission (FTC) Studies [x]

For the past several years, the FTC has maintained a database of consumer fraud complaints and law enforcement reports of criminal cases. In 2002, approximately 45% or 161,819 calls were due to identity theft. Since the FTC numbers are based on voluntary participation by consumers, and

many victims already feel they have enough calls to make, clearly not all victims have contacted the FTC to report the crime.

However, some of the statistical data based on this database (based on similar victims groups as those interviewed for this survey), especially in terms of how information was used has remained consistent throughout the last several years.

Since the FTC database is usually based on "moment of discovery" information, long-term victim impact studies will vary with details on costs to victims, businesses, numbers of hours, etc. This is because at the time the victim contacted the FTC, they had not realized the final impact of the crime.

Per a GAO study, the extent of harm reported to the FTC depends on the victims' knowledge at the time they call the FTC. (GAO-02-363)  Some victims call the FTC shortly after they discover the theft, while others may not hear about the hotline until months after they discover the crime. Thieves may continue to misuse identities long after victims call the hotline; the amount of harm that the victims are aware of at the time they call the FTC may not be the full extent of the harm they have or will experience.

Governmental Accounting Office (GAO)

The GAO has done numerous studies on identity theft, with varying answers and statistics. These reports are done by Congressional request and to answer specific questions. In the report released on February 14, 2002, Identity Theft: Available Data Indicate Growth in Prevalence and Cost , the GAO reiterated that the prevalence of identity theft was increasing. The report concluded that the cost of identity theft to victims includes potentially severe emotional harm as well as economic harm. "Even though financial institutions may not hold victims liable for fraudulent debts, victims feel "personally violated" and have reported significant amounts of time trying to resolve the problems caused by identity theft – problems such as bounced checks, loan denials, credit card application rejections, and debt collection harassment." (GAO-02-424T) In addition, a second report "Identity Theft: Prevalence and Cost Appear to be Growing,"GAO-02-363 included the following table. It is based on 94,100 FTC Data Clearinghouse complaints.

### Non-monetary Harm

| Type of Harm | Number of Complaints |
|---|---|
| Denied Credit | 7000 |
| Lost Time | 3500 |
| Criminal Investigation, Arrest, or Conviction | 1300 |

### Table 3 - Monetary Harm

| Type of Harm | Number of Complaints |
|---|---|
| Reported some out-of-pocket expenses | 2633* |

*Of the 2,633 complaints, 207 each alleged losses above $5,000; another 203 alleged losses above $10,000.

For one study, the FTC provided the GAO with the names and telephone number of 10 victims with the intent of obtaining direct understanding of their experiences. The 10 victims were selected to illustrate a range in the extent and variety of identity theft activities reported by victims; experiences of the 10 victims were not statistically representative of all victims. Findings from these interviews revealed that nine out of the 10 victims reported non-monetary as well as monetary harm. Regarding non-monetary harm, victims reported being harassed by collection agencies, expending time to clear their names, having difficulty obtaining credit, and losing productivity at work. One victim was the subject of an arrest warrant, based on speeding tickets issued to the perpetrator, and another victim was taken into police custody for a drug-related search stemming from the impersonator's illegal activities. The victims' out-of-pocket expenses were relatively low. However, two victims reported losing a job and wages, and another two victims reported an inability to obtain tax refunds. (GAO-02-363)

Florida Grand Jury Study (found at www.idtheftcenter.org under Speeches), January 2002

ITRC has found that nearly all the information reported in that study more than 1 ½ years ago still is relevant and true to the nature of this crime. The victim incidents are identical to the complaints being heard today. The recommendations made by this panel also apply today and many need to be adopted by every state in the nation.

## C. Pearls of Wisdom – From one victim to the next

- Know that you aren't alone.

- Do what you have to and then realize that it's not your fault and go about your life and enjoy it knowing that one day it will clear up. If you can't get a job because of it, get a lawyer and sue them. Go back to school/college and renew you mind and self worth is not found in a credit file or a false arrest record. Hold your head up and know that one day, they'll owe you an apology and possibly a lawsuit settlement. Place passwords on all existing accounts; Shred all documents; Check credit reports at least once a year

- Change the laws. Laws are inadequate.

- Get help from victim support programs

- Seek lots of support and get involved for change

- Be professional and practice good telephone manners. It is easier to be taken seriously.

- Try to hold on to your faith. Somehow, things will work out. Find someone to talk to--get into counseling. Don't give up and keep fighting for what is right.

