```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4     STEVEN G. MILLETT,

 5     MELODY J. MILLETT,

 6     On Behalf of themselves

 7     And all others similarly situated,

 8                         Plaintiffs,

 9     vs.                        No. 05-599-SLR

10     TRUELINK, INC.,

11     A Trans Union Company,

12                         Defendant.

13

14

15                        VOLUME II

16

17          CONTINUED DEPOSITION OF MELODY J.

18     MILLETT, a Plaintiff, taken on behalf of the

19     Defendant before Nissa M. Sharp, CSR, CCR #528,

20     pursuant to Notice on the 13th of July, 2007, at

21     the offices of CLOON LAW FIRM, One Hallbrook

22     Place, 11150 Overbrook Road, Suite 350, Leawood,

23     Kansas.

24

25
```

```
 1                    APPEARANCES

 2           Appearing for the Plaintiffs was MS. B.

 3   JOYCE YEAGER of YEAGER LAW FIRM, LLC, City

 4   Center Square, 26th Floor, 1100 Main Street,

 5   Kansas City, Missouri 64105.

 6           Also appearing for the Plaintiffs was

 7   MR. BRYSON R. CLOON of CLOON LAW FIRM, One

 8   Hallbrook Place, 11150 Overbrook Road, Suite

 9   350, Leawood, Kansas 66211.

10           Appearing for the Defendant were

11   MR. MICHAEL O'NEIL and MS. HEATHER SCHUMAN of

12   DLA PIPER US, LLP, 203 North LaSalle Street,

13   Suite 1900, Chicago, Illinois 60601-1293.

14           Also present was Lisa Hargis of MCR

15   VIDEO.

16                      INDEX

17   WITNESS:                        PAGE:

18     MELODY J. MILLETT

19       Continued Examination

20       By Mr. O'Neil                351

21       Examination by Ms. Yeager    554

22       Examination by Mr. O'Neil    571

23

24

25
```

| | EXHIBITS: | MARKED: | IDENTIFIED: |
|---|---|---|---|
| 1 | | | |
| 2 | M. Millett Exhibit 23 | 359 | 360 |
| 3 | M. Millett Exhibit 24 | 376 | 376 |
| 4 | M. Millett Exhibit 25 | 384 | 384 |
| 5 | M. Millett Exhibit 26 | 398 | 399 |
| 6 | M. Millett Exhibit 27 | 405 | 405 |
| 7 | M. Millett Exhibit 28 | 415 | 415 |
| 8 | M. Millett Exhibit 29 | 429 | 429 |
| 9 | M. Millett Exhibit 30 | 438 | 438 |
| 10 | M. Millett Exhibit 31 | 439 | 439 |
| 11 | M. Millett Exhibit 32 | 442 | 442 |
| 12 | M. Millett Exhibit 33 | 449 | 449 |
| 13 | M. Millett Exhibit 34 | 476 | 477 |
| 14 | M. Millett Exhibit 35 | 490 | 490 |
| 15 | M. Millett Exhibit 36 | 514 | 514 |
| 16 | M. Millett Exhibit 37 | 545 | 545 |

17

18           (Original Exhibits 23 through 37 were

19      filed with the original transcript.)

20

21           (The deposition commenced at 9:35 AM.)

22

23

24

25

1    VIDEOGRAPHER:  This is Volume 2

2  of the videotaped deposition of Melody Millett

3  in Case No. 05-599-SLR taken this 13th day of

4  July 2007.  We're now on the record.  The time

5  is 9:35 AM.

6    Will counsel please state their

7  appearances for the record?

8    MS. YEAGER:  Joyce Yeager,

9  attorney for Plaintiff.

10    MR. CLOON:  Bryson R. Cloon,

11  attorney for Plaintiff.

12    MR. O'NEIL:  And on behalf of the

13  Defendant, Michael O'Neil and Heather Schuman.

14    VIDEOGRAPHER:  Will the court

15  reporter please swear in the witness?

16    MELODY MILLETT,

17  being first duly sworn, testified under oath as

18  follows:

19    CONTINUED EXAMINATION

20  BY MR. O'NEIL:

21    Q.  Good morning, Mrs. Millett.

22    A.  Good morning, Mr. O'Neil.

23    VIDEOGRAPHER:  Sorry to

24  interrupt, but someone has a Blackberry or a

25  cell phone that needs to be turned off, please,

```
 1    it's interfering with the audio.  Thank you.

 2                MR. CLOON:  Okay, Heather.

 3                (Off the record.)

 4    Q.   (BY MR. O'NEIL) Mrs. Millett, since you

 5    were last -- had your deposition taken in this

 6    case, you had an opportunity to review the

 7    transcript of your prior deposition, right?

 8    A.   Yes.

 9    Q.   Okay.  And you reviewed it; is that

10    correct?

11    A.   Yes.

12    Q.   And you noted some misspellings in the

13    transcript, correct?

14    A.   Yes.

15    Q.   But, otherwise, the testimony you gave

16    that day was accurate, right?

17    A.   Yes.

18    Q.   Okay.  Have you reviewed any documents,

19    Mrs. Millett, in preparation for your testimony

20    today?

21    A.   I've reviewed my deposition.  I have

22    worked on this case in preparation for I think

23    other depositions, so I've been in other TU

24    documents or whatever over the last few weeks.

25    But, I mean, it wasn't specifically prepared for
```

1    this deposition.

2        Q.   What other depositions occurred that

3    you were working on, as you just referred to?

4        A.   I believe my attorneys went and took

5    two depositions from your clients.

6        Q.   Okay.  So, you were reviewing documents

7    to assist your lawyers in preparing for those

8    depositions?

9        A.   Yes.

10       Q.   Okay.  And have you seen the

11   transcripts of the depositions of the two

12   TrueLink employees?

13       A.   They were sent to me, but I haven't had

14   time to review those yet.

15       Q.   Aside from your attorneys, have you had

16   conversations with anybody regarding your

17   testimony today?

18       A.   No.

19       Q.   Aside from your attorneys, have you had

20   conversations with anybody else about your prior

21   testimony in this case?

22       A.   No.  Other than, you know, my husband,

23   and I might have discussed with him.

24       Q.   Did you?

25       A.   I mean, I don't specifically recall if

1   I did or didn't.  I mean, if we did, it was a

2   general conversation.

3       Q.    But as you sit here, you don't recall

4   having any conversations with your husband about

5   your testimony in this case?

6       A.    I mean, we might have discussed in

7   general terms.

8       Q.    Yeah, I understand that you might have,

9   but do you recall having any conversations to

10  that -- in that regard?

11      A.    I don't recall specifically having

12  them, but I'm not going to say that they didn't

13  happen is what I'm saying.

14      Q.    Since you had your deposition taken on

15  May 3rd, has there been any changes in your

16  employment?

17      A.    No.

18      Q.    Since your deposition on May 3rd, have

19  you moved your home residence?

20      A.    No.

21      Q.    And your marital status remains the

22  same since May 3rd, right?

23      A.    Yes.

24      Q.    Okay.  When is the last time you

25  visited the True Credit website?

1      A.   I don't know.  It's been quite a while.

2  I think I was -- last time was over when I went

3  over to my attorney's house to review documents

4  during the prep for the depositions.  I believe

5  we went out and looked at some things on the

6  True Credit website on that day.

7      Q.   And you --

8      A.   But I don't specifically recall what

9  day that was.

10     Q.   Was it since May 3rd?

11     A.   Yes, that would be since May 3rd, but I

12  don't remember exactly what day it was.

13     Q.   Do you recall seeing any statements on

14  the TrueLink website regarding the credit

15  monitoring product that you thought were

16  inaccurate?

17     A.   I don't recall specifically what I was

18  looking at, so I couldn't say one way or the

19  other.

20     Q.   Well, obviously you understand that

21  some of the allegations that you and your

22  husband are making in this case are that True

23  Credit misrepresented the credit monitoring

24  product, right?

25     A.   Yes, that's correct.

```
 1          Q.   When was the last time you recall
 2   seeing something on the True Credit website that
 3   you believe supported your contentions that True
 4   Credit continues to misrepresent the credit
 5   monitoring product?
 6          A.   I don't understand the question --
 7          Q.   Okay.
 8          A.   -- the way that it's phrased.
 9          Q.   It was a long one.  I understand that
10   you reviewed the True Credit website in August
11   of 2003 when you first bought the product on
12   behalf of your husband, right?
13          A.   Yes.
14          Q.   And, at that time, you saw some
15   representations that you thought -- that you
16   later determined that you thought were
17   inaccurate, right?
18          A.   Yes, that would be true.
19          Q.   Since that time, since August of 2003,
20   did you ever go back to the site and see either
21   the same or different representations which you
22   believed were inaccurate?
23               MS. YEAGER:  Objection.  Asked
24   and answered in the first deposition.  You may
25   answer.
```

1     A.    Yes, I have.

2     Q.    (BY MR. O'NEIL) Okay.  And when was the

3  last time you recall seeing those

4  representations?

5     A.    I couldn't specify a date, I would have

6  to say probably somewhere in the 2005 time

7  frame, or whatever, would be the last time that

8  I actually, you know, looked at those

9  representations.

10          However, the website would not be the

11 only place that some of those misrepresentations

12 are being made.  Some of them are being sent

13 directly to my mailbox, and I believe those

14 e-mails were produced.

15    Q.    Have you purchased any products from

16 TrueLink since May 3rd of this year?

17    A.    No, not that I know of.

18    Q.    Have you purchased any products from

19 Equifax since your last deposition date?

20    A.    No.

21    Q.    Have you purchased any products from

22 Experian?

23    A.    No.

24    Q.    Have you purchased any credit products

25 from any company since the first of this year?

```
1              MS. YEAGER:  Objection.  Vague.

2        A.   Well, I believe the monitoring

3  subscription for TU and the credit reports that

4  are provided therein were still going on after

5  the first of this year.

6              As far as Equifax, I believe it was

7  discontinued some time last year, and whenever

8  it's subscription ran out is whenever its

9  subscription ran out.

10             The Experian subscription I believe has

11 been terminated since some time in 2004.  I have

12 ordered some annual disclosures, which may have

13 come from either TransUnion, Equifax or

14 Experian, but those were not purchased, those

15 were my free annual disclosures.

16       Q.   So, other than what you just described,

17 you haven't made any other purchases from any

18 other companies since the first of this year?

19       A.   Other than -- I'm confused because so

20 many things get into credit products and -- or

21 are considered credit reporting type products.

22       Q.   Okay.

23       A.   So, you know, I've bought, for example,

24 they have a Social Security number locator

25 product that comes from First Public Records,
```

1    for example.  That's based on a credit report

2    data.  It might be considered a credit report, I

3    don't know.  But it's not from one of the three.

4         Q.   And what was the purpose for that

5    purchase -- I'm sorry, what was the purpose for

6    that purchase?

7         A.   To find out if there was a new alias

8    attached to my husband's Social Security number.

9         Q.   And what did you learn?

10        A.   I haven't seen one, no.

11        Q.   Okay.  And when did you make that

12   purchase?

13        A.   I don't specifically recall.  It was

14   some time in the first quarter.

15        Q.   Have you learned any facts since May

16   3rd of this year which you believe further

17   support your claims in this lawsuit?

18        A.   I don't think that there are any

19   additional facts to be learned that aren't

20   already out there in the marketplace.

21                  (M. Millett Exhibit 23 was marked

22   for identification by the reporter.)

23        Q.   (BY MR. O'NEIL) So, I assume that means

24   your answer is no then, that you haven't learned

25   any facts since May 3rd of this year that

1    support your claims?

2        A.    No.

3        Q.    Okay.  Mrs. Millett, I'm going to hand

4    you what's been marked Exhibit No. 23, which I

5    believe are documents produced by your counsel

6    in this case, although to be honest I'm not

7    sure.  Is that your signature on the second page

8    of Exhibit No. 23?

9        A.    Yes.

10       Q.    Okay.  And do you recall signing this

11   Declaration in support of your Motion For Class

12   Certification?

13       A.    Yes.

14       Q.    And that was in the case that you

15   brought against Experian, correct?

16       A.    Yes.

17       Q.    Okay.  To your knowledge, has the court

18   ruled on that Motion For Class Certification?

19       A.    I don't believe so.  But they may have

20   ruled on it and it was not -- I know portions of

21   the case were dismissed and portions are being

22   -- the portions of the dismissal are being

23   appealed.

24       Q.    Well, there was a motion for

25   reconsideration filed and that was denied,

1   right?

2       A.    Yes.

3       Q.    Okay.  Is there any further appeal

4   going on to your knowledge?

5       A.    What do you mean?

6       Q.    Well, I'm asking, you know --

7       A.    I --

8       Q.    My understanding is the next appeal

9   would be to the appellate court.  There's been

10  no appeal filed to the Ninth Circuit, has there?

11      A.    I don't believe it's been filed yet,

12  but I think that it's in preparation.

13      Q.    Okay.  In Paragraph 3 of your

14  Declaration, Mrs. Millett, there is a reference

15  to a group called the Identity Theft Resource

16  Center.  Do you see that?

17      A.    Yes, sir.

18      Q.    And what is the Identity Theft Resource

19  Center?

20      A.    It's a nonprofit identity theft

21  advocacy group.

22      Q.    And is this the group that is headed up

23  by I believe in your earlier testimony you

24  referred to Linda and Jay Foley?

25      A.    Yeah.

1      Q.   Okay.  And you have spoken to -- have

2   you spoken to either Linda or Jay Foley?

3      A.   Yes.  On several occasions.

4      Q.   Okay.  And you spoke to them about

5   Mr. Abundio's misuse of your husband's Social

6   Security number?

7      A.   Yes, I have.

8      Q.   Okay.  And what else have you spoken to

9   Mr. and Mrs. Foley about?

10      A.   Well, that was predominantly it.  I met

11   them originally in the very beginning.

12      Q.   Have you ever told either Linda or Jay

13   Foley that you and your husband -- you and your

14   husband have filed civil lawsuits?

15      A.   Yeah, I believe they know that.  I

16   mean, it was in the media.

17      Q.   Well, did you ever have conversations

18   with them about that?

19      A.   In a general sense, yeah.  But not in a

20   specific sense, no.

21      Q.   What did you tell them in a general

22   sense?

23      A.   Well, I mean they might have asked, you

24   know, they might have asked like when they saw

25   the article from the "Kansas City Star," for

1    example, you know, which lawsuits we filed, so

2    which parties were in the lawsuit, that's about

3    it.

4         Q.   And that was back in the summer of

5    2004, right?

6         A.   I believe so.

7         Q.   So, it's your understanding that they

8    learned about your lawsuits through the media?

9         A.   Well, I sent them the article myself.

10        Q.   Oh, okay.  Have you ever asked the

11   Identity Theft Resource Center for any kind of

12   assistance in the prosecution of your various

13   lawsuits?

14        A.   No.

15        Q.   Okay.

16        A.   They're not involved in that.

17        Q.   Have you ever asked the Identity Theft

18   Resource Center for information about identity

19   theft?

20        A.   Yeah, we've talked about various

21   aspects of identity theft, you know, different

22   types of identity theft, you know, what they

23   are.  I've worked on some surveys and stuff for

24   them and different stuff like that.  So, I

25   haven't like asked them to come and, you know,

1    be a -- I don't know what's the word --

2    witnesses or expert testimony or any of that

3    kind of thing.

4        Q.    Why not?

5        A.    Huh?

6        Q.    Why not?

7        A.    I just haven't done it.

8        Q.    Okay.  Have you talked to anybody,

9    aside from your attorneys, have you talked to

10   anybody about the possibility of them providing

11   opinion testimony in any of your lawsuits?

12       A.    I haven't specifically talked to anyone

13   about providing, that's a legal function.  I

14   mean, I know my lawyers have had conversations

15   with people.

16       Q.    But you haven't had conversations with

17   anybody about these lawsuits for the purpose of

18   exploring whether or not they can assist you,

19   aside from your attorneys?

20       A.    I'm sorry, I don't understand the

21   question.

22       Q.    Okay.  Aside from your attorneys, is it

23   your testimony that you haven't talked to

24   anybody else about possibly assisting in the

25   prosecution of your lawsuits?

```
1        A.   I don't understand the question.

2        Q.   Okay.  I think you -- you understand

3   that in litigation the parties can retain

4   purported experts to provide opinion testimony

5   at trial.  Do you understand that?

6        A.   Yes, I do.

7        Q.   Okay.  Have you had any conversations

8   with anybody to explore the possibility of them

9   providing those types of services to you and

10  your lawyers?

11       A.   That would not be something that I've

12  engaged in, no.

13       Q.   Okay.  Did you ever consider reaching

14  out to the Identity Theft Resource Center for

15  that purpose?

16       A.   I'm sorry, I don't understand the

17  question.

18       Q.   I'll restate it.  Have you ever

19  considered reaching out to the Identify Theft

20  Resource Center to see how they could help you

21  in your lawsuits?

22       A.   I don't understand the word "consider."

23       Q.   Okay.  Think about.  I think it's your

24  testimony that you never asked the Identity

25  Theft Resource Center for assistance in the
```

1    litigation; is that right?

