1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF DELAWARE

3

4        STEVEN G. MILLETT,

5        MELODY, J. MILLETT,

6        On Behalf of themselves

7        And all others similarly situated,

8                            Plaintiffs,

9        vs.                      No. 05-599-SLR

10       TRUELINK, INC.,

11       A Trans Union Company,

12                           Defendant.

13

14

15                       VOLUME I

16

17            DEPOSITION OF MELODY J. MILLETT, a

18       Plaintiff, taken on behalf of the Defendant

19       before Nissa M. Sharp, CSR, CCR #528, pursuant

20       to Notice on the 3rd of May, 2007, at the

21       offices of CLOON LAW FIRM, One Hallbrook Place,

22       11150 Overbrook Road, Suite 350, Leawood,

23       Kansas.

24

25

```
 1                    APPEARANCES

 2          Appearing for the Plaintiffs was MS. B.

 3  JOYCE YEAGER of YEAGER LAW FIRM, LLC, City

 4  Center Square, 26th Floor, 1100 Main Street,

 5  Kansas City, Missouri 64105.

 6          Also appearing for the Plaintiffs was

 7  MR. BRYSON R. CLOON of CLOON LAW FIRM, One

 8  Hallbrook Place, 11150 Overbrook Road, Suite

 9  350, Leawood, Kansas 66211.

10          Appearing for the Defendant were

11  MR. MICHAEL O'NEIL and MS. HEATHER SCHUMAN of

12  DLA PIPER US, LLP, 203 North LaSalle Street,

13  Suite 1900, Chicago, Illinois 60601-1293.

14          Also present was Leda Gipson of MCR

15  VIDEO.

16                      INDEX

17  WITNESS:                        PAGE:

18    MELODY J. MILLETT

19      Examination by Mr. O'Neil          4

20

21

22

23

24

25
```

```
 1    EXHIBITS:                   MARKED:   IDENTIFIED:

 2       M. Millett Exhibit 9       99        99

 3       M. Millett Exhibit 10     112       112

 4       M. Millett Exhibit 11     119       119

 5       M. Millett Exhibit 12     125       125

 6       M. Millett Exhibit 13     138       138

 7       M. Millett Exhibit 14     217       217

 8       M. Millett Exhibit 15     235       235

 9       M. Millett Exhibit 16     262       262

10       M. Millett Exhibit 17     268       268

11       M. Millett Exhibit 18     273       273

12       M. Millett Exhibit 19     277       277

13       M. Millett Exhibit 20     290       290

14       M. Millett Exhibit 21     306       306

15       M. Millett Exhibit 22     326       --

16          (Original Exhibits 9 through 22 were

17       filed with the original transcript.)

18

19          (The deposition commenced at 9:20 AM.)

20

21

22

23

24

25
```

1          VIDEOGRAPHER:  This is the

2   videotaped deposition of Melody J. Millett, Case

3   No. 05-599-SLR.  This deposition is being held

4   on Thursday, May the 3rd, 2007.  We are now

5   going on the record at 9:20 AM.

6          Will counsel please state their

7   appearances for the record?

8              MS. YEAGER:  For Plaintiffs,

9   Joyce Yeager and Bryson Cloon.

10             MR. O'NEIL:  And for the

11  Defendant, Michael O'Neil and Heather Schuman.

12             VIDEOGRAPHER:  You may now swear

13  the witness.

14             MELODY J. MILLETT,

15  being first duly sworn, testified under oath as

16  follows:

17                 EXAMINATION

18  BY MR. O'NEIL:

19      Q.   Good morning, Mrs. Millett.

20      A.   Good morning.

21      Q.   Are you currently employed?

22      A.   Yes.

23      Q.   And where are you employed?

24      A.   I work for

25      Q.   Could you spell that please?

 1        A.

 2        Q.    And how long have you worked at        ?

 3        A.    About 90 days.

 4        Q.    And what is your job title there, if

 5   you have one?

 6        A.    My current job title is Business

 7   Analyst 2.

 8        Q.    And what is the business of        ?

 9        A.    Embarq is a local telephone service

10   provider, also known as a local exchange

11   carrier.

12        Q.    And what are your job duties and

13   responsibilities at        ?

14        A.    Data warehouse management and

15   maintenance.  I manage approximately 23

16   databases for

17                    .

18        Q.    And were you employed prior to being

19   employed at        ?

20        A.    Yes, I was.

21        Q.    And where were you employed then?

22        A.    I was employed by

23

24                    .

25        Q.    Did you have essentially the same job

1    responsibilities in that position as you do

2    today?

3        A.    No.  My responsibilities over there

4    were a little bit different.

5        Q.    Okay.  And, briefly, what were those

6    responsibilities?

7        A.    I was an HR database management

8    relating to employment records, payroll, data

9    warehousing for HR records, which was all hyper

10   sensitive security, there was a lot more

11   security and management and that type of stuff

12   involved.

13       Q.    When did you first begin working for

14                  ?

15       A.    I first began working for

16   in 2000.

17       Q.    And did you work there continuously

18   until 90 days ago?

19       A.    Yep.

20       Q.    Okay.  What city did you graduate high

21   school from?

22       A.                              High School.

23       Q.    And have you attended any colleges or

24   universities since graduating from high school?

25       A.    I attended colleges and universities

1   both before and after graduating from high

2   school.

3       Q.   Okay.  Have you obtained any degrees

4   from a college or university?

5       A.   No, sir.

6       Q.   And what was the type of course work

7   that you had when you were taking college and

8   university courses?

9       A.   I had extensive studies in mathematics.

10  I was taking courses in electronics.  I have he

11  taken courses in computer and software systems,

12  Microsoft certification tracks, COMPTIA

13  certification tracks, all those are relating to

14  computers.

15      Q.   And how long -- for how long did you

16  have course work after you graduated from high

17  school?

18      A.   Well, it's kind of been off and on as

19  needed for whatever job I might have had or, you

20  know, employers will send you for training

21  classes or whatnot.  Most of my mathematics

22  classes were taken at the local community

23  college before I ever graduated from high

24  school.

25      Q.   Was it more than a year of course work

```
 1   together that you had after high school?
 2       A.   Yeah, it's been more than a year of
 3   course work.
 4       Q.   Could you -- is it more than two years?
 5       A.   Oh, maybe, two.  I mean, depends on how
 6   you say -- how would you characterize.  I mean,
 7   it's not like I went to a four-year university
 8   and I was there continuously for two years.  So,
 9   I mean, if I had to add it all up over, you
10   know, the course of my life since I graduated
11   from high school, I'd say I probably have maybe
12   two, two-and-a-half years.
13       Q.   Have you ever been deposed before?
14       A.   Yes.
15       Q.   Okay.  So, I'm sure you know this, but
16   let me just say it, obviously we have a court
17   reporter here who's taking down my questions and
18   your answers, so it would be helpful if you let
19   me finish my question before you answer, even if
20   you know what the question is going to be.
21   Sometimes I don't even know what the question is
22   going to be.
23            If you don't understand a question that
24   I ask today, which is entirely possible, please
25   let me know and I'll try to rephrase it for you.
```

1          We can take a break at any time that

2     you would like, other than when a question is

3     pending.

4          How many times have you had your

5     deposition taken?

6          A.   Once in the Ford Motor case and twice

7     in the Experian case.

8          Q.   Do you recall that you were actually

9     deposed on three separate days in the Experian

10    case?

11         A.   Yes.  One was two days, and another one

12    was a single day.

13         Q.   So, you have three days of depositions

14    in the Experian case?

15         A.   Yes.

16         Q.   And one full day in the Ford Motor

17    case?

18         A.   Yes.

19         Q.   Have you ever been -- had your

20    deposition taken in any other instances?

21         A.   No.

22         Q.   Have you ever reviewed the transcripts

23    or I should say -- strike that.

24         Have you ever reviewed the transcript

25    from your deposition in the Ford Motor case?

```
 1         A.    Yes, sir.

 2         Q.    And did you review it to make sure that

 3    it was accurate?

 4         A.    Yes, sir.

 5         Q.    And did you determine the transcript

 6    was accurate?

 7         A.    Yes.

 8         Q.    Did you make any changes to the

 9    transcript?

10         A.    I don't believe in Ford Motor Credit

11    there were any changes made to the transcript to

12    my recollection.

13         Q.    Let me direct your attention to the

14    three days of transcripts in the Experian case.

15    Have you ever reviewed those transcripts?

16         A.    Yes, sir.

17         Q.    And have you reviewed them to make sure

18    that they were accurate?

19         A.    Yes, sir.

20         Q.    And did you determine that those three

21    days of transcripts were accurate?

22         A.    As to substance, yes.

23         Q.    Okay.  But you noted some typographical

24    errors in the transcription?

25         A.    Yes, I sure did.
```

1    Q.    Okay.

2    A.    Misspellings of software language and

3    stuff like that.

4    Q.    Okay.  And do you recall, did you ever

5    complete an errata sheet changing the

6    typographical errors?

7    A.    Yes.  I did in the Experian deposition.

8    Q.    Okay.

9    A.    I believe it was the second one.

10    Q.    Okay.  But, otherwise, the transcripts

11    for the Experian case were accurate?

12    A.    Yes.

13    Q.    Have you looked at those transcripts

14    recently?

15    A.    I've reviewed all the depositions

16    recently, yes.

17    Q.    Was that in preparation for your

18    deposition today?

19    A.    Yes.  And sometimes in general just

20    because I have to do research for other aspects

21    of other cases as well too.

22    Q.    Other cases in which you are suing

23    somebody?

24    A.    Yes.

25    Q.    Okay.  What, if anything, have you done

1    to prepare for your deposition today?

2         A.   I've reviewed depositions taken by

3    Joyce in Chicago.  I've reviewed my husband's

4    deposition.  I've reviewed my own depositions.

5         Q.   When you say that you reviewed your

6    husband's deposition, is that the deposition

7    that was taken in connection with this case?

8         A.   Yes.

9         Q.   Did you review his depositions from any

10   other cases?

11        A.   Oh, I reviewed all of his depositions.

12        Q.   I'm sorry, it wasn't a clear question.

13   In connection with preparing for your deposition

14   today, did you review Mr. Millett's depositions

15   from any case other than in this case?

16        A.   Well, I've reviewed them, yes, and I've

17   reviewed them recently.

18        Q.   Okay.

19        A.   But it wasn't directly in relation to,

20   oh, I was prepping for the deposition today.  I

21   reviewed them weeks prior.

22        Q.   I understand.  Aside from looking at

23   the depositions that you just described, did you

24   do anything else to prepare for your deposition

25   today?

1      A.    Like what?  I mean, I've done -- been

2   researching on the cases.  I mean, I'm into

3   documents all the time.  So, I mean, it wasn't

4   specifically to prepare for this deposition, but

5   it may have been to answer other questions for

6   my legal representation.

7      Q.    You say you're in the documents all the

8   time, what documents are you referring to?

9      A.    The documents related to all my cases.

10     Q.    But you didn't do that in preparation

11   for your deposition today, you just did it

12   generally?

13     A.    Yeah, right.  It wasn't done directly,

14   oh, I need to go home and study and prepare for

15   this deposition.  It was I needed to answer some

16   specific questions, so you go out there and

17   review documents.

18     Q.    Specific questions that your counsel

19   had?

20     A.    Right.

21     Q.    Did you meet with anybody prior to your

22   deposition today in connection with your

23   deposition?

24          MS. YEAGER:  Objection to the

25   extent the question calls for attorney-client

1    privileged information.

2        Q.    (BY MR. O'NEIL) Yeah, I'm not -- I

3    don't want to ask you -- if you had any

4    conversations with your lawyer in connection

5    with your deposition today, I don't want to know

6    about that.  I'm just asking did you meet with

7    anybody in preparing for your deposition today?

8        A.    Just my lawyer.

9        Q.    Okay.  Did you have any conversations

10   with your husband regarding his deposition?

11       A.    I'm sorry, I don't understand the

12   question.

13       Q.    Well, you understand that Mr. Millett

14   was deposed in this case?

15       A.    Yes.

16       Q.    Okay.  Did you have any conversations

17   with him before his deposition regarding the

18   fact that he would be deposed?

19       A.    Well, that would go without saying

20   because we have children that we have to make

21   arrangements for and take care of, so.  I would

22   have to know, A, he was going to be deposed,

23   when he was going to be deposed and so somebody

24   could make arrangements to go and pick up the

25   kids at day care.

1      Q.    Okay.  So you had some conversations

2   regarding logistics?

3      A.    Uh-huh.

4      Q.    Putting those aside, did you have any

5   conversations regarding the substance of his

6   deposition?

7      A.    I mean, other than when I handed him

8   his interrogatories, which I printed off the

9   computer.

10     Q.    So, prior to his deposition, you gave

11  him the interrogatory responses that he signed?

12     A.    Yes.

13     Q.    Do you recall that he testified in his

14  deposition that he couldn't get a copy of those

15  interrogatory answers before his deposition?

16     A.    I'm sorry?

17     Q.    Do you recall in his deposition he

18  testified that he asked for, but could not get a

19  copy of those interrogatory answers prior to his

20  deposition?

21     A.    Because they were on the computer.  He

22  doesn't have the physical paper copy.  We have

23  the electronic copy.

24     Q.    Well, I thought you told me that you

25  gave him the interrogatory answers before his

1    deposition?

2         A.   I brought them up on the computer for

3    him, but he doesn't have a physical paper copy.

4    Because the printer is malfunctioning at this

5    point.

6         Q.   Did he, to your knowledge, did he

7    review those interrogatory answers prior to

8    giving his deposition?

9         A.   I don't know if he did or he didn't.  I

10   mean, I left the office, I pulled them up, and

11   what he did or didn't do, I don't know.

12        Q.   Did you have any conversations with

13   your husband prior to his deposition in this

14   case regarding the kinds of questions that might

15   be asked in the deposition?

16        A.   No.  We talked about the case in

17   general, status of filings, you know, what

18   claims are still pending and whatnot, because

19   the case has changed on a regular basis in terms

20   of what motions are filed and what's going on.

21        Q.   Did you ever explain to him prior to

22   his deposition that he was suing a company

23   called TrueLink?

24        A.   It may have been brought up.

25        Q.   Well, I understand it may have been,

1    what I'm asking you is do you recall having a

2    conversation with him?

3        A.   Not -- not specifically like you

4    mentioned, no.

5        Q.   Do you recall when you were read his

6    deposition that he didn't even realize that he

7    had sued a company called TrueLink?

8        A.   Yes.

9        Q.   And I guess that didn't surprise you

10   because you never explained that to him, did

11   you?

12       A.   I'm sorry?

13       Q.   I guess that did not surprise you that

14   he testified that way because you don't ever

15   recall explaining that to him, right?

16       A.   No, I don't recall explaining that to

17   him.  However, TransUnion and TrueLink -- I

18   mean, when we filed our original suit, the

19   original suit was filed against TransUnion and,

20   you know, to be quite frank with you, until

21   somebody corrected us, I didn't even know there

22   was a company called TrueLink.

23       Q.   Well, you sued TransUnion initially for

24   breach of contract, right?

25       A.   I believe so, yes.

1      Q.   Did you ever look at the contract that

2   you were suing on?

3      A.   Yes.

4      Q.   Okay.  And do you recall that it said

5   the contract was with TrueLink and not

6   TransUnion?

7      A.   I don't necessarily recall that as

8   being specific verbiage in there, but, you know,

9   it's a pretty long contract.  And the website

10  says "brought to you by TransUnion," so I

11  mean...

12     Q.   Did you have any conversations -- well,

13  aside from the logistics of picking up the

14  children and saying -- and telling him that you

15  pulled up the interrogatory responses on the

16  computer, did you have any other conversations

17  with Mr. Millett prior to his deposition

18  regarding his deposition?

19     A.   Not really.  I mean, we talk about the

20  cases all the time, so I mean there are little

21  factoids or things that need to be discussed or

22  conveyed that those discussions are ongoing in

23  our house and have been for the last three

24  years.

25     Q.   And in those conversations, is that

```
 1    when you're bringing him up to speed on what's

 2    going on in the various cases that you've

 3    brought?

 4         A.   Yes.

 5         Q.   Okay.  What kind of information do you

 6    share with him in that regard?

 7         A.   Just about everything.  He and I are a

 8    team, we work very well together.  We discuss

 9    everything.

10         Q.   Well, but you never told him that you

11    sued TrueLink, right?

12         A.   Well, I didn't know I sued TrueLink

13    originally because I sued TransUnion.

14         Q.   When did you first learn that you sued

15    TrueLink?

16         A.   When the lawsuit pleadings were changed

17    to reflect TrueLink as a party and TransUnion

18    was settled.

19         Q.   So, you got a pleading from your

20    lawyers, and that's the first time you learned

21    that you had sued TrueLink?

22              MS. YEAGER:  Objection.

23    Misstates the testimony.

24         A.   Well, to the extent that I shouldn't be

25    discussing anything that my lawyers had, I'm
```

1    sure that my lawyers contacted me either in

2    writing or by telephone prior to that point and

3    communicated that fact before the pleadings were

4    released.  I do review all the pleadings before

5    they are sent up.

6        Q.   (BY MR. O'NEIL) You said that you had

7    settled with TransUnion; is that right?

8        A.   Yes.

9        Q.   Did you sign a settlement agreement

10   with them?

11       A.   I don't recall if there was a

12   settlement agreement or not, but there were

13   discussions held with Amanda, the lead counsel

14   from TransUnion.

15       Q.   And as part of those discussions, you

16   or your lawyers decided to dismiss the case

17   against TransUnion, right?

18       A.   I believe she was the one who

19   originally conveyed that we were supposed to be

20   suing TrueLink.  I believe there was a meeting

21   held to that effect.

22       Q.   "She" meaning Amanda?

23       A.   Uh-huh.

24       Q.   And Amanda was counsel for TransUnion,

25   right?

1      A.   Yes, ma'am (sic).

2      Q.   And at some point in time, was it your

3   decision to dismiss the case against TransUnion

4   and sue TrueLink?

5      A.   I believe that the attorneys made the

6   decision that that was where those claims

7   belonged, so that would be some kind of legal

8   determination.  I mean, if you want to get into

9   navigating what corporation you need to be suing

10   for what claims and who is responsible for those

11   claims, that's a legal determination I don't

12   think I'm qualified to make.

13      Q.   To your knowledge, did you receive

14   anything from TransUnion in exchange for and

15   agreeing to drop the lawsuit against TransUnion?

16      A.   What do you mean by that?

17           MR. O'NEIL:  Could you please

18   read the question back for Mrs. Millett?

19           (Whereupon, the requested portion

20   of the record was read by the reporter.)

21      A.   I think TransUnion was supposed to

22   provide for us quarterly monitoring of their

23   databases to determine if another individual was

24   using Steve Millett's Social Security number.  I

25   believe that they had assigned a specific person

1    to handle some of those issues.  And, for

2    example, produce credit reports if needed or

3    that kind of thing.

4         Q.   (BY MR. O'NEIL) But have you ever seen

5    a piece of paper that reflects that agreement?

6         A.   I probably -- if one exists, I've

7    probably seen it, but I don't recall it as I'm

8    sitting here today.

9         Q.   Did you receive anything else in

10   connection with the decision to drop the lawsuit

11   against TransUnion?

12        A.   Not to my knowledge.

13        Q.   To your knowledge, has TransUnion done

14   what you think it agreed to do in terms of

15   providing you with information?

16        A.   Not always, no.

17        Q.   Have you requested that they live up to

18   their agreement?

19        A.   I believe since Amanda left, they're in

20   search of the new person who was supposed to

21   replace them to provide that information, so I'm

22   not quite sure where we are with that.

23        Q.   You said earlier that you often review

24   the documents for these cases, do you recall

25   that?

1       A.    Yes.

2       Q.    Are these documents physically at your

3   home?

4       A.    Well, no, documents are -- sometimes

5   documents are e-mailed to me as PDFs, and I keep

6   a lot of them in electronic format.  I have

7   documents that have been produced on CD for me

8   that I have that I can review.  I have paper

9   copies in some cases of existing documents that

10  I have for specific reasons or to investigate

11  certain aspects, like in connection with my

12  banking records or whatever.

13      Q.    And, of course, TrueLink and other

14  defendants you have sued have produced documents

15  to your lawyers in the lawsuits, right?

16      A.    Yes.

17      Q.    And you've reviewed those, right, or

18  some of those at least?

19      A.    I've reviewed as many of those as is

20  physically possible to do so.

21      Q.    Directing your attention to the

22  documents that originated from your files --

23      A.    Yes.

24      Q.    -- that relate to all the lawsuits.

25      A.    Uh-huh.

1    Q.    And I understand some of them are

2    electronic and not in paper form; is that right?

3    A.    What do you mean?

4    Q.    Okay.  The documents that originated

5    from you and your husband's files that are

6    relevant to all the lawsuits that you've

7    brought, do you have those all in hard copy?

8    A.    All of those documents have been turned

9    over to my lawyer, every last one of them.

10    Q.    So you don't have possession of those?

11    A.    No.

12    Q.    So, how do you review those documents

13    when you want to review them?

14    A.    I have a burned copy that was produced

15    by a document management company that was

16    produced on CD.

17    Q.    Okay.  So, you have those

18    electronically?

19    A.    Yes.

20    Q.    Okay.  Do you have any understanding as

21    to what would be the volume of those documents

22    if they were printed out?

23    A.    No, I have no understanding.

24    Q.    Okay.  So, you don't know if it would

25    be a half a box or 12 boxes; is that your

testimony?

A. Well, when I started this case with the identity -- when the identity theft started, at one point in time, yeah, I had boxes and boxes of stuff. And as of this point in time, because I have copies of just about every legal pleading that's been filed in this case, I have probably 12 totes in my dining room. So those are in my documents, yeah.

Q. Okay. So, you do -- so some of the documents that were produced by the defendants you actually have a hard copy?

A. Some of them.

Q. Okay. Again, directing your attention to the documents that originated from your files?

A. Uh-huh.

Q. What would be the volume of those documents?

A. Well, a lot of the documents that were produced in this case also deal with our general life, things like the trust agreements and financial banking records. So, I mean, if you wanted to talk about the volume of all of the Link documents that my husband and I possess,

1   financial or otherwise, I mean, you're probably

2   talking 15 or 20 boxes.

3        Q.   And do you believe those have all been

4   produced to TrueLink?

5        A.   They're not all relevant to this case.

6        Q.   Okay.  Well, let me go back to what I'm

7   asking about.  Do you think trust documents have

8   you been produced in this case?

9        A.   I don't think so, no.

10        Q.   Okay.

11        A.   But I don't know.

12        Q.   Do you have any idea what documents

13   have been produced from your files to TrueLink

14   in this case?

15        A.   I believe that the documents that have

16   been produced in this case for TrueLink were the

17   same documents that were produced in the

18   Experian case and the Equifax case and the Ford

19   Motor case and the Bank of America case and the

20   CSC case and the -- I don't know if we produced

21   any documents in Fair Isaac, I don't remember

22   that if we did or not.

23        Q.   And those documents that you believe

24   have been produced in this case --

25        A.   Uh-huh.

```
 1        Q.    -- what's the volume of those

 2   documents?

 3        A.    I don't know.  I think they're two CDs

 4   maybe, I don't know.  I don't know what the

 5   volume of those are all packaged up.

 6        Q.    Do you know of any reason why you

 7   couldn't give complete and accurate testimony

 8   today?

 9        A.    No.

10        Q.    You reviewed the -- did you --

11   Ms. Yeager took the depositions of three

12   individuals at TrueLink.

13        A.    Uh-huh.

14        Q.    Did you review all three of those

15   depositions?

16        A.    I've only briefed skimmed those at this

17   point.

18        Q.    Okay.  In skimming them, did you -- did

19   anything jump out at you as being particularly

20   significant in terms of whether or not your

21   claims will succeed or fail?

22                MS. YEAGER:  Objection.  Vague.

23   Compound.

24        A.    I'm sorry, I don't understand the

25   question.
```

1     Q.   (BY MR. O'NEIL) Okay, I'll rephrase it.

2     When you were skimming the deposition

3     transcripts, did you learn of any fact or see

4     any testimony that you thought might be

5     particularly relevant to whether or not your

6     claims are going to succeed or fail?

7                MS. YEAGER:  Objection.  Vague.

8     You can answer.

9     A.   I don't know, but I haven't completely

10    reviewed everything word for word, so I couldn't

11    even answer that at this point.

12    Q.   (BY MR. O'NEIL) But based upon whatever

13    skimming you did, nothing jumped out at you in

14    that regard as being significant; is that right?

15               MS. YEAGER:  Objection.

16    Misstates her testimony.

17               MR. O'NEIL:  Could you please let

18    me finish my question before you object?

19    Q.   (BY MR. O'NEIL) Did you get my

20    question?

21               MR. O'NEIL:  Can the court

22    reporter please read my question back to me?

23               (Whereupon, the requested portion

24    of the record was read by the reporter.)

25    A.   Yes, that is correct.  However, the

1    amount of skimming I did was minimal.

2        Q.    (BY MR. O'NEIL) Have you ever been

3    named as a defendant in a civil lawsuit?

4        A.    Not to my knowledge.

5        Q.    Okay.  Have you ever had criminal

6    charges brought against you?

7        A.    I'm sorry?

8        Q.    Have you ever had criminal charges

9    brought against you?

10                MS. YEAGER:  Objection.

11    Relevance.

12        A.    I've not been convicted of any crimes,

13    no.

14        Q.    (BY MR. O'NEIL) Okay.  Have you ever

15    had criminal charges brought against you though?

16        A.    I don't understand what you mean.

17        Q.    Have you ever been accused of a crime?

18        A.    Not like that, no.

19        Q.    Not like what?

20        A.    I mean, not like I've been charged and

21    gone through that whole process, no.

22        Q.    Have you been accused of something

23    short of that process?

24        A.    Well, I mean, you know, have you ever

25    not paid a parking ticket and then, you know, if

```
 1    you forget to pay the parking ticket, they issue

 2    a warrant for your arrest, and then they come

 3    and arrest you because you didn't pay the

 4    parking ticket, so.

 5         Q.   Have you ever had that happened to you?

 6         A.   Sure.

 7         Q.   Okay.  On more than one occasion?

 8         A.   No.  Just one occasion.

 9         Q.   Aside from that instance, were there

10    any other instances where the police came to

11    arrest you?

12         A.   No.

13         Q.   Have you ever had anybody else accuse

14    you of criminal conduct?

15         A.   No.

16         Q.   Have you ever filed a criminal

17    complaint?

18         A.   A criminal complaint?

19         Q.   Yes.

20         A.   On two occasions.

21         Q.   And what occasions are those, ma'am?

22         A.   The Abundio Perez identity theft case,

23    we went and filed a criminal complaint with the

24    Kansas Police Department.  And then on one

25    occasion in 1989, I was almost the victim of a
```

1    sexual assault.

2        Q.    Okay.  Now, you have brought a number

3    of lawsuits against defendants, right?

4        A.    Yes.  There are seven in total I

5    believe at this -- that are -- have been -- are

6    either in process or have been dismissed or

7    settled or resolved.

8        Q.    You knew what my next question was

9    going to be.  Can you -- so there's been seven

10   defendants that you have sued to your knowledge?

11       A.    Yes.

12       Q.    Okay.  Can you tell me who those

13   defendants are?

14       A.    Fair Isaac, CSC, Bank of America, Ford

15   Motor which later became Ford Motor Credit,

16   Experian, Equifax, TransUnion which later became

17   TrueLink, and I guess according to my

18   interrogatories will become TU Interactive here

19   shortly I guess.  I think I've got them all now.

20   Unless we want to talk about that it went from

21   Equifax to EIS or ECS or whoever that migrated

22   into.

23       Q.    I understand.  And you retained lawyers

24   to represent you in those lawsuits, right?

25       A.    I retained lawyers originally to

1    conduct an identity theft investigation.

2        Q.   And who did you retain at that point?

3        A.   That was when we retained Adler in

4    2003, and that wasn't until March I believe.

5        Q.   And how much did you pay Mr. Adler for

6    his services?

7        A.   I believe it was approximately $2,000.

8        Q.   And what did Mr. Adler do for you?

9        A.    Mr. Adler was specifically retained to

10   write letters to the credit bureaus, Bank of

11   America and Ford Motor Credit so that they would

12   appear to come from the law offices of.  Because

13   I was not getting any response out of any of the

14   three credit bureaus, Ford Motor or Bank of

15   America, on our identity theft issues.  And I

16   felt that at this point in time I needed to

17   start documenting the fact that no one would

18   help me and no one work on any of our issues.

19       Q.   Did Mr. Adler ever correspond with the

20   defendants that you had later sued?

21       A.   He corresponded with all of the

22   defendants that we later sued, with the

23   exception of I believe Fair Isaac, which was the

24   credit scoring piece.  And I believe that Adler

25   did not correspond directly with TrueLink.  I

1    think he was talking or communicating with

2    TransUnion and Experian and Equifax.  And the

3    same thing would hold true with like Equifax

4    with EIS versus ECS, or Experian which is now

5    consumerinfo.com.

6        Q.   Uh-huh.  Were you satisfied with

7    Mr. Adler's services?

8        A.   Well, at the time, yes, I sure was.

9        Q.   Are you satisfied today?

10       A.   I'm satisfied with the services that he

11   has provided, the services that he was

12   contracted to provide.

13       Q.   At some point, did you decide that you

14   were going to start suing companies?

15       A.   I'm sorry?

16       Q.   Well, did there come a point in time

17   when you decided that you were going to start

18   suing companies?

19       A.   Yeah, that would be late 2003.

20       Q.   Okay.  And why did you decide to sue

21   companies at that point?

22       A.   Because we had no other choice.  There

23   was no way we were going to get our lives back

24   unless we started suing people because nobody

25   was listening.

1          When you write repeated letters and you

2     make repeated phone calls, and then your lawyer

3     makes repeated letters -- writes repeated

4     letters, makes repeated phone calls, and then a

5     second sets of lawyers starts making and writing

6     letters and making repeated phone calls and

7     nobody wants to fix your problem and your life

8     is being adversely impacted, you get to the

9     point where you are backed in the corner and you

10    are left with no alternative but to avail

11    yourself of the system of government we have

12    here in the United States.

13         Q.   So, in late 2003, what was your

14    complaint with TransUnion that lead you to sue

15    them?

16         A.   Well, because at that point in time I

17    believed that the product that we had purchased

18    was being produced by TransUnion.

19         Q.   And what product is that, ma'am?

20         A.   That would be the True Credit product.

21         Q.   Well, is that the credit monitoring

22    product?

23         A.   Yes, True Credit is the credit

24    monitoring product brought to you by TransUnion.

25         Q.   Did you have complaints about any other

1    products brought to you by TransUnion in late

2    2003, other than the credit monitoring product?

3        A.    Well, I mean, I think the credit

4    reports are bad too, but.

5        Q.    By the end of 2003, have you -- did you

6    ever advise TransUnion that you were

7    dissatisfied with the products that they had

8    sold you?

9        A.    I believe my lawyers had had numerous

10   conversations over the course of 2003 that they

11   were dissatisfied with TransUnion's product as

12   far as their data.  I mean, because you have to

13   remember this case originally started as an

14   identity theft case.  So, you need to be very

15   specific as to whether you're talking about

16   TransUnion's data issues, which are data issues

17   at the credit bureau, and issues with the credit

18   monitoring or I'm not going to be able to keep

19   them straight.

20        So if you could, if you have any

21   additional information about how you want that

22   question answered, you're going to have to let

23   me know which way you want me to answer that

24   question specifically.  Because there are two

25   facets to that, and it's very complex.

1      Q.    Okay.  Well, you told me that you were

2   dissatisfied with the credit monitoring product

3   and the credit reports that TransUnion had told

4   sold you as of late 2003, right?

5      A.    Well, some of the TransUnion credit

6   reports I think were sold prior to late 2003,

7   but yeah.

8      Q.    Yeah.  But as of late 2003, you were

9   dissatisfied with the credit monitoring and

10  credit report products that TransUnion sold you?

11     A.    Yes.

12     Q.    To your knowledge, has any of your

13  lawyers ever written to TransUnion and advised

14  them prior to late 2003 that you were

15  dissatisfied?

16     A.    I believe -- I mean, I'm not following

17  how you -- what you want from that question, so

18  I don't understand the question as you said.

19     Q.    Okay.  Well, I'll repeat it again.

20  Late 2003, you're unhappy with TransUnion's

21  credit monitoring products and credit report

22  products, right?

23     A.    Right.

24     Q.    In late 2003, you decide that you're

25  going to sue TransUnion because of that

1    dissatisfaction, right?

2         A.    Yes.

3         Q.    Okay.  By the end of 2003, had anybody

4    -- well, strike that.

5              Had your lawyers advised TransUnion of

6    your dissatisfaction with those two products?

7         A.    I don't know.  I can't recall as I sit

8    here.  I mean...

9         Q.    Did you ever advise TransUnion by the

10   end of 2003 that you were unhappy with the

11   products they had sold to you?

12        A.    Once I had retained legal counsel, all

13   communication with the defendants has gone

14   through them, so.

15        Q.    So is that --

16        A.    I haven't communicated directly myself

17   with TransUnion since August of 2003.

18        Q.    So, to your knowledge, by the end of

19   2003, nobody had communicated on your behalf

20   with TransUnion advising of your dissatisfaction

21   with the products, correct?

22        A.    No.  I wouldn't characterize that,

23   because that's not what I said.

24        Q.    How was that wrong?

25        A.    It's wrong because you're making a

1    definitive statement saying that no -- that I'm

2    going to tell you that no one communicated, I

3    cannot say that sitting here, I do not know.

4        Q.   You don't have any information that you

5    could swear to under oath to suggest that that

6    statement was wrong, right?

7        A.   I don't have any statement that I would

8    swear to under oath that would say that the

9    statement was correct either.

10        Q.   Okay.  As you sit here today, are you

11    aware of any communication made to TransUnion on

12    your behalf by the end of 2003 expressing your

13    dissatisfaction with the products that

14    TransUnion sold you?

15            MS. YEAGER:   Objection.   Asked

16    and answered.

17        A.   I can't tell you every e-mail that my

18    lawyers communicated with TransUnion or every

19    phone conversation my lawyers had with

20    TransUnion or the contents thereof.  So I can't

21    answer that question one way or the other.

22        Q.   (BY MR. O'NEIL) You don't know; is that

23    right?

24        A.   I don't --

25            MS. YEAGER:   Objection.

1    Misstates her testimony.

2              MR. O'NEIL:  She's looking at

3    you, she's puzzled by that objection I think.

4        A.    No, I'm not puzzled.  I'm just waiting

5    to see if she was going to say anything else

6    before I would continue speaking.

7              No, I don't know specifically what the

8    lawyers said or didn't say.

9        Q.    (BY MR. O'NEIL) Do you have any idea as

10   to whether or not your lawyers produced any such

11   communication to TrueLink in this case?

12       A.    I don't know.  But I do know that I

13   have seen letters that are required under

14   various consumer remedies acts, whether it's

15   California or I mean whatever case is it's been

16   in that have been produced to various

17   defendants, so.  To categorize it and say it's

18   specifically TrueLink at this point, I can't

19   say.

20       Q.    So, when did you -- what lawyers or

21   lawyer did you retain to represent you in the

22   lawsuits that you have filed?

23       A.    Bryson Cloon is retained, Joyce Yeager,

24   Barry Grissom, Michael Blanton, I believe

25   Mr. Curtin is the local counsel in Delaware.

1    There are additional lawyers on other cases also

2    that are local counsels in their jurisdictions.

3        Q.   Is it fair to say that it was the four

4    lawyers that you hired who retained the local

5    counsel?

6        A.   Yes, that would be a fair statement.

7        Q.   The four lawyers that you mentioned,

8    and if you don't mind I'm just going to use

9    first names, Bryson, Joyce, Michael and Barry,

10    did you retain each of them?

11        A.   No.

12        Q.   Who did you retain?

13        A.   I obtained Barry Grissom.

14        Q.   Okay.  And then Mr. Grissom associated

15    with the other three lawyers; is that correct?

16        A.   Yes, that is correct.

17        Q.   When did you retain Mr. Grissom?

18        A.   I retained Mr. Grissom probably a month

19    after Adler had exhausted his retainer.

20        Q.   And when was that, ma'am?

21        A.   It was late August, or somewhere

22    thereabouts.

23        Q.   By the end of 2003, had you ever

24    thought about suing Mr. Perez?

25        A.   I've thought about suing Mr. Perez, the

1   question is you don't know who Mr. Perez is.

2       Q.   Uh-huh.  So, as I think you mentioned

3   before, you know, your lawsuits involve a number

4   of things, one of them is dissatisfaction with

5   the defendants' products, you know, when it

6   comes to Experian, TrueLink, and Equifax, right?

7       A.   I'm sorry, can you please reread the

8   question?

9       Q.   I'll withdraw it.  You mention identity

10  theft, do you remember?

11      A.   Yes.

12      Q.   Okay.  And that's kind of what prompted

13  your investigation, your purchase of products

14  and then the lawsuits, right?

15      A.   Well, we had identity theft, yes.

16      Q.   And to be more specific, what you were

17  referring to there is that somebody apparently

18  named "Mr. Perez" was using your husband's

19  Social Security number, right?

20      A.   Yes.

21      Q.   Okay.  Have you ever been a victim of

22  identity theft?

23      A.   I have been a victim of data breaches,

24  but I don't necessarily know that my particular

25  identity has been stolen.  But, you know, given

1     the information or the data that's available to

2     us, I'm not sure that I ever would really know.

3          Q.   What's the status of the lawsuit that

4     you filed against Fair Isaac?

5          A.   That lawsuit was dismissed.

6          Q.   Was it dismissed -- voluntarily

7     dismissed by you or dismissed by the court?

8          A.   Well, they and us agreed that we were

9     going to dismiss the lawsuit, and the remainder

10    of the information contained I believe under the

11    Fair Isaac is confidential.

12         Q.   Okay.  Did Fair Isaac agree to give you

13    something in return for your agreement to

14    dismiss the lawsuit?

15         A.   That would be a fair assertion, yes.

16         Q.   Okay.  And what did they agree to give

17    you?

18         A.   I can't disclose that, because I

19    believe it's covered by a confidentiality

20    agreement.

21         Q.   Let's have your lawyer make the

22    objections.

23              MS. YEAGER:  If she's

24    contractually bound, she is going to identify

25    her contractual obligation not to discuss it.

```
 1                MR. O'NEIL:  I don't know that

 2    what means.

 3                MS. YEAGER:  If she's

 4    contractually bound --

 5                MR. O'NEIL:  But I don't know if

 6    she's contractually bound.

 7        Q.   (BY MR. O'NEIL) Is it your

 8    understanding -- did you sign an agreement with

 9    Fair Isaac?

10        A.   It's, well, it's my understanding that

11    in all the cases that have been settled, there

12    is some form of agreement that has been signed

13    and most -- and all of them contain

14    confidentiality agreements.

15        Q.   Where did you get that understanding?

16        A.   Because I've read everything that I've

17    had to sign.

18        Q.   Okay.  Did you ever sign an agreement,

19    a settlement agreement, with Fair Isaac?

20        A.   I believe so or the case wouldn't be

21    settled.

22        Q.   Well, that's not necessarily true, but.

23    As you sit here today under oath, do you recall

24    ever signing a settlement agreement with Fair

25    Isaac?
```

1      A.    I don't specifically recall it, but I

2   believe that that is the case, yes.

3      Q.    Do you recall ever reviewing a draft

4   settlement agreement with Fair Isaac?

5      A.    I don't recall it, no, not as I sit

6   here.

7      Q.    Okay.  So, you don't know as I sit here

8   whether or not there's a confidentiality

9   provision in there; isn't that correct?

10      A.    If there is an agreement, it has a

11   confidentiality provision.

12      Q.    But how do you know that?

13      A.    Because there has not been a single

14   contract that I have signed for any of my

15   settlements that did not contain a

16   confidentiality provision.

17      Q.    Is that something that you always

18   insisted upon?

19      A.    No, it's something that they usually

20   insist upon.

21      Q.    But as you sit here now, you don't

22   know, A, if you signed an agreement or whether

23   or not it has specific confidentiality language

24   in it; is that right?

25      A.    That would be correct.

1      Q.    So, what did Fair Isaac agree -- you

2  know, strike that.

3            Do you know what Fair Isaac agreed to

4  do in exchange for your dismissal of the

5  lawsuit?

6      A.    Yes, I do.

7      Q.    Okay.  What did they agree?

8      A.    I'm not sure if I can answer that or

9  not.

10     Q.    Why not?

11     A.    Well, because if it is covered by a

12  confidentiality agreement, I'm not supposed to

13  answer it.  And since I can't recall

14  specifically whether it is or is not, I am not

15  going to answer it until I know for sure that

16  I'm not going to be violating some contractual

17  provision that I've already agreed to.

18     Q.    Well, you're aware that TrueLink has

19  asked for copies of the settlement agreements in

20  this litigation, aren't you?

21     A.    Yes, I'm aware of that fact.

22     Q.    And did you ever make any effort to

23  determine whether or not you could disclose

24  those agreements?

25     A.    Well, I believe in some of the let's

1    just say longer running cases, I mean Fair Isaac

2    made a fairly quick exit, so you'll have to

3    forgive me because you're talking four years

4    ago.  But in I know in Bank of America, CSC, I

5    know, and Ford Motor, I know in a lot of them

6    that they are all covered by confidentiality

7    provisions.

8        Q.    Let's just focus on the Fair Isaac

9    agreement.

10       A.    Okay.

11       Q.    Did you ever make an effort to find the

12   Fair Isaac agreement and determine if in fact

13   there is a confidentiality provision?

14       A.    I assume, because I have hired

15   competent legal counsel that if there was -- if

16   it was a settlement agreement that could have

17   been produced because it was not privy to a

18   confidential agreement, that it would have been

19   produced.

20       Q.    That was just an assumption you made?

21       A.    It's not an assumption.  I mean, you

22   hire legal representation to do their job.

23       Q.    And you assume they did their job?

24       A.    I have no evidence to the contrary that

25   they haven't done their job.

1     Q.   I'm going to ask you again, what did

2   Fair Isaac agree to give you as part of the

3   settlement?

4              MS. YEAGER:  Objection.  Asked

5   and answered.

6     Q.   (BY MR. O'NEIL) You can answer.

7              THE WITNESS:  Can I answer?

8     A.   Fair Isaac agreed to produce for us a

9   deposition.

10    Q.   (BY MR. O'NEIL) An employee of Fair

11  Isaac?

12    A.   Yes.

13    Q.   Did they produce an employee?

14    A.   Yes.

15    Q.   And was a deposition taken?

16    A.   Yes.

17    Q.   And did you ever see a transcript of

18  it?

19    A.   Yes, but that's been years ago.

20    Q.   Uh-huh.

21             MR. O'NEIL:  Can we get a copy of

22  the settlement agreement, as well as the

23  deposition, Ms. Yeager?

24             MS. YEAGER:  Let's go off the

25  record.

1          VIDEOGRAPHER:  We are now going

2    off the record at 10:04 AM.

3              (Off the record.)

4              (Recess.)

5          VIDEOGRAPHER:  One moment please.

6    The time is now 10:18 AM and we are back on the

7    record.  You may continue.

8      Q.   (BY MR. O'NEIL) Ms. Millett, off the

9    record, you had complained that TrueLink hadn't

10   produced some document that you said you needed

11   for litigation.  Do you recall that?

12     A.   Yes.

13     Q.   And what was the document that you were

14   looking for?

15     A.   I'm looking for the master TU file for

16   Steve Millett's credit file.

17     Q.   And you think TrueLink has that?

18     A.   No, I think its parent company,

19   TransUnion, has that.

20     Q.   Okay.  And you think that your lawyers

21   have asked that TrueLink produce it?

22     A.   I believe the request was made in the

23   production for documents for information with

24   Steve's Social Security number on it.  And to

25   the extent that TrueLink is owned by TU, the

1    parent company, I would assume that that would

2    include the information known by TransUnion for

3    Steve Millett's Social Security number.

4        Q.    And why do you need that information,

5    ma'am?

6        A.    Because TransUnion is not giving all of

7    its data to TrueLink like it's supposed to be

8    doing.  And I believe that there are suppressed

9    accounts that are existing on the TU master

10   credit file that were never provided or produced

11   in the monitoring product, which proves that the

12   product does not work.

13       Q.    Why do you believe that?

14       A.    Well, because the Home Depot account is

15   listed on the TU letter that was produced in

16   April of 2003, and that account was subsequently

17   labeled -- relabeled some time in 2004 and 2005

18   by Citibank to have Steve Millett's name and

19   address on it, even though it was Abundio's

20   fraudulent account.  And I have seen it on other

21   credit bureau admin reports.

22       Q.    What do you mean by "admin report"?

23       A.    Well, the admin report is the master

24   file held by the credit bureau for a particular

25   credit file in their database.  That admin

1    report has the entire archived history of every

2    item that has either appeared, been deleted,

3    expired of the information that's contained in

4    the credit bureau.

5        Q.    Aside from the Home Depot account, do

6    you think that there are other accounts that

7    TransUnion has on Mr. Millett's credit file?

8        A.    It's possible.  It is possible.  J. C.

9    Penney's would be another one.

10        Q.    Why do you believe that a J. C. Penney

11    account is on Mr. Millett's file?

12        A.    Because the J. C. Penney account, J. C.

13    Penney started sending mail to our house with

14    Abundio Perez's name with our address.  So, it's

15    another account in which the data at the

16    furnisher has been relabeled with my husband's

17    information and reported that way.

18        Q.    Have you ever asked TransUnion for this

19    information, outside of the litigation?

20        A.    I'm sorry?

21        Q.    Have you ever asked TransUnion for this

22    information outside of formal document requests

23    to TrueLink?

24        A.    I'm not sure how -- I'm not sure what

25    you mean by that.

1    Q.   Well, you recognize -- you are well

2    aware that you can call TransUnion and ask for

3    information regarding your husband, right?

4    A.   They're only going to give you a

5    consumer disclosure.  They're not going to get

6    their admin file.  You can only get their admin

7    file as a result of the litigation.  And I don't

8    know if they call it an admin file or if they

9    call it the master file or if they call it an

10   archive report or what it's called in their

11   lingo inside their company.  But they have a

12   master file which shows every piece of

13   information which has ever been stored, reported

14   or kept for Steve Millett's credit report for

15   the last ten years.

16   Q.   How do you know that?

17   A.   Because it's been contained on other

18   litigation out on the Pacer site that that

19   information has been produced in other cases.

20   Q.   By TransUnion?

21   A.   Yeah, uh-huh.

22   Q.   Okay.  Have you ever -- have you or

23   your husband ever requested his file disclosure

24   from TransUnion in the last several years?

25   A.   Oh, sure.

```
 1          Q.    Okay.  And did you receive them?

 2          A.    We received the consumer disclosure,

 3    yes.

 4          Q.    Okay.  And did you see any information

 5    on there that was inaccurate?

 6          A.    In some cases, yes.

 7          Q.    And did you dispute that information

 8    with TransUnion?

 9          A.    I believe it's come up with discussions

10    with TransUnion counsel when Amanda was here,

11    yes.

12          Q.    So you went through counsel?  You

13    didn't go to TransUnion directly to dispute it;

14    is that right?

15          A.    Well, I believe Amanda was the counsel

16    for TU.  And she's not outside counsel, she's

17    inside counsel, so she works for their company.

18    So, I mean, to the extent that I'm talking to

19    somebody who works directly for the company, I

20    mean, how do you want me to characterize that.

21          Q.    Well, I don't think Amanda works for

22    TransUnion.  But, in any event, I'm not asking

23    about the litigation.  You are well aware in the

24    Fair Credit Reporting Act that credits bureaus

25    like TransUnion are required to give you file
```

1    disclosures and then to investigate any

2    disputes, right?

3        A.   I'm well aware of that fact, yeah.

4        Q.   Okay.  To your knowledge, has your

5    husband or yourself ever contacted TransUnion

6    directly about any errors in the file

7    disclosures that you received?

8        A.   I'm not sure if my attorneys have

9    contacted them directly about that, but I know

10   discussions have been held about that.

11       Q.   Once again, ma'am, I'm not asking about

12   your attorneys.  I'm asking you or your husband,

13   have you ever contacted TransUnion to dispute

14   items on his file?

15       A.   When we got the TU letter in 2003 --

16       Q.   Okay.

17       A.   -- we called TransUnion about that.

18       Q.   Have you ever informed TransUnion that

19   you believe that it is suppressing Home Depot,

20   J. C. Penney or any other accounts?

21       A.   No, because those facts have only come

22   about after the litigation commenced.  We didn't

23   have those facts until after we started sending

24   out the subpoenas in the Experian case.

25       Q.   Okay.  Well, once you had the facts,

1    did you ever contact TransUnion and say I think

2    that you're suppressing the Home Depot, J. C.

3    Penney and other accounts?

4        A.    No, I did not call them about that, no.

5        Q.    Okay.  You said that you had sued CSC,

6    what's the status of that case, Mrs. Millett?

7        A.    That case is settled.

8        Q.    And did you sign a settlement agreement

9    with CSC?

10       A.    Yes.

11       Q.    And as part of that settlement

12   agreement, did you agree to dismiss the lawsuit

13   against CSC?

14       A.    Yes.

15       Q.    And what, if anything, did you get in

16   exchange for that agreement?

17               MS. YEAGER:  Objection.  That's

18   confidential information protected by the

19   agreement.  I'm going to instruct the client not

20   to answer.

21       Q.    (BY MR. O'NEIL) And will you accept

22   that instruction, ma'am?

23       A.    Yes.

24       Q.    Okay.  And then you also said that you

25   had sued Bank of America.  What's the status of

1    that lawsuit?

2         A.    That lawsuit is also settled.

3         Q.    Did you sign a settlement agreement

4    with Bank of America?

5         A.    Oh, yes.

6         Q.    And as part of that settlement, you

7    agreed to dismiss your lawsuit against Bank of

8    America, right?

9         A.    Yes.

10        Q.    And what, if anything, did you and your

11   husband get in exchange for the agreement to

12   dismiss your lawsuit?

13             MS. YEAGER:   Objection.   That is

14   part of a confidentiality agreement that was

15   contracted as part of the settlement, and I'll

16   instruct the client not to answer.

17        Q.    (BY MR. O'NEIL) And you'll accept that

18   instruction, ma'am?

19        A.    Yes.

20        Q.    You also sued Ford Motor and then Ford

21   Motor Credit, right?

22        A.    Yes.

23        Q.    And did you reach a settlement

24   agreement resolving that lawsuit?

25        A.    Yes, we did.

1     Q.   Did you sign that settlement agreement?

2     A.   Yes, I think I did.

3     Q.   Okay.  And what did you and/or your

4  husband get in exchange for your agreement to

5  drop the lawsuit?

6              MS. YEAGER:  Objection.  That is

7  protected by the agreement itself.  I'll

8  instruct the client not to answer.

9     Q.   (BY MR. O'NEIL) And you'll accept that

10  instruction?

11     A.   Yes.

12     Q.   The deposition that Fair Isaac agreed

13  to give in connection with the Ford Motor case,

14  what was -- why did you want that deposition to

15  occur as part of your settlement?

16     A.   That was a Fair Credit Reporting Act

17  case.  And the information related to the Fair

18  Isaac deposition was directly related to

19  furnisher data and how it impacts the scoring

20  model.

21     Q.   Okay.  Ultimately, the District Court

22  in the Ford Motor case ruled against your

23  claims, right?

24     A.   Initially, yes.  That would be correct.

25     Q.   Well, did they change -- did the

1    District Court change its decision later on?

2        A.    No.   We achieved a settlement in

3    between that and the processing of the appeal.

4        Q.    When you and your husband first had a

5    lawsuit filed on your behalf against all of the

6    defendants you sued initially, did you decide

7    who would be sued?

8        A.    I'm sorry, I don't understand the

9    question.

10       Q.    Okay.   Do you recall that you sued

11   those seven defendants in one lawsuit here in

12   Kansas?

13       A.    Yes.

14       Q.    Okay.   And did you participate in the

15   decision as to who would be sued and who would

16   not be sued?

17       A.    Yes.

18       Q.    Okay.   And did your husband participate

19   in that decision?

20       A.    Of course.   He participates in all the

21   decisions.

22       Q.    Well, he didn't participate in the

23   decision to sue TrueLink, right?

24       A.    He participated in the decision to sue

25   TransUnion, which ultimately became TrueLink.

1      Q.   But he didn't participate in the

2   decision to sue TrueLink, right?

3              MS. YEAGER:   Objection.   Asked

4   and answered.

5      A.   He participated in the discussion to

6   sue TransUnion, which was later renamed to

7   TrueLink.   And which I guess as a part of this

8   litigation will now be renamed to TU

9   Interactive.

10     Q.   (BY MR. O'NEIL) Do you recall that

11  Mr. Millett in his deposition taken in this case

12  said that he was deferring to you in making

13  decisions involving the lawsuits?

14     A.   Yes, I recalled that.   Yes.

15     Q.   Was that an inaccurate statement?

16     A.   It not inaccurate because I'm the one

17  that usually communicates to the attorneys, but

18  that does not mean that he has no input in how

19  the decision is made.

20     Q.   When you read his deposition, did you

21  see anything that he said that was inaccurate?

22     A.   I'm sorry, I don't understand the

23  question.

24     Q.   Okay.   Well, in his deposition, I asked

25  him questions and he gave answers, right?

1        A.    Yes.

2        Q.    And he gave answers about a lot of

3    information that's in your possession as well,

4    right?

5        A.    Yes.

6        Q.    Did you disagree with any of his

7    answers?

8        A.    No.

9        Q.    Okay.  After his deposition, did you

10    talk to him about his deposition?

11        A.    Not really.  Not really.  I mean, we

12    discussed how did he think it went today, and he

13    said it went -- I think it went okay and, you

14    know, that was it.  I'm tired, I'm going to bed,

15    so, I mean, you know.

16        Q.    That was the whole extent of your

17    conversation with Mr. Millett about his

18    deposition in this case?

19        A.    Paraphrasing at that point, yes.

20        Q.    Okay.

21        A.    On that day, yeah.

22        Q.    After you had -- okay, later days, did

23    you have other conversation with him about the

24    deposition?

25        A.    Yeah, he had other questions.  He

1    specifically asked about the TrueLink issue, and

2    I said, well, that's because we were suing

3    TransUnion and then it got renamed to TrueLink,

4    because he didn't understand why he -- and he

5    had misplaced it, we had discussed it

6    previously.

7         Q.   Did he express to you that he was a

8    little embarrassed that he didn't know facts

9    that he thought he should have known?

10        A.   No, he didn't discuss that he was

11   embarrassed.

12        Q.   Well, did he discuss something along

13   those lines?

14        A.   No, not along those lines, no.

15        Q.   Did he say that he was asked questions

16   he didn't know the answers to?

17        A.   Well, he said he asked questions he was

18   -- that he was asked questions that he was

19   confused by, yeah.

20        Q.   Uh-huh.  Was he angry with you that he

21   only learned in a deposition that he had sued

22   TrueLink?

23        A.   No, he was not angry with me.

24        Q.   After you read the deposition

25   transcript, did you have any conversations with

1    him about your review of the transcript and what

2    you thought about the deposition?

3        A.    I'm sorry?

4        Q.    You read his transcript, right?

5        A.    Right.

6        Q.    After you read it, did you have any

7    conversation with your husband about the

8    transcript?

9        A.    Yeah, I had some conversations with him

10   about the transcript.

11       Q.    What did you tell him?

12       A.    I didn't tell him anything.  I just...

13       Q.    Well, what did you say?

14       A.    Well, I mean, they were just in

15   general, you know.  Like how was this or how was

16   this phrased or how do you think about this

17   particular aspect of the deposition.  I mean, I

18   don't recall all the specifics, but, I mean, we

19   had a general conversation about it.

20       Q.    Did you tell him that you thought that

21   he had testified inaccurately?

22       A.    No.

23            MR. O'NEIL:  Okay, we have to go

24   off the record briefly to change the videotape,

25   so let's do that.

```
 1                 VIDEOGRAPHER:  We are now going
 2      off the record at 10:32 AM.
 3                 (Recess.)
 4                 VIDEOGRAPHER:  One moment please.
 5      We are now back on the record at 10:35 AM.  You
 6      may continue.
 7          Q.   (BY MR. O'NEIL) Mrs. Millett, did you
 8      play a role in deciding what particular legal
 9      claims would be brought against the defendants?
10          A.   No.
11          Q.   Did you review drafts of the complaints
12      that were filed on your behalf before they were
13      filed?
14          A.   Yes.
15          Q.   And did you review them for accuracy?
16          A.   Yes.
17          Q.   And did you make changes to any
18      complaints before they were filed?
19          A.   Yeah.  I believe, you know, there was a
20      review process, you make changes, you go back
21      and forth.
22          Q.   And before they were filed, were you
23      confident that they were -- that the factual
24      allegations were accurate?
25          A.   Yes.  I was fairly confident of that.
```

1       Q.    Okay.  And there have been a number of

2   legal briefs or memorandum that have been filed

3   in all the lawsuits that you and your husband

4   have brought?

5       A.    Yes.

6       Q.    Okay.  And have you ever reviewed

7   drafts of those legal briefs before they were

8   filed?

9       A.    Yes.

10      Q.    And did you ever review those briefs

11  for accuracy?

12      A.    Yes.

13      Q.    And did you ever make changes to those

14  briefs to make sure that they were accurate?

15      A.    Yes.  I've made changes.

16      Q.    And in your mind, were all those briefs

17  accurate when filed?

18      A.    Yes.

19      Q.    And there has been a number of

20  correspondence, I'm speculating here, but I

21  suspect that there's been a number of

22  correspondence between your lawyers and the

23  lawyers for all of the defendants that you have

24  sued.  My question is, do you see that

25  correspondence?

1    A.   I'm not sure I see every single piece

2    of correspondence.   I'm sure that you probably

3    have communicated with my lawyer information

4    about the time and set-up of this deposition

5    that may not have been shared with me.   But I'm

6    sure that, you know, Joyce has contacted me and

7    said, Melody, I need you to be here on Thursday

8    at such and such time.

9        Q.   Do you have an understanding as to what

10   types of correspondence between counsel you

11   would get copies of?

12       A.   I generally get copies of any

13   correspondence, which is official.   Like, for

14   example, if it relates to discovery disputes or

15   specific timetables, I think stuff from the

16   conferencing, timetable, whatever they call that

17   thing when you guys set up the scheduling orders

18   or whatever in the beginning.

19       Q.   Uh-huh.

20       A.   I've seen communication going back and

21   forth about requests for productions and

22   different stuff like that that gets shared with

23   me, yes.

24       Q.   And when your lawyers are discussing

25   settlement with the defendants you have sued, do

1    you get to see copies of that correspondence?

2        A.   Oh, yes, every settlement agreement or

3    every settlement offer has been conveyed, yes, I

4    believe so.

5        Q.   Have you approved the terms of all the

6    settlements that you've reached with the

7    defendants you've seed?

8        A.   Me and my husband have approved all the

9    terms, yes.

10       Q.   Okay.  And is it fair to say, I think

11   you said this earlier, but is it fair to say

12   that whenever you and your husband communicate

13   with the lawyers, that you're the one that

14   communicates to them?

15       A.   Well, I believe Steve has talked with

16   the lawyers on several occasions, but

17   predominantly speaking, I communicate with the

18   lawyers.  And, predominantly speaking, I

19   predominantly communicate with Joyce Yeager in

20   particular, so I don't talk to all the lawyers.

21       Q.   When you first retained Mr. Grissom,

22   did you sign a contract with him?

23       A.   We signed a representation agreement,

24   yes.

25       Q.   Okay.  And was that an agreement that

1    included the other lawyers or did it just

2    include Mr. Grissom?

3        A.   Well, at that time, it was just

4    Mr. Grissom.

5        Q.   But then later on did you sign another

6    agreement with the other lawyers that you had

7    retained?

8        A.   No, I did not.

9        Q.   Okay.  So, to your knowledge, the only

10   signed agreement you had with your lawyers is

11   with Mr. Grissom; is that right?

12       A.   That is correct.

13       Q.   Okay.  And is that agreement still in

14   effect today?

15       A.   I would hope so.

16       Q.   Okay.  And did you sign that agreement

17   when you first retained Mr. Grissom in 2003?

18       A.   Yes, sir.

19       Q.   Okay.  And did that agreement provide

20   that Mr. Grissom would share in a percentage of

21   whatever recovery you got in the lawsuits?

22       A.   It's a contingent fee arrangement, yes.

23       Q.   Okay.  And what percentage of recovery

24   does Mr. Grissom get under those agreements?

25                MS. YEAGER:  Objection.

1   Irrelevant.

2     A.   I believe it

3                I mean, I haven't looked

4   at the agreement and I've kind of misplaced it,

5   so it's -- I mean, I could get another copy but

6   I just haven't looked at it.

7     Q.   (BY MR. O'NEIL) And in connection with

8   the settlements that you've reached with a

9   number of the defendants, did Mr. Grissom share

10   in the recovery of money consistent with your

11   agreement with him?

12           MS. YEAGER:  Objection.  The

13   terms of the settlement agreements are

14   confidential, and I will instruct the client not

15   to answer.

16           MR. O'NEIL:  I'm not asking about

17   the terms of the settlement agreement.

18     Q.   (BY MR. O'NEIL) What I'm asking is, did

19   Mr. Grissom receive his percentage of money that

20   was agreed to under your engagement letter with

21   him whenever you receive money under the

22   settlement agreements?

23           MS. YEAGER:  I have to object to

24   that question.  There were instances in which

25   those terms of settlement were confidential, and

1    I'll instruct the client not to answer.

2              MR. O'NEIL:  Well, you've already

3    produced documents that tell us how much money

4    was received in certain of those agreements, so

5    I'm not sure how you could tell her that she

6    can't say it now.  I'm not even asking about the

7    terms of the settlement agreements.

8              I do know for a fact that the Milletts

9    got moneys under certain of the settlement

10   agreements, because she testified to that in the

11   Ford Motor case.  And after repeated requests,

12   you finally produced that.

13             So, you can't claim -- you can't claim

14   that she's prohibited from saying that, she's

15   already testified in other litigation.  But in

16   any event, that's not my question.

17   Q.   (BY MR. O'NEIL) You did receive moneys

18   under certain of the agreements that you reached

19   with defendants, right?

20   A.   Yes.

21   Q.   Okay.  And in each of those instances,

22   did Mr. Grissom get only the amount of money

23   that he was entitled to under your engagement

24   letter with him?

25   A.    I'm not dissatisfied with how much

1    money he got paid or I got paid if that's what

2    you mean.

3        Q.   Well, I'm glad.  I'm glad, but that's

4    not my question.  My question is that, when you

5    got the moneys under the settlement agreements,

6    did Mr. Grissom get his share and only his share

7    that he was entitled to under the engagement

8    letter you have with him?

9              MS. YEAGER:  Objection.

10   Relevance.  You may answer.

11       A.   I don't understand the question,

12   because normally what happens is the check is

13   produced and then Mr. Grissom produces a check

14   for me and, you know, you get a little paper

15   that tells you how it was done.  So I mean, you

16   know, I don't know.

17       Q.   (BY MR. O'NEIL) So, you don't know how

18   much Mr. Grissom got?  Is that what you're

19   testifying to?

20       A.   No, that's not what I'm testifying to.

21   What I'm testifying to is I know what the total

22   amount is, I know what I received.  To say that

23   in a particular agreement that I got -- that

24   Mr. Grissom                         , I

25   didn't do the math.

```
 1        Q.   Well, but you know that Mr. Grissom

 2   received much more than what was agreed to under

 3   that engagement letter with you in at least

 4   certain of the settlement; isn't that correct?

 5                MS. YEAGER:  Objection.  Assumes

 6   facts not in evidence.

 7        Q.   (BY MR. O'NEIL) You can answer.

 8                MS. YEAGER:  Objection.

 9   Relevance.  You may answer.

10                THE WITNESS:  Can somebody please

11   read back the question?

12                (Whereupon, the requested portion

13   of the record was read by the reporter.)

14        A.   No, that will not be correct.

15        Q.   (BY MR. O'NEIL) He received more than

16   the                    that he was supposed to get

17   under the engagement letter, right?

18        A.   No.  I mean, not from -- not from --

19   that's what I'm not understanding what you mean

20   by that.

21        Q.   Okay, well, let me try to make it more

22   clear.  You reached settlement agreements where

23   you and your husband got a certain amount of

24   money and your lawyers got a certain amount of

25   money, right?
```

1      A.    Of course.

2      Q.    And in at least some of those

3 settlements, your lawyers got more than

4                that was called for under your

5 engagement letter?

6                MS. YEAGER:  Objection.

7 Relevance.

8      A.    I still don't understand this question.

9 I really don't.

10     Q.    (BY MR. O'NEIL) Okay, well, then I'll

11 walk -- we'll walk through it.

12                MR. O'NEIL:  By the way, I'll

13 give you a standing objection on relevance to

14 all my questions.  Okay?

15     Q.    (BY MR. O'NEIL) As you said before,

16 under some of these agreements, the agreements

17 called for you and your husband getting a

18 certain amount of money and your lawyers getting

19 a certain amount of money, right?

20                MS. YEAGER:  Objection.

21 Misstates the agreement.

22                MR. O'NEIL:  She's already

23 testified to it, but if she wants to change her

24 testimony in light of your objection, she can do

25 that.  I'll restate the question.

```
 1        Q.    (BY MR. O'NEIL) In at least some of the

 2   agreements, the agreements called for the

 3   defendant paying you and your husband a certain

 4   amount of money and your lawyers getting a

 5   separate sum of money; isn't that correct?

 6        A.    Well, I think that that's the legal fee

 7   portion, but that's not -- that has nothing to

 8   do with the contingency portion of the

 9   agreement.

10        Q.    Okay.

11        A.    So that's where my confusion is coming

12   in.

13        Q.    I understand.  Now I understand why

14   you're confused.  So, as part of some of these

15   agreements, your lawyers actually got more than

16   they would have gotten if they had just got

17              of what you had gotten, right?

18        A.    Right.

19        Q.    Why do you agree to that?

20        A.    I'm sorry?

21        Q.    Why did you agree to that arrangement?

22        A.    To what arrangement?

23        Q.    Where your lawyers are getting more

24   money than they would have been entitled to

25   under your contingency fee agreement?
```

```
 1       A.   Because some cases are different than

 2   others.   Some cases are pure contingency.   Then

 3   there's the matter of originally there was a

 4   $10,000 retainer which was paid to Mr. Grissom

 5   which was used to execute certain other cases.

 6            But, I mean, for me to keep track of,

 7   okay, I retained a person to engage in a

 8   specific course of action, which dollars were

 9   applied to which cases and how and when, you

10   know, I can't keep track of all that.   That's

11   their accounting issue.   And I've had no issue

12   with it.

13       Q.   Whose accounting issue is it?

14       A.   I mean, it's not -- I mean, it's how

15   they do legal accounting.   I'm not an expert on

16   how you're supposed to bill cases or do hours,

17   you know.   I mean, I don't feel like anything

18   has been unfair, so.

19       Q.   And the amounts of money moneys that

20   you have received under the agreements were much

21   larger when it was a class action that you

22   brought; isn't that correct?

23       A.   I'm sorry?

24       Q.   The amount of money that you and your

25   husband received was much larger where it was a
```

1  class action that was being settled as opposed

2  to the individual cases being settled; isn't

3  that correct?

4          MS. YEAGER:  Objection.  That

5  involves material that is protected by the

6  confidentiality provisions of the settlement

7  agreements, and I'm going to instruct the client

8  not to answer.

9      Q.   (BY MR. O'NEIL) And will you accept

10  that instruction?

11      A.   Yes.

12      Q.   Okay.  And the settlements involving

13  purported class action lawsuits gave your

14  lawyers much more money than the settlements

15  where it was individual lawsuits; isn't that

16  correct?

17          MS. YEAGER:  Objection.  The

18  terms of those settlement agreements are

19  confidential.  There is a confidentiality

20  provision in the settlement agreements, and I'll

21  instruct the client not to answer.

22      Q.   (BY MR. O'NEIL) And you will accept

23  that instruction, Mrs. Millett?

24      A.   Yes.

25      Q.   Is it fair to say that you took the

1    lead in investigating the misuse of your

2    husband's Social Security number?

3        A.   Yes.

4        Q.   Okay.  Is it fair to say that you took

5    the lead in ordering file disclosures from the

6    credit bureaus for your husband?

7        A.   Yes.  As his agent, I ordered those

8    file disclosures.

9        Q.   And were you his agent for disputing

10   information with the bureaus regarding his

11   credit file?

12       A.   Yes, myself and Mr. Adler, and of

13   course his other legal counsel.

14       Q.   And were you also his agent for

15   ordering products from TrueLink and Equifax and

16   Experian, right?

17       A.   Yes.

18       Q.   And you were also his agent in

19   answering the interrogatories that were directed

20   at him, right?

21       A.   Yes.

22       Q.   And that's because -- isn't that

23   because -- is one reason for that is because you

24   thought you knew the information better than

25   your husband?

```
 1        A.    Well, because I've handled many of the
 2   items as on his behalf as his agent.  And when
 3   the interrogatories call for a specific or
 4   detailed answer, that -- I need to answer that,
 5   yeah.
 6        Q.    And are you his agent for purposes of
 7   prosecuting the lawsuit against TrueLink?
 8        A.    I don't understand the question.  He
 9   and I are doing this together.
10        Q.    But you're the one who's taking the
11   lead in talking to the lawyers, right?
12        A.    Yes.
13        Q.    And you're the one who's been
14   identified as having more information about the
15   facts relevant to this lawsuit than your
16   husband, right?
17        A.    I have more facts, that would be true.
18        Q.    What is it, Mrs. Millett, that you seek
19   to achieve by the lawsuit that you've filed
20   against TrueLink?
21        A.    I'm sorry, I don't understand the
22   question.
23        Q.    What is it that you want to achieve by
24   filing the lawsuit against TrueLink?
25        A.    We want to fix the system so that
```

```
 1    nobody else has to go through what we've gone

 2    through.

 3         Q.   Any other goals that you have for the

 4    lawsuit?

 5         A.   Yeah.  I'd like for the company to be

 6    honest with people about what the credit

 7    monitoring actually does and does not do.  And

 8    to stop advertising complete identify theft

 9    protection when they have no intention of

10    providing it.

11              I'd like for them to pay my attorneys

12    their attorneys fees.

13              I would like to obtain my relief under

14    the Kansas Consumer Protection Act.

15              I would like to, once again, have peace

16    of mind that someone somewhere will, you know,

17    take a look at what it is they're marketing and

18    figure out that what they're doing is not the

19    right thing, that it lacks a certain amount of

20    common sense.  And that if the common person

21    knew actually what was not covered by the

22    advertising of complete identity theft

23    protection, that they -- most people would

24    choose not to purchase that product.

25         Q.   Any other goals you are trying to
```

1   achieve by the lawsuit that you've filed against

2   TrueLink?

3        A.   No, I don't think so.

4        Q.   Okay.  What relief under the KCPA, the

5   Kansas Consumer Protection Act, are you seeking?

6        A.   I believe there's statutory relief and

7   legal fees provided under that particular

8   section.

9        Q.   Do you know what statutory relief is

10  available under that statute?

11       A.   I think it's about $10,000, but I get

12  confused because I've got California Legal

13  Remedies Act and a few others running around, so

14  it gets funky.  I know in this case at one time

15  the Delaware Act was in and then it was removed

16  and it's hard to follow.

17       Q.   It is.  I mean, your lawyers have

18  brought claims against TrueLink under Kansas

19  law, Delaware law, and California law, right?

20       A.   I don't know that that would be correct

21  at this point in time.

22       Q.   Well, no, at various times they've

23  brought various claims under various state laws;

24  isn't that true?

25       A.   I think that was in response to

1    defendant's answers, which basically said that,

2    in this instance, Delaware law didn't cover and

3    maybe the judge agreed or didn't agree and then

4    something got changed and reinserted.  So, I

5    mean, it's not entirely my lawyers' decisions.

6    In some cases, I think the court has shaped

7    which items have been put in or removed.

8        Q.   Well, it's your lawyers' decisions to

9    decide what claims will be asserted, right?

10       A.   Well, I think that's a decision we kind

11   of all make together.  I mean, we all discuss

12   the facts of the case.  And we think we're going

13   to do this and do you agree or don't you agree,

14   and then my husband and I discuss and we say,

15   okay, that's what we're going to do.

16       Q.   Well, you testified earlier that it was

17   really the decision of your lawyers as to what

18   legal claims are brought.  Are you now saying

19   that actually you and your husband are involved

20   in that decision making as well?

21       A.   Well, what I am saying is they decide

22   how to apply our facts to whatever.

23       Q.   Right.  I mean, you and your husband

24   have never had a conversation about deciding

25   whether or not you're going to bring a claim

1   under California statute or Delaware statute or

2   Kansas statute, have you?

3        A.   No, we don't have that kind of

4   conversation.  But I'm sure my lawyer has called

5   me up and said these are your available options,

6   you know, we would recommend that you pursue

7   this option.  So, then I either agree or I don't

8   agree or we agree or we don't agree and then we

9   go forward.

10       Q.   Are you aware that there is a provision

11  in the contract between TrueLink and your

12  husband that says what law governs any claims

13  that might arise from that contract?

14       A.   Yes, I am aware of that now, yeah.

15       Q.   Okay.  When did you first become aware

16  of that?

17       A.   I think it was after that -- we were

18  putting a lawsuit together that that, you know,

19  it's in the fine print.  I mean, that agreement

20  is how many paragraphs long, I think, you know,

21  20, 30, I don't know.

22       Q.   Did you ever read that agreement?

23       A.   Yeah, I skimmed it.

24       Q.   Okay.

25       A.   I mean, do you read every single

1   agreement that you get for every single piece of

2   software you ever install from top to bottom?

3       Q.   I don't generally answer questions in a

4   deposition, but I'll tell you no.  I don't.  But

5   you know what, if I'm going to sue somebody on a

6   class-wide basis for it, yeah, I'm going to read

7   it.

8                MS. YEAGER:  I'm going to object

9   to the --

10      Q.   (BY MR. O'NEIL) Are you seeking any

11  money for you and your husband as part of this

12  settlement?

13      A.   Well, I believe there would be

14  statutory relief under the Kansas Consumer

15  Protect Act, and I believe there would be the

16  matter of the contract breach and the fees paid

17  on behalf for the product that is the subject of

18  the breach.

19      Q.   So, you want the money back that you

20  paid for the products that you're not satisfied

21  with; is that right?

22      A.   Yes.

23      Q.   Do you want all the money back?

24      A.   Well, yeah.  For the class, yes, of

25  course.

```
 1        Q.   Well, right now I'm just asking about

 2   you, we'll get to the class.  Do you know how

 3   much money you've paid TrueLink over the years?

 4        A.   I'm sure it's in one of those documents

 5   somewhere that I've seen.

 6        Q.   I haven't seen it, but.

 7        A.   I believe it was in your production,

 8   it's the order management screen that's got all

 9   the transactions on there.

10        Q.   And do you want all -- do you want the

11   court to order that TrueLink must deliver all

12   that money back to you?

13        A.   Well, I believe I've heard the legal

14   term referred to as "disengorgement," is that

15   how that works?  When you make false claims and

16   entice people to buy something under false

17   pretenses, that you don't have the right to keep

18   the money that you've made as a result of those

19   false assertions, is that how that works?  I

20   think.

21        Q.   Is it your understanding that you

22   brought a claim for disgorgment against

23   TrueLink?

24        A.   It's my understanding that the class

25   will get some kind of relief for the products
```

1   that they purchased that did not work.  Now, how

2   much relief that is or is not is a determination

3   for the court to make or as a result of any

4   class action settlement, should there be one.

5       Q.   Well, you would agree that there's some

6   value to the products that you've purchased from

7   TrueLink, right?

8       A.   Well, I mean, the value that exists for

9   the product only exists in the fact that you're

10  viewing your consumer disclosure online.  That,

11  you know, there's a convenience value in that

12  aspect of it.  But it does not perform as it's

13  advertised to perform in the fact that it does

14  not provide complete protection from identify

15  theft.  It doesn't even provide basic protection

16  from identity theft.

17      Q.   Have you canceled the subscription that

18  Mr. Millett has with TrueLink for credit

19  monitoring?

20      A.   I believe so.  It's been canceled now.

21      Q.   Okay.  And when did you cancel it?

22      A.   I believe it was allowed to expire and

23  lapse, and the credit card that's in there was

24  expired and so you -- they have not been able to

25  place a new charge.  So, I believe it lapsed in

1    and of its own accord.  It's not like I called

2    somebody to cancel it.

3        Q.    So, when did that occur?

4        A.    I think the last charge was in November

5    of 2006 and there hasn't been one since.

6        Q.    Why didn't you make effort to give a

7    new credit card so you can continue the credit

8    monitoring service?

9        A.    Because there's no purpose in it.

10        Q.    When did you come to the conclusion

11   that there was no purpose in purchasing the

12   credit monitoring service from TrueLink?

13        A.    Well, I mean, it's been some time over

14   the course of the litigation.  But, I mean, now

15   that I know that it really doesn't even cover

16   for anything, then there was just no point in

17   it, so I've discontinued it.

18        Q.    And when did you learn that?

19        A.    Like I said, that's been a evolving

20   process as new evidence has arised in this case

21   as we've gone along.  But, I mean, there have

22   been little things.  But, I mean, getting the

23   information, for example, that the -- that the

24   -- I'm drawing a blank here for a moment -- that

25   the Home Depot account had been relabeled and

1    that that information was still not presenting

2    in the product.  The fact that we had had false

3    alert triggers on and off throughout 2005, I

4    believe was the year that those were occurring

5    in.  That it serves no purpose, so I just

6    discontinued it.

7         Q.    Prior to November of 2006, you

8    discontinued it?

9         A.    No.  I didn't renew -- the last charge

10   was in November of 2006, and I've not placed a

11   new credit card in there.

12        Q.    Was November 2006 when you came to the

13   conclusion that there was no purpose for

14   purchasing the credit monitoring service?

15        A.    No.  It was when I made the conscious

16   decision to go in there and end it.  TrueLink's

17   monitoring service is a negative opt-in.  You

18   must specifically opt out or the subscription

19   continues automatically through no interference

20   or whatever of your own.

21        Q.    Did you ever cancel it affirmatively?

22        A.    What do you mean affirmatively?

23        Q.    Meaning what you just said, that you

24   called TrueLink and said cancel it?

25        A.    I already answered that, and I said no.

1    I allowed the subscription to lapse by not

2    giving them a new credit card number with the

3    correct expiration date.

4        Q.    Because you told the "New York Times"

5    reporter that there was some value to credit

6    monitoring, right?

7        A.    I told the "New York Times" reporter

8    that it was the best tool available, but it was

9    not as advertised.

10       Q.    Right.  And that you had continued to

11   purchase the product, right?

12       A.    Well, you still have to be able to look

13   at your credit report, sir.

14       Q.    Okay.  So, when you had the

15   conversation with the reporter for the "New York

16   Times", you still thought that there was value

17   in the credit monitoring service, right?

18       A.    Not the monitoring service.  There is

19   value in having access to your credit report on

20   an ongoing basis, especially when you already

21   know you're a victim of identity theft.

22   However, it is not complete identity theft

23   protection as is advertised.

24       Q.    Is that what TrueLink advertises?

25       A.    I believe that's what was on their

1    product advertisement, complete protection from

2    identity theft.

3        Q.    Do you want all the money that you ever

4    paid TrueLink back?

5        A.    Well, at this point in time, I'd settle

6    for the money for the product, because that's a

7    class-wide basis.  But, technically on an

8    individual basis, they probably should reimburse

9    me for all the credit reports they made me

10   purchase by receiving blank alerts, but.  You

11   know, for the betterment of the class, I'm

12   willing to forgo that if I have to.

13       Q.    You're concerned about the class?

14       A.    Oh, yes, I'm concerned about the class.

15       Q.    What do you want to get for the class?

16   All those things that you described before?

17       A.    You know, I want the company to

18   disclose to people up front in big letters when

19   they purchase this product that, you know, you

20   are not going to see everything for your Social

21   Security number, you are never going to see it,

22   and that we are legally going to sell credit

23   reports from our parent company for individuals

24   who are using your Social Security number

25   incorrectly.

```
 1              I mean, really and truly.  I mean, that
 2        we are going to pick and choose which
 3        information we're going to display to you in
 4        your reports.  And that if we, our parent
 5        company, has made the decision to suppress that
 6        information and keep it from you, that it will
 7        not be displayed and you will not be made
 8        notified of it.
 9              That we may have more than one person
10        who has subscribed to credit monitoring using
11        your personal identifier, like your Social
12        Security number.
13              I mean, these are things that could
14        have been disclosed up front in advance that
15        were hidden behind deceptive marketing and
16        advertising that prey on people's fears and
17        weaknesses and assumptions about what credit
18        bureaus do and don't do in their business model.
19              I mean, do you know that the -- most of
20        the people that I've talked to are very confused
21        when I tell them that there's allowed to be sold
22        multiple credit reports with the Social Security
23        number.  They don't believe that that can
24        happen.
25        Q.   If TrueLink agreed to do what you just
```

1    described, would that satisfy you?

2        A.    I'm sorry?

3        Q.    If TrueLink agreed to make the

4    disclosures that you just described, would that

5    satisfy you?

6        A.    It would go a long way towards

7    improving things, but that doesn't change the

8    fact that the people who have already purchased

9    the product have purchased the product that --

10   under the assertion by TrueLink that this was

11   going to be complete identity theft protection.

12       Q.    Are you aware of anybody other than you

13   and your husband who are dissatisfied with

14   TrueLink's credit monitoring service for the

15   reasons that you just described?

16       A.    There are a lot of people who are

17   dissatisfied.  They're all over the web.

18   They're all over places like ripoffreport.com.

19   They're all over the place.  Various forms,

20   there's a blog on "The Washington Post" about

21   identity theft where people have posted about

22   problems they have with their credit monitoring

23   products.

24       Q.    I understand that, ma'am.  What I'm

25   asking is the particular complaint that you

1    have, because, as you acknowledge, a lot of

2    people were surprised or confused by what you

3    had said.  And I'm sure you're well aware of

4    this, I've seen your other depositions, you've

5    acknowledged that credit monitoring will alert

6    you to true name fraud, right?

7              MS. YEAGER:  Objection.

8    Foundation.

9        A.   It should, but it does not work that

10   way.

11       Q.   (BY MR. O'NEIL) Okay.

12       A.   And that's new evidence that's been

13   discovered, and that goes back to the Home Depot

14   credit card which was relabeled with Steve's

15   name and address which was never alerted in the

16   product.

17       Q.   Well, with all due respect, ma'am, it's

18   just speculation on your part that TransUnion

19   has this Home Depot trade line and they've

20   concealed it from you and TrueLink, right?

21       A.   Actually, the Home Depot trade line is

22   on the TU letter dated April 23rd, 2003, and we

23   have the subpoena information from the

24   furnishers of that data.

25       Q.   Okay, well, let's walk through this.

1    The letter said in April 2003 TransUnion advised

2    you that on Mr. Perez's credit file is a Home

3    Depot account, right?

4         A.    Correct.

5         Q.    And you've never seen the Home Depot

6    account on any file disclosure or any other

7    credit reporting product regarding your husband,

8    right?

9         A.    I've seen inquiries, yes.  Citibank,

10   NA, for the Home Depot account did in fact make

11   inquiries on Steve's TransUnion reports.

12        Q.    Okay.  You've never seen the Home Depot

13   trade line on Mr. Millett's account, credit

14   file, right?

15        A.    No, not on his actual consumer

16   disclosure, no.

17        Q.    You've seen it on other credit bureaus'

18   credit reports, right?

19        A.    No.  It's never appeared on Steve

20   Millett's credit report on any bureau.

21        Q.    Okay.  What evidence -- and if you

22   don't have any, tell me that -- what evidence do

23   you have to support your belief that TransUnion

24   is maintaining a Home Depot account on your

25   husband's credit file?

1        A.    The information from Monogram Bank,

2   subpoenas and the information from Citibank's

3   subpoenas, which show basically that they are

4   reporting that information.  And if they've

5   reported it, they're reporting it to all three

6   bureaus.  Because obviously it was on the TU

7   letter in '03, so if they were going to update

8   their reporting, I would assume that they would

9   update it at least the bureau that they sent the

10  letter for.  So it's a reasonable assumption on

11  my part.

12       Q.    Well, it's reasonable to assume that

13  they're reporting it, but why do you believe

14  it's --

15       A.    Because --

16       Q.    If I can finish.

17       A.    Okay, I'm sorry.

18       Q.    Why do you believe it's showing up on

19  your husband's credit file?

20       A.    Because it's now relabeled with Steve's

21  name and address and Social Security number,

22  which is supposed to be the three criteria that

23  they use to pull a consumer disclosure.  And it

24  still has Abundio Perez's telephone number.  And

25  that's the information we got directly from

1     those subpoenas.

2          Q.   Is that all the information you have to

3     support your contention that you believe

4     TransUnion is maintaining a Home Depot account

5     on your husband's file?

6          A.   Because I don't have the actual file

7     from TransUnion, that has not been produced,

8     yes, that's all I have at this point.  That and

9     a check from Home Depot that was mailed to our

10    house.

11         Q.   Do you blame TrueLink for Mr. Perez's

12    misuse of your husband's Social Security number?

13         A.   I'm sorry?

14         Q.   Do you blame TrueLink for Mr. Perez's

15    misuse of your husband's Social Security number?

16         A.   Well, to the extent that you're a

17    subsidiary of TransUnion, I would say probably I

18    blame the entire thing, yes, I would say.

19         Q.   What -- okay, so you're not blaming

20    TrueLink, but you're blaming TransUnion, right?

21         A.   Of course.

22         Q.   Okay.  And, of course, you dismissed

23    your lawsuit against TransUnion, right?

24         A.   No.  The lawsuit from TransUnion was

25    changed into the lawsuit for TrueLink.

1    Q.   What did TransUnion do or not do that

2    you think facilitated Mr. Perez's misuse of

3    yours husband's Social Security number?

4    A.   They sold a credit report to Mr. Perez

5    quite abundantly.  They sold a credit report for

6    Mr. Perez to each of the furnishers that's

7    listed on the TU letter.

8    Q.   To your knowledge, have they done that

9    since August of 2003?

10    A.   To my knowledge, they have contacted

11    repeatedly certain furnishers regarding

12    Mr. Abundio Perez's reported data because we

13    have those in the subpoenas.

14    Q.   Do you -- this claim that you just

15    described, do you think that that's pending in

16    the lawsuit that you've filed against TrueLink?

17    A.   Which claim?

18    Q.   The claim that TrueLink, because

19    they're a subsidiary of TransUnion, is

20    responsible for your husband's identity theft?

21    Do you think that claim is pending right now?

22    A.   No, I don't.

23    Q.   Okay.

24    A.   This is strictly the -- this is

25    strictly about the contract breach of the

1    product for the credit monitoring.

2        Q.   Okay.  So, for purposes of the

3    lawsuit --

4        A.   Uh-huh.

5        Q.   -- you're not blaming TrueLink for the

6    misuse of your husband's Social Security number

7    that you discovered in 2003, right?

8        A.   I'm blaming TrueLink for not reporting

9    the information about that Social Security

10   number misuse after August of 2003.

11       Q.   Okay.  You understand, or maybe you

12   don't, but do you understand that TrueLink gets

13   information from TransUnion to provide the

14   products to you and your husband?

15       A.   Yes.

16       Q.   Okay.  If in fact TransUnion did not

17   disclose the information to TrueLink, then you

18   can't blame TrueLink for not disclosing it to

19   you and your husband; isn't that correct?

20       A.   Well, that would assume that you and

21   TransUnion had a truly separate relationship and

22   you were going out and buying information from a

23   third party with which you had no relationship.

24   But since the two companies are interrelated and

25   obviously have interrelated computer systems and

1    operating systems, and apparently you guys even

2    share accounting systems, the idea that TrueLink

3    would not know what TransUnion was or was not

4    providing is information or what information

5    that TransUnion provided had available to

6    provide to it is a little bit incredulous to me.

7        Q.    Did you or your husband ever advise

8    TrueLink that there was somebody out there

9    misusing your husband's Social Security number?

10       A.    I believe TrueLink has seen the

11   Consumer Victims Statement on our consumer

12   disclosure and that that information is

13   available to them.  The consumer disclosure

14   clearly states at the top have been an identity

15   theft victim, please contact me at my home if

16   any extensions or granting of credit, blah,

17   blah, and it gives a phone number.

18       Q.    Well, the consumer statement doesn't

19   mention Mr. Perez, does it?

20       A.    Well, that's because TransUnion didn't

21   put it in.  That's not how TransUnion puts that

22   information, but it's not like that is not a

23   standard consumer statement that you would not

24   be aware that that's not identity theft.  I

25   mean, I'm sitting here -- I'm sitting here

1    wondering how you expect someone else to notify

2    you of information that you have internally

3    available to yourself.

4        Q.    Okay, I'm going to go back to my

5    original question.  You and your husband,

6    neither one of you have ever advised TrueLink

7    that you believe there's a Mr. Perez out there

8    who's opening up credit accounts with your

9    husband's Social Security number; isn't that

10   correct?

11       A.    Well, I believe when we signed up for

12   the TrueLink product, we had to go through the

13   ICS process, because you couldn't activate the

14   credit report online.  And because it had a

15   Consumer Victims Statement, you had to go

16   through and extra verification process.  So, to

17   that extent, I think they knew already at that

18   time that I was a victim of -- we were victims

19   of identity theft.

20            Now, they did not specifically know

21   about Mr. Perez.  In other words, I didn't

22   communicate that fact to them during that call.

23   But, you know, to the extent that TransUnion

24   already had sent out that letter and had

25   received legal correspondence from Mr. Adler,

1    the fact that TrueLink doesn't know that is a

2    little bit incredulous to myself.  I mean, I

3    just -- I don't believe that.

4       Q.   Well, putting aside your beliefs or

5    contentions, I'd like you to answer my question.

6    Which is that you never advised TrueLink that

7    Mr. Perez was misusing your husband's Social

8    Security number to open up credit accounts;

9    isn't that correct?

10       A.   Well, I believed that I had, because

11    prior to the filing of this litigation, I

12    believed TrueLink and TransUnion were the same

13    entity.

14       Q.   Okay.  So you told TransUnion is what

15    you're saying?

16       A.   Yes.

17       Q.   Okay.  But you never told TrueLink,

18    right?

19       A.   Well, I mean, from where I sit, I

20    thought they were the same thing, so.

21       Q.   Okay.  And you never sent the

22    TransUnion letter to TrueLink, right?

23       A.   What do you mean I never sent the

24    TransUnion letter to TrueLink?  Why would I send

25    the TransUnion letter to TrueLink?

1      Q.    You didn't send it, right?

2      A.    No, I did not.

3      Q.    Okay.  And you never called TrueLink

4   and said I was expecting to see accounts

5   relating to Mr. Perez on my husband's credit

6   file and I didn't see it?  You never made that

7   call to TrueLink, did you?

8      A.    No, I didn't.

9      Q.    Did you -- strike that.

10          I'm going to show you an exhibit,

11   Mrs. Millett.

12               (M. Millett Exhibit 9 was marked

13   for identification by the reporter.)

14      Q.    (BY MR. O'NEIL) Mrs. Millett, I'm

15   showing you what's been marked Exhibit No. 9,

16   which I -- which I'll represent to you is the

17   complaint that was filed in the district -- in

18   the federal court in the District of Kansas on

19   behalf of you and your husband suing the seven

20   companies that you identified previously.

21      A.    Yes.

22      Q.    And you saw this before it was filed,

23   right?

24      A.    Oh, yes.

25      Q.    And you made sure that it was accurate,

```
1   right?

2       A.   Yep.

3       Q.   Okay.  Do you know what the Organized

4   Crime Control Act of 1970 is?

5       A.   Are you talking about RICO?

6       Q.   Yes.

7       A.   Yes.

8       Q.   Are you familiar with RICO?

9       A.   Uh-huh.

10      Q.   Okay.  And are you aware that you

11  brought claims against these certain defendants

12  under RICO?

13      A.   Yes.

14      Q.   But those claims were ultimately

15  dropped by your lawyers, weren't they?

16      A.   As the investigation wore on, yes.

17      Q.   Well, it was actually much -- I mean,

18  it was only a few months after you first filed

19  this lawsuit, right?

20      A.   Right, but the investigation was

21  ongoing at that time.

22      Q.   Okay.  I want to -- are you generally

23  familiar with the procedural course of all of

24  the various lawsuits that you've filed against

25  all the various defendants?
```

1      A.   I'm sorry, I don't understand what you

2   mean.

3      Q.   Okay.  You get all the pleadings that

4   were filed in this case?

5      A.   Yes.

6      Q.   Okay.  And you're aware that claims

7   were filed against certain defendants that were

8   voluntarily dismissed, right?

9      A.   Or dropped, yeah.

10      Q.   Yeah.  You're also aware that claims

11   were filed in one court and then later filed in

12   another court, right?

13      A.   For those claims where whatever the

14   contracts had specified jurisdictions then, yes,

15   those courts were moved.

16      Q.   Okay.  Were you disappointed when your

17   lawyers told you that they had to dismiss all

18   but one or two of the defendants from the

19   initial case and file separate cases in the same

20   court?

21            MS. YEAGER:  Objection.

22   Misstates the facts.  Lack of foundation.

23      A.   I'm sorry?  Can I get the question

24   reread please?

25      Q.   (BY MR. O'NEIL) You know what, I'll

1    withdraw it.  Were you surprised when you

2    realized that you had to file multiple

3    complaints in multiple courts before you finally

4    got the right to take discovery and get the

5    court to rule on motions?

6              MS. YEAGER:  Objection.  Lack of

7    foundation.  Misstates testimony.  Misstates

8    facts.  You can answer.

9        A.   Okay, can I get the question read back?

10       Q.   (BY MR. O'NEIL) Well, hold on, I want

11   to address Ms. Yeager's objection that I

12   misstated facts.  Are you aware that the first

13   lawsuit that was filed on behalf of you and

14   Mr. Millett by Barry Grissom and his colleagues

15   was the lawsuit that's right before you,

16   Exhibit 9?

17       A.   Yes, I'm aware of that.

18       Q.   Okay.  And then are you also aware that

19   a decision was made a few months later to

20   dismiss most of those defendants and sue them in

21   separate lawsuits?

22       A.   I believe this action remained and

23   became the Equifax case.

24       Q.   Right.  And you dismissed certain of

25   the defendants here from this case, and then you

1    filed separate lawsuits against them?

2        A.    They were refiled, yeah, I believe.

3        Q.    Okay.  Do you have an understanding as

4    to why only a few months after the initial

5    lawsuit was filed a decision was made to dismiss

6    some of these and refile the individual cases?

7        A.    I know a decision was made.  I can't

8    discuss the content of the decision -- of the

9    discussions that were made to get to this

10   decision.

11       Q.    Were you disappointed that it slowed

12   the progress of the litigation that that had to

13   occur?

14       A.    The progress of the litigation is what

15   the progress of the litigation is.

16       Q.    Uh-huh.

17       A.    I mean, am I disappointed every time

18   the court postpones something or extends

19   deadlines or, you know, we get a new judge and

20   they set up a new schedule, I mean, it is what

21   it is.

22       Q.    Uh-huh.  And then once the individual

23   lawsuits were brought in the District of Kansas,

24   you learned that they had to be dismissed and

25   then filed in other courts, other parts of the

1    country, right?

2        A.   I don't believe they were dismissed.   I

3    believe some of them were transferred.

4        Q.   Okay.  Good point, they were

5    transferred.  So, then the lawsuit in the

6    District of Kansas was over and you had to start

7    all over again in Georgia, in Delaware, in

8    California, right?

9                MS. YEAGER:  Objection.

10   Foundation.  Misstates facts in evidence.

11       A.   I don't characterize it as a starting

12   over because it, like for example in the

13   Experian case, we already had all of those

14   subpoenas.  So, the fact that it had move

15   California or moved from Kansas to California, I

16   don't view that as necessarily starting over.  I

17   didn't have to give back all the information

18   from the subpoenas.

19       Q.   (BY MR. O'NEIL) Did you ever have to

20   explain to your husband all of these various

21   procedural maneuvering in order to pursue the

22   claims?

23                MS. YEAGER:  Objection.

24   Misstates facts in evidence.  Foundation.

25       A.   Do you mean did I tell him that the

1    case moved to California or the case moved to

2    Delaware or the case moved to Georgia?  Yes, I

3    did tell him those.

4        Q.    (BY MR. O'NEIL) Okay.  And did you tell

5    him that's because the contract that you sued on

6    required you to sue in those cases -- in those

7    courts?

8        A.    We probably discussed that, but he may

9    not have gotten -- grasped all the nuances

10   associated with that.

11       Q.    Uh-huh.  Did he ever ask, well, why

12   didn't we just sue in those courts originally?

13       A.    No, he did not ask that question.

14       Q.    I count there's 13 counts or 13 claims

15   in the complaint which is marked Exhibit No. 9.

16   You can -- I can point you to particular pages,

17   but do you recall that you had common claims

18   against Equifax, TransUnion and Experian?

19       A.    I'd have to review it.

20       Q.    Okay.  Why don't we take --

21       A.    I haven't look looked at this since,

22   what, 2004 I believe.

23       Q.    Okay.  Well, let me direct your

24   attention to Page 9.  Well, actually, strike

25   that.  I mean, page -- well, let me direct your

1    attention to Page 5.  There's a heading there --

2        A.    Uh-huh.

3        Q.    -- that says, quote, "Opt-in class

4    action Class 1."  Do you see that?

5        A.    Yep.

6        Q.    Do you know what an "opt-in class

7    action" is?

8        A.    I believe that's where the class

9    members have to opt in.

10       Q.    Okay.  And the class action that you

11   brought against TrueLink, is that an opt-in

12   class that you're seeking?

13       A.    I believe it's an opt-out class.

14       Q.    Okay.

15       A.    Don't you specifically have to opt out

16   of the class?  I think so.

17       Q.    Okay.  Did you decide that you should

18   go from the opt-in class to an opt-out class

19   against TrueLink?

20              MS. YEAGER:  Objection to the

21   extent it calls for attorney-client privilege.

22              MR. O'NEIL:  I'm just asking if

23   she's decided it.

24       A.    I don't -- how could I -- I don't --

25   someone would have to sit down and explain to me

1    all the nuances of an opt-in versus an opt-out,

2    so.

3        Q.    (BY MR. O'NEIL) And no one has, right?

4        A.    I'm sure it's been discussed.

5        Q.    Okay.

6        A.    But as I sit here today, I cannot

7    recollect that, so.

8        Q.    Okay, I go back to my question.  Did

9    you decide that you would file an opt-in class

10   or an opt-out class action?

11       A.    How would I make that decision?  I'm a

12   regular person.

13       Q.    Ma'am, I'm just asking if you did.

14   It's really a yes or no question.

15       A.    Well, it's not really a yes or no

16   question, because if I don't understand the

17   nature of the question, then I can't answer yes

18   or no.  Because I don't know if I'm making the

19   correct answer or not making the correct answer.

20       Q.    Okay.  What don't understand the about

21   the question?  Here's the question and let me

22   know if you don't understand it.  You filed an

23   opt-in class action in July of 2004, right?

24       A.    Yes.

25       Q.    Did you make that decision?

1      A.    I believe the -- which claims were

2    included was a discussion that my lawyers had,

3    in terms of which claims were going to be

4    brought within the lawsuit.

5      Q.    I don't want to know about your

6    discussions with your lawyers.  Did you make the

7    decision to bring an opt-in class action?

8              MS. YEAGER:  Objection.  Asked

9    and answered.

10     Q.    (BY MR. O'NEIL) You can answer.

11     A.    Well, to the extent that I signed the

12    complaint, I guess so, but, you know.

13     Q.    Okay.  And when you filed I think --

14    what's the latest -- the fourth amended

15    complaint against TrueLink, which has an opt-out

16    class, did you make the decision to make that an

17    opt-out class as opposed to an opt-sin class?

18              MS. YEAGER:  To the extent it

19    calls for attorney-client privilege, I'll

20    object.

21     A.    I didn't make the decision.  That would

22    be one of those things where your attorney comes

23    and says these are your options, this is what we

24    want to pursue, this is what we recommend and

25    then you, as the client, go yay or nay.  But to

1    the extent that I signed the complaint, yes, I

2    guess I did ultimately make the decision.

3         Q.   (BY MR. O'NEIL) But you don't

4    understand the nuances between, the differences

5    between, an opt-in class and an opt-out class,

6    right?

7                   MS. YEAGER:  Objection.  Asked

8    and answered.

9         A.   I understand the basics, sir.  I don't

10   understand all of the legal ramifications of

11   what constitutes one or the other.

12        Q.   (BY MR. O'NEIL) Let me direct your

13   attention to a couple of pages and I'll have a

14   question after I -- Page 6.  At the bottom

15   there, there's a heading that's entitled "Class

16   Action Allegations - Conversion - Defendants

17   Equifax, TransUnion and Experian."  Do you see

18   that?

19        A.   Uh-huh.

20        Q.   Do you recall that your class action

21   allegations regarding your conversion claim

22   against Equifax, TransUnion, Experian were all

23   part of the same numbered paragraphs in the

24   complaint?

25        A.   I'm sorry, I don't understand that

1    question.

2        Q.    Okay.  Well, then I'll withdraw it.

3    Let me take your attention to Page 9.  Do you

4    see the heading there "Class Action Allegations

5    - Common Law Breach of Contract - Defendants

6    Equifax, TransUnion, Experian"?  Do you see

7    that, ma'am?

8        A.    Yeah.

9        Q.    And then Paragraph 32, as an example,

10    states, quote, "Plaintiffs bring this action

11    against Defendants Equifax, TransUnion and

12    Experian, under the common law of the state of

13    Kansas as a class action."

14        A.    Yes.

15        Q.    And then goes on to say, "Defendants,

16    Equifax, TransUnion and Experian breached the

17    express and implied terms of the contract for

18    sale of the plaintiffs and other members of the

19    class through the following acts," and then it

20    has a number of paragraphs.

21        A.    Yep.

22        Q.    Do you see that, ma'am?

23        A.    Uh-huh.

24        Q.    Great.

25        A.    Yes, I do.

1      Q.   Okay.  And then Page 11 there's a

2   heading "Class Action Allegations - Fraud and

3   Negligence - Defendants Equifax, TransUnion

4   Experian." Do you see that, ma'am?

5      A.   Yes.

6      Q.   And then in Paragraph 38, it refers to

7   common questions of law and fact arising in this

8   action, as an example, subparagraph A, "Whether

9   the conduct of defendants Equifax, TransUnion

10   Experian," and then it goes on. Do you see

11   that, ma'am?

12      A.   Yeah.

13      Q.   Okay.  Is this refreshing your

14   recollection that certain of the claims that you

15   were bringing against -- well, actually, I think

16   strike that. All of the claims that you were

17   bringing against TransUnion, Experian and

18   Equifax were all the same?

19      A.   Yeah.

20      Q.   Okay.  Because you had bought the same

21   types of products and you thought they had

22   failed in the same way, right?

23      A.   Well, I mean, they have similar

24   failures, yes.  I don't know that I'd use the

25   word "same".

1      Q.    So you'd use the word "similar" but not

2    "same"?

3      A.    Correct.

4      Q.    Bear with me, Mrs. Millett.  Now, the

5    claims that you brought against Bank of America

6    and Ford Motor were not class action claims,

7    correct?

8      A.    No, those were specific claims I

9    believe.

10      Q.    And what do you mean by that, "specific

11    claims"?

12      A.    They were specific claims to us I

13    believe, when they were refiled at least.

14      Q.    You have a case pending against

15    Experian Information Solutions; isn't that

16    correct, ma'am?

17      A.    I believe so, and I believe

18    consumerinfo.com is also on that suit too.

19      Q.    Okay.  Let me show you the complaint,

20    you're absolutely right.  Let me hand you what's

21    been marked Millett Exhibit No. 10.

22                (M. Millett Exhibit 10 was marked

23    for identification by the reporter.)

24      Q.    (BY MR. O'NEIL) Which has a stamp

25    indicating it was filed with the U.S. District

1    Court in Los Angeles on October 17, 2006.

2        A.   Well, it says it was lodged on the

3    16th, but.

4        Q.   Good point, I was looking at it says

5    filed below on the 17th, but.  I think the way

6    it works is nowadays you can -- well, it doesn't

7    matter.

8            To your knowledge, is this the pending

9    complaint that you've filed against Experian and

10   consumerinfo.com?

11       A.   Well, I'd have to read through it from

12   end to end to verify word for word that it's the

13   exact complaint, but.

14       Q.   Is that because you have the pending

15   complaint memorized, so that's how you can do

16   that?

17       A.   No, it's because -- it's because these

18   pleadings have changed significantly.  So, while

19   I review each pleading, for me to sit there an

20   say this is the latest pleading, I'd have to

21   read it and go through it to say yes it is or no

22   it is not.

23       Q.   Well, handwriting indicates this is the

24   fourth amended complaint?

25       A.   Okay.

1      Q.    Do you understand that means that this

2    is the fifth complaint that you've tried to

3    allege against Experian and CSC?

4              MS. YEAGER:   Objection.   Lack of

5    foundation.   Misstates facts.

6      A.    That's not my understanding.

7      Q.    (BY MR. O'NEIL) What's your

8    understanding?

9      A.    My understanding that -- is that as new

10   facts or evidence or understanding as derived,

11   that complaints have changed or claims have been

12   altered or changed to suit the circumstances

13   that are now present.

14     Q.    And this is the fifth one that you've

15   brought against Experian CIC, right?

16             MS. YEAGER:   Objection.

17   Foundation.   Misstates facts not in evidence.

18     A.    I believe it's the fourth one against

19   Experian Information Solutions and CIC.   I

20   believe the original litigation that was filed

21   in Kansas was against Experian Information

22   Solutions and did not include CSC at all -- or

23   not CSC, but consumerinfo.com, I'm sorry, I get

24   my acronyms screwed up.

25     Q.    (BY MR. O'NEIL) There's quite a few.   I

1    can represent to you and you can take a look at

2    it, it appears that there's two legal claims

3    being brought in this lawsuit.  The first one is

4    on Page 12, or at least begins on Page 12.  It

5    says, there's a heading there at the bottom

6    "Count I - Consumer Legal Remedies Act."

7        A.    Yes.

8        Q.    And do you have an understanding of

9    what that claim is based upon?

10       A.    That is the --

11              MS. YEAGER:  Objection.

12   Relevance.

13       A.    That is the California Consumer Legal

14   Remedies Act.

15       Q.    (BY MR. O'NEIL) Okay.  And then if I

16   could direct your attention, Mrs. Millett, to

17   Page 18, the bottom there, says "Count II --"

18       A.    Yes.

19       Q.    "Breach of contract."

20       A.    Uh-huh.

21       Q.    And I'll represent to you those are the

22   only two counts that I see in this complaint.

23   Is it your understanding that the pending

24   complaint you have against Experian and CIC is

25   one under the California statute, and two for

1    breach of contract?

2             MS. YEAGER:  Objection.

3    Relevance.

4        A.   I'm sorry, I don't understand the

5    question.  Are you talking about before or after

6    the' courts ruling?

7        Q.   (BY MR. O'NEIL) Well, I understand the

8    court dismissed certain of these claims.

9        A.   Okay.

10       Q.   Right.  The court dismissed your breach

11   of contract claim, right?

12       A.   No, not in its entirely.

13       Q.   Okay, just one part of it.  I guess

14   what I'm asking is, the court dismissed the

15   California statutory claim, right?

16       A.   I believe so.  But in the ruling when

17   they dismissed it, I believe the judge didn't

18   specifically reference -- he dismissed it, but

19   he didn't specifically answer it in his

20   judgement as to why it was dismissed.

21       Q.   So, as you sit here, you don't know the

22   reasons that he offered for why he dismissed

23   your California statutory claims?

24       A.   I don't think they were given.  But, I

25   mean, my recollection could be faulty as I sit

```
1    here.  But I think that that's one of the big

2    issues with that particular aspect of that

3    dismissal, was that the portion of the

4    California Legal Remedies Act were dismissed and

5    no reason for the dismissal was given.

6         Q.   Okay.  But the point is they were

7    dismissed, right?

8         A.   Yeah.

9         Q.   Okay.  And then your counsel then asked

10   the court to reconsider its decision, right?

11        A.   Yes.

12             MS. YEAGER:  Objection.

13   Relevance.

14        Q.   (BY MR. O'NEIL) And that motion was

15   denied, right?

16             MS. YEAGER:  Objection.

17   Relevance.

18        A.   Yes, that's correct.

19        Q.   (BY MR. O'NEIL) And so the only claim

20   you have pending against Experian now is a

21   partial breach of contract claim, right?

22             MS. YEAGER:  Objection.

23   Relevance.  May I have an ongoing objection?

24             MR. CLOON:  You have a standing

25   objection.
```

 1          MR. O'NEIL:  I gave it to you

 2     before.

 3          MS. YEAGER:  Thank you.

 4     A.   I'm sorry, can I have the question read

 5     back?

 6     Q.   (BY MR. O'NEIL) Yeah, I'll -- it's your

 7     understanding that what remains now, because the

 8     California statutory claim was dismissed, is the

 9     claim for breach of contract against Experian

10     and CIC, right?

11     A.   And I believe it's a very specific

12     breach of contract claim relating to the 30-day

13     renewal notice provision.

14     Q.   Because the other breach of contract

15     claims you brought were dismissed by the judge,

16     right?

17     A.   Right.

18          MR. O'NEIL:  Okay, I think we

19     have to change the tape again, so let's go off

20     the record.

21          VIDEOGRAPHER:  We are now going

22     off the record at 11:33 AM.

23          (Recess.)

24          VIDEOGRAPHER:  The time now is

25     11:42 AM and we are back on the record.  You may

1    continue.

2                    MR. O'NEIL:  Thank you.

3        Q.    (BY MR. O'NEIL) Mrs. Millett, I'm

4    handing you what's been marked as Exhibit No.

5    11, which is a document that was produced by

6    your lawyers in this case.

7        A.    Yep.

8        Q.    I know that you have provided testimony

9    regarding this document before, so I'll be

10   brief.

11                    (M. Millett Exhibit 11 was marked

12   for identification by the reporter.)

13       Q.    (BY MR. O'NEIL) Did you prepare what's

14   been marked as Exhibit No. 11?

15       A.    Yes, we did.

16       Q.    You said "we", did somebody else help

17   you prepare this?

18       A.    No, I prepared it, but my husband was

19   aware of it.

20       Q.    Oh, okay.  And what was your purpose

21   for preparing it?

22       A.    The purpose for preparing it was to

23   provide it to Senator Brownback's and Roberts'

24   office for some stuff that they had going up on

25   Capital Hill at that time.

1    Q.    Okay.  And do you recall -- you

2    forwarded it on to those Congressmen?

3    A.    Yes.  They're senators actually.

4    Q.    Okay.  Senators hate to admit it, but

5    technically Senators are Congressmen, too.  But

6    in any event, do you recall when you prepared

7    this, Mrs. Millett?

8    A.    I want to say it was some time in 2004

9    or late 2003, but I don't know the exact date

10   now anymore.

11   Q.    Okay.  And is the information contained

12   in Exhibit 11 accurate?

13   A.    It's accurate as of the time it was

14   produced.

15   Q.    Okay.  Do you believe that there's now

16   -- it's now inaccurate?

17   A.    Well, no, there are facts that have

18   been changed or altered by the arrival of new

19   evidence and information in this case.  So,

20   there are things in here that what we knew at

21   that time are not as -- they're not infactual,

22   but they've been altered.

23   Q.    Okay.  And as is indicated in

24   Exhibit 11, in approximately January 2003, you

25   requested the credit files regarding your

1    husband from each of the three major credit

2    bureaus, do you recall that?

3        A.    Yeah.    I also requested Abundio Perez's

4    credit report too.

5        Q.    Yeah, and you didn't get that, did you?

6        A.    No, I did not.

7        Q.    But you did get some information from

8    TransUnion that was helpful in your

9    investigation of Mr. Perez's misuse of your

10   husband's Social Security number, right?

11                MS. YEAGER:    Objection.

12   Foundation.

13       A.    I don't recall providing somebody a

14   list of accounts that tells you that you need to

15   dispute with each furnisher exactly helpful.

16       Q.    (BY MR. O'NEIL) Okay.    So, you didn't

17   get any helpful information from TransUnion?    Is

18   that your testimony?

19       A.    No, that's not the testimony.    I got

20   information from TransUnion.    The information

21   was not helpful because the information did not

22   contain the account numbers for the accounts in

23   question, which meant I every time I called one

24   of those furnishers, I had to go through three

25   days of agony, pain and whatever just to try to

1    get to the bottom of what accounts he actually

2    had for those furnishers.  And, in some cases,

3    those furnishers had five, six, seven, eight or

4    nine different accounts associated with them,

5    and it would have been helpful to know that

6    information.

7         Q.   What -- how did you get the information

8    regarding what furnishers to contact?

9         A.   I got that information from the TU

10   letter.  But that required the retainer --

11   retention of a lawyer and $1,750 worth of legal

12   fees to get that letter.

13        Q.   Well, how do you know that?

14        A.   What?

15        Q.   How do you know that you had to get a

16   lawyer before you could get the information from

17   TransUnion?

18        A.   Because TU didn't give me that letter

19   in January when I called.  They didn't give that

20   -- give me that letter until Adler sent them a

21   letter intending to sue in April of 2003

22   certified mail.

23        Q.   So, if you testified elsewhere that the

24   information from TransUnion was helpful, would

25   that have been false testimony?

1      A.    No.

2      Q.    Oh, okay.

3      A.    The information was somewhat helpful,

4   but, you know, I don't -- you're trying to

5   characterize it as, you know, TransUnion is

6   being altruistically helpful, and they're just

7   giving this information to me of their own free

8   will, and I don't see it that way.

9      Q.    I don't think that's what I asked you,

10  but.  Let me make sure I understand.   The

11  information was helpful in investigating

12  Mr. Perez's misuse of your Social Security

13  number; isn't that correct?

14     A.    Yes, the information was somewhat

15  helpful, yes.

16     Q.    And TransUnion didn't charge you

17  anything for that information; isn't that

18  correct?

19     A.    TransUnion didn't charge me anything

20  for the information?

21     Q.    Right.

22     A.    No, TransUnion did not charge me

23  anything to send that letter, but it cost me

24  money.

25     Q.    The letter cost you money?

1      A.    Sure it did.  I didn't get any

2  information from them until I hired a lawyer who

3  threatened to sue them.

4      Q.    And was this threat in writing?

5      A.    I believe Adler sent letters saying

6  that he was going to be seeking legal action if

7  they did not respond and provide the

8  information, so at that point the letter was

9  provided.

10      Q.    And TransUnion provided the information

11  that Experian and Equifax refused to provide,

12  right?

13      A.    I had not gotten a similar letter from

14  Equifax or Experian at that point, no.

15      Q.    Well, you've testified before that when

16  Mr. Adler made the same request of Experian and

17  Equifax, that they refused, right?

18      A.    They did not provide the information,

19  yes.

20      Q.    Okay.  And that testimony was accurate

21  when you testified previously, correct?

22      A.    Yeah.

23      Q.    Okay.

24      A.    Uh-huh.

25      Q.    Let me show you what's been marked

1    Exhibit No. 12, another document that was

2    produced by your lawyers in this case.

3                    (M. Millett Exhibit 12 was marked

4    for identification by the reporter.)

5         Q.    (BY MR. O'NEIL) Do you recognize

6    Exhibit No. 12?

7         A.    Yes.

8         Q.    And what is it?

9         A.    This is the consumer disclosure for

10   Steven G. Millett for January 28, 2003.

11        Q.    And Mr. Adler didn't request this, you

12   did, right?

13        A.    Yes, I did.

14        Q.    Okay.  And you were making that request

15   as an agent of your husband, right?

16        A.    Yes.

17        Q.    Okay.  And did you review it when you

18   received it?

19        A.    Yes.

20        Q.    Is that your handwriting on the first

21   page of the document?

22        A.    Yes.

23        Q.    What's a -- do you know, what did you

24   intend by the reference at the top there "10

25   years 1993-IRS"?

1      A.   Well, you know, one of the things that

2   happens to you, as I was going through the

3   investigation, I'm on the phone with somebody, I

4   don't have a piece of paper, so that's the note

5   from the Internal Revenue Service when I

6   contacted them, that said that they had tax

7   returns going back to 1993 for Abundio Perez.

8      Q.   Did you ever request information from

9   the IRS?

10      A.   Yes.

11      Q.   Did they give it to you?

12      A.   No.

13      Q.   You requested information regarding

14   Mr. Perez from the IRS; is that correct?

15      A.   I requested copies of Mr. Perez's tax

16   returns, yes.

17      Q.   And they refused to give it to you,

18   correct?

19      A.   They refused to give it to me.

20      Q.   Okay.  Is that your handwriting on the

21   bottom of the first page of Exhibit No. 12?

22      A.   Yes, it sure is.

23      Q.   And do you recall what that's a

24   reference to?

25      A.   It's probably some consumer relations

1    department I had to call.

2        Q.    You're aware that TransUnion has what's

3    called a Fraud Victims Assistance Department,

4    right?

5        A.    Yes.

6        Q.    Have you ever contacted that department

7    at TransUnion?

8        A.    I believe I have.

9        Q.    Okay.  And what was the purpose for

10   your contact with the FVAD?

11       A.    I've had numerous contacts with them, I

12   guess, over the period of the course of the

13   investigations.

14       Q.    What was the purpose of your contacts?

15       A.    Well, I mean, the purpose of the

16   contacts was to discuss, well, in some cases

17   like for example there were inquiries being

18   generated by some of Abundio Perez's furnishers

19   on Steve Millett's credit report.  And I had

20   called and specifically asked them to stop

21   giving his credit report to the fraudulent

22   account holders.

23       Q.    Uh-huh.

24       A.    There was one phone conversation with

25   the Fraud Victim Assistance Unit in which, when

1    I got the TU letter in particular, where I

2    called them and wanted to understand why they

3    didn't provide the account numbers and

4    information contained therein.  I mean, they

5    gave me the furnishers, but they didn't give me

6    the account numbers.

7        Q.    When's the last time you had any

8    conversations with any representative of

9    TransUnion, any employee of TransUnion?

10       A.    Well, I don't know when the last time

11   was we met with Amanda.

12       Q.    Putting that aside, because Amanda's

13   not an employee of TransUnion.  When's the last

14   time you called, telephoned, TransUnion about

15   anything?  Well, strike that.  You know

16   TransUnion has got their Fraud Victims

17   Assistance Department, right?

18       A.    Yeah.

19       Q.    When's the last time you called them?

20       A.    I mean, sitting here, I can't recall

21   the exact date.  I mean, I've called them, but I

22   would say probably by the time we had retained

23   Barry, I probably had stopped calling the Fraud

24   Victims Assistance Department by then.

25       Q.    Okay.  And then TransUnion never

1    charged you for your requests and their response

2    to the Fraud Victim Assistance Department,

3    right?

4         A.    No, those are services that they

5    provide under the Fair Credit Reporting Act for

6    disputes.

7         Q.    For free, right?

8         A.    Well, I'm assuming that they have some

9    cost associated with them as far as internally,

10   but.

11        Q.    Well, obviously, Mrs. Millett, I'm not

12   asking you about TransUnion's internal costs.

13   I'm asking a very simple question, which really

14   just is a yes or no answer.  Did TransUnion

15   charge you for your dealings with them?

16        A.    No.

17        Q.    The second page of Exhibit 12 has

18   what's called a "Consumer Statement" on it.

19        A.    Yep.

20        Q.    Did you ask TransUnion that that

21   consumer statement be put in the file?

22        A.    Yes.  Either I or Mr. Adler.  It

23   depends on -- well, this one is 1/28, so this

24   one's me, this is the 30-day alert or 90-day

25   alert or whatever.  There was later a seven-year

1    alert added, so that's a different animal.

2        Q.    You think this is a 90-day alert?

3        A.    This is a 90-day consumer statement.

4    They fall off after 90 days.

5        Q.    Okay.  And what's the basis for that

6    statement?

7        A.    What?

8        Q.    That you believe they fall off in 90

9    days?

10       A.    Because when you call the credit

11   bureaus and you do not request it in writing,

12   the fraud alert that is added to your file is

13   only good for 90 days.  You must request in

14   writing a seven-year fraud alert.

15       Q.    Did you ever do that?

16       A.    What?  Request a seven-year fraud

17   alert?  Yes, I did.

18       Q.    In writing?

19       A.    Uh-huh.

20       Q.    To TransUnion?

21       A.    I didn't write it, my lawyers did.

22       Q.    Which one?

23       A.    It's in some of the legal

24   correspondence somewhere.  I believe it was

25   conversations with Amanda or whatever, the

1   seven-year alert was put on.

2       Q.   Okay, we're getting confused here.  Did

3   you ever write to TransUnion and ask that a

4   seven-year fraud alert be put on your husband's

5   file?

6       A.   No, I have not.

7       Q.   Okay.  Did any of your lawyers ever

8   write to TransUnion and ask that a seven-year

9   fraud alert be put on the file?

10      A.   I believe that that conversation has

11  occurred, yes.

12      Q.   Conversation?

13      A.   Well, I mean, I believe it happened in

14  the room.  Amanda was physically at the legal

15  office.

16      Q.   Were you in the room?

17      A.   Yes, I sure was.

18      Q.   But it wasn't in writing?

19      A.   I don't know if my lawyer sent Amanda

20  an e-mail or not to follow-up.

21      Q.   Okay.  Did you -- the consumer

22  statement on Page 2 of Exhibit No. 12 is

23  obviously has, you know, it says, "Potential

24  Fraud Victim Alert," and goes on.  Did you draft

25  that?  Did you ask that TransUnion put this

1    particular language --

2        A.    No, this is stock language.  They do

3    this for everybody.

4        Q.    You say they do this for everybody,

5    what does that mean?

6        A.    Anybody -- if you were to call their

7    800 number, type in your Social Security number,

8    verify some identifying pieces of information,

9    press option one, this alert would appear on

10   your credit file.

11       Q.    Are you also aware that you have a

12   right to put 100-word statement on your file

13   that you can write?

14       A.    Yes, I'm aware of that, but that's not

15   what's been done.  This has been done by the

16   system.

17       Q.    You've never prepared a unique

18   statement and asked that TransUnion put it on

19   your husband's file; is that right?

20       A.    On my husband's file, that is correct.

21       Q.    Have you prepared a unique statement

22   and asked that it be put on your file?

23       A.    Yes.  That would be a correct

24   statement.

25       Q.    And what does that statement say?

1    A.   I don't know.  I haven't looked the at

2    it in probably ten years, so I don't even know

3    if it's still on there or not.  It's been quite

4    a while.

5    Q.   I'm not asking if it's on there.  I'm

6    asking what was the statement that you asked

7    that TransUnion put on your file?

8    A.   It's very similar in nature to this,

9    but I don't know the exact wording because I

10   haven't looked at it in ten years.

11   Q.   I won't ask you for the exact wording.

12   But what -- so you claim to be a victim of

13   identity theft ten years ago?

14   A.   No.  It was not identity theft.  I was

15   having problems with an ex-husband.

16   Q.   Okay, well, you said it's the same as

17   this, and this says, quote, "My identifying

18   information may have been stolen."  That's not

19   what your statement says?

20   A.   It's a consumer statement, so it's the

21   same as this.

22   Q.   Okay.

23   A.   It's in the same box on the credit

24   report.

25   Q.   The consumer statement has a phone

1      number there, do you see that?

2          A.    Yes.

3          Q.    What phone number is that?

4          A.    That's our home phone number.

5          Q.    Okay.  Has any credit grantor ever

6      telephoned you at home saying that we want to

7      extend credit to Mr. Millett, but we were told

8      we had to contact you first?

9          A.    No.  Someone's called us at home and

10     said we're verifying a credit application that

11     you've made.

12         Q.    Oh, okay.  To your knowledge, has the

13     presence of this statement on Mr. Millett's file

14     ever made it more difficult for him to get

15     credit?

16         A.    Yes, it has.

17         Q.    Now, do you blame TrueLink for that?

18         A.    I'm sorry?

19         Q.    Do you blame TrueLink for the fact that

20     it was more difficult for Mr. Millett to get

21     credit because of the consumer statement that

22     you put on his file?

23         A.    Why would I -- why is that even -- why

24     -- no.

25         Q.    When you reviewed -- did Mr. Millett

1    review this credit report when --

2         A.    I'm sure he's seen it at some point in

3    time.

4         Q.    Okay.  Did you note that there were any

5    errors in this report when you reviewed in

6    January 2003?

7         A.    The only error -- the only thing we had

8    questions about and that we didn't -- but we

9    didn't have questions at this time, so disputes

10   were not made at that time, were some questions

11   relating to -- information relating to Farmers

12   Insurance Group, because that was also Abundio

13   Perez's insurer.

14        Q.    Really?

15        A.    Yes.

16        Q.    How do you know that?

17        A.    Because I have documents from the

18   subpoenas that show that, from Ford Motor Credit

19   in fact, that showed that Farmers Insurance was

20   one of the insurance carriers of Abundio Perez.

21        Q.    Okay.  Well, but you didn't dispute it

22   in January 2003, right?

23        A.    I didn't dispute it in January of 2003

24   because I wouldn't get those documents until

25   later of 2004.

 1        Q.   Well, let me turn your attention to

 2   Page 2, it has the Farmers inquiries.

 3        A.   I understand that, but we also had

 4   Farmers Insurance at that time.

 5        Q.   Oh.

 6        A.   So, in other words, I don't know by

 7   looking at this whether or not this inquiry

 8   relates to Steve Millett's -- they're looking

 9   for Steve Millett or they're looking for Abundio

10   Perez.

11        Q.   Okay.  So, when you saw this in January

12   2003 and you saw the inquiries from Farmers

13   Insurance, you assumed that that was because you

14   had been doing business with Farmers, right?

15        A.   We assumed that, but that may not be

16   the case any longer.

17        Q.   Have you ever subpoenaed Farmers

18   Insurance?

19        A.   I'm not sure, but I'm pretty sure that

20   I think that some of the insurance companies had

21   received subpoenas, but I'm not sure which ones.

22        Q.   And if you got documents from those

23   subpoenas, you would have seen them, right?

24        A.   Right.  But some of the companies had

25   destroyed their documents, so by the time the

1    subpoenas issued, in some cases, there were no

2    documents to get, so...

3        Q.   But, as you sit here, you don't have

4    any knowledge that these inquiries from Farmers

5    were prompted by an application by Mr. Perez,

6    right?

7        A.   Well, that's why I was asking earlier

8    about the master file, because that will tell

9    you which information -- what this information

10   was released for.

11       Q.   Really?

12       A.   Yeah.

13       Q.   That's your understanding?

14       A.   My understanding --- well, yeah, they

15   keep a record of each inquiry and what

16   information was used to generate that inquiry.

17   Because the inquiries have to appear for two

18   years.

19       Q.   Have you ever seen an inquiry on

20   Mr. Millett's file that you know was a result of

21   an application made by Mr. Perez?

22       A.   The answer to that would have to be no.

23   But that does not mean there have not been

24   inquiries on Mr. Millett's file relating to

25   accounts belonging to Mr. Perez.

1           (M. Millett Exhibit 13 was marked

2     for identification by the reporter.)

3         Q.   (BY MR. O'NEIL) Mrs. Millett, I'm

4     handing you what has been marked as Exhibit 13,

5     which is another set of documents that were

6     produced by your lawyers in this case.  It's

7     actually two documents, one is a letter to

8     Mr. Millett dated April 10th, 2003, from

9     TransUnion?

10        A.   Uh-huh.

11        Q.   The second is a letter from TransUnion

12    to Mr. Millett dated April 23, 2003.  Do you see

13    that?

14        A.   Uh-huh.

15        Q.   And you saw these documents and they

16    were received by your husband in April of 2003,

17    right?

18        A.   Yep.

19        Q.   Is that your handwriting on the first

20    page, ma'am?

21        A.   Sure, it is.

22        Q.   Okay.  And could you read the first

23    handwriting notation on that page?

24        A.   "Fraud alert not to be added to

25    fraudulent file, nor will file be deleted."

1       Q.    Okay.  Is this information that you got

2    from TransUnion?

3       A.    What?

4       Q.    That the fraud alert would not be added

5    to the fraudulent file, nor will the file be

6    deleted?

7       A.    I believe that probably came from the

8    Victims Assistance Department.

9       Q.    Okay.  So, it wasn't information that

10   you got from Mr. Adler, it was information you

11   got directly from TransUnion?

12      A.    I believe so.

13      Q.    Okay.  So, do you recall contacting

14   TransUnion when you got these letters?

15      A.    Around the time frames, yeah.

16      Q.    Okay.  You didn't have to pay your

17   lawyer to calls TransUnion, you just did it

18   yourself, right?

19      A.    Yeah.

20      Q.    And then what's the second handwriting

21   on that page, ma'am?

22      A.    "Files are split.  Fraud alerts do not

23   work."

24      Q.    And what does that mean?

25      A.    It means that during this time period

1    Abundio Perez actually got another automobile

2    loan because they didn't even get the fraud

3    alert.

4         Q.    How did you discover that?

5         A.    Well, that -- huh?

6         Q.    How did you discover that?

7         A.    Because we were talking to Ford Motor

8    Credit at this point in time.

9         Q.    And Ford Motor told you what?

10        A.    That they were -- that they told us

11   that the only fraud alert that they had in their

12   file was on the reports they were receiving for

13   our accounts, that they did not have a fraud

14   alert on their account -- for their other

15   accounts for Abundio.

16        Q.    Okay.  You first put the fraud alert in

17   your husband's file in January of 2003, right?

18        A.    That was the phone call one where you

19   dial the 800 number, like I was telling you, and

20   you push the prompt and they add the fraud

21   alert.  This one is where the protective

22   statement was added by Adler, because he wrote

23   letters to them requesting.

24        Q.    Okay.  The handwriting on this

25   document, did you make these notations in April

1    of 2003 when you first contacted the FVAD after

2    you got these letters?

3        A.    I don't know.  They could have been

4    notes I made much later.  I couldn't even

5    speculate as to the time period as to when they

6    were made.  It could have been notes I wrote on

7    there for my attorneys when I turned the

8    documents over to Barry's office.  I don't

9    remember.

10       Q.    Well, I guess I'll go back to what I

11   said before now in light of your comment there.

12   The first handwriting that you described for

13   us --

14       A.    Uh-huh.

15       Q.    -- that says, "Fraud alert not to be

16   added to fraudulent file"?

17       A.    Uh-huh.

18       Q.    Did you get that information from

19   TransUnion?

20       A.    TransUnion did tell me that, yes.

21       Q.    Okay.  And was that when you first

22   contacted them in following up in April of 2003?

23       A.    Yes.

24       Q.    Okay.  Do you have any reason to

25   believe that you didn't make that notation in

1    April of 2003?

2        A.    Yes, I do.

3        Q.    Why?

4        A.    Because I make notes on documents when

5    it became relevant to make the -- like for

6    example, on the second page where it goes, this

7    makes no sense.  I know that this notation here

8    wasn't put on until way much later.

9        Q.    Okay.

10       A.    So, I mean, what I do is, as I'm going

11   along and I make notes, sometimes I made notes

12   on the relevant document.  So, I can't say that

13   I made this notation on this document in April

14   of 2003.

15       Q.    Okay, I appreciate that.  And in any

16   event, the information about the fraud alert not

17   be being added to the fraudulent file, you got

18   that from TransUnion?

19       A.    Oh, yeah.

20       Q.    Okay.

21       A.    They told me they would not put our

22   fraud alert with our number on the Abundio Perez

23   file.

24       Q.    Okay.  And then the information that

25   you have in the other handwriting, "Files are

1    split.  Fraud alerts do not work," where did you

2    get that information?  Or where did you get the

3    information that lead you to that conclusion?

4         A.   That was much later.

5         Q.   Okay.  And that was -- what information

6    did you get that lead you to that conclusion?

7         A.   Like I said, you know, in dealing with

8    the investigation and talking to the different

9    furnishers over time, some of the furnishers in

10   question Steve Millett already had a fraud alert

11   on file and they were still receiving

12   information from the credit bureaus obviously on

13   Abundio Perez on active accounts, and they still

14   has not received Mr. Millett's fraud alert.

15        Q.   I understand now.  So, turning to the

16   second document, after you got this information

17   from TransUnion, you started contacting each of

18   the data furnishers that TransUnion identified

19   for you, right?

20        A.   Right.

21        Q.   And it was during the course of those

22   phone calls that you learned the information

23   that lead you to believe that files are split,

24   fraud alerts do not work?

25        A.   Right.

 1      Q.    Okay.

 2      A.    Because I talked to -- for example,

 3   we'll just take for an example on here, Chase,

 4   NA.  This guy, Chase, Chase Mortgage, and --

 5   Chase, NA, Chase Mortgage and then there's

 6   another Chase, Chase had three accounts, a

 7   mortgage, a car payment and a credit card.  Neal

 8   had a three-in-one credit report for Abundio

 9   Perez.

10      Q.    Neal?

11      A.    That's the guy I talked to.

12      Q.    Okay.

13      A.    And he had three-in-one credit report

14   for Abundio Perez, and he specifically told me

15   that your fraud alert does not appear anywhere

16   on there.

17      Q.    And when did you start making these

18   phone calls to all the data furnishers listed on

19   the April 23 letter?

20      A.    Would have been some time on or after

21   maybe April 26 or so, because the mail three

22   days, you know, bring it home, lay it on the

23   counter for a day and then you go open it up and

24   go -- because I thought it was another credit

25   report and, you know, you get nine, 10 credit

1    reports in the mail, they were piling up or

2    whatever.  I work on them when I can.

3        Q.   But then after you finally opened them

4    up, that's when you started making all these

5    phone calls, right?

6        A.   Well, first, I looked at this and I

7    didn't know what to do, and the first phone call

8    I made was to the Foleys at the Identity Theft

9    Resource Center.

10       Q.   Okay.  And do you recall anything about

11   that conversation?

12       A.   I mean, it was just a general

13   conversation.  I was freaked out.  Linda and Jay

14   are particularly good at calming down.  They

15   provide, you know, victims assistance,

16   counseling, support, that kind of thing.

17       Q.   Who are Linda and Jay?

18       A.   Linda and Jay Foley?  At the Identity

19   Theft Resource Center.

20       Q.   Oh, okay.

21       A.   Yeah.

22       Q.   I don't know them.  But soon after

23   April 2003, when you first started making these

24   calls at the end of April 2003, you determined

25   that there was separate files for your husband

1    and for Mr. Perez, right?

2        A.   Well, that was the assumption.   I

3    didn't have concrete proof of that.

4        Q.   Understood.

5        A.   Yeah.   Because obviously none of this

6    information had ever been on our file or we

7    would have called somebody and disputed it.

8        Q.   Right.   And some of the data furnishers

9    are saying, well, we got credit reports from

10   Mr. Perez and there's no fraud alert there,

11   right?

12       A.   Well, not only that, but they couldn't

13   understand how they had gotten the credit report

14   for Mr. Perez when Mr. Millett had a police

15   report and a Social Security card with the

16   actual number that was being used.

17       Q.   Now, by my count, there's 28 different

18   furnishers identified on the April 23rd letter?

19       A.   Yep.

20       Q.   And you got even more information about

21   the particular accounts that each furnisher had

22   with Mr. Perez, right?

23       A.   That's correct.

24       Q.   Okay.   To your knowledge, had any of

25   those accounts showed up on your husband's

1    credit file?

2        A.    The accounts themselves?

3        Q.    Yes.

4        A.    Not on the consumer disclosure, but I

5    don't know that they're not hidden in the master

6    file.

7        Q.    Okay.  Aside from your suspicion that

8    there is something being hidden by TransUnion,

9    you don't have any evidence that these accounts

10   were actually on Mr. Millett's file, correct?

11               MS. YEAGER:  Objection.

12   Foundation.

13       A.    I don't know.  I think inquiries count

14   as being on someone's file.  So, I mean, to the

15   extent that inquiries are also disputable

16   information, I mean, if you want to be

17   technical, no trade lines have ever appeared.

18       Q.    (BY MR. O'NEIL) Okay.  What was your

19   husband's reaction -- your husband never dealt

20   with the bureaus, right, directly?

21       A.    Well, at that point in time, my husband

22   was too -- too angry to properly deal with

23   anybody.

24       Q.    Oh, that's why you assumed the

25   responsibility?

1    A.    Well, it's not totally.    Part of the

2    reason I assumed the responsibility is a lot of

3    this stuff is all computer related.    It all

4    relates to how the database is transmitted and

5    receive information, how they store information,

6    what the nature of the cliche is.    And so when I

7    call customer service, I already know how the

8    systems work, it's easier for me to tell them

9    what's wrong and how to fix it.

10    Q.    Well, it was also, according to your

11    husband, it was also because you were the one

12    that handled those matters for him, right?

13    A.    Right.    I'm the only one who would

14    probably know exactly which account number

15    should be appearing on the report in the first

16    place, because I pay all the bills for all these

17    car notes and loans and stuff.

18    Q.    When -- Ms. Yeager once told me that

19    you wear the pants in the family.    Would you

20    agree with that statement?

21            MS. YEAGER:    Objection.

22    Foundation.

23    A.    Yeah, I would agree with that statement

24    in terms of I wear the pants in the family.    But

25    I wouldn't necessarily mean that that means

1    Steve assumes a subservient role.  I mean, he

2    and I are partners in everything.  I mean, to

3    me, the term "pants in the family" means like

4    I'm in charge and he does what I say, and that's

5    not how it is.  We do a lot of things together.

6    Each of us have their own specialties and things

7    that we're good at, and those that are good, do,

8    and those that are good at other things, do

9    other things.

10        Q.   (BY MR. O'NEIL) So, do you recall

11   explaining to your husband what you had learned

12   after you got this information from the credit

13   bureaus and the furnishers?  Did you explain to

14   him at that time, I'm guessing this is in May of

15   2003, that Mr. Perez has opened up numerous

16   accounts using his Social Security number?

17        A.   Well, I believe we had the discussion

18   in April when we first got the letter before I

19   even started calling, but by May and possibly

20   the beginning of June, we were aware that each

21   one of these furnishers in some cases had as

22   many as five, six, seven, eight accounts.

23        Q.   Uh-huh.

24        A.   So, I mean, you know, it's not 28

25   accounts, it's 26 credit cards, 11 automobile

1    loans and two mortgages are represented by this

2    data.

3        Q.   I understand.  Did you or your husband

4    -- well, strike that.

5        Did you take any comfort in knowing

6    that in fact TransUnion was maintaining separate

7    files regarding Mr. Perez and Mr. Millett, as

8    opposed to combining the information?

9        A.   No.  That's a complete fallacy.  There

10   is no comfort in that whatsoever, because it

11   denied us the right to dispute the information,

12   to go back to the furnishers and make them

13   remove the data from their system.

14       It allowed Abundio to operate as an

15   independent person with a legitimate credit

16   report and a background check that allowed him

17   to get a job for like a significant period of

18   time.

19       Q.   So, you would have preferred that

20   TransUnion combine the information regarding

21   your husband and Mr. Perez?  Is that your

22   testimony?

23       A.   Yes.  Because at least then it would

24   have been visible and you could have disputed

25   it.  What we had instead were people who just

1    didn't want to do business with us.  Didn't just

2    want to grant us any credit whatsoever.  And we

3    had no explanation why and nobody would give us

4    any information why.

5            I can sit here today in 2006 and tell

6    you that I can go back and through history and

7    point to numerous occasions where very funny

8    things happened as far as credit was concerned,

9    like when we were denied our first time home

10   buyer from FHA.  But now with the information I

11   now have, I now know that that's a result of

12   information from Chase Mortgage contained right

13   here on this TU letter.

14       Q.   Are you telling me that you know that

15   you were denied loans?

16       A.   Well, no, we got the loan, but we only

17   got the loan because we have significant

18   resources and could afford to juggle until we

19   made the bank gives us the loan.  You put enough

20   money down, they're going to give you the

21   mortgage eventually.

22            But I didn't get the same mortgage

23   someone else would have gotten if I wanted to go

24   in and have a first time buyer and put $5,000

25   down and buy a house.  That opportunity was

1    denied to me.

2         That opportunity was taken by Abundio

3    Perez as a result of this Chase Mortgage right

4    here.  And this Chase Mortgage here was filed

5    with the Federal Housing Association in which

6    Mr. Perez was allowed under my husband's Social

7    Security number to take our first time buyer

8    from the FHA.

9         So, this credit report from TransUnion

10   that provided this Chase Mortgage credit report,

11   the one that I'm telling you about Mr. Knowell

12   (phon), Mr. Knowell has, is the one that caused

13   us to lose our right to have a first time buyer

14   purchase from FHA.

15      Q.   So, when the FHA was considering your

16   loan application --

17      A.   They already had Abundio.

18      Q.   Can I finish my sentence?

19      A.   Okay.  I'm sorry.

20      Q.   Is it your testimony that when the FHA

21   considered your loan application, that they had

22   pulled a TransUnion credit report?

23      A.   Not FHA, no.  Chase.

24      Q.   Okay.  So, Chase pulled a TransUnion

25   credit report?

1      A.    They have all three, they pulled a

2    three in one.  Most mortgage companies do.

3      Q.    Do you have any evidence that Chase

4    pulled a TransUnion credit report in connection

5    with your FHA loan application?

6      A.    We only have the data that's contained

7    in the subpoena from Chase, and I'm not sure if

8    they provided any documents or if those

9    documents were destroyed, because some of them

10   had documents destroyed.

11     Q.    So, that's what I'm trying to figure

12   out what the facts are.  What facts do you have?

13     A.    I have the documents from the FHA.

14     Q.    And do any of those documents indicate

15   that Chase pulled a credit report from

16   TransUnion?

17     A.    I have the testimony of their fraud

18   person who told me on the phone when I contacted

19   him in relationship to the letter right here in

20   May where he told me he had a three-in-one

21   credit report from TransUnion, Equifax and

22   Experian.

23     Q.    Relating to the FHA loan that you had

24   made?

25     A.    No.

1      Q.    Or relating to an application that

2   Mr. Abundio Perez had made?

3      A.    It was for Abundio's FHA mortgage.

4      Q.    Okay.  Here's what I'm trying to

5   understand, I understand that all this is very

6   upsetting and I completely understand that.  I'm

7   trying to understand facts which can stand up in

8   a court of law that somehow attributes whatever

9   damages you and your husband believe you may

10  have suffered to the conduct of TrueLink.  Do

11  you hold TrueLink responsible for whatever

12  happened to your FHA loan in 1999?

13     A.    Well, I didn't have a relationship with

14  TrueLink, as it was, until August of 2003, or,

15  yeah, 2003.  So, to the extent that that

16  occurred prior to that point, the answer to that

17  would be I guess no.  However, TransUnion would

18  still be responsible, and they're your parent

19  company, so.  You know, but that has nothing to

20  do with the claims that have been filed here

21  which were for breach of contract.

22     Q.    Right.

23     A.    And I do understand the difference

24  between the two.

25     Q.    Okay.  Do you hold TrueLink responsible

1    for any denial of credit that you or your

2    husband may have suffered?

3        A.    Well, to the extent that I guess

4    TrueLink is not a credit reporting agency, how

5    could they be responsible for a denial of

6    credit?  I don't understand that.

7        Q.    So the answer is no, right?

8        A.    Well, the answer is no, but I don't

9    agree with that premise necessarily.

10       Q.    What premise?  Was there a premise in

11   my question?

12       A.    No.  There's a premise in your

13   contract.  TrueLink asserts in its contract that

14   it's not a credit reporting agency, and that

15   their documents do not -- their reports do not

16   have to be Fair Credit Reporting Act compliant

17   because they're not a credit reporting agency.

18       Q.    Well, the issue, Mrs. Millett isn't

19   whether or not they're a credit reporting

20   agency, the issues is -- to your knowledge,

21   TrueLink has never disclosed information

22   regarding your husband to anybody other than you

23   and your husband, right?

24       A.    Well, I don't know who TrueLink sells

25   data to.  So, I couldn't answer that question.

1   That would be TrueLink's business process, and I

2   don't know if their business arm is selling

3   products to third parties or whatever.  I don't

4   know.

5       Q.   Okay.  Well, putting aside what you

6   don't know, let me ask you what you do know.  Do

7   you have any information that would -- do you

8   have any evidence that TrueLink discloses credit

9   information regarding your husband to anybody

10  other than you and your husband?

11      A.   I don't have any information to that

12  respect, no.

13      Q.   And that's why you don't hold TrueLink

14  responsible for any credit denials that you or

15  your husband may have suffered, right?

16      A.   Well, that's -- if that assertion

17  remains true, then, yes, that would be true.

18      Q.   Okay.  So, getting back to you said

19  that you would have preferred that TransUnion

20  merged the files of Mr. Perez and your husband,

21  because then you could have disputed Mr. Perez's

22  accounts, right?

23      A.   We would have known a lot sooner.  We

24  would have known in some cases, six, seven,

25  eight, nine years earlier.

1    Q.   Well, why do you say that?

2    A.   Because in 1998 when we went to buy our

3    house in Phoenix on less-than-favorable terms,

4    three-in-one credit reports were pulled.  If the

5    Abundio data had already been merged with the

6    Steve Millett data, it would have appeared when

7    we pulled that credit report.

8         My husband went to apply for a car loan

9    in 1996 for the Ford Thunderbird, which was not

10   accepted, so we bought the car outright.

11        That particular --  if the data had

12   been merged, because Mr. Perez already had a

13   credit file at that time, we would have been

14   notified of the identity theft then.  So, the

15   issue becomes -- is we would have been notified

16   much sooner, I mean, by a factor of years.

17   Q.   Okay.  So, let's assume that your

18   speculation is true.  Then what would have

19   happened that hasn't already happened?  What

20   benefit would accrue to you if in fact that had

21   occurred?

22   A.   Well, we'd be further down the road to

23   restoring our life.  This is a very time

24   consuming -- I mean, restoring your life after

25   identity theft is a very time consuming process.

1      Q.   So --

2      A.   It can take years.

3      Q.   So, instead of going that process in

4  2003, you would have gone through it in 1999?

5  Is that your testimony?

6      A.   Or in 1996.  Or 1994.

7      Q.   Okay.  So, let's just say going with --

8              MR. O'NEIL:  Why do you keep

9  touching your witness?  I prefer that you not do

10  that.

11             MS. YEAGER:  I am putting my hand

12  under the table, and what I have under the table

13  is my leg and a chair.

14             MR. O'NEIL:  Okay, so you haven't

15  been touching your witness at certain points

16  during the deposition today?

17             MS. YEAGER:  Not intentionally.

18             THE WITNESS:  I kicked her once

19  earlier.

20      Q.   (BY MR. O'NEIL) Let's say that

21  TransUnion had merged the two files, as you now

22  wish they had and you would have been alerted to

23  this identity theft.  Then you would have

24  disputed Mr. Perez's accounts on your husband's

25  credit report, right?

1      A.    Oh sure.

2      Q.    And then, presumably, TransUnion would

3    have made sure that those trade lines never

4    showed up on your husband's credit file, right?

5      A.    And any time he had gone to apply for

6    credit as well, the creditors would have known

7    that the number belonged to Steve Millett and

8    not Abundio Perez.

9      Q.    Well, how -- I mean, when your husband

10    applied for credit, he didn't apply for credit

11    very often, when your husband applied for

12    credit, nobody thought that he was using

13    Mr. Perez's Social Security number, right?

14      A.    That would not be a true statement.

15      Q.    Oh, okay.  Why is that not true?

16      A.    Because my husband received specific

17    credit denials that specifically say "unable to

18    verify Social Security number."

19      Q.    Well, that's because you put the

20    consumer statement on his file, right?

21      A.    No.  The Exxon Mobil was an Abundio

22    Perez account holder.  The problem you're

23    missing with all this is once Abundio Perez goes

24    into somebody's computer system, and they only

25    allow one holder for each Social Security number

1    in that system, that well has been polluted.

2        Q.   Okay, but that's not a problem with the

3    credit file, it's a problem with the internal

4    file of Mobil or Exxon or whoever it is, right?

5        A.   No.  That's a problem with the credit

6    file because the credit file is the one that

7    went out there and polluted the well in the

8    first place.  Because you represented to those

9    people that this person was the legitimate

10   person to grant credit to.

11       Q.   And all this is why you sued TransUnion

12   in July 2004, right?

13       A.   It was part of the reason.  An

14   additional reason was over the credit monitoring

15   products as well, yeah, uh-huh.  Because, if I

16   remember correctly, the suit in 2004 also had

17   Fair Credit Reporting Act counts in it as well.

18       Q.   Okay.  Well, but it sounds to me like

19   you've got two separate types of claims that

20   you've alleged in all these lawsuits.  One has

21   to do with the identity theft and the fact that

22   you believe certain companies, Bank of America,

23   Ford Motor, maybe even the credit bureaus,

24   somehow facilitated the identity theft that you

25   discovered in early 2003, right?

1    A.    That's correct, yes.

2    Q.    Okay.  And then you've got other claims

3    that say and then after I discovered this

4    identity theft, I bought credit monitoring

5    products and they didn't work, right?

6    A.    Correct.

7    Q.    The only claims you have left against

8    TrueLink are those latter claims that the

9    product didn't work, right?

10    A.    That is correct.  But to the extent

11    that the product sits on top of the data, the

12    fact that the bureau is or is not providing you

13    all of the data or whether or not it's providing

14    to you and you're not providing it to me, I

15    think that's relevant to TrueLink's claims.

16    Q.    What data has TrueLink not provided to

17    you that you believe they should have provided

18    to you?

19    A.    Public record judgements were filed

20    with my husband's Social Security number in 2004

21    while we were subscribed to the product that

22    were not notified in the product.  In addition

23    to that, there were credit accounts belonging to

24    Abundio Perez over 2004 and 2005, most notably

25    which would be the Home Depot account and J. C.

1    Penney's account, and then later the CB USA,

2    Citibank USA account that were relabeled to

3    Steve Millett's name and address and/or

4    variations thereof that were never alerted in

5    the product.

6          According to your own documents which

7    you've supplied, the actual credit monitoring

8    subscription itself as registered with TU was

9    allowed to fall off and lapse for well over

10   three months before it was finally restored and

11   put back on while you were charging us.

12          And in the meantime, the product

13   proceeded to produce blank alerts which would

14   tell you you have an alert, something's changed

15   in your file.  You would go into the product,

16   click on the web link, the alert would come up

17   and be a completely blank white box with nothing

18   in it.  And I had just used my quarterly credit

19   report from the product, because the product

20   only gives you one report quarterly, and I would

21   be forced to buy a new report thinking it was

22   going to show me some change, and then there was

23   nothing.  It matched the report I had just

24   opened two weeks ago from my quarterly allowance

25   and I had just -- now I'm out 9.95.

1      Q.   Any other complaints that you have

2   against the TrueLink product?

3      A.   I'm sorry, I'm thinking.

4      Q.   Take your time.

5      A.   Yeah, my other complaint on the

6   TrueLink product would be that the product is

7   being marketed now for bulk purchase for

8   companies that are now purchasing it to give to

9   their data breach victims.

10      Q.   Are there any other complaints, other

11   than what you just described, that you have

12   regarding the credit monitoring service that you

13   bought on behalf of your husband from TrueLink?

14      A.   Well, the lack of notification e-mails,

15   they could have provided an alert at any time

16   that said, hey, someone's using your Social

17   Security number.  They don't have to give me

18   Abundio's file, but they could have said, hey,

19   your Social Security number appears in six other

20   people's credit reports.  I think that to me

21   would be a big indicator that you had a problem.

22   And it wouldn't violate anybody's privacy.

23      Q.   Anything else?

24      A.   Notification as to the inquiries.  When

25   soft inquiries are generated, because a lot of

1    these fraud people that are out there doing

2    fraud research for the furnishers made soft

3    inquiries.  If soft inquiries, the people who

4    make soft inquiries or make hard inquiries that

5    they disclose the information used to generate

6    the inquiry.

7            In other words, if they were looking

8    for give me data on ███████████ the name was

9    Abundio Perez and you showed them Steve

10   Millett's credit report, I think I have a right

11   to know that.

12        Q.   I'm not sure I understand.

13        A.   Okay, we'll go back to this exhibit

14   here.  Because it'll be easier for me to show

15   you.  For example --

16        Q.   For the record, what exhibit are you

17   referring to?

18        A.   This is Exhibit No. 12.

19        Q.   Thank you.

20        A.   On Exhibit No. 12, do you remember me

21   telling you about the Farmers Insurance exhibits

22   inquiries that were listed on here as a

23   permissible purpose where I could not identify

24   to you whether these are Abundio Perez's

25   insurance policies or my husband's insurance

1     policies?  It's on Page 2 of 3 at the top where

2     it says "Farmers".

3          Q.   So, what you're saying then is you

4     think TrueLink should have told you what

5     identifying information was used by the

6     inquirer --

7          A.   To generate this inquiry.

8          Q.   Okay.  Is this just something you wish

9     they would do or is that something you actually

10    believed that you would get as part of this

11    service?

12         A.   Well, I would think that if inquiries

13    were being generated as a result of the Abundio

14    Perez's information, like the Citibank inquiry

15    la was that that information would be disclosed

16    to me.  Because it would be an indicator of

17    identity fraud, and they're promising complete

18    identity theft protection.  So, I mean, the

19    Citibank USA inquiry that appears on the

20    TransUnion credit reports from later on in 2004

21    I believe and 2005 that particular inquiry was

22    generated -- my husband doesn't have an account

23    with Citibank and never did.  It was generated

24    as a result of this account that's listed here

25    on this portion of the TransUnion letter from

1    what used to be Home Depot.

2         Q.   So, you didn't need to get the

3    identifying information, you knew right away

4    there wasn't related to your husband, right?

5         A.   Which one?

6         Q.   The Citibank one?

7         A.   The Citibank one I knew, yes.  Because

8    they called me.

9         Q.   Well, no, when you saw this Citibank

10   one, you said wait a minute, my husband doesn't

11   have a Citibank card, he never applied for

12   Citibank.  I happen to know that Perez did.  You

13   knew right away without getting information from

14   TrueLink that that was what you believed to be a

15   fraudulent inquiry?

16        A.   No, it was not.  Because Citibank is

17   also a furnisher, they provide card services for

18   numerous individuals besides Home Depot.  So,

19   for example, we don't have a Citibank card, that

20   doesn't necessarily mean that some card that we

21   do have is not managed by them.

22        Q.   When you saw the inquiry, did you think

23   it was a fraudulent inquiry?

24        A.   I had questions about it, but I didn't

25   know if it was fraudulent or not fraudulent

1    until I got more information on it.  I mean, you

2    can't look at an inquiry and just go

3    automatically this inquiry is fraudulent.  But

4    if you know this Farmers -- because I have -- we

5    had Farmers Insurance.  But if this Farmers

6    Insurance had come through and said, you know,

7    the information that we used to produce this

8    inquiry said Abundio Perez in Los Angeles,

9    California, I would have been going, uh, wait a

10   minute, that's not me.

11        Q.   Well, TrueLink told you that they would

12   advise of any inquiries, right, so that you

13   could investigate if you wanted to?  TrueLink

14   didn't tell you that we're going to give you all

15   the identifying information that was used to

16   make that inquiry; isn't that correct?

17        A.   Well, here's the problem.

18        Q.   Could you just answer my question

19   before you go off and whatever it is you want to

20   say?

21        A.   I'm -- I am trying to answer your

22   question.

23             MR. O'NEIL:  Could you please

24   read my question back so that that's what she's

25   answering?

```
 1                    (Whereupon, the requested portion
 2      of the record was read by the reporter.)
 3           A.   No, that's not correct.
 4           Q.   (BY MR. O'NEIL) What's not correct
 5      about it, ma'am?
 6           A.   It's not correct because the inquiry
 7      that you're presenting on a report with Steve
 8      Millett's name and Social Security number should
 9      be associated with that particular individual.
10      So, based on the way your product -- based on
11      the way you just presented that, the Citibank
12      inquiry should never have appeared on
13      Mr. Millett's report or they should have never
14      been given the report.
15           Q.   Maybe you misunderstood my question.  I
16      was asking you about what TrueLink told you they
17      would do.  Did TrueLink ever tell you that when
18      we alert you to an inquiry, we're going to give
19      you all of the information that was used to make
20      that inquiry?
21           A.   Well, my understanding is when you say
22      complete, you mean complete.
23           Q.   I will ask the question again.  When
24      TrueLink advised you that as part of the credit
25      monitoring service that you would be alerted to
```

1    inquiries, did TrueLink further tell you that

2    you would be receiving the identifying

3    information which formed the inquiry?

4        A.    They already -- they provide the --

5    they do provide the identifying information of

6    the furnisher in the inquiry.

7        Q.    You know what we're talking about here,

8    Mrs. Millett.  We're talking about the

9    identifying information that the furnisher sent

10   to the credit bureau.

11       A.    Okay.  But from where I sit, for that

12   inquiry to be on Mr. Millett's report in the

13   first place, that inquiry should have contained

14   Mr. Millett's information.

15       Q.    So, your complaint is on what

16   TransUnion puts and doesn't put on your

17   husband's file, right?

18       A.    Well, that's correct.  And then the

19   assertions that are made by TrueLink on the

20   basis of information that they know about how

21   the file behaves that they're not sharing with

22   the general public.

23       Q.    I will go back to my original question.

24   TrueLink never told you that when it would alert

25   you and your husband to an inquiry, that it

1    would provide the name, address and Social

2    Security number that was provided by the data

3    furnisher as part of the inquiry; isn't that

4    correct?

5        A.   I believe the only word it uses is the

6    word "inquiry," it doesn't specify how complete

7    or not.  But there are other advertisements in

8    the actual product advertising where they talk

9    about and use the words such as "total,"

10   "complete," you know.

11           I mean, I'm sitting here going if

12   you're going to provide an alert about an

13   inquiry, and you're going to say you have an

14   inquiry and that inquiry was generated as a

15   result of data that does not match the file

16   you're presenting it in, how can you not

17   acknowledge that that's some form or a possible

18   fraudulent activity that would need be

19   identified by a product that advertises complete

20   identity theft production.

21           MR. O'NEIL:  I think it's time to

22   change the tape, so let's take a break.

23           VIDEOGRAPHER:  We are now going

24   off the record at 12:35.

25           (Recess.)

1           VIDEOGRAPHER:  It is now

2    1:43 p.m. and we are back on the record.  You

3    may continue.

4           Q.   (BY MR. O'NEIL) Thank you.  Good

5    afternoon, Mrs. Millett.

6           A.   Good afternoon.

7           Q.   Do you understand that you're still

8    under oath?

9           A.   Yes.

10          Q.   Are you aware of any instances after

11   August 6th of 2003 in which Mr. Perez used your

12   husband's Social Security number to open up a

13   new account?

14          A.   I believe that there are possible

15   instances of that, yes.  But I have no

16   definitive proof let's just say.

17          Q.   Do you have any proof?

18          A.   Well, his house on Pico Street was

19   refinanced in like the spring of 2005 or four, I

20   believe, I can't remember which year exactly it

21   is.  And I don't know if that information is

22   currently being reported under Steve Millett's

23   Social Security number or not.  I know the

24   number is attached to the file, but I'm not sure

25   if it was used in the initial credit granting

1    process.  Or that his wife was not the one that

2    was using the number.  So, I mean, that's what

3    the issue is there.

4        Q.   Any other possible openings of accounts

5    by Mr. Perez using your husband's Social

6    Security number that you're aware of?

7        A.   Judgements that were reported in the

8    Ford Motor case when Ford Motor obtained a legal

9    judgement using Steve Millett's Social Security

10   number, I believe that one was in 2004 as well.

11   That's when they start calling to collect the

12   judgement.

13       Q.   Ford Motor had a judgement entered

14   against Mr. Perez?

15       A.   Yes.

16       Q.   How did you learn that?

17       A.   There were two ways I learned about

18   that.  One was through LexisNexis public records

19   search, and the other one was via phone calls

20   that were made by Ford Motor Credit to the house

21   about Mr. Perez's debt that was outstanding.

22       Q.   Do you know why -- was Mr. Perez not

23   paying his bills to Ford Motor?  Is that what

24   prompted the judgement, do you know?

25       A.   What prompted the judgement was the

1    cars were repossessed, and the sell-off of the

2    cars did not satisfy the note deficiencies.

3        Q.    Okay.  And the cars were repossessed

4    because you alerted Ford Motor to the fact that

5    Mr. Perez had submitted a fraudulent

6    application, right?

7        A.    No, because when I initially alerted

8    Ford Motor, they took no action.

9        Q.    Do you have an understanding as to why

10   Ford Motor repossessed the cars?

11       A.    Yes, because I sent an e-mail to the

12   CEO.

13       Q.    So you prompted the repossession of the

14   automobiles?

15       A.    Yes.

16       Q.    Okay.  And you also succeeded in having

17   many of Mr. Perez's credit grantors close his

18   accounts, right?

19       A.    That would be a true statement.

20       Q.    Okay.  How many accounts do you think

21   you managed to have closed?

22       A.    Well, I know I was successful in a

23   majority of cases.  It's probably easier to talk

24   about the exceptions than it is to talk about

25   the ones that were actually closed, because, I

1    mean, to sit there and try and rattle off I

2    closed this one or I closed this one, it's

3    not --

4        Q.   That's fine.  But your understanding is

5    that you succeeded in having most of the

6    accounts that you learned about through

7    TransUnion's April 2003 letter that they be

8    closed?

9        A.   Some of the accounts were already

10   inactivated.  What I succeeded in doing is

11   marking them so they could not be reactivated.

12   But then there were some accounts that were not

13   closed.  And even though the furnishers in

14   question said that they had been closed, they

15   did not close them.  And then there were of

16   course some accounts that I did close.

17            I don't know if I'd characterize it as

18   "most" simply because there's a mixture in there

19   of different account statuses.

20       Q.   So, let me ask you about how you've

21   been able to remedy the misuse of your husband's

22   Social Security number.  Or maybe put another

23   way how you were able to limit Mr. Perez's

24   ability to benefit from the misuse of your

25   husband's Social Security number.  You prompted

1      Ford Motor to repossess his two cars, right?

2          A.    It took six months, but yes.

3          Q.    Okay.  You were able to have some of

4      his accounts closed, right?

5          A.    Yes.

6          Q.    Are you aware of any other consequences

7      to Mr. Perez resulting from your investigation

8      of what he had done?

9          A.    Yes.  He was convicted by the

10     Department of Motor Vehicles of lying to the

11     California DMV.

12         Q.    Do you know what kind of penalty he got

13     as a result of that conviction?

14         A.    I have no idea.  I know that it

15     originally went up there were like three charges

16     that were made, I think that was the only one

17     that was eventually followed through on.  I

18     think they were either dropped or reduced or he

19     pled guilty or however that works.

20         Q.    And have you seen any court records or

21     police records that indicate the criminal

22     charges being filed against him?

23         A.    I think the record that we received was

24     like just a partial record of what that

25     information contained, like there were three

1    charges.  I think that was another LexisNexis by

2    credit card public record thing.  So, whatever

3    the little blurb is that's available for that

4    online, then that's what I saw.

5         Q.   Aside from the repossession of the car,

6    the closing of certain accounts and the

7    conviction, are you aware of any other

8    consequences to Mr. Perez as a result of your

9    efforts?

10        A.   I'm not sure, but I believe that at

11   some point in time that he lost his employment

12   and/or that his employer made him come back

13   using a different name and Social Security

14   number.  That would be Bonds.

15        Q.   Because you contacted the credit union,

16   right?

17        A.   I contacted his employer directly.

18        Q.   Okay.  And you advised his employer

19   that he was using your husband's Social Security

20   number?

21        A.   Uh-huh.

22        Q.   And you think that he may have lost his

23   job as a result of that?

24        A.   Well, no, I know he's working there

25   again now.

1      Q.    Okay.

2      A.    But he may be using a different name

3  and Social Security number.

4      Q.    Are you aware of any other consequences

5  to Mr. Perez as a result of your efforts?

6      A.    Not directly.  I mean, unless other

7  parties have taken actions that I'm not aware

8  of, so.

9      Q.    I mean, is it fair to say that

10  Mr. Perez learned that the people whose SSN he

11  stole were after him?

12      A.    I would --

13            MS. YEAGER:  Objection.

14  Foundation.  Misstates the evidence.

15      A.    I'm sorry.  Repeat the question.

16            MR. O'NEIL:  Misstates the

17  evidence?  I'll withdraw the question.

18      Q.    (BY MR. O'NEIL) Given that you were

19  able to -- given that his two cars were

20  repossessed, he had some accounts closed without

21  any action by him, he was convicted by the

22  California DMV for submitting -- I'm sorry, he

23  was convicted for submitting false information

24  to the California DMV, his employer learned

25  about his misuse of the Social Security number,

1    would you say it's fair to say that he was aware

2    that his misuse of your husband's Social

3    Security number had been discovered?

4         A.    I would say that that was probably a

5    fair statement.

6         Q.    Yeah.  Do you have any reason to

7    believe that despite all that knowledge he

8    continued to use your husband's Social Security

9    number?

10        A.    It's possible him or his wife, and that

11   there's now a new file for his wife using the

12   number.

13        Q.    File where?

14        A.    At the credit bureaus.

15        Q.    How do you know that?

16        A.    Because there have been inklings of

17   documents and things that are contained in

18   documents, like the house purchase I was talking

19   about earlier, where Abundio Perez's name is not

20   on it but the Social Security number is on it

21   and his wife's name is on it and the house is

22   now titled in the public records solely in

23   Manuela's name.  So, it is possible that they

24   just exchanged numbers now, and they are now it

25   at whatever it is they were doing again.

1    Q.    On behalf of your husband, you

2    purchased certain products from TrueLink in

3    August of 2003, right?

4    A.    Yes, sir.

5    Q.    Okay.  And have you always been the one

6    to access the e-mails and the website of

7    TrueLink on behalf of your husband?

8    A.    Pretty much, yeah, uh-huh.

9    Q.    Okay.  I mean, to your knowledge, your

10   husband never accessed the website, right?

11   A.    Not where he went like by himself and

12   logged in, no.

13   Q.    Okay.  And you testified I believe

14   earlier today that you let the subscription to

15   credit monitoring lapse in November of 2006

16   because -- when the credit card was no longer

17   active, right?

18   A.    Correct.

19   Q.    Okay.

20   A.    But the subscription probably would

21   have continued on for like three months, because

22   I think they renew it quarterly.  So, you know,

23   that was the last payment that was made.  So

24   whatever it is, three months or the quarter is

25   after that date is probably when it expired,

1    which January, maybe February of '07, I don't

2    know.

3        Q.    Okay.  Did you continue to get e-mails

4    from TrueLink until January or February 2007?

5        A.    I got an e-mail from TrueLink yesterday

6    advertising for me to come back and resubscribe

7    to the product.

8        Q.    Did you continue to get e-mails, credit

9    monitoring alert e-mails, from TrueLink until

10   January or February this year?

11       A.    Well, they only give you -- send you an

12   alert if you -- if there's been a change.

13       Q.    Okay.

14       A.    So, there's not been an alert e-mail in

15   January or February of '07.

16       Q.    When was the last time you got an

17   alert?

18       A.    Oh, it's been I think in December some

19   time.

20       Q.    December of 2006?

21       A.    Yeah.

22       Q.    Okay.

23       A.    When we bought the car.

24       Q.    That inquiry prompted the alert; is

25   that right?

1    A.    I think it was the reporting of the new

2    trade line that prompted the alert.

3    Q.    Okay.  Wouldn't you also get e-mails if

4    there were no alerts?  Like after a month, would

5    you also get an e-mail saying there's been no

6    alerts in the last month?

7    A.    Some months you get those, some months

8    you don't.

9    Q.    Okay.

10    A.    I don't know if it's a problem with the

11    spam filters or whatever.  I mean, I have my own

12    personal spam filter and I check those pretty

13    regularly to make sure that I get all the

14    e-mails that I need to be getting.  But

15    sometimes you can get black listed at a domain

16    and, for example, sbcglobal, which is my ISP

17    rejects all the e-mail from that provider before

18    it even gets to your mailbox.

19    Q.    Did e-mails from TrueLink ever show up

20    in your spam folder?

21    A.    Occasionally they'll show up in the

22    spam folder and I just take them out and put

23    them back in my regular white list folder.

24    Q.    Since you filed this lawsuit in 2004,

25    have you printed out of the all of the e-mails

1    you got from TrueLink?

2        A.    No.  They're in electronic format.

3        Q.    Okay.  So you have all of those e-mail

4    in electronic format?

5        A.    If I've received them, minus -- I can't

6    say I have every single one of them.  I had a

7    massive hard drive failure at one point in my

8    computer, and I lost a lot of data.  So, I mean,

9    to the extent that I had it backed up and it was

10   on a backup disk, I have that information.  But

11   if it wasn't on the backup disk, it may have

12   been lost, so I could be missing a couple.

13       Q.    When did the hard drive failure occur?

14       A.    I'm trying to think, I think it was in

15   December of '04.  I've had more than one.  I've

16   had two over the course of the litigation.

17       Q.    When was the other failure?

18       A.    I think I had another one at the end of

19   '05 or beginning of '06 where I had a hard drive

20   just die.  I have a ray-to-ray, so that's two

21   hard drives stacked on top of each other and

22   basically they operate together as one full

23   drive.  And so if one fails, sometimes you lose

24   information.

25       Q.    Have you made any effort to -- well,

1    strike that.

2         Do you know that TrueLink has served

3    requests for documents on you and your husband

4    in connection with this lawsuit?

5    A.    Yes.

6    Q.    And did you ever review those requests?

7    A.    Yes.

8    Q.    Okay.  And did you make any effort to

9    give documents to your lawyers at that time in

10   response to that request?

11   A.    Yes.

12   Q.    Okay.

13   A.    But my lawyers have received all the

14   documents, most of the documents they received

15   up front.  Documents relating to e-mails from

16   the product that have been ongoing since 2004 to

17   current are sent to my lawyers on a regular

18   basis.

19   Q.    Have you sent e-mails to your lawyers

20   that you -- strike that, that was a bad

21   question.

22        Have you sent to your lawyers e-mails

23   that you have received from TrueLink since

24   August of 2005?

25   A.    I believe so.

1          Q.   I mean, because you got e-mails, many

2     e-mails after August of 2005, right?

3          A.   I've gotten some e-mails, yes.

4          Q.   Okay.

5          A.   Those are all zipped up and forwarded

6     on a regular basis.  I send those ought.

7          Q.   Okay.

8          A.   So, if they exist, they've been

9     produced.

10         Q.   To your lawyers?

11         A.   Yeah.

12         Q.   But you don't know if the lawyers have

13    produced them to us, right?

14         A.   What do you mean?  No, I don't know

15    that.

16         Q.   Right.  Have you viewed the website,

17    the True Credit website, since August of 2003?

18         A.   Yes.

19         Q.   And how frequently have you reviewed

20    the website since then?

21         A.   I don't know how you would -- how

22    frequent -- how you would characterize frequent.

23    I mean, you go in and you get a quarterly credit

24    report, that report doesn't change for the life

25    of the quarter.

1    Q.   If I can interrupt you.  I understand

2   that you obtained products from TrueLink, like

3   credit reports and scores, whatever else.  What

4   I'm asking is, whether or not, separate and

5   apart from retrieving that information either in

6   an e-mail, whatever, have you ever just like

7   viewed the, you know, the general website itself

8   that's available to everybody?

9               MS. YEAGER:  I'm going to object

10  to the extent this would call for you to reveal

11  attorney-client privilege to the extent that any

12  of that has been done as work product in the

13  course of working with your attorneys and it has

14  been discussed as attorney-client privileged,

15  you're not to disclose that.

16   Q.   (BY MR. O'NEIL) Okay, let's be clear

17  because I don't think Ms. Yeager understands my

18  question.  I'm not asking about any

19  communications you've had with lawyers.  I'm not

20  asking why you viewed the website.  I'm not

21  asking you if you did it at the instruction of

22  your counsel.

23              I'm simply asking if, since August of

24  2003, you have viewed the pages of the website

25  that, for example, describe the credit

1    monitoring product?

2        A.    Yes, I have.  Because you'd have to in

3    order to be able to get to the product.  You

4    cannot access your subscription without going

5    through the TrueLink site.  So, to the extent

6    that you would go out online --

7        Q.    Okay.

8        A.    -- to view your report, you would have

9    to go through the website in order to get there.

10       Q.    I mean, there's product pages which

11   describe the products that TrueLink sells,

12   right?

13       A.    Oh sure.

14       Q.    So, if you want to access your alert,

15   do you have to read through all of the marketing

16   materials regarding the credit monitoring

17   product?

18       A.    Well, they're on the front page right

19   when you get to the TrueLink.com site.  So, I

20   mean, the marketing materials are right there,

21   the ad is right there when you get to the web

22   page.

23       Q.    Did you print -- whenever you would

24   visit the site, did you print out pages from the

25   website that you viewed?

1     A.   Well, I believe in 2003 I did, but I

2    don't do it on every occasion, no.

3     Q.   Well, I'll show you some pages that

4    have the description on TrueLink's website in

5    August of 2003 regarding the credit monitoring

6    product.  Is it your testimony that in order for

7    you to access any product from TrueLink, you had

8    to look at that page or go through that page

9    first?

10     A.   I believe in the upper right-hand

11    corner there's a little button that says "log

12    in" that's what you click on to log on to the

13    product.

14     Q.   Okay.  That's on the home page?

15     A.   Yeah.

16     Q.   Okay.  There's a home page and then

17    there's pages that describe particular products,

18    right?

19     A.   Well, the home page has products

20    described on the front of it.

21     Q.   I understand.  I understand.  And --

22     A.   And I might click those ads and go and

23    view some information, but where that takes me

24    to --

25     Q.   Okay.

1      A.    -- in the site I can't say without the

2   HTML code in front of me that say this page

3   links to this page.

4      Q.    With I believe the exception of two

5   pieces of paper, the only website -- the only

6   screen prints from the TrueLink website that

7   were produced by your lawyers are in August of

8   2003?

9      A.    That would be a true statement.  I

10  haven't printed anything from the website since

11  then I don't think.

12     Q.    Okay.

13     A.    Unless maybe there's a printed credit

14  report or something like that where I've gone in

15  and printed out the product credit report.

16     Q.    I understand.  Have you ever viewed the

17  description that TrueLink has regarding credit

18  monitoring service since August of 2003?

19     A.    It's all over the web.  I mean,

20  obviously I do a lot of Google research on

21  identity theft.  So, I mean, every time I go to

22  Google, I get an ad or marketing for TrueLink

23  when you do searches associated with identity

24  theft.  So, you know, you click on the link and

25  you look at the stuff.  So, where that goes, I

1   don't know if that's at TrueLink's site or if

2   that's at another site.

3       Q.   Right now I'm just talking about the

4   TrueLink website.  Have you ever viewed

5   TrueLink's description of the credit monitoring

6   product since August of 2003?

7       A.   I just answered that question, yes.

8   But it's been as a result of I'm on Google, I'm

9   researching identity theft matters and a link

10  will come up for TrueLink that's protect your

11  identity or whatever and I might click on it and

12  that will take me to a page.  Now, whether

13  that's in TrueLink's site or not in TrueLink's

14  site, I can't say.  But it is marketing material

15  for the TrueLink product.

16      Q.   But you never printed that out?

17      A.   No.

18      Q.   Do you think it's relevant to this

19  lawsuit?

20      A.   What?

21      Q.   The marketing of the credit monitoring

22  product that you saw since August of 2003?  Do

23  you think that's relevant to this lawsuit?

24      A.   Well, I mean, yeah, it's relevant.

25      Q.   Okay.  Did you notice any changes in

1   the marketing of the product since August of

2   2003?

3       A.   There's been subtle changes in wording

4   and whatnot.

5       Q.   Uh-huh.  And do you think those changes

6   made the marketing more accurate, less accurate

7   or didn't make a difference?

8       A.   Well, I still think that the marketing

9   the way that it's currently being phrased and

10  presented to people leads people to believe that

11  the product contains features and services that

12  it does not contain, yes, I believe it's still

13  inaccurate.

14      Q.   But you couldn't really tell me in what

15  way, because you don't have that actual

16  marketing materials, right?

17      A.   Well, if you'd like, I'll go home

18  tonight and print out the site and I'll send it

19  to you and I'll tell you why I think it's

20  inaccurate.

21      Q.   That might be helpful actually.

22            MS. YEAGER:  Counsel's going to

23  request that you put that request in writing.

24            MR. O'NEIL:  Well, I think --

25  well...

1      Q.    (BY MR. O'NEIL) From August of 2003

2  until the time that your subscription lapsed,

3  had you been paying on a monthly basis for the

4  credit monitoring service from TrueLink?

5      A.    I believe it's billed quarterly.

6      Q.    Okay.

7      A.    And I believe there's also a period of

8  time between August of 2003 and August -- and

9  2006 when the last payment was made that there

10 was a period of time which the product was

11 provided pro bono, I believe it was three months

12 or four months or whatever, and that was a part

13 of the discussions with Amanda.

14     Q.    Okay.  But during -- since August of

15 2003 until some time recently, you had access to

16 the credit monitoring service; is that right?

17     A.    For the most part, yes.

18     Q.    Okay.  Did the access lapse at any

19 time?

20     A.    Well, there was the period of time

21 where it was sending out alerts and the

22 alerts -- you would log into the products and

23 the alerts were blank.  So, you could say that

24 the product was malfunctioning.

25     Q.    Uh-huh.  With the exception of some

1    free months that you think Amanda promised you,

2    as far as you know, did you and your husband pay

3    for the product during that entire time period?

4         A.    Yes.

5         Q.    And have you made any effort to find

6    records that showed that you had paid for those

7    products?

8         A.    I believe they're on your documents

9    that you produced where it has my credit card

10   number and my name and the dates and the amounts

11   that were paid, so.

12        Q.    And you reviewed that information?

13        A.    I reviewed that information.

14        Q.    Was it accurate?

15        A.    I think it's probably accurate for the

16   time period it covers.  I'm not sure it covers

17   the entire time period, because they may be

18   rolling transactions off or whatever.

19        Q.    Have you made any effort yourself to

20   find proof in your records as to when you've

21   paid TrueLink?

22        A.    Well, I mean, I have my bank statements

23   if that's what you're referring to.

24        Q.    Well, I'm just asking if you made any

25   efforts to find your own records?

1          A.    Well, yeah, I have my bank records.

2          Q.    Have you looked at those for that

3     purposes?

4          A.    I look at my bank records everyday, but

5     not just for that purpose.

6          Q.    Okay.  If we can just focus on what my

7     question -- I'm sure you look at your bank

8     records for other purposes, that's not what I'm

9     asking you.  What I'm asking you is, have you

10    ever made an effort to review your own bank

11    records to determine what you've paid TrueLink

12    over the years?

13               MS. YEAGER:  I'm going to object

14    to the extent this has been done as the result

15    of attorney-client information and direct you

16    not to disclose anything we might have discussed

17    that was privileged.

18         Q.    (BY MR. O'NEIL) Okay, well, once again

19    I'm not asking about your conversation.  I think

20    to date I've never asked about your

21    conversations with your lawyers.  So, let's go

22    back to what I'm asking you.

23               Have you made any effort to determine

24    to find in your record what you paid TrueLink?

25         A.    Yes, me and my attorneys are working on

1    that.

2        Q.    What have you done in that regard?

3        A.    I'm working on obtaining and providing

4    all the bank records, which are having to be

5    extracted from microfilm at the bank.

6        Q.    Really?  You don't have copies of your

7    own bank statements in your home?

8        A.    Of course not.  Bank statements through

9    the mail are the best way to have your identity

10   stolen at the mailbox.

11       Q.    Okay.  So, when -- you've asked the

12   bank for these records?

13       A.    Yes.

14       Q.    When did you ask them?

15       A.    I believe about a week ago.

16       Q.    And when are you going to get them?

17       A.    Don't know until the people in India

18   write back and tell me, because you know online

19   banking is all done via e-mail.  So, I've sent

20   the request out and they're supposed to respond

21   as to whether or not and how far back the

22   information exists.

23       Q.    It was just a week ago that you made

24   this inquiry?

25       A.    I think it was just a week ago that the

1    specific question came up of the specific

2    charges that people wanted the information for

3    that.  So I went out to get the bank records

4    specifically for this purpose.

5         Q.    On behalf of your husband, you've also

6    purchased credit reports and other products from

7    TrueLink, right?

8         A.    That would be correct.

9         Q.    None of those are really mentioned in

10   your complaint though, do you recall that?  I

11   mean, your complaint is about credit monitoring,

12   that's the product you reference in the

13   complaint?

14        A.    Correct.

15        Q.    Do you -- are you suing -- are you

16   suing TrueLink with regard to the other products

17   that you purchased other than credit monitoring?

18        A.    I think we've reduced it just down to

19   the breach of contract for the credit monitoring

20   TrueLink product, so yes.  But, I mean, in the

21   beginning, I think that we were suing for fair

22   credit reporting violations which would have

23   concerned the reports that were involved.

24        Q.    And are you suing -- have you ever

25   purchased credit monitoring for yourself?

1      A.    No.  Not that I'm aware of.

2      Q.    Okay.  Have you ever purchased any

3  products from TrueLink for yourself?

4      A.    I think there was a purchase made for a

5  three-in-one credit report for myself at some

6  point in time.  But I cannot find the records

7  that are associated with it.

8      Q.    When did you make this purchase?

9      A.    I mean, I don't recall the exact time

10  period.  I know that there was a time period

11  that we bought both reports for my husband and

12  myself, because we didn't know what was going on

13  with all of the banking information and

14  everything was all chaotic.  So, there was a

15  point in time where I had both my report and his

16  report.

17      Q.    From TrueLink?

18      A.    Well, from TransUnion.  I don't know if

19  it's TrueLink or not.  You know, it's very hard

20  to delineate that relationship.  You know, if

21  you buy the credit report online and you go to

22  TransUnion.com, you get a credit report through

23  TrueLink.  So, whether I bought the report from

24  TransUnion or TrueLink, I don't know.  I can

25  only tell you that I bought a report.  Now, I

1    bought a three-in-one report.  Now, I can't find

2    any record of it.  I went through your

3    documents, I couldn't find any record of it.

4    So, I know I've seen the report, I just can't

5    find the copy anywhere, and so I don't know

6    where it is or -- I mean, it's not a figment of

7    my imagination because I know we went through

8    all the data contained in there, there were some

9    errors.

10       Q.   You say it's not a figment of your

11   imagination.  Let's figure out what you do know

12   that you can testify to under oath.  Can you

13   testify under oath that you ever bought a

14   three-in-one credit report on yourself from

15   TrueLink?

16       A.   I can't give you 100 percent definitive

17   answer on that because I think I did, but I'm

18   not entirely sure.

19       Q.   Well, actually, you already have given

20   us 100 percent definitive answer on that; isn't

21   that right?

22              MS. YEAGER:  Objection.  Asked

23   and answered.

24       A.   I have a subscription.  I have a log-in

25   ID and stuff and information for TrueLink which

1    would be used to purchase a product.  But there

2    is no record remaining in the product that I

3    ever bought a credit report, and I don't have

4    the credit report.

5         Q.    You're talking about the documents that

6    TrueLink produced, right?

7         A.    No, I'm talking about my web account at

8    TrueLink where I log in with my user name and

9    password and when you --

10        Q.    Are there any documents reflecting

11   those facts --

12        A.    What?

13        Q.    -- in your possession?  That you have a

14   separate account for yourself with TrueLink?  Do

15   you have any documents that reflect that fact?

16        A.    They're in your documents.

17        Q.    Ma'am, I'm asking about your files.

18   I'm asking about what you know and what's the

19   basis for your testimony and your interrogatory

20   answers, so I'm going to ask it again.

21             Do you have any records originating

22   from your files to support your sworn

23   interrogatory answer that you have purchased

24   products yourself from TrueLink?

25             MS. YEAGER:  Objection.  Assumes

1    facts not in evidence.    Foundation.

2        A.    All I have is the web product.    If

3    you'd like me to log in and show you the fact

4    that I have my own log-in with a user name and

5    password, I would be more than happy to do that.

6        Q.    (BY MR. O'NEIL) Well, the fact that you

7    have -- well, actually, we've asked for that

8    information and we're still waiting for it, so.

9        A.    Which information?

10        Q.    Any proof that you bought a product

11    from TrueLink.  We've asked for that.  Are you

12    aware of that?  Are you aware that when we first

13    sent the first set of document requests months

14    and months and months ago, it asked for all

15    records regarding purchases by either one of

16    you?

17        A.    I understand that.

18        Q.    Okay.  And at that time, did you make

19    any effort to search your records for proof that

20    you had purchased products on your behalf?

21        A.    We produced our banking records at that

22    time which show the charges from TrueLink, the

23    ones that we had at that time.  Now, we're going

24    back to 2003, so I have to go back and get

25    additional bank statements to support that.  But

1    I'm --

2        Q.   Let me interrupt you.  You produced

3    banking statements?

4        A.   My attorneys have had bank records for

5    me for quite a while.

6        Q.   Oh really?

7        A.   They were produced I believe in some

8    other case.

9        Q.   Well, they weren't produced in this

10   case.  Matter of fact I've been asking

11   Ms. Yeager, and she keeps telling me that

12   they're coming, they're coming.  But you're

13   telling me that she has them; is that right?

14       A.   Well, there were bank records produced

15   in a limited fashion for the Bank of America

16   case, because that is the bank in question that

17   we're talking about.  So, bank records of course

18   in that case were produced.

19       Q.   Do you remember getting an

20   interrogatory directed to you in this case?

21       A.   Yes, there were three questions on it I

22   believe.

23       Q.   Right.  And the first question was,

24   have you ever purchased from TrueLink a credit

25   score or other information regarding your credit

 1    report.  Do you recall that being the first

 2    question?

 3                    MS. YEAGER:  Objection.

 4    Foundation.

 5                    MR. O'NEIL:  Well...

 6        A.    Yes, I recall the interrogatory answer.

 7        Q.    (BY MR. O'NEIL) Okay.  And what was

 8    your answer?

 9        A.    I believe the answer is yes.

10        Q.    And what was the factual basis for that

11    answer?

12        A.    Because I believe I bought a

13    three-in-one credit product from TrueLink

14    regarding my own personal credit report.

15        Q.    Now, but you didn't provide that

16    information in response to the very next

17    interrogatory that asked that; isn't that

18    correct?

19        A.    What?

20        Q.    The next interrogatory asked you what

21    did you buy and when?  Did you provide that

22    information to your lawyers?

23        A.    The next interrogatory, I believe,

24    exceeds the number, maximum number, of

25    interrogatories that were allowed under the

1   case.  If that's -- if I remember correctly.

2        Q.   I don't think that Ms. Yeager wants you

3   to disclose anything she's told you, unless you

4   counted them yourself.

5        A.   What I'm saying that that's the answer

6   that is on the interrogatory, and that those

7   interrogatory answers were prepared by me with

8   the help of my legal counsel, so.

9        Q.   Did you count the interrogatories

10  yourself?

11       A.   I --

12               MS. YEAGER:  Objection.

13       Q.   (BY MR. O'NEIL) Did you count the

14  interrogatories yourself?

15       A.   No, I haven't counted the

16  interrogatories myself.

17       Q.   Okay.  Did you provide the information

18  to your lawyers that was responsive to that

19  interrogatory?

20       A.   I believe they know that I had believed

21  that I had purchased a three-in-one credit

22  report.

23       Q.   But at the time it was just a belief,

24  right?

25       A.   I'm sorry, no, I don't have the credit

 1    report.  So, I guess it's just a belief.

 2         Q.    That's good.  You don't have the

 3    three-in-one credit report that you think you

 4    bought, right?

 5         A.    No.

 6         Q.    You don't have any screen prints from

 7    the date that you allegedly bought it, right?

 8         A.    No, I don't.

 9         Q.    You don't have any records that show

10    that you paid TrueLink for it; isn't that

11    correct?

12         A.    I have records that show I paid

13    TrueLink, but the records that show I paid

14    TrueLink aren't identified specifically as to

15    whether they're Melody's account or Steve

16    account, so I can't say whether a particular

17    banking transaction belongs to Steve's purchase

18    of the product or belongs to mine.

19         Q.    And I can't either, because I haven't

20    seen those records.  I'm still waiting for them.

21    Can you give me an idea of when you thought you

22    may have bought this three-in-one product from

23    TrueLink?

24         A.    Well, the subscription says when you go

25    to the log-in page for my account that I logged

1    in -- that the account was started some time in

2    March of 2005.

3        Q.   Okay.  Now what are you referring to?

4    Are you referring to your records or the records

5    that were produced to your lawyers in this case?

6        A.   I'm referring to when you log in to the

7    TrueLink website --

8        Q.   Uh-huh.

9        A.   -- itself, under my account name and

10   password, it says member since March of 2005.

11       Q.   And have you printed that out and given

12   those to your lawyers?

13       A.   No, I haven't printed that out.

14       Q.   Well, did you understand that when you

15   had received the request for documents from

16   TrueLink, that you had to produce things that

17   even were just stored electronically but not

18   printed out?

19       A.   Well, I understand that, but that data

20   isn't stored electronically.  That data resides

21   on TrueLink's website, sir.  That data doesn't

22   reside on my PC.

23       Q.   Well, the same is true of the website

24   that you printed out and produced to us in this

25   case, right?

1     A.   Well, that's true, but I chose to print

2     that out.  Are you --

3     Q.   Did you understand that you were

4     requested to produce all documentation that you

5     had regarding any purchase by you from TrueLink?

6     Did you understand that?

7              MS. YEAGER:  Objection.  Asked

8     and answered.

9     A.   Oh, I understand that.

10     Q.   (BY MR. O'NEIL) Okay.  And when you

11     understood that, did you say, well, I have no

12     idea where this three-in-one credit report is, I

13     have no proof of it, but I do have this

14     information on the TrueLink website, so I'll

15     print that out?  Do you think that?

16              MS. YEAGER:  Objection.  Asked

17     and answered.

18     A.   No, I didn't think that.  Because why

19     would I produce documents that the defendants

20     already have in their possession and can

21     recreate themselves at any time.

22     Q.   (BY MR. O'NEIL) So, when you've been

23     producing documents in this case and when you've

24     been answering document requests, did you not

25     give us things that you thought we already had?

1      A.   I only gave you those things which were

2   in my possession.  If it's not in my possession,

3   I don't know that I'm obligated to produce it if

4   it's not in my possession.

5      Q.   Do you know what year you allegedly

6   purchased this three-in-one credit report from

7   TrueLink on your own behalf?

8              MS. YEAGER:  Objection.  Asked

9   and answered.

10     A.   I would assume it would have to be some

11  time after March of 2005, because that's when

12  the website records that I had a new membership

13  created.

14     Q.   (BY MR. O'NEIL) But in any event,

15  whether or not -- I mean, assuming that you

16  actually did buy this product, you're not suing

17  on that product, right?

18     A.   That's a credit report, that's not

19  monitoring.

20     Q.   Ma'am, it's really a yes or no answer.

21  I'll say it again.  Regardless -- assuming that

22  you actually bought this three-in-one credit

23  report relating to yourself from TrueLink,

24  you're not suing TrueLink on behalf -- with

25  regard to that product, right?

1        A.    No.

2        Q.    Did you actually get the

3   interrogatories that TrueLink's lawyers sent to

4   your lawyer asking about your purchases?

5                MS. YEAGER:  Objection.  Asked

6   and answered.

7                MR. O'NEIL:  No, it wasn't.

8        Q.    (BY MR. O'NEIL) Go ahead and answer,

9   Mrs. Millett.

10       A.    Yes.

11       Q.    And did you prepare, physically

12  prepare, the document that was the response to

13  the interrogatories?

14       A.    The interrogatory -- my

15  interrogatories?

16       Q.    Yes.

17       A.    I worked with my attorneys to prepare

18  those.  I didn't physically type them if that's

19  what you mean.

20       Q.    That's what I meant.

21       A.    No, I didn't physically type them.

22       Q.    You just gave the information to your

23  lawyers and they prepared it?

24       A.    Right.

25       Q.    Okay.  And did you review the

1     interrogatory responses before they were served?

2         A.    Yes.

3         Q.    And did you sign a verification?

4         A.    Yes.

5         Q.    And where were you when you signed that

6     verification?

7         A.    Barry's office, probably more likely

8     than not, most of the documents get notarized by

9     Libby.

10        Q.    Okay.  And we recently got just days

11    ago the verification.

12        A.    I understand that.

13        Q.    And it was dated April 25, 2007.  Is

14    that when you signed the verification?

15        A.    That's the second time I signed the

16    verification.

17        Q.    You signed an earlier verification?

18        A.    Yes, I sure did.

19        Q.    And when was that?

20        A.    Right around the time that the

21    interrogatories were produced.

22        Q.    Do you remember, was it in March?

23        A.    I don't recall exactly what day it was.

24        Q.    Okay.  And you're aware of course that

25    we never got those verification, aren't you?

1      A.    Yes, I of course am, uh-huh.

2      Q.    Okay.  And your verification that we

3  asked -- which we got just days ago says, quote,

4  "Note, this is second signed copy created by me

5  for those interrogatories."

6      A.    Uh-huh.

7      Q.    What -- is it -- did you write that?

8      A.    I sure did.

9      Q.    Why?  Why did you write that on the

10  verification?

11      A.    Because the first copy was misplaced

12  and this is the second copy.  So, I don't want

13  anyone to think that the first copy was not

14  signed or produced by me in a timely fashion.

15      Q.    Who misplaced them?

16      A.    They -- somehow they got lost in the

17  documents.

18      Q.    Are you also aware that there's a

19  dispute among counsel as to when your

20  interrogatory answers were served?

21      A.    I'm aware that there's some disputes,

22  yes.

23      Q.    Okay.  Have you seen the e-mails

24  between your lawyer and lawyers for TrueLink

25  regarding this issue?

1          MS. YEAGER:  I object to the

2    extent this calls you to disclose

3    attorney-client privilege.

4          MR. O'NEIL:  You know what,

5    Joyce, you know that question does not ask for

6    the disclosure of attorney-client privilege.

7          MS. YEAGER:  I don't know that.

8          MR. O'NEIL:  Oh, you don't?

9    Okay.

10   Q.   (BY MR. O'NEIL) Well, once again, I'll

11   say it again, I'm not asking for you to disclose

12   your communication with your lawyers.  I'm

13   asking you if you got copies of the

14   correspondence between your counsel and counsel

15   for TrueLink regarding the failure to timely

16   serve your interrogatory responses?

17   A.   Well, I've seen some e-mails about the

18   disputes, I guess, that are going on among you

19   guys.  Now, whether I specifically remembered

20   that statement in the dispute, I can't say yes

21   or no.

22   Q.   And are you aware that Ms. Yeager is

23   still investigating the service of your

24   interrogatory responses?

25   A.   Yes, I'm aware of that fact.

1    Q.   Okay.

2              MR. O'NEIL:  Are you still

3    investigating that, Joyce?

4              MS. YEAGER:  Yes.

5              MR. O'NEIL:  Okay.  Can you let

6    us know when your investigation is complete?

7              MS. YEAGER:  Yes.

8              MR. O'NEIL:  Thank you.

9    Q.   (BY MR. O'NEIL) The interrogatory that

10   followed the only one you decided to answer was

11   identify the product purchased.  You think it's

12   a three in one; is that right?

13   A.   I think so.

14   Q.   Okay.

15   A.   That's what I believe.

16   Q.   Well, did you print it out when you

17   first purchased it?

18              MS. YEAGER:  Objection.  Asked

19   and answered.

20              MR. O'NEIL:  You know what, I did

21   not answer (sic) that.  Either you're not paying

22   attention or you're just trying to be

23   obstructionist.  I never asked that question.

24   Q.   (BY MR. O'NEIL) Did you print out the

25   three-in-one credit report when you purchased

1    it?

2         A.    I don't recall.  And but if I did, I no

3    longer have it in my possession.

4         Q.    You were then asked identify the date

5    and cost of each -- wait a minute.  You don't

6    have it in your possession anymore.  Do you

7    think you destroyed it?

8         A.    No, I think it may have got -- if I

9    printed it, it's been lost.  I don't recall

10   printing it --

11        Q.    Okay.

12        A.    -- but if I have printed it, then it's

13   been lost because I can't find it and I haven't

14   been able to produce it.

15        Q.    So, just so we're all clear, the

16   three-in-one credit report has been lost, the

17   initial interrogatory answers have been lost,

18   and the initial verification has been lost.  Is

19   that your understanding of the facts?

20        A.    No.

21        Q.    What's wrong about those three things?

22        A.    Because I don't understand -- I don't

23   understand what you mean by those three things.

24   The initial credit report, I'm not sure if I

25   printed it or not.  So it may not have even been

1    printed in the first place, which is how I

2    answered that question.

3            Second of all, the original

4    verifications may have been misplaced.  They

5    could later show up somewhere in the large

6    volumous (sic) file of documents and pleadings

7    that are running around associated with these

8    cases, I don't know.

9        Q.    You think there's a large volume of

10    documents associated with this lawsuit?

11        A.    No, I'm talking about --

12        Q.    They're a very small set of documents

13    that have been produced by your lawyers in this

14    case.

15        A.    I'm talking about the pleadings and the

16    books and everything that has all the legal

17    stuff in it from all the cases and the motions

18    and the everything.

19        Q.    You don't know the date that you

20    purchased this product, right?

21        A.    I only know -- the only information I

22    know for sure sitting here in this chair is that

23    my website log on was established in March of

24    2005.  That's all I know.

25        Q.    Well, do you know whether or not you

1    purchased a product from TrueLink?

2        A.    I believe I purchased a three-in-one

3    credit report.

4        Q.    Do you know how much it cost you?

5        A.    I can't even say.  Maybe 19.95 or

6    whatever they charge for it.  I don't really --

7    cost wasn't the issue when I purchased it

8    anyhow.

9        Q.    What was the purchase -- what was the

10   purpose for which you purchased it?

11       A.    Just to look at my own information.

12       Q.    Did you see any defects in the

13   three-in-one credit report?

14       A.    What do you mean?

15       Q.    Did you see any deficiencies in the

16   product that you had purchased from TrueLink?

17       A.    Well, I mean, not on TrueLink's part,

18   but there were deficiencies in credit furnishers

19   that had misreported information on my behalf,

20   yes.

21       Q.    Have you ever entered into a contract

22   with TrueLink?

23       A.    Not for monitoring, no.

24       Q.    Have you ever entered into a contract

25   with TrueLink for any product?

1      A.   I believe that by signing up for the

2   website, that there is a terms of use and other

3   legal mumbo-jumbo that goes along with that, so

4   I don't know if you would consider that a

5   contract or not.

6      Q.   Well, in Paragraph 49 of the complaint

7   that you filed against my client --

8      A.   Uh-huh.

9      Q.   -- you state that valid contracts

10  existed between TrueLink and yourself.  Is that

11  an accurate statement?

12     A.   Well, considering that my debit card

13  was used to purchase the information and that I,

14  acting as my agent on behalf of my husband, I

15  would say yes.

16     Q.   So, you think that when you act as an

17  agent for your husband, that that makes you a

18  party to the contract?

19     A.   I went online and purchased the

20  product.  Does that not make --

21     Q.   On behalf of your husband?

22     A.   On behalf of my husband.

23     Q.   Right.

24     A.   Right.

25     Q.   Well, and you think you're a party to

1    that contract?

2        A.    Well, it's purchased with joint funds.

3    It's purchased with my debit card.  It's

4    purchased from my bank account.

5        Q.    So, you think that makes you a party to

6    the contract?

7        A.    I think so.

8        Q.    Oh, okay.  Have you ever purchased a

9    home?

10       A.    Yes, we've purchased a home.

11       Q.    And have you ever had a real estate

12   agent help you purchase the home?

13       A.    Yes.  We've had a realtor.

14       Q.    And do you think the real estate agent

15   is a party to the contract by which you

16   purchased the home?

17       A.    I don't know.  The real estate agent

18   has to sign some papers, so I don't know.

19       Q.    All right.

20       A.    That's a legal distinction.

21       Q.    So, it's your lawyers -- did your

22   lawyers come to the conclusion that your -- have

23   contracted with TrueLink instead of you?

24       A.    I agree with that perception if that's

25   what you want to know.

1  Q. Ms. Millett, I'm going to show you

2 what's been marked as Exhibit No. 14.  These

3 were some documents that were produced by

4 TrueLink to your counsel in this matter.

5    (M. Millett Exhibit 14 was marked

6 for identification by the reporter.)

7  A. Uh-huh.

8  Q. (BY MR. O'NEIL) Is this the document

9 that you said that you referred to before that

10 was a summary of your purchases and your

11 husband's purchases from TrueLink?

12  A. It's a summary of purchases, yes, but I

13 can't be sure that everything's on here.

14  Q. That's not what I asked, ma'am.  You

15 referred earlier to seeing a document that was

16 produced by TrueLink?

17  A. Yes.

18  Q. Is this the document you were referring

19 to?

20  A. Yes, it is.

21  Q. Okay.  And have you reviewed this

22 document to see if there was any inaccuracies in

23 it?

24  A. I have reviewed the document to see if

25 there was any inaccuracies in it, yes.

1    Q.    Okay.  And did you find any

2    inaccuracies?

3    A.    That's why I requested the 2003 bank

4    records, because I can't verify if there's any

5    inaccuracies until I get those.

6    Q.    What about the 2004 and 2005 bank

7    records?  Have you --

8    A.    I haven't physically reviewed that, no.

9    Q.    Have you asked for those?

10    A.    For what?

11    Q.    The bank records for 2004, 2005 and

12    2006?

13    A.    Yes, I've asked for those.

14    Q.    Oh, okay.

15    A.    Yeah.  Uh-huh.

16    Q.    You only said 2003, so I was just

17    wanting to make sure that after all this time

18    we're not only getting partial information.  So,

19    just so I understand, your request to your bank

20    was all bank records going back to August of

21    2003; is that right?

22    A.    Yes, that's correct.

23    Q.    Okay.

24    A.    Some are easier to produce than others

25    though.

1      Q.    Well, so far we don't have any, so.

2    Anything you can produce would be wonderful, can

3    move this case along.

4          I understand you're waiting for the

5    bank records, but separate and apart from

6    comparing Exhibit No. 14 with your bank records,

7    did you see any errors in this document?

8      A.    How would I know if there's any errors

9    in this document.  This is a True Credit

10   document.

11     Q.    Okay, Mrs. Millett.  If that's the game

12   we're going to play, let's -- do you understand

13   that this document indicated what you purchased

14   and how much you paid?

15     A.    I understand this document demonstrates

16   what was purchased and paid, yes.

17     Q.    Okay.  And that's information that you

18   would have possession of, right?

19     A.    Well, I mean, as far as the actual

20   credit card transaction on my bank record, I

21   guess, yes.

22     Q.    Let me direct your attention to the

23   last page, Mrs. Millett.  The very last entry

24   there is dated August 6, 2003.  Do you see that?

25     A.    Yes.

 1        Q.    And it indicates a purchase of a TU

 2    report, credit score and analysis, credit score

 3    monitoring, debt analysis, debt monitoring,

 4    weekly credit alerts.  Do you see that?

 5        A.    Yes.

 6        Q.    It says that $20.85 was paid.  Do you

 7    see that?

 8        A.    Yep.

 9        Q.    Is that accurate information as far as

10    you know?

11        A.    As far as I know, yeah.

12        Q.    Okay.

13        A.    I think that's the first quarter.

14        Q.    And then up above, it shows orders

15    canceled in February, April and May of 2004.  Do

16    you see that?

17        A.    Yeah.

18        Q.    And it shows that among the things that

19    were being canceled were credit monitoring, do

20    you see that?

21        A.    Wasn't canceled by me.

22        Q.    To your knowledge, were you getting

23    credit monitoring during that time frame?

24        A.    To my knowledge, yes, I was.

25        Q.    Okay.  Then up above, it has orders

1    canceled in September of 2004.  Do you see that?

2        A.    Yep.

3        Q.    And but it's your understanding that

4    you didn't cancel any orders in that time frame,

5    right?

6        A.    Well, the one up there that was

7    canceled on 9/11/04 was canceled, the TransUnion

8    report was canceled in favor of the three-in-one

9    report upgrade.  So what the system is doing is

10   inserting the original basic credit order, and

11   then the second line is you ordered the upgrade,

12   so it cancels the original order and then

13   inserts the up-sale order.

14        But the one there where on 9/1/04

15   three-in-one credit report, credit score and

16   analysis that was canceled on 9/1/04, I don't

17   know why that is.

18        Q.    Did you ever cancel, affirmatively

19   cancel, any products that you had purchased from

20   TrueLink?

21        A.    No.  I don't know what this is in here

22   where they have stuff canceling and

23   uncancelling.

24        Q.    Okay.  If I can direct your attention,

25   Mrs. Millett, to the second page.  The third

1    entry from the bottom there indicates that on

2    November 21st, 2006, credit monitoring was

3    purchased.  Do you see that?

4         A.   Yep.

5         Q.   Is that correct?

6         A.   Yep, that's the last charge.

7         Q.   And then right above there on that

8    page, Mrs. Millett, is a heading called "System

9    Log Data."  Do you see that?

10        A.   Yes.

11        Q.   Do you have any understanding of what

12   that might mean?

13        A.   Yeah.  These are -- this is a log of

14   all the IP addresses and their time stamps and

15   when they've accessed the site.

16        Q.   So, would that indicate to you that

17   this True Credit's records of when on behalf of

18   your husband you accessed the site?

19        A.   Yes, but I'm not sure that it's

20   complete.

21        Q.   Okay.

22        A.   This will only -- this would only

23   record information or log data if in fact you

24   logged into the product.  Because there's a

25   unique system generated user ID over here on the

1    left-hand column which belongs to Steve Millett,

2    which would only be tapped if you had actually

3    logged into the physical product itself.

4         Q.   So, potentially, you could have viewed

5    the website without logging in and that wouldn't

6    be reflected here, right?

7         A.   Right.  It would be another log.  It

8    would be stored in other computer logs.

9         Q.   All right.  Let me direct your

10   attention to the first page, Mrs. Millett.

11        A.   Uh-huh.

12        Q.   This seems to be -- well, this

13   indicates an effort to purchase a product from

14   the TU Disclosure Fact website; do you see that?

15        A.   Yes, that's the annualcreditreport.com

16   website where you would request your free annual

17   file disclosure.

18        Q.   Okay.  Did you do that?

19        A.   Yes, I sure did.

20        Q.   And did you get a copy of your free

21   annual credit report from TransUnion?

22        A.   On this occasion, I believe no.

23        Q.   And why not?

24        A.   Because the ICS did not complete.

25        Q.   Now, you said that if you go on to your

1  computer, which I don't have the luxury of

2  doing, and if you logged in to the website as

3  yourself, it would indicate that you're a member

4  since March of 2005.  Is that what you said?

5     A.    That's correct.

6     Q.    Okay.  Now, this document indicates

7  that you attempted to get your free annual

8  disclosure from TransUnion in March 2005, right?

9     A.    But I did that via the -- I did that --

10  that's the disclosure that's the fact act

11  disclosure, that's via the

12  annualcreditreport.com, that's not through the

13  TrueLink site.

14     Q.    So, it's just coincidence then, as far

15  as you know, that both these dates are

16  March 2005?

17     A.    Well, yeah, exactly.

18     Q.    Okay.

19     A.    Because I may have gone to one and then

20  not gotten it there, and then gone and tried to

21  log in directly or done something, I don't know.

22     Q.    I apologize if I asked this before,

23  have you ever telephoned TrueLink?

24     A.    Yes.  I had to talk to TrueLink when

25  Steve's credit monitoring subscription was

1    enabled because he couldn't pass ICS either.

2        Q.    And do you know why that was?

3        A.    Because he had a fraud alert on his

4    credit file.

5        Q.    All right.

6        A.    Now, one of the things that's

7    interesting is I don't understand as I'm looking

8    at this document is why Steve Millett's unique

9    user ID appears on my enrollment.

10       Q.    Where do you see that, ma'am?

11       A.    Under System Generated User ID under

12   System Log Data, do you see the unique user ID

13   the ███████ number associated with the IP

14   address on 3/6 of 2005?  That unique user ID

15   belongs to Steven Millett, Social Security No.

16   5██████, and it's listed on Page 2 of this

17   exhibit.

18       Q.    Uh-huh.

19       A.    In other words, they are tracking IPs

20   and then associating IPs with other people's

21   files.

22       Q.    That's what you're concluding from this

23   document?

24       A.    No, that's what this document says.  By

25   IP address, they are attaching my husband's

1    unique user ID to my individual subscription to

2    this particular website.

3        Q.    Where does it say that?

4        A.    Right there where it says User ID 111

5    --

6        Q.    Yeah, I see that ma'am.

7        A.    Okay, now go to the next page.

8        Q.    Okay.

9        A.    What is Steve Millett's user ID?

10       Q.    Same number.

11       A.    Yeah.

12       Q.    Okay.  But --

13       A.    Now when you look at Steve Millett's

14   system log data, what is the user ID generated

15   next to each IP for each log-in to the website

16   for his use of the product?

17       Q.    Okay.

18             MS. YEAGER:  I'm sorry, Melody,

19   but you're the witness, and you don't need to be

20   asking him questions.  He asks you.

21             MR. O'NEIL:  She's doing a good

22   job though, give her that.

23       Q.    (BY MR. O'NEIL) There's two e-mail

24   addresses on the first two pages of this

25   document.  On the first page, it's

1    melodymillett@kc.rr.com.  Do you see that?

2        A.    Yes.

3        Q.    Is that one of your e-mail addresses?

4        A.    Yes, that's my private e-mail address.

5        Q.    Okay.  Is that the e-mail address that

6    you used to open up your membership with True

7    Credit?

8        A.    For mine.

9        Q.    Yes.

10       A.    Because the same e-mail address cannot

11   be used twice.

12       Q.    Right.  And the e-mail address that you

13   gave TrueLink when you were purchasing as an

14   agent on behalf of your husband is

15   metalmaiden@sbcglobal.net, right?

16       A.    That's correct.

17       Q.    Has that e-mail address been the same

18   since August of 2003?

19       A.    Yes.

20       Q.    Okay.

21       A.    That's our default e-mail address for

22   our home ISP account.

23       Q.    What does that mean, that's your

24   default?

25       A.    That's the e-mail address registered

1    with the phone company, you know, for my DSL

2    service.

3        Q.   Okay.  But the only people who will use

4    that address are the ones that you gave them

5    that address, right?  I mean...

6        A.   No.  What I mean is it's the default

7    account for the whole household.  It belongs to

8    the phone number.  Obviously we all use it, me,

9    my husband, some of the kids.

10       Q.   Does your husband have his own unique

11   e-mail address?

12       A.   No, he does not.

13       Q.   You're not allowed to have more than

14   one e-mail account with your phone company?

15       A.   No.  We can, but those are called sub

16   accounts.  This is the master.

17       Q.   So, your husband doesn't have his own

18   unique e-mail address; is that right?

19       A.   Right.

20       Q.   Okay.

21           MR. O'NEIL:  I think we have to

22   change the tape, so let's go off the record.

23           VIDEOGRAPHER:  We are now going

24   off the record at 2:41 p.m.

25           (Recess.)

```
 1              VIDEOGRAPHER:  One moment please.

 2    It is now 2:43 p.m. and we are back on the

 3    record.  You may continue.

 4         Q.   (BY MR. O'NEIL) Mrs. Millett, just so

 5    the record's clear, you said that you telephoned

 6    TrueLink when you first opened up the account

 7    for your husband, right?

 8         A.   We had to because of the fraud alert.

 9         Q.   Okay.  Did you ever telephone TrueLink

10    any time after that?

11         A.   I may have.

12         Q.   But, as you sit here, you don't recall?

13         A.   I don't specifically recall specific

14    dates, no.

15         Q.   Well, not that you don't recall

16    specific dates, you don't recall ever calling

17    them again, right?

18         A.   I don't recall specifically calling

19    them, no.  I know I've had communication with

20    some of the credit bureaus regarding specific

21    products, it's just hard to keep them all sorted

22    out.

23         Q.   When you had conversations with the

24    credit bureaus or -- did you take notes of those

25    conversations?
```

1    A.    What do you mean?  I mean, if I had the

2    -- any notes that I have, have already been

3    produced.

4    Q.    Well, we don't have any -- we haven't

5    seen any notes of any conversations you had with

6    people from TrueLink.  So, would that suggest to

7    you that there are no such notes?

8    A.    That would be probably a fairly

9    accurate assumption.

10    Q.    Okay.  Why did you decide to buy

11    products from TrueLink on behalf of your husband

12    in August of 2003?

13    A.    Because at that time we were only

14    monitoring one bureau.

15    Q.    And that was Equifax, right?

16    A.    That was Equifax.

17    Q.    So you wanted to monitor Mr. Millett's

18    file at TransUnion?

19    A.    Yes, and Experian.

20    Q.    Okay.  And what were you, specifically,

21    were you hoping to learn of as part of buying

22    that service?

23    A.    Any future activity that would occur

24    with Mr. Millett's Social Security number, or

25    any of the fraudulent accounts, or any

 1    fraudulent accounts in the future that would be

 2    recorded after the time of purchase of the

 3    product.

 4         Q.   Now, by August of 2003, you had already

 5    determined that TransUnion had what you called

 6    split files for Mr. Millett and Mr. Perez,

 7    right?

 8         A.   That's correct.

 9         Q.   And you had already determined that the

10    file disclosures you had seen to date for

11    Mr. Millett didn't show any indication of

12    Mr. Perez's activity, right?

13         A.   The Fair Credit Reporting Act consumer

14    disclosures didn't have any indication, no.

15         Q.   Right.  Right.  So, you thought that if

16    in the future some of Mr. Perez's accounts went

17    on your husband's file, you would get notice of

18    that, right?

19         A.   Yes.

20         Q.   But you never got any notice of that;

21    is that correct?

22         A.   That is correct.

23         Q.   Okay.  Did you have any conversations

24    with your husband about whether or not you

25    should be purchasing credit monitoring products

1    from TransUnion or TrueLink?

2        A.    Yeah, we discussed it.

3        Q.    Okay.  And he testified that, and I

4    think it's in the interrogatory answers that you

5    wrote, that you recommended it and he agreed?

6              MS. YEAGER:  Objection.

7    Foundation.

8        A.    Yeah, we were looking -- I was looking

9    at websites or whatever, and I found some

10   advertisements and we looked at it and we said,

11   okay, yeah, let's do that because it won't hurt

12   anything, or at least at the time we thought it

13   wouldn't hurt anything.

14       Q.    (BY MR. O'NEIL) And you wanted to make

15   sure that if Mr. Perez continued his fraudulent

16   activity that you'd get notice of it, right?

17       A.    Yep.

18       Q.    Okay.  And how did you get to the True

19   Credit website?

20       A.    From the web.  I imagine I entered

21   through the TransUnion.com website.

22       Q.    Well, do you imagine or do you know?

23       A.    Well, I mean, I clicked on a link on

24   the Google page and I went to the TransUnion

25   website and then there's the advertisement, and

1  you click on the button and then that's how you

2  go.

3      Q.   So, you started off at Google then?

4      A.   Google or Yahoo or some search engine.

5  I'm assuming it's Google because that's the one

6  I predominantly use.

7      Q.   Okay.  So, what did you type in to

8  Google then?

9      A.   What do you mean?  I was at Google

10  looking --

11      Q.   Right.

12      A.   -- for identity theft products.

13      Q.   So you must have typed a search --

14      A.   Engine.

15      Q.   Okay.  You typed search terms in to

16  Google?

17      A.   Uh-huh.

18      Q.   What did you type in?

19      A.   Well, I don't specifically recall

20  exactly what words I used.

21      Q.   Okay.

22      A.   I mean...

23      Q.   I mean -- okay.  And then eventually

24  somehow, some way, you got to the True Credit

25  site?

1      A.   I got to the TransUnion site, yeah.

2      Q.   Okay.  And then that took you to the

3   True Credit site?

4      A.   Well, you click like the button on the

5   TransUnion site to sign up for monitoring, and

6   then you go into the whole monitoring sign up

7   page.

8      Q.   Right.

9      A.   I don't even know at that point in time

10  that I was even aware that I was in the True

11  Credit site.

12     Q.   Well, you can always see the URL of the

13  page that you're on, right?

14     A.   Well, sometimes you can and sometimes

15  you can't.

16     Q.   Have you ever gone into the True Credit

17  site that same way since August of 2003?

18     A.   What do you mean?

19     Q.   You know, when you came in through the

20  TransUnion site?

21     A.   I think you can still get there from

22  the TransUnion site.

23     Q.   Okay.

24     A.   But, I mean, now I usually open up like

25  the last e-mail we got and click the link that's

1    in there and go directly out there.

2        Q.    Have you ever noticed the URL says

3    "truecredit.com"?

4        A.    It does now.  I don't know that it did

5    then.

6                (M. Millett Exhibit 15 was marked

7    for identification by the reporter.)

8        Q.    (BY MR. O'NEIL) Let me hand you what's

9    been marked Exhibit 15.

10       A.    Okay.

11       Q.    They're some more pages that your

12   lawyers have produced to us in this case.

13       A.    Uh-huh.

14       Q.    Have you ever seen these before?

15       A.    Yes.  I have.

16       Q.    Can you identify them for the record?

17       A.    I believe they're a copy of Steve

18   Millett's receipt and credit report from the

19   True Credit site, and some miscellaneous pages.

20   Partial terms of use, I don't know if I got the

21   whole thing.  Yeah, I think it's the whole

22   thing.

23       Q.    And you printed these out, right?

24       A.    Yep.

25       Q.    Did you view pages that day -- if you

1   look in the bottom right-hand corner, it says

2   8/6/2003?

3        A.    Yep.

4        Q.    And I believe each one of the pages in

5   Exhibit 15 have the same date?

6        A.    Yes.

7        Q.    Do you understand that that means

8   that's the date that you printed these out?

9        A.    Yes, I understand that.

10       Q.    Okay.  And do you see the URL on each

11  of these pages?

12       A.    Yes.

13       Q.    And it's truecredit.com, right?

14       A.    I understand that, yes.

15       Q.    Okay.

16       A.    Uh-huh.

17       Q.    So, does this refresh your recollection

18  it didn't say TransUnion, it said

19  truecredit.com?

20       A.    Well, what displays here is the actual

21  website.  It's possible for the address bar in a

22  browser to display a different URL than the one

23  that will print out at the bottom of this verse,

24  so.

25       Q.    Anything's possible, isn't sit,

1    Mrs. Millett?  But as far as you know, it said

2    truecredit.com, right?

3        A.   As far as I know -- as far as I know, I

4    can't recall whether it said TransUnion or

5    truecredit.com.

6        Q.   Did you view any pages in the True

7    Credit website that day that you didn't print

8    out?

9        A.   I could have.

10       Q.   But you don't know as you sit here?

11       A.   Not as I sit here, no.

12       Q.   Okay.  Why were you printing out the

13   pages that you did?

14       A.   Because this is the pages from when we

15   signed up for the product.

16       Q.   But -- so you just wanted to print out

17   every page you looked at that day?

18       A.   No.  I printed out the pages from the

19   product for where I signed up the product --

20   from the product.  Because this shows I'm

21   agreeing to pay a certain amount of money every

22   so often, and I need that for my records so that

23   when something shows up on my bank account I

24   know how much I'm supposed to be billed.

25       Q.   But you printed out pages that did much

1    more than just tell you how much you owed,

2    right?  I mean, for example, the very first page

3    of Exhibit 15.  That doesn't tell you how much

4    you're going to have to pay, does it?

5        A.    10.95 per quarter.

6        Q.    Okay.  Did you read the text on the

7    first page of Exhibit 15 prior to deciding to

8    purchase the product?

9        A.    Yes.

10       Q.    Did you read all of it?

11       A.    I read a lot of this, yes.

12       Q.    Directing your attention to the very

13   first page, did you read all of the text on that

14   first page before you decided to buy the

15   product?

16       A.    Well, like I probably didn't read this

17   little box down here where it says "example

18   credit trending."  I mean, you know, I read the

19   basic text that's on the page.

20       Q.    Well, on the right-hand side of the

21   page, it tells you what you're going to get as

22   part of the product, right?

23       A.    Yes.

24       Q.    Did you read that part?

25       A.    Oh, yeah.

1     Q.    Oh okay.  And then on the far right of

2   each of those four categories, it says, says

3   "learn M" but I'll represent to you it says

4   "learn more."  Okay?

5     A.    It probably was cut off because this is

6   one of those elongated pages that --

7     Q.    Sure.

8     A.    -- didn't want to print right.

9     Q.    Do you recall, did you click on these

10  "learn more" links to learn more about the

11  characteristics of the product that you were

12  about to buy?

13    A.    I probably read all of this and then

14  read -- clicked the "yes keep me informed"

15  button.

16    Q.    So, then is it your testimony that you

17  did not click on the "learn more" links

18  associated with each of the four categories of

19  information?

20    A.    No, that's not what I'm representing to

21  you.

22    Q.    Okay.  That's my question, that's

23  why --

24    A.    I can't say that before I signed up for

25  the product I clicked the "learn more" buttons,

1    because I may not have.  But I may have done so

2    at a later date.

3       Q.   Okay.

4       A.   And so I may have a copy in here of the

5    "learn more" and I may have actually read those

6    pages.

7       Q.   All right.

8       A.   But I can't recall in what order I

9    might have viewed that information, only that

10   I've probably viewed every page that's out there

11   on the TU site at some point in time or other

12   now.

13      Q.   The TU site?

14      A.   The TU, TrueLink, whoever it is now.

15      Q.   Okay.  Well, I think it's important

16   that we understand what site we're talking

17   about, wouldn't you agree?

18      A.   Well, as I sit here, it still says

19   "TransUnion" at the top.

20      Q.   Okay.  Let me go back to the question I

21   asked some time ago.

22      A.   Okay.

23      Q.   Do you know if you ever clicked on the

24   "learn more" hyperlinks which is reflected on

25   the first page of Exhibit 15?

```
 1        A.   I couldn't answer that one way or the

 2   other.

 3        Q.   Okay.  Because you don't know, right?

 4        A.   I don't know for sure, no.  I could

 5   have and I also could not have.

 6        Q.   The top of the page says "Knowledge,

 7   protection, convenience."  Do you see that,

 8   ma'am?

 9        A.   Yes.

10        Q.   Says, "Knowledge, quarterly access to

11   your credit report with the analytical tools,"

12   right?

13        A.   Yes.

14        Q.   Okay.  Did you read that?

15             MS. YEAGER:  I'm so to interrupt.

16   What page are we on?

17             MR. O'NEIL:  First page.

18             THE WITNESS:  We're on the first

19   page.

20        A.   Yes, I read that.

21        Q.   (BY MR. O'NEIL) Okay.  And then going

22   down in the right-hand side, it describes your

23   weekly fraud watch e-mails.  I mean, that was

24   the main thing that you were getting as part of

25   the credit monitoring service, right?
```

```
 1        A.   The main thing?

 2        Q.   Well, you know, that's a bad question,

 3   let me withdraw that.  Do you see there it says,

 4   "Receive weekly e-mail alerts to changes in your

 5   report"?

 6        A.   Yes.

 7        Q.   And then below that it says,

 8   "Immediately find out about credit report

 9   changes, including fraudulent activity, etc."

10   Do you see that?

11        A.   Yes.

12        Q.   When you read this, did you think to

13   yourself, well, this is only going to tell us

14   about changes to my husband's report and not

15   about changes to Mr. Perez's report?

16        A.   It says up here, "Complete identity

17   theft protection with weekly fraud watch

18   e-mails" at the very top.

19        Q.   Could you just answer my question?

20             MR. O'NEIL:  Let me go -- can the

21   court reporter read back my question?

22             (Whereupon, the requested portion

23   of the record was read by the reporter.)

24        A.   No, I did not.

25        Q.   (BY MR. O'NEIL) And did you believe on
```

1    August 6, 2003, that even though TransUnion told

2    you they couldn't give you that information,

3    that you thought TrueLink was going to be able

4    to tell you about changes to Mr. Perez's report?

5        A.    No.   I thought they were going to tell

6    me about changes relating to my husband's Social

7    Security number.

8        Q.    And why did you think that?

9        A.    Because they're advertising complete

10   identity theft protection, and I thought that

11   meant they were going to be protecting the

12   Social Security number once I signed up for this

13   product.

14       Q.    Well, Mrs. Millett, wait a minute.   As

15   of August 2003, you had already gone around and

16   round and round with TransUnion, Experian and

17   Equifax, right?   And all three of them told you

18   we can't give you any information in Mr. Perez's

19   report, right?

20       A.    No, TransUnion gave me information in

21   Mr. Perez's report, it's in the letter.

22       Q.    Okay.   They told you what the accounts

23   were, but they told you they couldn't give you

24   the details about the report, right?

25       A.    I'm sorry, I don't understand the

1    question.

2        Q.   Okay.  Here's my question, given your

3    frustration with the credit bureaus, because now

4    you're suggesting that TransUnion was helpful,

5    but earlier you suggested that none of the

6    bureaus were helping you in trying to understand

7    how Mr. Perez's activity might impact your

8    husband's credit file, right?

9                MS. YEAGER:  Objection.

10   Misstates the testimony.

11       A.   I'm sorry, I don't understand the

12   question.

13       Q.   (BY MR. O'NEIL) Okay.  You just told me

14   that you believed on August 6, 2003, that

15   TrueLink was going to advise you of Mr. Perez's

16   use of your husband's Social Security number.

17   Is that what you said?

18       A.   Yes.

19       Q.   Okay.  But you already knew that such

20   information wasn't on your husband's TransUnion

21   file disclosure, right?

22       A.   Some was.

23       Q.   What?

24       A.   The inquiries.

25       Q.   No, you know what, Mrs. Millett, we're

1    going to be here for four days.  You already

2    testified that in January 2003 you did not

3    suspect that it was a fraudulent inquiry by

4    Farmers, it was only much later after you got

5    subpoenas.  Do you recall that?

6        A.   Yes, I recall that.

7        Q.   Let's focus your attention on August 6,

8    2003, and what you knew that day.  Okay?

9        A.   Okay.

10       Q.   August 6, 2003, you already knew that

11   TransUnion's file disclosure didn't have any

12   evidence of Mr. Perez's misuse of your husband's

13   SSN, right?

14       A.   On August 6, 2003, yes, that's correct.

15       Q.   Okay.  And you also already knew that

16   TransUnion would not give you any information

17   regarding Mr. Perez's use of the SSN?

18       A.   That is not a true statement.

19       Q.   Oh, because you had to ask for the

20   letter?

21       A.   Because they gave me the letter.

22       Q.   Well, no, because you told me this

23   morning that they only gave it to you after your

24   lawyer threatened litigation, right?

25       A.   I understand that, but they did give me

1    the letter.

2        Q.    According to you, according to your

3    testimony this morning, they only did it after

4    your lawyer threatened litigation.  Do you

5    recall that testimony?

6        A.    That is correct.

7        Q.    Okay.  So, you thought that even though

8    you weren't threatening TrueLink with litigation

9    on August 6, 2003, and everything that you knew

10   -- and I'm not going to go through it now

11   because our record's pretty clear about what you

12   knew and what your dealings were with TransUnion

13   prior to August 6, 2003, the record is what it

14   is -- are you telling me that on August 6, 2003,

15   you honestly believed that TrueLink was going to

16   give you information that TransUnion wouldn't?

17   Is that your testimony?

18       A.    It is my -- yes, it is my testimony.

19   It's my testimony that they were going to give

20   me information relating to my husband's Social

21   Security number, yes, it is.  Because they're

22   advertising complete identity theft protection.

23       Q.    I'm going to answer -- ask the question

24   again.  Is it your testimony that on August 6,

25   2003, you thought you can get information from

1    TransUnion through TrueLink that TransUnion

2    itself wouldn't give you?

3         A.   Yes, that's correct.

4         Q.   And the reason why you thought that,

5    ma'am?

6         A.   Because their marketing material

7    advertises complete identity theft protection,

8    so I thought that they would be getting

9    information relating to protecting someone from

10   identity theft and the fraudulent use of Social

11   Security number in the future from the data

12   product purchase.  That's what I thought, yes.

13        Q.   Even though it says the weekly e-mail

14   alerts would only alert you to changes in

15   Mr. Millett's report?

16             MS. YEAGER:  Objection.

17   Foundation.

18        A.   I'm sorry?

19        Q.   (BY MR. O'NEIL) You thought that even

20   though you were expressly advised that the

21   weekly fraud watch e-mails would only alert you

22   to changes in Mr. Millett's report?  You thought

23   that?

24        A.   Well, we've already -- yes, I still

25   thought that.

1     Q.    Okay.  And you explained all this to

2     the judge in the Experian case, right?

3                 MS. YEAGER:  Objection.

4     Foundation.

5     A.    I didn't explain anything to the judge

6     in the Experian case, because I haven't even

7     seen the judge in the Experian case.

8     Q.    (BY MR. O'NEIL) Okay.  Well, you

9     understand that your lawyers made arguments on

10    your behalf?

11    A.    Oh, I understand that, yes.

12    Q.    Okay.

13    A.    But that's not what you said.

14    Q.    Okay.  Well, I'm sorry, that's why I

15    made another question.  You made this same claim

16    in the Experian case, right?  You made the claim

17    that even though there is specific references to

18    only changes in your report, because there was a

19    general promise of identity theft protection,

20    that you believed you'd get information outside

21    the report.  Do you recall that that was one of

22    the claims you made in the Experian case?

23                 MS. YEAGER:  Objection.

24    Foundation.  Misstates the evidence.

25    A.    It's essentially the same.

1       Q.   (BY MR. O'NEIL) It's the same claim,

2  right?

3       A.   It's not the same exact claim, but,

4  yes, it's the same.

5       Q.   Okay.

6       A.   It's similar.

7       Q.   And the judge rejected that, didn't he?

8       A.   I'm sorry.

9       Q.   The judge rejected that understanding?

10  The judge rejected that claim; isn't that right?

11       A.   Well, that claim was dismissed, yes, on

12  a motion for summary judgement.

13       Q.   Do you recall that the judge said that

14  it was not reasonable for you to think that you

15  were going to get that information, given that

16  you were told you'd only be alerted to changes

17  in your credit report?

18            MS. YEAGER:  Objection.  Lack of

19  foundation.  Misstates the evidence.

20       A.   I'm sorry, somebody will have to repeat

21  the question?

22            MR. O'NEIL:  I'll ask the court

23  reporter to do it.

24            (Whereupon, the requested portion

25  of the record was read by the reporter.)

1      A.   I'm not sure that that's exactly how

2   that's worded in the pleading.  I'd have to look

3   at the judgement thing to confirm how that

4   actually is worded.  So, I don't necessarily

5   agree with that presentation of it.

6      Q.   (BY MR. O'NEIL) Did you ever read the

7   ruling?

8      A.   Yes, I did read the ruling.

9      Q.   So you don't remember him calling your

10  belief unreasonable?

11      A.   I also recall -- I don't -- I don't

12  recall him saying that exactly, no, I don't.

13      Q.   Okay.  Let me direct your attention,

14  Mrs. Millett, to the page that's numbered

15  Millett 877.  Can you identify that for the

16  record, ma'am?

17      A.   Identify what for the record?

18      Q.   What is this document, do you know?

19      A.   Looks to be part of the sign-on for the

20  True Credit product, but I can't be sure because

21  some of the text is blurry.  I can't read the

22  title at the top, so I'm not sure.  But it does

23  look to be like that might be part of it.

24      Q.   Okay.  And then let me go two pages

25  later, if I can ask you to turn two pages later,

1    Mrs. Millett.

2        A.    Uh-huh.

3        Q.    It says, "Your credit monitoring

4    membership includes fraud resolution services."

5    Do you see that?

6        A.    Yes.

7        Q.    Did you ever use the fraud resolution

8    services offered by TrueLink?

9        A.    No.  Because the TrueLink product has

10   never notified me of any fraud which I needed to

11   contact fraud resolution services for.

12       Q.    Well, you thought Mr. Millett was a

13   victim of identity theft on August 6, 2003,

14   right?

15       A.    Well, that's correct, but I didn't

16   purchase the product to deal with identity theft

17   that occurred before August 6, 2003.  I

18   purchased the product to monitor for identity

19   theft in the future, which I was never notified

20   of, so, therefore, I never accessed the fraud

21   resolution services.

22       Q.    So you never had any need to access the

23   fraud resolution services; is that right?

24       A.    No, that's not a true statement either.

25   We had a need, we just didn't know we had a

1    need.

2        Q.    Okay, wait a minute.  August 6, 2003,

3    did you think your husband was a victim of

4    identity theft?

5        A.    Of course.

6        Q.    Okay.  So, why didn't you use it on the

7    very first day?

8        A.    Because their product services their --

9    this is specifically supposed to be used for

10   services that are notified for you by their

11   monitoring service.  So, since I don't have --

12       Q.    Okay.

13       A.    You know, I can't call them up to say,

14   oh, you need to resolve this account from 2002,

15   because I wasn't a member in 2002.

16       Q.    That's your understanding?

17       A.    That's my understanding.

18       Q.    Okay.  Has your husband been a victim

19   of identity theft since August 2003?

20       A.    Yes.

21       Q.    In what way?

22       A.    Abundio Perez has obtained additional

23   activities that are related to credit that have

24   occurred since August of 2003, yes.

25       Q.    Using your husband's SSN?

1    A.    Yes.

2    Q.    What activity is that?

3    A.    Judgement from Ford Motor Credit for

4    $4,000, public records information, criminal

5    conviction, I believe, recorded against my

6    husband's Social Security number in California

7    that was not part of this record.

8    Q.    I'm sorry, go ahead.

9    A.    The J. C. Penney's account, which was

10   relabeled with my husband's address which then

11   resulted in Abundio Perez's mail being sent to

12   my house.  The Home Depot account which was

13   later relabeled with my husband's name and

14   address, still has his Social Security number,

15   but has Abundio Perez's telephone number.

16   Q.    So, when you learned all this after

17   August 6, 2003, did you call the fraud

18   resolutions services then?

19   A.    I didn't learn all of that until TU

20   began -- and some of it I didn't learn until

21   2005 when we started with subpoenas and

22   subpoenaed documents.  So, I mean, you know, I

23   didn't know it in 2003, no.

24   Q.    Okay.  So, in 2005 when you learned

25   about it, did you call and take advantage of the

1    fraud resolution services?

2        A.   No, I did not.  I worked out that those

3    issues are being worked through my attorney,

4    because they were a result of this litigation

5    investigation.

6        Q.   So, are you making any claim in this

7    lawsuit with respect to the fraud resolution

8    services?

9        A.   I believe that there was some

10   information on that in the breach of contract

11   claim in that the fraud resolutions services

12   relating to Promise Mark were in the original

13   contract and that Promise Mark was not

14   available.

15       Q.   Well, that's what your lawyers have

16   said.

17       A.   Right.

18       Q.   I'm asking what you're saying under

19   oath.  Do you have any factual knowledge to

20   support any claim regarding the fraud resolution

21   services?

22       A.   What do you mean factual claim?  If you

23   have something in the contract for fraud

24   resolution services that says Promise Mark is

25   going to provide those services, and you no

1    longer even had a contract with Promise Mark to

2    cover the period of time for our contract, then

3    there was nobody to provide the contracted

4    services.  So, I don't know --

5        Q.    How do you know that?

6        A.    Huh?

7        Q.    How do you know that?

8        A.    How do I know what?

9        Q.    That there was nobody to provide the

10   services?

11       A.    Well, because Promise Mark -- you

12   didn't have an agreement with Promise Mark after

13   a certain date, it's in your documents.

14       Q.    Well, yeah, you learned that after you

15   filed the lawsuit?

16       A.    Right.

17       Q.    Okay.  So, it's your belief that there

18   was a period of time when TrueLink wasn't

19   offering fraud resolution services?

20       A.    I believe there was a period of time in

21   which TrueLink was advertising it had fraud

22   resolutions services, but I'm not sure that the

23   people who signed the contracts had listed in

24   their contracts the actual person who was

25   providing the services they were receiving.

1    Q.   Okay.  Well, I'll show you later that

2    that claim has no merit.  But you don't have any

3    information about it, it's just what your

4    lawyers told you, right?

5    A.   Well, it's just what my -- and what

6    I've seen in the documents.

7    Q.   Do you remember reading on August six,

8    2003, that credit monitoring membership

9    agreement?

10   A.   I believe it's in this document right

11   here.

12   Q.   Where is that, ma'am?

13   A.   It's on Page 879, "Fraud resolution

14   service provided by Promise Mark terms of

15   service provide..."

16   Q.   Okay.  So you're -- I asked you about

17   the membership agreement, you're talking about

18   something else.

19   A.   It says right here, "Your credit

20   monitoring membership --"

21   Q.   Ma'am, please just listen to my

22   question and answer my question.  My question

23   was, do you recall reading the credit monitoring

24   membership agreement that was on the site on

25   August 6, 2003?

```
1        A.    I thought this was it.

2        Q.    Okay.  That's your understanding?

3        A.    I thought this was it.

4        Q.    Okay.  Do you recall having to click "I

5   agree" to a contract before you could get the

6   services from TrueLink?  I'll tell you it's not

7   in there, so you can look all you want.

8        A.    No, I'm looking for the part in the

9   paragraph where it says you have to click "I

10  agree".

11       Q.    It's -- what I'm telling you, ma'am,

12  it's not in there.  You can look all you want,

13  but it's not in there.  That's why I asked you

14  the question, which is really separate and apart

15  from what you're looking at.  As you sit here

16  today, do you recall reading the credit

17  monitoring membership agreement on the

18  TransUnion website when you were establishing

19  the account on behalf of your husband?

20            MS. YEAGER:  Objection.

21  Foundation.

22       A.    Well, I read parts of it, because there

23  is it is right there.

24       Q.    (BY MR. O'NEIL) Okay.  Do you remember

25  this morning joking about how it's got 20
```

1    paragraphs and it's so long and who reads that

2    stuff?  Do you remember that?

3         A.    Yes.

4         Q.    Okay.  What's your recollection?  Did

5    you read the first sentence?  Did you read none

6    of it?  Did you skim it?  I think you said you

7    skimmed it this morning?

8         A.    Yep.

9         Q.    Okay.  Do you recall when you skimmed

10   the membership agreement in August of 2003, did

11   it have any reference to the fraud resolution

12   services?

13        A.    Yes.

14        Q.    You do recall that?

15        A.    I do recall some of it.

16        Q.    Okay.

17        A.    Yeah.

18        Q.    And did it tell you that they'd be

19   presented by Promise Mark?

20        A.    Well, the advertisement on the page

21   represented that, so I don't know that I

22   remember that the agreement specifically says

23   that, but it is part of my recollection.

24        Q.    Were you acting as an agent for your

25   husband when you clicked "I agree" to the credit

1    monitoring membership agreement?

2        A.   Sure.

3        Q.   And then part of Exhibit 15 is the

4    credit file for your husband, right?

5        A.   I think there would -- looked like

6    there were some pages to it in here.

7        Q.   It begins on Page 884, Mrs. Millett.

8        A.   Okay.

9        Q.   There's no handwriting on these pages.

10   Do you or your husband recall noting any

11   inaccuracies in this information?

12       A.   There's no notes on these pages because

13   at that time I don't think we noted any because

14   this was printed in August of 2003.

15       Q.   Do you recall noting any errors in the

16   document?

17       A.   Well, there was an inquiry on 4/29 of

18   '03 from Citibank, which does not correspond to

19   any granting of credit, that's on Millett 888.

20   But that wouldn't be discovered for much later.

21       Q.   What I'm asking is, when you read this

22   in August of 2003, did you see that inquiry and

23   think, well, that's not ours?

24       A.   Well, this inquiry section that's on

25   here doesn't tell you what type of inquiry it

1    would, like it would on an official TransUnion

2    disclosure.  So I don't know if this is a fraud

3    inquiry, I don't know if it's a promotional

4    inquiry, I don't know what kind of inquiry it is

5    sitting here looking on the inquiry information

6    on this product.

7        Q.   Do you see the sentence under the

8    heading "Inquiry Information"?

9        A.   Yes, I see that section.  But that's --

10   there are different types of inquiries at the

11   credit bureaus.  There's hard inquiries, there's

12   soft inquiries, there are inquiries where your

13   information has been sold as a promotional

14   purpose.

15       Q.   Okay, I'll go back to the question I

16   asked some time ago.

17       A.   Okay.

18       Q.   When you saw this document in August of

19   2003, at that time, do you recall noting any

20   questions, errors, discrepancies in this

21   document?

22       A.   I don't recall noting anything specific

23   or writing anything specific down, but this Citi

24   one in my mind even at that point in time was

25   kind of questionable.

1    Q.    Oh, you recall thinking that in August

2    of 2003?

3    A.    I recall thinking that, but not

4    understanding.  Because, you have to remember, I

5    closed down Citibank accounts for Abundio Perez,

6    so I didn't know if this was a fraud inquiry or

7    what it was.  And without additional

8    investigation, I wouldn't know that.

9    Q.    Did you ever -- when you were calling

10   all of the creditors of Mr. Perez in early 2003,

11   did you ever say that they could check your

12   credit report as part of their investigation?

13   A.    No.

14   Q.    Okay.

15   A.    And nor do they have the right to do

16   so, I don't think, as part of a fraud

17   investigation.

18   Q.    They have a right to do so if you tell

19   them they can.  Do you understand that?

20   A.    Well, if I told them I could, but that

21   would have to be in writing.

22   Q.    Okay.  Let me show you what's been

23   marked Exhibit 16, which are two pages that were

24   produced by your lawyers in this case,

25   Mrs. Millett.

1              (M. Millett Exhibit 16 was marked

2      for identification by the reporter.)

3          Q.   (BY MR. O'NEIL) Do you recall that you

4      printed out certain of the e-mails you got from

5      TrueLink for your lawyers?

6          A.   Did I print this or did somebody else

7      print this at the legal office?  I don't know.

8          Q.   I have no idea either.

9          A.   I could have sent it to them

10     electronically and they could have printed this

11     out.

12         Q.   We're all trying to figure out how that

13     whole thing worked actually.  Do you recall

14     getting an e-mail a month after you signed up

15     for credit monitoring on behalf of your

16     husband --

17         A.   Uh-huh.

18         Q.   -- alerting you that no credit alerts

19     had been triggered by changes to your credit

20     report?

21         A.   Yeah, but this is the monthly e-mail,

22     it's not the weekly e-mail.

23         Q.   Okay.  So, even when you don't get the

24     weekly alerts, you got a monthly alert telling

25     you there's been no alerts?

1      A.    Right.

2      Q.    And you got this type of e-mail on a

3   number of occasions, didn't you?

4      A.    Yes.

5      Q.    Okay.

6      A.    I can't tell you exactly how many

7   times.

8      Q.    I wasn't going to ask you.  It says,

9   "Dear Steven, During the last 30 days, no credit

10  alerts have been triggered by changes to your

11  credit report."  Do you see that?

12     A.    Uh-huh.

13     Q.    And it says, "That means, 1, no one has

14  applied for credit in your name."

15     A.    Uh-huh.

16     Q.    "No one has opened an account in your

17  name."

18     A.    Uh-huh.

19     Q.    "There were no late payments recorded

20  on your credit report.  There were no

21  bankruptcies other public records posted to your

22  credit report."  And says, "No one has changed

23  your address with the credit bureaus."  Says,

24  "You are now informed and up to date about your

25  credit status."  Do you see that, ma'am?

1      A.    Uh-huh.

2      Q.    When you got these, did you think,

3   well, I was expecting much more than this, I was

4   expecting that they would give me information

5   about Mr. Perez's use of my husband's SSN even

6   if it didn't hit his file?  Did you think that?

7      A.    I'm sorry, I don't understand the

8   question.

9      Q.    Okay.  Well, it was a long one, so

10   that's fair.

11      A.    Yeah, I got twisted around somewhere in

12   there.

13      Q.    Yeah.  Well, let me try to make it

14   shorter.  Isn't it fair to say that what

15   TrueLink was telling you the first month after

16   you bought this service that the service was

17   about changes to your credit report, it wasn't

18   saying -- and that it was about credit in your

19   name, not credit using your Social Security

20   number, it was about opening an account in your

21   name, not opening an account with your Social

22   Security number.  When you read this, did you

23   think to yourself, well, maybe just like

24   TransUnion wouldn't do it before, this credit

25   monitoring service is not going to give me the

1    information that I thought that they were going

2    to give me?

3        A.    Well, on September 5th when I received

4    this e-mail, I kind of went, whew, you know.

5        Q.    Okay.

6        A.    Later on though, as the evidence in the

7    subpoenas and the information from the subpoenas

8    rolled in, now I'm kind of angry about it.

9    Because on or around this time that this

10   particular e-mail that you bring up which has

11   specific significance is this is when the

12   account for Home Depot was relabeled.  So, if

13   the Home Depot account was going to appear, this

14   is the particular e-mail it should have appeared

15   in.

16       Q.    Well, if the Home Depot account was on

17   your husband's credit report, it should show up

18   here, right?

19       A.    Well, if it's on his file, his credit

20   file --

21       Q.    Right.

22       A.    -- not his disclosure, but his file, it

23   should have appeared here.

24       Q.    And, of course, if it wasn't on his

25   credit file, then it shouldn't have, right?

1       A.    Well, but it is, so.

2       Q.    And we've been through that.

3       A.    Right.

4       Q.    That's your speculation that someday

5    you think you're going to prove.

6       A.    Well, I think it's a reasonable

7    inference because we have the information from

8    the creditor in question that shows their own

9    system where they changed the file.

10      Q.    Does anywhere here does it say that no

11   one has applied for credit using your SSN?

12      A.    No, it does not.

13      Q.    Does anywhere does it say that nothing

14   has occurred outside of your credit report?

15      A.    No, it doesn't say that.

16      Q.    It says that you could view a complete

17   history of your credit alerts by linking to a

18   particular hyperlink.  Do you see that?

19      A.    Yeah, that's where you go in and view

20   an alert if you had one.

21      Q.    Okay.  Well, no, you can view a

22   complete history of your alerts it says.

23      A.    Well, I know.

24      Q.    Okay.  Have you ever done that?

25      A.    No.

```
 1        Q.    Have you ever printed that out for your

 2   lawyers?

 3        A.    No.

 4        Q.    No.  You could go into it today and

 5   print out a history of all the alerts you got,

 6   right, since August of 2003?

 7        A.    I think so, yeah.

 8        Q.    But you haven't done that, right?

 9        A.    No, because it's designed to be an

10   online product.

11        Q.    Well, did you ever stop to think that

12   I'm suing TrueLink on behalf of a class

13   regarding the credit alerts, they have asked for

14   all information regarding the credit alerts,

15   maybe I should print that out and give it to

16   them in response to their document request?

17        A.    I'm sorry?

18        Q.    Did you ever think that you had to --

19   you had an obligation to print the history of

20   the credit alerts in responding to document

21   requests in this case?

22        A.    No, I didn't think so.

23                   MR. CLOON:  Can we take a break?

24   We've been going for an hour 45 minutes.

25                   THE WITNESS:  I need to pee.  I'm
```

 1   sorry, was that on the record.

 2                    MR. O'NEIL:  She needs to pee,

 3   then we've got to take a break.

 4                    THE WITNESS:  Sorry, I just said

 5   that on the record.

 6                    MR. O'NEIL:  That's okay, let's

 7   take a break.

 8                    VIDEOGRAPHER:  We are now going

 9   off the record at 3:21.

10                    (Recess.)

11                    VIDEOGRAPHER:  The time now is

12   3:39 p.m. and we are back on the record.  You

13   may continue.

14       Q.   (BY MR. O'NEIL) Thank you.

15   Mrs. Millett, I'm handing you what's been marked

16   as Exhibit 17, which is another document that

17   your lawyers have produced to TrueLink in this

18   case.  Appears to be a -- appears to be an

19   e-mail dated November 3, 2003 addressed to

20   Steven, but with your e-mail address, correct?

21       A.   Yes.

22       Q.   Okay.

23                    (M. Millett Exhibit 17 was marked

24   for identification by the reporter.)

25       Q.   (BY MR. O'NEIL) The subject line is

1    "Important upgrade to your service," and then

2    the text of the e-mail describes the upgrades.

3    Do you recall learning shortly after you had

4    purchased the credit monitoring product on

5    behalf of your husband that True Credit had

6    upgraded the service?

7        A.   Well, they sent this e-mail saying they

8    had upgraded the service.

9        Q.   Right.  Well, do you have any reason to

10   believe that it was inaccurate to say that you

11   were now going to be getting identity theft

12   insurance at no additional cost?

13       A.   I'm sorry, I don't understand.

14       Q.   Well, I asked you if you recall that

15   there was an upgrade, and you said, well, they

16   said there was an upgrade, so I was wondering if

17   you were suggesting that this was another lie

18   that they had made to you.  I mean, according to

19   the e-mail, you were being informed that the

20   credit monitoring service now includes identity

21   theft insurance, and enhanced fraud resolution.

22   Do you recall getting this e-mail?

23       A.   Yeah, I recall getting the e-mail.

24       Q.   And do you recall learning it for the

25   first time at no additional cost you would now

1    have identity theft insurance as part of the

2    service that you had purchased?

3        A.   No, I would not have identity theft

4    insurance.

5        Q.   Why not?

6        A.   Because the identity theft insurance

7    rider that goes along with this particular

8    upgrade specifically excludes identity theft

9    which has occurred prior to the institution of

10   the policy.

11       Q.   Okay.  But it covered identity theft

12   that occurred after you began the service,

13   right?

14       A.   No, it doesn't.  It only covers -- it

15   only covers identity theft that actually occurs

16   after the policy is in force.  If the person who

17   is using the identity was using the identity

18   before the policy took effect, even if the theft

19   is recorded after the insurance goes into

20   effect, you don't have any benefits or coverage.

21       Q.   Okay.  And how do you know that?

22       A.   Because that's what the fine print says

23   on the product.

24       Q.   Okay.  But, of course, if somebody else

25   stole your husband's identity, that would be

1    covered, right?

2        A.    Provided the actual identity theft

3    occurred after the policy was put in place.

4        Q.    Okay.   Okay.   So you do recall that

5    then?

6        A.    Yes.

7        Q.    Okay.   And then it also describes how

8    the fraud resolution services have become

9    improved, or "enhanced" is the word they use.

10   Do you see that?

11       A.    (Indicating.)

12       Q.    And do you see that it says on the

13   right-hand side about fraud resolution, it says,

14   quote, "Previously provided by Promise Mark,

15   fraud resolution services are now provided by

16   TransUnion's Fraud Victims Assistance

17   Department"?  Do you see that?

18       A.    Yes.  I see that.

19       Q.    Okay.   Now, does that refresh your

20   recollection that there was never any lapse in

21   the fraud resolution services that were offered

22   as part of credit monitoring?

23       A.    Well, the TransUnion Fraud Victims

24   Assistance Department here doesn't take effect

25   until November 3rd of 2003 when they sent this

1    e-mail out.  So, the contract was started in

2    August of 2003, so who was covering it between

3    August and November?

4         Q.   Do you have any reason to believe that

5    it wasn't TransUnion?

6         A.   What do you mean?  That it wasn't

7    Promise Mark or it wasn't --

8         Q.   Well, who cares.  I mean, frankly, does

9    it matter who's providing the service?

10        A.   Well, if you've contracted for a

11   service and that person is no longer and has not

12   been providing that service -- this does not

13   show that TransUnion was covering it from August

14   until now.  This only says that TransUnion comes

15   on in November and starts covering it.

16        Q.   Do you have any evidence that fraud

17   resolution services were not available to those

18   who purchased credit monitoring at any time

19   since August 6, 2003, other than the pleading

20   that you saw your lawyers had written?

21        A.   I think there's some documents to that

22   effect, or something along those lines, relating

23   to when Promise Mark exited or whatever, there

24   are dates associated with that.

25        Q.   Well, as you sit here today now, do you

1    think those documents indicate that there was a

2    lapse in the services, the fraud resolutions

3    services that were being provided by TrueLink?

4        A.   Well, I mean, the -- in my mind, at

5    least from my understanding and that's all I can

6    speak to, I don't -- I don't know who was

7    providing those service from August of 2003

8    until November of 2003 when this notice arrived.

9        Q.   Do you have any reason to believe it

10    wasn't Promise Mark?

11       A.   Well, I didn't call the fraud services,

12    so I don't know for sure that it wasn't Promise

13    Mark.  But I do know that the documents that

14    were produced, at least from my understanding

15    and my recollection as I sit here, was that

16    Promise Mark exited, I thought, some time during

17    the summer, and so then there was no coverage

18    between the time I enrolled in the product and

19    the time that TU's fraud resolutions services

20    took over.  But, I mean, that's just my

21    recollection as I'm sitting here.  I don't have

22    those documents in front of me.

23       Q.   Okay.

24                   (M. Millett Exhibit 18 was marked

25    for identification by the reporter.)

1    Q.    (BY MR. O'NEIL) Let me hand you what's

2    been marked Exhibit 18.  Which is another

3    document that was produced by your lawyers.

4    Again, it's addressed to

5    metalmaiden@sbcglobal.net.  And it's -- the

6    subject line is "Your receipt from True Credit."

7    Do you see that, ma'am?

8    A.    Yes.

9    Q.    Says, "Dear Steven, Welcome to True

10   Credit's award winning credit monitoring

11   service."  Do you see that?

12   A.    Uh-huh.

13   Q.    "We're pleased that you've chosen our

14   program."  And then down below, it has "order

15   details."

16   A.    Uh-huh.

17   Q.    Has an order date of May 23, 2004.

18   A.    Uh-huh.

19   Q.    Do you recall getting this e-mail?

20   A.    Yes.

21   Q.    So, did you affirmatively -- you told

22   us earlier that you thought the credit

23   monitoring subscription was self renewing unless

24   you told it not to renew?

25   A.    I believe that's what the agreement

1    says.

2         Q.    Okay.  Do you recall now that you

3    affirmatively ordered credit monitoring again in

4    May of 2004?

5         A.    No, I do not.

6         Q.    Okay.

7         A.    This is the receipt that they generate

8    every quarter when they renew the product.  They

9    always send a receipt every quarter like this.

10        Q.    And every receipt of renewal says

11   welcome to the service, as opposed to you've

12   been renewed automatically?

13        A.    Sometimes they do, yeah.

14        Q.    Okay.  So, --

15        A.    I mean, I didn't physically go into the

16   site and renew the product to get this mail.

17   This was sent to me.  This was after the alert

18   fell off and was reinstated.  And Amanda was

19   around this time I know, because we were having

20   discussions about at that time they thought it

21   was the fraud alert falling on and off or some

22   other issue, but that's not what we later

23   determined.

24        Q.    With all due respect, Amanda wasn't

25   around.  This was dated May of 2004, you didn't

1    sue TransUnion until June of 2004.

2         A.   But there's another mail like this one

3    in '05 I believe.

4         Q.   Did you get receipts whenever the

5    subscription automatically renewed?

6         A.   Yes.

7         Q.   And did they always say welcome to the

8    service, we're pleased that you've chosen, which

9    would suggest to me that it's a brand new start

10   of the service and not a renewal?

11        A.   Well, they sent the mail, so I don't

12   know why this mail says welcome.  But I did not

13   go in and renew the service.

14        Q.   Okay.  Did you ever recall getting

15   receipts that said we've renewed your

16   subscription?

17        A.   I've gotten receipts like that, but I

18   can't say if it's with this product or one of

19   the other products.  So, I mean, I'd have to

20   look at the mail to be able to say.

21        Q.   I'm not sure that we've ever seen any

22   documents that were produced by your lawyers

23   that constituted notice of a renewal from

24   TrueLink.  But you think that you did get such

25   e-mails?

1      A.    Well, I mean, I got e-mails from some

2    of the credit monitoring products that say

3    here's your renewal or whatever.  So, whether it

4    was this one or not, unless I had the e-mail

5    here in front of me, I really couldn't say.

6      Q.    And if I don't have the e-mail, I can't

7    help refresh your recollection, right?

8      A.    Correct.

9      Q.    But, otherwise, you're confused as to

10    what e-mails you got from what company, right?

11      A.    I've gotten a bunch of e-mails, there's

12    no question.

13      Q.    From multiple companies?

14      A.    Yes.

15      Q.    And unless somebody puts them in front

16    of you, it's hard for you to separate them out?

17      A.    Yes.

18      Q.    Okay.

19            (M. Millett Exhibit 19 was marked

20    for identification by the reporter.)

21      Q.    (BY MR. O'NEIL) Let me show you what's

22    been marked Exhibit 19, which is another

23    document that was produced by your lawyers in

24    this case.  The first part of the document

25    appears to be a copy of a credit report that you

1    got from TrueLink regarding your husband.  I'd

2    like to direct your attention to the last two

3    pages.  Beginning on the second to the last

4    page, it seems to be the end of the credit

5    report, but then at the bottom of that page

6    seems to be the beginning of an e-mail.  Do you

7    see that?

8        A.   Yep.

9        Q.   And the credit report is dated -- well,

10   I'm not sure there is a date -- can you explain

11   why it looks as if two separate documents were

12   somehow combined into one?

13       A.   Because the credit report was printed

14   -- because there was an e-mail in between here

15   too to Barry Grissom.

16       Q.   Yeah, we'll get to that in a second.

17   But there is the credit report and then there is

18   the e-mail alert.  Do you see that?

19       A.   I see that.

20       Q.   But you didn't get the documents this

21   way from TrueLink, did you?

22       A.   What do you mean?

23       Q.   Meaning that on the second to last

24   page, there was the end of the credit report and

25   then the beginning of an e-mail?

1      A.    I got the alert e-mail first.

2      Q.    Right.

3      A.    This alert was blank.  So I went in and

4    purchased the credit report, which is the piece

5    that's pasted in to the top of the e-mail which

6    was then forwarded to my attorney.

7      Q.    Okay, now I understand.  So, you took

8    the two documents, put them in one e-mail and

9    sent them to your lawyers?

10     A.    Well, actually, no.  I took the

11   original e-mail sent from True Credit and

12   forwarded it.  I pasted the new credit report

13   inside it and then typed my stuff on the front

14   and then mailed it to Barry and Joyce.

15     Q.    So, this is not how you got the two

16   separate documents from TrueLink, you kind of

17   combined them in an e-mail to your lawyer?

18     A.    I forwarded the one document to my

19   lawyer directly.

20     Q.    What document is that?

21     A.    That's this last one which says it's

22   the credit alert, that's why the subject says FW

23   colon, because it's a forward of the actual

24   credit alert e-mail that came from TransUnion.

25     Q.    I understand.  But then you also --

1      A.   I pasted in the credit report I

2   purchased.

3      Q.   Okay, now I understand.  So, when you

4   pasted in the credit report -- okay.  But the

5   credit report doesn't have a date on it?

6      A.   Yes, it does, on Page 1000.

7      Q.   Oh, you're right, I'm sorry, it does

8   say August 16th there.  So the -- okay, now I

9   understand.

10         Now, the last page of this document is

11   the credit alert, says "If changes appear in

12   your credit report, for further details click

13   here."  The last page ma'am?

14      A.   Yes.

15      Q.   Now, that's the way the alert's always

16   looked, that the e-mail just said there was a

17   change in your credit report, and then you had

18   to click on a link to learn what the change was,

19   right?

20      A.   You click on the link and then you log

21   in.

22      Q.   Okay.

23      A.   And then you can learn what the --

24      Q.   Okay.

25      A.   What the --

1       Q.   Okay.  And there was a separate page on

2   the website that tells you the details of what

3   prompted the credit alert?

4       A.   Right.

5       Q.   Like, for example, an inquiry or new

6   account?

7       A.   Correct.

8       Q.   Okay.  Did you ever print out those

9   pages?

10      A.   No.

11      Q.   Okay.  Because I'll tell you that we

12   haven't received any of those types of pages

13   from your lawyer that explain what the alert --

14   what actually was the alert.  And you're telling

15   me that's because you never printed them out,

16   right?

17      A.   I never printed them out, no.

18      Q.   Okay.

19      A.   Because you can't print the alerts out.

20      Q.   Well, can you print the history of the

21   alerts, which we saw in the earlier document?

22      A.   Well, I think you can print the history

23   of the alerts today, but in 2003 and 2004, you

24   couldn't print an alert.  It would pop up in its

25   own window.

1      Q.    Okay.

2      A.    And then all of the right click menus

3   were disabled, so you didn't have the option to

4   like print or copy or paste or do anything with

5   it.

6      Q.    I understand, okay.  I understand.  But

7   you think that this is one of those examples

8   where you clicked on and then what, it was

9   blank?

10     A.    Yeah, the alert had nothing in it.

11     Q.    Literally just --

12     A.    Blank.  It was a white box.

13     Q.    Okay.  Did you ever call TrueLink and

14  say there's something wrong here because I'm

15  getting these alerts and they're blank?

16     A.    At this point in time, August 16, 2004,

17  we had already filed the lawsuits.  So, I took

18  the information from the alert, I had went and

19  purchased the credit report to figure out if

20  there actually was a true change being reported,

21  so that if needed I could let my lawyers know

22  that and I forwarded that information to my

23  attorneys.

24     Q.    Okay, I understand that you had sued

25  TransUnion, but not TrueLink as of this point.

1    But are you suggesting that because you had

2    already sued TransUnion that you couldn't

3    contact TrueLink and say there's a problem with

4    my service?

5        A.    My understanding was that my lawyers

6    were handling that, those matters for us at that

7    time.  So I took the information that I received

8    and I turned it over to our lawyers.

9        Q.    To your knowledge, have you, your

10   husband, or your lawyers ever notified TrueLink

11   of what you saw as being a problem with the

12   alerts being blank?

13       A.    I don't know if my lawyers ever

14   communicated that or not.  My husband and

15   myself, no, did not call TrueLink directly.

16       Q.    Okay.  To your knowledge, is the fact

17   that you believe these alerts were blank, is

18   that part of the claims in this lawsuit?

19       A.    Well, it's part of the information that

20   shows that the product is malfunctioning.

21       Q.    Well, I understand.  But I think your

22   primary complaint, if not your only one, is that

23   it doesn't give you information outside of your

24   credit report?

25                    MS. YEAGER:   Objection.

1    Misstates the record.

2        A.    No, that's not true.

3        Q.    (BY MR. O'NEIL) Okay.  Okay.  Well --

4    I'm sorry, I didn't want to characterize your

5    claim.  I'm just trying to understand.  I don't

6    think I saw in the complaint, and we never

7    learned about this until very recently, but I'm

8    trying to understand, are one of the claims you

9    have in this case based upon these blank alerts

10   you were getting?

11       A.    Yes.  Because it's a malfunction of the

12   product.

13       Q.    Okay.  But you never told TrueLink that

14   the product was malfunctioning, right?

15       A.    I believe we talked to TransUnion about

16   this.  This is August of 2004, I know somebody

17   was here -- I know somebody from TransUnion was

18   here in September of '04, because we met with

19   them in personal in Barry Grissom's office.

20   Experian was here also during that time frame,

21   the September-October time frame of '04.

22       Q.    And this is when they were explaining

23   to you that you sued the wrong company?

24       A.    Right.

25       Q.    And you sued the --

1      A.    Exactly.

2      Q.    Okay.  But you never told TrueLink.

3  You told -- you think you told TransUnion's

4  lawyers in a settlement conference or something?

5           MS. YEAGER:  Objection.

6  Misstates the testimony.

7      A.    It was not a settlement conference.

8      Q.    (BY MR. O'NEIL) Okay.

9      A.    They came out after the lawsuits were

10 filed.  What they came here for, I don't know.

11 I mean, they came here to talk to us about the

12 case, but I don't know that they came here for

13 the purposes of discussing settlement.

14     Q.    In any event, going back to my original

15 question.  To your knowledge, neither you nor

16 your lawyers have advised TrueLink of this

17 problem in the product?

18     A.    I'm sitting here going if TransUnion is

19 notified and they're your parent company, then

20 you've been notified.

21     Q.    Okay.  I understand that's your

22 position.  But when I ask you have you contacted

23 TrueLink, would you please understand that I

24 mean TrueLink and I don't mean their parent

25 company?  Can we just have an understanding

1    going forward that that's what I mean?

2         A.    Okay, as long as 100 percent of the

3    time that you use the word "TrueLink," it will

4    mean only TrueLink and not refer to any

5    information from the parent company, then I can

6    accept that.

7         Q.    Yeah, when I say "TrueLink," that means

8    TrueLink.  When I say "TransUnion," that means

9    TransUnion.  Fair enough?

10         A.    Okay.

11         Q.    Good.  When you -- okay, so then

12    there's an e-mail that you sent to Mr. Grissom.

13    And it says, "Now showing below highlighted in

14    red are two accounts now showing that are not

15    ours, one of whom is an insurance in Los

16    Angeles, California."  Do you see that?

17         A.    Yep.

18         Q.    What are the two accounts you're

19    referring to?

20         A.    The -- these are listed in the inquiry

21    section on the last page where it has creditor

22    information on 1004.

23         Q.    Okay.

24         A.    Do you see Citi Card CBS DNA from Sioux

25    Falls, South Dakota, that's No. 1.  And the

1    second one is Farmers Insurance Group from Los

2    Angeles, California.

3        Q.   So, it's not accounts, it's inquiries

4    that you were --

5        A.   No, this says "creditor information."

6    "The creditor information section provides the

7    names, addresses and phone numbers of all

8    creditors that appears on your credit report."

9        Q.   Okay.

10       A.   There is a creditor appearing here for

11   which there is no trade line.

12       Q.   Well, it's because it's the inquiry.

13       A.   No --

14       Q.   You didn't understand that?

15       A.   This doesn't say about inquiries, this

16   says "provides the information of -- phone

17   numbers of all creditors."  A creditor is a

18   person I owe money to.  A creditor is not

19   somebody who's made an inquiry.

20       Q.   Okay.  Let's go to the inquiry

21   information on the prior page.

22       A.   Right.

23       Q.   Do you see what it says?

24       A.   Uh-huh.

25       Q.   Says "creditor name," right?

1          A.    It says, "A list of companies that have

2    requested your credit report," it does not use

3    the word "creditor."  Well, this says "creditor

4    name" here.  I'm saying but when they're

5    describing the inquiry information, it does not

6    say or use the word "creditor."

7          Q.    So, you don't understand "creditor"

8    here to mean the same as creditor on the next

9    page?

10         A.    Well, and the reason for that is

11   because American Honda Finance, Ford Motor

12   Credit, Jared Jeweler and Washington Mutual are

13   legitimate creditors on this credit report for

14   which trade lines appear.

15         Q.    I understand, you just didn't

16   understand.  I understand.  And then you also

17   tell your lawyers that, quote, "It seems their

18   defense will entail trying to show we never

19   requested fraud alerts for our files."  Do you

20   see that?

21         A.    Uh-huh.

22         Q.    Do you still believe that that's

23   TrueLink's defense in this case?

24         A.    What?

25         Q.    That we'll claim that you never

1  requested fraud alerts?

2      A.  Well, the problem is, is with this

3  particular report was that the fraud alert was

4  redated.  And I didn't want anybody to come back

5  and say I did not have a fraud alert in '03 when

6  I did.

7      Q.  To your knowledge, are we claiming that

8  you never put a fraud alert in the file?

9      A.  Not at this time, no.  But it has been

10 brought up.

11     Q.  By who?

12     A.  Well, it was brought up I think in the

13 Experian deposition.

14             MR. O'NEIL:  Okay, let's go off

15 the record.

16             VIDEOGRAPHER:  We are now going

17 off the record at 4:00 p.m.

18         (Recess.)

19             VIDEOGRAPHER:  One moment please.

20 It is now 4:01 p.m. and we are back on the

21 record.  You may continue.

22     Q.  (BY MR. O'NEIL) Thank you.

23 Mrs. Millett, I'm showing you what's been marked

24 Exhibit 20, which are some more pages that were

25 produced by your lawyers in this case.

1              (M. Millett Exhibit 20 was marked

2      for identification by the reporter.)

3          Q.    (BY MR. O'NEIL) Can you tell me if

4      you've ever seen this document before?

5          A.    I probably have.  This looks like it's

6      a TransUnion Consumer Disclosure.

7          Q.    So, this is not information from

8      TrueLink, it's information from TransUnion,

9      right?

10         A.    Yes.  This is a TransUnion consumer

11     disclosure.

12         Q.    And although the letter is addressed to

13     Mr. Millett, you were the one who contacted

14     TransUnion asking for the information, right?

15         A.    Well, it's a dispute I think.

16         Q.    Okay.  You're right, because the letter

17     says "Re:  Dispute status."

18         A.    Uh-huh.

19         Q.    It says, "Based on the information

20     provided TransUnion, our records show that the

21     information you disputed does not currently

22     appear in your TransUnion credit report," closed

23     quote.  Do you see that?

24         A.    Yes.

25         Q.    Do you recall what in September 2004

1  you were disputing with TransUnion on behalf of

2  your husband?

3      A.   It was information I think regarding

4  the two creditors that weren't supposed to be

5  appearing there, but I can't recall exactly.

6      Q.   Okay, this makes sense.  So, Exhibit 19

7  you tell your lawyers that you interpreted this

8  TrueLink credit report as indicating that there

9  was Farmers and Citi Cards accounts on your

10  husband's credit report?

11      A.   Right.

12      Q.   And so you contacted TransUnion and

13  said there is Farmers and Citibank accounts on

14  my husband's credit report, right?

15      A.   Well, listed as creditors, yeah.

16      Q.   Okay.  And then TransUnion writes back

17  and says, no, we don't have that information on

18  the credit report, right?

19      A.   Correct.

20      Q.   And it wasn't, was it?  I mean, there

21  was no Citibank or Farmers accounts on the

22  credit report, right?

23      A.   It is listed in the section where it

24  says, "the following companies have received

25  your credit report," and the important thing is

1    neither one of those people have a permissible

2    purpose for receiving my husband's credit

3    report.

4        Q.    Okay, well, before we get to that.  You

5    do understand the difference between a credit

6    account on your file and an inquiry, right?

7        A.    I understand the difference between a

8    trade line and an inquiry, yes.

9        Q.    Okay, good.  Is that your handwriting

10    that's on exhibit -- what Exhibit No. -- 20?

11                MR. CLOON:  Yes.

12                MR. O'NEIL:  Thank you.  Yes.

13        Q.    (BY MR. O'NEIL) Okay.

14        A.    I mean, as far as I -- let me go back

15    through here and make sure all of them are mine.

16        Q.    On the second page, there's some

17    handwriting, do you see that?

18        A.    Yeah, I saw that.  I'm just going

19    through looking at all the written notes just to

20    make sure they're all mine and nobody's added

21    anything that's been copied in.

22        Q.    Good idea.

23        A.    Okay.  I'm satisfied all the written

24    notes on the report are mine.

25        Q.    Okay.  When you reviewed this report,

1     did you see anything in it that should have been

2     but was not the subject of a credit alert from

3     TrueLink?

4          A.    I had some items that were

5     questionable.  They're notated in brackets.

6          Q.    But I think your questions are about

7     something different, and we'll get to that.

8     Right now what I'm asking about is the TrueLink

9     product.

10         A.    Uh-huh.  There were no trade lines

11    appearing on here that would have generated an

12    alert let's just say.

13         Q.    Okay.  Well, let me be more broad.

14    Because you understood that the TrueLink credit

15    monitoring service was going to monitor

16    Mr. Millett's credit file, right?

17         A.    Correct.

18         Q.    Okay.  Now that you got a copy of

19    TransUnion's credit file, did you see anything

20    -- and I'm asking you to think back to 2004, not

21    today.

22         A.    I understand that.

23         Q.    In September of 2004, did you think to

24    yourself, wait a minute, there's something on

25    this report that I didn't get a weekly alert

 1    from True Credit for?

 2         A.    I didn't see anything in here that was

 3    not in the True Credit report, no.

 4         Q.    Okay.  The first handwriting is on the

 5    second page.  Can you tell me what that

 6    handwriting says?

 7         A.    "Why VIN on credit report?"

 8         Q.    Okay.

 9         A.    Why is my vehicle identification number

10    on my credit report.

11         Q.    And did that concern you?

12         A.    Yeah, it concerns me because people

13    steal VINs all the time and attach them to

14    vehicles and commit crimes.  I mean, as you get

15    into identity theft investigations as a whole,

16    you find out there's a whole scary realm of

17    unique identifiers out there that can be copied

18    and be linked back to you.

19         Q.    Yeah, I mean -- frankly, I mean, if an

20    identity theft got ahold of your husband's

21    credit report, the VIN would be the least of

22    your problems.

23         A.    Right.  Uh-huh.  But the problem with

24    it is is -- the problem with it is the credit

25    reports are looked at by so many different

 1    individuals, that it would be possible for

 2    somebody in a convenient place to take

 3    information with the intent to do harm to other

 4    people.

 5        Q.   And in the second page, what's the

 6    handwriting there on the left -- I'm sorry.  The

 7    third page, what's the handwriting on the left?

 8        A.   "No permissible purpose" and I can't

 9    even read that, so I don't know what the one

10    below it around Farmers Insurance says.  I don't

11    know what that says.  I can't read my own

12    writing, I'm sorry.

13        Q.   Sometimes that happens to me too.

14        A.   I think the second word looks like

15    "good."  That one looks like "good," but I can't

16    see what it says above it, so I don't know what

17    I meant or what was good or not good.

18        Q.   And then down below there's some

19    handwriting, can you read that?

20        A.   I think that says "Who are these".

21        Q.   Uh-huh.  Did you understand that these

22    are soft inquiries down at the bottom?

23        A.   Yes, I understand that they're soft

24    inquiries.  But we had a promotional block

25    placed on your file, so there probably shouldn't

1    have been any soft inquiries.

2        Q.    When did you have a promotional block

3    put in place?

4        A.    The same time that the credit fraud

5    alert was placed.

6                MS. YEAGER:  I'm sorry, Melody,

7    you need to take your hand down.

8                THE WITNESS:  Oh, I'm sorry.

9        Q.    (BY MR. O'NEIL) Did you ever contact

10   TransUnion and ask them to put a promotional

11   block on your husband's file?

12       A.    At the time that they did the fraud

13   alert, yeah.

14       Q.    Okay, well, in September of 2004 when

15   they gave you a copy of Mr. Millett's credit

16   report -- and it was for free, right?

17       A.    What?  This one?

18       Q.    Yeah.

19       A.    Yeah, because this one was in response

20   to the dispute that was initiated from this

21   other report I believe.

22       Q.    Yeah.  I mean, any time you want a free

23   credit report from TransUnion, you can just

24   dispute something and you'll get one, right?

25       A.    Well, yeah, I think so.  I think that's

1   pretty much how it works.

2        Q.   All right.  And then the letter says,

3   "If you have any additional questions or

4   concerns, please contract TransUnion at the

5   address shown below."  So, in September of 2004

6   when you got this credit report, did you call

7   TransUnion and say please make sure that there

8   is a promotional block on my husband's credit

9   file?

10       A.   I believe one of my attorneys either

11  discussed that with the TransUnion attorneys or

12  somebody at that time.

13       Q.   Well, I don't understand.  Because

14  you're contacting TransUnion directly to dispute

15  information and to get copies of your husband's

16  file, right?

17       A.   But I didn't talk to anybody.  I

18  disputed it on the web.  You know, you can click

19  on the link and go out and do the web dispute,

20  and you just dispute the item and say it's

21  disputed, and then they go out and do their --

22  you don't talk to a person, it's like self

23  service.

24       Q.   Okay.  Well, what prevented you from

25  asking TransUnion to put a block on promotional

1    inquiries that way?

2        A.   Well, I wanted my lawyers to talk to

3    them, because some of these promotional

4    inquiries appear to be from accounts that were

5    related to the identity theft, and I didn't want

6    for, you know, information from the

7    investigation to get lost.  Because you have two

8    Citi -- there's two City card soft inquiries and

9    an inquiry on here from American General

10   Financial, whom we've never done business with,

11   who was an Abundio Perez creditor as well.

12       Q.   Okay.  Aside from in I think you said

13   January 2003, did you ever contact TransUnion to

14   ask that promotional block be put on

15   Mr. Millett's file?

16       A.   I'm sorry, can I get the question

17   reread please?

18       Q.   Yeah, I'll just do it.  I think you

19   said that you initially requested that

20   Mr. Millett's file be blocked from promotional

21   inquiries in January 2003, right?

22       A.   Yeah.

23       Q.   Okay.  At any other time after January

24   2003, did you contact TransUnion and renew that

25   request?

1    A.   No, but one of our attorneys has I

2  think.

3    Q.   And on Page 3 of the credit report, you

4  have a notation "no permissible purpose" next to

5  the "Farmers Insurance inquiry"?

6    A.   Yes.

7    Q.   But you already testified earlier that

8  you had done business with Farmers, do you

9  recall that?

10    A.   Correct.  But they were no longer our

11  insurance carrier at that time.

12    Q.   Well, the inquiry wasn't in September

13  of 2004, it was in --

14    A.   November of 2003, and they were already

15  fired.

16    Q.   Okay.

17    A.   They got fired after the hail storms we

18  had here in June of 2003 which destroyed my

19  Acura and required $9,000 worth of damage, and I

20  had to argue with them for four months to get

21  them to pay for my car, so, yeah, they were

22  fired.

23    Q.   Did you use an insurance agent to

24  obtain that insurance?

25    A.   Which one?  The All State or the

1   Farmers?

2        Q.    Farmers?

3        A.    I went to a Farmers' agent.

4        Q.    Uh-huh.  Did you ever advise TransUnion

5   that you thought Farmers Insurance had no

6   permissible purpose to pull that report?

7        A.    I believe we discussed this with their

8   attorneys in, I don't know which report this is,

9   but when they were here in '04.  Because this

10  inquiry here was already on the report for quite

11  some time prior to that point in time.

12       Q.    And in the fall of 2004 is when you or

13  your lawyers dismissed TransUnion from the case

14  and added TrueLink, right?

15       A.    I would say that the time period seems

16  about right.

17       Q.    Okay.

18       A.    I don't know if it was exactly the fall

19  or if it was more closer to winter.

20       Q.    Yeah, I could be wrong on that timing.

21  I think I'm wrong on that, but okay.  I may have

22  asked you this before, did you ever sign a

23  settlement agreement with TransUnion?

24       A.    I don't recall.  I don't think so.

25       Q.    Do you know, is there any written

1    documentation of any agreement that you had with

2    TransUnion in connection with dismissing them

3    from the lawsuit?

4        A.   I think it was just relabeled to

5    TrueLink, because they said that was the party

6    we were supposed to be suing.  So, I'm kind of

7    at, you know...

8        Q.   But you've made reference to

9    conversations with Amanda and where they

10   promised you quarterly reports or something like

11   that.  Do you remember that testimony today?

12       A.   Yes.

13       Q.   Is that understanding in writing

14   anywhere as far as you know?

15       A.   I don't know.  I don't think so.  I

16   don't -- it's not like, oh, I signed a legal

17   agreement that's notarized that's shoved

18   somewhere, I don't think that that occurred, no.

19       Q.   Have you ever seen correspondence

20   between your lawyers and Amanda and her law

21   firm?

22       A.   I've seen correspondence from Amanda,

23   but I don't know if I've seen any that relates

24   to this particular situation.  I mean, if I was

25   supposed to receive it, I've received it.  But

1     I've had 3,000 e-mails since then.

2          Q.    How many e-mails do you get a day?

3          A.    Home or work?

4          Q.    Home.

5          A.    About five or 600.

6          Q.    Really?

7          A.    Uh-huh.

8          Q.    Are most of them from people you don't

9     know?

10         A.    No.   I mean, my dad's a very prolific

11    e-mail sender, my mom's a prolific e-mail

12    sender, I have relatives that are -- I have

13    friends in the internet community and the

14    identity theft community that e-mail me on a

15    regular basis.   And then of course you have your

16    regular obligatory 250 spam messages a day,

17    because I have an e-mail address that has the

18    luxury of being approximately, what, six, seven

19    years old now.   So, that's how that goes.

20         Q.    Do you look at them all?

21         A.    Well, I skim them, I delete the spam.

22    I keep the important ones.   Ones that come from

23    addresses that are white listed go into special

24    folders so I know I read those first, and the

25    rest of them I kind of skim through at my

1    leisure.

2        Q.    In the last four or five months, have

3    you made any effort to go through all of your

4    stored e-mails and to print out those that

5    relate to TrueLink?

6        A.    In the last four or five months, I made

7    an effort to go through all of my electronic

8    mail and forward them to my attorneys, but they

9    were zipped and they were sent electronically.

10   They weren't printed by me.

11       Q.    Okay.  So, you did make an effort to

12   identify e-mails that were responsive to the

13   document requests here?

14       A.    Yes.

15       Q.    And to forward those on?

16       A.    Yes.

17       Q.    But you don't know if your lawyers have

18   produced it to TrueLink's counsel, right?

19       A.    I don't know if they've all been

20   produced or not.  And, of course, you know, the

21   e-mails are ongoing.  So, if you produced it in

22   March and 15 e-mails have come in from TrueLink

23   since then, it's possible you could be missing

24   some.

25       Q.    Well, the last e-mail was August of

1    2005, we're probably missing a lot, right?

2        A.    I'm not so sure how many you'd be

3    missing at that point.

4        Q.    Uh-huh.

5        A.    I think they were more prolific in

6    e-mail prior to that.

7        Q.    Do you recall making any effort to

8    print out the credit monitoring member agreement

9    that you had to click on on August 6, 2003, in

10   order to purchase the products on behalf of your

11   husband?

12                  MS. YEAGER:   Objection.   Asked

13   and answered.

14       A.    Are you talking about the contract?

15       Q.    (BY MR. O'NEIL) Yes.

16       A.    Do I remember what?

17       Q.    Trying to print that out.

18       A.    I remember it was extremely difficult

19   to print out.

20       Q.    Uh-huh.   So you did try?

21       A.    I did try.

22       Q.    Well, did you succeed?

23       A.    I don't think I was successful, no.

24       Q.    Okay.

25       A.    But I could have that confused with

1    some other case, because some of them you can

2    print and some of them you can't.  Those web

3    forms get funky and some of them won't let you

4    print them and...

5         Q.   Did you make any effort to print out

6    the contract with TrueLink after August 6, 2003?

7              MS. YEAGER:  I'm going to object

8    to the extent it calls for attorney-client

9    privilege.  You may answer.

10        A.   I'm not sure when the next attempt was

11   made or --

12        Q.   (BY MR. O'NEIL) Or if one -- right now

13   I'm just asking if you ever made an attempt.

14        A.   I've made attempts, but I can't

15   necessarily tie it specifically to this product.

16   So I mean...

17        Q.   So, it may have been other products?

18        A.   It may have been another product.

19        Q.   Before you authorized your lawyers to

20   file that complaint against seven defendants in

21   July of 2004, did you make any attempt to read

22   the contract that you were suing on?

23        A.   Yes.

24        Q.   Okay.  Did you notice then that the

25   contract was with TrueLink and not TransUnion?

 1          A.    I'm sorry, what?

 2          Q.    Did you notice when you read that

 3     contract at that time that in fact the contract

 4     was with TrueLink not TransUnion?

 5          A.    I understood TrueLink to be part of the

 6     contract, but, I mean, you -- it says TransUnion

 7     and there's TransUnion all over the page, so.  I

 8     mean, at that point I thought it was possible

 9     TrueLink could be TransUnion, I mean, you know.

10                (M. Millett Exhibit 21 was marked

11     for identification by the reporter.)

12          Q.    (BY MR. O'NEIL) I'm going to hand you

13     what's been marked Exhibit 21, which are some

14     more documents that were produced by your

15     lawyers in this case.  Do you recognize this

16     document?

17          A.    Yes, this is an e-mail I sent to Joyce

18     of the new TrueLink service agreement in October

19     of 2004.

20          Q.    So you were able to print it at least

21     in October of 2004, right?

22          A.    Yes.

23          Q.    What prompted you to send this to your

24     lawyer at that time?

25          A.    Because I think that they -- I think

1    when you logged in to the site, there was some

2    notification or something that the service

3    agreement was updated or whatever, so I went out

4    there and printed it and sent it.

5        Q.    Did you read it at that time?

6        A.    Yes, I read this at that time.

7        Q.    Did you read the whole thing or did you

8    just skim it?

9        A.    No.  At this time, I probably read the

10   whole thing from top to bottom.

11       Q.    Let me direct your attention to Page 5.

12       A.    Okay.

13       Q.    Under the heading "Applicable Law."

14       A.    Uh-huh.

15       Q.    Do you recall learning when you read

16   this at that time that Delaware law governed any

17   claims brought under the contract?

18       A.    I just -- I just interpreted that this

19   meant that the case had to be prosecuted in

20   Delaware, you know.

21       Q.    But in fact you had filed the lawsuit

22   in Kansas, right?

23       A.    Correct.

24       Q.    Actually, you filed two lawsuits

25   against TransUnion in Kansas in 2004, do you

1    recall that?

2         A.    Well, it's one lawsuit.

3         Q.    Well, technically, you filed one

4    lawsuit against seven defendants and TransUnion

5    was one of them, right?

6         A.    Right.

7         Q.    And then you voluntarily dismissed

8    without prejudice TransUnion, and then you filed

9    a new lawsuit in Kansas.  Do you recall that?

10        A.    Yeah, I recall that.

11        Q.    Okay.

12        A.    I just don't characterize it the way

13    that you do, because I think that was a

14    procedural thing.

15        Q.    Did you ever discuss this contract with

16    your husband?

17        A.    Which one?  This new contract?

18        Q.    You know what that's a good question.

19    Did you ever discuss any contract between your

20    husband and TrueLink with your husband?

21        A.    Well, I mean, he knows we entered into

22    one, I mean.

23        Q.    But you obviously never gave him -- you

24    know, you never discussed the details of the

25    contract, right?

1       A.   No.  I mean, when I act as his agent if

2   he had -- if I read a contract or whatever and I

3   say, you know, we say it's okay or whatever,

4   then it's okay, and that's okay.

5       Q.   So, basically, because you had agreed

6   to the terms of the contract, that was good

7   enough for your husband, right?

8       A.   Yeah.

9       Q.   Okay.  And you had agreed to the terms

10  of the contract, right, when you first signed up

11  for the service in August of 2003?

12      A.   Yeah, that's part -- you enter into a

13  contract, that's what the issue is I think.

14      Q.   Has -- have you suffered any damages as

15  a result of the breach of contract that you

16  allege TrueLink committed?

17      A.   My husband and I have lost the money

18  that we paid for the product.

19      Q.   Well, you understand technically your

20  husband paid for the product, right?

21      A.   No, technically, I paid for the

22  product, it's my debit card.

23      Q.   Okay.  Any other damages that you or

24  your -- well, let's stick to your husband.  Has

25  your husband suffered any other damages as a

1    result of the alleged breach of contract by

2    TrueLink?

3        A.    Well, he -- he's statutory damages, he

4    has -- I think there's injunctive relief that's

5    being requested, his attorney cost and fees.

6        Q.    Well, you know, maybe I shouldn't use

7    the word "damages," because that can sometimes

8    have a legal meaning.  Let's talk about harm,

9    kind of a non-legal term.

10       A.    Okay.

11       Q.    Has your husband suffered any harm as a

12   result of TrueLink allegedly not delivering what

13   it promised?

14       A.    Yeah.

15       Q.    And what harm has he suffered?

16       A.    He's suffered the harm of not being

17   notified that there was a public judgement

18   issued against his Social Security number

19   without his knowledge.  Additional harm includes

20   accounts that have been relabeled that he was

21   never notified about that have his name and

22   address associated with him.

23       Q.    If I can just stop you.  And maybe we

24   should go back to what you said before lunch,

25   but.  Because you listed a number of things

1    that --

2        A.    Right.

3        Q.    -- you think TrueLink did or didn't do

4    that is the subject of your claim.

5        A.    Right.

6        Q.    So, let's go to that and -- first one

7    you said is just what you said before that there

8    was -- you said that TrueLink failed to disclose

9    that there was a judgement entered in a public

10   record using Mr. Millett's Social Security

11   number?

12       A.    Yep.

13       Q.    How was he harmed by that though?

14       A.    Well, he's harmed by that because the

15   collectors then started calling the house trying

16   to collect the judgement.

17       Q.    They did?

18       A.    Yes.  Ford Motor Credit called on at

19   least two occasions.

20       Q.    Okay.  Well, that -- the phone calls

21   weren't a result of TrueLink not notifying you,

22   the phone calls were the result of Mr. Perez

23   using your husband's Social Security number,

24   right?

25       A.    Right.  But public records are used as

1    background checks for employment and other

2    instances.  And, I mean, if I can go out there

3    to log in to LexisNexis and find that public

4    record for $2.95 with my husband's Social

5    Security number attached to it, I don't think

6    there's any reason why the TrueLink product

7    shouldn't have been able to notify me about

8    that.

9        Q.   Ma'am, I understand you think they

10   should have notified you.  What I'm asking is,

11   so what?  They didn't notify you, what harm was

12   attributable not to the identity theft, not to

13   the filing of the public record judgement.  What

14   I'm asking is, what harm did your husband suffer

15   because TrueLink didn't tell you about it?

16       A.   It took longer to find out about it.

17       Q.   Well, when was the public record

18   judgement filed?

19       A.   I'm thinking it was some time in the

20   April or May time frame or maybe it was sooner

21   than that, it was March or whatever, that whole

22   process got started.  I'd have to look at the

23   documents.  But I know that it was in the first

24   part of 2004.

25       Q.   Have you ever seen a copy of the

1    judgement that was entered in the public record?

2        A.    Yes, I have.

3        Q.    And has it been produced to your

4    lawyers?

5        A.    Yes, my lawyers got a copy of it in the

6    Ford Motor case.

7        Q.    Okay.  Well, we haven't seen it, so.

8    It would be helpful to get that since it's now

9    part of your claim.

10           You told us this morning that your

11    credit monitoring service lapsed for three

12    months while you were still being charged?

13       A.    Yes.

14       Q.    When was that?

15       A.    That's in the TU documents that you all

16    produced where it shows that the credit watch

17    was ended and there was still product being --

18    still billing period being recorded on.

19       Q.    Is that the document I showed you

20    before?

21       A.    Well, that's part of it.  But you need

22    the other piece too, which that has the actual

23    little computer transactions going back and

24    forth between you and TransUnion that show when

25    the credit watch is placed on their file and

1    removed from the file.

2        Q.    Okay.  But --

3        A.    I don't know what document numbers

4    those are off the top of my head.

5        Q.    And you think that you were charged

6    during that time period?

7        A.    Yes.

8        Q.    Okay.  But if you look at -- well,

9    okay.  And we're awaiting your bank records to

10   show whether or not you've been charged, right?

11       A.    Correct.

12       Q.    Okay.  Look forward to seeing those.

13   You also said that one of the problems you had

14   with TrueLink was the product is being marketed

15   for bulk purchase to give to data breach

16   victims.  Do you recall that?

17       A.    Yes.

18       Q.    Well, your husband hasn't been harmed

19   by that fact, has he?

20       A.    Well, no, but those people would be

21   part of this class as well, because those data

22   breach victims, like the Veterans Administration

23   and whatnot that are being offered these

24   products and services as identity theft

25   remediation for them due to data breaches of

1    computer systems are receiving the same product

2    we are.  And if their identity can be stolen and

3    their Social Security number can be used, then

4    they're not going to be notified, then how

5    valuable is the product really to them in terms

6    of being an identity theft product.

7         Q.   Well, do you think that people who

8    didn't pay for the product but had the Veteran

9    Administration pay for it, do you think that

10   they're members of your class you want to

11   represent?

12        A.   Well, I think the Veterans

13   Administration should get it's money back, don't

14   you?

15        Q.   So you think the Veterans

16   Administration is a member of your class then?

17        A.   Well, if they in fact purchased this

18   product and they were a part of this class,

19   then, yeah, they would be part of this class.

20        Q.   Well, what if they didn't share your

21   understanding of what the product could do?

22        A.   Well, it's obviously that they should

23   -- they have an assumption about what the

24   product could do or they wouldn't be purchasing

25   that product to give to identity theft victims.

1      Q.   Well, no.  I mean, with all due

2   respect, Mrs. Millett, you're the only person I

3   ever met who thought that the credit monitoring

4   product could actually alert you to things

5   occurring outside of your credit file.  Do you

6   have any reason to believe that the Veteran

7   Administration believed that when they bought

8   the product?

9      A.   No, I don't have reason to believe

10  that, I just know they bought the product.

11     Q.   Okay.

12     A.   Because it was in one of the news

13  articles I read.

14     Q.   Because you've acknowledged that the

15  product does identify true name fraud, right?

16     A.   Well, at least I thought it did at some

17  point, but I don't believe that anymore.

18     Q.   Okay.  And when you told "The New York

19  Times" that you thought it was still a valuable

20  product, then, what, you were lying then or

21  you've changed your mind since then?

22            MS. YEAGER:  Objection.

23  Misstates her testimony.  Misstates facts not in

24  evidence.  Foundation.

25     A.   "The New York Times" article does not

1    characterize it in that way.

2        Q.   (BY MR. O'NEIL) So, whenever the --

3    you've read "The New York Times" article, right?

4        A.   Yes, I participated in it.

5        Q.   Okay.  And --

6                MS. YEAGER:  Do we have a

7    question?

8                VIDEOGRAPHER:  Go ahead.

9                MS. YEAGER:  I'm sorry to

10   interrupt.

11       Q.   (BY MR. O'NEIL) Were you misquoted in

12   that article?

13       A.   No, you're misquoting the article.

14       Q.   Okay.  So, is everything in that

15   article accurate as far as you're concerned?

16       A.   Fairly accurate, yeah.

17       Q.   Fairly accurate?

18       A.   Uh-huh.

19       Q.   Okay.

20       A.   I mean, because the article isn't

21   100 percent about me, so I don't know.  I can't

22   attest to the accuracy of the rest of it.

23       Q.   I understand.  Obviously.  You're

24   quoted as saying, quote, "I still have credit

25   monitoring because of the simple fact that it is

1    the best tool available at this time."

2         A.    And what's the rest of sentence?

3         Q.    "It is not ideal, it is broken and it

4    is not as advertised."  Is that an accurate

5    statement?

6         A.    That's the statement, yes.

7         Q.    Okay.  So, it's still valuable enough

8    for you to continue using it and continue buying

9    it; isn't that correct?

10        A.    Well, I'm not buying it anymore, am I?

11        Q.    Well, you did for years and years and

12   years after you claimed that it didn't work?

13        A.    And I don't deny that.

14        Q.    Okay.  And the only reason why you're

15   not buying it today is because your credit card

16   changed and you didn't give the company a new

17   credit card?

18             MS. YEAGER:  Objection.

19   Misstates --

20        Q.    (BY MR. O'NEIL) Isn't that right?

21             MS. YEAGER:  -- the testimony.

22        A.    No.  I just -- I elected not to go in

23   there and put in a new credit card when it

24   arrived.  So, to that extent that's why it's no

25   longer going on.

1    Q.    (BY MR. O'NEIL) What other harm has

2    your husband suffered as a result of TrueLink's

3    failures as alleged in the complaint?

4    A.    Well, I think there's a sincere

5    dissolutionment with the system.  I mean, people

6    who give their -- people give their word and

7    they say that they're going to provide you a

8    product or service, and then you go out and say,

9    okay, I want that product or service and I'm

10   going to pay for it.  And then when you don't

11   get what you've paid for, it's very

12   disheartening, especially when you're talking

13   about a product or service like the one we're

14   talking about for someone who's been a victim.

15   Q.    It's disheartening to you, right?

16   A.    Well, it's disheartening to both of us.

17   Q.    I mean, your husband didn't read the

18   representations that you claim lead you to

19   believe that the product could do something you

20   thought it could do, right?

21            MS. YEAGER:  Objection.  Assumes

22   facts not in evidence.

23   A.    I am almost 100 percent certain that my

24   husband believes that his Social Security number

25   would be protected as a result of the purchase

1    of this product, yes, I do.

2        Q.    (BY MR. O'NEIL) That's because you --

3    was that because you told him that?

4        A.    Well, he was there when we signed up

5    for it.  I mean, and he read the same ad I did.

6        Q.    No, he was playing video games.

7        A.    Well, I know he was playing video games

8    but I'm saying he read -- he -- we talked about

9    the ad, so I --

10       Q.    Okay?

11       A.    So, I know he knows what it said.

12       Q.    You're not suggesting that he read the

13   ad, are you?

14       A.    No, I read the ad to him.

15       Q.    Oh, you read it out loud to him?

16       A.    Yes.

17       Q.    Oh.

18       A.    He sits right behind me.

19       Q.    Oh.

20       A.    At his computer and I'm sitting at my

21   computer.

22       Q.    He didn't say that, though, did he, in

23   his deposition?

24       A.    What?

25       Q.    So, it's your testimony that you're at

1    one computer with your back to him ordering

2    products from TrueLink, he's in the same room

3    playing video games?

4         A.    Behind me.

5         Q.    And you read word for word the

6    marketing materials on the TrueLink website?   Is

7    that your testimony?

8         A.    I may have read -- I read a few

9    sentences.   I didn't read all of the testimony.

10        Q.    What sentences did you read to him?

11        A.    I don't recall specifically.   I just

12   know in general that we read and talked about

13   what the product could do for us and that we

14   discussed that.

15        Q.    Is it fair to say that you were more

16   interested in buying this product that

17   Mr. Millett was?

18        A.    No.   It was fair to say that both him

19   and I were looking for solutions to the problems

20   that we had -- were now facing.

21        Q.    But he wasn't so interested that he

22   would stop playing his video games to actually

23   read about the product that you were buying on

24   his behalf, right?

25        A.    I handle all those types of things, all

1    the financial stuff, so he'd probably just go

2    whatever.

3        Q.    So, any representation that he got

4    about the product came from, right?

5        A.    Right.    And those came from the ad.

6        Q.    Did you tell him on August 6, 2003,

7    that this credit monitoring product by TrueLink

8    would advise of conduct by Mr. Perez that did

9    not show up on his TransUnion credit report?

10        A.    I don't think it was characterized like

11    that, no.    I think what I said was that this

12    product would help us and would provide some

13    assistance to us possibly.

14        Q.    And that's what he relied upon in

15    okaying your decision to buy the product, right?

16        A.    Yep.

17        Q.    Do you recall that TrueLink sent

18    interrogatories to your husband?

19        A.    Yes.

20        Q.    But he didn't answer them, right?

21            MS. YEAGER:    Objection.

22    Misstates the evidence.

23        A.    I'm sorry?

24        Q.    (BY MR. O'NEIL) He did not answer the

25    interrogatories, you did, right?

 1        A.    He didn't physically answer them, no.

 2   He read them and signed them.

 3        Q.    Why did you take it upon yourself to

 4   answer the interrogatories for him?

 5        A.    Because throughout all the cases, in

 6   some cases, is the interrogatories have called

 7   for facts that mostly resided with me, because I

 8   conducted the investigation into the identity

 9   theft in the first place.

10          So, I'm the one that's been filling

11   them out and I've filled them out usually with

12   the help of my lawyer.

13        Q.    Do any of the facts reside with your

14   husband?

15        A.    I'm sorry?

16        Q.    Do any of the facts reside with your

17   husband?

18        A.    There are some facts, yes.

19        Q.    What facts does your husband know that

20   you don't know?

21              MS. YEAGER:   Objection.   Calls

22   for speculation.

23        A.    I don't know the answer to that, but

24   I'm saying there are facts that we both know.

25        Q.    (BY MR. O'NEIL) Uh-huh.   All the facts

1    he knows he got from you though, right?

2        A.    No.  He was present when his police

3    reports was filed.

4        Q.    But you wrote it, right?

5        A.    I filled it out, yes, I did.

6        Q.    And then you signed it and then the

7    police officers said, well, actually,

8    Mr. Millett should sign it, right?

9        A.    No we both --

10            MS. YEAGER:  Objection.  That

11   misstates the evidence.

12       A.    No.  Actually, we both signed it,

13   because I had to sign -- the police officer

14   wanted me to sign it, because the statements

15   that were being made in connection with the

16   discovery of the crime were discovered by me

17   because I'm the one that talked to Ford Motor.

18       Q.    (BY MR. O'NEIL)  Mr. Millett verified

19   the interrogatory responses that you provided,

20   right?

21            MS. YEAGER:  Objection.

22   Misstates the evidence.

23            MR. O'NEIL:  Am I wrong, Joyce?

24   No, no, let's be clear.  Am I wrong?  Did

25   Mr. Millett not verify these interrogatory

1    answers?

2                MS. YEAGER:  She did not provide

3    them.  She helped prepare them.

4                MR. O'NEIL:  Oh, no, that

5    misstates the evidence of both your clients.

6        A.   I prepared them with my lawyer.  Now

7    did I physically sit down at the typewriter and

8    type each and every answer, no, I did not.

9        Q.   (BY MR. O'NEIL) Oh, you don't?

10       A.   No.

11       Q.   Who did?

12       A.   My attorneys typed those for me.

13       Q.   Oh.

14       A.   But I provided the content and the

15   context for each answer that's on the

16   interrogatory.

17       Q.   Okay.  So, interrogatories go to

18   Mr. Millett -- were you a little irritated that

19   they only went to Mr. Millett and not you as

20   well?

21       A.   No.

22       Q.   Okay.  So the interrogatories go to

23   Mr. Millett, you provided the information and

24   Ms. Yeager types it.  Is that the way it worked?

25       A.   Yeah, I guess so.

1      Q.    To your knowledge, were those responses

2    that you prepared accurate?

3      A.    Yes, to my knowledge, yeah.

4            VIDEOGRAPHER:  Mrs. Millett,

5    could I ask you to turn back toward the video

6    please?  That's fine, thank you.

7            THE WITNESS:  I'm sorry, I got

8    pushed away from the table.

9            (M. Millett Exhibit 22 was marked

10    for identification by the reporter.)

11      Q.    (BY MR. O'NEIL) Are you aware of any

12    individual who is a member of the class that you

13    seek to represent?

14      A.    I'm sorry?

15      Q.    Do you know any particular individual

16    who is a member of the class that you seek to

17    represent?

18      A.    I think I've heard of people who have

19    purchased the products, yes.

20      Q.    What does that mean, you've heard of

21    people who purchased the product?

22      A.    Well, I mean, you know, it's like

23    somebody I talked to at work or whatever and

24    their relative has the product or --

25      Q.    Have you ever spoken to anybody who is

1    in the class that you seek to represent?

2        A.    No.

3        Q.    Let me hand you what's been marked

4    Exhibit 22, which are the interrogatory

5    responses that we got in this case.

6        A.    Uh-huh.

7        Q.    It looks like the font and type size of

8    the answers is different from the font and type

9    size of the questions.  Would you agree?

10       A.    Yeah.

11       Q.    Okay.  But it's your testimony that you

12   didn't write these words, you just gave the

13   information to your lawyers and your lawyers

14   wrote them?

15       A.    This information that's in here is not

16   based verbatim from the e-mail response I made

17   that answered this particular question.

18       Q.    Okay.  So you sent an e-mail to your

19   lawyers --

20       A.    Answering the questions.

21       Q.    Okay.

22       A.    And then they may have pasted them into

23   the appropriate responses.

24       Q.    Did they change your answers?

25       A.    I'm sorry?

1      Q.   Did your lawyers change the text of the

2   answers that you provided to them before they

3   finalized it and sent it to counsel for

4   TrueLink?

5      A.   I believe they went back and forth

6   several times.

7      Q.   Between you and the lawyers?

8      A.   Uh-huh.

9      Q.   Okay.  So they made some changes and

10   you made some changes, is that how it worked?

11      A.   Yeah.

12      Q.   Okay.  Now, there's several places --

13   well, let's just -- response to Interrogatory

14   No. 6, and I apologize these pages are not

15   numbered, but if you look at Interrogatory No.

16   6.

17      A.   Uh-huh.

18      Q.   The interrogatories there describe in

19   detail all instances in which plaintiff has

20   purchased credit report, etc.  Do you see that,

21   ma'am?

22      A.   Yeah.

23      Q.   And then the answer -- and then there's

24   a lot of objections, but the real answer comes

25   in the next page.  It says here, "We knew that

1    TransUnion might have information which Equifax

2    and Experian did not have."

3         A.   Yes.

4         Q.   What does that mean?

5         A.   Well, because the three bureaus have

6    three separate databases.

7         Q.   Right.

8         A.   Well...

9         Q.   So, some credit bureaus have accounts

10   and others don't?

11        A.   Correct.

12        Q.   So, it's possible that the Home Depot

13   trade line could have been on some other credit

14   bureau's files but not on TransUnion, right?

15        A.   Well, no, it was already on the TU

16   letter, so.

17        Q.   Ma'am, I'm talking about your husband's

18   credit file.

19        A.   That's what I'm talking about too.  The

20   Home Depot account is on the original TU letter

21   from 4/23.

22        Q.   But that indicates that that Home Depot

23   account is on Mr. Perez's credit file, not your

24   husband's, right?

25        A.   Right.

1     Q.   But you're not suggesting, although

2  we're still waiting for evidence, you're now

3  suggesting that the Home Depot trade line is on

4  TransUnion's file?

5     A.   It's been relabeled.  That has been

6  relabeled with Steven Millett's name and

7  address, yeah, so then it would be on our file

8  or my husband's file.

9     Q.   Well, it could be on the file of one

10  bureau, three bureaus or no bureaus, right?

11     A.   Well, I know it's on at least one

12  bureau.

13     Q.   And whose bureau is that?

14          MS. YEAGER:  I need to object.

15  That is subject to a confidentiality protective

16  order.  The document was labeled "highly

17  confidential."  We have the same sort of

18  agreement that we have you.

19          MR. O'NEIL:  Okay.  Well, then I

20  guess you can't use it as evidence in this case.

21  I'll move on.

22     Q.   (BY MR. O'NEIL) So, it's on one credit

23  bureau, but you can't tell me which one?

24     A.   Well, there is the information on the

25  subpoena from Home Depot itself, which shows

1    where they've relabeled the accounts with Steve

2    Millett's name and address, and that's how

3    they're reporting it.

4        Q.   But the Home Depot subpoena documents

5    don't tell you who they reported it to?

6        A.   Right, but it's a reasonable inference

7    since the Home Depot already appears on the

8    TransUnion letter on file in 2003 that Home

9    Depot reports to TransUnion.

10       Q.   Well, there's differences between

11   inferences and evidence, we'll see how that

12   plays out.   Interrogatory No. 7 on that same

13   page asks if plaintiff claims to have suffered

14   any economic loss as a result of the conduct of

15   defendant alleged in the fourth amended

16   complaint.   It asks you to provide or asks

17   Mr. Millett to provide certain information,

18   right?

19       A.   Uh-huh.

20       Q.   And it says:   "My wife handled these

21   matters for our family.   We lost a lot of money

22   because we could not get credit or could not get

23   good rates."   Right?

24              MS. YEAGER:   I'm sorry to

25   interrupt.   What number are we on?

1          MR. O'NEIL:   Interrogatory No. 7.

2          MS. YEAGER:   Thank you.   Sorry to

3     interrupt.

4          MR. O'NEIL:   That's okay.

5     Q.   (BY MR. O'NEIL) So, the interrogatory

6     response says you lost a lot of money because we

7     could not get credit, we had to pay extra money

8     for insurance?

9     A.   Uh-huh.   Right.

10    Q.   But you're not seeking those damages in

11    this case, are you?

12    A.   We're seeking the damages for breach of

13    contract that we're supposed to be getting.

14    Q.   Okay.   Well, maybe I should just ask

15    you.   This interrogatory suggests that you are

16    -- that you have suffered these economic losses

17    as a result of TrueLink's conduct.   Is that

18    accurate?

19    A.   Well, to the extent that I -- my

20    thought process still thinks that TransUnion and

21    TrueLink are the same company, yes, those are

22    economic losses that have been suffered.   Now,

23    whether or not they're recoverable in this

24    particular case because of the claims that have

25    been brought is a different matter.   But it's

 1    been answered here.

 2        Q.   Are there -- are you seeking recovery

 3    of those in this case?

 4        A.   No.  I don't believe so.

 5        Q.   Oh, okay.

 6        A.   I believe the Fair Credit Reporting Act

 7    portion of this case was dismissed, so.

 8        Q.   Why was it dismissed?

 9        A.   I don't know.  I think it was just

10    dropped.

11        Q.   You don't know why?

12        A.   I think that would be a matter between

13    myself and my attorneys as to why.

14        Q.   No.  I'm not asking you to disclose

15    conversations you've had with your lawyers.  I'm

16    asking you do you know why you decided to

17    dismiss the --

18        A.   Yes, I do.

19        Q.   Okay.  Why is that?

20        A.   That's a discussion I had with my

21    lawyers.

22        Q.   Well, I don't want you to tell me about

23    your discussion with your lawyers.  If you only

24    know why you dismissed it because your lawyers

25    told you, then don't say.

1       A.   Well, then I'm not going to say.

2       Q.   Okay.  So, it was the lawyers who told

3    you why they dismissed it?

4       A.   No, that mischaracterizes what I just

5    said.  Me and the lawyers had a discussion about

6    it and we came to the agreement to dismiss the

7    count, at which point in time the count was

8    dismissed.

9       Q.   Got it.  Thank you.  Now, in that same

10   response it says, "I remember sometimes my wife

11   ordered a credit report because TransUnion told

12   us there was a change, and then the report did

13   not a change on it."  Do you see that?

14      A.   Yep.

15      Q.   Did you make sure that your husband

16   actually had that memory or did you just do it

17   from your own memory?

18      A.   No.  He should have had that memory,

19   because when that occurred and I bought a credit

20   report and there was no change on it, there was

21   some salty language in that house that there was

22   no way he could have missed.

23      Q.   Yeah.  Because he kind of said that he

24   didn't have personal knowledge of some of the

25   things in these responses.  But you're

1    disagreeing with him then?

2        A.   He may not have recalled it sitting

3    here in this chair, but that doesn't mean he

4    wasn't present when it occurred.

5        Q.   He said he had a bad memory; is that

6    true?

7        A.   He tends to be a very simple person.

8    Complex things are very complex.

9        Q.   This litigation is very complex, isn't

10   it?

11       A.   It would be complex for any person.  I

12   -- wouldn't matter if Albert Einstein was

13   sitting in this chair.

14       Q.   Now, let me direct your attention to

15   Interrogatory No. 12.  And you can read the

16   interrogatory, but it's not really relevant to

17   my question.  In the answer you said:  "I asked

18   my wife to handle this as my agent.  I know that

19   she has a lot more information about this."

20       A.   Uh-huh.

21       Q.   Okay.  And there's other responses, No.

22   15, "My wife and my attorneys have more

23   information about this."  Number 16 and 17, "My

24   wife has more information about this."  Number

25   18, "My wife has more information about this."

 1    Same with No. 19 and No. 20 and No. 21, No. 26.

 2    Here's my question, Mrs. Millett, why don't you

 3    give us the information in the interrogatory

 4    responses, instead of suggesting that you're

 5    simply providing the information that

 6    Mr. Millett has and making us ask you the

 7    questions?

 8                MS. YEAGER:  Objection to the

 9    extent it calls for a legal conclusion.  Object

10    to the extent it calls for the sharing of

11    attorney-client privilege.

12                THE WITNESS:  Can I answer now?

13                MS. YEAGER:  Yes, please.

14                THE WITNESS:  Okay.

15        A.    Because this one says Interrogatories

16    to Plaintiff Steven Millett, and most of the

17    interrogatory pages I've read are about what

18    you, the plaintiff, that's being given the

19    questions knows.  So, they're answered from

20    Steve's perspective because that's what Steve

21    knows.  What I know is something completely

22    different.

23        Q.    (BY MR. O'NEIL) Okay.  Well, do you

24    understand that under the law when you're asked

25    questions and if the information is in the

1    possession of your agent, that you're obligated

2    to give the information from your agent?

3              MS. YEAGER:  Objection.  Calls

4    for a legal conclusion.

5      Q.   (BY MR. O'NEIL) Do you understand that?

6    That's not simply enough to say, well, I don't

7    know.  That if someone is your agent, you have

8    an obligation to get the information from the

9    agent to provide it.  Do you understand that?

10             MS. YEAGER:  Objection.  Calls

11   for a legal conclusion.

12     A.   I don't understand what you mean.  I'm

13   sorry.  I thought these were my husband's

14   questions, and every case up to now I've gotten

15   my own set.  So, then I fill it what I know in

16   my set and he fills out what he knows in his

17   set.

18     Q.   (BY MR. O'NEIL) Yeah, well, actually,

19   I've seen your interrogatories answers in the

20   Experian case, they were identical.  So, are you

21   suggesting to me that when you got separate

22   interrogatories, that there was different

23   information in the responses, depending on who

24   knew what?

25     A.   Experian had a different definition

1    for, I think, for the definition of who "you"

2    meant in their particular interrogatories.

3        Q.    Are you telling me that when you had

4    separate interrogatories served to both you and

5    your husband, that the responses were different

6    based upon the knowledge of you and your

7    husband?

8        A.    No, because that's not how Experian

9    defined the term when they asked that the

10   interrogatories be answered.

11       Q.    Oh, I thought that's what you said,

12   that you've answered interrogatory --

13       A.    No, I'm talking about in this case.

14       Q.    Oh, okay.

15       A.    Because you didn't give us a definition

16   -- I don't know where the definition of "you" is

17   in this one.

18       Q.    Have you ever heard of something called

19   the Credit Repair Organizations Act?

20       A.    Yes.

21       Q.    Okay.  And what's your understanding of

22   what that is?

23       A.    Credit Repair Organizations Act, also

24   known as CROA, basically it's a federal law that

25   details how credit repair organizations are

1    classified and how they must deal with consumers

2    in the marketplace.

3        Q.    And you brought a claim against

4    TrueLink under CROA, right?

5        A.    I believe, but I don't think that that

6    remains anymore at this time.

7        Q.    Did you believe you had a factual basis

8    to make that claim against TrueLink when you

9    made it?

10        A.    Sure I did.

11        Q.    Okay.  And did at some point in time

12    you come to a different conclusion?

13        A.    No, I still have that conclusion.  I

14    just -- we've decided to drop that claim.

15        Q.    For strategic purposes?

16        A.    It's not strategic.  I believe it was

17    because of the ruling in Georgia with the Fourth

18    Circuit.

19        Q.    You didn't think that because the claim

20    failed in that case, you decided to dismiss it

21    in the case you brought against TrueLink; is

22    that right?

23        A.    Pretty much, yeah.

24        Q.    Okay.  So, now that the claim in the

25    Experian case failed, are you going to be

1    dismissing the same claims against TrueLink in

2    this case?

3        A.    No.  Because the Experian claims will

4    be appealed.

5        Q.    You're aware of course, Mrs. Millett,

6    that you want to represent a class of

7    individuals in this case, right?

8        A.    Oh, yes.

9        Q.    Okay.  And you probably don't know, but

10   do you -- can you -- do you know what the class

11   is, how the class is defined that you want to

12   represent?

13       A.    I believe the class is defined as all

14   purchasers of the product, but I'm not quite

15   sure of the date range, it's from a certain --

16   there's a certain statutory period that's

17   covered, and I'm not quite sure how that all

18   works.  But I believe it's from 2001 I think.

19       Q.    That's correct.  It's September 9,

20   2001.  Why do you want to bring a claim on

21   behalf of people that you don't know?

22       A.    Why do I want to -- because I like to

23   help people.

24       Q.    Okay.  But you've never met anybody who

25   bought the credit monitoring service, right?

1    A.   I've met people who have bought credit

2    monitoring services, just not this specific one.

3    Q.   Okay.  And so you don't know if they

4    had the same understanding of what that product

5    was as you did, right?

6    A.   Well, I've talked about credit

7    reporting in general with people, and most

8    people believe there's only one credit report

9    for each Social Security number.

10    Q.   Ma'am, that's not the subject of the

11    claim you brought against TrueLink.  I don't

12    know if you understand that.

13    A.   I understand that.  But to the extent

14    that the credit monitoring is monitoring the

15    credit report, most people believe because

16    there's only one credit report for that Social

17    Security number that if they've bought

18    monitoring though that credit report, that

19    includes all that information.  They don't

20    understand that there's 15 credit reports out

21    there for the same identifier, and that they're

22    only getting monitoring on the one report which

23    is directly associated with their name, address

24    and Social Security number.  Most people are

25    thoroughly confused by that fact.

1        Q.    You say most people, who are you

2    talking about?

3        A.    Well, I mean, just in general.    Anybody

4    I've ever spoken to about the fact the credit

5    bureaus have more than one file for the same

6    Social Security number look at me like I'm

7    completely nuts until, you know, they see -- I

8    whip out --

9        Q.    And how often do you think this occurs?

10       A.    What?

11       Q.    The fact that there's more than one

12   file for one Social Security number?

13       A.    Well, given the fact that in this

14   particular case the perpetrator is an

15   undocumented alien that bought the Social

16   Security card on the street, I would say it's

17   probably more common than most people realize.

18       Q.    You don't like illegal aliens, do you?

19       A.    Huh?

20       Q.    You don't like illegal aliens, do you?

21       A.    Actually, no, I don't have any dislike

22   or like for them one way or the other.    They

23   have just as much right to come to this country

24   if they want to, but I don't care for them to be

25   using my information, no, or my husband's

1    information.

2        Q.   Do you have any thoughts or any

3    information as to what percentage of identity

4    theft is made up of illegal aliens using

5    somebody else's Social Security number?

6        A.   I know I've seen the number somewhere

7    before, but I don't have that percentage right

8    off the top of my head.

9        Q.   Do you have any thoughts or

10   understanding as to what percentage of,

11   quote-unquote, "identity theft" is another

12   person using someone else's Social Security

13   number, but no other identifying information of

14   that person?

15       A.   Well, most of the information that

16   comes from that that's available on that topic

17   is anecdotal and derived from the Social

18   Security Administration in their report on the

19   amount of money an payors into the U.S. Suspense

20   Fund.

21       Q.   Okay.

22            MR. O'NEIL:  I have a note here

23   that we have to change the tape.  I also see

24   that it's 5:00, so.

25            MS. YEAGER:  Let's go off for a

1    second and we'll discuss it.

2                    MR. O'NEIL:  Sure.

3                    VIDEOGRAPHER:  We are now going

4    off the record at 4:58 p.m.

5                    (Recess.)

6                    VIDEOGRAPHER:  One moment please.

7    It is 5:00 p.m. and we are back on the record.

8    You may continue.

9                    MR. O'NEIL:  I think counsel had

10   a conversation off the record, it's 5:00 now, I

11   still have some more questions for the ever

12   patient Mrs. Millett.  We're also hoping to have

13   complete the document production on behalf of

14   the plaintiffs.  So, the agreement was that

15   we're going to try to continue this deposition

16   at some later date, and so that's what we plan

17   to do.

18                   MR. CLOON:  No objection by the

19   plaintiff.  We just want to point that we're

20   willing to cooperate and go in excess of the

21   six-hour standard order for the depositions, but

22   we do want to try to finish it up perhaps in an

23   afternoon in good faith once we have obtained

24   all of the document outstanding productions and

25   get those to you.  And we'll work on a mutually

1    agreeable time and date.

2              MR. O'NEIL:  Okay, great.  Thank

3    you.  Thank you, Mrs. Millett.

4              VIDEOGRAPHER:  We are now going

5    off the record at 5:01 p.m.

6         (The deposition adjourned for the day

7    at 5:01 p.m. and will be continued at a later

8    date.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7          _____

8          MELODY J. MILLETT

9

10

11

12          Subscribed and Sworn to before

13   me this _____ day of _____,

14   20__.

15

16

17

18          _____

19          Notary Public

20          County of _____

21          State of _____

22

23

24   Millett v. TrueLink, Inc.

25

1                    C E R T I F I C A T E

2

3              I, Nissa M. Sharp, a Certified

4    Shorthand Reporter of the State of Kansas, do

5    hereby certify:

6              That prior to being examined the

7    witness was by me duly sworn;

8              That said deposition was taken down by

9    me in shorthand at the time and place

10   hereinbefore stated and was thereafter reduced

11   to writing under my direction;

12             That I am not a relative or employee

13   or attorney or counsel of any of the parties, or

14   a relative or employee of such attorney or

15   counsel, or financially interested in the

16   action.

17             WITNESS my hand and seal this _____

18   day of _____ 20 __.

19

20

21             _____

22             Nissa M. Sharp, CSR, CCR #528

```
 1   May 18, 2007

 2

 3   Mrs. Melody J. Millett
     c/o Ms. B. Joyce Yeager
 4   YEAGER LAW FIRM, LLC
     City Center Square, 26th Floor
 5   1100 Main Street
     Kansas City, Missouri 64105

 6
     RE:  Millett v. TrueLink, Inc.
 7
     Dear Mrs. Millett:
 8
     Enclosed is your deposition, given in the
 9   above-named matter, for your examination and
     signing.  You will also find a signature page
10   and an errata sheet for your convenience in
     making any changes or corrections.
11
     Pursuant to the law, any change in "form or
12   substance" of an answer shall be accompanied
     with a statement of the reason given by you for
13   making such change.
14   Upon completion of your examination and reading,
     please sign the enclosed signature page and
15   errata sheet and return them to this office in
     the enclosed self-addressed envelope.  If we
16   have not received the signed documents from you
     within 30 days from the date of this letter, an
17   unsigned copy of your deposition will be filed.
18   Yours very truly,
19   METROPOLITAN COURT REPORTERS, INC.
20
21
22
23
24
25   By:  Nissa M. Sharp, CSR, CCR #528
```

```
1                        ERRATA SHEET
2
3      RE:  Millett v. TrueLink, Inc.
4      DEPOSITION OF:  MELODY J. MILLETT
5
6      PG/LN NO.  CORRECTION        REASON FOR CHANGE
7
        :_____:_____:_____
8
        :_____:_____:_____
9
        :_____:_____:_____
10
        :_____:_____:_____
11
        :_____:_____:_____
12
        :_____:_____:_____
13
        :_____:_____:_____
14
        :_____:_____:_____
15
        :_____:_____:_____
16
        :_____:_____:_____
17
        :_____:_____:_____
18
        :_____:_____:_____
19
        _____ I certify that I have read my deposition
20     in the above case and I request that no changes
       be made.
21      _____ I certify that I have read my deposition
       in the above case and I request that the above
22     changes be made.
23                     SIGNATURE OF DEPONENT:
                       _____
24
25                     DATED: _____
```