# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| STEVEN G. MILLETT, MELODY J. MILLETT, | ) | |
| On Behalf of Themselves and All Others | ) | |
| Similarly Situated, | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 05-599-SLR |
| v. | ) | |
| | ) | |
| TRUELINK, INC., | ) | |
| A Trans Union Company, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' REPLY TO DEFENDANT'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Christopher J. Curtin, Esquire
MacElree Harvey, Ltd.
5721 Kennett Pike
Centreville, DE  19807
Phone:  302.654.4454
Facsimile:  302.654.4954
Email:  ccurtin@macelree.com
Website:  macelree.com


COUNSEL FOR PLAINTIFFS
STEVEN G. MILLETT
AND MELODY J. MILLETT

DATE:  November 13, 2007

## PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFFS MOTION FOR PARTIAL SUMMARY JUDGMENT AND BRIEF IN OPPOSITION

Plaintiffs, by and through counsel of record, provide this reply to Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment (D.I. 165) and Defendant's Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment. (D.I. 163)   After the conclusion of discovery, Plaintiffs filed their motion for partial summary judgment as to one type of claims: claims alleging violations of  Section 50-627 of the Kansas Consumer Protection Act.  (D.I. 147/148, 156/147, 159/150)   Plaintiffs reply to Defendant's answering briefs in opposition to their motion for partial summary judgment as follows:

## I. FACTUAL ALLEGATIONS

### A.  UNCONTROVERTED FACTS

1. The following facts are uncontroverted for purposes of Plaintiff's motion for partial summary judgment:[1]

a.  Reporting industry records contain inaccuracies.  (Pl. ¶¶ 15, 37, 73, 88; D. ¶¶ 5, 10).

b.  Plaintiffs received reports of changes to their credit report when, in fact, no changes had been made.  (Pl. ¶ 33; D. ¶ 37)   From May 5, 2004 to April 19, 2005, TrueLink was aware that certain subscribers of credit monitoring received blank alerts.  (D. ¶ 38)[2]

---

[1]  Plaintiffs, for the convenience of the Court and the parties, provide an exhibit which references the corresponding fact paragraphs of Plaintiffs motion and Defendant's answering brief in opposition.  Where significant, page numbers to briefing cross references are also included. Although an attempt was made to use key words to summarize material, the use of key words was not meant to be argument.

[2]  Additional factual assertions from Defendant's answering briefing remain uncontroverted by Plaintiffs solely for purposes of this motion.  See Ex. 1.F.  Those assertions which are not applicable to Plaintiffs' argument in reply have not been added to the text.

c. There were instances when an individual who was attempting to subscribe to credit monitoring data could not be matched to a credit reporting agency record. (Pl. ¶¶ 41-43; D. ¶¶ 40-43)

d. Defendant admits that Plaintiffs are "consumers" as defined by the Act. (Pl. ¶ 1)

e. Defendant admits that it is a "supplier" as defined by the Act. (Pl. ¶ 2)

f. Defendant sold a product or service which purported to monitor the credit file, or three credit files in the instance of "three bureau reporting", of those who purchased credit monitoring. (Pl. ¶ 3)

g. Defendant admits that the purchase of credit monitoring is a "consumer transaction" as defined in the Act. (Pl. ¶ 4)

h. Defendant admits that it supplied a "service" as defined by the Act. (Pl. ¶ 5)

i. Defendant has provided the number of consumers who paid money and purchased credit monitoring and provided a mailing address in the State of Kansas from September 1, 2001, through May 31, 2007. (Pl. ¶ 6 )

j. It is important to Kansas consumers to know whether or not someone else is reporting the consumer's personal information. (Pl. ¶ 8) (D.I. 174, Ex. 1, pp. 341-42)

k. Defendant incorporated into the terms of the contract the language of the web page advertising. (Pl. ¶ 9)[3]

l. Defendant represented in its marketing that the purchaser of credit monitoring would be "protected" from "identity theft". (Pl. ¶ 12)

m. Defendant could only access and supply that information posted for its customers which Defendant's parent corporation, Trans Union, supplied. This information does not contain all the

---

[3]  Defendant made a legal objection to the use of the word "incorporate" but agrees that the contract terms are explained by the web page advertising. (D. para. 4)

information in a consumer disclosure and does not contain all of the consumer's information which is contained in Trans Union's credit file.  (Pl. ¶ 15; D. ¶¶ 10, 51)

n.  Defendant's internet pages contained advertising.  (Pl. ¶ 18)(Ex. F.2)

o.  The words "identity theft" are words that Defendant uses frequently, at least annually, in advertising and marketing.  (Pl. ¶ 19)

p.  Defendant, in its employee manuals, tells its employees that it is fraud when an imposter uses another person's identity by stealing a Social Security number, address, date of birth, or other identifiable information to open a credit account or access a credit report.  (Pl. ¶ 24)

q.  Defendant posted a contract on the website and the same contract was utilized until the contract was revised.   The subsequent contract was then uniformly utilized until replaced. Consumers were required to monitor the web site for any changes to the contract provisions.  (Pl. ¶ 29)

r.  Defendant incorporated or referred,  in the terms of the contract, to the language of the web page advertising.  (Pl. ¶ 9)[4]  (Ex. F.2)

s.  The "credit report" does not contain all information available to Trans Union about a consumer which is contained in a consumer file held by Trans Union.  (Pl. ¶ 37, D. ¶ 4, 10)

t.  The credit scores which Defendant provided were based upon its scoring mechanism or algorithm and not the actual scoring mechanism or algorithm of the three credit reporting agencies. (P. ¶ 38) (Ex. F.2; pp. 86 to end [selected pages])

u.  Kansas consumers consider the use of a Social Security number by another to be a form of identity theft.  (Pl. ¶ 44)[5]; (E.I. 174, pp. 341-42)

