# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

STEVEN G. MILLETT, MELODY J. MILLETT,     )
On Behalf of Themselves and All Others     )
Similarly Situated,     )
                    Plaintiffs,     )
                                 )     Case No. 05-599-SLR
v.     )
                                 )
TRUELINK, INC.,     )
A Trans Union Company,     )
                               )
             Defendant.     )

## REDACTED
## APPENDIX TO
## PLAINTIFFS' REPLY TO DEFENDANT'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Christopher J. Curtin, Esquire
MacElree Harvey, Ltd.
5721 Kennett Pike
Centreville, DE 19807
Phone: 302.654.4454
Facsimile: 302.654.4954
Email: ccurtin@macelree.com
Website: macelree.com

COUNSEL FOR PLAINTIFFS
STEVEN G. MILLETT
AND MELODY J. MILLETT

DATE: November 13, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| STEVEN G. MILLETT, MELODY J. MILLETT, | ) | |
| On Behalf of Themselves and All Others | ) | |
| Similarly Situated, | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 05-599-SLR |
| v. | ) | |
| | ) | |
| TRUELINK, INC., | ) | |
| A Trans Union Company, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX TO PLAINTIFFS' REPLY TO DEFENDANT'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

MACELREE HARVEY, LTD.
Christopher J. Curtin, Esquire
MacElree Harvey, Ltd.
5721 Kennett Pike
Centreville, DE  19807
Phone:  302.654.4454
Facsimile:  302.654.4954
Email:  ccurtin@macelree.com
Website:  macelree.com


COUNSEL FOR PLAINTIFFS
STEVEN G. MILLETT
AND MELODY J. MILLETT

FILED:  November 13, 2007

APPENDIX INDEX

1        EXHIBIT OF FACTS PARAGRAPHS
2.       DEPOSITION PAGES OF STEVEN MILLETT
3.       DEPOSITION PAGES OF KATE ANDERSON
4.       DEPOSITION PAGES OF NEIL DANAHER
5.       DEPOSITION PAGES OF BARBARA KOZEL
6A.      DEPOSITION PAGES OF LUCY DUNI, WORK EXPERIENCE
6B.      DEPOSITION PAGES OF LUCY DUNI, SALES AND MARKETING

## CERTIFICATE OF SERVICE

I, Christopher J. Curtin, Esq., hereby certify that on November 13, 2007, I served a copy of the foregoing Appendix to Plaintiffs' Reply to Defendant's Answering Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment by depositing the same in the United States Mail, postage prepaid to:

William M. Lafferty, Esq.
Jay N. Moffitt., Esq.
Morris Nichols Arsht & Tunnell
1201 N. Market St.
Wilmington, DE 19801
wlafferty@mnat.com

and that I served a copy electronically this day to the following:

Michael C. O'Neil
Paula D. Friedman
DLA Piper US LLP
203 N. LaSalle St., Ste. 1900
Chicago, IL 60601-1293
michael.Oneil@dlapiper.com
paula.friedman@dlapiper.com

      s/ Christopher J. Curtin
    Christopher J. Curtin, Esquire
    MacElree Harvey, Ltd.
    5721 Kennett Pike
    Centreville, DE 19807
    Phone: 302.654.4454
    Facsimile: 302.654.4954
    Email: ccurtin@macelree.com
    Website: macelree.com

DATE: November 13, 2007

EXHIBIT A

**EXHIBIT 1** OFFERED FOR THE CONVENIENCE OF THE PARTIES AND
COUNSEL, AN EXHIBIT ACCOMPANYING, WITHOUT ARGUMENT INTENDED,
PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFFS MOTION
FOR PARTIAL SUMMARY JUDGMENT
AND BRIEF IN OPPOSITION

_____

EXHIBIT.1.A

<u>PLAINTIFFS FACTS CONTROVERTED BY DEFENDANT'S ANSWERING BRIEF</u>

Plaintiffs provide the following summary, for the convenience of the Court

and the parties, concerning the factual allegations which have been **controverted**

by Defendant's response (D.I. 165).

| Page on D.I. 165 | Plaintiff's ¶ | Defense ¶ | Topic | Cross references |
|---|---|---|---|---|
| 2 | 11–12, 26, 28, 34–37, 46 | 1 | Defendant summary of argument (no allegation of fact asserted) | |
| 4 | 9, 11–12, 19, 20, 26, 34–37, 46 | 4 (Also see D's paragraph 7) | Terms of advertising and contract incorporation | Statements in Paragraph 4 do not dispute **factual** allegations of 9, 11–12, 19–20, 26, 34–37, 46. |
| 5–6 | 11, 12, 26 | 7 | Applicability of advertising | |
| 10 | 20–22 | 16 | Dates of "complete protection" advertising | |
| 12 | 84 | 20 | Content of electronic mail (no need to be concerned content) | |

| Page on D.I. 165 | Plaintiff's ¶ | Defense ¶ | Topic | Cross references |
|---|---|---|---|---|
| 14–15 | 31–32, 78–83, 93 | 24 | "Watch status" | |
| 19 | 56–58 | 45 | Credit denials | Relevancy argument |
| 19 | | 46 | Credit denials | Relevancy argument |
| 21 | 7, 10, 16, 17, 20, 21, 23 † | 49 | Uniform contract | Relevancy argument |
| 21 | 13 | 50(1st bullet) | TrueLink knowledge of information in credit "file" | |
| 21 | 25 | 50(2nd bullet) | Use of Social Security number is theft | |
| 21–22 | 28 | 50(3rd bullet) | Credit "report" and detections | |
| 22 | 14 | 51(1st bullet) | Economic harm and testimony of corp. officers | |
| 22 | 27 | 51(2nd bullet) | Whether it is possible to protect oneself from identity theft | |
| 22 | 34 | 51(3rd bullet) | Representations as to identity theft | |
| 22 | 35 | 51(4th bullet) | Credit report as tool | |
| 23 | 51 | 51(5th bullet) ‡ | Aware of reason for purchase | |
| 23 | 52 | 51(6th bullet) | Notification of a type of fraud | |
| 23 | 53 | 51 (7th bullet) | Aware of reason to purchase | |

| Page on D.I. 165 | Plaintiff's ¶ | Defense ¶ | Topic | Cross references |
|---|---|---|---|---|
| 23 | 73–75 | 51(8th bullet) μ | Credit file matching and use of more than one Social Security number | |
| 23 | 15, 72 | 52(1st bullet) | Access of credit bureau information | |
| 24 | 54 | 52(2nd bullet) | Mr. Millett directed spouse to purchase | |
| 24 | 89 | 52(3rd bullet) | Notification date | |
| 24 | 90 | 52(4th bullet) | Profit reference | |
| 24 | 30 | 30(5th bullet) | Contract term on discontinuation of service | |

EXHIBIT 1.B. PLAINTIFFS FACTS CONTROVERTED BY DEFENDANT SOLELY
BY MOTION TO STRIKE EXPERT REPORT OF DIMBERT

Plaintiffs provide the following summary, for the convenience of the Court

and the parties, concerning the factual allegations which have been **controverted**

solely by Defendant's reference to Defendant's **motion to strike the report** of

Plaintiffs' expert, Ronald Dimbert.

| | Plaintiff's paragraph | Defendant's paragraph | Topic | Page References |
|---|---|---|---|---|
| 20-21 | 8, 44 | 48 | Kansas consumer expectations | Motion strike report of Dimbert |

4

EXHIBIT 1.C. PLAINTIFFS' FACTS CONTROVERTED SOLELY BY DEFENSE MOTION TO STRIKE MS. MILLETT'S AFFIDAVIT

Plaintiffs provide the following summary, for the convenience of the Court and the parties, concerning the factual allegations which have been **disputed** by Defendant solely by reference to Defendant's Motion to **strike the affidavit** of Plaintiff Melody Millett.  Plaintiffs have opposed the Motion to strike the affidavit which was offered in support of Plaintiffs' Motion for Partial Summary Judgment.

|       | Plaintiff's paragraph | Defense § | Topic | Page Reference |
|-------|-----------------------|-----------|-------|----------------|
| 19-20 | 59-61, 66-70 | 47 | Trans Union knowledge of data fraud as to Perez accounts | Motion to strike Millett affidavit |

EXHIBIT 1.D.  DEFENDANT'S FACTS ASSERTED WHICH ARE
CONTROVERTED BY PLAINTIFFS' REPLY

Plaintiffs provide the following summary, for the convenience of the Court

and the parties, of the **facts which are raised in Defendant's answering brief** in

opposition (D.I. 165).  Plaintiffs provide this reference to their responses to

**controvert Defendant's new facts asserted.**

| Page in D.I. 165 | Plaintiff¶ | Defense¶ | Topic | Argument |
|---|---|---|---|---|
| 2 | | 2 | Purchase facts | |
| 3–4 | | 3 | Purchase facts | |
| 4 | 9, 11–12, 19 20, 26, 34–37, 46 ¥ | 4 | Terms of advertising and contract incorporation | Legal objection |
| ¥ No *factual* dispute appears to be offered as to these paragraphs: Plaintiffs paragraph 9:<br><br>"Defendant incorporated into the terms of the contract the language of the web page advertising."<br><br>Plaintiffs paragraph 19:<br>"Defendant's credit monitoring contract incorporated the web page information."<br><br>Plaintiffs' paragraph 37:  "The 'credit report' does not contain all information available to Trans Union about a consumer which is contained in a consumer file held by Trans Union."<br><br>Plaintiffs' paragraph 46:<br>"Defendant promised to alert its purchasers to potential identity theft." | | | | |
| 4 | | 5 | Applicability of FRCA | |
| 5 | | 6 | Fraud watch and "identity theft"/ "credit report" | |
| 5–6 | 11, 12, 26 | 7 | Applicability of advertising | |

6

| 6-7 | | 9 | Disclaimer terms | |
| 8-9 | | 11 | Terms of FCRA | |
| 9 | | 12 | Disclaimers in industry | |
| 9 | | 13 | Disclaimers in resellers agreements | |
| 9-10 | | 14 | Plaintiffs' expectations | |
| 10 | | 15 | Plaintiff testimony | |
| 11 | | 17 | Definition identity theft | |
| 11 | | 18 | Reasonable person interpretation of advertising | |
| 12 | | 19 | Identity theft events not on Mr. Millett's credit "file" | |
| 13 | | 21 | Email alerts and Steven Millett response | |
| 13 | | 22 | A)  did not report problem; B)  did not request refund C) did not cancel D) found product had value | |
| 14 | | 23 | A)  purchases B) types of identity theft C) value of product | |
| 20 | 8, 44 | 48 | Consumer survey | |

## Exhibit. 1. E.  Uncontroverted Facts

Plaintiffs provide the following summary, for the convenience of the Court and the parties, of the facts from Plaintiffs' motion for partial summary judgment which are factually **uncontroverted**.

| D.I. 165 page # | Plaintiff's paragraph | Defendant's paragraph | Topic | Notes |
|---|---|---|---|---|
| 8 | 15, 37, 73, 88± | 10 | Reporting industry inaccuracies | |
| 17 | 33 | 37 | Plaintiffs received reports of changes but no change had occurred | |
| 18 | 41–43, 47 | 39 | Allegations made concerning "CoreFail" | |
| | 1 | | Plaintiffs are consumers under Act | |
| | 2 | | Defendant is supplier under Act | |
| | 3 | | Defendant sold a product or service | |
| | 4 | | Purchase of credit monitoring is a "consumer transaction" defined by Act | |
| | 5 | | Defendant supplied a "service" as defined by the act | Fact uncontested |
| | 6 | | Number of members of KCPA class | Fact uncontested |
| | 9 | | Advertising incorporated into contract | Fact uncontested |
| 23 | 15 | 10 € | Aware of reason for purchase | |
| | 18 | | Internet pages contained advertising | |

| D.I. 165 page # | Plaintiff's paragraph | Defendant's paragraph | Topic | Notes |
|---|---|---|---|---|
| | 24 | | Defendant tells employees fraud includes imposter using identifiers | |
| | 29 | | Contract posted and utilized until replaced; consumers were to check website for changes | |
| 4 | 9, 11–12, 19–20, 26, 34–37, 46£ | 4 | Terms of advertising and contract incorporation | |
| | 48 | | All purchasers agree to similar contract | |
| 6 | 49 | 8 | Warranties for merchantability and fitness for a particular purpose were excluded | |
| 6 | 50 | 8 | Warranties were excluded∞ | |
| | 55 | | Steven Millett first purchase date (delegated to Melody Millett) | |
| | 62 | | Perez purchase of Social Security number | Defendant's motion to strike Millett affidavit |
| | 63 | | Discovery litigation allowed Plaintiffs to learn of Social Security use by Perez | Defendant motion to strike Millett affidavit |
| | 64 | | Ms. Millett and code used in industry | Defendant motion to strike Millett affidavit |
| | 65 | | Credit reporting agencies use unified reporting | Defendant motion to strike Millett affidavit |

| D.I. 165 page # | Plaintiff's paragraph | Defendant's paragraph | Topic | Notes |
|---|---|---|---|---|
| | 76 | | Defendant and credit reporting agency cannot determine who has been issued any given Social Security number | |
| | 77 | | Defendant used Social Security number as one of key identifiers | |
| | 85 | | Millett can close only accounts he discovers | |
| | 86 | | Compliance officer, Anderson, statements as to use of reports as detection tool | Anderson Affidavit to support answering brief in opposition, |
| | 87 | | Plaintiffs' litigation | |
| | 88 | | Credit report is not always accurate | |
| | 91 | | Police warn Plaintiffs to be cautious | Motion to strike affidavit, |
| | 93 | | Defendant told subscribers to relax and have "peace of mind" because monitoring had been paid for | |

10

Ex. 1.E. DEFENDANT'S ACTS UNCONTROVERTED BY PLAINTIFFS FOR PURPOSES OF THE MOTION FOR SUMMARY JUDGMENT ONLY

Plaintiffs provide this summary, for the convenience of the Courts and the parties, of those new facts asserted by Defendant in its brief in opposition (D.I. 165).  These **new facts are not controverted by Plaintiffs for purposes of this Court's determination of Plaintiffs' motion** for partial summary judgment and for purposes of this motion only.

| D.I. 165 page # | Plaintiff's paragraph | Defense ¶ | Topic | Page Pl. (D.I.----) | Page Def. (D.I. 165) |
|---|---|---|---|---|---|
| 15 | 32{*} | 25 | "Watch" set | | |
| {*} These paragraph references were added by Plaintiffs but not referenced by Defendant in the answering briefing | | | | | |
| 15 | 79 {*} | 26 | "Watch" request to TU | | |
| 15 | 79–80, 83, 93 {*} | 27 | "Watch set failure" | | |
| 15 | 79 | 28 | TU monitors "credit report" for changes | | |
| 15 | | 29 | Debit card charge failed | | |
| 16 | | 30 | Defendant notified Mr. Millett | | |
| 16 | | 31 | New order failed | | |
| 16 | | 32 | Policy to attempt to charge again | | |
| 16 | | 33 | "Confirm Watch Delete" for non-payment | | |
| 16 | | 34 | New order cancelled | | |

| D.I. 165 page # | Plaintiff's paragraph | Defense ¶ | Topic | Page Pl. (D.I.---) | Page Def. (D.I. 165) |
|---|---|---|---|---|---|
| 16 | | 35 | Completed order for monitoring | | |
| 16– 17 | | 36 | A) No charges made while the "watch" was not set<br>B)  Ms. Millett has not established that she paid for monitoring with her debit card | | |
| 17 | | 38 | Blank fraud alert changes for customers with fraud alerts on credit "file" from 5/5/04 to 4/29/05 | | |
| 18 | 39, 40, 41, 42 | 40 | Steps to enrollment | | |
| 18 | 39, 40, 41, 42 | 41 | After charge, pull credit report, if valid credit report, identification verification | | |
| 18 | 41 | 42 | CoreFail defined | | |
| 18 | 42–43, 47 | 43 | If CoreFail, steps | | |
| 18 | | 44 | No CoreFail with Mr. Millett | | |

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


STEVEN G. MILLETT,

MELODY J. MILLETT,

On Behalf of Themselves and

All Others Similarly Situated,

               Plaintiffs,

vs.                    C.A. No. 05-599-SLR

TRUELINK, INC.,        Class Action

a Trans Union Company,   Jury Trial Demanded

              Defendant.




VIDEOTAPED DEPOSITION OF STEVEN G.

MILLETT, a Plaintiff, taken on behalf of the

Defendant before Nissa M. Sharp, CSR, CCR #528,

pursuant to Notice on the 30th of March, 2007,

at the offices of THE CLOON LAW FIRM, 11350

Tomahawk Creek Parkway, Suite 100, Leawood,

Kansas.

1    undoubtedly will occur, just let me know and

2    I'll rephrase it.

3            Also, as I'm sure you've been told and

4    you've had depositions before, I would ask that

5    you let me finish my question before you answer

6    it so that the court reporter has an easier time

7    of recording what's said.

8            If you ever need to take a break during

9    the deposition, just let us know and we'll take

10   a break.  This is not a marathon.  However, for

11   questions pending, I would ask that you answer

12   the question before we take a break.

13           Do you know what company I represent in

14   connection with this deposition today?

15       A.    Trans Union.

16       Q.    Okay.  And do you understand that -- is

17   it your understanding that this deposition is in

18   a lawsuit that you brought against Trans Union?

19       A.    Correct.

20       Q.    Okay.  What's your understanding of the

21   claims that you have brought against Trans

22   Union?

23       A.    It's about the misrepresentation of the

24   -- your product is deceptive.

25       Q.    Trans Union's products you mean?

1      A.   Well, the identity theft monitoring.

2      Q.   What's deceptive about it, sir?

3      A.   It says it protects you from identity

4   theft.

5      Q.   And you think that was an inaccurate

6   statement?

7      A.   Well, I don't think it protects from

8   all forms of identity theft.

9      Q.   And why do you believe that, sir?

10     A.   Because my Social Security number was

11   stolen.

12     Q.   Was it stolen after you purchased the

13   product from Trans Union?

14     A.   It was stolen before.

15     Q.   Okay.  So, you couldn't -- you didn't

16   expect the product that you purchased after your

17   Social Security number was stolen would actually

18   prevent the theft of that Social Security

19   number, did you?

20     A.   No.  But I expect to find information,

21   that's why we bought your product, we were

22   expecting to find information about the other

23   person using my Social Security number.

24     Q.   Was there some information that you

25   expected the product to give you that you didn't

1   get?

2        A.   Could you repeat the question?

3        Q.   Sure.  Was there some information that

4   you expected this product to give to you that

5   you did not get?

6        A.   Well, I expected to see the other

7   person's accounts and, you know, what they

8   bought, and all I saw was my stuff.

9        Q.   Why did you expect to see information

10   regarding the other person?

11        A.   Well, we were just -- we were just

12   looking for information.  We were hoping to see

13   something.  We never saw anything.

14        Q.   You and your wife have bought a number

15   of credit monitoring products from a number of

16   companies, right?

17        A.   Yes, sir.

18        Q.   And none of those products gave you the

19   information that you're telling us today you

20   expected to get, right?

21        A.   Right.

22        Q.   Why did you expect to get that

23   information then?

24        A.   Well, we should have got some kind of

25   alert or something if you're monitoring my

1    credit.