- Victims must to be empowered to reclaim their financial identities. Empowerment can be gained through knowledge of our rights as victims of identity theft. Read the "Summary of Your Rights" information given by the CRA's with your credit reports and consult with agencies such as the ITRC and FTC. I firmly believe if both ID theft victims and the public at large were aware of the lack of penalties for those in the credit industry who fail in their legally mandated responsibilities, there would be a public outcry. The public outcry might help to create better laws that would both assist future victims AND help to give better incentive for the industry to act more responsibly, and therefore, help stymie the growth of ID Theft.

- Act immediately. Contact police. Get credit reports and start systematically making contacts.

- Document, document, document. Keep good records of everyone you speak with and what they said.

- Seek help. Follow instructions. Use ITRC's information. It really helped me.

- Fight back. Even if a family member, file a report -- put them in jail.

- Aggressively pursue correcting problems resulting from the ID theft, such as demanding a police report with your own copy and disputing fraudulent items on credit files.

- If the criminal is a family member: do the right thing and file a police report. Don't listen to what others have to say. They are not in charge of your security or the security of your own family (if you have or want children). In making this decision, try to think in simple terms: What this person is doing is hurting me. If I do nothing, I am allowing this person (who obviously doesn't care about me) to hurt me and the future of my own or future family. Do it because you love yourself over the criminal -- because in cases like these you can't have both. You must choose.

- Seek emotional help. Get help and counseling specifically for grief: once I put a name on what I was experiencing, only then could the healing begin. I felt profound grief.

- Don't give up. You can overcome this nightmare.

- Save all of your documentation and be persistent.

- Contact your elected representatives, senators, and state & federal government agencies to have the Credit Bureau Industry regulated and be more supportive of victims of mistakes made by the credit bureaus.

- Don't blame yourself or be afraid of this nightmare. Above all don't give up.You're not alone: there is help out there to get you through this.

- Take a deep breath, make a list of things that need to be done (if you are not sure use the web to find out) and tackle each task one at a time

- Take action immediately!!! No matter how angry or frustrated you get, Don't Give Up!!! You have every right to feel every emotion you go through and do not let anyone tell you differently!

- Try not to stress out over what you have no control over. Exercise relieves stress.

- To keep a calendar or somehow keep track of everyone you have contacted & keep on them, be fully educated on the matter - your rights, etc., be tenacious, keep accurate records of all your transactions, try to live your life & not let this take over.

- When caring for a terminally ill person, contact all financial institutions and credit agencies regarding the condition of the person.

- Have some patience, because it is a long process with many annoying letters and phone calls to be make.

- Learn about this crime and what you need to do to be effective in clearing your name.

**D. Responses to question #9:  Estimate the total fraudulent charges on all accounts.**

Estimate the total fraudulent charges on all accounts:

| # | Response |
|---|---|
| 1 | $9000 |
| 2 | 25,000 |
| 3 | 150,000 |
| 4 | $210,000 |
| 5 | $25,000 |
| 6 | $15,000 |
| 7 | $35,000 |
| 8 | approx. $1000 but still rising! |
| 9 | over $50,000 |
| 10 | 65,000 |
| 11 | 9,000 so far |
| 12 | $30,000 |
| 13 | 62,100 |
| 14 | $750,000 |
| 15 | 7,000 |
| 16 | $250,00, also stole stocks, copyrights, property |
| 17 | 10,000 |

| 18 | 20,222 |
| 19 | 44,000 |
| 20 | I don't know how to total the charges. Way to many |
| 21 | $45,000 |
| 22 | 3+ |
| 23 | $2600 |
| 24 | $900 |
| 25 | over $8000 |
| 26 | $8,000 |
| 27 | $30,000 |
| 28 | 70,000 |
| 29 | 2,000 |
| 30 | don't know |
| 31 | Not sure, it was criminal not monetary |
| 32 | 20,000 |
| 33 | $130,000 |
| 34 | $15,000 to $20,000 |
| 35 | $0.00 |
| 36 | $15,000 |
| 37 | 36,000 |
| 38 | 15,000 |
| 39 | 500 |
| 40 | $6,000 |
| 41 | $6,000 |
| 42 | $10,000. |
| 43 | $3,500 |
| 44 | $1,500 |
| 45 | $40,000 |
| 46 | 15,000 |
| 47 | 800 |
| 48 | 10,000 |
| 49 | Luckily only about 150.00 |
| 50 | $3,000 |
| 51 | 12000 |
| 52 | $800 |
| 53 | ongoing |