2        A.   Yes.

3        Q.   Okay.  Have you ever considered it,

4    thought that maybe you should do that?

5        A.   I've thought about it, but I've not

6    discussed that with anybody.

7        Q.   Okay.  And you ultimately decided that

8    you weren't going to ask the Identity Theft

9    Resource Center, or the IRTC (sic), to assist

10   you in that regard?

11       A.   That wouldn't -- I don't understand the

12   question.

13       Q.   Okay, it's really simple.  You've

14   testified that you considered and you thought

15   about the possibility of reaching out to the

16   IRTC -- actually, it's the ITRC, and to see if

17   they could help you in the litigation, right?

18       A.   I mean, I've thought about it in my

19   mind.

20       Q.   Okay.

21       A.   I mean, you know, but that's -- I mean,

22   to the extent that someone thinks about

23   something, that's not --

24       Q.   Okay.

25       A.   -- that's not action.

1     Q.   And is it fair to say that you decided

2   not to ask them to assist in that regard?

3     A.   Well, you speak like the case is closed

4   or like I might never do that, so I'm not -- I'm

5   confused as to the question.

6     Q.   Well, obviously I'm not asking you

7   about your future thoughts, Mrs. Millett.  I'm

8   asking about whatever thoughts you've had as of

9   today right now.

10    A.   Well, as of today right now, I have no

11   plans and no intentions of doing so.

12    Q.   Okay.  And why did you make that

13   decision to date?

14    A.   Because I haven't felt like I've needed

15   it.

16    Q.   Okay.  Do you understand that there is

17   a deadline for the disclosure of experts in this

18   case?

19    A.   I understand that.  Yes.

20    Q.   Do you know when it is?

21    A.   I believe probably it's, what, in the

22   next few weeks or so.

23    Q.   Uh-huh.  Your Declaration, Exhibit 23,

24   states that you are the state representative for

25   Kansas.

```
 1          A.    In 2006, that was true.

 2          Q.    And just so the record is clear, that

 3    you -- in 2006, you said that you were the state

 4    representative for Kansas for the Identity Theft

 5    Resource Center, right?

 6          A.    Uh-huh.  Uh-huh.

 7          Q.    And that was true, right?

 8          A.    Yes, that was true.

 9          Q.    Okay.  It's no longer true?

10          A.    No, it's not that it's not no longer

11    true, it's that I'm not actively working in that

12    type of role at this point in time.

13          Q.    Okay.

14          A.    Which is, you know, helping other

15    victims and helping people resolve their -- I

16    just have too much on my plate.

17          Q.    Okay.

18          A.    And --

19          Q.    I'm sorry.

20          A.    And since it's free, you know, it's not

21    like I'm getting paid, so.

22          Q.    But at some point in time you were

23    playing more of an active role as a Kansas state

24    representative?

25          A.    Yeah, I was helping them with, you
```

1    know, surveys and other type of stuff, and local

2    victims were needed and we were doing training

3    and different stuff.

4         Q.   So, you have met with other victims of

5    identity theft?

6         A.   I'm sorry?

7         Q.   Have you met with other victims of

8    identity theft in connection with being a state

9    representative for the group?

10        A.   It's predominantly e-mail and phone.

11        Q.   Okay.  What's -- what kind of surveys

12   have you assisted the group with?

13        A.   I have looked at and done some work on

14   the aggregation of survey results from the

15   Annual Victims Survey from I believe it was 2004

16   I worked on and -- but that was in 2005.

17        Q.   And what was the subject matter of the

18   questions which were part of this survey?

19        A.   It was a victims survey, you know, for

20   example, if someone stole -- when someone stole

21   your identity, how many times was it used, how

22   many credit cards were opened, that kind of type

23   of information.

24             It's -- in my specific field of

25   employment when I worked in HR, I did a lot of

370

1    employment surveys and statistical analysis, so

2    it's basically in my field of expertise.

3        Q.    And have any of the results -- have any

4    of the results of the surveys that you assisted

5    with been published?

6        A.    I'm not sure, but I believe the Victims

7    Survey was.  My job was to take the results that

8    they got from the survey and to present them in

9    a dec, in a meaningful way.

10            Now, I provided the information in an

11   Excel workbook, lets just say, to Linda and Jay,

12   it was e-mailed to them.  What they ever did

13   with it, whether they showed it to anybody or

14   whether it was ever published or utilized, I

15   have no idea.

16       Q.    And when you say a dec, is that a power

17   point presentation?

18       A.    No, it's an Excel spreadsheet.  It's

19   aggregated statistics.

20       Q.    Paragraph 3 of your Declaration,

21   Mrs. Millett, says that you've submitted written

22   testimony to Congress on two separate occasions.

23       A.    Yes.

24       Q.    And one was through Representative

25   Dennis Moore's office?

```
1        A.   Yes.

2        Q.   Is that the statement that we reviewed

3   earlier in your earlier deposition?

4        A.   Yes.

5        Q.   Okay.  And then the second, you also

6   said that you presented testimony to Congress

7   through the Identity Theft Resource Center,

8   correct?

9        A.   Correct.

10        Q.   Could you explain that to me how you

11   did that?

12        A.   Identity Theft Resource Center took

13   victims' statements in an anonymous format and

14   presented them in testimony that went to

15   Congress.  So, I mean, if I went through like,

16   for example, the whole thing, I could pick out

17   the pieces that included, for example, my

18   husband and myself.

19        Q.   Okay.  And have you ever done that for

20   purposes of producing documents in this lawsuit?

21        A.   I'm sorry?

22        Q.   Have you ever done that for the purpose

23   of producing documents in this lawsuit?

24        A.   It was not presented as media as such,

25   so it's not -- it's not individually mine.
```

1      Q.    So, you made a decision that you didn't

2    have to do that then?

3      A.    Well, I guess so, yes.

4      Q.    Okay.  And when did you prepare that

5    testimony, if you will?

6      A.    There wasn't any prepared testimony.

7    There was conversations with the victims

8    advocate in San Francisco and a few other people

9    that were exchanged by e-mail and were sent and

10   aggregated up and presented in whatever their

11   story was.

12           They went to go talk about Social

13   Security numbers, and the FACTA Act and some

14   other things I believe in late 2004, I believe

15   that's when it was.

16     Q.    When did you first become the state

17   representative for Kansas for this group?

18     A.    Well, I was in -- I was the only person

19   in Kansas that was affiliated with the group, so

20   it was by default.  The idea was that they

21   wanted to have at least one resource that they

22   could use for volunteer work in every state in

23   the United States.

24     Q.    And when did that occur?

25     A.    I first started working with them on a

1    regular basis in -- I was familiar with them

2    before then, but, I mean, as far as that was

3    concerned and working on specific tasks if

4    requested and stuff was in 2004.

5        Q.    Do you believe that the Identity Theft

6    Resource Center provides valuable services to

7    the affected public?

8        A.    Yes, I do.

9        Q.    Do you think that they're a good

10   resource for information about identity theft?

11       A.    I think they're one of the best.

12       Q.    Okay.  What other resources or other

13   groups out there that you think are also helpful

14   in providing information about identity theft?

15       A.    The FTC.

16       Q.    Okay.  Any other groups, Mrs. Millett?

17       A.    No.

18       Q.    You're aware of other groups that offer

19   educational and other informational services

20   about identity theft, right?

21       A.    Oh, yes, I'm aware.  Uh-huh.

22       Q.    But really it's the FTC and the

23   Identity Theft Resource Center which you think

24   are the most authoritative?

25       A.    I would say that they are the most

1   knowledgeable.

2        Q.    Okay.  Can you identify any individuals

3   which you believe are similarly knowledgeable

4   about the topic of identity theft?

5              MS. YEAGER:  Objection.  Vague.

6        A.    I mean, individuals like as in how?

7        Q.    (BY MR. O'NEIL) Well, I think before

8   we're talking about groups, now I'm talking

9   about people, individual persons.

10       A.    Well, I would say Jay and Linda Foley

11  are fairly knowledgeable.  I would say, you

12  know, the gal that works in San Francisco is

13  fairly knowledgeable, her name is Tracy but I

14  don't know her last name.

15             And then, you know, you have people out

16  there like Hoofnagle and a few others that are

17  out there in like EPIC and Pirg and a few other

18  groups like that that are fairly knowledgeable

19  as well.

20       Q.    I think I asked you before about

21  whether or not you asked the Identity Theft

22  Resource Center to help you in this litigation.

23  Let me ask you a slightly different question.

24  Have you ever helped Jay -- have you ever asked

25  Jay or Linda Foley to assist you in the

1    litigation?

2        A.    No.

3        Q.    Your Declaration says, quote, "I have

4    devoted a substantial amount of time to studying

5    materials relating to identity theft and credit

6    reporting."  What type types of materials have

7    you studied in that regard?

8        A.    Well, I mean, I've studied just about

9    every survey that comes out, whether it's

10   published in the paper or newspaper articles.

11   You know, I've looked at testimony that -- the

12   public stuff that's available from Congress.

13   Anything that was related to the FACTA Act,

14   because that was really big at that time.

15           They were still I think in the comment

16   period in 2006 related to the FACTA Act.  And

17   so, I mean, like there were instances liked

18   related to credit scoring and whatnot where I've

19   submitted comments to, you know, the Federal

20   Reserve or whatever whenever they were making

21   all the new banking rule changes, especially

22   like with Check 21 and stuff like that.

23           Credit scoring and insurance modeling,

24   the data breach incidences that have been -- I

25   followed the Choice Point story pretty closely,

1    and a few of the others, like University of Los

2    Angeles, a few others that had big data

3    breaches.

4          The one that went from Lexis Nexis, and

5    then there was another data breach I think with

6    Ford Motor Credit where somebody was using

7    illegal passwords and sign-ons and logging in to

8    their credit reporting tool and stealing

9    people's credit reports.

10         I've followed numerous stories.  I

11   mean, I pick up -- I even follow them in Canada

12   and the United Kingdom.

13         Q.   Do you consider yourself an expert on

14   the topic of identity theft?

15         A.   Well, I mean, as close as you can

16   probably come as being a self-made expert, I

17   guess, yeah, I probably would be.  I have more

18   knowledge I guess than the average bear.

19              (M. Millett Exhibit 24 was marked

20   for identification by the reporter.)

21         Q.   (BY MR. O'NEIL) Mrs. Millett, I'm going

22   to show you what's been marked Exhibit 24, which

23   I'll represent to you is a document that we

24   received from your lawyers in this case.

25         A.   Uh-huh.

1      Q.   Have you ever seen this document

2   before, Mrs. Millett?

3      A.   Yeah, once upon a time in a galaxy far,

4   far away I believe.  I think that was, what,

5   maybe two or three years ago.

6      Q.   And this one appears to be maybe in a

7   closer galaxy.

8      A.   This one says 2006.

9      Q.   Right.  On the first page, it

10  identifies you as a witness who's likely to have

11  discoverable information that you and your

12  husband may use to support your claims.  Do you

13  see that, ma'am?

14     A.   Yes.

15     Q.   Okay.  And then identifies a number of

16  possible subject matter of testimony --

17     A.   Uh-huh.

18     Q.   -- that would be elicited from you?

19     A.   Yes.

20     Q.   Did you ever have a change to review

21  the description of your subject matter of

22  testimony here before it was produced by your

23  lawyers in this case?

24     A.   I have reviewed every one of these

25  before they were produced.

1    Q.    So, do you believe that you can provide

2    all the types of testimony that's described in

3    that document?

4    A.    Pardon me while I refresh myself.

5    Yeah, I believe so.

6    Q.    It states here on Page 2, Mrs. Millett,

7    that, quote, "Plaintiff, Melody Millett, will

8    also provide testimony about the affects of

9    identity theft and the forms of identity theft,"

10   closed quote.  Do you see that, ma'am?

11   A.    Yes, sir.

12   Q.    What kind of testimony can you provide

13   about the forms of identity theft?

14   A.    Well, I'm familiar with just about all

15   the forms of identity theft.  I mean, you know,

16   you have true name fraud, you have synthetic

17   identity fraud, you have Social Security number

18   fraud, you have, I mean, any form in which any

19   piece of identifying information is used to

20   commit identity or financial fraud basically has

21   a type associated with it.

22       I mean, there is child identity theft

23   where people are out there using children's

24   identities to hide whether it's from legal or

25   criminal matters or financial matters and they

379

1    impersonate their children.  They do it to get

2    back at spouses.  There's all different types of

3    identity theft out there.

4        Q.    In your view, what type of identity

5    theft did your husband suffer?

6        A.    Well, he suffered -- he suffers from

7    what used to be referred to as Social Security

8    number identity theft in which your number is

9    stolen.

10            Nowadays, the, quote, "term of the term

11    de jour" for that is they're referring to that

12    now as synthetic identity theft, in which

13    components or pieces of other people's actual

14    identities are used to create whole new

15    identities.  But that term "synthetic identity"

16    theft wasn't coined until 2006, so it's a

17    relatively recent term.

18        Q.    Who termed it?

19        A.    I don't recall which specific article

20    was the first place that I saw it, but I believe

21    it was in "The Washington Post," but I could be

22    mistaken.

23        Q.    And I know you said this before, but I

24    was -- I can't write as fast as you can talk.

25    What do you understand or what do you think --

1   what is "synthetic identity theft"?

2        A.   Synthetic identity theft is when they

3   take unique identifiers which are recognized by

4   computer systems, and they use them to fabricate

5   whole new identities, which the computer systems

6   are essentially confused by, and then allow just

7   access to their system because they're already

8   accepted identifiers.

9            I mean, Abundio Perez is an example of

10  synthetic identity theft.  He took a number that

11  didn't belong to him, but is a real and valid

12  working Social Security number.  And he went

13  through every computer system in the country,

14  including the FHA, and passed the muster because

15  it's a legitimate number.  It passes all the

16  validation logic.

17           So, synthetic identity theft where you

18  take real identifiers which already exist and

19  are known and validated by computers and pass

20  all the validation logic, and you cobble

21  together a whole new identity, because the way

22  the keying systems work in the databases, this

23  new identity passes all the validation tests and

24  then is allowed free movement among all the

25  computer systems because it's passing all of the

1    programmed logic.

2        Q.   To your knowledge, when Mr. Abundio was

3    creating this new identity, did he use

4    identifying information of anybody other than

5    himself and your husband?

6        A.   I don't think he's even using his own

7    himself.  Because Mr. Perez, with my husband's

8    number, has used multiple aliases.

9        Q.   Okay.  Well, he's used his own address,

10   hasn't he?

11       A.   I don't even know that it's -- he's

12   used the address of the house that he purchased

13   with one of the aliases.  I don't know that he

14   resides at that address.

15       Q.   Right.  To your knowledge, has he used

16   information belonging to anybody else besides

17   your husband?

18       A.   I couldn't say because of the number of

19   aliases.  I mean, Maricio Cuatle could be his

20   brother or could not be, or it could be a made

21   up name, it could be -- I have in idea.

22       Q.   Yeah, obviously if you don't know, you

23   don't know.  I'm just wondering if you know.

24       A.   No.  I have suppositions and theories,

25   but that's all I have.

1       Q.    Now, you said that it used to be called

2    Social Security number identity theft?

3       A.    Right.

4       Q.    Who called it that?

5       A.    Well, I believe the Social Security

6    Administration referred to it as Social Security

7    -- they referred to it as Social Security number

8    fraud.  But the FTC first started talking about

9    Social Security number identify theft on their

10   website in like '04 or '03, somewhere in that

11   frame, when the first stuff was going on with

12   FACTA.

13      Q.    Are you aware of any references to

14   Social Security number identity theft prior to

15   2004 or 2003?

16      A.    Well, yes.

17      Q.    And by whom?

18      A.    There was a reference to -- there was

19   an article in "The New York Times" in like 1996

20   that was actually an article from TransUnion's

21   general counsel about how Social Security number

22   identity theft was going to be the next big

23   thing.  But I pulled that out of the archives,

24   and I believe that I pulled that out some time

25   in '03.  I mean, before January of '03, I

1   wouldn't have really been that interested in it

2   per se.

3        Q.   Do you have a copy of this article in

4   your possession?

5        A.   No, I don't.  I saw it online.

6        Q.   Okay.  So, you never gave it to your

7   lawyers then?

8        A.   I don't know.  I think I -- I don't

9   know if I gave it to my lawyers or not.

10  Sometimes I forward those news articles to them

11  that I find that are interesting, and sometimes

12  I don't because it's not related to the case.

13       Q.   Did you decide not to forward that

14  article because it's not related to the case?

15       A.   No.  It's from 1996.  I mean, you know,

16  you're out there looking around and reading, I

17  find stuff that's interesting all the time.  I

18  don't forward everything I find that's

19  interesting.

20       Q.   Well, are you aware that your lawyers

21  have produced in this case certain articles and

22  certain reports about identity theft?