---

[4]  Defendant offers a legal objection that the advertising was not incorporated into the contract. Defendant agrees that the advertising describes the subscription referred to in the contract.

[5]   Defendant offers a motion to strike the report of Mr. Dimbert, the source cited by Plaintiffs for this assertion, but does not offer a factual dispute to the statement.

v.  Use of one's Social Security number by another is a sign of possible identity theft.  (FTC Report, pages 37-46)  The detection of possible identity theft was also advertised.  (Pl. ¶ 45)

w.  Defendant promised to alert its purchasers to potential identity theft.  (Pl. ¶ 46, D. ¶ 4)

x. All purchasers were required to agree to the terms of the same or similar contract.  (Pl. ¶ 48)

y.  Defendant excluded and attempted to limit the implied warranties of merchantability and fitness for a particular purpose and any remedy at law for a breach of these warranties.  (Pl. ¶ 48)

z. Defendant's contracts with consumers disclaimed warranties.  With respect to the membership services, TrueLink and TransUnion expressly disclaimed all warranties, express or implied, and stated that the product was offered "as is".  (Pl. ¶ 49)

aa.  Through the delegated acts of his spouse and agent, Melody Millett, Steven Millett became a purchaser of TrueCredit on or about August 6, 2003.  (Pl. ¶ 55)

bb.  Abundio Cuautle Perez ("Perez") purchased the Social Security number, the one which had been issued to Steven Millett earlier, on Soto Street in Los Angeles from a notary public.  (Pl. ¶ 62)[6]

cc.  Upon obtaining discovery in their lawsuits, Plaintiffs were able to determine that Perez utilized this number to open bank accounts, obtain employment, obtain credit cards, finance multiple automobiles, and obtain home financing.  (Pl. ¶ 63)[7]

dd.  Ms. Millett is employed in the information technologies field.  She has learned to read the codes from those who provide information to the credit reporting agencies.  (Pl. ¶ 64)[8]

ee.  The credit reporting agencies and the credit reporting industry have a unified method of reporting credit data.  (Pl. ¶ 65)[9]

---

[6]  Defendant has moved to strike the Affidavit of Melody Millet which was offered in support or as partial support of these items.  No factual allegations have been made to dispute this assertion.
[7]  Id.
[8]  Id.

ff.  The credit files of Defendant's credit monitoring purchasers were not always able to be matched with purchasers of the product because more than one person was reporting had the same Social Security number associated with a credit file at Trans Union.  (Pl. ¶ 73; D. ¶¶ 10, 51)

gg.  The record provided by Citibank, pursuant to the subpoena, indicated that, as the Milletts worked to close accounts which had been opened by Perez, those accounts monitored and serviced for Home Depot and J.C. Penney by Monogram Bank of Georgia ("Monogram"), were incorrectly changed.  (Pl. ¶ 66)[10]

hh.  The accounts serviced by Monogram were changed so that the data information of Steven Millett and the data information of Perez were mixed.  The Milletts received refund checks and correspondence which reflected this mixed data.  Mrs. Millett, on behalf of the family, continued to work to correct the errors.  (Pl. ¶ 67)[11]

ii.  On April 5, 2004, Plaintiffs filed their initial complaint alleging that Trans Union had engaged in fraud and other violations of statutory and common law concerning the manner in which it serviced its products.  (Pl. ¶ 68)[12]

jj.  On August 6, 2004, a person named "Debi" at "Trans Union credit bureau" contacted the company servicing the Home Depot account and asked if the account was "fraud".  The account reflected data of Steven Millett for his name and address, the Social Security number Steven had been issued which was also being used by Perez, and California telephone numbers of Perez.  By reading the codes and the letter from Citibank alongside the refunds and letters, Mrs. Millett could see that the data had been mixed when Mrs. Millett attempted to close Perez' accounts in 2003. (Pl. ¶ 47)

---

[9] Id.

[10] Defendant has moved to strike the Affidavit of Melody Millet which was offered in support or as partial support of these items.  No factual allegations have been made to dispute this assertion.

[11] Id.