2        Q.    You talked this morning about some

3    expectation you had about this product.  Was it

4    your decision to buy the product from Trans

5    Union?

6        A.    It was my wife's -- I mean, we agreed

7    on it.  My wife said this would help us out.  I

8    said okay, go ahead and buy it.

9        Q.    And what did your wife tell you in that

10   conversation as to why she thought you should

11   buy the product?

12       A.    Could you repeat the question, I'm

13   sorry?

14       Q.    Sure.  I think you told me that your

15   wife suggested that you buy the product and you

16   agreed, right?

17       A.    Right.

18       Q.    Okay.  What did she say to you, if

19   anything, besides, Steven, we should buy this

20   product?

21       A.    She said we should buy this, this would

22   help us out.

23       Q.    Did she explain to you how she thought

24   it would help you out?

25       A.    No.  But that's where I thought it

 1   lawsuit, you have to file what's called a

 2   complaint?

 3        A.   Yeah.

 4        Q.   Okay.   Have you ever seen a complaint

 5   that was filed on your behalf?

 6        A.   I think, yes.

 7        Q.   Okay.   And you understand that in the

 8   complaint you have to describe facts, right?

 9        A.   Right.

10        Q.   And you also have to identify the legal

11   claims that you're asserting, do you understand

12   that?

13        A.   That's why I hired my lawyer, sir.

14        Q.   Okay.   But do you understand that a

15   complaint has to describe the legal claims that

16   you're asserting?

17        A.   Right.

18        Q.   Okay.   And do you also understand that

19   as part of a complaint, you have to tell the

20   Court what you want the Court to do?

21        A.   Right.

22        Q.   The relief that you're seeking?

23        A.   I understand.

24        Q.   Okay.   What relief are you seeking in

25   the lawsuit that we're talking about today?

1    that it's not Trans Union's product, it's

2    Truelink's product.  Am I mistaken about that?

3              MR. O'NEIL:  I'm asking your

4    client about his knowledge.  He told me it was a

5    Trans Union product.

6              MR. CLOON:  But you've misled him

7    by saying it is a Trans Union product.  He's

8    stated on the record that he's got them all

9    confused.  He thinks Trans Union is a part of

10   Truelink.

11             MR. O'NEIL:  Okay.  I'll withdraw

12   the question, you know what, because it's a

13   waste of time.

14        Q.   (BY MR. O'NEIL) At some point in time,

15   your wife went online and bought a credit

16   monitoring product from either Trans Union or

17   Truelink, right?

18        A.   Correct.

19        Q.   Okay.  At that time, did you actually

20   see the website pages she was looking at?

21        A.   Yeah, I think it said protect me from

22   identity theft.

23        Q.   Uh-huh.  What else did it say?

24        A.   I can't recall.

25        Q.   Okay.

1        A.    I mean, that's the gist of it.

2        Q.    And so when you and your wife read

3    that, did you think, great, this product will

4    protect us from identity theft?

5        A.    Yes, sir.

6        Q.    Okay.  Of course, you were already a

7    victim office identify theft, that's your

8    position, right?

9        A.    Yes, sir.

10       Q.    Okay.  Has anybody else stolen your

11    identity since Mr. Perez did?

12       A.    As far as I know, no.

13       Q.    And, to your knowledge, has Mr. Perez

14    opened up any other accounts since you first

15    bought the product from Trans Union or Truelink?

16       A.    I can't answer that, I don't know.

17       Q.    Okay.  So, as you sit here now, you

18    don't have any evidence that there was any

19    additional misuse of your Social Security number

20    after your wife first bought the product?

21             MR. CLOON:  I'm going to object

22    to the form of the question.  Lacks foundation.

23    Calls for speculation.

24       A.    Can you repeat the question?

25       Q.    (BY MR. O'NEIL) I'll ask the court

1    reporter to repeat the question for you,

2    Mr. Millett.

3                    (Whereupon, the requested portion

4    of the record was read by the reporter.)

5                    MR. CLOON:  Same objection.

6        A.    Correct.

7        Q.    (BY MR. O'NEIL) Okay.  You also

8    mentioned something about the KCPA.  Do you

9    recall saying that this morning?

10       A.    Who?

11       Q.    You also mentioned the Kansas Consumer

12   Protection Act?

13       A.    Right.  Right.

14       Q.    What's that?

15       A.    It's a law.

16       Q.    Do you know anything more about it?

17       A.    Well -- it's the Consumer Protection

18   Act, that's about all I know.

19       Q.    Okay.  You also said that you wanted to

20   have your money returned?

21       A.    Right.

22       Q.    What money do you want to have returned

23   to you?

24       A.    What we paid for the product.

25       Q.    The full amount that you paid for the

1   product you want returned to you?

2       A.   Well, it doesn't work, so we want our

3   money back.

4       Q.   Did you ever ask Trans Union or

5   Truelink for a refund?

6       A.   Not me personally, no.

7       Q.   Has somebody else?

8       A.   Well, my wife has.

9       Q.   Really?  When did she do that?

10      A.   Well, I think she's did that.  I

11  can't --

12      Q.   Okay, well, your lawyer a couple times

13  this morning said calls for speculation, I don't

14  want you to speculate.  I'm asking, do you have

15  any knowledge that anybody --

16      A.   My wife handled that.

17      Q.   So you don't have any knowledge then?

18      A.   Yes, sir.

19      Q.   Okay.  So, as far as you know, you've

20  never asked Trans Union or Truelink for a

21  refund, right?

22      A.   Correct.

23      Q.   And at some point in time, you and your

24  wife decided that this product doesn't -- it

25  doesn't work, right?

1        A.    Yes, sir.

2        Q.    And did you immediately cancel your

3    product?

4        A.    You have to ask my wife that.

5        Q.    Well, I'm asking you, sir.  Once you

6    came to this conclusion that this product

7    doesn't work and that you want your money back,

8    did you -- and you don't know if you ever asked

9    for the money back, but I'm asking you now, did

10   you ever cancel the product?

11       A.    You'll have to ask my wife that.

12       Q.    I'm asking you, sir.

13       A.    I don't know.  I don't know.

14       Q.    Isn't it true, Mr. Millett, that to

15   this day, you're still paying money to Truelink

16   for the product that you're now claiming doesn't

17   work?

18              MR. CLOON:  Objection.

19   Argumentative.  But you may answer.

20       A.    I don't know.

21       Q.    (BY MR. O'NEIL) So, as you sit here

22   today, you don't know if you are still buying

23   this product; is that right?

24       A.    That's right.

25       Q.    Did you ever have a conversation with

1    your wife since you first filed these lawsuits

2    in 2004 and asked her are we still paying money

3    for these products?

4        A.    I've never asked her.

5        Q.    Did you ever have any conversation with

6    your wife since July of 2004 where the two of

7    you said the product we got from Trans Union or

8    Truelink, it doesn't work?  Did you ever have

9    that conversation with her?

10       A.    I think in general terms we had

11   conversations about all the consumer products.

12       Q.    Okay.  Right now I'd just like to focus

13   your attention on the product, the credit

14   monitoring product --

15       A.    I don't recall.

16       Q.    Okay.  So, you don't recall having a

17   conversation with your wife after you bought the

18   product where you said it doesn't work; is that

19   right?

20       A.    Yes.

21       Q.    Did you ever have a conversation with

22   your wife at any time since you first bought the

23   product where the two of you discussed the fact

24   that the marketing was deceptive?

25       A.    I think we've had conversations about

1    that quite a bit.

2        Q.   Okay.   And in the context of those

3    conversations, did you ever say, well, we

4    shouldn't continue paying for that product then?

5        A.   I don't think we ever had a

6    conversation like that.

7        Q.   Okay.   In fact, your wife believes the

8    products are helpful, right?

9                MR. CLOON:   Objection.   Calls for

10   speculation.

11       A.   So what do I think?

12       Q.   (BY MR. O'NEIL) I'm asking --

13       A.   Is that what you're asking me?

14       Q.   No, I'm asking what your wife thinks.

15   Isn't it true that your wife believes these

16   products are helpful?

17       A.   Well, you'll have to ask her that

18   question.

19       Q.   Sir, I'm asking you now.

20       A.   Well, I don't know what she thinks all

21   the time.

22       Q.   Okay.   Well, actually, I'm not asking

23   about all the time or anything, I'm asking about

24   one particular topic.   Which is that the product

25   which is the basis for the lawsuit against my

1    to this line of questioning as being totally

2    irrelevant to the issues in this case.

3        Q.    (BY MR. O'NEIL) You can answer.

4        A.    Can you repeat the question?

5        Q.    Sure.

6              MR. O'NEIL:  Could you please

7    repeat the question, Ms. Court Reporter?

8              (Whereupon, the requested portion

9    of the record was read by the reporter.)

10             MR. CLOON:  Same objection and

11   lacks foundation.

12       A.    Yeah.  Yes, sir.

13       Q.    (BY MR. O'NEIL) Why do you think the

14   Court should permit you to represent all those

15   other credit monitoring customers, instead of

16   having them represent themselves?

17       A.    We bought the product just like

18   everybody else.

19       Q.    And you made the decision that you

20   thought the product was defective and you sued

21   Truelink, right?

22       A.    Yes, sir.

23       Q.    And now you want to make that decision

24   for everybody else who bought the product; isn't

25   that correct?

1      A.    Yes, sir.

2      Q.    But you haven't talked to any of those

3   people, right?

4      A.    Well, maybe they don't know.

5      Q.    You haven't talked to any of those

6   people, right?

7      A.    No, I haven't talked to all your

8   customers.

9      Q.    So you don't know whether or not they

10  have the same complaints that you allegedly have

11  about the product, right?

12     A.    I don't think they're aware of what the

13  product does and does not do.

14     Q.    Uh-huh.   When you first bought the

15  product from Truelink, you and your wife had a

16  conversation where you both agreed you're going

17  to buy it, correct?

18     A.    Yes, sir.

19     Q.    Do you understand that additional

20  products have been purchased from Truelink by

21  your wife since that time?

22     A.    No, I'm not aware of that.

23     Q.    Okay.   So, as far as you know, there

24  was just the one product that you agreed to buy

25  at the very beginning, right?

1       A.   Yes, sir.

2       Q.   Okay.  And that was a credit monitoring

3    product?

4       A.   Yes, sir.

5       Q.   Did you buy anything else at that time

6    from Truelink?

7       A.   Not that I'm aware of.

8       Q.   Okay.  And that was a product that was

9    -- that provided you with information over a

10   period of time, right?

11      A.   Right.

12      Q.   Okay.  And how long a period of time

13   did that last?

14      A.   I don't know.  You said it's ongoing,

15   so we must still have it then.

16      Q.   And as part of your -- the credit

17   monitoring product you bought, e-mails were sent

18   from Truelink to your home, right?

19      A.   Right.

20      Q.   And, in fact, they weren't sent to your

21   e-mail address, but to you're wife's e-mail

22   address?

23      A.   Correct.

24      Q.   Okay.  Did you ever see any of those

25   e-mails?

1    A.    I think maybe I saw one.   Everything is

2    honky-dory.

3    Q.    Do you know how often your wife

4    received those e-mails?

5    A.    No, I can't answer that, I don't know.

6    Q.    Did you ever ask her, ask your wife, if

7    she ever got more than one e-mail from Truelink?

8    A.    No.  I don't recall asking her that.

9    Q.    Do you know when you purchased the

10   credit monitoring service from Truelink?

11   A.    I can't give you exact date.

12   Q.    Can you give me a rough date?

13   A.    I think it was like after the police

14   report or some time around there.

15   Q.    Okay.

16   A.    In general.

17   Q.    Do you know what year that was?

18   A.    I think it was 2003, I think.

19   Q.    And you told us today that you think

20   the product that Truelink sold to you doesn't

21   work, right?

22   A.    Yes, sir.

23   Q.    And could you tell me in what ways the

24   product doesn't work?

25   A.    Doesn't tell you if somebody's using

```
 1   no longer in this lawsuit, so they're totally

 2   irrelevant.

 3       Q.   (BY MR. O'NEIL) Have you ever heard of

 4   something called a Credit Repair Organization?

 5       A.   No.

 6            MR. CLOON:  Same objection.

 7       Q.   (BY MR. O'NEIL) Are you aware that your

 8   lawyers claim that Truelink violated the Credit

 9   Repair Organizations Act?

10            MR. CLOON:  Same objection.

11   Those claims have been dismissed.  They're no

12   longer in this lawsuit and they're totally

13   irrelevant.

14       Q.   (BY MR. O'NEIL) Are you aware that your

15   lawyers filed a claim against Truelink alleging

16   that Truelink has violated the Credit Repair

17   Organizations Act?

18            MR. CLOON:  Same objection.

19       A.   No.

20       Q.   (BY MR. O'NEIL) To your knowledge, have

21   you ever been denied credit based upon

22   information prepared by Truelink?

23       A.   I wouldn't know.

24       Q.   I'm sorry?

25       A.   I don't know.
```

1   your Social Security number.

2        Q.   Any other problems that you have with

3   the product?

4        A.   Well, it says it's supposed to protect

5   me from identity theft, I'm not even sure it

6   does that.

7        Q.   So you don't know?  It may, but you

8   don't know; is that right?

9        A.   Yes, sir.

10       Q.   Okay.  And to your knowledge, you

11  haven't been the victim of identity theft, other

12  than this use by Mr. Perez of your Social

13  Security number, right?

14       A.   That's correct.

15       Q.   Okay.  Any other problems that you have

16  with the Truelink credit monitoring service?

17       A.   I think you should change your

18  advertising.

19       Q.   So, you're not happy with the

20  advertising, right?

21       A.   Correct.

22       Q.   Okay.  But you haven't seen the

23  advertising since that very first day in 2003

24  since you looked at it, right?

25       A.   Correct.

1      Q.  So you don't know if you have any

2   problem with the advertising that's occurred

3   since that date, right?

4      A.  Right.

5      Q.  Have you ever had any conversations

6   with your wife about the advertising?

7      A.  Yeah, that they should change it.

8      Q.  Okay.

9             MR. O'NEIL:  Well, looks like we

10  need to change the tape, so let's go off the

11  record.

12            VIDEOGRAPHER:  We are now going

13  off the record at 9:56 AM.

14            (Recess.)

15            VIDEOGRAPHER:  It is now 9:58 AM

16  and we are back on the record.  You may

17  continue.

18      Q.  (BY MR. O'NEIL) Mr. Millett, have you

19  ever heard of something called the Credit Repair

20  Organizations Act?

21      A.  No.

22      Q.  Okay.  Have you ever heard of something

23  called a Credit Repair Organization?

24             MR. CLOON:  I'm going to object

25  to this line of questioning.  Those claims are

1    to Mr. Perez?

2         A.   I wouldn't know that.

3         Q.   Well, you and your wife have done a

4    detailed investigation over the last five years

5    regarding that very topic, right?

6         A.   My wife has.

7         Q.   Okay.  And did she tell you the results

8    of that investigation?

9         A.   Can you repeat the question?

10        Q.   Sure.  Are you aware whether or not

11   your credit history information maintained by

12   one of the three credit bureaus has ever been

13   accessed by someone who was considering a credit

14   application of Mr. Perez?

15        A.   No.  I don't know that.

16        Q.   Okay.  To your knowledge, has -- well,

17   strike that.

18             Let me direct your attention to Page 4

19   of that exhibit, Mr. Millett.  Top of Page 4 is

20   Paragraph 14.  Could you read that to yourself,

21   sir, and let me know when you're done reading

22   it?

23        A.   Okay.

24        Q.   Do you recall getting home loan

25   financing in approximately 1998?

1    to Mr. Perez?

2        A.    I wouldn't know that.

3        Q.    Well, you and your wife have done a

4    detailed investigation over the last five years

5    regarding that very topic, right?

6        A.    My wife has.

7        Q.    Okay.  And did she tell you the results

8    of that investigation?

9        A.    Can you repeat the question?

10       Q.    Sure.  Are you aware whether or not

11   your credit history information maintained by

12   one of the three credit bureaus has ever been

13   accessed by someone who was considering a credit

14   application of Mr. Perez?

15       A.    No.  I don't know that.

16       Q.    Okay.  To your knowledge, has -- well,

17   strike that.

18           Let me direct your attention to Page 4

19   of that exhibit, Mr. Millett.  Top of Page 4 is

20   Paragraph 14.  Could you read that to yourself,

21   sir, and let me know when you're done reading

22   it?

23       A.    Okay.

24       Q.    Do you recall getting home loan

25   financing in approximately 1998?

1        A.    That's when I was in Phoenix, yeah.

2        Q.   Okay.  And do you recall that the terms

3    of that home loan financing were less favorable

4    than you wanted them to be?

5        A.   Right.  I remember that, yeah.

6        Q.   And do you have any reason to believe

7    that the reason why those terms were less

8    favorable was because of Mr. Perez's use of your

9    Social Security number?

10       A.   Okay, repeat the question again.

11       Q.   It was a long question.

12       A.   I'm sorry.

13       Q.   No, you don't have to apologize, it was

14   a long question.  Paragraph 14 states, and I'm

15   paraphrasing here, that you agreed to home loan

16   financing on less favorable terms, quote,

17   "because you and your wife were unaware that the

18   fraudulent use of Plaintiff Steven Millett's

19   Social Security number and the identity theft

20   had adversely impacted their credit histories,

21   credit reports and credit scores," closed quote.

22   Do you see that?

23       A.   Yes, sir.

24       Q.   Do you have any reason to believe that

25   Mr. Perez's use of your Social Security number,

1      Q.    For what purpose?

2      A.    I can't remember.

3      Q.    Were you present when your wife wrote

4   the handwritten notes on the third page of this

5   document?

6      A.    Yes.

7      Q.    And was that at the police station?

8      A.    Yes.

9      Q.    There's some handwriting on the very

10  first page.  Do you see that, sir?  In the

11  middle there, I know there's handwriting at the

12  top, but in the middle of the page there's some

13  handwriting on the side.  Do you see that?

14     A.    Yeah, Byron.

15     Q.    Right.  Do you know whose handwriting

16  that is?

17     A.    No.  I'm not sure.

18     Q.    Okay.  Let me direct your attention,

19  Mr. Millett, back to the other document, the

20  Ford Motor complaint.

21     A.    All right.

22     Q.    And I'd ask you to go to Page 6.  This

23  is Paragraph 32.  Paragraph 32 on Page 6 states,

24  quote, "From January 2003 to the present date,

25  Plaintiffs have been forced to expend numerous

1    hours and their own funds in order to close

2    multiple accounts opened by fraud and to monitor

3    the conduct of Defendant and individuals and

4    entities who extend credit or utilize

5    information provided by Defendant."  Do you see

6    that, sir?

7         A.    Yes, sir.

8         Q.    Did you or your wife ever have to close

9    multiple accounts opened by fraud?

10        A.    Can you repeat that?

11        Q.    Well, it says here that you and your

12   wife, quote, "have been forced to expend

13   numerous hours and their own funds in order to

14   close multiple accounts opened by fraud."  Do

15   you see that?

16        A.    Yes, sir.

17        Q.    You never had to close multiple

18   accounts opened by fraud, did you?

19        A.    My wife handled that.

20        Q.    She never had to close multiple

21   accounts opened by fraud, did she?

22        A.    I don't think I can answer that.  I

23   don't know.

24        Q.    Do you have any idea what that's

25   referring to?