| 54 | $25,000 |
| 55 | Over $50,000 |
| 56 | $25,000 |
| 57 | $10,000 |
| 58 | $1,000 |
| 59 | $20,000 |
| 60 | 20,000 |
| 61 | None, just damaged my credit rating |
| 62 | 180,000 |
| 63 | hundreds of thousands of dollars |
| 64 | $1,500 |
| 65 | 75,000. |
| 66 | 9,000 |
| 67 | 80,000. |
| 68 | 15,800 |
| 69 | 60,000 |
| 70 | $152 |
| 71 | 23,000 |
| 72 | 7,000,000 |
| 73 | approximately $10,000 |
| 74 | $1,000 |
| 75 | $4,500 |
| 76 | $875,000 |
| 77 | 1,500 |
| 78 | $80,000 |
| 79 | $1,100 to date |
| 80 | 30,000 |
| 81 | $1,150 |
| 82 | $15,000 |
| 83 | $10,000 |
| 84 | $7000 |
| 85 | my accounts were closed before any charges |
| 86 | 30,000 |
| 87 | 50 |
| 88 | $5,500 |
| 89 | $7,000 |

| | |
|---|---|
| 90 | 15,000 or more |
| 91 | $190,000 |
| 92 | $316 |
| 93 | 50,000 |
| 94 | $150 |
| 95 | 4 |
| 96 | 711 |
| 97 | 1,000 |
| 98 | 2,000 |
| 99 | 7,500 |
| 100 | 1,500 |
| 101 | 10,000 |
| 102 | $70,000 |
| 103 | $3,900 |
| 104 | 70 |
| 105 | $44,000 |
| 106 | 20,000 |
| 107 | 10,000 |
| 108 | 20,000 |
| 109 | $2,000 |
| 110 | $40,000 |
| 111 | $4,348 to date |
| 112 | $5,000 |
| 113 | 1,000 |
| 114 | 40,000 |
| 115 | $9,000 |
| 116 | $6,000 |
| 117 | $5,000 |
| 118 | 3,000 |
| 119 | approx 5,000 |
| 120 | 75,000 |
| 121 | 50,000 |
| 122 | $1,050 |
| 123 | $3,500 |
| 124 | $15,000 |
| 125 | $1,900 |

| 126 | $2,000 - $3,000 so far |
| 127 | 25,000 |
| 128 | $11,000 |
| 129 | $30K |
| 130 | 30,000 |
| 131 | approximately $8,000 |
| 132 | $3,000 |
| 133 | 5,000 |
| 134 | $3,600 |
| 135 | $25,000 |
| 136 | unknown |
| 137 | $3,000 |
| 138 | 2,000 |
| 139 | 120,000 |
| 140 | $75,000 |
| 141 | $4,500 |
| 142 | 7,500 |
| 143 | 1.2 million |
| 144 | 50,000 |
| 145 | $3,000 |
| 146 | 3000 |
| 147 | still unknown above20,000.00 |
| 148 | $2000.00 |
| 149 | $600 |

## ENDNOTES:

[i] Dr. Dale Pletcher has been a Professor of Finance at California State University, Sacramento since 1975. He received a B.S. from Purdue University, a M.B.A. from Western Michigan University, and a D.B.A. from Kent State University.

[ii] Paul Colins Consulting, 40 Brittany Way, Atlanta GA 30324, 404 869 1817 (Office/Fax). Mr. Colins was a former business analyst for a major credit issuer and now works as a consultant in the area of business solutions for identity theft. Summary of study done by Paul Colins, Sept. 2003.

[iii] Dr. Charles Nelson, Ph.D. is licensed psychologist, the Director of the Crime and Trauma Recovery Program and Founder and Director of the Family Treatment Institute. Dr. Nelson is a nationally respected authority on crime victims, having furnished expert court qualified testimony on murder, domestic violence, post-traumatic stress disorder, and Rape Trauma Syndrome cases since 1971. Besides his work with clients, Dr. Nelson has trained law enforcement, victim assistance counselors, clinical practitioners and graduate students in the area of crime victim trauma since 1976.

One of his research project involved studying the nation's 400 largest police sex crime units and community based victim assistance centers regarding their attitudes and sensitivity toward victims. (1973 - 1974) He has published numerous works on the impact of crime on individuals and trained as NOVA trained crisis intervention specialist for the United States.