23       A.   Yes.

24       Q.   Okay.  And some of those came from you,

25  right?

1          A.    I don't know if they did or didn't.

2     I'd have to go and look at the specific article

3     and say whether or not I may have seen that one

4     or not seen that.  And sometimes they send me

5     the articles, in which case it's, you know, a

6     two-way street.

7                    (M. Millett Exhibit 25 was marked

8     for identification by the reporter.)

9          Q.    (BY MR. O'NEIL) Well, let me show you a

10    document that was produced by your lawyers in

11    this case that identifies some of these

12    articles.  I'm going to hand you what's been

13    marked Exhibit No. 25, which I'll represent to

14    you is a document we received from your lawyers

15    in this case.  Have you ever seen any portion of

16    this document, Mrs. Millett?

17         A.    This is a list on what's on the CDs I

18    believe.

19         Q.    Have you ever seen it before?

20         A.    I've seen it in parts.  I don't think

21    I've seen it in exactly this format, but that's

22    all right.

23         Q.    Let me direct your attention to the

24    second to the last page of this exhibit,

25    Mrs. Millett.

```
 1        A.    Yep.

 2        Q.    There's a heading "Disk 7 Documents,"

 3   do you see that, ma'am?

 4        A.    Yes.

 5        Q.    And then there's a number of documents

 6   identified there.

 7        A.    Uh-huh.

 8        Q.    Have you ever seen this listing of

 9   documents before?

10        A.    Well, I've seen all these documents at

11   some form or another, yeah.

12        Q.    Okay.  Have you ever seen a listing of

13   these particular documents?

14              MS. YEAGER:  Objection.  Vague.

15        A.    A listing, I'm looking at a listing

16   right now, I mean...

17        Q.    (BY MR. O'NEIL) Okay, well, then let me

18   start with that.  Have you ever seen this

19   particular document before?

20        A.    I know that when they produced this

21   document that the list was sent to me, but it

22   was not in this format, so.  I mean, you know,

23   so have I seen this particular document, no.

24   But have I seen all the list of what was being

25   produced and which disks they're on, yes, I
```

1    have.

2         Q.    Okay.   And to your knowledge, have

3    these same documents been produced by your

4    lawyers in the other litigation that you've

5    filed?

6         A.    I'm not sure, but I'm sure they have.

7         Q.    Okay.   Do you -- do you have an

8    understanding as to why these particular

9    documents were produced in this litigation?

10        A.    Well, some of these documents, for

11   example, the 2003 Credit Reporting Resource

12   Guide by the CDIA, that's the one that deals

13   with the actual credit reporting formats.   That

14   would be relevant if you were trying to talk

15   about, you know, that there was something wrong

16   with credit reports or that credit reports were

17   somehow inaccurate.

18             And when we started all these case,

19   they all had a Fair Credit Reporting Act

20   components.   That's why being on this list it

21   kind of makes sense.

22             The FTC Identity Theft Victim Complaint

23   Data Fact, those are all the statistics I think

24   from the FTC on how many people have suffered

25   particular forms of identity theft and the

1    amounts of money that are lost by victims and so

2    on and so forth.

3          And since this is basically a breach of

4    contract that's related to identity theft, in

5    that the breach is that the product doesn't work

6    for the purpose of identity theft for which it's

7    advertised, I would think that that would

8    probably be highly relevant.

9          The 2004 report on Social Security

10   numbers and private sector use is the actual

11   testimony from Congress which deals with the use

12   -- Social Security number fraud and the

13   prevalence of duplicate Social Security number

14   usage in the financial markets and what the

15   impact and affect that's having.

16         The September 2003 FTC Overview of

17   Identity Theft Program is when they kicked off

18   all the FACTA stuff and it was about all the

19   comment periods and everything else that were

20   related to the Fair and Accurate Credit

21   Transactions Act, which is specifically enacted

22   for identity theft and gave you the right to

23   include fraud alerts, that gave people the right

24   to free annual disclosures, etc., etc., etc.

25         The 2005 FTC statement is an update

1    basically on identity theft on -- related to

2    individuals' sensitive information, which

3    includes some information on Social Security

4    number fraud.

5        Q.   If I can just stop you.   What about

6    that document at the very bottom there, "Summer

7    2003 Identity Theft, the Aftermath 2003"?

8        A.   Yeah.   That's the comprehensive study,

9    that's the piece that I was telling you about

10   that went with the IRTC -- with the ITRC to --

11   they took that to Congress.   That was part of

12   their FACTA testimony was that document there.

13       Q.   Okay.   And are you aware that in the

14   depositions that were taken in California, some

15   of the witnesses were questioned about that

16   particular document?

17       A.   Uh-huh.

18       Q.   Okay.   Is there something significant

19   about that document in your mind, as opposed to

20   some of the other documents?

21       A.   Well, the specific document from the

22   IRTC is relevant because it tends to be more

23   anecdotal.   It deals with -- it doesn't deal

24   with the esoteric experience of identity theft

25   which you usually get from the FTC, Congress and

1    other governmental bodies, in which you start

2    talking about that, you know, five million

3    people that had their identifiers stolen or the

4    average cost per victim is $5,000 or it takes

5    them 300 hours to clean it up.

6           What it talks about is what really

7    happens in people's lives when the computer

8    system holds you in their grip, takes everything

9    about you that is your personal identifier, will

10   not let it go, and how that impacts specific

11   individuals from an anecdotal perspective.

12          Because one of the things that gets

13   missed in all the facts, figures and everything

14   else is the emotional damage and harm that is

15   done when you go to somewhere and someone tells

16   you they're not going to do business with you

17   because they believe that you're trying to

18   defraud them.  And the emotional impact of that,

19   which is tremendous.

20          And for some people, I mean, for some

21   people that are out there that are so badly

22   broken in the computer systems due to pollution,

23   your lives are so impacted, I mean, even just a

24   simple act of going to Best Buy and saying, hey,

25   would you like to sign up for our Best Buy

1    credit card today and get 20 percent of your

2    T.V. purchase, how many of those opportunities

3    that are lost in your life that, you know, can't

4    even aggregate them or calculate them.

5         It is a never-ending source of ongoing

6    frustration, stress, and turmoil that goes on

7    because you never know when you're going to walk

8    in and something is not going to be right.

9         Q.    And you think this report captures

10   that?

11        A.    It captures a lot, some of that, yeah.

12        Q.    Okay.

13        A.    Uh-huh.  And that's very difficult to

14   capture, because nobody really wants to get down

15   be the nitty gritty or the detail of it and say

16   this is what the experience really is.  It's

17   easier for them to talk about it took you 30

18   hours to clean it up or took you 300 hours to

19   clean it up, or you need to make a few phone

20   calls or it cost you 500 bucks.

21        Q.    Okay.  You identified a number of forms

22   of identity theft earlier for us, Mrs. Millett.

23        A.    Uh-huh.

24        Q.    The first one you identified something

25   called "true name fraud"?

```
1         A.    Uh-huh.

2         Q.    What's that?

3         A.    True name is when I take everything

4   that you are, your name, your address, your

5   Social Security number, everything that you are,

6   and I go out and I pretend that I'm going to be

7   Mr. O'Neil.

8         Q.    Uh-huh.

9         A.    That's true name fraud.

10        Q.    Okay.  And Social Security identity

11  theft is when someone just takes your Social

12  Security number I guess; is that right?

13        A.    Yes.

14        Q.    Okay.  Do you have an understanding as

15  to, during any time period, you know, what

16  percentage of identity theft is true name fraud?

17        A.    It's hard to quantify, because a lot of

18  the Social Security number fraud is basically

19  hidden.  People only discover that by accident.

20  So, in my husband's case, you know, he found

21  Abundio Perez because somebody --

22        Q.    Ma'am, if I could just stop you?

23        A.    Yeah.

24        Q.    Because we're all trying to get out of

25  here.
```

1        A.    Okay.

2        Q.    Are you aware of any reports, surveys,

3    studies, governmental reports, private reports,

4    that try to determine what percentage of

5    identity theft is true name fraud?

6        A.    Yes, I'm aware of several reports.

7        Q.    And what are they?

8        A.    There was the report in here on the

9    FACTA Act, there was some statistics in that.

10    The FTC puts out an annual report every year

11    that talks about the statistics.  There are

12    various different studies in places.  I think

13    even the Federal Reserve does a study on

14    identity theft in the financial markets, and

15    then they put that out every year.

16        Q.    And what's your understanding from all

17    those reports as to what percentage of identity

18    theft is true name fraud?

19        A.    Well, that percentage varies, and I

20    don't necessarily always agree with how the

21    percentages are calculated.  Because I think

22    there is a huge amount of identity theft that is

23    either underreported or not calculated in the

24    percentage.

25        Q.    Okay.  And I'll ask you about your

```
 1    thoughts about them, but, first, do you recall

 2    as you sit here --

 3         A.   Not the exact percentage, no.

 4         Q.   Okay.  Do you recall the general

 5    percentage?

 6         A.   No, I don't.  Not off the top of my

 7    head.

 8         Q.   But whatever it is, you disagree with

 9    it?

10         A.   I disagree with any of the percentages

11    because they don't have the whole.

12         Q.   Okay.

13         A.   You can't calculate a percentage

14    accurately if you don't know what the whole is.

15         Q.   So, is it fair to say that in your

16    opinion there's really no good way of

17    quantifying what percentage of identity theft

18    falls within the various types of identity

19    theft?

20         A.   Well, there are some methods by which

21    you can quantify, for example, how many

22    particular types of, let's say, identity theft

23    have occurred.  The Visa company, for example,

24    knows how many fraudulent credit card

25    transactions there were.  That's a form of
```

1    identity theft because you're stealing

2    somebody's credit card number.

3         Q.    Okay.

4         A.    Okay.

5         Q.    Ma'am --

6         A.    But we don't know what the percentage

7    is because we don't know what the whole is.

8         Q.    Okay.  So, then you would agree that

9    it's really difficult to quantify what

10   percentages of identity theft are made up of

11   particular types of identity theft?

12        A.    I would -- for percentages, I would

13   agree that it's hard to determine percentages,

14   not actuals.

15        Q.    Do you have any sense as to whether or

16   not true name fraud is more prevalent than

17   Social Security number identity theft?

18        A.    My personal opinion would be based on

19   the information from ICE Enforcement and Social

20   Security Administration's testimony on the

21   suspense fund at the Social Security

22   Administration.  I bet that if it was fully

23   reported, Social Security number fraud would

24   outstrip true name fraud by a significant

25   margin.

1    Q.    And what's the basis for that belief?

2    A.    Ten million undocumented aliens all

3    using fraudulent Social Security numbers.

4    Q.    Of course, you could use a fraudulent

5    Social Security number without stealing it from

6    somebody else, right?

7    A.    They don't pass the validation process

8    that's now in place with ICE and several of the

9    various states.  So it has to be a valid number.

10   Q.    Would you agree given all of your

11   knowledge and reading about anecdotal evidence

12   of the emotional stress and the financial harm

13   created by identity theft that, and generally

14   speaking, true name fraud has a much greater

15   negative impact on the victim than Social

16   Security number identity theft?

17   A.    No, I would not agree necessarily.  I

18   would say that true name fraud is probably

19   easier to clean up.

20   Q.    Okay.  That wasn't my question.  My

21   question had to do with the impact on victims,

22   the financial impact, the emotional impact.

23   Would you agree that true name fraud has a much

24   greater negative impact on victims than Social

25   Security number identity theft?

1          A.    No, I would not.  Because it's easier

2     to clean up.

3          Q.    Okay.

4          A.    It's easier for you to produce yourself

5     and your fingerprints at the DMV and sit there

6     and say I'm not -- this is not me and this is

7     not my person.  So, you can resolve yourself

8     because you have DNA and you have fingerprints

9     and that belongs to your true name identity.

10          With the Social Security number, the

11     problem becomes you can't get anyone to sit

12     there and say this number is owned by you and

13     you own this number.  So, now the wrestling goes

14     on with you having to prove that you actually

15     have the right to use and own that number.

16          And since it's not easy to clean up,

17     since it's -- since it's systematic in the

18     computer, the problem becomes that it cost more

19     time, it cost more money, it's way more

20     aggravation.  Trying to explain why two people

21     are using the same number is more time

22     consuming.  I almost think that Social Security

23     number fraud, once it's uncovered, is very, very

24     difficult and much more damaging and time

25     consuming.  I really think it is.

```
1        Q.   Would you agree that one of the reasons

2    why you think Social Security number identity

3    theft is under reported is because people are,

4    quote, "victims" of it without ever knowing it?

5        A.   People are victims and victimized and

6    not always aware why.  That's -- there's a

7    difference there.  Not knowing it implies that

8    it has no impact on their life and it goes on

9    behind their back and it's of no impact or

10   import to them, and I would disagree with that

11   statement whole heartedly.

12            What it is, is it's transactional

13   records where you go to the bank to take out a

14   mortgage and you don't get the mortgage, but

15   nobody really comes out and tells you the reason

16   you don't get a mortgage is because three people

17   in California are already using your number and

18   took your FHA mortgage from the federal

19   government.

20       Q.   So, you're not aware of laws that

21   obligate financial institutions to advise you

22   when you're denied a mortgage as to why you were

23   denied?

24       A.   Oh, they advise you as to why you were

25   denied, but they don't tell you the truth.
```

1      Q.   Okay.  Why do you think they're lying

2  to you about that?

3      A.   What do you mean?

4      Q.   Well, you say they don't tell you the

5  truth.  Why do you think financial institutions

6  violate federal and state law and misstate the

7  reasons why you're being denied?  Why do you

8  think they're doing that?  Is it for some

9  financial gain?

10     A.   I don't understand the question the way

11  that you just said it.

12     Q.   Okay.

13     A.   Because I would not characterize it as

14  violating federal and state law.  I would

15  characterize it as they are skating along the

16  very edges of the state law and federal law.

17              (M. Millett Exhibit 26 was marked

18  for identification by the reporter.)

19     Q.   (BY MR. O'NEIL) Let me hand you what's

20  been marked as Deposition Exhibit No. 26, which

21  is a document that was produced by your lawyers

22  in this case.

23     A.   Uh-huh.

24     Q.   Have you ever seen this before?

25     A.   Yes, I have.

```
 1          Q.   And this is the report that you

 2     referred to earlier and that was referenced in

 3     Exhibit 25, right?

 4          A.   Right.

 5          Q.   Okay.  And you've read this, haven't

 6     you?

 7          A.   Yeah, uh-huh.

 8          Q.   And --

 9          A.   I'm fairly familiar with this, yes.

10          Q.   Okay, let me turn your attention to

11     Page 5.

12          A.   Uh-huh.

13          Q.   And here the Identity Theft Resource

14     Center is identifying three main forms of

15     identity theft, right?

16          A.   Yes.

17          Q.   And you've seen this before, haven't

18     you?

19          A.   Uh-huh.

20          Q.   Okay.  And your husband didn't suffer

21     any of these forms of identity theft, did he?

22          A.   Actually, that would be the financial

23     identity theft paragraph where it says, "theft

24     involves impostor's use of personal identifying

25     information, primarily the Social Security
```

1   number."

2        Q.   Okay.  So, of the three forms of

3   identity theft that the Identity Theft Resource

4   Center has identified, you believe that

5   Mr. Millett suffered the first form?

6        A.   He would be included in the first form,

7   yes.

8        Q.   Okay.  Well, let's read the whole

9   sentence that you quoted from.  It says,

10  "Financial identity theft involves the

11  impostor's use of personal identifying

12  information, primarily the Social Security

13  number, to establish new credit lines in the

14  name of the victim."  Do you see that?

15       A.   Uh-huh.  Right.

16       Q.   I mean, Mr. Abundio, or whatever his

17  name is, never established credit lines in the

18  name Steven Millett, did he?

19       A.   No, he did not.

20       Q.   Okay.  I think we --

21            MR. O'NEIL:  How much time do we

22  have left on the tape?

23            VIDEOGRAPHER:  Four.

24            MR. O'NEIL:  Four, okay, well,

25  let's keep going then.

1    Q.    (BY MR. O'NEIL) Let me direct your

2    attention to Page 11, Mrs. Millett.

3    A.    Yes.

4    Q.    And there is a heading "Financial

5    Identity Theft," which is the type of identity

6    theft that you believe your husband suffered,

7    right?

8    A.    Well, no, I don't believe my husband

9    suffered.  In 2003, Social Security number fraud

10   and true name fraud were all aggregated under

11   the same type of identity theft.  The types of

12   identity theft have been evolving since this

13   original survey was done in 2003, so.

14   Q.    So, Social Security number identity

15   theft did not exist in 2003?

16   A.    Well, it didn't exist as a separate

17   category.

18   Q.    Oh.  Has the Identity Theft Resource

19   Center now issued something that says there's

20   another type of identity theft called "Social

21   Security number identity theft"?

22   A.    The people, the people who control the

23   definitions of identity theft are the FTC, the

24   Federal Trade Commission.

25   Q.    Okay.

1        A.    So, in 2003, Social Security number

2    fraud was included in financial identity theft

3    because it was used for financial transactions.