[12] Id.

kk.  No notification of this data or the changes was sent by Trans Union to Steven Millett. No notification of this data or change was sent to Steven Millett by Defendant.  (Pl. ¶ 70)  Plaintiff Steven Millett was a purchaser of the product at that time.  (Pl. ¶ 71, D. ¶ 35)

ll.  The credit reporting agency and Defendant cannot ascertain which individual reporting a Social Security number is the individual to whom the number was actually issued. (Pl. ¶ 76)

mm.  Defendant utilized the Social Security number of its purchasers as one of the key informational pieces for establishing identity of its purchasers to determine which Trans Union credit file would be monitored.  (Pl. ¶ 77)

nn.  Steven Millett knows that he can only close the fraudulently opened accounts of Perez if he can discover them.  (Pl. ¶ 85)

oo.  The compliance officer of Defendant testified at the close of her deposition:

     9    Q.  Do you tell your customers that there are some
    10   forms of identity theft which cannot be included on a
    11   credit report, that there are some types of identity
    12   theft which aren't reflected on credit reports?
    13     A.  No. (Deposition of Anderson, D.I. 150, App. Ex. E. Pl. ¶ 86)

pp.  Plaintiffs have been involved with several matters in litigation since 2004.  (Pl. ¶ 87)

qq.  A "credit report" is not always accurate.  (Pl. ¶ 88: D. ¶ 10)

rr.  The Milletts were told by police in Los Angeles to be cautious for a few days during the time period when Ford Motor Credit repossessed Perez' fraudulently obtained vehicles after Ford Motor Credit learned of the identity theft from Plaintiffs.  (Pl. ¶ 91)

ss.  Defendant told its customers to relax and have "peace of mind" because credit monitoring had been paid for.  (Pl. ¶ 92)

**I.B.  CONTROVERTED FACTS IN RESPONSE TO DEFENDANT'S STATEMENT OF FACTS**

1) Plaintiffs had some information about an identity thief when they purchased the product. (D.I. 174 - 1,  143, 149-52, 159-60)  At or about that time, Plaintiffs also purchased a product from Experian Information Services.  (Ex. B)  They previously had purchased a product from Equifax Consumer Services.  (Ex. B)   Plaintiff Melody Millett accessed, probably by conducting a Google search, the Trans Union website.  (D.I. 174 - 1, pp. 188-89)  She linked to the web pages to view the credit monitoring product.   (D.I. 174 - 1, pp. 188-89)  She printed some pages she viewed.  (D.I. 174 - 1, pp. 188-90, 235-41)  She read aloud information from the website to Plaintiff Steven Millett.  (D.I. 174 - 1, pp. 320-22)  Mr. Millett viewed at least some part of the website.  (Ex. B)  He agreed that if the product would help, it should be purchased.  (Ex. B)  Steven Millett expected to receive information about the use of his identifying personal information by anyone else who might use it after the date of the purchase.  He wanted to cross-check the information provided by the other credit reporting agencies.  (Ex. B)  Plaintiff Melody Millett expected to know if there were new uses of Steven Millett's identifiers after the purchase.  (D.I. 174 - 1, pp. 48-51, 137, 50-51, 76-78, 81, 90-95, 121-24, 139, 140, 151-54, 161-68, 171-78, 230-32, 235-38, 243, 246-47, 251-53, 265-66)  Money was paid by electronic transfer of funds using Melody Millett's debit card to access the family bank account.  (D.I. 174 - 1, 422-24)

2) Plaintiffs discovered more and more information about credit monitoring as time passed. (D.I. 174 - 1, pp. 157-58, 164-67, 172-74, 265-66)    Attorneys were hired but the Milletts could not gain access to the information they sought about any data from Mr. Millett's reports to creditors that might reference Perez, the identity thief.  They also could not gain access to information about all the accounts Perez was utilizing or had opened.  (D.I. 174 - 1, pp. 143, 147, 150-54, 157-58, 172-73; Ex. B)

3) A lawsuit was filed seeking to represent a class of persons. (D.I. 1) Defendant's parent was named and, later, Defendant was substituted as a party. (D.I. 150, Ex. A)

4) As the discovery progressed, Ms. Millett learned more about identity theft. She concluded that some forms of identity theft would be detected by credit monitoring. (See para. 1-2 p. 7) She learned more information in discovery and then concluded that credit monitoring was not a viable tool for detecting or preventing or protecting from identity theft or credit fraud or related uses of personal identifiers. (See para. 1-2, p. 7) Mr. Millett agreed. (Ex. B) When it was time to renew, she allowed the TrueLink subscription to expire. (D.I. 174- 1, pp. 84-86)

5) Defendant is now a wholly owned subsidiary of Trans Union, LLC, a credit reporting agency. Company officers and managers who were identified in Defendant's Rule 26 disclosures were deposed. Defendant's corporate officer said that consumers primarily buy credit monitoring for one of two reasons. The first most common reason to purchase is when the consumer is about to make and purchase and wishes to monitor their credit score. (Ex. 1)

6) The second primary reason that consumers purchase credit monitoring is because the consumer has a concern about identity theft. The product prevents and protects a subscriber from identity theft because it provides the consumer with a way to monitor their credit reports. (Ex. 1)   A company manager said an individual could not protect himself or herself from identity theft. (Ex. 126, Ex. K)

7) When a consumer is delayed in learning about identity theft, their losses are greater and it is more difficult to repair. (D.I. 126, Ex. H; D.I. 174, pp. 388-91, 394-97, 404-05) The Milletts did not learn about several instances of use of Mr. Millett's personal identification while they were purchasing the product. (See para. 1-2, p. 7) As a result, they paid more

for car insurance and were unable to gain access to credit from certain entities.  (See para. 1-2;  D.I. 174-1, p. 7, 135, 164, 270)