Case 1:05-cv-00599-SLR    Document 176    Filed 11/14/2007    Page 44 of 176

1        A.    I can tell you what I think.

2        Q.    Please do.

3        A.    That she had to close the accounts

4    opened by Mr. Perez.

5        Q.    Did she ever tell you that?

6        A.    I know she was working on that.

7        Q.    Did she ever close accounts that

8    somebody else had opened?

9        A.    She was trying to close down those

10   Abundio accounts that Trans Union sent from that

11   letter.

12       Q.    Did she ever succeed?

13       A.    I think she did on most of them.

14       Q.    So, it's your understanding that your

15   wife succeeded in closing credit accounts that

16   Mr. Perez had with other companies?

17       A.    Yes, sir.

18       Q.    Okay.  And what's the basis for that

19   understanding?  Is it because your wife told you

20   that?

21       A.    Because she was calling up people on

22   the phone.

23       Q.    Well, I understand she was calling

24   people on the phone.  But my question is, did

25   she actually close accounts?

1      A.   Right.

2      Q.   Okay.  Did she tell you how "The New

3    York Times" came to make a decision to do an

4    article on you?

5      A.   No.

6      Q.   Okay.  So, did she contact "The New

7    York Times" and suggest to them that they do an

8    article?

9      A.   I have no idea.

10     Q.   Okay.  What was your reaction to your

11   wife's news that "The New York Times" was going

12   to write an article on you and your wife?

13     A.   How did I feel?

14     Q.   Yeah.

15     A.   I felt okay with it.  I wasn't angry or

16   I wasn't, you know, it didn't bother me any

17   that...

18     Q.   Okay.  What else did you do -- going

19   back to my earlier question.  So, in January of

20   2003, you discover for sure that somebody else

21   is using your Social Security number, right?

22     A.   Yes, sir.

23     Q.   And you filed a police report, right?

24     A.   Right.

25     Q.   What else did you do to investigate

Metropolitan Court Reporters, Inc.              913-317-8800

1    this misuse of your Social Security number?

2        A.   I can't remember.

3        Q.   Well, did you do anything yourself to

4    investigate?

5        A.   I think I turned it all over to my

6    wife.

7        Q.   Why did you do that?

8        A.   Because she's better at numbers,

9    remembering.

10       Q.   Were you concerned when you discovered

11   that this gentleman was using your Social

12   Security number?

13       A.   Yes, sir.

14       Q.   And what were you concerned about?

15       A.   He was just out there buying up the

16   world.

17       Q.   Do you recall that you and your wife

18   decided you had to look at your credit reports

19   now that you've learned somebody was using your

20   Social Security number?

21       A.   Right.

22       Q.   Okay.  And did you do that?

23       A.   I think my wife did.

24       Q.   Okay.  And she got credit reports from

25   each of the three major credit bureaus, right?

1      A.    Right.

2      Q.    Okay.  Did you ever look at those

3   credit reports?

4      A.    I, yeah, I -- I don't see anything,

5   remember anything specific, but I think I looked

6   at them.

7      Q.    And what was your purpose in looking at

8   those credit reports?

9      A.    I was just seeing if there was Abundio

10  Perez anywhere.

11     Q.    Was there?

12     A.    No, not that I recall, no.

13     Q.    So you got credit reports from Trans

14  Union, Experian and Equifax, right?

15     A.    Right.

16     Q.    Okay.  And none of those credit reports

17  had any mention of Mr. Perez, right?

18     A.    As far as I know, right.

19     Q.    And none of those credit reports had on

20  them credit accounts that were Mr. Perez's,

21  right?

22     A.    As far as I know, yes.

23     Q.    And none of those credit reports

24  indicated that your credit report had been

25  accessed by somebody who was considering giving

1    Q.  And you don't recall seeing any

2  evidence of that fact, correct?

3    A.  Correct.

4    Q.  So, did that kind of put you at ease a

5  little bit that your credit report had not been

6  impacted by Mr. Perez's use of your Social

7  Security number?

8           MR. CLOON:  I'm going to object

9  to the form of the question.  Misstates the

10  evidence as to whether or not --

11    Q.  (BY MR. O'NEIL) You can answer.

12           MR. CLOON:  -- the credit report

13  was impacted.

14           MR. O'NEIL:  You know what, save

15  the argument for trial.  Let's just get the

16  facts here.

17           MR. CLOON:  Well, you know what,

18  Mike, I'm just trying to protect the record.

19           MR. O'NEIL:  Right.

20           MR. CLOON:  And I don't know what

21  the term "impacted" means.  I mean, that's vague

22  and ambiguous.

23           MR. O'NEIL:  You know what, I'll

24  withdraw -- vague and ambiguous is probably a

25  good objection, so I'll withdraw the question.

1   earlier, Mr. Millett, that when your wife first

2   purchased the credit monitoring product from

3   Truelink, that you were kind of -- you looked at

4   some of the marketing that was on the website at

5   that time?  Or maybe I'm wrong.  You know --

6   strike.

7       A.   I think --

8       Q.   Go ahead.

9       A.   Yeah, I think I said that.

10      Q.   Okay.  So, she, Mrs. Millett, purchased

11  the product over the internet, right?

12      A.   Correct.

13      Q.   And did she do it from her computer at

14  home?

15      A.   Right.

16      Q.   And were you sitting there with her in

17  front of the computer at the time?

18      A.   I was sitting behind her.

19      Q.   Okay.  Why was it that you were sitting

20  with her while she was buying the product?

21      A.   Because I was on my computer.

22      Q.   Oh, I see.  So you were in the same

23  room, but you were doing stuff on your own

24  computer?

25      A.   Right.

1      Q.    I see.  So, you weren't really watching

2    her go through each step of purchasing the

3    product, were you?

4      A.    No.

5      Q.    Okay.  Were you even looking at what

6    she was doing at that time?

7      A.    Well, I just kind of glanced over there

8    and read some stuff, and then I walked back to

9    my computer.

10     Q.    What were you reading?

11     A.    The -- what your opening statements

12   were.

13     Q.    You mean the statements on the website?

14     A.    Well, telling what about what the

15   product was, yeah.

16     Q.    Okay.  And why were you interested in

17   looking at that?

18     A.    Just to see what -- if you had any

19   disclaimers in there what you did and didn't do.

20     Q.    So, when you -- when your wife was

21   purchasing the product for you, you were

22   particularly interested in --

23     A.    Oh, I was just reading the activity

24   advertisement just seeing what you had in there.

25     Q.    Okay.  But you and your wife had

1    already purchased credit monitoring products

2    from other companies, right?

3        A.    Right.

4        Q.    And so you were familiar with what the

5    product was, right?

6        A.    In general.

7        Q.    Okay.  And when your wife purchased the

8    products from the other companies prior to

9    purchasing it from Truelink, were you sitting

10   looking at the information on the website during

11   those earlier purchases?

12       A.    I don't think so.

13       Q.    Okay.  What were you doing on the

14   computer while your wife was purchasing the

15   product?

16       A.    I think I was playing some video game

17   or something.

18       Q.    Is there a reason why your wife was

19   purchasing the product instead of you?

20       A.    Why she was doing it?

21       Q.    Right.

22       A.    I just -- I think she was looking at it

23   and she said it was -- it could help us.

24       Q.    And do you recall that she provided her

25   e-mail address instead of yours?

1      A.    Right.

2      Q.    When she purchased the products from

3   Experian and Equifax, did she also give her

4   e-mail address instead of yours?

5      A.    Yeah.

6      Q.    Okay.  And that's why you only think

7   you saw one e-mail from Truelink, right?

8      A.    Right.

9      Q.    Because they were going to your wife's

10  e-mail address, not yours, right?

11     A.    Right.

12     Q.    Okay.  Do you recall your wife asking

13  you any questions while she was purchasing the

14  product over the internet from Truelink?

15     A.    No.

16     Q.    Do you recall her saying anything to

17  you during the process of her purchasing the

18  product from Truelink?

19     A.    I think all she said this would help

20  us.

21     Q.    Did she say how it would help you?

22     A.    She said it would help us with this

23  Abundio stuff.

24     Q.    Now, at the time, you already knew that

25  the Equifax product didn't give you any

1    information about Mr. Perez, right?

2        A.    Right.

3        Q.    And you already knew that the Experian

4    product didn't give you any information about

5    Mr. Perez, right?

6        A.    Right.

7        Q.    Did you and your wife have any

8    conversations along the lines of, but we think

9    Truelink will provide information about

10   Mr. Perez?

11       A.    I think we bought the other two to

12   cross reference information.

13       Q.    Okay.  Well, you and your wife were

14   disappointed -- or correct me if I'm wrong, this

15   is a question -- were you and your wife

16   disappointed that the Experian and Equifax

17   products didn't give you any information about

18   Mr. Perez's use of your Social Security number?

19                 MR. CLOON:  I'm going to object

20   to the form of the question.  Lacks foundation.

21   There are no dates, times or places stated.

22       Q.    (BY MR. O'NEIL) You can answer.

23       A.    I wasn't happy.

24       Q.    Okay.  So, did you have any

25   conversations with your wife prior to purchasing

Metropolitan Court Reporters, Inc.              913-317-8800

1    the product from Truelink where you thought that

2    Truelink would provide that information?

3         A.    We didn't know.

4         Q.    Okay, I understand you didn't know.

5    What I'm asking is, did you have any

6    conversation with your wife prior to purchasing

7    the product from Truelink where you discussed

8    whether or not Truelink would provide the

9    information that you were looking for?

10        A.    I don't think we had a conversation

11   like that, no.

12        Q.    Did you ever ask your wife why are we

13   buying the same product from another credit

14   bureau?

15        A.    I think that was the same time when she

16   said it would help us.

17        Q.    I understand that, sir.  But did you

18   ever question why you were buying the same

19   product from a different credit bureau?

20        A.    It was just a cross reference to see

21   what the other two had.

22        Q.    Were you ever concerned about the

23   expense of these credit monitoring products that

24   you were purchasing?

25        A.    No.

1      Q.    Okay.  So, if in fact you were a victim

2    of identity theft or if in fact as it appears

3    this guy misused your Social Security number

4    prior to August 2, 2003, you can't blame

5    Truelink for that, right?

6      A.    Right.

7      Q.    And you don't have any evidence that

8    there's been additional identity theft that has

9    occurred since August 2nd, 2003, do you?

10     A.    Right.

11     Q.    Are there any other ways that you think

12   Truelink's alleged failure to deliver what it

13   promised has hurt you?

14     A.    Well, I just -- I mean, if you said in

15   your advertisement that this doesn't protect

16   from Social Security fraud, then we probably

17   wouldn't have bought it.

18     Q.    Really?  Is that your testimony today?

19   That if Truelink had told you that we're only

20   going to give you information in your credit

21   report and not information in another person's

22   report, that you wouldn't have bought the

23   product; is that your testimony?

24     A.    Well, it said it would protect me from

25   identify theft.

Metropolitan Court Reporters, Inc.                    913-317-8800

1        Q.    So --

2        A.    I consider Social Security -- stealing

3    my Social Security is an identity theft.

4              MR. O'NEIL:    Could you please

5    read back my question for the witness, and I'll

6    ask him to answer that question?

7              (Whereupon, the requested portion

8    of the record was read by the reporter.)

9        A.    I'm not understanding.

10       Q.    (BY MR. O'NEIL) Well, I understand that

11   you haven't ever looked at the marketing of

12   Truelink, other than some undefined page on the

13   one date that your wife purchased the product,

14   but.  Do you understand during the course of

15   your lawsuits against Trans Union, Truelink,

16   Experian, Equifax, that all of those companies

17   have explained that we only give you information

18   about your credit report, and we only tell you

19   about changes to your credit report?  Do you

20   understand that?

21       A.    Okay.

22       Q.    But did you understand that that's been

23   the positions of the companies that you have

24   sued?

25       A.    Okay.  Yeah.

1       Q.   Okay.  And do you understand that that

2   was the basis, one of the bases for the Court in

3   California dismissing some of the claims you

4   brought against Experian?

5       A.   Okay.

6       Q.   Okay.  So, go back to my original

7   question.  Are you saying that if you had been

8   told by Truelink that we're only going to alert

9   you to changes in your credit report, that you

10  would not have bought the product?

11      A.   I'm saying that if they would have said

12  what this product does and doesn't do, then, I

13  mean, we might have bought it and we might not

14  have bought it.  If it was all spelled up

15  instead of with the broad statement, well, this

16  is -- we protect you from identify theft.

17      Q.   With all due respect, sir, you don't

18  know what Truelink told you in August of 2003

19  about their product, isn't that correct, because

20  you didn't look at it?

21              MR. CLOON:  I'm going to object.

22  That's argumentative.

23      Q.   (BY MR. O'NEIL) You can answer.

24      A.   Can you ask that question again?

25      Q.   With the exception of -- somehow this

 1    thing you remember, you do remember that

 2    Truelink supposedly promised identity theft

 3    protection, right?

 4        A.    Yes, sir.

 5        Q.    Because that -- you do remember that

 6    one, right?

 7        A.    Right.

 8        Q.    Okay.  You don't remember anything else

 9    that Truelink said, right, about the product?

10        A.    That's right.

11        Q.    That's the only thing you remember?

12        A.    Right.

13        Q.    So, if in fact Truelink had told you

14    and your wife that you'll be getting weekly

15    e-mail alerts about changes to your report and

16    never suggested to you that you'd be getting

17    information about other people's reports, you

18    wouldn't know that because you didn't look at

19    that information --

20        A.    Right.

21        Q.    -- isn't that correct?  I'm sorry?

22        A.    Right.

23        Q.    Did your wife ever tell you, Steven,

24    unlike those other guys, I think Truelink is

25    going to give us information about Mr. Perez?

 1      A.    I don't ever recall her saying that,

 2  no.

 3      Q.    Do you ever recall her saying, Steven,

 4  I'm disappointed, I completely believed that

 5  Truelink was going to give us information --

 6      A.    I never --

 7      Q.    -- about Mr. Perez?

 8      A.    I don't remember her saying that.

 9      Q.    By the time you and your wife had

10  decided to buy the Truelink product in August of

11  2003, you and your wife had already hired

12  lawyers, right?

13      A.    I don't -- I think we hired Adler.

14      Q.    Right.  Did he ever suggest to you that

15  you buy the product from all of the people who

16  were selling credit monitoring products?

17      A.    No.

18                  MR. O'NEIL:  I think this is a

19  good time to take a break for lunch.

20                  MR. CLOON:  Okay.

21                  VIDEOGRAPHER:  We are now going

22  off the record at 11:40 AM.

23                  (Recess.)

24                  VIDEOGRAPHER:  It is now 1:08 PM

25  and we are back on the record.  You may

1    to whether or not you would have obligations to

2    the other unnamed members of the class if you

3    were to represent them?

4         A.    I'm representing the whole class.

5         Q.    Okay.  And are you aware that if you

6    are appointed to represent the class, are you

7    aware of any duties that you would owe to that

8    class?

9         A.    I'd be responsible for them.

10        Q.    Okay.  Do you understand that you'd be

11   responsible for making decisions in the lawsuit

12   on their behalf?

13        A.    Yes, sir.

14        Q.    Okay.  Are you seeking to represent

15   other people who bought the credit monitoring

16   product from Truelink who are victims of

17   identify theft?

18        A.    Yes, sir.

19        Q.    And are you seeking to represent people

20   who bought the Truelink product who are not

21   victims of identity theft?

22        A.    Well, I think whoever bought this, they

23   didn't get -- it is deceptive from the get-go in

24   my view.

25        Q.    So you're seeking to represent all

1    purchasers of credit monitoring by Truelink,

2    whether or not they were a victim of identity

3    theft or not; is that right?

4        A.    Exactly.

5        Q.    Okay.  Do you think that if you win

6    this case and if you're appointed the class

7    representative, that all members of the class

8    should get the same money?

9        A.    That's hard.  I don't know how to

10   answer that.

11       Q.    Why not?

12       A.    Well, I don't know what would be fair

13   to the whole class.  I don't know.

14       Q.    Because it depends on the particular

15   harm that each class member suffered, right?

16       A.    Well, some of them could have been

17   paying longer than others, I mean.

18       Q.    And some may have actually, in theory

19   if what you say is true, if your allegations are

20   all proven true, some people may have suffered

21   identity theft that they wouldn't have suffered

22   if Truelink's product was as delivered -- was as

23   promised; isn't that correct?

24       A.    Right.

25       Q.    Those people would really have damages,

1    wouldn't they?

2       A.    Right.

3       Q.    And you want to represent those people,

4    right?

5       A.    I want to represent the class, whoever

6    signed up for this product.

7       Q.    Well, isn't it fair to say that that

8    kind of customer who suffered identity theft

9    that really could have been prevented by

10   Truelink, that they suffered more damages than

11   somebody who never was a victim of identity

12   theft?

13      A.    I think it would have to be determined

14   individual case by case.

15      Q.    Do you recall answering written

16   questions that were posed to you and your

17   lawyers by Truelink in this case?

18      A.    Right, my wife helped me with those.

19      Q.    Okay, so you do recall it?

20      A.    Yeah.

21      Q.    Okay.  How did your wife help you?

22      A.    Well, she, like I said before, she

23   handled most of this.

24      Q.    Did she actually answer the

25   interrogatories for you?

1              MR. O'NEIL:  Sure.

2              VIDEOGRAPHER:  We are now going

3    off the record at 1:46 PM.

4              (Recess.)

5              VIDEOGRAPHER:  One moment please.

6    It is now 1:54 PM and we are back on the record.

7    You may continue.

8         Q.   (BY MR. O'NEIL) Mr. Millett, do you

9    recall testifying this morning that you believed

10   you did see one of the e-mails that Truelink

11   sent to your wife?

12        A.   I think so.

13        Q.   And I think you said that it indicated

14   that everything was honky-dory.  Do you remember

15   that?

16        A.   Yes, sir.

17        Q.   Okay.

18              (Millett Exhibit 7 was marked for

19   identification by the reporter.)

20        Q.   (BY MR. O'NEIL) Let me show you what's

21   been marked Exhibit No. 7, which I'll represent

22   to you are some pages that were produced by your

23   lawyers in this case.  And, for the record, it

24   seems to be an e-mail from True Credit sent on

25   October 5, 2003.  Do you recall, is -- have you

1    ever seen this e-mail before?

2        A.    I'll say this, it looks familiar.

3        Q.    Okay.  You don't know if you saw this

4    particular e-mail dated October 5th, 2003?

5        A.    Right.  Right.  Exactly.

6        Q.    Do you recall that this was the content

7    of the one e-mail that you did see that you

8    described as --

9        A.    I'd say --

10       Q.    -- everything is honky-dory?

11       A.    Yeah.  Yes, sir.

12       Q.    The e-mail is addressed to

13   meadowmaiden@sbcglobal.net.  Do you see that,

14   sir?

15       A.    Yeah.

16       Q.    Is that your wife's e-mail address?

17       A.    Yes, sir.

18       Q.    Although the greeting says, "Dear

19   Steven," right?

20       A.    Yes, sir.

21       Q.    And that's because your wife had

22   indicated that all alerts regarding your credit

23   report should be sent to that e-mail address,

24   right?

25       A.    Yes, sir.

1      Q.    Okay.  Let me just read the first

2    paragraph to you.  It says, quote:  "During the

3    last 30 days, no credit alerts have been

4    triggered by changes to your credit report.

5    This means you can have peace of mind knowing

6    that according to Trans Union, one of the three

7    national credit bureaus...", and then it lists

8    five statements there.  Do you see that, sir?