[iv] www.privacyrights.org Privacy Rights Clearinghouse is a national, non-profit advocacy group that specializes in the area of privacy. In 1993, it became one of the pioneers in recognizing the problem of identity theft and is responsible for some of the California's and the nation's identity theft awareness and laws. It is directed by Beth Givens, a widely-respected expert in the area of privacy. It is based in San Diego, CA. The Identity Theft Resource Center was originally an affiliate program of PRC. She was one of the two co-writers of the landmark "Nowhere to Turn" study, done in 2000 and the first to study long-term impacts of identity theft on victims.

[v] FTC study, website: www.consumer.gov/sentinel

[vi] www.privacyrights.org Privacy Rights Clearinghouse is a national, non-profit advocacy group that specializes in the area of privacy. In 1993, it became one of the pioneers in recognizing the problem of identity theft and is responsible for some of the California and the nation's identity theft awareness and laws. It is directed by Beth Givens, a widely-respected expert in the area of privacy. It is based in San Diego, CA. The Identity Theft Resource Center was originally an affiliate program of PRC. She was one of the two co-writers of the landmark "Nowhere to Turn" study, done in 2000 and the first to study long-term impacts of identity theft on victims.

[vii] www.privacyrights.org Privacy Rights Clearinghouse is a national, non-profit advocacy group that specializes in the area of privacy. In 1993 it became one of the pioneers in recognizing the problem of identity theft and is responsible for some of the California's and the nation's identity theft awareness and laws. It is directed by Beth Givens, a widely-respected expert in the area of privacy. It is based in San Diego, CA. The Identity Theft Resource Center was originally an affiliate program of PRC. She was one of the two co-writers of the landmark "Nowhere to Turn" study, done in 2000 and the first to study long-term impacts of identity theft on victims.

[viii] The California Public Interest Research Group (CALPIRG) is a statewide, non-profit public interest advocacy group that works on environmental, consumer, and good-government issues. Since 1972, CALPIRG has been one of the state's leading public interest groups, with 70,000 student and citizen members across the state. The consumer program works to protect consumers from financial rip-offs, unsafe products, identity theft and invasions of privacy. U.S. PIRG serves for the national lobbying office of CALPIRG and other state PIRGs. It also acts as a clearinghouse of information and a coordinator of various consumer groups interested in similar topics. www.pirg.org

[ix] (http://www.privacyrights.org/ar/id_theft.htm)
[x] www.consumer.gov/idtheft and www.consumer.gov/sentinel

# EXHIBIT O

# WHOLE EXHIBIT REDACTED

# EXHIBIT P

Page 3

```
 1              IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF DELAWARE

 2

         STEVEN G. MILLETT, MELODY J.  )

 3       MILLETT, On Behalf of         )

         Themselves and All Others     )

 4       Similarly Situated,           )

                                       )

 5                    Plaintiffs,      )   05-559-SLR

                                       )

 6         vs.                         )

                                       )

 7       TrueLink, INC., A Trans Union )

         Company,                      )

 8                                     )

                      Defendant.       )

 9

10

11             THE VIDEOTAPED DEPOSITION OF

12       JOHN DANAHER, produced, sworn, and examined on

13       behalf of the Plaintiff, March 27th, 2007, between

14       the hours of 9:30 a.m. and 4:40 p.m. on that day, at

15       203 North LaSalle Street, Chicago, Illinois,

16       before Cheryl L. Sandecki, a Certified Shorthand

17       Reporter, a Registered Professional Reporter, and a

18       Notary Public.

19

20

21

22

23

24

25
```

Page 4

1    APPEARANCES

2

3        The Plaintiffs represented by Ms. B. Joyce
Yeager, of the law firm of Yeager Law Firm, L.L.C.,

4    7270 West 98th Terrace, Building 7, Suite 220,
Overland Park, Kansas  66212.

5

6        The Defendant was represented by Mr. Michael C.
O'Neil of the law firm of DLA Piper US LLP,

7    203 North LaSalle Street, Chicago, Illinois 60601.

8

         Also Present:  Mr. Joseph Cirillo, Videographer

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 25

1      consumers who was concerned about identity theft?

2              MR. O'NEIL:  Objection, vague.  TrueCredit

3          product?

4              THE WITNESS:  We have -- we have different

5          products.  Some are more relevant to certain

6          instances than others.

7      BY MS. YEAGER:

8          Q.   Is any one of your products more helpful

9      to those who have a concern about identity theft

10     than some of your other products?