4        Q.    Okay.  I guess right now I'm just

5    asking about Exhibit 26.

6        A.    Right.  And I'm telling you that a lot

7    of the stuff that Linda and Jay Foley used, in

8    terms of how stuff is defined, is derived from

9    the Federal Trade Commission because they're the

10   ones who have defined in law what identity theft

11   is.

12       Q.    Do you know why Exhibit 26 doesn't

13   identify Social Security number identity theft?

14       A.    No, I do not.

15       Q.    Did you ever ask Mr. or Mrs. Foley

16   about that?

17       A.    Huh?

18       Q.    Did you ever ask Mr. and Mrs. Foley why

19   their 58-page report on identity theft in 2003

20   didn't mention the type of identity theft that

21   you believe your husband suffered?

22       A.    Because in 2003 --

23       Q.    Ma'am, I'm asking you if you ever asked

24   them that question?

25       A.    I haven't asked them that question, no.

```
1        Q.    Okay.  Did you ever -- okay.

2              Going back to Page 11, it identifies a

3     number of ways in which personal information was

4     used to facilitate financial identity theft, do

5     you see that, ma'am?

6        A.    Yes.

7        Q.    Take a look at all of those ways in

8     which information was used and let me know if

9     any of those ways were used by your husband's

10    identity thief.

11       A.    Purchase, get new cellular phone

12    service, get a new table, T.V. or energy utility

13    account, purchase -- get new home telephone

14    service, open new checking or saving accounts.

15       Q.    Do you have any document --

16       A.    Wait, it continues on the second page.

17       Q.    Yeah, and we'll get to that, ma'am.  Do

18    you have any documentation that supports your

19    belief that your husband's identity thief opened

20    or -- well, obviously, your -- this identity

21    thief never took over any of your husband's

22    accounts, right?

23       A.    No.

24       Q.    Okay.  But you think he created

25    accounts, he created a cell phone account using
```

1    your husband's Social Security number?

2         A.    Yes.

3         Q.    Do you have any proof of that?

4         A.    Yes, the phone bills are on the

5    TransUnion letter.  The vendors, the vendors for

6    all these accounts we're talking about right

7    here, Mr. O'Neil, are on the TransUnion letter

8    that was in my last deposition.  AT&T Universal

9    is on there, and that's where the phone accounts

10   were held, the wireless account.

11        Q.    Okay.

12        A.    And cell phone.

13        Q.    So, all the proof you have to support

14   your contention is that letter you got from

15   TransUnion in April 2003?

16        A.    And some documents that were produced

17   on this disk, like U.S. Department of Housing

18   and Urban Development, which shows that

19   Mr. Abundio Perez purchased a house using my

20   husband's Social Security number, and an FHA

21   mortgage to boot.

22        Q.    I guess I don't see purchasing a house

23   on --

24        A.    That's on the next page.

25        Q.    Oh, okay.

1      A.    See, you cut me off.

2      Q.    No, I didn't cut you off.  We got three

3  minutes left on the -- I'm just trying to focus.

4      A.    Okay.

5      Q.    It's all about focus today, because

6  your lawyers are trying to limit the scope of

7  this deposition.  And if we're going to do that,

8  it's only going to be if I get my answers -- my

9  questions answered.

10              MR. O'NEIL:  Let's go off the

11  record so we can change the tape.

12              VIDEOGRAPHER:  The time is now

13  10:34 AM.  We're going off the record.

14              (Recess.)

15              VIDEOGRAPHER:  We're back on the

16  record.  The time is 10:40 AM.

17      Q.    (BY MR. O'NEIL) Mrs. Millett, I'm

18  handing you what's been marked as Exhibit 27,

19  which I'll represent to you is a set of

20  discovery requests that your lawyers sent to us

21  for our client to answer.

22              (M. Millett Exhibit 27 was marked

23  for identification by the reporter.)

24      A.    Okay.

25      Q.    (BY MR. O'NEIL) Entitled "Plaintiff's

1    First Request for Admission to Defendant

2    TrueLink, Inc."  Have you ever seen this

3    document before?

4        A.   I've seen drafts or whatever, but have

5    I seen this particular document in final form, I

6    don't know.

7        Q.   Okay.  There's definitions in this

8    document, definitions of words that are

9    apparently used in the document, although that

10   wasn't really clear to us.  But, in any event,

11   on Page 2, there's a definition of "identity

12   theft."

13       A.   Yes.

14       Q.   Do you recall ever having seen that

15   definition before?

16       A.   Yes.

17       Q.   Okay.  Did you have any -- play any

18   part in coming up with this definition?

19       A.   I believe the definitions were created

20   by my legal team.

21       Q.   Okay.  And you didn't have any input

22   into it then?

23              MS. YEAGER:  Objection.  Calls

24   for work product.  Attorney-client privilege.

25       Q.   (BY MR. O'NEIL) You can answer.

1        A.    We've discussed identity theft over the

2    years in depth with my attorneys, so.

3        Q.    But you never specifically had a

4    conversation with your lawyer about the

5    particular definition which is in discovery

6    requests served of TrueLink, correct?

7                MS. YEAGER:   Same objection.

8        A.    No, I don't --

9        Q.    (BY MR. O'NEIL) Okay.

10       A.    I don't recall any specific

11   conversation.

12       Q.    Your lawyers have defined "identity

13   theft" for purposes of this discovery request to

14   mean, quote, "the unauthorized use of personal

15   information by another to obtain or attempt to

16   obtain credit, make charges, secure employment,

17   or obtain identification," closed quote.  Do you

18   see that?

19       A.    Yeah.

20       Q.    And would you agree with that

21   definition of "identity theft"?

22       A.    Yeah, that's a very general definition

23   of "identity theft," but, yeah, it works.

24       Q.    Do you think it fails to include

25   certain types of identity theft?

1      A.   I'm sorry, I don't understand the

2    purpose -- the question, I'm sorry.

3      Q.   Do you think that there's identity

4    theft that exists that is not encompassed within

5    this definition?

6      A.   Yeah.  There would be criminal identity

7    theft where a person would go and commit crimes

8    and then be arrested and incarcerated, or maybe

9    -- bankruptcy might not be included in this

10   because that would be a court proceeding, but

11   people do file bankruptcy illegally under other

12   people's identity, so.  But, I mean, the

13   bankruptcy would be generated by the credit and

14   the making charges, so, I mean, it probably

15   would be fitting in there anyway.

16     Q.   So, do you think it would be identity

17   theft if someone used personal information on a

18   job application?

19     A.   Yes.  Because most job applications

20   have a paragraph at the bottom that say under

21   penalty of whatever, blah, blah, I hereby

22   certify that the following and foregoing is true

23   and correct.

24     Q.   Okay.  In August of 2003, you said that

25   you -- strike that.

1          You testified earlier that you recall

2     in August of 2003 you thought TrueLink was

3     promising your husband complete identity theft

4     approximately.  Do you recall that testimony?

5          A.   Yes.

6          Q.   Okay.  So, in August of 2003, did you

7     believe that TrueLink could prevent somebody

8     from using your husband's Social Security number

9     on an employment application?

10          A.   If true -- if TransUnion was contacted

11     for the background check, then, yeah, that

12     should be the case.

13          Q.   Okay.  So, you recognize that it

14     wouldn't provide complete identity theft

15     protection under all circumstances?

16          A.   Well, only as it would relate to

17     TransUnion's data.

18          Q.   So, if Mr. Abundio Perez used your

19     husband's Social Security number on a job

20     application, but the employer never sought data

21     from TransUnion, that would still be identity

22     theft, right?

23          A.   Oh, yes, it would still be identity

24     theft.

25          Q.   Okay.  But you never thought that

1    TrueLink would prevent that type of identity

2    theft, right?

3        A.    I'm sorry?

4        Q.    You never thought that -- and, well,

5    no, in August of 2003, you didn't think that

6    that type of identity theft would be prevented

7    by buying credit monitoring from True Credit,

8    right?

9        A.    Only to the extent that the background

10   check used for the employment was pulled from

11   one of your subsidiaries, yeah.

12       Q.    Okay.  Well, I'll go back to my

13   original question because that was my

14   hypothetical.

15       A.    Uh-huh.

16       Q.    Mr. Perez uses your husband's Social

17   Security number on an employment application but

18   the employer never contacts TransUnion.  You

19   never thought that your husband would be

20   protected by that type of identity theft by

21   buying credit monitoring, right?

22       A.    No, and no reasonable person would.

23       Q.    Because you have to read those types of

24   things reasonably, right?

25       A.    Yes.

1      Q.    That's what the judge in your Experian

2    case said, right?

3              MS. YEAGER:  Objection.  Calls

4    for a legal conclusion.

5              MR. O'NEIL:  No, it doesn't.

6      Q.    (BY MR. O'NEIL) You can answer.

7      A.    What was the question again?  Can

8    somebody please read it back?

9      Q.    Do you recall when the judge dismissed

10   most of your claims against Experian, the judge

11   said that no reasonable person would interpret

12   Experian's statements regarding credit

13   monitoring in the way that you did?

14     A.    I recall the judge's opinion.  I

15   disagree with it.

16     Q.    Okay.  Do you recall that when you

17   bought the Experian product, it said that

18   purchasing credit monitoring would help bring

19   you the good things in life?

20     A.    I'm sorry?

21     Q.    Do you recall that when you purchased

22   the Experian product on behalf of your husband

23   in August of 2003 that one of the things you

24   were told was that credit monitoring would help

25   bring the good things in life to you and your

1   husband?

2       A.   I don't recall specifically.  I'd need

3   to get the documents here in front of me.

4       Q.   Did you believe that buying credit

5   monitoring from Experian in August of 2003 would

6   bring the good things in life to you and your

7   husband?

8       A.   I'm sorry?

9       Q.   Did you, when you bought the Experian

10  product in August of 2003, did you think that as

11  a result that you would get the good things in

12  life?

13              MS. YEAGER:  Objection.

14  Relevance.

15      A.   I don't understand, because I don't

16  recall that specific statement that you're

17  asking about, so I can't answer that question.

18      Q.   (BY MR. O'NEIL) And you know,

19  Mrs. Millett, that -- of course you know -- that

20  you have been trying to get banking records from

21  your bank for purposes of this lawsuit, right?

22      A.   The ones that we needed to come back

23  off of microfilm, yes.

24      Q.   Yeah.  To your knowledge, have you

25  obtained all of the banking records that you

1    needed for purposes of this litigation?

2        A.   I obtained a good portion of them, I

3    believe that those were redacted and provided to

4    you.  There may be still some months that are

5    missing or outstanding, I'm not sure.  I have a

6    list at home that I'm working, so I can't tell

7    you exactly which ones they are.

8        Q.   Okay.  Well, you understood that one of

9    the reasons we had to continue your deposition

10   to today was so that you and your lawyers could

11   produce some of the documents, right?

12       A.   Correct.

13       Q.   Okay.  And you knew that you had to get

14   these banking records to complete your

15   deposition, right?

16       A.   Right.

17       Q.   Okay.  But, as you sit here now, you

18   don't know whether or not you've gotten all the

19   documents?

20       A.   I believe so.

21       Q.   Okay.  So, you do think you got all the

22   records?

23       A.   Yes.  I'm running an additional check

24   for some other months to see if there are

25   additional transactions that may have been

1    overlooked.

2        Q.    Okay.  Did you get all the records that

3    you requested from the bank?

4        A.    Yes, I did.

5        Q.    Have you looked at all of them?

6        A.    Yes.

7        Q.    For the purpose of determining which

8    pages are relevant to the lawsuit?

9        A.    Oh, no, I didn't do that.  My lawyers

10   did that for me.

11       Q.    Oh, okay.

12       A.    I turned over all the bank records to

13   them.

14       Q.    Okay.  So, there's no reason for you to

15   believe that you have to continue this search,

16   is there?

17       A.    I'm sorry?

18       Q.    Well, I guess I'm confused, because you

19   told me earlier that you're not sure if you have

20   everything and you've got to look at home.  But

21   for purposes of producing documentation in this

22   case to prove whatever claims you have, to your

23   knowledge, did you get from the bank all the

24   records you needed?

25       A.    I believe so.

1    Q.   Okay.  And you've turned those over to

2    your lawyers, right?

3    A.   I believe so.

4         (M. Millett Exhibit 28 was marked

5    for identification by the reporter.)

6    Q.   (BY MR. O'NEIL) Okay.  Let me show you

7    what's been marked Exhibit 28, which is a letter

8    that we got from Ms. Yeager enclosing some

9    redacted banking records.  You and your husband

10   are shown as a CC recipient of the letter.  Have

11   you ever seen this letter?

12   A.   Yeah, I've seen the letter.

13   Q.   Have you ever seen the redacted banking

14   records which are attached to it?

15   A.   Oh, yes, I saw them this morning.

16   Q.   Have you seen them prior to this

17   morning?

18   A.   What?  The redacted or the actuals?

19   Q.   The redacted?

20   A.   No, not the redacted.

21   Q.   Okay.  Do you have an understanding as

22   to the significance of the line items in your

23   banking records which are not redacted?

24   A.   Yes.  These are the line items that

25   show the products purchase.

1    Q.    Products purchased from whom?

2    A.    From TransUnion and TrueLink.

3    Q.    Is there a way that you can tell that

4    these purchase -- that these moneys went to

5    TrueLink, as opposed to Experian or

6    consumerinfo.com, or Equifax or Intersections?

7    A.    Well, most of them, most of them, for

8    the Intersections -- Intersections in specific

9    -- the ones that went to Intersections are

10   specifically identified as Intersections.  The

11   ones that went to Experian show consumerinfo.com

12   after a certain point in time.  But prior to

13   that they showed Credit Manager or something

14   like that.  And the Equifax ones said Equifax,

15   so, I mean, they're -- it's pretty easy to

16   figure out.

17        And this one here says True Credit on

18   11/2/90.  So, True Credit specifically

19   identified with that specific account number.

20   And that phone number that's next to it, that

21   (800) 492-3292, matches the one that's on Page

22   11267 which just says credit report.  So, I

23   don't believe that TrueLink would be allowing

24   multiple people to use its phone number, but

25   that's just me.

```
 1      Q.   Okay.  So, I think you make a pretty
 2   compelling argument that those two entries are
 3   probably related to True Credit.
 4      A.   Uh-huh.
 5      Q.   But what about the other two entries?
 6   Like if you look at the entry on the fourth page
 7   for January 27, 2003, there's a different phone
 8   number and it doesn't say True Credit.
 9      A.   That's TransUnion.  And I do believe
10   producing TransUnion would be compelling to this
11   case.  Would you not think?
12           MS. YEAGER:  I'm sorry, what
13   Bates stamp number are you on, please?
14           THE WITNESS:  He's on 11258.
15      Q.   (BY MR. O'NEIL) I -- okay.  Well, I
16   understood perhaps erroneously, that the purpose
17   of producing these records is to determine the
18   amount of money you paid to True Credit.  But
19   you're telling me now that it includes moneys
20   paid to TransUnion?
21      A.   Well, it's very difficult from where I
22   sit, because this is in '03, sir, for me to tell
23   you specifically which entity owned this account
24   in '03.  That would be something for you all to
25   determine.  I can only tell you I went to a
```

1    website, clicked on a button, purchased a

2    product.  I cannot tell you which corporate

3    entity had its hand in this particular account.

4        Q.    Okay.  Well, let's step back here,

5    Mrs. Millett, and I guess we're going to have to

6    go over some questions that I think we have to.

7            As part of your lawsuit, you're seeking

8    the return of moneys that you paid to True

9    Credit, right?

10       A.    Right.

11       Q.    Okay.  And the basis for that, and

12   correct me if I'm wrong, is that you believe the

13   product was not as promised?

14       A.    Correct.

15       Q.    And, therefore, you should get your

16   money back?

17       A.    Correct.

18       Q.    Okay.  You think you should get all

19   your money back?

20       A.    Well, in some of these particular

21   cases, like for example this one here on

22   1111258, some of these credit reports were

23   purchased because the product was malfunctioning

24   and was sending blank alerts.

25       Q.    Well, I think you're probably

1   misspeaking then.  You first bought a product

2   from True Credit in August of 2003, do you

3   recall that?

4       A.    Yes, I do.

5       Q.    Okay.  This reflects a purchase of a

6   product in January of 2003?

7       A.    Correct.

8       Q.    You're not seeking a return of this

9   money?

10      A.    No, that's not what I'm --

11      Q.    Okay.  Well, that's what I'm trying to

12  get at, ma'am.

13      A.    Well --

14      Q.    I'm trying to figure out --

15      A.    And here's where the clarification --

16      Q.    Can I just ask a question?

17      A.    Can I finish please?

18      Q.    Well, there's no question pending, but

19  go ahead.  But this is not going to the time

20  that I get to take this deposition.  But go

21  ahead, Mrs. Millett.