## II.  LEGAL ARGUMENT

## II. A.  UNCONSCIONABLE ACTS

It is important to understand that Plaintiffs' motion is based upon unconscionability which is proscribed by K.S.A. § 50-627.  It is unconscionable for a supplier to make a misleading statement of *opinion* upon which the customer is likely to rely to the consumer's detriment.  Equitable Life Leasing Corp v. Abbick, 757 P.2d 304, 306 (Kan. 1988).  This is distinguished from a claim under K.S.A. § 50-626 which focuses on *acts*.  Id.   For the reasons stated herein and in the Conclusion section, infra, Plaintiffs have met their burden for summary judgment as to the KCPA count for unconscionable conduct.[13]

Standing to pursue a KCPA claim is established if the Plaintiff demonstrates that there was a loss as a result of relying upon a false statement.  Benedict v. Altria Group, Inc., 241 F.R.D. 668 (D. Kan. 2007).  Plaintiffs and class members in *Benedict* sought to recover money spent on "light cigarettes" because they claimed they did not get what they paid for and were promised: cigarettes with lower levels of tar and nicotine than regular cigarettes.  Id. at 679.  The district court determined that the named plaintiff had individual standing because she was seeking money damages and claiming a personal economic loss as a result of Defendant's deceptive representations regarding its product.  Id. at 675.  Plaintiffs in this action have also met this threshold.[14]

---

[13]   Plaintiffs have met their obligation to demonstrate that they are aggrieved and may bring a claim under either K.S.A. § 50-626 or K.S.A. § 50-627. Portions of Defendant's argument in its answering briefs focuses on issues which are inapplicable to this motion for unconscionable behavior proscribed by Section 627.

[14]     It should be noted that the Kansas District Court went on to determine that the "amount" of tar and nicotine "received" by each class member would not allow class certification because there would be individual economic injury for class members depending upon the amount of tar and

Plaintiffs' motion, seeking judgment on claims of unconscionability, should be granted because Defendant knew or had reason to know it engages in unconscionable behavior. (Uncontroverted Fact paragraphs)   The four corporate officers deposed have been in the credit data reporting industry for a combined 40 years or so.  (Ex. A to F.1)   If, as Defendant argues, these Plaintiffs are sophisticated about the industry because they have been involved with these issues since 2003, it seems inconsistent to argue that this Defendant had no reason to know of the unconscionable nature of its actions.

Defendant admits it is a "supplier" for purposes of the Act.  (D.I. 126, L)  Defendant's accounting is the responsibility of a corporate officer of Trans Union.  (Ex. E, pp. 7-20)  Defendant provides services to Trans Union for customer support.  (Ex. E)  Defendant is a wholly owned subsidiary of this major credit reporting agency.  (Ex. E, p. 8)  Defendant is responsible for online ordering functions for Trans Union.  Defendant supplies credit reports for consumers for Trans Union.  (Ex. C, pp. 48-49)  Defendant orders and supplies credit reports from all three major credit reporting agencies.  (D.I. 163)   Defendant's training materials indicate that it is aware that utilization of an individual's personal identifiers is a form of fraud.  (Fact ¶ p.)

Defendant's own disclaimer, as well as its discussion of the need for it in its answering briefing, is an acknowledgement that there are inaccuracies in credit reporting.  Defendant continued to market and sell its credit monitoring product to detect identity theft.  Defendant represented that access to "credit reports" was a useful tool to detect identity theft.  (Ex. D; Ex. F.2)  As the comments published with the passage of the KCPA explain, unconscionability involves

---

nicotine which was delivered to each smoker.  In this action, however, Plaintiffs and class members seek to recover for a product which was sold with uniform contracts, uniform advertising, uniform costs, and a uniform method of performance by Defendant.  No examination of individual injury would be necessary in this matter because all class members were sold a product with the same limitations based upon the same representations.

over-reaching and not necessarily direct deception.  Kansas comment, 1973, sec. 1, K.S.A. § 2005

50-627.  Defendant had reason to know its behavior was unconscionable.


## II.B.  NOTICE

Defendant argues that it should not be held to the notice date of the waiver of service of

process in this action because that waiver was executed by counsel for its parent.  A Defendant

cannot insulate itself in such a manner.  An entity may not avoid the consequences of its

misrepresentations by asserting it was passively involved in activities surrounding the consumer

transactions.  *See*, York v. Intrust Bank, N.A., 962 P.2d 405 (Kan. 1998).


## II. C. PLAINTIFF'S ARGUMENT IN REPLY

The uncontroverted facts herein demonstrate clearly that credit monitoring is only

marginally effective to detect some forms of identity theft.  The Defendants' assertions that

detection, prevention and/or protection is possible because one purchases credit monitoring is

unconscionable because Defendant knows or has reason to know that this is not true.