9      A.    Yes, sir.

10     Q.    So, the e-mail that you described as

11   indicating everything was honky-dory, was that

12   an e-mail that indicated there were no credit

13   alerts on your file?

14     A.    Yes, sir.

15     Q.    Okay.  So, Truelink further describes

16   what it means to not have any credit alerts.  It

17   says:  "One, no one has applied for credit in

18   your name; two, no one has opened an account in

19   your name; three, there were no lay payments

20   recorded on your credit report; four, there were

21   no bankruptcies or other public records posted

22   to your credit reports; and, five, no one has

23   changed your address with the credit bureaus."

24   Do you see that, sir?

25     A.    Yes, sir.

1     Q.    Do you have any reason to believe that

2   those five statements weren't accurate in

3   October of 2003?

4     A.    Yeah.   That would be accurate.

5     Q.    So, is it fair to say that this e-mail

6   is describing changes, or the lack of changes,

7   in your credit report?

8     A.    Yes.

9     Q.    Nowhere on this e-mail does it say that

10   no one is using your Social Security number,

11   does it?

12     A.    No.

13     Q.    When you read this type of e-mail, were

14   you surprised that Truelink wasn't telling you

15   what Trans Union had previously told you, that

16   Mr. Perez had been using your Social Security

17   number?

18     A.    I'd think there would be some kind of

19   alert.

20     Q.    So, were you surprised when you didn't

21   get that alert from Truelink?

22     A.    Yeah.   If somebody's using my Social

23   Security number, I want to know about it.

24     Q.    And you knew in October 2003 that

25   somebody had been using your Social Security

 1    number?

 2        A.    Yeah, but it wasn't showing up on here.

 3        Q.    So, did you realize then that this

 4    credit monitoring product is not going to tell

 5    you about things that occur outside of your

 6    credit report?

 7        A.    That's the conclusion I came to.

 8        Q.    And did you have a conversation with

 9    your wife at that point about that fact?

10        A.    Yeah, something along those lines,

11    yeah.

12        Q.    Tell me about that conversation.  What

13    did you tell -- what did you say to her when you

14    realized that just like Experian and Equifax,

15    Truelink wasn't going to be telling you as part

16    of their credit monitoring service that

17    Mr. Perez was using your Social Security number?

18        A.    That's the basic conversation right

19    there.

20        Q.    And what was your wife's response?

21        A.    We didn't understand.

22        Q.    So, did you suggest to her at that

23    point that you might as well cancel this

24    subscription?

25        A.    I don't think we discussed that, no.

1        Q.   Did you tell her, you know, Melody, I'm

2   thinking that maybe this credit monitoring

3   service only tells me about my credit report and

4   not Mr. Perez's credit report?

5                  MR. CLOON:   Object to form.

6   Leading and suggestive.

7        Q.   (BY MR. O'NEIL)  You can answer.

8        A.   Can you repeat that, sir?

9        Q.   Sure, I'll rephrase it.  Did you

10  suggest to your wife that if what you say is

11  true, you were both mistaken in believing that

12  the credit monitoring service would alert you to

13  changes outside of your own credit report?

14       A.   I think we were thinking that we'd see

15  something on my credit report that he's out

16  there charging stuff, that's what my assumption

17  was.

18       Q.   And you never saw those?

19       A.   Right.  Correct.

20       Q.   So, your assumption was wrong, right?

21       A.   Right.

22       Q.   And you knew that pretty early on,

23  didn't you?

24       A.   We were just trying to compare

25  information between the three credit

1   monitorings.

2        Q.    And they were all the same, no -- none

3   of those credit monitoring products by any of

4   those companies ever told you that Mr. Perez was

5   using your Social Security number; isn't that

6   correct?

7        A.    Yes.

8        Q.    Did you continue to believe, however,

9   that some day Truelink was going to provide that

10  information to you?

11       A.    Well, they shouldn't -- they shouldn't

12  advertise that they'd protect me from identity

13  theft, they just protect with name theft and

14  credit card.

15             MR. O'NEIL:   Could you restate

16  the question for Mr. Millett?   I'll ask you to

17  answer the question.

18                  (Whereupon, the requested portion

19  of the record was read by the reporter.)

20       A.    Through their credit monitoring?

21       Q.    (BY MR. O'NEIL) Yes.

22       A.    No.

23       Q.    You realized you weren't going to get

24  that information through any credit monitoring

25  service, right?

1    A.    Okay.

2    Q.    Is it your belief, and I'm asking you

3    as you sit here today under oath, is it your

4    belief that you could not get credit because of

5    the conduct of Truelink as alleged in your

6    complaint?

7    A.    I'd have to answer it's a mixture of

8    things.

9    Q.    So, it's you couldn't get credit

10   because of things other than the conduct of

11   Truelink?

12   A.    I'd say it's all one big mess.

13   Q.    What conduct of Truelink made it

14   impossible for you to get credit?

15   A.    I can't -- I don't know.  I can't

16   answer that.

17   Q.    Were you ever denied credit?

18   A.    I couldn't get some credit cards I

19   think.

20   Q.    You think?  What credit cards could you

21   not get?

22   A.    I can't remember specifically which

23   ones they were.

24   Q.    Was this prior to August of 2003 that

25   you couldn't get credit?

1      A.    I don't remember when.

2      Q.    What conduct of Truelink contributed to

3    you not being able to get a credit card?

4      A.    I don't know.

5      Q.    Your answer also says, "We had to pay

6    extra money for insurance, too." What insurance

7    did you have to pay extra money for?

8      A.    I think, I can't remember if it was All

9    State.

10     Q.    What kind of insurance is that, sir?

11     A.    It's for the cars and the house.

12     Q.    Okay. And why couldn't -- why did you

13   have to pay extra money for insurance with All

14   State?

15     A.    Because my credit score wasn't as high

16   as it should be.

17     Q.    Okay. And was that because you didn't

18   have many credit accounts?

19     A.    No, I believe because of this Abundio.

20     Q.    Do you have any evidence of that,

21   Mr. Millett?

22     A.    No, that's what I believe.

23     Q.    What's the reason why you believe that

24   Mr. Perez's conduct made your All State

25   insurance more expensive?

1       A.    Because I feel like he lowered my

2    credit score because he's out there charging

3    stuff.

4       Q.    Is that your complete answer?

5       A.    Yeah, I guess so.  Yeah.

6       Q.    Do you think the conduct of Truelink

7    somehow contributed to --

8       A.    I don't know.

9       Q.    Let me finish my question.  Do you

10   think that the conduct of Truelink made your All

11   State insurance more expensive?

12      A.    I don't know.  I can't answer that.

13      Q.    Well, actually, you did answer it and

14   you said, yes.  You said that, yes, conduct of

15   Truelink made you have to spend a lot more money

16   to get insurance.  Are you withdrawing that

17   statement now, sir?

18      A.    I think it all contributed.

19      Q.    You also state that you had to borrow

20   money for your home from the family trust.  Do

21   you see that, sir?

22      A.    Yes, sir.

23      Q.    Was the alleged failure of Truelink to

24   deliver a credit monitoring product that you

25   think they promised somehow require you to

1    borrow money from a family trust?

2        A.    Can you repeat the question?

3        Q.    Do you think that somehow Truelink's

4    alleged failure to deliver a credit monitoring

5    product that it allegedly promised, somehow

6    required you to borrow money from your family

7    trust?

8        A.    I'd say yeah.

9        Q.    And how did that -- why do you think

10   that those two things are connected?

11       A.    I think it's all connected.

12       Q.    Sir, I'm not asking about all.  I'm

13   asking about the conduct alleged by Truelink.

14   The failure of Truelink to deliver the product

15   that you think it promised, how did that

16   contribute to you having to spend -- you having

17   to borrow money from a family trust?

18       A.    Because I couldn't get a mortgage rate.

19       Q.    And you think that that was because of

20   some conduct by Truelink?

21       A.    I can answer it this way, I think it's

22   -- I think so, yeah.

23       Q.    Okay.

24               MR. O'NEIL:  We apparently have

25   to change the tape, so let's go off the record.

EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


STEVEN G. MILLETT, MELODY J.        )
MILLETT, On Behalf of              )
Themselves and All Others          )
Similarly Situated,                ) Case No. 05-599-SLR
                                   )
              Plaintiffs,          )
                                   )
vs.                                )
                                   )
TRUELINK, INC., A Trans Union      )
Company,                           )
                                   )
              Defendants.          )
                                   )
_____    )


VIDEOTAPED DEPOSITION OF KATE ANDERSON

San Luis Obispo, California

Tuesday, June 26, 2007

9:30 a.m. - 4:40 p.m.


Reported by:  Lora L. Shoffstall, RPR, CSR 9271

```
 1                        EXAMINATION

 2  BY MS. YEAGER:

 3      Q.   Good morning, Ms. Anderson.

 4      A.   Good morning.

 5           (Plaintiffs' Exhibit 41 was marked for

 6           identification and is attached hereto.)

 7  BY MS. YEAGER:

 8      Q.   I appreciate your flexibility as we videotape

 9  the deposition.  Thank you very much for allowing us to

10  do that, and thanks to counsel for that.

11           I'm going to mark as Exhibit 41 the notice of

12  the videotaped deposition.

13           Have you ever been deposed before?

14      A.   Once.

15      Q.   And what matter was that?

16      A.   Um, Townes versus TrueLink.

17      Q.   And were you deposed as a company witness?

18      A.   Yes.

19      Q.   As a company witness.

20           MS. FRIEDMAN:  I'm sorry.  Can you clarify

21  what you mean by that?

22           MS. YEAGER:  As opposed to being an individual

23  witness.  You didn't --

24      Q.   Did you testify as to your own knowledge or

25  were you an authority B6 witness?  Were you a
```

1    company-designated witness?

2        A.    Yes.

3             MS. FRIEDMAN:  Just for the record, I don't

4    think that is reflected in the Townes record.  I think

5    she was individually identified.

6    BY MS. YEAGER:

7        Q.    Are you employed by TrueLink?

8        A.    Yes, I am.

9        Q.    And has that company recently undergone a name

10   change?

11       A.    Yes, they have.

12       Q.    And what is the new name?

13       A.    TransUnion Interactive.

14       Q.    Would it be okay with you for purposes of

15   today's deposition if I continued to refer to the

16   company as TrueLink?

17       A.    Yes.

18       Q.    I have not yet wrapped my mind around the name

19   change.

20       A.    That's fine.

21       Q.    Thank you.  Are you a corporate officer?

22       A.    Yes.

23       Q.    Are you a director?

24       A.    I'm an officer.  That would be classified, I

25   think, as a director.

1     Q.   And how long have you been a corporate

2   officer?

3     A.   Since January 2002.

4     Q.   Is TrueLink now wholly owned by the TransUnion

5   LLC?

6     A.   Yes.

7     Q.   And do you have any position on the board of

8   TransUnion?

9     A.   No, I do not.

10    Q.   Who are the other corporate officers?

11         MS. FRIEDMAN:  Of what company?

12         MS. YEAGER:  I'm sorry.  Of TransLink --

13   TrueLink.  I'm sorry.

14    Q.   Who are the other corporate officers of

15   TrueLink?

16    A.   John Danaher is president.  Scott Metzger is

17   chief technology officer.  Um, Pat Nieman is a vice

18   president.

19    Q.   Could you spell that last name, please?

20    A.   N-i-e-m-a-n.  Rob Siebert is a vice president.

21   That's S-i-e-b-e-r-t.  Did you want directors?

22    Q.   Yes, please.

23    A.   Um, Eleanor Wilson Dempsey, Brad Rubin, Eric

24   McClung.

25    Q.   Could you spell his last name, please?

1       A.    Generally monthly.

2       Q.    Do you know how long after a reporting entity

3   provides credit information to TransUnion it is posted

4   to a credit record?

5       A.    No, I do not.

6       Q.    How can consuming -- excuse me.  How can

7   purchasing the TransUnion credit monitoring unlimited

8   improve a consumer's credit?

9       A.    Improve a consumer's credit?

10      Q.    Yes.

11      A.    By -- by knowledge of what is in the report.

12   For example, if there are inaccuracies that may be

13   harming their credit, they would have the information

14   to be able to dispute that information.

15      Q.    Are all inaccuracies -- strike that.  Who

16   determines -- strike that.  I think you already asked

17   and answered that one.

18            Who generates the credit report pages that the

19   consumer actually sees if they are purchasing the

20   credit-monitoring product?

21      A.    Who generates those?

22      Q.    Yes.

23      A.    The display of the information?

24      Q.    Yes.

25      A.    We do.

1    Q.   Do you obtain the data from TransUnion?

2    A.   Yes.

3    Q.   Does the credit report that you display to a

4    consumer have the same appearance as a credit report

5    that would be purchased directly from TransUnion?

6         MS. FRIEDMAN:  Objection.  Lack of foundation.

7         THE WITNESS:  A consumer?

8         MS. YEAGER:  Could you read that back?  Sorry.

9         (Record read.)

10        THE WITNESS:  It appears slightly different.

11   BY MS. YEAGER:

12   Q.   In what way?

13   A.   Just the -- the -- the way that it's

14   formatted.  You know, we have our own display and our

15   own -- you know, we have formatted the credit report

16   ourselves.

17   Q.   Does TransUnion provide free advertising for

18   TrueLink products?

19   A.   Free advertising?

20   Q.   Yes.

21        MS. FRIEDMAN:  Object to the form of the

22   question.

23        THE WITNESS:  Explain "advertising."

24   BY MS. YEAGER:

25   Q.   Are -- are there advertisements available to

1    score.   Typically it's TransUnion.  So we would say the

2    data is TransUnion's data, rather than Experian or

3    Equifax.   That's just an example.

4         Q.   Do you -- did you -- pardon me.  Did you make

5    that particular change because there are legal

6    restrictions in the way you can advertise --

7         A.   No.

8         Q.   -- free credit scores?

9              I need to mark Exhibit Number 45.

10        A.   Uh-huh.

11             (Plaintiffs' Exhibit 45 was marked for

12             identification and is attached hereto.)

13   BY MS. YEAGER:

14        Q.   Is this part of the TrueLink training

15   documentation?

16        A.   It appears to be.

17        Q.   And it appears to have a date of

18   November 10th, 2004, does it not?

19        A.   Yes, it does.

20        Q.   This would indicate that TrueCredit.com is

21   going to be taking over some of the online ordering

22   process.  Who is TrueCredit.com?

23        A.   TrueCredit.com is a web site owned by TrueLink

24   and --

25        Q.   Does that mean that the TrueLink employees

1    were going to be taking over this particular aspect of

2    ordering products?

3       A.   This refers to the fact that we -- TrueLink

4    will be providing the online credit reports on

5    behalf -- consumer disclosures on behalf of TransUnion.

6    It's nothing to do with TrueCredit.

7       Q.   So these would be the consumer disclosures

8    that someone would purchase directly from TransUnion?

9       A.   Consumers.

10      Q.   This makes reference to the FactAct.  What

11   impact did the FactAct have on the decision that

12   TrueCredit would be taking over this process?

13      A.   TrueCredit -- TrueLink.  It has nothing to do

14   with TrueLink -- TrueCredit.

15      Q.   Thank you.

16      A.   TrueLink specializes in online web

17   applications, web site applications.  That is our --

18   our proficiency.  TransUnion does not have that.  They

19   do not have other products and services that they do in

20   such a manner.  So FactAct provides every consumer with

21   the ability to obtain a free annual disclosure of their

22   information, and TransUnion simply does not have the

23   prowess to do that.  So we were engaged to do that on

24   their behalf online only.

25      Q.   Does this mean that you have access to

EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

STEVEN G. MILLETT, MELODY J.    )
MILLETT, On Behalf of          )
Themselves and All Others      )
Similarly Situated,            )
                               )
            Plaintiffs,        )    05-559-SLR
                               )
  vs.                          )
                               )
TRUELINK, INC., A Trans Union )
Company,                       )
                               )
            Defendant.         )


THE VIDEOTAPED DEPOSITION OF

JOHN DANAHER


Taken on behalf of the Plaintiff

March 27, 2007


Reported by Cheryl L. Sandecki, CSR, RPR
Illinois License No. 084-03710

1    company, which companies you work for or which

2    company you work for and your position?

3         A.    I'm the president of TransUnion

4    Interactive.

5         Q.    And could you briefly describe your job

6    responsibilities?

7         A.    I'm responsible for the sale -- sales,

8    marketing, operations and technology for the

9    company.

10        Q.    For all of TransUnion?

11        A.    For TransUnion Interactive.

12        Q.    And what is the relationship of TransUnion

13   Interactive with the defendant TrueLink, Inc.?

14        A.    It's the successor company.  In 2006 the

15   name was changed from TrueLink, Inc., to TransUnion

16   Interactive, Inc.

17        Q.    Was there a change of corporate ownership

18   or merely a name change?

19        A.    A name change.

20        Q.    And what was the reason for the name

21   change?

22        A.    The name change was done primarily to --

23   as -- as a way of more closely associating

24   ourselves with TransUnion for financial services

25   clients.

1    Q.    And what services do you perform for

2    financial services clients?

3    A.    We sell products to them, Credit

4    Monitoring, Credit Reports, Credit Scores, which

5    they, in turn, sell to their customers.

6    Q.    And how long have you been with TrueLink,

7    Inc., or TU Interactive?

8    A.    It will be six years next month.

9    Q.    And how long have you been a director?

10   A.    I started as the chief operating officer,

11   and in 2004 I became the president.

12        MR. O'NEIL:   I want to lodge a late

13      objection about assumes facts not in evidence,

14      lack of foundation as to the earlier question.

15   BY MS. YEAGER:

16   Q.    Were you employed by TrueLink, Inc., prior

17   to your employment with TU Interactive?

18   A.    Yes.

19   Q.    Were your job responsibilities similar?

20   A.    Yes.

21   Q.    How was your position as chief operating

22   officer different than your time as president?

23   A.    As chief operating officer, I had

24   responsibility for product development, marketing

25   and operations.   I didn't have responsibility for

1    consumers who was concerned about identity theft?

2            MR. O'NEIL:  Objection, vague.  TrueCredit

3        product?

4            THE WITNESS:  We have -- we have different

5        products.  Some are more relevant to certain

6        instances than others.

7    BY MS. YEAGER:

8        Q.    Is any one of your products more helpful

9    to those who have a concern about identity theft

10   than some of your other products?

11       A.    Credit Monitoring.

12       Q.    And why is Credit Monitoring helpful to

13   those who are interested in addressing their

14   concern about identity theft?

15       A.    It alerts the consumer to key changes on

16   their credit report, the most germane being a new

17   inquiry or a new account opening.

18       Q.    What is a key change?

19       A.    A key change is the term we use to

20   describe, I think, the eleven different changes

21   that we alert consumers to in terms of their credit

22   report.

23       Q.    What are those eleven changes, please?

24       A.    I don't think I can name them all.

25       Q.    Could you generally describe the manner in

1      which one -- let me begin again, please.

2                Can you generally describe the manner in

3      which the credit monitoring product alerts a

4      consumer to the key changes?

5          A.     Do you mean to describe the process?

6          Q.     Please.

7                MR. O'NEIL:  The process for alerting the

8          consumer of the key change?

9                MS. YEAGER:  Correct.

10               THE WITNESS:  We are notified from one of

11         the credit bureaus that a change has taken

12         place, and we send the customer an E-mail

13         advising them that there has been a change and

14         to come back onto our website to get the

15         details.