11         A.   Credit Monitoring.

12         Q.   And why is Credit Monitoring helpful to

13     those who are interested in addressing their

14     concern about identity theft?

15         A.   It alerts the consumer to key changes on

16     their credit report, the most germane being a new

17     inquiry or a new account opening.

18         Q.   What is a key change?

19         A.   A key change is the term we use to

20     describe, I think, the eleven different changes

21     that we alert consumers to in terms of their credit

22     report.

23         Q.   What are those eleven changes, please?

24         A.   I don't think I can name them all.

25         Q.   Could you generally describe the manner in

Page 26

1    which one -- let me begin again, please.

2            Can you generally describe the manner in

3    which the credit monitoring product alerts a

4    consumer to the key changes?

5        A.    **Do you mean to describe the process?**

6        Q.    Please.

7            MR. O'NEIL:    The process for alerting the

8    consumer of the key change?

9            MS. YEAGER:    Correct.

10           THE WITNESS:    We are notified from one of

11   the credit bureaus that a change has taken

12   place, and we send the customer an E-mail

13   advising them that there has been a change and

14   to come back onto our website to get the

15   details.

16   BY MS. YEAGER:

17       Q.    The customer who comes to the website to

18   review the details, could you generally describe

19   what information they might see once they take that

20   step to come onto the website to review the changes

21   or the details that you were describing?

22       A.    **So, for example, if we send -- if there**

23   **has been a new inquiry, if you log onto the site,**

24   **you will see generally the date of the inquiry and**

25   **who made the inquiry.  You might get the location.**

Page 27

1        Q.    The location of what, please?

2        A.    Of -- of the person who has made the

3    inquiry, their -- their address, where they are.

4        Q.    How does that information become

5    accessible?  I am looking if you can generally

6    describe, please, from the manner in which the data

7    that the consumer reviews is placed onto the

8    website.  Is that placed there by someone from your

9    company?

10       A.    We use a service with all three credit

11   bureaus now that they daily will put a file out

12   there of the changes.  We pick up the file from

13   each of them and process it, put it on our website

14   and send out the notification.

15       Q.    Could you describe generally what you mean

16   when you say you process it?

17       A.    We change it from the format that we pick

18   it up in, which is generally what's referred to as

19   a machine readable format.  And I believe we

20   transform that into a -- you know, an XML format

21   and we do what we call -- we normalize it.  In

22   other words, we make it readable.  And then again

23   we post it to the site and send a notification.

24       Q.    How long have you been monitoring or

25   receiving notification from three credit bureaus?

Page 162

```
 1          document.  I will also object to the extent

 2          that you are only showing him a portion of,

 3          obviously, a large document and a portion of a

 4          chapter in a document.  You are only showing

 5          him one page.

 6               THE WITNESS:  Yeah, so if a customer

 7          provides an incorrect Social Security number.

 8     BY MS. YEAGER:

 9          Q.   In the process of ordering a product?

10          A.   Yes.

11          Q.   How can you tell that there is a

12     Social Security number mismatch?

13          A.   Again, I am -- I believe it's when we are

14     doing that process of checking between the

15     Social Security number provided by the customer and

16     the Social Security number returned on the credit

17     report.  In those cases we won't show the -- the

18     file to the consumer.  So in this --

19          Q.   If --

20          A.   Sorry.

21          Q.   Please continue, I'm sorry.

22          A.   I think the purpose for this paragraph is

23     to deal with the issue of a customer inputting the

24     wrong -- their fat fingering or whatever their

25     Social Security number.
```

Page 163

1          Q.    Is the customer informed that there has

2     been a mismatch?

3          **A.    Yes.**

4          Q.    What does the notification to the customer

5     say?

6          **A.    I don't know.**

7          Q.    Do you know whether or not they are just

8     directed to re-enter their Social Security number?

9          **A.    I don't believe so.    I think they are**

10    **directed to call customer service.**

11              MS. YEAGER:    Let's mark an exhibit that

12              begins with page 18342 and goes through

13              page 18367 -- I am sorry, 369, 18342 to 18369.

14                            (Document marked as TrueLink

15                            Exhibit No. 19 for

16                            identification, 03/27/2007.)

17    BY MS. YEAGER:

18         Q.    If I could direct your attention to

19    page 18343.  Are you familiar with this document?

20              MR. O'NEIL:    Well, I would object to this

21              document to the extent that you are

22              characterizing it as being a document that you

23              have put together as a -- you know, it doesn't

24              appear to be a document to me.  I object to

25              the extent -- any questions about this until