22      A.    Well, the problem you have with that is

23  the lawsuit actually goes back to 2001.  So, in

24  that particular instance, this purchase that may

25  have come from True Credit's website in

1    January 2003 would be covered by that.  Would it

2    not?  In the terms of the general class.  So, I

3    can't sit here and say that just because I

4    bought my product in August of 2003 that that

5    24.95 is not relevant to this case.  That's the

6    point I'm trying to make.

7         Q.   Okay.  Well, with all due respect, I'm

8    not really interested in your theories of

9    relevance.  I'm trying to figure out what this

10   document means.

11             At trial, if we ever get there, you're

12   going to ask that some money be paid to you

13   because you paid money to True Credit for a

14   product that you believe was not as promised.

15   What I'm trying to figure out is how much are

16   you going to ask for.  Do you know?  Do you know

17   how much money you paid True Credit for credit

18   monitoring services?

19        A.   10.95 a quarter.

20        Q.   Okay.  And will you be seeking the a

21   return of the full 10.95 or some portion

22   thereof?

23        A.   I believe it's the 10.95 per quarter.

24        Q.   Okay.

25        A.   But I -- I could be wrong.  I'm...

1      Q.    So, then on page Millett 11260, there's

2      a purchase of a three-in-one credit report in

3      June of 2003.  Do you see that?

4      A.    Yes.

5      Q.    Are you seeking the return of that

6      money from TrueLink?

7      A.    I don't -- you asked me to produce --

8      no, I'm not.

9      Q.    Okay.

10     A.    Because you asked me to produce the

11     banking records, and so, you know, if I do it

12     one way -- I'm dang'd if I do and I'm dang'd if

13     I don't.  If I don't produce enough information,

14     you accuse me of withholding information.  I've

15     now given you every transaction that has

16     occurred between TrueLink, TransUnion and myself

17     and all of my banking statements to the best of

18     my ability.

19     Q.    Well, I'm not going to waste anybody's

20     time telling you what we really asked for and

21     what your lawyers told us, but.  I never asked

22     for banking records, I just asked for

23     documentation that would support whatever

24     amounts of money you're seeking at trial.  So, I

25     didn't ask for these particular banking records.

1         And then on exhibit -- on this exhibit

2    Millett 11262, there is an entry on August 8,

3    2003, for $20.85.  Do you see that, ma'am?

4         A.   Yes.

5         Q.   Okay.  And is that a purchase of a

6    credit report from TransUnion?

7         A.   I'm not sure.  I think that is the

8    original product purchase of the TU credit

9    monitoring.

10        Q.   Okay.

11        A.   Because it was -- there was additional

12   stuff tacked on to it, so I'm not -- I don't --

13   I think it was 10.95 plus whatever, so I think

14   that's the original purchase.

15        Q.   Okay.

16        A.   And that's what I want you to see.  It

17   didn't come off as monitoring, it says it's a

18   credit report.

19        Q.   I understand.  And you always used the

20   account number on your debit card for purchases

21   from True Credit, right?

22        A.   I believe that's on your transaction

23   log, yes.

24        Q.   Ma'am, I'm asking you and what you

25   know.  Unless you're just going to accept as

1   gospel what is on our transaction log.

2       A.   No.  I'm just saying the number that's

3   on your transaction log is my debit card, yes,

4   it is.

5       Q.   Do you have any reason to believe that

6   you purchased products from True Credit using

7   anything other than your debit card?

8       A.   If they had been used even by any other

9   debit card, they would still be here.  These are

10  all linked accounts.  This is every account I

11  have all linked together.

12      Q.   I'll ask the question again.  Do you

13  have any reason to believe that you paid for

14  True Credit products using anything other than

15  your debit card?

16      A.   No.

17      Q.   Okay.  How much money do you seek to

18  recover?  And by "you," I mean you and your

19  husband.  How much money do you and your husband

20  seek to recover if you prevail in this

21  litigation?

22      A.   I'm sorry, I don't understand the

23  question.

24      Q.   Okay.  You understand that you're

25  seeking money from TrueLink as part of the

1    lawsuit that you and your husband have filed?

2        A.    Yeah, that's part of the damages.

3        Q.    Okay.  And I understand that you're

4    seeking statutory damages under the Kansas

5    Consumer Protection Act.

6        A.    Okay.

7        Q.    I'm not asking about that.  I'm asking

8    about your breach of contract claim.

9        A.    Uh-huh.

10       Q.    It's a very simple claim in a sense.

11   Your husband agreed to pay money for a product,

12   you didn't get what you think was promised,

13   right?

14       A.    Correct.

15       Q.    How much do you and your husband

16   believe -- well, strike that.  How much do you

17   believe you and your husband are entitled to if

18   you prevail on your breach of contract claim?

19       A.    The 10.95 per quarter for the duration

20   of the subscription.

21       Q.    Okay.  And when you sued Equifax for

22   breach of contract because you believe that

23   their credit monitoring product was not as

24   represented, you are also seeking a return of

25   moneys that you paid to Equifax, right?

1              MS. YEAGER:  Objection.

2    Relevance.

3         A.   Yes.  The moneys that were paid to

4    Equifax, yes.  And their particular case I think

5    there were different accounts too out there in

6    Georgia.  There was a CROA account I think too.

7         Q.   (BY MR. O'NEIL) Well, you had a CROA

8    account in the case against TrueLink, right?

9         A.   Yeah, but it was dismissed already.

10        Q.   But you understand that your claim

11   under the CROA was for the return of moneys that

12   you paid for the product?

13        A.   Oh, yes, I understand that.

14        Q.   Okay.  So, once again, you're seeking a

15   return of money that you paid, right?

16        A.   Right.

17        Q.   Okay.  And was Equifax charging you

18   roughly the same amount TrueLink was, about 11

19   bucks a quarter for the credit monitoring

20   service?

21        A.   No --

22              MS. YEAGER:  Objection.

23   Relevance.

24        A.   Equifax is an annual subscription.

25        Q.   (BY MR. O'NEIL) Okay.  So, how much

1    were you paying them?

2                MS. YEAGER:  Objection.

3    Relevance.

4        A.   I believe it's either 89.95 or 79.  One

5    is 89.95 and the other one is 79.95, so.

6        Q.   (BY MR. O'NEIL) So, you paid about 90

7    bucks a year for credit monitoring from Equifax?

8        A.   Uh-huh.

9                MS. YEAGER:  Objection.

10   Relevance.

11       Q.   (BY MR. O'NEIL) How many years did you

12   buy credit monitoring from Equifax?

13               MS. YEAGER:  Can I have a

14   standing objection to any other questions that

15   pertain to the other litigation and of her

16   consumer monitoring products?

17               MR. O'NEIL:  On relevance

18   grounds?

19               MS. YEAGER:  Yes.

20               MR. O'NEIL:  Sure.  Sure.  I'll

21   rephrase the question for Mrs. Millett.

22       Q.   (BY MR. O'NEIL) So, you purchased

23   credit monitoring from Equifax for about three

24   years?

25       A.   I started Equifax in 2002.

```
1          Q.    Okay.  And when did you end that

2    subscription?

3          A.    It lapsed just before the TU

4    subscription lapsed.

5          Q.    So about the end of 2006?

6          A.    Somewhere in there, yeah.

7          Q.    Okay.  So you -- roughly, you paid

8    Equifax about $270 for their credit monitoring

9    service?

10         A.    Yeah, give or take.

11         Q.    All right.  And that's what you would

12   want back from Equifax if you went to trial and

13   prevailed on your breach of contract claim,

14   right?

15         A.    Yes.

16         Q.    So, to your knowledge, does Exhibit 28

17   reflect all the moneys that you paid to True

18   Credit for credit monitoring?

19         A.    To the best of my knowledge, yes.

20         Q.    Okay.  It looks like it also includes

21   money that you paid to TransUnion, money --

22         A.    Or TrueLink for credit reports, yeah.

23         Q.    Thank you, I was about to say that,

24   yeah.  Okay.  Are you aware that we recently

25   obtained a settlement agreement from counsel for
```

1    Ford Motor Credit Company?

2        A.   Yes, I'm aware.

3        Q.   Okay.  And so they've consented to you

4    talking about the settlement agreement?  Do you

5    understand that?

6        A.   Yes, I do.

7        Q.   Okay.  Have you read that settlement

8    agreement recently?

9        A.   No, I have not.

10       Q.   Okay.

11       A.   So, you'd have to refresh my

12   recollection.

13       Q.   Do you know how much money you received

14   from Ford Motor Credit in exchange for releasing

15   your claims and dropping your lawsuit against

16   them?

17       A.    I didn't receive any money.

18            MR. O'NEIL:  And, Joyce, I got

19   yesterday -- I just realized I'm sitting here, I

20   got yesterday a copy of the settlement agreement

21   between the Milletts and Bank of America.  Did

22   you get a copy of that from him?

23            MS. YEAGER:  I did not see that

24   in the mail yet.

25            MR. O'NEIL:  Yeah, he sent it to

1   me by e-mail yesterday, and it just donned on me

2   as I was walking out the door that I'm not sure

3   you got the copy of it.

4              MS. YEAGER:  No, I don't think I

5   did.  I haven't seen it yet.  If he mailed it, I

6   haven't seen it yet.

7              (M. Millett Exhibit 29 was marked

8   for identification by the reporter.)

9       Q.   (BY MR. O'NEIL) Mrs. Millett, I'm

10  handing you what's been marked as Exhibit No.

11  29, which I'll represent to you is a document I

12  received from counsel for Bank of America

13  yesterday.

14      A.   Yes.

15      Q.   They had, you know -- as you may know,

16  your lawyers said, you know, you can have access

17  to this information, but you have to get the

18  consent of the other side, and we did that with

19  Bank of America.  And you and your husband --

20  well, strike that.

21           Let me refer you to Page 5 of this

22  exhibit.  Is that your signature?

23      A.   Where?

24      Q.   Page 5, Mrs. Millett.

25      A.   Hold on a second.  Yes, it is.

```
 1          Q.   Okay.  And that's your husband's
 2    signature as well, isn't it?
 3          A.   Yes, it is.
 4          Q.   Okay.  And do you recall that in
 5    exchange for you and your husband dropping all
 6    of its claims against Bank of America, that you
 7    and your husband and your lawyers
 8                        ?
 9          A.   Yes.
10          Q.   Okay.  And part of the claim that you
11    had against Bank of America was that they had
12    wrongfully denied your husband credit, right?
13          A.   No.  Part of the -- the big issue with
14    Bank of America was the fact that they had
15    accounts opened for Abundio Perez at the same
16    bank at the same time we had all our money in
17    that bank.
18          Q.   Okay.  If you go to the first page of
19    Exhibit 29, Mrs. Millett.
20          A.   Uh-huh.
21          Q.   The fourth "whereas" clause says,
22    "Whereas, on February 9, 2005, Mr. Millett was
23    turned down by Bank of America for a Bank of
24    America credit card."  Do you see that?
25          A.   That is correct.
```

1    Q.   Okay.

2    A.   That came out of the mediation.  I was

3    instructed by the Bank of America

4    representatives to go back to the house and

5    apply for the Bank of America credit card, and

6    we were denied.                      [redacted]

7

8

9              .

10   Q.   Okay.  So, is it fair to say in your

11   mind that the denial of credit raised the

12   settlement value of your claims?

13   A.   I don't think necessarily so that it

14   would have altered very much.  Bank of America

15   also had automobile loans and credit card loans

16   for Mr. Abundio Perez, and those existed before

17   that occurred.

18   Q.   Let me direct your attention to Page 3

19   of Exhibit 29, Mrs. Millett.  Paragraph 9

20   provides that Bank of America would furnish your

21   lawyers with copies    [redacted]

22                         .  Do you see that,

23   ma'am?

24   A.   Yes, sir.

25   Q.   Did they do that?

432

```
1        A.   Yes, sir.

2        Q.   And then Paragraph 9 further expressly

3   states

4                    [redacted]

5                        ?

6        A.   Yes.

7        Q.   Okay.  To your knowledge, have those

8   documents been turned over to TrueLink in this

9   case?

10       A.   I don't know, I'd have to look at this

11  document list to see for sure.

12       Q.   Well, I can do that, ma'am, I don't

13  want to waste your time.  I didn't see it in

14  there.

15            To your knowledge, did you ever see a

16  TransUnion credit report that was pulled by Bank

17  of America?

18       A.   I'm not sure if the Bank of America

19  credit report actually came from TransUnion or

20  not.  I think it was -- I'm not sure if it was

21  Experian or Equifax.

22       Q.   Okay.

23       A.   But my recollection might be faulty.

24       Q.   But you do recall seeing some credit

25  report issued to Bank of America on Mr. Perez?
```

```
 1        A.   Yes.  And it may have been even for

 2    multiple credit agencies, but I don't -- it's

 3    not a standard format.  It's not like, oh, it's

 4    title and it says, oh, here's a TransUnion

 5    report and here's Experian.  It's kind of like

 6    one of those computer printout things that like

 7    electronically was generated type thing.

 8        Q.   I understand.  To your knowledge, have

 9    all of the credit reports that you received

10    regarding Mr. Perez been produced in this

11    litigation?

12        A.   That would be a question for my

13    lawyers.  I mean, they keep all those.  These --

14    those are highly confidential documents, so they

15    would keep all those.  And probably -- I might

16    not even have copies of those at the house.

17        Q.   Paragraph 11 on the same page,

18    Mrs. Millett, is entitled "Additional

19    Communication with TransUnion."            [redacted]

20

21

22

23                                   ?

24        A.   Where?

25        Q.   I'm sorry, it's Paragraph 11, it's the
```

1    second sentence.

2         A.   Yes.  Because the denial of credit on

3    2005 I believe was, that one, was related to

4    TransUnion.

5         Q.   Okay.  Did you ever see any -- okay, so

6    you think it was -- there was a TransUnion

7    credit report that Bank of America pulled on

8    your husband?

9         A.   On Steve, but not on Abundio.

10        Q.   Okay.

11        A.   That's what the distinction is.

12        Q.   Okay.  And you've seen that credit

13   report?

14        A.   I'm sure I have.

15        Q.   Okay.  I haven't, so that's why I was

16   asking.  It hasn't been produced to us.  Have

17   you ever seen any communications between

18   TransUnion and Bank of America regarding the

19   denial of credit in February 2005?

20        A.        [redacted]

21

22

23

24

25              It's not like somebody called

1    somebody on the phone or there's a letter

2    somewhere.  And I believe it's electronic.

3        Q.    But when you saw it, it was in paper

4    format, right?

5        A.    What?

6        Q.    The credit report that TransUnion

7    delivered to Bank of America, you saw it in

8    paper form, right?

9        A.    I'm not sure if I saw it in paper form,

10   sir, or electronic format.  I handle a lot of

11   PDFs, they look like paper but they're not.

12       Q.    In any event, you saw it?

13       A.    I'm sure that I did at the time.  I

14   don't specifically recall what it looks like

15   sitting here now, but that was in 2005.

16       Q.    I don't know what it looks like either.

17            MR. O'NEIL:  Maybe we can go off

18   the record for just a second, I want to talk to

19   counsel.  Can we just go off the record?

20            VIDEOGRAPHER:  Sure.  The time is

21   11:13 AM.  We're going off the report.

22            (Off the record.)

23            VIDEOGRAPHER:  We're back on the

24   record.  The time is 11:20 AM.

25       Q.    (BY MR. O'NEIL) Mrs. Millett, you and

1    your husband are not claiming in this action

2    that TrueLink provided information to a third

3    party that resulted in a credit denial, right?

4         A.   I don't know that -- I don't know.

5         Q.   Okay.  I understand that there's facts

6    you may not know.  But what I think you do know

7    is what you're claiming in this case.  Are you

8    claiming in this case that TrueLink provided

9    information to a third party who was considering

10   a credit application of your husband that

11   resulted in a denial of that application?

12        A.   I don't know.

13        Q.   You don't know if you're claiming that

14   or not?

15        A.   Well, no, I know I'm not claiming that,

16   that this is a breach of contract claim.

17        Q.   Okay.  You had a claim against -- okay.

18   So, you're not claiming that TrueLink provided

19   information which led to a credit denial; is

20   that correct?

21        A.   Not in this action, no.

22        Q.   Okay.  Do you believe that your husband

23   was unfairly denied credit since August of 2003?

24        A.   On several occasions.

25        Q.   Okay.  And do you believe that that was

1    a result of any action by TrueLink?

2        A.    I can't say.  I don't know who produces

3    what at TransUnion.

4        Q.    I'm not asking about TransUnion, ma'am,

5    I'm asking about TrueLink.

6        A.    I understand that, but TrueLink is a

7    wholly owned subsidiary or TransUnion.

8               MR. O'NEIL:  Can you please read

9    back my original question, Miss Court Reporter.

10              (Whereupon, the requested portion

11   of the record was read by the reporter.)

12       A.    I don't know.

13       Q.    (BY MR. O'NEIL) Well, your counsel has

14   produced documents in this case which relate to

15   credit denials.  You're aware of that, right?

16       A.    Yes.

17       Q.    And you've looked at those documents,

18   right?