The Plaintiffs' understanding, obtained through discovery as "private attorney generals" on

behalf of class members who might not yet know the product's limitations, has become such that

they no longer purchase any credit monitoring products and continue litigation efforts in order to

increase consumer understanding.  Defendant has had notice of its violations under the Act as early

as August 8, 2004, and as late as September 7, 2006. (D.I. 147)

When Plaintiff Melody Millett received their first notice in an electronic mail

communication from Defendant that there were no changes to Mr. Millett's "credit report," they

were relieved.  They later discovered, however, that there were ongoing and subsequent uses of Mr.

Millett's personal identifiers as well as credit lines of Mr. Perez containing Mr. Millett's name, address, and Social Security number and containing both Plaintiffs' address.  (Facts bb-jj)

Defendant freely interchanges references to "credit file" and "credit report" at will, without regard for the meanings which might be attributed to them by consumers.  (D.I. 126, Ex. M, D.I. 163, pp. 5-6, 12)  Defendant also argues that any failure of credit monitoring to detect identity theft is attributable to the industry.  Taken together, these facts demonstrate that Defendant knew or had reason to know that its advertising representations were misleading.  This is a violation of the KCPA which defines such conduct as unconscionable.  K.S.A. § 50-627.

Defendant's contracts were uniform over time and everyone who viewed the contracts at any time viewed the same terms.  Renewals and new subscribers in any given year were forced to accept uniform terms.  The terms uniformly lacked clarity and uniformly attempted to exclude the same warranties.  It is unconscionable to nullify Uniform Commercial Code warranties with disclaimers limiting merchantability and fitness for a particular purpose.  K.S.A. § 50-627.

Defendant has engaged in more than puffing.  As the KCPA comments make clear, the act prohibits subjective expressions of opinion on which a supplier would reasonably suspect a consumer to rely to his detriment.  "For example, a violation of K.S.A. § 50-627(b)(6) occurs if a *prospective* purchaser asked a supplier what the useful life of a paint job was and the supplier, with reason to know that repainting would be necessary within two years, responded, 'in my opinion the paint will wear like iron.'"  Kansas comment 1973, K.S.A. § 2005 50-627, cmt. 2 (reprinted in State ex rel Stovall v. Confimed.com, LLC, 38 P.3d 707 (2002)).

The Defendant would not have made the statements about the benefits of credit monitoring as a tool to detect or prevent or provide protection from identity theft if it did not intend for consumers to rely upon the representations.  (Ex. F.2, Selected pages contained therein pp. 35 to 65)  A consumer would rely upon that the statements made about the benefits of credit monitoring, the

content of the email alerts, and the purported benefits of access to "credit reports". (Ex. F.2, Selected pages contained therein pp. 35-65)  The KCPA attempts to eliminate the common-law doctrine of caveat emptor and check deceptive and unconscionable acts of suppliers in the market place" by providing civil penalties as an alternative to actual damages "in the hope that [consumers] will enforce the KCPA as 'private attorney generals'." Alexander v. Certified Master Builders Corp., 1 P.3d 899 (Kan. 2000).[15]

The Kansas Consumer Protection Act protects consumers for actions occurring before, during and after a transaction. York v. InTrust Bank, N.A., 962 P.2d 405 (Kan. 1998) (discovery of information after the purchase by consumers evidencing misrepresentation is indicative that the information was material and should have been disclosed). Ongoing failure to disclose after receiving a complaint from a consumer is a violation. Id. Consequently, conduct of Defendant or knowledge of Defendant during the applicable time period when it encouraged its subscribers to renew is also actionable.

Misrepresentations in a solicitation will subject a supplier to penalties under the Act regardless of whether the solicitation results in a sale. Watkins v. Roach Cadillac, Inc., 637 P.2d 458 (Kan.App. 1981), rev. denied 230 Kan. 819 (1982). A statement that turns out to be untrue is a violation. Haag v. Dry Basement, Inc., 732 P.2d 392 (Kan.App. 1987).

---

[15]  If it was unreasonable to rely upon language in advertisements to the purchaser, then Defendant would still be in violation of K.S.A. § 50-626. "Overt factual misstatements expressed in the form of opinion are dealt with by K.S.A. §50-626's proscription of deceptive consumer sales practices. For example, a violation of 50-626 would occur if a prospective purchaser asked a supplier what the useful life of a two-year paint job was and the supplier responded, 'in my opinion repainting will not be necessary for five years.'" Kansas comment 1973, K.S.A. § 2005 50-627, cmt. 2. (reprinted in State ex rel Stovall v. Confimed.com, LLC, 38 p.3d 707 (2002). The statements in the electronic mail alerts provided opinions that no action had been taken which impacted the consumer's "credit" or their "credit report" or records with "the credit bureaus." (D.I. 163, pp. 11-2: See also discussion herein)