16     BY MS. YEAGER:

17         Q.     The customer who comes to the website to

18     review the details, could you generally describe

19     what information they might see once they take that

20     step to come onto the website to review the changes

21     or the details that you were describing?

22         A.     So, for example, if we send -- if there

23     has been a new inquiry, if you log onto the site,

24     you will see generally the date of the inquiry and

25     who made the inquiry.  You might get the location.

1      Q.    The location of what, please?

2      A.    Of -- of the person who has made the

3  inquiry, their -- their address, where they are.

4      Q.    How does that information become

5  accessible?  I am looking if you can generally

6  describe, please, from the manner in which the data

7  that the consumer reviews is placed onto the

8  website.  Is that placed there by someone from your

9  company?

10     A.    We use a service with all three credit

11  bureaus now that they daily will put a file out

12  there of the changes.  We pick up the file from

13  each of them and process it, put it on our website

14  and send out the notification.

15     Q.    Could you describe generally what you mean

16  when you say you process it?

17     A.    We change it from the format that we pick

18  it up in, which is generally what's referred to as

19  a machine readable format.  And I believe we

20  transform that into a -- you know, an XML format

21  and we do what we call -- we normalize it.  In

22  other words, we make it readable.  And then again

23  we post it to the site and send a notification.

24     Q.    How long have you been monitoring or

25  receiving notification from three credit bureaus?

1          A.    Since 2005.

2          Q.    Prior to that time, did you only use one

3     credit bureau?

4          A.    Yes.

5          Q.    What was that credit bureau?

6          A.    TransUnion.

7          Q.    What was the reason that you only used

8     TransUnion reports prior to 2005?

9          A.    Yeah, a combination -- probably a

10    combination of -- you know, we didn't have the

11    resources to build that particular product out.  So

12    it was something that we wanted to get to, but we

13    weren't able.

14              I think the other reason was contractually

15    we had to make agreements with Equifax and Experian

16    to make the service available.  And I don't think

17    those were concluded until 2004, if I'm not

18    mistaken.

19              So once we had the contractual -- excuse

20    me, the -- you know, the means to get the data from

21    the other two, it was probably about a year or year

22    and a half later that we put the product out there.

23         Q.    Does your company pay a fee to the credit

24    bureaus when they obtain a credit report?

25              MR. O'NEIL:  Objection, vague.  That --

1     that second they I don't know who you are

2     referring to, when they obtain a credit

3     report.

4          MS. YEAGER:  Thank you.

5     BY MS. YEAGER:

6     Q.   Does your company pay a fee to a credit

7     bureau when it obtains one of the credit bureau's

8     credit reports?

9     A.   Yes.

10    Q.   Is that a flat fee per report order?

11    A.   To TransUnion we pay a flat fee per year

12    for an unlimited number of reports.  To Equifax and

13    Experian we pay per report.

14          MR. O'NEIL:  Do you want something to

15     drink?

16    BY MS. YEAGER:

17    Q.   When was TrueLink established?  When was

18    it founded?

19          MR. O'NEIL:  Objection, vague, lack of

20     foundation.

21          THE WITNESS:  In 1995.

22    BY MS. YEAGER:

23    Q.   At that time was it a subsidiary of

24    another company?

25    A.   No.

1        Q.   Did it ever have a relationship with

2   Lehman Brothers, L-E-H-M-A-N?

3        A.   Yes.

4        Q.   What was its relationship with Lehman

5   Brothers?

6             MR. O'NEIL:  Objection, vague as to time.

7   BY MS. YEAGER:

8        Q.   What was its affiliation or association

9   with Lehman Brothers in 1995?

10       A.   It had no association in 1995.

11       Q.   Was there a time when it came to be

12   affiliated or associated with Lehman Brothers?

13       A.   Yes.

14       Q.   What year was that?

15       A.   In 2000, I believe.

16       Q.   And what was its affiliation?  Was there a

17   product offered together?

18       A.   No.  Lehman Brothers purchased the

19   majority ownership of TrueLink, Inc.  I believe

20   that was completed in 2000.  It might have been

21   late 1999.

22       Q.   Does Lehman Brothers still have a majority

23   ownership of TrueLink, Inc.?

24       A.   No.

25       Q.   Who now has a majority ownership of

1              (Document marked as TrueLink

2               Exhibit No. 6 for

3               identification, 03/27/2007.)

4    BY MS. YEAGER:

5        Q.   Without discussing anything that you might

6    have learned about this document from your counsel,

7    have you otherwise seen this document before?

8        A.   No.

9        Q.   And have you reviewed this document with

10   your counsel?

11       A.   I don't think so.

12       Q.   Are you familiar with the policies of

13   TransUnion when a victim requests that a

14   consumer -- let me rephrase that.

15            Are you familiar with the policies of

16   TransUnion when an identity theft victim requests

17   investigation by TransUnion about the information

18   in their credit file?

19       A.   You know, no, just generally.

20       Q.   What generally do you know about that?

21       A.   They will do some type of investigation or

22   checking, interview the customer as to the facts

23   and then try and help the customer to resolution.

24       Q.   Would one have to be a customer of your

25   company in order to receive that service from

1    TransUnion?

2         A.   No.

3         Q.   If one of your customers were to notify

4    you that they were a victim of identity theft and

5    saw errors on their credit report, what is your

6    policy?

7         A.   We refer that customer to the fraud

8    victims assistance department in Fullerton.

9         Q.   And you began doing that in 2003, I recall

10   your testimony; is that correct?

11        A.   Yes.

12        Q.   And what did you do prior to 2003?

13        A.   If we thought they were a victim of

14   identity theft, we referred them to PromiseMark.

15        Q.   And if you did not think they were, what

16   did you direct them to do?

17        A.   Well, when somebody says -- calls us and

18   asks -- says I think I'm a victim of identity

19   theft, we ask them a couple of questions to

20   determine if they are a victim or not.

21        Q.   What sorts of questions?

22             MR. O'NEIL:  Objection, lack of

23        foundation.

24             THE WITNESS:  For example, somebody may

25        call and say I think I have been a victim of

1   account were opened utilizing a consumer's

2   Social Security number?

3          MR. O'NEIL:  Objection, calls for

4   speculation, vague.

5          THE WITNESS:  Yeah, I can't -- I don't

6   know what a consumer would think about that or

7   -- or not.

8   BY MS. YEAGER:

9   Q.   If you purchased the product for yourself,

10  would you expect someone to notify you if a

11  judgment was entered which recorded your

12  Social Security number?

13         MR. O'NEIL:  Objection.  What product?

14         THE WITNESS:  Not unless it was under my

15  name.

16  BY MS. YEAGER:

17  Q.   Would you as an individual person consider

18  it identity theft if someone were utilizing your

19  Social Security number?

20  A.   No.

21  Q.   Why not?

22  A.   I mean, you -- you asked a very specific

23  question --

24  Q.   Yes.

25  A.   -- using your Social Security number.  I

1     define identity theft as somebody using your

2     personal information for, you know, fraudulent

3     purposes, including -- you know, criminal financial

4     gain. In other words, opening credit accounts in

5     your name and then using those accounts to enrich

6     themselves.

7     Q. Does -- is it a federal crime to use

8     someone else's Social Security number?

9     A. I don't -- I don't know.

10     Q. Does the FTC provide publications which

11     indicate that using someone else's Social Security

12     number is illegal?

13     A. I don't know.

14     Q. If TransUnion were aware that a judgment

15     had been entered using you, your own personal

16     Social Security number, would you want TransUnion

17     to notify you?

18     A. Do you mean on a -- on somebody else's

19     file?

20     Q. If another individual were using your

21     personal Social Security number, would you want

22     TransUnion to notify you?

23     A. Using it how?

24     Q. If another individual were using your

25     Social Security number, were getting employment or

1    a driver's license or obtaining credit, if another

2    person were using your Social Security number,

3    would you want TransUnion to notify you?

4            MR. O'NEIL:  Objection, assumes facts not

5        in evidence.

6            THE WITNESS:  Yeah, I don't know.  I mean,

7        somebody might be using my Social Security

8        now.

9    BY MS. YEAGER:

10       Q.   And would you want TransUnion to notify

11   you of that fact?

12       A.   I -- I wouldn't expect them to notify me.

13       Q.   Why wouldn't you expect them to notify

14   you?

15       A.   Because they are not the Social Security

16   Administration.

17       Q.   If another individual were opening a line

18   of credit using your Social Security number, would

19   you want TransUnion to notify you?

20           MR. O'NEIL:  Objection, assumes fact not

21       in evidence and assumes that TransUnion would

22       have this information.

23           Go ahead and answer, if you can.

24           THE WITNESS:  If somebody else is using

25       their name and address and my Social Security

```
 1      items would be monitored at your company?

 2              MR. O'NEIL:  Objection, lack of

 3          foundation.

 4              THE WITNESS:  I wouldn't characterize it

 5          as a decision.  You know, when we -- when we

 6          introduced the product, it was a TransUnion

 7          only product, and TransUnion told us which --

 8          which factors they were monitoring.

 9      BY MS. YEAGER:

10          Q.   Do you know why TransUnion selected the

11      items it selected?

12          A.   No.

13          Q.   Do you know why other companies monitor

14      other items that are different?

15              MR. O'NEIL:  Objection, assumes facts not

16          in evidence.

17              Go ahead and answer, if you can.

18              THE WITNESS:  No, I don't know.

19      BY MS. YEAGER:

20          Q.   Are there different types of identity

21      theft?

22              MR. O'NEIL:  Objection, lack of

23          foundation, vague.

24              THE WITNESS:  Yes.

25
```

1      BY MS. YEAGER:

2           Q.    What different types of identity theft are

3      there?

4           A.    Well, I think the -- you know, the

5      definition of identity theft is still kind of up in

6      the air.

7                 I gave you what I thought my definition

8      was earlier in terms of somebody using a consumer's

9      personal information for nefarious financial

10     purposes, so emphasis on the word theft.

11                But, for example, you know, I know that

12     there is quite a bit of confusion around the, you

13     know, credit card -- what I term credit card fraud,

14     somebody using your credit card, not necessarily

15     knowing the rest of your personal information, but

16     somebody using your credit card to make an

17     unauthorized purchase sometimes called identity

18     theft.

19                You know, I know there is, you know,

20     criminals who use other people's identities.   You

21     know, I have heard of cases where people have been

22     arrested and provided false documentation in terms

23     of they were posing as somebody else.

24           Q.    Of these different types of identity theft

25     and credit card fraud that you have discussed,

1    which of these would trigger an alert to one of

2    your customers?

3         A.    Just the one that I defined where somebody

4    is using your personal information to attempt to

5    get credit in your name.

6         Q.    If an individual were using your

7    Social Security number and that was the only piece

8    of personal identification that was being reported

9    fraudulently, would the original holder of the

10   Social Security number be notified?

11        A.    No.

12        Q.    Why not?

13        A.    Because there is no way to verify who is

14   the legitimate holder of that Social Security

15   number.

16        Q.    If you had two -- do you need to take a

17   break?

18        A.    No.

19        Q.    If you had two customers who wanted to

20   subscribe to Credit Monitoring in 2003 and both of

21   those customers tried to sign up for Credit

22   Monitoring with your company in 2003 using the same

23   Social Security number, could they both do so?

24        A.    Our system only allows for one account, a

25   unique Social Security number.  So on our system,

EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

STEVEN G. MILLETT, MELODY J.    )
MILLETT, On Behalf of    )
Themselves and All Others    )
Similarly Situated,    )
    )
    Plaintiffs,    )
    )
    vs.    )   No. 05-599-SLR
    )
TRUELINK, INC., a Trans Union    )
Company,    )
    )
    Defendant.    )

VIDEOTAPED DEPOSITION OF BARBARA KOZEL

Taken on behalf of Plaintiff

March 29, 2007

Reported by Roselind C. Pisano, CSR

Illinois License No. 084-002031

1      A.    Richard Siegel.

2      Q.    Could you spell his last name please?

3      A.    S-i-e-g-e-l.

4      Q.    I'm going to ask you to phonetically say

5    the name of the individual in Orange County whose

6    first name is Stan, and I'm going to try to

7    phonetically write a note.

8      A.    Tom Disdanislaw.

9      Q.    Is TransUnion compensated for providing

10   accounting services to TU Interactive?

11     A.    Yes.

12     Q.    Is that a flat fee?

13     A.    Yes.

14     Q.    Do you know what that flat fee is?

15     A.    No.

16     Q.    Is that an amount that's negotiated every

17   year?

18     A.    No.

19     Q.    How long has it been since that flat fee

20   was changed?

21     A.    It changes every year.

22     Q.    Is that a fee that is negotiated?

23     A.    No.

24     Q.    Who determines that fee?

25     A.    It's determined -- the accounting

1    BY MS. YEAGER:

2        Q.   Are your functions in the consumer division

3    services provided for TU and for TU Interactive or

4    only for TU Interactive?

5        A.   Can you repeat that, I guess?

6        Q.   Sure.   The action that we have involves TU

7    Interactive, and I understand that TransUnion

8    provides those accounting services for TU

9    Interactive, is that correct?

10       A.   Correct.

11       Q.   And then you're the person, you're the

12   segment controller for the consumer division at TU?

13       A.   Correct.

14       Q.   And so are your responsibilities solely for

15   accounting services for TU Interactive or do you

16   also handle accounting services for TU itself?

17       A.   Both.

18       Q.   And as concerns the accounting functions

19   that you provide for TU, could you generally

20   describe those for me again?

21            I think I've misunderstood your testimony

22   and I just want to make certain I have it correct.

23            So if you were thinking in terms of what

24   services you provide for TU, could you generally

25   describe those?

1        A.    I provide the accounting services, which is

2    financial reporting, budgets, forecasts, commission

3    processing, billing for two divisions within

4    TransUnion.  And those divisions are consumer

5    relations and direct-to-consumer resellers.

6        Q.    Thank you.  I think I'm clear now.  Thank

7    you for clarifying that.

8              Approximately how much -- let me begin

9    again.

10             Approximately what percentage of your time

11   is devoted to providing accounting services for TU

12   Interactive?

13        A.    About 85 percent.

14        Q.    And those whom you supervise, can you

15   estimate the amount of time that they would spend

16   providing accounting services to TU Interactive?

17        A.    I would say it's probably 60/40.

18        Q.    About 60 percent of your group's time would

19   be spent for TU Interactive?

20        A.    Yes.

21        Q.    I understand that's an approximation and I

22   appreciate that.

23             As the accounting controller for the TU

24   Interactive services you provide or assist in the

25   preparation of a number of reports, is that correct?

1    BY MS. YEAGER:

2        Q.    Is this a financial report such as the type

3    of report that your company prepares for TU

4    Interactive?

5        A.    Yes.

6        Q.    What is the name of this report?

7        A.    This is the daily report.

8        Q.    And does your group prepare this report?

9        A.    A person in my group prepares this, yes.

10       Q.    Who is the individual who prepares these?

11       A.    Anthony Chen.

12       Q.    Could you spell the last name?

13       A.    C-h-e-n.

14       Q.    Are you familiar with the contents of this

15   report?

16       A.    Yes.

17       Q.    I have a few questions that I'd like to ask

18   so that I understand the content of the reports more

19   clearly.  We had a series of these produced to us

20   and they were a date range of 3-31-03 was the first

21   report that was produced to us.  And then the last

22   report produced to us was a date 3-31-06.

23              Do you know why these reports began to be

24   generated in 3-31-03, or were they begun in 3-31-03?

25              MS. CASTILLO:  Objection.  Foundation, and

1    compound.

2    BY MS. YEAGER:

3        Q.   Were these reports prepared prior to

4    3-31-03?

5        A.   I believe so, yes.

6        Q.   Would they have been of a similar

7    appearance?  Were they formatted similarly?

8        A.   Yes.

9        Q.   As to the text of these, what is a run

10   date?

11           MS. CASTILLO:  Are you referring to a

12   particular page?

13           MS. YEAGER:  Right on the very top line of

14   18813.

15           MS. CASTILLO:  18813?

16           MS. YEAGER:  Uh-huh.

17           What are the page numbers you have?

18           MS. CASTILLO:  Maybe --

19           MS. YEAGER:  Let's go off for a second.  I

20   think I've got the wrong Exhibit in front of me.

21           THE VIDEOGRAPHER:  We're going off the

22   record at 10:32.

23                        (Whereupon, a break was taken

24                         from 10:32 until 10:46 a.m.)

25           THE VIDEOGRAPHER:  We are back on the

1    Park, Illinois.

2        Q.   Are you on any medications that might

3    affect your ability to testify today?

4        A.   No.

5        Q.   We'll ask that you speak clearly and give

6    verbal responses so that the court reporter can

7    record your answers.  Uhms are very difficult to

8    interpret on the record.  Yes and no is more

9    helpful.

10           Please keep your voice up for the reporter.

11           If you need for me to repeat a question,

12   please feel free to ask me to do that.  And if you

13   need a break, we can take one at any time.  I rather

14   not take a break when there's a question pending.

15   But if at any other time you wish to take a break,

16   please let me know.

17           If there's something about the question

18   that I'm asking that you don't understand, please

19   let me know.

20           What is your educational background please?

21       A.   I have a BS in accounting.

22       Q.   From what institution did you obtain your

23   degree?

24       A.   The University of Illinois in Champaign-

25   Urbana.

Page 8

1        Q.    And what year did you obtain that degree?

2        A.    December 1988.

3        Q.    And do you have any other degrees?

4        A.    No.

5        Q.    Do you have any professional licenses?

6        A.    No.

7        Q.    You're not a CPA?

8        A.    No.

9        Q.    Are you currently employed by TU

10   Interactive?

11       A.    No.

12       Q.    Who is your current employer?

13       A.    TransUnion LLC.

14       Q.    Does TransUnion LLC perform accounting

15   functions for TU Interactive?

16       A.    Yes.

17       Q.    And how long have they done so?

18       A.    Since the acquisition in November of 2002.

19       Q.    November of '02?

20       A.    Yes.   2002.

21       Q.    Do you know who performs the accounting

22   functions for TU Interactive prior to that time?

23       A.    No.

24       Q.    Do you have access to any of those

25   accounting records for the time prior to November of

1    2002?

2         A.    Yes.

3         Q.    And are those records stored at your

4    offices at the TransUnion facility?

5         A.    Yes.

6         Q.    Was the accounting for TU Interactive

7    handled by someone who was a TU Interactive employee

8    prior to the time that TransUnion began doing the

9    accounting?

10        A.    Yes.

11        Q.    Did they have an outside CPA firm as well?

12        A.    I don't know.

13        Q.    Was there an accounting department at TU

14   Interactive prior to the time that TU began doing

15   their accounting?

16        A.    I don't know.

17        Q.    Are the accounting records for TU audited

18   on a routine basis?

19        A.    No.

20              MS. CASTILLO:   Are you speaking of

21   TransUnion, TU?

22   BY MS. YEAGER:

23        Q.    Yes.  Let me clarify.  Are the accounting

24   records for TransUnion audited on a routine basis?