19       A.    Yes.

20       Q.    And you've seen -- those documents

21   identify the source of the information which led

22   to the credit denial, right?

23       A.    Yes.

24       Q.    Did any of those documents ever

25   identify TrueLink as a source of information?

1     A.    No, they don't identify TrueLink as a

2   source of information.

3                 (M. Millett Exhibit 30 was marked

4   for identification by the reporter.)

5     Q.    (BY MR. O'NEIL) Okay.  Let me hand you

6   what's been marked Exhibit 30.  Try to do this

7   as quickly as possible.  This is a response to

8   discovery that was filed on behalf of you and

9   your husband.

10        I'd like to direct your attention to

11  Page 22.  Paragraph 34 asks for all documents

12  which relate to an allegation in the complaint

13  that, quote, "named Plaintiffs were unfairly

14  denied credit based upon a credit report

15  prepared by TransUnion, LLC," closed quote.

16        Do you see that?

17    A.    Yes.

18    Q.    Okay.  And I'll represent to you that

19  there's no allegation in the complaint that

20  either one of you were denied credit based upon

21  a credit report prepared by TrueLink.  That

22  doesn't surprise you, right?

23    A.    No, it doesn't.

24    Q.    Okay.  And then in response, your

25  lawyers referred to two pieces of information.

1    One is a document that's numbered Millett 1006.

2                    (M. Millett Exhibit 31 was marked

3    for identification by the reporter.)

4         Q.    (BY MR. O'NEIL) And I'm going to show

5    that document to you.  It's Exhibit 31 for the

6    record.

7         A.    Yeah, this is the Sears one.

8         Q.    Okay.  And it indicates that Sears

9    received information from TransUnion, right?

10        A.    Yep.

11        Q.    And it says that the reason why the

12   request for credit was denied because Sears was

13   unable to comply with the consumer statement.

14   Do you see that?

15        A.    Yep.

16        Q.    Did you ever have any -- do you have

17   any further information as to why Sears denied

18   the application by your husband?

19        A.    Yep.

20        Q.    And what information is that?

21        A.    The Citibank USA, NA, account, which is

22   also Sears, was relabeled with Steve Millett's

23   information and was formerly Abundio's account.

24        Q.    Where do you get that information?

25        A.    Because I talked to them at Citibank

1   USA.

2       Q.   Okay.  And is there any documentation

3   of this conversation?

4       A.   No --

5       Q.   Okay.

6       A.   -- there's no documents.  I mean, it

7   was a phone conversation.

8       Q.   Okay.  So then Sears was being

9   inaccurate when they advised you under the Fair

10  Credit Reporting Act that the reason for the

11  denial was they couldn't comply with the

12  consumer statement?

13      A.   No, that's not accurate.

14      Q.   You mean the document from Sears is not

15  accurate?

16      A.   No.  I mean, that reason that they

17  placed there on there is not accurate.

18      Q.   Okay.  So, Sears lied in this document,

19  but they told you the truth in some phone call?

20  Is that your testimony?

21      A.   No, I'm not characterizing it that way.

22  I wish you would quit characterizing things with

23  certain emotional context and then asking me to

24  answer yes or no questions.

25            MS. YEAGER:  Just answer the

1    question.

2         Q.   (BY MR. O'NEIL) Okay.  Do you blame

3    TrueLink for this denial of credit by Sears?

4         A.   Well, I don't blame TrueLink per se.

5    But TrueLink at this point in time should have

6    notified us that Sears was still reporting data

7    for Abundio Perez.  Because they were calling

8    them, TransUnion was calling them.

9         Q.   TransUnion was calling who?

10        A.   Sears.

11        Q.   Do you know who at TransUnion called

12   somebody at Sears?

13        A.   No, they were calling Ford too at that

14   time I think.

15        Q.   Who's "they"?

16        A.   The people from TransUnion were calling

17   the remaining open accounts that were still open

18   on the Abundio Perez file and telling them that

19   they needed to close them for fraud.

20        Q.   And when was that?

21        A.   That was in 2005.

22        Q.   Okay.  And do you have any --

23        A.   And 2004.

24        Q.   Do you have any like admissible

25   evidence or documentation regarding these

1   beliefs that you have?

2       A.   The Ford documents showed that TU was

3   calling Ford Motor Credit about the Abundio

4   Perez accounts.

5       Q.   Okay.  Let me give you Exhibit 32,

6   which is another document that was produced by

7   your lawyers in this case.

8       A.   Yep.

9               (M. Millett Exhibit 32 was marked

10  for identification by the reporter.)

11      Q.   (BY MR. O'NEIL) Is this the credit

12  denial which is referenced in response to

13  Document Request No. 34?

14      A.   I believe it to be so.

15      Q.   Okay.  And you see of course that this

16  credit denial was based upon information from

17  Experian and Equifax, right?

18      A.   Yes.

19      Q.   You don't have any reason to believe it

20  was based upon information from TransUnion, do

21  you?

22      A.   No, I don't.

23      Q.   Okay.

24      A.   That's not -- they didn't cite

25  TransUnion, so I don't have any reason to

1    believe that.

2        Q.    Are there any other credit denials that

3    you believe your husband suffered as a result of

4    information provided by TransUnion?

5        A.    There is the Bank of America one.

6        Q.    But, of course, you haven't produced

7    that credit report, have you?

8        A.    I don't know if I have or haven't, sir.

9        Q.    Do you have any information -- do you

10   know why Bank of America denied your husband

11   credit?

12       A.    Well, they claimed it was because of

13   some error in the web interface or some error on

14   somebody's part when the web form was filled

15   out.  But I don't necessarily agree with that

16   assertion.

17       Q.    Well, actually, you did agree to it.

18       A.    Well --

19       Q.    If you take a look at Exhibit 29,

20   Paragraph 11 says on February 9, 2005,

21        Milletts' application for a credit card was

22   denied due to the fact that Millett improperly

23   completed his online application.  And that's in

24   the agreement that you and your husband signed,

25   right?

```
1          A.   I understand that, sir.

2          Q.   So, are you now saying that --

3          A.   But it's --

4          Q.   -- you didn't agree to that statement

5     when you signed this and got        [redacted]

6          A.   No, do not mischaracterize what I said.

7     What I said is there was a web error.  Now,

8     whether the error -- that does not -- you're

9     trying to twist improper into something like

10    somebody made some error on -- due to stupidity

11    or some other problem.  There was some problem

12    apparently with the web interface.  So, yes, the

13    application was improperly completed on their

14    end and did not process through their system.

15         Q.   But you don't have any reason to

16    believe that the denial of credit was due to

17    information received from TransUnion, do you?

18         A.   It says so.

19         Q.   Where?

20         A.   It says, "Bank of America agrees to

21    provide the Milletts' counsel any communication

22    between TransUnion and Bank of America in

23    connection with the denial of credit."

24         Q.   Maybe you misunderstood my question.

25    You don't have any reason to believe that the
```

1    denial of credit was due not to an online

2    failure, but to information produced by

3    TransUnion?

4         A.   No, I don't have any reason to believe

5    that.  [redacted]

6

1

2      Q.    Have you ever created a blog yourself.

3      A.    I had one at one time, yeah.

4      Q.    What was it called?

5      A.    Well, I had a website Credit Monitoring

6    Sucks, and then I had some blog postings which

7    were on a public forum for Fight For Credit

8    Suit.

9      Q.    Is that Fight Back?

10     A.    I think it is.  But it's been a long

11   time since I've been there.

12     Q.    So, you had a website called "Credit

13   Monitoring Sucks"?

14     A.    Yeah.

15     Q.    And that was the URL?

16     A.    No, that was the title on the web page.

17     Q.    What was the domain name?

18     A.    Yahoo.com.

19     Q.    Okay.

20     A.    It was one of those personal internet

21   pages.

22     Q.    Okay.  Well, let me warn you right now

23   I don't know anything about this, so I'm going

24   to ask stupid questions about this.

25     A.    That's all right.

26     Q.    So, you had your own personal website

1   that was on Yahoo.com that was entitled "Credit

2   Monitoring Sucks;" is that right?

3       A.   Yeah.

4       Q.   And what period of time was that up and

5   running?

6       A.   That was up and running until -- I took

7   it down when the Bank of America case settled.

8       Q.   Why did you take it down at that point

9   in time?

10      A.   It was part of the mediation.

11      Q.   Does that mean as part of the

12  settlement?  Or you were just trying to take it

13  down to help facilitate settlement?

14      A.   Well, I don't think it specifically

15  enumerated in the settlement agreement that I

16  would take down the website, but I think it was

17  requested by Bank of America's counsel and then

18  I did comply with their request.

19      Q.   Well, why did -- do you have any idea

20  why Bank of America wanted you to take down a

21  site called "Credit Monitoring Sucks"?

22      A.   Because the site had on it verbiage

23  related to Bank of America, because Bank of

24  America was one of the entities that we were at

25  that time suing.

```
1          Q.    Okay.  So, you filed your initial
2     lawsuit against Bank of America and the other
3     parties in the summer of 2004?
4          A.    Right.
5          Q.    When did you first create that website?
6          A.    I think it was right around the same
7     time, because it basically went up with a copy
8     of the TU letter.  The top part of it was
9     redacted, the Social Security number was
10    redacted, and then it had the filings from when
11    the lawsuits were filed, the actual original
12    lawsuit filing.
13         Q.    Well, that letter was dated April of
14    2003.
15         A.    Right.  But it wasn't posted until I
16    filed suit.
17         Q.    Okay.
18         A.    You know, so it was around that time.
19         Q.    Okay.  So, the website was created
20    about the same time you filed the lawsuits?
21         A.    Maybe a month or two before.
22         Q.    Okay.
23         A.    But you know...
24         Q.    So, say from May of 2004 until the time
25    you reached your settlement with Bank of
```

1    America, which I believe was maybe late 2005.

2    Does that sound right?

3        A.    Maybe more like April.  I want to say

4    it's more April.

5        Q.    April of 2004?

6        A.    Yeah, maybe more April, possibly end of

7    March.  It's hard to say.

8        Q.    Okay.

9        A.    It's been three years.

10       Q.    And your settlement with BofA was

11   reached in July of 2005, so.  Okay.  What

12   content was on that website during that time

13   period?

14       A.    I believe I already answered that, but

15   it was the TU letter, and there was some

16   verbiage on there about Bank of America.  And

17   then there were links to the -- there were links

18   to the PDFs of the actual legal filing, which

19   was the lawsuit we filed.

20       Q.    You said there was verbiage regarding

21   Bank of America?

22       A.    Uh-huh.

23       Q.    Was their verbiage regarding anybody

24   else?

25       A.    Well, it was verbiage regarding the

1    Bank of America and Ford Motor Credit.

2        Q.   Was there any verbiage regarding

3    TransUnion?

4        A.   Well, I mean, they were named on the

5    site, yes.  And, of course, the TU letter was

6    posted there.

7        Q.   Right.  You said there was verbiage,

8    I'm not sure what that means.  There was

9    verbiage regarding Bank of America and Ford

10   Motor Credit?

11       A.   Right.

12       Q.   Was there verbiage regarding anybody

13   else?

14       A.   Well, I mean, there was just a

15   statement on there that -- there was a paragraph

16   on the page of text,

17

18                                             I

19   took it down.

20       Q.   Okay.

21       A.   Now, I don't recall exactly what the

22   verbiage is verbatim.  TU's name was on the page

23   because obviously the TU letter was the main

24   page.

25       Q.   Was there any mention of TransUnion in

```
1    the verbiage, the paragraph of verbiage?

2         A.    There could have been, yes.

3         Q.    But you don't recall what that was?

4         A.    I don't recall what the specific -- how

5    I phrased whatever it is I phrased.

6         Q.    Whatever it was

7                                right?

8         A.                              .

9         Q.    Okay.  But you don't recall what it

10   was?

11        A.    I think it was something to the effect

12   of you --

13              MS. YEAGER:  Don't speculate.

14        A.    Okay.

15              MR. O'NEIL:  No, wait a minute.

16   No, no, no, no, no, no.  She wasn't going to

17   speculate, she was going to summarize.

18        A.    It's something to the effect of it was

19   about $300,000 in identity theft and give these

20   people your money and it'll go unnoticed, or

21   something along those lines.  But whatever it

22   was, I'm paraphrasing here,

23                              .

24        Q.    (BY MR. O'NEIL) What did it say about

25   TransUnion?
```

1       A.   It didn't say anything about

2  TransUnion.  TransUnion's letter is the

3  background of the physical page.

4       Q.   I understand that, ma'am, I'm not

5  asking about the letter.

6       A.   Okay.

7       Q.   I'm asking about I thought you said

8  that the TransUnion was in the paragraph of

9  verbiage?

10       A.   I said they could be, but I don't

11  specifically recall that.

12       Q.   Okay.  Do you have any copies of any of

13  the content on the website?

14       A.   No.

15       Q.   You don't have any electronic --

16       A.   No.

17       Q.   Why is that?

18       A.   Because it's electronic.  All it was

19  was a copy of the TU letter, which I still have

20  and has been produced, and it was a copy of my

21  original court filing, which has still been

22  produced, and it had a web page title and then a

23  small blurb of paragraph that was typed in the

24  Yahoo website that I never physically possessed

25  on my machine.  And when I took the site down,

```
 1    my only options were to destroy the site, were

 2    to delete the site holder or whatever for Yahoo.

 3    And then it gives you a confirmation e-mail that

 4    says the site's been deleted or whatever.

 5

 6

 7                              Anyhow -- but that's

 8    all you have.

 9         Q.   Well, I don't have anything, so.

10    That's why I'm asking these questions, so.

11         A.   It's all right.

12         Q.   Then you mentioned a blog that you

13    contributed to?

14         A.   That's on I believe the Fight Back

15    site.

16         Q.   Okay.  Is there other blogs you've

17    contributed to besides the Fight Back blog?

18         A.   You mean about this case?

19         Q.   About anything.

20         A.   Well, I mean, there's Microsoft

21    technical sites or whatever that I've posted on,

22    but, I mean, you know.

23         Q.   Right.  Did you post on any blogs

24    information at all related to any of your

25    lawsuits, other than the Fight Back blog?
```

1      A.   Well, I was active in some credit

2   forums in some other places too on the net, but

3   I don't know that there's -- I don't know that

4   they were even -- they're still functioning or

5   whatnot.

6      Q.   And did you ever print out copies of

7   these blogs?

8      A.   No.

9      Q.   Do you have any electronic versions of

10   these blogs?

11      A.   No.

12      Q.   Okay.  I mean, you told us before

13   you're a pack rat, and you told us before --

14      A.   Yeah.

15      Q.   -- that you've got all these CDs and

16   you got all this electronic data, right?

17      A.   Right.

18      Q.   You said you've got boxes and boxes of

19   documents.

20      A.   I have boxes of the legal filings and

21   papers and the defendants discovery production

22   and all that kind of stuff, yeah, I have all

23   that in boxes.

24      Q.   Given all that, why is it that you

25   don't have any record of the blog or of your

1    website?

2        A.   Because those are just -- they're not

3    important enough to catalog.  And it's like --

4    I'm trying to understand where you're going with

5    this.  I don't think you understand the medium.

6    I mean, if you go out and post in forums, first

7    of all, I don't own the forums that I posted in.

8            Second of all, you don't save copies

9    just because you went out and visited, like I go

10   to Microsoft and visit their technical forum all

11   the time.

12       Q.   Well, you could.

13       A.   You could, but --

14       Q.   You could.

15       A.   You could, but you don't.

16       Q.   Okay.  I mean, the blog listings, you

17   know, haven't been very helpful to you in the

18   litigation, right?

19               MS. YEAGER:  Objection.  Vague.

20       A.   I'm sorry?

21       Q.   (BY MR. O'NEIL) The -- Experian found

22   some of your blogs, right?

23       A.   You mean they found some forums?

24       Q.   Okay, sorry, wrong terminology.  As I

25   understand, it's not your blog?

```
1        A.    Right.

2        Q.    You just posted to it?

3        A.    Right.

4        Q.    Experian found some postings that you

5   made to the Fight Back blog, right?

6        A.    Yeah.  Uh-huh.

7        Q.    And they questioned you about it in

8   your deposition?

9        A.    Of course, uh-huh.

10        Q.    Right.  And then of course

11              idn't like your website, right?

12        A.    No.

13        Q.    Okay.

14              MS. YEAGER:  Melody, you need to

15   take your hands down please.

16              THE WITNESS:  I'm sorry.

17        Q.    (BY MR. O'NEIL) I see a reference in

18   one of these blogs to

19   "www.geocities.com/creditmonitoringsucks"?

20        A.    Yes, that's at Yahoo.

21        Q.    That's at Yahoo?

22        A.    Yahoo owns geocities.

23        Q.    Okay.  And then on your postings, you

24   gave your e-mail address and told people they

25   could e-mail you about credit monitoring and
```

1    other identity theft issues, right?

2         A.    Yeah.

3         Q.    Okay.  And did you get those types of

4    e-mails?