Suppliers are not shielded because consumers "failed to heed warnings." Buyers are not required to dispel any suspicions about the representations of the supplier. York v. InTrust Bank, N.A., 962 P.2d 405 (Kan. 1998).[16] Plaintiffs are not required to continue to beg for information from Defendant or to seek a remedy convenient for Defendant, as it asserts. "[T]he doctrine of avoidable consequences is simply one of good faith and fair dealing. The injured party need not undertake extraordinary efforts to do what is unreasonable or impractical in an effort to minimize damages." York v. Intrust Bank, N.A., 962 P.2d 405, syl. ¶ 17 (Kan. 1998). Reliance for this proposition cannot be found in Dodson v. U-Needa Self Storage, LLC, 96 P3d 667 (Kan. App. 2004). All the Plaintiffs would have to do in the instance of the storage facility lockout discussed in *Dodson* to address the Act's violations by their supplier would be to obtain access to the storage facility. Plaintiffs in this instance could not have made the product operate as represented. Plaintiffs in this instance could not have been made whole by a refund; a refund would only have closed off access to the limited information Plaintiffs thought, at the time, they would receive. (D.I. 173; D.I. 174) No refund would have placed them in possession of the information they needed to ascertain why they could not obtain credit. This information was made available to them as a result of litigation. Plaintiffs made demands. Plaintiffs continued to seek information. Nothing additional should be required of them.

Plaintiffs and consumers are aggrieved when they expend funds for a defective product, do not know how to protect themselves from the product's inefficiencies, and are asked to renew when the product clearly has operational problems known to its employees, officers and directors.

---

[16] Plaintiffs are also under no obligation to pursue additional discovery which might be helpful to Defendant, such as obtaining from Defendant or its advertising agencies what was intended to be conveyed by a certain advertisement or mailing, or such as taking additional depositions of its parent. Plaintiffs were entitled to rely upon Defendant to update its discovery about any affirmative defenses it planned to offer and are entitled to rely upon Defendant's representations in its Rule 26 disclosures that Defendant had identified those witnesses with information pertaining to claims and defenses. See, Averbach v. Rival Mfg. Co., 879 F.2d 1196, 1201 (3rd Cir. 1989); F.R. Civ. P. 26.

The statute provides for the recovery of the *greater amount* of actual damages or statutory penalties.   In addition, Plaintiffs damages are difficult to quantify.  (D.I. 174, pp. 394-96, 404-05, 395-97, 388-91; Ex. B)  Plaintiffs seek a hearing to determine:  1) which actions alleged by Plaintiffs are unconscionable; 2) which unconscionable acts are "ongoing"; 3) which acts warrant an enhanced penalty directed by the KCPA; and 4) the date Defendant was made aware of the product's deficiencies.  Defendant agrees a hearing is necessary to determine the appropriate parameters of injunctive relief which might be awarded.

## II.D.  ONGOING RELIEF SOUGHT IN SETTLEMENT OF *TOWNES*

Defendant repeats its argument that there is no class because the class is subsumed within the *Townes* settlement.  The interests of the class members in *Townes* is not, as Defendant asserts, sufficiently aligned with the interests of the claims represented by these Plaintiffs in this action. There is a potential conflict of interest, if not an actual conflict of interest, of the class members in this matter and that of the CROA class members in *Townes*.  In *Townes*, the purchasers could be aligned in their interest in having adequate notices required by CROA and could derive a benefit from additional subscription time with credit reports and scores.  As to this class, however, additional subscriptions of a product which is not effective at detecting instances of credit fraud or identity theft, additional subscriptions to a product which cannot provide adequate information about that fraud or theft, are not adequate relief for this class.

The class members for this action are not served by the settlement in *Townes* even if it purports to provide minimal relief in terms of a single contract paragraph, a paragraph which appears to Plaintiffs' counsel to be taken from settlement negotiations and/or Plaintiffs' work on behalf of consumers as to the credit products of Equifax and its subsidiaries.  (D.I. 150, Ex. A) These class members are not typical of the class represented in the *Townes* action because the

incentives of the named plaintiffs in *Townes* do not align with those of these absent class members. Georgine v. Amchem Products, Inc., 83 F.3d 610 (3rd Cir. 1996).[17]

If Defendant elects to be subject to CROA, as it is asserted in the *Townes* settlement, then it must agree that it provides a service. If it provides a service, it cannot charge for credit monitoring in advance, as it does now, without being in violation of CROA. Hillis v. Equifax Consumer Services, Inc., 237 F.R.D. 491, 509-17 (citing 15 U.S.C. § 1679b(b)). (See also argument herein on the Uniform Commercial Code)[18]

Defendant now asserts that no act which is unconscionable under the KCPA may be awarded for exclusion of warranties as to "goods". However, a "consumer transaction" as defined by the Act includes sale of property **or goods** within Kansas as well as solicitations by a supplier with respect to any of these "dispositions for value". K.S.A. § 50-624(c). The KCPA has abolished privity requirements for warranties. Kansas comment 1973, K.S.A. § 50-639(b) cmt. 3; K.S.A. § 84-2-318 Kan.cmt. 1, The KCPA is to be broadly interpreted and it trumps any conflicts with the Uniform Commercial Code. K.S.A. § 84-2-316 cmt. 8; State ex rel Stovall v. DVM Enters., Inc., 62 P.3d 653, 660 (Kan. 2003); Professional Lens Plan, Inc. v. Polaris Leasing Corp., 675 P.2d 887, 898 (Kan. 1984); Stair v. Gaylord, 659 P.2d 178, 181-83 (Kan. 1983).

---

[17] In such instances partial certification of the common issues is preferred.