25        A.    TransUnion, yes.

1        Q.    And who does those audits?

2        A.    I don't know.

3        Q.    Is that an outside company?

4        A.    Yes.

5        Q.    Is there an accounting department at

6    TransUnion?

7        A.    Yes.

8        Q.    And how large is it?

9        A.    It's about 100 people.

10       Q.    Do you supervise the entire department?

11       A.    No.

12       Q.    Who supervises the department at TU?

13       A.    The CFO, which is Scott Schubert.

14       Q.    Could you spell his last name please?

15       A.    I think it's S-c-h-u-b-e-r-t.

16       Q.    What is your title at TU?

17       A.    I am the segment controller for the

18   consumer division.

19       Q.    Segment controller for the consumer

20   division, is that right?

21       A.    Yes.

22       Q.    How many divisions are there at TU?

23       A.    There are five primary segments or

24   divisions.

25       Q.    And could you name those please?

Page 11

1          A.    The consumer -- consumer, USIS, real estate

2     services, international, and corporate.

3          Q.    And what is -- let me start again please.

4                In that consumer segment or division, what

5     entities or companies or products do you handle?

6          A.    TransUnion Interactive, Inc., the consumer

7     relations division of TransUnion, and

8     direct-to-consumer resellers.

9          Q.    I think you mentioned a segment USIS.  Did

10    I get that right?

11         A.    Yes.

12         Q.    And what is the USIS segment?

13         A.    That's the U.S. credit reporting segment.

14         Q.    That is the segment of TransUnion which is

15    considered a credit reporting agency?

16                MS. CASTILLO:  Objection, foundation.

17                Go ahead.

18                THE WITNESS:  I don't know.

19    BY MS. YEAGER:

20         Q.    Okay.  That's fine.  Does that segment

21    comprise the part of TransUnion which maintains

22    credit reports and credit files about consumers?

23                MS. CASTILLO:  Objection, foundation.

24                Go ahead.

25                THE WITNESS:  Yes.

1    BY MS. YEAGER:

2        Q.   Does it have any other components?

3        A.   I don't know.

4        Q.   You mentioned a real estate segment, is

5    that correct?

6        A.   Yes.

7        Q.   And what is that segment about?

8        A.   That segment sells credit products to

9    mortgage companies.

10       Q.   What sorts of products does it sell, can

11   you --

12       A.   I don't know.

13       Q.   -- give me an idea?

14            Is the idea that a mortgage company would

15   need to have access to a consumer's information in

16   order to issue --

17       A.   I don't know.

18       Q.   -- mortgages?

19            And the international segment, what does

20   that comprise?

21       A.   That comprises our international holdings.

22       Q.   What is held internationally?

23       A.   We have Canada, South Africa, Hong Kong.

24       Q.   Do any of those international holdings

25   provide direct-to-consumer sales?

1          A.    I guess I need question clarity.

2          Q.    Oh, sure. You mentioned, for example, that

3    you had an international holding in Canada.   Does

4    the company that is in Canada, or the group that's

5    in Canada, sell products directly to consumers?

6              MS. CASTILLO:  Objection, foundation.

7              THE WITNESS:  No.

8    BY MS. YEAGER:

9          Q.    Does the group in South Africa?

10         A.    I don't know.

11         Q.    And Hong Kong?

12         A.    I don't know.

13         Q.    And then I think the last one you mentioned

14   was the corporate segment?

15         A.    Yes.

16         Q.    And what is involved in the corporate

17   segment?

18         A.    I don't know.

19         Q.    Who is the person who is in charge of

20   accounting for the USIS segment?

21         A.    Todd Cello.

22         Q.    And is he also a controller?

23         A.    Yes.

24         Q.    Could you spell his last name?

25         A.    C-e-l-l-o.

1        Q.   And the individual who is in charge of the

2    real estate segment?

3        A.   David D'Agostine.

4        Q.   Could you spell the last name?

5        A.   I don't know how to spell his last name.

6        Q.   Is it Agostine or D'Agostine?

7        A.   I don't know.

8        Q.   Is he a controller as well?

9        A.   Yes.

10       Q.   But you think his last name starts with a

11   D, the letter D?

12       A.   Yes, uh-huh.

13       Q.   And in the international group, who is the

14   head of that segment?

15       A.   Claudia Vilim.

16       Q.   Could you spell her last name?

17       A.   V-i-l-i-m.

18       Q.   And is she also a controller?

19       A.   She's actually a CFO.

20       Q.   The CFO.  The chief financial officer?

21       A.   Yes.

22       Q.   And is she a chief financial officer for a

23   particular segment or for TransUnion?

24       A.   For the international segment.

25       Q.   For the international segment.  Thank you.

1          And the corporate segment, do you know --

2     A.   David Gilbert.

3     Q.   G-i-l-b-e-r-t?

4     A.   Yes.

5     Q.   And is he a controller?

6     A.   I don't know his exact title.

7     Q.   What are your functions as a controller?

8     A.   I'm responsible for all of the accounting

9  and financial analysis for the consumer segment.  It

10 includes preparing financial statements, budgets,

11 forecasts, budgets and forecasts, account

12 reconciliations, commission payments, vendor

13 payments, billing.

14    Q.   Do you supervise a staff?

15    A.   Yes.

16    Q.   And how large is the staff you supervise?

17    A.   Seven.  Seven people.

18    Q.   And are all of those seven people here in

19 Illinois?

20    A.   Six of them are.

21    Q.   And the seventh?

22    A.   Is in San Luis Obispo, California.

23    Q.   How long have you been a controller?

24    A.   For about nine years.

25    Q.   Have you been a controller with TU the

1   entire nine years?

2        A.   Yes.

3        Q.   Has your title remained the same during

4   that entire time?

5        A.   Yes.

6        Q.   What did you do prior to the time that you

7   were a controller at TransUnion?

8        A.   I was a director at TransUnion.

9        Q.   And how long were you a director at

10  TransUnion?

11       A.   I'm not sure.

12       Q.   Do you have the approximate date range?

13       A.   Probably like two or three years.

14       Q.   What were your responsibilities as a

15  director?

16       A.   Very similar to my responsibilities as a

17  controller.

18       Q.   What was the reason for the change of the

19  name of your title?

20       A.   I don't remember.

21       Q.   Prior to the time that you were a director,

22  were you also employed at TransUnion?

23       A.   Yes.

24       Q.   And what was your position prior to the

25  time you were a director?

```
 1          A.    I was a manager.

 2          Q.    And what did you manage?

 3          A.    I managed specific segments -- specific

 4    divisions within the U.S. credit reporting segment.

 5          Q.    How long did you have that job?

 6          A.    Maybe about two years.

 7          Q.    And did you have any other positions with

 8    TransUnion prior to that time?

 9          A.    Yes.  And --

10          Q.    Please.

11          A.    I was a supervisor in international.

12          Q.    And how long were you a supervisor in

13    international?

14          A.    I think it was like one or two years.

15          Q.    And prior to that time did you have any

16    other positions?

17          A.    Yes.

18          Q.    What was your prior position?

19          A.    I was a financial analyst.

20          Q.    And what did you do while you were a

21    financial analyst?

22          A.    I was doing -- I was basically running the

23    closing cycle, so I was doing journal entries,

24    account reconciliations.

25          Q.    How long did you work as a financial
```

1    analyst?

2        A.    One or two years.

3        Q.    Did you have any positions at TransUnion

4    prior to the time you were a financial analyst?

5        A.    Yes.

6        Q.    And what was that position?

7        A.    I was a senior accountant.

8        Q.    What were your jobs -- excuse me.  What was

9    your job responsibility as a senior accountant?

10       A.    I don't remember.

11       Q.    And do you remember approximately how long

12   you operated as a senior accountant?

13       A.    Like a year.

14       Q.    Did you have any other positions prior to

15   that time?

16       A.    Yes.

17       Q.    What was your prior position?

18       A.    I was a staff accountant.

19       Q.    Were you also with --

20       A.    Yes.

21       Q.    -- TransUnion at that time?

22       A.    Yes, yes.

23       Q.    Do you remember approximately how long you

24   were a staff accountant?

25       A.    Six months.

1       Q.    Any other positions with TU --

2       A.    No.

3       Q.    -- prior to that time?

4       A.    No.

5       Q.    I'm just going to repeat this and we'll see

6   if we've got it together.

7             You started as a staff accountant for a few

8   months, and then you were a senior accountant for

9   about a year, then you became a financial analyst

10  for one or two years, then you were a supervisor

11  dealing with international segment for one or

12  two years, and then for about two years you were a

13  manager, then you became a director for two to

14  three years, and then you have been a controller

15  since that time for approximately nine years.

16      A.    There's probably too many years in there,

17  but that's close enough.

18      Q.    Close enough.  Very good.

19            And what year did you begin with

20  TransUnion?

21      A.    1989.

22      Q.    Have they always been TransUnion since

23  you've been employed there?  Has that always been

24  the company name?

25      A.    Yes.

1      Q.    Did you begin with TransUnion upon your

2      graduation with your Bachelor's Degree?

3      A.    Yes.

4      Q.    Did you have any jobs as an accounting

5      nature prior to the time that you graduated?

6      A.    No.

7      Q.    Do you participate in continuing education?

8      A.    No.

9      Q.    Have you participated in any other

10     litigation while you've been employed at TransUnion

11     as a witness?

12     A.    Yes.

13     Q.    And where were you a witness, for what

14     matter?

15           MS. CASTILLO:  Are you talking about the

16     case names or --

17     BY MS. YEAGER:

18     Q.    Yes, please.

19     A.    Carmel, Pebble Beach.

20     Q.    Was that the location of the action?

21     A.    I don't know.

22     Q.    Was that the case name?

23           MS. CASTILLO:  It's more of a case name,

24     Carmel, Pebble Beach versus TransUnion.

25

EXHIBIT F – Duni experience

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

STEVEN G. MILLETT, MELODY J.   )
MILLETT, On Behalf of          )
Themselves and All Others     )
Similarly Situated,          )
                          )
        Plaintiffs,      )
                          )
    vs.                 )  No. 05-599-SLR
                          )
TRUELINK, INC., a Trans Union  )
Company,               )
                          )
        Defendant.      )

VIDEOTAPED DEPOSITION OF LUCY DUNI

Taken on behalf of Plaintiff

March 28, 2007

Reported by Roselind C. Pisano, CSR

Illinois License No. 084-002031

```
 1     please?

 2          A.   Waveland.

 3          Q.   W-a-v-e-l-a-n-d?

 4          A.   Yes.

 5          Q.   Could you describe your educational

 6     background for me please?

 7          A.   Yes.  I studied advertising at Pepperdine

 8     University.

 9          Q.   And do you have a degree from that

10     institution?

11          A.   Yes.

12          Q.   And what year was your degree?

13          A.   1998.

14          Q.   And was that a Bachelor's Degree?

15          A.   Yes.

16          Q.   Are you currently employed by TU

17     Interactive?

18          A.   Yes.

19          Q.   And how long have you been employed?

20          A.   Since September of 1998.

21          Q.   Did you have any other professional

22     employment other than your employment with TU

23     Interactive?

24          A.   I had some internships during college.

25     That was it.
```

1      Q.   And what have been your positions at TU

2    Interactive?

3           What did you begin doing in 1998?

4      A.   I began doing marketing, and then I've held

5    various positions in the marketing department.

6      Q.   And how large was the marketing department

7    at that time?

8      A.   Just one, me.

9      Q.   And how long were you employed in the

10   marketing department?

11     A.   Since then until presently.

12     Q.   Has your job title always remained the

13   same?

14     A.   It's changed.

15     Q.   Could you walk me through the history of

16   that?  What was your first title after 1998?

17     A.   I believe it was marketing specialist and

18   then marketing manager, and now it's director of

19   marketing.

20     Q.   What year did you become a marketing -- the

21   marketing specialist?

22     A.   That was 1998.

23     Q.   And what year did you become the marketing

24   manager?

25     A.   That was around 2002 or '3.

1          Q.    And how many people did you manage as

2     marketing manager?

3          A.    Two.

4          Q.    Where were you employed?

5          A.    In San Luis Obispo, California.

6          Q.    And how long did you work as marketing

7     manager?

8          A.    Until my last promotion, which was 2005.

9          Q.    And now your title is director of

10    marketing?

11         A.    Yes.

12         Q.    What were your job responsibilities as

13    marketing manager?

14         A.    They were similar to what they are now,

15    customer acquisition, customer retention for

16    TrueCredit.com.

17         Q.    Who are the customers for TrueCredit.com?

18              MS. FRIEDMAN:  Objection, vague.

19              THE WITNESS:  Can you --

20    BY MS. YEAGER:

21         Q.    You just mentioned that you were in charge

22    of customer acquisition --

23         A.    Uh-huh.

24         Q.    -- for TrueCredit.com.  Are your customers

25    individual consumers, businesses, corporations?

1          A.   Yes, consumers.

2          Q.   Consumers.  And then in 2005 you became the

3     director of marketing.  Are you still managing

4     individual people within the company?

5          A.   Yes.

6          Q.   And how has your job changed?

7          A.   My responsibilities have increased since

8     that promotion.

9          Q.   And what -- how were your responsibilities

10    increased?

11         A.   To include product management.  And the

12    rest of the responsibilities have remained the same.

13         Q.   And what do you do for product management?

14         A.   A -- I mean there's someone dedicated to

15    managing the products on TrueCredit.com, and I

16    manage that person.

17         Q.   How many people are now under your

18    supervision?

19         A.   Five.

20         Q.   Are you currently located in California?

21         A.   No.  I'm located here now in Chicago.

22         Q.   Is the entire department now here in

23    Chicago?

24         A.   No.  There's -- here and San Luis Obispo.

25         Q.   Are you taking any medications today which

EXHIBIT F – Sales and Marketing and Scoring

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

STEVEN G. MILLETT, MELODY J.    )
MILLETT, On Behalf of    )
Themselves and All Others    )
Similarly Situated,    )
    )
        Plaintiffs,    )
    )
   vs.    )   No. 05-599-SLR
    )
TRUELINK, INC., a Trans Union    )
Company,    )
    )
        Defendant.    )

VIDEOTAPED DEPOSITION OF LUCY DUNI

Taken on behalf of Plaintiff

March 28, 2007

Reported by Roselind C. Pisano, CSR

Illinois License No. 084-002031

Page 35

1    that, you know, we helped to design the whole page,

2    but these are the products that we're responsible

3    for.

4        Q.    Thank you for that clarification.

5            I'd like to direct your attention to the

6    third item down, the entry that says "Online credit

7    monitoring starting at 10.95 a quarter."

8            Do you see that reference on this document?

9        A.    Yes.

10       Q.    And that line reads "Identity theft and

11   fraud protection.  Stay informed with ongoing access

12   to your credit report and weekly fraud-watch

13   e-mails."

14           Am I reading that correctly?

15       A.    Yes.

16       Q.    What -- in what manner does online credit

17   monitoring provide fraud protection?

18       A.    Well the fraud-watch e-mails alert you to

19   significant changes in your credit file, and if it's

20   something that you don't recognize it could be a

21   sign of fraud.

22       Q.    Can one be a victim of fraud and discover

23   that many, many years after the fact?

24           MS. FRIEDMAN:  Objection.  Lack of

25   foundation, calls for speculation.

Page 36

1          THE WITNESS:  Can you -- yeah.  Can you

2     repeat the question?

3     BY MS. YEAGER:

4          Q.   Can an individual be a fraud victim and yet

5     not learn of that for many years?

6          A.   Sure.

7          Q.   Can an individual be a victim of fraud and

8     yet not have that fraud appear as an item on their

9     credit report?

10          MS. FRIEDMAN:  Same objection.

11          THE WITNESS:  I mean the information that

12     is contained in a credit report can be -- if you

13     don't recognize some of that information, it can be

14     a sign of fraud.

15          So I mean that's really all I know about

16     the fraud-watch e-mails.

17     BY MS. YEAGER:

18          Q.   Do you know whether or not all data which

19     is available to a credit reporting agency would

20     appear on an individual consumer's credit report?

21          A.   I know -- no, I don't know that.  I know

22     what information -- roughly what information appears

23     in a credit report.

24          Q.   Do you have any idea whether or not

25     everything known about an individual is presented on

1       Q.    Assuming, as we must, that this page was

2       from 2003.  Making that assumption, what monitoring

3       service products would have been available in 2003?

4                 MS. FRIEDMAN:  Objection.  Lack of

5       foundation.

6                 THE WITNESS:  The product that's described

7       here, the Credit Monitoring.

8       BY MS. YEAGER:

9             Q.    And does this particular product monitor

10      only one credit union report?

11            A.    Yes.

12            Q.    Which credit union?

13            A.    TransUnion.

14            Q.    I'd like to refer you, if I might, to the

15      second entry.  It says "Protection: Complete

16      identity theft protection with weekly fraud-watch

17      e-mails."

18                 Am I reading that text correctly?

19            A.    Yes.

20            Q.    How does the monitoring service provide

21      complete identity theft protection?

22            A.    Well it specifies "weekly fraud-watch

23      e-mails," and then down below it explains how those

24      work.  "Receive weekly e-mail alerts to changes in

25      your report, find out about credit report changes,

1    including fraudulent activity, new inquiries, new

2    accounts, late payments and more."

3          And then there is this "Learn More" link

4    that goes on to describe it in more detail.

5          Q.   If one were to follow that link, would one

6    be referred to a TrueCredit.com web site page?

7          A.   Yes.

8          Q.   Are there any other changes to a credit

9    report that would result in an e-mail alert?

10          MS. FRIEDMAN:   Objection.   Vague.   Any

11    other changes other than what?

12          MS. YEAGER:   The five she's directed us to

13    here.

14          MS. FRIEDMAN:   Well it says "And more,"

15    so...

16          THE WITNESS:   Yes.

17    BY MS. YEAGER:

18          Q.   Do you know what the "and more" reference

19    is to?

20          A.   I don't know them off the top of my head.

21          Q.   Where could I find those?

22          A.   They are on the web site.

23          Q.   Are all of the changes which are monitored

24    listed on the web site?

25          A.   Yes.

1        Q.    You mentioned that currently the company

2    that you work for also has a credit monitoring

3    product that monitors three credit bureau reports,

4    is that correct?

5        A.    Yes.

6        Q.    And do you know what items would be

7    triggering an alert from those credit bureau

8    reports?

9        A.    No.   It's similar, but I don't know

10   exactly.

11       Q.    Do you know where one could find out what

12   those would be?

13       A.    Yes.   On the web site.

14       Q.    And would that be on the TrueCredit.com web

15   site?

16       A.    Yes.

17       Q.    Are triggers the same or -- let me begin

18   that question again.

19            If one had a new account e-mail alert from,

20   for example, TransUnion, would one also get an alert

21   about the same account from Equifax?

22            MS. FRIEDMAN:  Objection.  Lack of

23   foundation.

24            THE WITNESS:  If the -- if there was a new

25   account that appeared on both credit reports, then

1    presumably there would be two alerts.

2    BY MS. YEAGER:

3        Q.   If an account only appeared on one credit

4    report, then would only one alert be sent?

5        A.   Yes.

6        Q.   How does the fact that one receives a

7    fraud-watch e-mail alert provide complete identity

8    theft protection?

9        A.   Well in the context of the way that we're

10   selling the product here, it alerts then to

11   potential fraud.                                     .

12       Q.   Does it alert you after the fraud has taken

13   place?

14       A.   Well it would alert you to those critical

15   changes, like an address change or a new inquiry or

16   a new account, which could signal fraud.

17       Q.   In what way is a change to a credit report

18   an indication of fraud?