5         A.    I got some.

6         Q.    Okay.

7         A.    But not really that many.

8         Q.    And do you remember what your e-mail

9    address was?

10        A.    I don't recall, but I'm sure you'll

11   tell me.

12        Q.    Was it creditmonitoringsucks@yahoo.com?

13        A.    Yes.

14        Q.    Okay.  And you testified about some of

15   these postings in your Experian deposition,

16   right?

17        A.    Yes.

18        Q.    And all that testimony is accurate,

19   right?

20        A.    Yes.

21        Q.    Okay.  You gave a lot of advice to

22   people about what they should do if they're a

23   victim of identity theft on these postings.  Do

24   you recall that?

25        A.    Yes.

1      Q.    Okay.  And, you know, one of your
2   pieces of advice was to go to the FTC website
3   and download the ID theft affidavit and get that
4   signed, right?
5      A.    Yeah.
6      Q.    Did your husband ever do that?
7      A.    Yes.
8      Q.    He did?
9      A.    Uh-huh.
10      Q.    Okay.
11      A.    It's 17 pages and it's got to be
12   notarized.
13      Q.    Do you know, did you ever give that to
14   your lawyers to produce to TrueLink in this
15   case?
16      A.    I believe -- where is the document of
17   production?  It's already on that thing, on the
18   CD somewhere.  It's on my two core CDs that they
19   give out for all my document productions.
20      Q.    Well, part of the problem is I don't
21   know what you gave your lawyers, I only know
22   what I got from your lawyers.  So you gave that
23   affidavit --
24      A.    You have to have it, because you
25   produced the police report at my last

1    deposition.

2        Q.   The police report was just produced to

3    by itself.  We never got the FTC affidavit,

4    that's why I'm asking.

5            So, your husband did sign a 17-page

6    identity theft affidavit on the FTC forum?

7        A.   Yes, and it was notarized by a Bank of

8    America official.

9                MR. O'NEIL:  Okay, can we get a

10   copy of that.  Joyce.

11               MS. YEAGER:  (Indicating.)

12               MR. O'NEIL:  Thank you.

13       Q.   (BY MR. O'NEIL) And then in one of your

14   pieces of advice is that you have to request a

15   seven-year fraud alert by registered mail.  Do

16   you recall that advice?

17       A.   Yes.

18       Q.   Did you or Mr. Millett ever do that?

19       A.   I believe my attorneys filed a report

20   and requested a seven-year fraud alert.  I don't

21   believe that I sent it by registered mail.  I

22   think Adler took care of that, but I don't

23   recall exactly how that worked.

24       Q.   Have you ever seen this, this request

25   by your attorney?

1  A. What?

2  Q. For a seven-year fraud alert?  Did you

3 ever see -- you said you thought that Mr. Adler

4 had submitted a seven-year fraud alert request

5 to the bureaus.  Have you ever seen that

6 request?

7  A. Well, I believe we have a seven-year

8 fraud alert.

9  Q. Ma'am, you're asking a different

10 question -- you're answering a different

11 question.  I'm asking, because you told me --

12 it's another document we haven't seen.  You told

13 me that you never submitted a written request

14 for a seven-year fraud alert, but you think

15 Mr. Adler did, right?

16  A. Well, I think -- I don't know if it was

17 written or by telephone.  I don't know if he was

18 talking to them by phone or if he talked to them

19 in a letter, so I don't know if it's a document.

20  Q. I guess because you said, yes, he sent

21 a written request, that's what I thought.  But

22 now you're telling me that you don't know if he

23 ever did it anyway?

24  A. Well, I'm saying he sent a request.  I

25 didn't use the word "written."

```
1         Q.    Well, you are advising people, quote,

2    "you are going to have a request a seven-year

3    fraud alert by registered mail.  Yes, I said

4    registered," closed quote.  But you didn't do

5    that, right?

6         A.    I didn't to that no, because my --

7         Q.    And your husband didn't do that, right?

8         A.    No.  Because at that point we already

9    had legal counsel.

10        Q.    And your lawyer didn't do that, right?

11        A.    I'm sorry?

12        Q.    Your lawyer didn't do that for you

13   either?

14        A.    Not like that, no, I don't guess not.

15        Q.    Okay.

16        A.    I have all the green cards for what

17   Adler sent out registered mail, so I, you know.

18                 (M. Millett Exhibit 37 was marked

19   for identification by the reporter.)

20        Q.    (BY MR. O'NEIL) Mrs. Millett, I'm going

21   to show you what's been marked as Exhibit 37,

22   which was also an exhibit in the -- I think in

23   the Experian deposition, although I'm not sure.

24        A.    Yeah, because it's got the deposition

25   -- it's got the exhibit on the corner.
```

1          Q.    I'm sorry?

2          A.    I said it's got the Experian exhibit

3     number on the corner.

4          Q.    Yeah.  Is this a printout from a blog?

5          A.    No, this is a printout from a forum.

6          Q.    I thought you said Fight Back was a

7     blog?

8          A.    She has a blog page, but this is the

9     forums.

10         Q.    Got it.  So, it's a printout from a

11    forum on a blog?

12         A.    Right.

13         Q.    The first posting, is that by someone

14    who goes by the name "creditmonitoringsucks"?

15         A.    Yes.

16         Q.    Okay, is that you?

17         A.    Yes.

18         Q.    Okay.  And so the verbiage on -- wow --

19    so, all of the verbiage on this forum is all

20    written by you; is that right?  On this exhibit

21    at least.

22         A.    On this posting, yes.  This is an

23    individual single posting.  Notice it says "Post

24    No. 1."

25         Q.    So what does that mean?

1      A.   That's the first posting in the thread.

2   Somebody else could come in behind me and make

3   additional postings.  And as I testified in the

4   Experian case, there was one thread that they

5   produced where other people were responding and

6   they -- I had to tell them that that was not me

7   because that was additional posters.

8      Q.   Lawyers don't know this stuff.

9      A.   Right, I understand that and I'm a

10  technical person, so I'm just explaining it.  So

11  this is Post No. 1.

12     Q.   You do better with the appellate

13  process than I do with postings, so I guess you

14  got me there.  And so this is the first posting

15  that people can respond to.  However, you also

16  responded to other people's postings, right?

17     A.   Some, but not much.  Mostly I posted

18  stuff for people to --

19     Q.   Uh-huh.

20     A.   -- have as reference material.

21     Q.   Now, on the first page, you identify

22  two types of identity theft, right?

23     A.   Yes.

24     Q.   Okay.  And those are the only two types

25  of identity theft that you discuss, right?

1       A.   At that time, yes.

2       Q.   Okay.

3       A.   Uh-huh.

4       Q.   And then you define "true name fraud."

5       A.   Uh-huh.

6       Q.   And then you refer to something called

7    "SSN only fraud"?

8       A.   Correct.

9       Q.   And it said, you say, "They say it is

10   the fastest growing."  Who's "they"?

11      A.   Well, I mean, like for example, the FTC

12   had sent out a -- when this was posted, there

13   was some kind of like news article or something

14   where they were talking about SSN fraud as being

15   the fastest form of identity theft.  So, it's

16   topical at that time period.

17      Q.   So, your recollection is that the FTC

18   identified SSN only fraud as the fastest growing

19   type of --

20      A.   It was a news article.  I don't

21   recall --

22      Q.   Okay.

23      A.   -- if it was the FTC or what entity is

24   the one that said it, but I think it was

25   somebody in the government because they're the

```
1    ones that keep those kinds of statistics.  Could
2    be the GAO too.
3         Q.   Now, in 2003 --
4         A.   Uh-huh.
5         Q.   -- when you unfortunately had to learn
6    all about identity theft and you were learning
7    all about identity theft, did you understand at
8    that time that there was different types of
9    identity theft?
10        A.   No.  Are you talking about when I first
11   discovered the identity theft?
12        Q.   Well, actually, let's say August 2003.
13        A.   Yes.
14        Q.   Did you understand at that point that
15   there was more than one type of identity theft?
16        A.   Well, I mean, I understood that there
17   were like credit card identity theft, and then I
18   understood that there was like identity theft.
19   But I didn't necessarily understand at that
20   point the distinction like between true name
21   identity theft and just use of a Social Security
22   number.
23        Q.   Okay.
24        A.   So, I mean, that's one of those
25   evolving knowledge kind of things.
```

1    Q.    Okay.   So, in August of 2003, you

2    didn't understand that there were different

3    types of identity theft; is that right?

4    A.    Identity, I mean, to me identity theft

5    was identity theft.  I mean, we knew that our

6    identity theft involved the use of my husband's

7    Social Security number.  But, for example, I

8    didn't know about synthetic identity fraud, I

9    didn't know about mortgage fraud with the FHA.

10         I mean, there's so many different forms

11   of identity theft now that are out there that at

12   that point in time I wasn't necessarily aware of

13   all of them.

14   Q.    But my question was, were you aware

15   that there was more than -- there were types of

16   identity theft?

17   A.    Yeah, there were types of identity

18   theft and I knew that in August of 2003.

19   Q.    Okay.  And did you think that the

20   credit monitoring product that you purchased

21   from TrueLink would protect you and your husband

22   against all those types of identity theft?

23   A.    Well, it was advertising complete

24   identity theft protection.

25   Q.    Ma'am, can I just please have you

1    answer my question?  Rather than tell me

2    something else.  I was asking what you thought.

3         A.    Yes.

4         Q.    Okay.  So, just so the record's clear,

5    you thought in August of 2003 -- you were aware

6    that there were different types of identity

7    theft and you thought that the product that you

8    purchased on behalf of your husband would

9    protect against all of it?

10        A.    All of the ones that I knew about at

11   that point.

12        Q.    Okay.  Page 2 of Exhibit 37,

13   Mrs. Millett.

14        A.    Uh-huh.

15        Q.    Like the third paragraph down, there's

16   a paragraph that begins, "I know they exist, I

17   have personally seen them," do you see that?

18        A.    Yep.

19        Q.    Says, "I have copies of the TransUnion

20   sub file accounts from TransUnion."

21        A.    Yep.

22        Q.    What's that in reference to?

23        A.    That's a reference to the TU letter.

24   Has all the sub file accounts on it.  The

25   accounts that are on Abundio Perez's file.

1      Q.    Okay.  Have you seen FTC reports that

2   talk about the fact that the credit bureaus

3   maintain multiple files with the same Social

4   Security number?

5      A.    I'm sorry, I don't understand the

6   question.

7      Q.    Okay.  Well, I mean, I think what

8   you're talking about here, what I've seen you

9   write about is complaining about the fact that a

10   credit bureau maintains more than one --

11   sometimes can maintain more than one file that

12   has the same Social Security number, right?

13      A.    Right.

14      Q.    Okay.  And are you aware that the FTC

15   has acknowledged that practice in its reports

16   regarding identity theft?

17      A.    I -- not specifically, no.

18      Q.    Okay.  So, then you wouldn't know what

19   the FTC has said about that; is that right?

20      A.    Well, I know that the FTC said that

21   file segregation was illegal, as pertains to

22   credit repair organizations.  So, the part that

23   was incongruent to me was the fact that the FTC

24   allows sub files in the credit reporting

25   context, but doesn't allow in the credit

1    reporting context, so.

2        Q.    Do you understand why the FTC has

3    stated on the record that there are reasons why

4    the bureaus do that?

5        A.    I understand that -- I haven't seen any

6    of that testimony if that's the case.

7        Q.    Okay.  And you understand that the FTC

8    acknowledges that it's not a bad practice to not

9    have credit bureaus matched solely on Social

10    Security numbers?

11        A.    I would disagree with that assertion by

12    the FTC because --

13        Q.    Ma'am, I'm not asking for your opinion

14    about it.  I'm asking if you're aware that

15    that's what the FTC has said?

16        A.    No, I'm not aware of that.  And I would

17    love to see the public documents that would

18    enumerate that fact for me.

19        Q.    Well, they're out there.

20            MR. O'NEIL:  I think we have to

21    change the tape.  Let's go off the record.

22            VIDEOGRAPHER:  The time is

23    3:05 PM.  We're going off the record.

24            (Recess.)

25            VIDEOGRAPHER:  The time is

1    3:14 PM.  We're back on the record.

2                    MR. O'NEIL:  As I indicated off

3    the record, I have no further questions at this

4    time.  I appreciate Mrs. Millett's patience.  I

5    don't envision having to continue this

6    deposition, however, once again you've

7    identified more documents that have not been

8    produced.  We've established that certain

9    documents that weren't produced should have

10   been, so once we get those documents, I reserve

11   the right to question Mrs. Millett on those

12   documents, but hopefully that won't be

13   necessary.

14                    EXAMINATION

15   BY MS. YEAGER:

16       Q.   Mrs. Millett, I need to ask you some

17   questions about both of your depositions.  Your

18   deposition from -- pardon me -- I need to ask

19   you questions about both of your depositions,

20   both from today and from the prior deposition

21   that you gave in May.

22                    When I ask you questions about your May

23   deposition, if you don't remember the answer,

24   feel free to say that you don't remember,

25   because I know that's been some time and we

1    can't all remember everything.

2         So, if you don't remember particular

3    testimony and I ask you about it, just feel free

4    to say that you don't remember.

5         A.   Okay.

6         Q.   When we were here in May, we talked

7    about some documents that were marked as an

8    exhibit, and the documents pertained to the

9    enrollment form from 2004 for the credit

10   monitoring product.  Do you remember those

11   documents?

12        A.   No.

13        Q.   Okay.  Was there at one point -- do you

14   recall testimony about some of the documents

15   from TransUnion that had a birth date FOR

16   Mr. Millett that was not his actual birth date?

17        A.   Yeah, I recall that.  I believe it's on

18   the whatever the user screen thing that you all

19   brought to the deposition was.

20        Q.   And do you recall what birth date was

21   in that particular box?

22        A.   I believe it was like 1/1/1901 or

23   something like that.

24        Q.   And did you enter that date yourself?

25        A.   No, I did not.

1     Q.   And do you have reason to know why the
2   date is reflected on that document in the manner
3   that it is?
4     A.   Yes, I do.   In preparation for the
5   depositions that were taken for the defendants
6   over the last two, three weeks ago, we found in
7   the documents in one of the logs that was from
8   TrueLink that that was a default date entered
9   for subscription monitoring customers that
10  existed prior to the implementation of the birth
11  date routine.
12    Q.   So, you did not ever lie when you
13  filled out any documents for TransUnion or
14  TrueLink?
15    A.   No.
16    Q.   We've also talked about the fact that
17  there are a lot of documents connected with this
18  case, and we had some questions today about that
19  as well.   In your May testimony, you talked
20  about 15 or 20 boxes or 12 totes.   Do some of
21  those documents contain discovery that was
22  produced from other defendants in other
23  litigation?
24    A.   Yes, they do.
25    Q.   And has -- have some of those documents

1      that have been produced by other defendants in

2      other litigation been designated confidential by

3      those defendants?

4            A.    Confidential or highly confidential.

5            Q.    And so those are not free for us to

6      disclose to the counsel for TransUnion; is that

7      correct?

8            A.    As far as my understanding is, no.  I'm

9      not supposed to disclose those to anybody.

10           Q.    I'd like to ask you some questions

11     about the Fair Isaac claim that was originally

12     filed.  In your May deposition, you indicated

13     that you believed that Fair Isaac count or the

14     Fair Isaac entity had been dismissed as part of

15     a settlement agreement; is that correct?  Do you

16     recall that testimony?

17           A.    Yes, I recall that testimony.

18           Q.    Do you still think that that's the

19     case?

20           A.    No, I do not.

21           Q.    And why is that?

22           A.    There was a settlement, but there's no

23     agreement associated with it.  It's basically

24     that we all agreed that they weren't going to be

25     a party, and we kicked them out.

1      Q.   When you enrolled initially for the

2   credit monitoring product, did you select the

3   three items that were purchased that were

4   reflected on the enrollment screen?

5      A.   I don't recall specifically checking

6   all three boxes.  I thought when you clicked the

7   link on the main page, it took you to another

8   page, and then all three of the boxes were

9   already selected because it was a package deal.

10     Q.   Do you know whether all three of those

11  products that were listed on the enrollment

12  documents are still offered at this time?

13             MR. O'NEIL:  Objection.  Lack of

14  foundation.  I don't know what products you're

15  talking about.  Or what form you're talking

16  about, for that matter.

17     Q.   (BY MS. YEAGER) Do you recall the

18  testimony about the enrollment that you did for

19  the credit monitoring product?

20     A.   The web form?

21     Q.   Yes.

22     A.   The online web form had like the

23  monitoring and then it had scoring or score

24  training or whatever.  It was some package

25  promotional deal that you clicked on the link

1    when you logged in and it put the whole package

2    together.  Because I believe the subscription

3    was more than 10.95 at that time when I signed

4    up.  The enrollment was like 20 bucks or

5    something.  And then I think subsequently

6    certain of those items were discontinued because

7    the prices of monitoring dropped to like 10.95 a

8    quarter.