[18] As noted by opinions in the Court in *Browning v. Yahoo, Inc.*, No. C04-01463 HRL, 2006 WL 3826714 (N.D. Cal. Dec. 27, 2006), and the Court in *Hillis v. Equifax Consumer Servs., Inc.*, 2006 WL 2434078 (N.D. Ga. Aug. 18, 2006), whether or not credit monitoring services are sold for the purpose of improving a customer's credit record, history or rating as provided by CROA is a question of fact which was not necessarily resolved prior to approval of a settlement of those class claims. In both instances, and in the instance of this Defendant and its parent corporation in *Townes*, the credit reporting agencies asserted that they were providing a product and, perhaps, asserted this in order to avoid being subject to the provisions of CROA which pertains to services. In this matter, Defendant asserts that it is providing a service, perhaps so that it might avoid liability for unconscionable warranty limitations. For a discussion of the distinction between goods and services as concerns production of a credit report, see Standfacts Credit Services, Inc. v. Experian, 405 F.Supp.2d 1141, 1156-59 (C.D. Cal. 2005) (interpreting federal price discrimination statute). Defendant utilized its computer functionality to make the credit data sent by Trans Union or other credit reporting agencies readable by consumers. (Ex. D, pp. 27-30)

**II.F. RELIEF**

The parties appear to agree that equitable relief may be granted on a motion for summary judgment. *See*, <u>Nalco Chemical Co. v. Hydro Technologies, Inc.</u>, 809 F.Supp. 672 (E.D. Wisc. 1992) (determination of proper scope of geographic constraint in employment agreement). Plaintiffs agree with Defendant that this Court, before awarding injunctive relief, might need to hold a hearing.

Plaintiffs seek statutory damages. Where a class action seeks statutory damages, the District Court is not obligated to require individual proof of injury from each class member. <u>Acosta v. Trans Union LLC</u>, 243 F.R.D. 377 (C.D. Cal. 2007) (FCRA claim). A consumer may bring a KCPA class action when damages are caused by an act or practice. K.S.A. § 50-634(d); Kansas comment, 1973, K.S.A. § 2005 50-634 sec. 4. A consumer who seeks or is entitled to damages and is aggrieved may bring an action to enjoin the behavior of a supplier. K.S.A. § 50-634(a). Kansas comment, 1973, K.S.A. § 2005 50-634, sec. 1. A consumer may obtain declaratory and injunctive relief regardless of whether the consumer recovers or has standing to recover damages. <u>Id</u>. Once action is prohibited by a court order, a class action for damages may be pursued and, in that action, monetary damages for the class members may be sought. K.S.A. § 50-634(d); Kansas comment, 1973, K.S.A. § 2005 50-634 sec. 4.

Damages or civil penalties for class action members cannot be recovered until a supplier is on constructive notice of violations. <u>Id</u>. A "private attorney general" acting on behalf of the class is not required to make an election to pursue either 1) injunctive relief for the class or 2) their own relief in the form of the greater of statutory penalties or actual damages. Kansas comment, 1973, K.S.A. § 2005 50-634.

Just as an attorney general in a public enforcement action is authorized to recover reasonable expenses, a consumer may seek to recover reasonable attorneys fees. A supplier found in violation through judgment or settlement may be subject to payment of reasonable attorneys fees. Kansas comment, 1973, K.S.A. § 2005 50-634 sec. 5. The Court retains jurisdiction, in the event there is a willful violation of its orders, to award a civil penalty of up to $20,000 *for each violation* in addition to other penalties that may be imposed. K.S.A. § 50-636(b). If the Court determines that there is a violation of the act not connected with a specific identifiable consumer transaction but which is continuing in nature, each day the act or practice exists is a separate violation. K.S.A. § 50-636(d). The Kansas legislature has authorized this Court to award an amount of up to $10,000 *for each violation* to Plaintiffs, each of which is an aggrieved consumer. K.S.A. § 50-636(a)(emphasis added).

Plaintiffs have alleged a violation of K.S.A. § 60-527(b)(1) because the supplier took advantage of the inability of a consumer to protect his or her interest because they were unable to understand the language of their agreements with Defendant. This claim is based upon the use of confusing language by Defendant in marketing. Plaintiffs assert that they have established this violation and note that, in addition to those arguments made by Defendant which actually support this claim, certain uncontroverted fact paragraphs, including but not limited to paragraphs a, d-i, j-s, u-w, aa-hh, jj, kk, oo, qq, and ss, establish this violation.

Plaintiffs have alleged a violation of K.S.A. § 50-627(b)(5) for its use of unconscionable contract terms. This claim is based upon use of the boilerplate contract drawn by the party in the strongest economic position which used industry-wide standards offered in a "take it or leave it" basis. The contract included terms allowing Defendant to stop providing some facet of its service and induced the consumer into a one-sided contract. Plaintiffs assert that they have established this violation and that, in addition to the arguments made in the answering brief in opposition which

support Plaintiff's claim for this violation, uncontroverted fact paragraphs, including but limited to fact paragraphs d-I, k, m-t, w-z, aa, ee, ii, and oo establish this violation.