19            MS. FRIEDMAN:  Objection.  Lack of

20   foundation.

21            THE WITNESS:  Can you say that one more

22   time?

23   BY MS. YEAGER:

24       Q.   As I understand your testimony, you're

25   saying that you are completely protected from

Page 48

1    identity theft if you receive alerts about changes

2    to your credit report.  Is that your testimony?

3        A.   Well, I mean, in the context of credit

4    monitoring, alerting you to changes in your credit

5    report is a good way to identity -- identify

6    identity theft.

7        Q.   But you don't know whether or not all the

8    information available to a credit union appears on

9    one's credit report?

10       A.   I don't know what information TransUnion or

11   any credit bureau ultimately know exactly what is

12   stored, no.

13       Q.   I need to direct your attention down to the

14   box that says "New! Fraud Resolution Services."

15            It's near the bottom of the page.  Do you

16   see that entry?

17       A.   Yes.

18       Q.   What are fraud resolution services?

19       A.   Fraud resolution services is what is

20   described here.  If you become a victim of identity

21   theft the service helps you to resolve the identity

22   theft.

23       Q.   And how does it help resolve?

24       A.   By -- the way that it works is, you know,

25   you call and they can help you to remove inaccurate

1    information from the credit report, to file

2    affidavits.  All of the information is here.  If you

3    click the "Learn More" it describes how it works.

4         Q.   Can the fraud resolution service -- first,

5    who provides the fraud resolution services that

6    would have been offered in 2003?

7         A.   There is -- I'm not sure exactly.  There's

8    been various providers over the years.

9         Q.   Are those generally provided by another

10   entity, someone other than TU Interactive?

11        A.   Yes.

12        Q.   Would the entity or individual who is

13   providing the fraud resolution services be available

14   to directly work with individuals to remove

15   fraudulent items, or would the consumer still have

16   to take those steps on their own behalf?

17             MS. FRIEDMAN:  Objection.  Compound, lack

18   of foundation.

19             THE WITNESS:  Consumers -- or, you know,

20   the people can call TransUnion Fraud Victims

21   Assistance directly.

22   BY MS. YEAGER:

23        Q.   If one located a fraudulent item on their

24   credit report and that fraudulent item were, for

25   example, a credit card account that should not be

1     attributed to one of your customers, that customer

2     has learned about that credit card account that

3     needs to be closed; can the company who's providing

4     the fraud resolution services close that account?

5            MS. FRIEDMAN:  Objection.  Lack of

6     foundation.

7            THE WITNESS:  I don't know.  I know that if

8     you call TransUnion Fraud Victims Assistance they

9     can help you over the phone to remove fraudulent

10    information.  But I don't know exactly how it works,

11    if it's closing, or what not.

12    BY MS. YEAGER:

13       Q.   I need to direct your attention down to a

14    page.  I'm just going to hold it up off the camera

15    to help you find it.  At the top it reads

16    "TrueCredit Manage Your Credit and Debt - Your

17    Life."  And it's page 1 of 1.  And then the URL

18    reads "TrueCredit.com/popup/creditMonitor/

19    monitoringSample3.jsp?"

20            Are we on the same page?

21       A.   Yes.

22       Q.   And it's dated on my copy 8-6-2003.

23            Is this the services you were just

24    referring to, the fraud resolution services?

25       A.   Yes.

```
1           Q.   I'd like to direct your attention down in

2      the little bulleted items to the entry that says

3      "Help you order a copy of your Social Security

4      Personal Earnings and Benefits Statement and check

5      it for accuracy."

6                Did I accurately read that line?

7           A.   Yes.

8           Q.   Why is it important to order a copy of your

9      Personal Earnings and Benefits Statement from the

10     Social Security Administration?

11               MS. FRIEDMAN:  Objection.  Lack of

12     foundation.

13               THE WITNESS:  Yes.  I don't know why it's

14     important to do that.

15               MS. YEAGER:  For the record, I note that

16     there is some material I need to redact from this

17     packet, and I will do that at break.  I just wanted

18     to let counsel know that I'll be taking a marker and

19     blacking over the social security number listed on

20     these pages.

21               MS. FRIEDMAN:  Oh, okay.  I haven't gotten

22     to those pages yet, but fine.

23     BY MS. YEAGER:

24          Q.   I do not intend to have you disclose to us

25     any of the information you might have discussed with
```

1    Interactive?

2              MS. FRIEDMAN:  Objection, vague.

3              THE WITNESS:  No.

4    BY MS. YEAGER:

5         Q.   Are e-mails directed to certain sets of

6    customers of TU Interactive?

7         A.   Yes.

8         Q.   Why is that so?

9         A.   To offer products to -- to avoid offering

10   products to someone who already owns that product.

11        Q.   Do you track sales based upon any given

12   e-mail?

13        A.   Yes.

14        Q.   And why do you do that?

15        A.   As part of our, you know, standard sales

16   reporting.

17        Q.   Are your e-mails designed to increase

18   sales?

19        A.   Yes.

20             MS. YEAGER:  I'd like to enter another item

21   as an Exhibit.  I believe we're on 24.

22                       (TrueLink Exhibit No. 24

23                       marked for identification.)

24   BY MS. YEAGER:

25        Q.   I know this is voluminous, but I wanted to

1    enter it as an Exhibit in its entirety.  I promise

2    not to make you read the entire document before we

3    leave.

4          Are you familiar with this document?  It

5    was provided in this group to us by your counsel --

6    by counsel for the company.

7          Are you familiar with this document?

8    A.    I just need to look at it for a minute.

9    Q.    Please.  Take all the time you need.

10         MS. FRIEDMAN:  Do you want to identify the

11   Bates number ranges for that?

12   BY MS. YEAGER:

13   Q.    The Bates number range is TLM018435 through

14   TLM018590.

15   A.    It looks like it's a -- has to do with our

16   Google campaign.

17   Q.    Is this a report of some kind?

18   A.    Yes.

19   Q.    Have you seen it before, do you know?

20   A.    No, I haven't seen this in this format

21   before.

22   Q.    What was the Google campaign?

23   A.    Google paid search.

24   Q.    I'm sorry, paid search?

25   A.    Uh-huh.

Page 84

1    page?

2            "Compliance Product," are you familiar with

3    that term?  It's in the box on the far right column.

4        A.   No.  "Compliance Products," I don't know

5    what that means.

6        Q.   You do or do not?

7        A.   I don't.

8        Q.   Do not.  Are you familiar with the use of

9    this phrase, "Customer View Services"?

10       A.   No.

11       Q.   Are you familiar with the

12   "Cspt.truelink.com" reference?

13       A.   Yes.

14       Q.   What is that?

15       A.   CSPT is the -- are the letters that we use

16   to refer to our customer support tool.

17       Q.   What is the customer support tool?

18       A.   It's the tool used by customer service to

19   help customers on the telephone.

20       Q.   Is the customer service support tool

21   displayed to employees of TU or their agents?

22       A.   Yes.

23       Q.   Is it displayed to a consumer?

24       A.   No.

25       Q.   Who designs the customer support tool at

1      this time?

2              MS. FRIEDMAN:  Objection.  Lack of

3      foundation.

4              THE WITNESS:  Product development.

5      BY MS. YEAGER:

6          Q.   Is that a division of TU Interactive?

7          A.   Yes.

8          Q.   Where are those employees located, if you

9      know?

10         A.   Which employees?

11         Q.   The product development employees.

12         A.   San Luis Obispo.

13         Q.   Are you familiar with the process of credit

14     scoring?

15         A.   Yes.

16         Q.   What's your understanding about a credit

17     score?

18         A.   It's a number based on the information in

19     your credit report.

20         Q.   Why is the number generated?

21             MS. FRIEDMAN:  Objection.  Lack of

22     foundation.

23             THE WITNESS:  I don't know.  That's hard to

24     say why.

25

1    BY MS. YEAGER:

2        Q.    The number is the basis of the information

3    reflected on your credit report.  Why is the number

4    generated?

5            What's the purpose of the number?

6        A.    Well there's different purposes.  Lenders

7    use a credit score, consumers look at their credit

8    score.

9        Q.    Why would a consumer look at their credit

10   score?

11           MS. FRIEDMAN:  Objection.  Calls for

12   speculation.  Lack of foundation.

13           THE WITNESS:  To help them manage their

14   credit.

15   BY MS. YEAGER:

16       Q.    How does viewing one's credit score help

17   you manage your credit?

18       A.    Well it allows you to understand where you

19   stand, how you're doing as far as managing your

20   credit.

21       Q.    Who generates the credit score?

22       A.    On what web site?  Or what do you mean

23   exactly?

24       Q.    How -- who determines what a credit score

25   is?  Who makes the number?

1      A.    There's a lot of different credit scores.

2      Q.    What types of credit scores are there?

3      A.    Well, you know, I don't know all of them

4    off the top of my head.

5      Q.    Does TrueCredit generate credit scores?

6      A.    No.

7      Q.    Does TU Interactive generate credit scores?

8      A.    No.

9      Q.    Does TransUnion generate credit scores?

10     A.    Yes.

11     Q.    Does Experian generate credit scores?

12     A.    Yes.

13     Q.    Does Equifax generate credit scores?

14     A.    I don't know if they do.

15     Q.    Can someone order information about their

16    credit score from TU Interactive?

17     A.    Yes.

18     Q.    Are there a number of products which make

19    an individual's credit score available?

20     A.    Yes.

21     Q.    What products are those?

22     A.    Currently our three products; TransUnion

23    Credit Monitoring, 3-Bureau Credit Monitoring, and

24    3-in-1 Credit Report.

25     Q.    In the TU Credit Monitoring product, how is

1    the credit score generated?

2          MS. FRIEDMAN:  For clarification, you're

3    talking about the current TransUnion Credit

4    Monitoring product?

5    BY MS. YEAGER:

6          Q.    Yes.   Thank you.

7          A.    The current product uses the TransRisk

8    credit score.

9          Q.    What is the TransRisk credit score?

10         A.    It is a credit score provided by

11   TransUnion.

12         Q.    In 2005 how was the TransUnion credit score

13   generated?

14         A.    What do you mean by that?

15         Q.    Was the TransRisk credit score also the

16   source of the credit score in 2005?

17         A.    As far as I know, TransRisk is the name

18   that TransUnion has always used for their credit

19   score.

20         Q.    Are you familiar with a score called a

21   CreditXpert score?  C-r-e-d-i-t, the letter X

22   capitalized, then p-e-r-t, all one word.

23         A.    Yes.

24         Q.    What is your understanding of the

25   CreditXpert score?

1        A.    It is another score that we use to provide

2    -- that we used before we used the TransRisk score.

3        Q.    Do you know what years it was used?

4        A.    I know it was used before 2002.

5        Q.    Was the CreditXpert score generated by TU?

6              MS. FRIEDMAN:  Objection.   Lack of

7    foundation.

8              THE WITNESS:   No.

9    BY MS. YEAGER:

10       Q.    Who generated the CreditXpert score?

11       A.    I believe the company was called

12   CreditXpert.

13       Q.    Do you know anything about that company?

14       A.    Not other than that was the score that we

15   used at the time.

16       Q.    Do you know why the CreditXpert score is no

17   longer being used?

18       A.    Well, you know, when we were acquired by

19   TransUnion we switched to the TransUnion credit

20   score.

21       Q.    Has the TransUnion credit score always been

22   called TransRisk?

23       A.    As far as I know.  But I don't know as far

24   -- you know, as long as I've been familiar with it.

25       Q.    Is it an accurate restatement of your

1    testimony that you understand that Experian also

2    generates credit scores?

3        A.    Yes.

4        Q.    Do you know how Experian generates its

5    credit scores?

6        A.    No.

7        Q.    Do you know whether it uses the TransRisk

8    program to generate credit scores?

9        A.    I don't think so.

10        Q.    Do you know whether it uses the CreditXpert

11    program to generate credit scores?

12        A.    I don't know.

13        Q.    Is an individual's data in their Experian

14    credit report the same data in their TransUnion

15    credit report?

16            MS. FRIEDMAN:    Objection.    Lack of

17    foundation.

18            THE WITNESS:    You know, it's hard to say.

19    It depends on the person.

20    BY MS. YEAGER:

21        Q.    And why would it depend?

22        A.    The three national credit bureaus collect

23    information independently.

24        Q.    Because they collect data independently,

25    might one credit report have information that would

1    not be on the credit report of another?

2              MS. FRIEDMAN:  Objection.  Calls for

3    speculation.

4              THE WITNESS:  Yes.

5    BY MS. YEAGER:

6        Q.   If Experian, Equifax and TransUnion were to

7    each generate a credit score, would the credit score

8    number be the same for each of the three companies?

9              MS. FRIEDMAN:  Objection.  Lack of

10   foundation.

11             THE WITNESS:  I don't know.  That's hard to

12   say.

13             MS. YEAGER:  Let's mark Exhibit No. 27.

14                  (TrueLink Exhibit No. 27

15                  marked for identification.)

16   BY MS. YEAGER:

17       Q.   This is -- Exhibit No. 27 has a number

18   TLM000920.

19             Are you familiar with this page?

20       A.   This is an e-mail.

21       Q.   Did you help develop this e-mail?

22       A.   Someone in my group.

23       Q.   Do you know who?

24       A.   No.  It's a group effort.

25       Q.   Did your group design the entire e-mail?

1       A.    Yes.

2            Q.    In the text underneath the picture of the

3       ever-so-happy couple there are three different items

4       listed there; one for TransUnion, one for Experian

5       and one for Equifax, and then underneath those names

6       there are three digit numbers, are there not?

7            A.    Yes.

8            Q.    Are those three digit numbers intended to

9       convey a certain score?

10           A.    Right.    It says "Example:    How do your

11      scores rank?"

12           Q.    And would this be a credit score that you

13      intended to convey?

14           A.    Yes.

15           Q.    And why did you convey that the three

16      scores were different for the three different credit

17      reports?

18           A.    Since the bureaus collect information

19      independently, the data can be different, so then

20      the scores can be different.

21           Q.    If the exact same data were available in an

22      Experian credit report and in a TransUnion credit

23      report, would the credit scores which were generated

24      be the same?

25                 MS. FRIEDMAN:    Objection.    Lack of

1    foundation.

2              THE WITNESS:  Yeah.  It's hard to say

3    because it depends on each person, all the different

4    factors.

5    BY MS. YEAGER:

6         Q.   Does it depend on which computer program is

7    being used to generate the score?

8         A.   I would think so.

9         Q.   When TU Interactive sells a 3-in-1 Credit

10   Report, do they also provide a credit score for each

11   of the three credit reports?

12             MS. FRIEDMAN:  At what time frame?

13             MS. YEAGER:  In 2006.

14             MS. FRIEDMAN:  You're asking if -- I'm

15   sorry.  Are you asking if it's offered or if it's

16   always provided?

17             MS. YEAGER:  Let me begin again.

18             MS. FRIEDMAN:  I'm sorry.

19             MS. YEAGER:  Thank you.  No, I appreciate

20   the help.

21   BY MS. YEAGER:

22        Q.   In 2006 if a consumer were to order a

23   3-in-1 Credit Score -- let me begin again.

24             In 2006 if a consumer were to order a

25   3-in-1 Credit Report, would that report also contain

1     credit scores?

2          A.    No.    One is included, and then the other

3     two are available for an additional fee.

4          Q.    Which score is included?

5          A.    TransUnion.

6          Q.    And that is a score which is calculated

7     based upon -- in 2006 -- the TransRisk program, is

8     that correct?

9          A.    Yes, that's correct.

10         Q.    And if a 3-in-1 Credit Report were ordered

11    before 2002, that score generated by TransUnion

12    would use the CreditXpert scoring system, is that

13    correct?

14              MS. FRIEDMAN:    I think your question is

15    somewhat misleading because you're starting with the

16    premise that in '06 the 3-in-1 includes a score.

17              In 2002 it may have been different.    I

18    don't know.

19    BY MS. YEAGER:

20         Q.    You're right.    Let's break that up.    In

21    2006 when one ordered a 3-in-1 Credit Report and one

22    received their TU credit score, would that credit

23    score have been based on the TransRisk program?

24         A.    Yes.

25         Q.    In 2002 if one ordered a 3-in-1 credit

1     score from TU Interactive, would they have received

2     a credit score from TU?

3          A.    I don't know.  And I don't know that we had

4     -- yeah.  I don't know what the product mix was off

5     the top of my head in 2002.

6               MS. FRIEDMAN:  And I'll just object to the

7     extent that your question assumed that there was a

8     3-in-1 report available at that time.

9     BY MS. YEAGER:

10         Q.    You mentioned that when a consumer

11    purchased a 3-in-1 report in 2006, that they had a

12    single score from TransUnion and that other scores

13    were available.  Is that a correct statement of your

14    testimony?

15         A.    Yes.

16         Q.    Did one -- did the consumer pay an extra

17    fee for the other scores?

18         A.    Yes.

19         Q.    Who set that fee?

20         A.    There's a lot of people involved with

21    pricing.

22         Q.    Is there an individual department at TU

23    Interactive that works on pricing products?

24         A.    Yes.

25         Q.    And what group is that?

1      A.    Marketing.

2           Q.    And who is the individual who heads

3     marketing?

4      A.    Myself.

5           Q.    Are you responsible then for developing the

6     pricing of products?

7      A.    We propose pricing, we research pricing,

8     but I'm not ultimately responsible.

9           Q.    Who is ultimately responsible?

10     A.    John Danaher, our president.

11          Q.    I apologize, I lost my train of thought.

12          All right.  We were talking about the fees

13    that might be paid for other scores.  And if I

14    remember your testimony you were saying that the two

15    other scores that might be obtained when one ordered

16    a 3-in-1 report could be obtained for a fee, is that

17    right?

18     A.    Yes.

19          Q.    And that fee might fluctuate from time to

20    time, is that correct?

21     A.    I think it's been pretty steady.

22          Q.    And what is that fee?

23     A.    It's 9.95.

24          Q.    And how much is the 3-in-1 Credit Report if

25    one does not get the extra two scores?

1          MS. FRIEDMAN:  Right now or in 2006?

2     BY MS. YEAGER:

3          Q.   In 2006.

4          A.   29.95.

5          Q.   Who calculates the scores which are

6     provided with a 3-in-1 Credit Report at this time?

7          A.   We use the TransRisk credit score.

8          Q.   Do you use that program to generate the

9     Experian credit score?

10         A.   Yes.

11         Q.   Do you use that program to generate the

12    Equifax credit score?

13         A.   Yes.

14         Q.   Why do you use that program?

15              MS. FRIEDMAN:  Objection.  Lack of

16    foundation.

17              THE WITNESS:  As far as I know it's -- I

18    mean it's just because we were told to.

19    BY MS. YEAGER:

20         Q.   If an individual were to obtain their

21    credit score directly from Experian, would Experian

22    use the TransRisk credit program?

23              MS. FRIEDMAN:  Objection.  Lack of

24    foundation.

25              THE WITNESS:  Not as far as I know.

1    BY MS. YEAGER:

2        Q.   Do you know what program they would use?

3        A.   I don't know.

4        Q.   Is there any information on this page which

5    conveys to the consumer that a single program is

6    being used to generate the three different scores?

7        A.   Well, no, not on this page.

8        Q.   How would a consumer learn that fact?

9        A.   Well when you click through here you go to

10   the web site and then you have a lot of information

11   on the web site on the details.