9                    MR. O'NEIL:  Joyce, it might be

10   helpful to me, because I have a copy of her May

11   deposition, if you're referencing testimony if

12   you could give me a page number.  You don't have

13   to --

14                   MS. YEAGER:  I'd be happy to do

15   that.

16                   MR. O'NEIL:  Because I'm --

17                   MS. YEAGER:  I would be happy to

18   do that.

19                   MR. O'NEIL:  None of these

20   questions make any sense to me because I don't

21   know what you're talking about.

22                   MS. YEAGER:  I'd be happy to do

23   that.

24                   MR. O'NEIL:  Thank you.

25        Q.   (BY MS. YEAGER) I apologize that this

1    is taking a minute, but some of these -- some of

2    your prior testimony was clarified with your

3    testimony today, so I'm skimming through my

4    notes.  I apologize that it's taking a minute

5    for me to do that.

6                    MR. O'NEIL:  Take your time,

7    Joyce.

8         Q.   (BY MS. YEAGER) In your testimony from

9    May 3rd beginning on about Page 186, you offered

10   some testimony about how you proceed through a

11   web page, and you made reference to clicking on

12   links.  Do you recall that testimony?

13        A.   No, I don't.

14        Q.   You are experienced at manipulating web

15   pages; is that correct?

16        A.   I would be experienced with operating

17   web pages, yeah.

18        Q.   Why is -- why does a web page have a

19   link?  What is a link?  I'm sorry, that was two

20   questions.  What is a link on a web page?

21        A.   A link usually is like a hot spot in

22   the actual web page where you can put your

23   cursor over it and it will change, and you can

24   click on it then and then that link will take

25   you to either another part of the site, it might

```
1     take you to another web page.  It will take you

2     anywhere else that the internet can resolve for

3     the name that's attached to the link.

4          Q.   In your prior testimony, there was some

5     discussion about the fact that you could not

6     tell if certain documents were related because

7     you didn't have all of the connection pieces for

8     all of the links that you visited; is that

9     correct?

10                    MR. O'NEIL:  Objection.

11    Foundation.  I have no idea what you're talking

12    about.  What web pages?  Whose pages?  True

13    Credit's pages?

14                    MS. YEAGER:  The enrollment web

15    pages.

16                    MR. O'NEIL:  Of True Credit?

17                    MS. YEAGER:  It wasn't True

18    Credit at the time -- yes, True Credit, yes.

19                    MR. O'NEIL:  I'm sorry, if I

20    could just ask her to read back the question,

21    and if you could tell me what page you're

22    referring to.  Because I don't remember that

23    testimony, that's why I'm asking.

24                    MS. YEAGER:  I'm looking at Page

25    185, the bottom of it, through 189.  And then
```

1    there's some additional testimony on Page 198.

2                    MR. O'NEIL:  Thank you.

3                    MS. YEAGER:  And I believe that

4    it came up again in some additional places as

5    well.

6                    MR. O'NEIL:  Yeah, I see those

7    pages.  I don't see any testimony about what you

8    said.  Maybe I misunderstood your question.  Go

9    ahead.

10                    THE WITNESS:  I'm sorry, I don't

11    even know what the question is now.

12    Q.    (BY MS. YEAGER) That's okay, I'll start

13    over.  And then again on 224.

14                    MR. O'NEIL:  Yeah, because

15    they're two different -- they're completely

16    different sites though, so.

17                    MS. YEAGER:  Yeah, I will clarify

18    the question, thank you.

19    Q.    (BY MS. YEAGER) When you manipulate a

20    web page so that you click on a link, as I would

21    refer to it as a layman, how can you tell where

22    you're going in the internet?

23    A.    You'd have to view the original HTML

24    code for the actual web page itself.  Because a

25    lot of links are just some text.  Like for

1    example might say "click here" and it is a link,

2    and when you click here, the actual address has

3    been concealed or embedded actually in the

4    website code.

5         Q.    And how can you see that website code?

6         A.    You have to view the actual HTML file

7    or ASP or whatever web programming language that

8    that particular website has been written in,

9    whether it's Java or whatever, so that you could

10   actually tell that that link was directing it

11   into this page.

12        Q.    And are you capable of doing what you

13   just described?

14        A.    Yes, I'm capable of viewing code if I

15   have it.  But to just look at the printout of a

16   web page, you can't determine where a particular

17   link might then take you to.

18        Q.    But because of your work experience and

19   your training, you are able to look at HTML

20   code; is that correct?

21        A.    Yes.

22        Q.    In your deposition testimony beginning

23   at the bottom of Page 193 and continuing on, as

24   I recall, throughout the rest of the deposition,

25   but particularly 193, 194, there was some

 1     discussion about our conversations about getting

 2     banking records.  Do you recall that testimony?

 3          A.   Some of it, yes.

 4          Q.   Did we have more than one conversation

 5     about ordering banking records?

 6          A.   Who?  You and I?

 7          Q.   Yes.

 8          A.   Yes, I had talked to you on numerous

 9     occasions about acquisition of banking records.

10          Q.   And that's been an ongoing process for

11     us in this litigation for some time, has it not?

12          A.   Yes, it has.

13               MS. YEAGER:  Heather, did I get

14     my documents together so they're not as tight.

15               MR. O'NEIL:  For the record, and

16     Ms. Schuman will back me up, I got the documents

17     together.

18               MS. YEAGER:  I meant earlier

19     today in the deposition, she did such a

20     wonderful job of putting yours in order.  Could

21     you hand me Exhibit 26?  I don't seem to have

22     mine back together.

23               MR. O'NEIL:  For the record, I

24     put the documents together.  I don't know what

25     Ms. Schuman has done.  Heather, can you back me

1    up on this one?

2                    MS. SCHUMAN:  (Indicating.)

3                    MS. YEAGER:  Let the record

4    reflect Ms. Schuman is nodding yes.

5                    THE WITNESS:  Oh my.  Legal

6    silliness in the afternoon on Friday the 13th.

7                    MR. O'NEIL:  It's so rare that I

8    get credit for anything, I was just trying to,

9    you know, get credit for something.  The

10   documents were in excellent order by the way.  I

11   just want to comment on that.

12       Q.   (BY MS. YEAGER) Earlier, we were

13   discussing Exhibit No. 26, and it was the

14   identity theft, the Aftermath 2003 Report, from

15   the Identity Theft Resource Center.  And you

16   were being asked questions about Page 5.  In

17   particular, we were discussing the definition in

18   the first bulleted item of financial identity

19   theft.

20       A.   Yeah.

21       Q.   Mr. O'Neil was asking you some

22   questions about establishing lines in the name

23   of the victim.  Do you recall that testimony?

24       A.   Yes.

25       Q.   Has there been an instance in which

1    accounts which were opened by Mr. Perez were in

2    fact changed so that Steven Millett's name was

3    placed on the accounts?

4        A.   Yes, in at least two instances that I

5    can recall.

6        Q.   Is there a name for that sort of

7    process in the credit reporting industry or

8    amongst those of you who work in identity theft

9    about that particular process where an account's

10   name is changed?

11       A.   Well, normally, that's called account

12   take-over fraud, because normally it happens in

13   reverse.  The thief shows up and takes over your

14   existing accounts and relabels them with new

15   addresses or new phone numbers or whatever.

16           But in the case of Social Security

17   number fraud, what you do see is a lot of it in

18   reverse.  The victim has called and filed a

19   fraud report, and now the furnishers start

20   relabeling the accounts with your information

21   that you provided to them on your FTC affidavit.

22   And then those accounts then start getting

23   reported back to the credit bureaus with your

24   name attached to what used to be a fraudulent

25   account.

1      Q.   So, in your particular instance,

2    Mr. Perez's use of Steve Millett's Social

3    Security number actually resulted in a

4    relabeling of an account; is that correct?

5              MR. O'NEIL:  Objection.  Lack of

6    foundation.

7      A.   There were two accounts that were

8    relabeled, one for J.C. Penney's and one for

9    Home Depot.

10     Q.   (BY MS. YEAGER) And did you obtain that

11   information in the course of this litigation?

12   Not this particular case, but in the course of

13   prosecuting the cases that you've brought about

14   the identity theft?

15     A.   Yes.  It was -- the information was

16   produced as a result of I think subpoenas in the

17   Experian case.

18     Q.   And at the time that those accounts

19   were relabeled, were you informed by anyone?

20     A.   No.  None of the credit monitoring

21   products notified me that the accounts were

22   relabeled.

23              MR. O'NEIL:  Objection.  Assumes

24   facts not in evidence.

25     Q.   (BY MS. YEAGER) If you could pull out

1   Exhibit No. 34, please.

2       A.   Okay.

3       Q.   Do you recall a bit of your testimony

4   about this particular exhibit?

5       A.   Yes.

6       Q.   Do you know whether or not these were

7   the only exchanges between counsel in the

8   process of attempting to negotiate a settlement

9   of this matter?

10      A.   I believe there were more e-mails than

11  this.

12      Q.   Do you know whether or not this was the

13  last e-mail exchange between counsel concerning

14  settlement?

15      A.   I don't know, but I don't believe so.

16      Q.   Are you aware that your attorneys have

17  an arrangement about how any fees that are paid

18  from these cases will be divided?

19      A.   I believe they have an agreement, but

20  I've not seen it.

21      Q.   Is the agreement that was negotiated

22  between counsel in the Equifax case similar to

23  the agreement that is in place for counsel in

24  this case?

25                  MR. O'NEIL:  Objection.  You

1    would not let her answer my questions on that

2    topic, so you can't answer -- ask her questions

3    on that topic.

4              MS. YEAGER:  Fair enough.

5        Q.   (BY MS. YEAGER) I know that you're not

6    an attorney, but I do know that you have

7    extensive experience from these cases.  Are you

8    aware that fraud claims are much more difficult

9    to establish than, for example, a breach of

10   contract claim?

11       A.   Yes.  Fraud is way more difficult to

12   establish.

13       Q.   And why is that?

14             MR. O'NEIL:  Objection, lack of

15   foundation.  Vague as to what claims we're

16   talking about or comparing, but go ahead,

17   Mrs. Millett.

18       A.   The fraud claims require evidence you

19   may or may not uncover in the course of

20   discovery.  Whereas, a breach of contract is

21   whether or not they adhered to the terms of the

22   contract or didn't adhere to the terms of the

23   contract.  And that's what you have is in

24   writing.

25       Q.   (BY MS. YEAGER) Is there a difference

1    between the advertising which was prepared by

2    Experian and the advertising which was prepared

3    by TransUnion -- excuse me, by TrueLink?  Let me

4    do that again.

5          Is there a difference between the

6    advertising prepared by Experian and the

7    advertising prepared by TransUnion?  I did it

8    again.

9          Is there a difference between the

10   advertising prepared by Experian and the

11   advertising prepared by TrueLink?

12   A.   Yes.  The advertising prepared by

13   TrueLink does not specifically identify or

14   enumerate, at least at the time we registered

15   for the product, which items were specifically

16   going to be monitored.  Whereas, the Experian

17   website specifically enumerated it was like six

18   or seven things that they were specifically

19   going to be monitoring.

20               MS. YEAGER:  I think that's all I

21   have.

22               MR. O'NEIL:  I just have a little

23   bit of follow-up.

24

25

```
1                    EXAMINATION
2   BY MR. O'NEIL:
3        Q.   Are you aware that you've accused
4   TrueLink of making fraudulent statements as part
5   of your claims in this case?
6        A.   I'm sorry?
7        Q.   Are you aware that you have accused
8   TrueLink of making fraudulent statements in this
9   case, as part of your Kansas Consumer Protection
10  Act claim?
11       A.   Yes.
12       Q.   Okay.  I want to go back to Exhibit 26,
13  I'm not sure you need to look at it, because
14  Ms. Yeager's questions weren't really tied to
15  it.  She pointed out that the Identity Theft
16  Resource Center identified financial identity
17  theft as the use of information to establish new
18  credit lines in the name of the victim.
19       A.   Yes.
20       Q.   But then she asked you a different
21  question about some type -- what you termed, she
22  didn't term it, you termed it "account take-over
23  fraud," which is when -- well, tell us what
24  "account take-over fraud" is again?
25       A.   Well, account take-over fraud in
```

1    identity theft is when the thief comes in and

2    takes over your account and then has it

3    redirected.

4        Q.    Right.  But that didn't happen with the

5    J.C. Penney or Home Depot accounts, right?

6        A.    Well, what happened --

7        Q.    Can you just answer the question yes or

8    no, please?

9        A.    Because it's not that simple.  It's not

10   a yes or no question.

11       Q.    Okay.  I understand what you think

12   happened, but you're not suggesting that

13   Mr. Perez committed account take-over fraud with

14   respect to the J.C. Penney or Home Depot trade

15   lines, are you?

16       A.    No.  What I'm suggesting --

17       Q.    Okay.

18       A.    -- that happened in that particular

19   instance is that the accounts were relabeled by

20   the furnishers to include the victim's

21   information.  They were fraudulent accounts to

22   start with, and they were relabeled with the

23   victim's information.  Then they were reported

24   to the credit bureaus.

25       Q.    But that's not account take-over fraud,

1    is it?

2         A.    To the computer system, sir, it's the

3    same thing.  It functions in exactly the same

4    way.

5         Q.    Ma'am, I'm not asking about what

6    computer systems think.  I'm asking under your

7    definition and the commonly accepted definition

8    of "account take-over fraud" that's not account

9    take-over fraud, right?

10        A.    No, it's not.

11        Q.    Okay.  Okay.  And then you said in

12   account take-over fraud, those accounts show up

13   on the victim's credit report, right?

14        A.    Yes.

15        Q.    But those accounts never showed up on

16   Mr. Millett's TransUnion credit report, right?

17        A.    That's correct.  Even though they were

18   relabeled with his name and address.

19                MR. O'NEIL:  I have nothing

20   further.  Thank you for your patience.

21                VIDEOGRAPHER:  The time is

22   3:41 PM.  We're going off the record.

23            (The deposition concluded at 3:41 PM.)

24

25

573

1

2

3

4

5

6

7          _____

8              MELODY MILLETT

9

10

11

12              Subscribed and Sworn to before

13    me this _____ day of _____,

14    20___.

15

16

17

18          _____

19              Notary Public

20              County of _____

21              State of _____

22

23

24    Millett v. TrueLink

25

```
1                C E R T I F I C A T E

2

3                I, Nissa M. Sharp, a Certified

4     Shorthand Reporter of the State of Kansas, do

5     hereby certify:

6                That prior to being examined the

7     witness was by me duly sworn;

8                That said deposition was taken down by

9     me in shorthand at the time and place

10    hereinbefore stated and was thereafter reduced

11    to writing under my direction;

12               That I am not a relative or employee

13    or attorney or counsel of any of the parties, or

14    a relative or employee of such attorney or

15    counsel, or financially interested in the

16    action.

17               WITNESS my hand and seal this _____

18    day of _____ 20 ___.

19

20

21               _____

22               Nissa M. Sharp, CSR, CCR #528
```

```
1    July 19, 2007
2
3    Mrs. Melody Millett
     c/o Ms. B. Joyce Yeager
4    YEAGER LAW FIRM, LLC
     City Center Square, 26th Floor
5    1100 Main Street
     Kansas City, Missouri 64105
6
     RE:  Millett v. TrueLink
7
     Dear Mrs. Millett:
8
     Enclosed is your deposition, given in the
9    above-named matter, for your examination and
     signing.  You will also find a signature page
10   and an errata sheet for your convenience in
     making any changes or corrections.
11
     Pursuant to the law, any change in "form or
12   substance" of an answer shall be accompanied
     with a statement of the reason given by you for
13   making such change.
14   Upon completion of your examination and reading,
     please sign the enclosed signature page and
15   errata sheet and return them to this office in
     the enclosed self-addressed envelope.  If we
16   have not received the signed documents from you
     within 30 days from the date of this letter, an
17   unsigned copy of your deposition will be filed.
18   Yours very truly,
19   METROPOLITAN COURT REPORTERS, INC.
20
21
22
23
24
25   By:  Nissa M. Sharp, CSR, CCR #528
```

```
 1                        ERRATA SHEET
 2
 3    RE:  Millett v. TrueLink
 4    DEPOSITION OF:  MELODY MILLETT
 5    PG/LN NO.  CORRECTION            REASON FOR CHANGE
 6
         :_____:_____:_____
 7
         :_____:_____:_____
 8
         :_____:_____:_____
 9
         :_____:_____:_____
10
         :_____:_____:_____
11
         :_____:_____:_____
12
         :_____:_____:_____
13
         :_____:_____:_____
14
         :_____:_____:_____
15
         :_____:_____:_____
16
         :_____:_____:_____
17
         :_____:_____:_____
18
         _____ I certify that I have read my deposition
19    in the above case and I request that no changes
      be made.
20        _____ I certify that I have read my deposition
      in the above case and I request that the above
21    changes be made.
22                      SIGNATURE OF DEPONENT:
23                      _____
24
25                      DATED: _____
```