Plaintiffs have alleged a violation of K.S.A. § 50-627(b)(6) for misleading statements of opinion on which the consumer was likely to rely to the consumer's detriment. This claim is based upon Defendant's knowledge that the watch status could change, Defendant's knowledge that "credit reports" were of limited use as a tool to detect for some forms of identity theft and credit fraud, Defendant's use of its own scoring mechanism, the circumstances surrounding use of Social Security numbers as an identifier, and Defendant's knowledge that the frequency of CoreFails was an indication that there was a potential for errors in its new subscriber's information with the credit reporting agency or agencies. Plaintiffs assert that they have established this violation. In addition to the arguments in Defendant's briefing which actually support Plaintiffs' claims, the uncontroverted facts, including but not limited to a-x, aa-oo, qq-ss, establish this violation. Defendant knew or should have known the "credit reports" are, at best, capable of detection of some forms of credit fraud or identity theft after the crime or misuse has occurred.

Plaintiffs have alleged a violation of K.S.A. § 50-627(b)(7) for the improper exclusion of warranties of merchantability and fitness for a particular purpose. This claim is based upon the contract language which excludes warranties and the Defendant's demonstrated knowledge that consumers purchased the product because they relied upon Defendant to provide accurate scores in order to time their purchases, as well as Defendant's knowledge that consumers purchased credit monitoring to learn about identity theft. (Ex.1 attached) Despite this knowledge, Defendant attempted to exclude warranties. Plaintiffs assert that they have established this violation. In addition to the arguments in Defendant's briefing which actually support Plaintiffs' claims, uncontroverted facts, including but not limited to a, c, aa, ee, ff, kk, ll, mm, qq, and ss establish this violation.

## CONCLUSION

It is important to understand that Plaintiffs' *motion* is for claims of unconscionability based upon Section 50-627. Unconscionability involves conduct by which a supplier seeks to induce or to require a consumer to assume risks which materially exceed the benefits to the consumer. It involves over-reaching, not necessarily deception. The KCPA replaced the Kansas Buyer Protection Act which had no such provision. The terms "knowledge and reason to know" often will be established by the supplier's course of conduct. Kansas comment, 1973, K.S.A. § 2000 Supp. 50-627.[19]   The direction of the KCPA is that its terms are to be construed liberally to protect consumers from suppliers who commit deceptive and unconscionable practices. K.S.A. § 50-623.[20] As to the Kansas Consumer Protection Act, subsequent deceptive actions after the contract is made are also actionable. Willman v. Ewen, 230 Kan. 262, 266, 634 P.2d 1061, 1064 (Kan. 1981). A contract for the sale of a product with some value but a product limited in its usefulness or value can be indicative of "an overall imbalance" in the obligations and rights imposed by the bargain. Tuft v. Newmar Corp., 53 F. Supp.2d 1171, 1183 (D. Kan. 1999). The KCPA applies regardless of whether a consumer was misled or relied upon the deceptive act or practice and does not require proof of intent to defraud. Haag v. Dry Basement, Inc., 732 P.2d 392 (Kan. App. 1987) *rev. denied*, 241 Kan. 838 (1987).

---

[19]   The example in the comment which references language is, as Defendant noted, selling an English encyclopedia to a Spanish American bachelor who does not read English. Id. This is, however, only an example. L.1973, ch. 217, Sect. 5; Willman v. Ewen, 6 Kan.App.2d 321, 324, 627 P.2d 1190, 1192 (1981), *aff'd* 230 Kan. 262, 634 P.2d 1061 (1981) (tests are not exclusive).

[20]  Defendant continues to refer to the California federal court opinion in the Millett's litigation with Experian and its subsidiary. (D.I. 163) The California Court did not consider, in its opinion, this mandate from the Kansas legislature concerning representations made within Kansas. The *Experian* holding is not controlling and is not persuasive to this Court as this Court considers unconscionability as defined by the Kansas consumer statute.

<u>CERTIFICATE OF SERVICE</u>

I, Christopher J. Curtin, Esq., hereby certify that on November 13, 2007, I served a copy of the foregoing Plaintiffs' Reply to Defendant's Answering Briefs in Opposition to Plaintiffs' Motion for Partial Summary Judgment by depositing the same in the United States Mail, postage prepaid to:

William M. Lafferty, Esq.
Jay N. Moffitt., Esq.
Morris Nichols Arsht & Tunnell
1201 N. Market St.
Wilmington, DE 19801
wlafferty@mnat.com

and that I served a copy electronically this day to the following:

Michael C. O'Neil
Paula D. Friedman
DLA Piper US LLP
203 N. LaSalle St., Ste. 1900
Chicago, IL 60601-1293
michael.Oneil@dlapiper.com
paula.friedman@dlapiper.com

_____/s/ Christopher J. Curtin_____
Christopher J. Curtin, Esquire
MacElree Harvey, Ltd.
5721 Kennett Pike
Centreville, DE 19807
Phone: 302.654.4454
Facsimile: 302.654.4954
Email: ccurtin@macelree.com
Website: macelree.com

COUNSEL FOR PLAINTIFFS
STEVEN G. MILLETT
AND MELODY J. MILLETT

DATE: November 13, 2007