12       Q.   And is your department responsible for the

13   development of the web pages on the web site?

14       A.   Yes.

15       Q.   Are you aware of anyplace in which the

16   consumer is notified that a single program is being

17   used to generate the three different credit scores?

18       A.   I don't know exactly the name of the page.

19       Q.   Do you think that there is such a

20   disclosure?

21       A.   Yes.

22       Q.   Do you know what language is included on

23   that disclosure?

24       A.   No, I don't.

25       Q.   Did you draft the language?

1          A.    I think it's probably in our terms.  So no,

2     I didn't draft it.

3          Q.    Who would have drafted the terms?

4          A.    Our legal and compliance groups.

5          Q.    Is a consumer expected to review the terms

6     before they purchase a credit score?

7          A.    Yes.

8          Q.    How is the terms -- excuse me.  How are the

9     terms displayed to the consumer?

10         A.    They are on the order form, and you have to

11    agree to them.

12         Q.    Have the terms and conditions changed over

13    time?

14               MS. FRIEDMAN:  Objection.  Lack of

15    foundation.

16               THE WITNESS:  Yes, I think so.

17    BY MS. YEAGER:

18         Q.    And did you tell me who drafted the terms

19    and conditions?

20         A.    I believe it's our legal and compliance

21    groups.

22         Q.    Is that a group within TU Interactive?

23         A.    Yes.

24               MS. YEAGER:  We're on Exhibit No. 28.

25

1                    (TrueLink Exhibit No. 28

2                    marked for identification.)

3    BY MS. YEAGER:

4        Q.    Are you familiar with the contents of this

5    page?

6        A.    No.

7        Q.    Does this page contain a reference to the

8    TransRisk score?

9        A.    Yes.

10       Q.    Could you just read for the record the text

11   of that reference?

12       A.    "TransUnion TransRisk New Account."

13       Q.    Are you familiar with any of these other

14   scoring systems?

15       A.    Yes.

16       Q.    Which ones are you familiar with?

17       A.    I'm familiar with FICO, CreditXpert.  And

18   that's it.

19       Q.    This page references the CreditXpert as

20   being Experian CreditXpert.  Do you know what the

21   relationship between Experian and CreditXpert is?

22       A.    No.

23       Q.    There is a column here that indicates

24   "Range."  Are you familiar with why there would be a

25   range of scores in a credit scoring system?

1          A.    What do you mean by why?

2          Q.    For example, it appears that some of the

3     ranges are from 190 to 950, and then some other

4     ranges appear to be from, for example, 300 to 850.

5     Do you know why those ranges are different between

6     scores?

7          A.    No, I don't know why they're different.

8                MS. YEAGER:    I think we're about out of

9     tape.   Let's go off the record.

10               THE VIDEOGRAPHER:    This is the end of tape

11    number 2.   We're going off the record at 12:31.

12                        (Whereupon, a break was taken

13                         from 12:31 until 1:35 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1              A F T E R N O O N   S E S S I O N

2              THE VIDEOGRAPHER:  This is the beginning of

3        tape number 3.  We are back on the record at 1:35

4        p.m.

5              MS. YEAGER:  Let's mark the next Exhibit

6        please, Exhibit No. 29.

7                          (TrueLink Exhibit No. 29

8                          marked for identification.)

9        BY MS. YEAGER:

10             Q.   This is a document, TLM000948.

11             Are you familiar with this document?

12        A.   Yes.

13             Q.   Did you have input into the development of

14        this document?

15        A.   Yes.

16             Q.   Is this an e-mail?

17        A.   Yes.

18             Q.   The text is somewhat hard to read, but I

19        think you can make it out.  If I can, I think anyone

20        probably can.

21             I'm trying to interview you about the text

22        that says, "Your three scores are an essential part

23        of your finances, since many lenders look at all

24        three of your scores when making decisions about

25        your loans."

1          Can you read that text?

2     A.   Yes.

3     Q.   When a lender obtains a score in order to

4     issue credit, are they looking at a score which is

5     generated by TransLink?

6          MS. FRIEDMAN:  Objection.  Lack of

7     foundation.

8          THE WITNESS:  They could.  I don't know.

9     Lenders use a variety of scores.

10    BY MS. YEAGER:

11    Q.   What kinds of scores do they use?

12         MS. FRIEDMAN:  Same objection.

13         THE WITNESS:  You know, there's, you know,

14    literally thousands of different scoring models out

15    there, and then each lender applies their own

16    business rules to that score.  So, you know, it

17    depends on what lender you're talking about.

18    BY MS. YEAGER:

19    Q.   If a lender secures a credit score from

20    Experian, would that credit score be based upon the

21    TransLink product?

22         MS. FRIEDMAN:  Objection.  Lack of

23    foundation, and I don't think you mean TransLink.

24    BY MS. YEAGER:

25    Q.   Let me rephrase that.  Yes, thank you.

1              If a lender were looking at an Experian

2       credit report, would they be looking at a credit

3       score that had been developed using the TransLink

4       program?

5              MS. FRIEDMAN:  Objection.  Lack of

6       foundation.

7              THE WITNESS:  You know, there are lenders

8       that used the TransRisk score, but I don't know.  It

9       depends on what lender you're talking about.

10      BY MS. YEAGER:

11         Q.   When a lender orders a credit score from

12      each of the three credit bureaus, TransUnion,

13      Equifax and Experian, are those scores all scored

14      based upon the TransRisk program?

15             MS. FRIEDMAN:  Objection.  Lack of

16      foundation.

17             THE WITNESS:  It would -- I mean it would

18      just depend upon what scoring model the lender was

19      using.

20      BY MS. YEAGER:

21         Q.   Let me refer you back to a previous

22      Exhibit, if I might.  Let me refer you back to

23      Exhibit No. 28.

24             Does TransUnion -- excuse me.  Does the

25      Experian MyFICO score use the TransRisk program?

Page 105

1      A.   No.

2           MS. FRIEDMAN:  Objection.  Lack of

3      foundation.

4      BY MS. YEAGER:

5           Q.   Does the Experian CreditXpert score use the

6      TransRisk program?

7           MS. FRIEDMAN:  Same objection.

8           THE WITNESS:  Well, these are all scoring

9      models.  So you have the three credit reports.  And

10     you can run any of your three reports through any of

11     these scoring models.  That's how I understand it to

12     work.

13     BY MS. YEAGER:

14          Q.   Would a lender obtaining an Experian Credit

15     Report obtain a credit score from Experian as well

16     as the credit report?

17          MS. FRIEDMAN:  Objection.  Lack of

18     foundation.

19          THE WITNESS:  I don't know.

20          MS. YEAGER:  Let's mark Exhibit No. 30,

21     please.

22                    (TrueLink Exhibit No. 30

23                    marked for identification.)

24     BY MS. YEAGER:

25          Q.   This is a document number TLM018370.

1      paragraph that begins with "Contact the Social

2      Security Administration."

3           A.    Uh-huh.

4           Q.    This would seem to indicate that a social

5      security number could be used to establish credits

6      or new accounts.  Are you familiar with how that

7      might happen?

8           A.    I am familiar with how to apply for a new

9      account.

10          Q.    Are you aware of any services that your

11     company provides to individuals whose social

12     security number has been used to establish new

13     accounts?

14          A.    Well if there was a new account -- you

15     know, new accounts are one of the things that we --

16     that trigger an alert.  So if there is a new

17     account, then that would be a service for that type

18     of person.

19          Q.    Do you know whether or not this text was

20     written by someone from TransUnion or written by

21     someone from TransUnion Interactive?

22               MS. FRIEDMAN:  Objection.  Lack of

23     foundation.

24               THE WITNESS:  I don't know who wrote this

25     document.

Page 121

1            MS. YEAGER:  I'd like to mark Exhibit 34,

2      please.

3                        (TrueLink Exhibit No. 34

4                        marked for identification.)

5      BY MS. YEAGER:

6      Q.    Are you familiar with Exhibit 34?

7      A.    Yes.

8      Q.    Did you help to develop this --

9      A.    Yes.

10     Q.    -- piece of information?

11           Do you have any idea generally when this

12     document was in use?

13     A.    It was first in use when we introduced this

14     unlimited reports and scores, which was mid 2005.

15     Q.    Are the items that are referenced in this

16     black box -- I'm certain that it was probably a

17     beautifully colored photograph before it was

18     reproduced on a copier.  Is that a save assumption

19     on my part?

20     A.    Yes.

21     Q.    Within what is now black text, are the

22     services that are listed there services that one

23     must pay for?

24     A.    The unlimited access to your credit

25     reports, notification and insurance, yes.

1    Q.    What is a complimentary credit score?

2    A.    The complimentary score is the TransUnion

3    score that accompanies the 3-in-1 Credit Report.

4    Q.    Under the "Please Note" box, which is the

5    first text, it says "TrueCredit features TransUnion

6    data for all complimentary credit scores as well as

7    fraud-watch e-mails."

8    A.    Uh-huh.

9    Q.    Does this notify the consumer that the

10   credit scores which are depicted by this image are

11   based on the TU scoring model?

12   A.    The "Please Note" is standard on -- in our

13   communications and on the web site.  When we promote

14   the free credit score with the 3-in-1 purchase, that

15   is to notify the customer that the complimentary

16   score is based on TransUnion data.

17         And then in the past in some of those other

18   promotions that we were looking at, we would offer

19   the fraud-watch e-mails complimentary for a certain

20   period of time, and those were also based on

21   TransUnion data.  So that's the purpose of the

22   "Please Note."

23   Q.    When were the fraud-watch e-mails

24   complimentary?

25   A.    Again, I don't know the exact period of

1    time.

2         Q.   Was that particular feature, the

3    complimentary fraud-watch e-mails, offered with a

4    specific version of one of your products?

5         A.   It was offered with purchase of a credit

6    report, but I don't know the exact -- there was

7    various product configurations.

8         Q.   Going back to Exhibit 34.  Did you intend

9    to convey to the consumer that the TransUnion score

10   reflected here of 724 would be a score computed by

11   TransUnion?

12        A.   The purpose of the samples -- and I think

13   it's not showing up here, but it says "sample"

14   across -- is just to show what credit scores could

15   be and, you know, to pique curiosity of what is your

16   score.

17        Q.   Did you intend to convey that the Experian

18   score which would be provided with the 3-in-1 Report

19   was computed by Experian?

20        A.   No.  We're intending to convey that these

21   are credit scores based off of data provided by the

22   three national credit bureaus.

23             MS. YEAGER:  I'd like to mark Exhibit

24   No. 35.

25

Page 124

1                     (TrueLink Exhibit No. 35

2                     marked for identification.)

3      BY MS. YEAGER:

4          Q.    Are you familiar with Exhibit No. 35?

5          A.    Yes.  I think we already looked at this.

6          Q.    Have we looked at this?

7          A.    Yeah.

8                MS. YEAGER:  Let's withdraw that then.

9                MS. FRIEDMAN:  Yes.  It's Exhibit No. 27.

10               MS. YEAGER:  I apologize for the delay.

11     There is no need to solicit duplicate testimony so

12     I'm trying to cull through some of the documents I

13     intended to use for exhibits, and I'll beg your

14     indulgence for a few more minutes.

15               Let's make this then 35.

16                     (TrueLink Exhibit No. 35

17                     re-marked for identification.)

18     BY MS. YEAGER:

19         Q.    Exhibit 35 is TLM956.  Are you familiar

20     with this document?

21         A.    This -- it doesn't look as familiar as the

22     others.  It might be because it's older.  I'm not

23     sure.  But it looks like a TrueCredit e-mail.

24         Q.    But you don't recall actually designing

25     this particular one?

1    A.    I don't know if it's just the way that it's

2    reproduced.  It doesn't look familiar to me.  But I

3    mean it looks like one of our e-mails.

4    Q.    In this e-mail under the text it says, "You

5    have shown in the past that you are concerned about

6    your credit report and score."

7    Is this an example of the targeted e-mails

8    that you mentioned in your earlier testimony today?

9    A.    Well, yes.  I mean this would be sent to

10   someone who had, you know, their -- they've opted to

11   receive e-mail from us, they've ordered a product

12   that they aren't on a subscription.  They just

13   ordered a one-time credit report.

14   Q.    And how can you tell that?

15   A.    We can tell that from their purchase

16   history.

17   Q.    Are there other individual pieces that

18   would be designed for targeting to other sets of

19   individuals?

20   For example, this isn't the only instance

21   in which you developed a targeted e-mail, is it?

22   A.    No.

23   Q.    And do you have any idea how many targeted

24   e-mails you would have developed within 2006?

25   A.    Well they are all targeted to some extent

1    as far as selling products to people who don't own

2    those products.  So we weekly.  So 52.  Almost.

3    Probably 50.

4        Q.   And is there some document within your

5    company that would identify which e-mails might be

6    sent to which customer?

7        A.   Yes.

8        Q.   And what document is that?

9        A.   It's a marketing calendar, e-mail marketing

10   calendar.

11       Q.   Does that take the form of a report or a

12   spreadsheet?

13       A.   It's a spreadsheet that's set up like a

14   calendar.

15       Q.   So when you actually view it, it appears as

16   though you're looking at a calendar?

17       A.   Uh-huh.

18       Q.   And does the fact that it's set up in a

19   calendar help track which e-mails might be sent on

20   any given day?

21       A.   Uh-huh.

22       Q.   Is that the purpose for setting it up?

23       A.   Yes.

24       Q.   Is that the purpose for setting it up as a

25   display for a calendar?

1          A.    Yes.

2          Q.    Did you help develop this piece?

3          A.    Yes.

4          Q.    Is this an e-mail?

5          A.    Yes.

6          Q.    Is this an e-mail that would have been sent

7     to a selected group of customers?

8          A.    Yes.

9          Q.    Are all e-mails sent to only selected

10    groups of customers?

11         A.    What do you mean by selected group?

12         Q.    Is there any instance in which an e-mail

13    would be sent to every customer?

14              MS. FRIEDMAN:  I'm sorry, go ahead and

15    answer.  Then we can go off the record for a second.

16              THE WITNESS:  I was just going to say that

17    no, because not all of our customers want to receive

18    e-mail from us.  So it's just those who opt to

19    receive e-mail.

20              MS. YEAGER:  Can I ask one follow-up

21    question or do you need to stop?

22              MS. FRIEDMAN:  I think it might help.

23              MS. YEAGER:  Go ahead.

24              THE VIDEOGRAPHER:  We are going off the

25    record at 2:28.

Page 133

```
 1                    (Whereupon, a break was taken

 2                    from 2:228 until 2:29 p.m.)

 3            THE VIDEOGRAPHER:  We are back on the

 4       record at 2:29 p.m.

 5       BY MS. YEAGER:

 6            Q.   And there are -- okay.  There are some

 7       individuals who sign up to receive your e-mails who

 8       never buy a product from your company, is that

 9       correct?

10            A.   Or who have not yet bought a product.

11            Q.   Are there individuals who elect not to

12       receive any e-mails at all?

13            A.   Yes.

14            Q.   For those of your customers who have

15       actually already purchased a product, thinking of

16       that group of people, are there instances when all

17       of those individuals would receive an e-mail?

18            A.   Yes.

19            Q.   The more common practice, if I'm

20       understanding your testimony, is that it is much

21       more common for an e-mail to be sent to a subset of

22       your customers who have already purchased a product

23       rather than all your customers who have already

24       purchased a product?

25            A.   Yes.
```

1         Q.    I would like to direct your attention to

2    the item number 3, "Watch your progress:  With 24

3    hour e-mail notice of critical changes, plus the

4    ability to refresh your three reports every day,

5    your progress is easy to track."

6              Did I read that correctly?

7         A.    Yes.

8         Q.    And we've already talked about the

9    frequency of e-mails and how one can now receive

10   notification within 24 hours.  Is -- if a consumer

11   elects to refresh their reports every day, what does

12   that mean?

13        A.    That means that they are getting an updated

14   credit report every day.

15        Q.    Can one get an updated credit report more

16   often than once a day?

17        A.    No.

18        Q.    Can one update a credit report utilizing

19   this product, can one update a credit report from

20   one bureau without updating a credit report from all

21   three bureaus?

22        A.    Not with this product, no.

23        Q.    Is there a product with which a customer

24   could do that?

25        A.    Well with the TransUnion Credit Monitoring

Page 142

1    the photocopier was corrected.

2            We appreciate the fact that you went to so

3    much effort to do that.  This happened in a number

4    of instances.

5            MS. FRIEDMAN:  But you're not suggesting

6    that you played with the toning.

7            MS. YEAGER:  Oh, no.  That's something that

8    you did for us.

9            MS. FRIEDMAN:  I don't know that we did,

10   but I can see that they are marked as separate

11   pages.

12           MS. YEAGER:  That happened in several

13   instances in the document production where there

14   were multiple pieces so that we could see the entire

15   picture.

16           For example, if someone had only given us

17   588 we wouldn't have had, as you noted, the check

18   marks.

19   BY MS. YEAGER:

20       Q.   The text, if I can direct you to 587,

21   references the Federal Trade Commission.  What is

22   your knowledge about the reference in this piece in

23   2003 to the Federal Trade Commission and their

24   report about the number of identity theft incidents?

25       A.   My knowledge is that we took some

Page 143

1    statistics from their report, or whatever they had

2    issued, on the number of victims of identity theft.

3        Q.   Do you know what report is being

4    referenced?

5        A.   I don't.

6        Q.   Do you know what the Federal Trade

7    Commission uses for a definition of identity theft?

8            MS. FRIEDMAN:  Objection.  Vague.  What

9    point in time?

10           THE WITNESS:  I don't know how they define

11   identity theft.

12   BY MS. YEAGER:

13       Q.   Do you know how identity theft was defined

14   in the particular report referenced here?

15       A.   No.

16       Q.   Can you tell me what TU Interactive

17   considers identity theft?

18           MS. FRIEDMAN:  Objection.  Lack of

19   foundation.

20           THE WITNESS:  As far as I know we don't

21   have a definition, a company-wide definition.

22           MS. YEAGER:  Exhibit No. 39, please.

23                   (TrueLink Exhibit No. 39

24                   marked for identification.)

25

<u>CERTIFICATE OF SERVICE</u>

I, Christopher J. Curtin, Esq., hereby certify that on November 13, 2007, I served a copy of the

foregoing Appendix to Plaintiffs' Reply to Defendant's Answering Brief in Opposition to Plaintiffs' Motion for

Partial Summary Judgment by depositing the same in the United States Mail, postage prepaid to:

> William M. Lafferty, Esq.
> Jay N. Moffitt., Esq.
> Morris Nichols Arsht & Tunnell
> 1201 N. Market St.
> Wilmington, DE 19801
> wlafferty@mnat.com

and that I served a copy electronically this day to the following:

> Michael C. O'Neil
> Paula D. Friedman
> DLA Piper US LLP
> 203 N. LaSalle St., Ste. 1900
> Chicago, IL 60601-1293
> michael.Oneil@dlapiper.com
> paula.friedman@dlapiper.com

_____/s/ Christopher J. Curtin_____
Christopher J. Curtin, Esquire
MacElree Harvey, Ltd.
5721 Kennett Pike
Centreville, DE 19807
Phone: 302.654.4454
Facsimile: 302.654.4954
Email: ccurtin@macelree.com
Website: macelree.com

COUNSEL FOR PLAINTIFFS
STEVEN G. MILLETT
AND MELODY J. MILLETT

DATE: November 13, 2007

1