IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STEVEN G. MILLETT, MELODY J. MILLETT, On Behalf Of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>TRUELINK, INC., A Trans Union Company,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 05-599-SLR<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT TRUELINK INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS
MOTION TO STRIKE THE REPORT AND TESTIMONY OF RONALD DIMBERT**

                                William M. Lafferty (#2755)
                                Jay N. Moffitt (#4742)
                                **Morris, Nichols, Arsht & Tunnell LLP**
                                1201 N. Market Street
                                Wilmington, DE 19899
                                Phone: (302) 658-9200
                                Fax: (302) 658-3989

                                OF COUNSEL:
                                Michael O'Neil
                                Paula D. Friedman
                                **DLA Piper US LLP**
                                203 North LaSalle Street, Suite 1900
                                Chicago, IL 60601-1293
                                Phone: (312) 368-4000
                                Fax: (312) 236-7516

                                Counsel for Defendant

November 19, 2007

**TABLE OF CONTENTS**

                                                 **Page**

I.    THE DIMBERT REPORT EXPRESSES OPINIONS WHICH DO NOT "FIT" THE ISSUES BEFORE THIS COURT ............................................................................ 2

II.    DIMBERT'S METHODOLOGY IS FLAWED IN HIS FAILURE TO PRESENT THE STIMULI AS IT WOULD BE ENCOUNTERED BY REAL CONSUMERS ........ 5

III.    PLAINTIFFS DO NOT ADDRESS THE SEVERITY OF ANY OF THE OTHER FLAWS INHERENT IN THE DIMBERT REPORT ...................................................... 8

IV.    THE DIMBERT REPORT CONTAINS FATAL FLAWS THAT GO BEYOND MERE TECHNICAL DEFICIENCIES .................................................................... 10

V.    CONCLUSION .................................................................................................... 12

## TABLE OF AUTHORITIES

## FEDERAL CASES

Bartlett v. Heibl, 128 F.3d 497 (7th Cir. 1997)..................................................................5

Citizens Financial Group, Inc. v. Citizens National Bank of Evans City, 383 F.3d
    110 (3d Cir. 2004)..............................................................................................4, 8, 10

Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) ..................................1

Eclipse Electronics v. Chubb Corp., 176 F.Supp.2d 406 (E.D. Pa. 2001).........................11

Hernandez v. Attention, LLC, 429 F.Supp.2d 912 (N.D. Ill. 2005).....................................8

J & J Snack Foods, Corp. v. Earthgrains Co., 220 F.Supp.2d 358 (D.N.J. 2002) .........6, 13

Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802 (3d Cir. 1997)......................................11

Kargo Global, Inc. v. Advance Magazine Publishers, Inc., 2007 WL 2258688
    (S.D.N.Y. Aug. 6, 2007) ................................................................................7, 8, 10, 12

Kumho Tire Company, Ltd., v. Carmichael, 526 U.S. 137 (1999)......................................1

Muha v. Encore Receivable Management, Inc., 2007 WL 2827408 (E.D. Wis.
    Sept. 28, 2007) ..............................................................................................................5, 8, 9

Pfizer, Inc. v. Tiva Pharmaceuticals USA, Inc., 461 F.Supp.2d 271 (D.N.J. 2006)..........10

Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77 (1st Cir.
    1998) ...........................................................................................................................11

Simon Property Group LP v. mySimon, Inc., 104 F.Supp.2d 1033
    (S.D. Ind. 2000) ................................................................................................9, 11, 13

Trouble v. The Wet Seal, Inc., 179 F.Supp.2d 291 (S.D.N.Y. 2001)..................................4

United States v. Mitchell, 365 F.3d 215 (3d Cir. 2004).....................................................10

Wells Fargo & Co. v. Whenu.com, Inc., 293 F.Supp.2d 734 (E.D. Mich. 2003)............4, 8

## FEDERAL STATUTES

Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq ..............................5

FED. R. EVID. 801..............................................................................................1

FED. R. EVID. 702............................................................................................12

## MISCELLANEOUS

5 McCarthy, *Trademarks and Unfair Competition* § 32:16 ................................5

WEINSTEIN, FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC
    EVIDENCE, ..................................................................................................1

TrueLink Inc. ("TrueLink")[1] has moved to strike the Dimbert Report submitted by Plaintiffs in support of both their motion for class certification and their motion for partial summary judgment. Plaintiffs have submitted a response in which they attempt to trivialize the methodological flaws inherent in the Dimbert Report. They argue that the deficiencies amount to nothing more than a suggestion that another expert could have done a better job, (see Plaintiffs' Brief in Opposition to Defendant's Motion to Strike Testimony of Ronald Dimbert ("Plaintiffs' Opposition") p. 12), or that Dimbert did not use the "best possible methodology." (Id. at p. 4.) Plaintiffs suggest that all of the errors in the Dimbert Report can be effectively addressed on cross-examination. Plaintiffs' attempts to downplay the serious methodological flaws of the Dimbert Report, however, do not make the report relevant or admissible under the standards set by the United States Supreme Court in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Kumho Tire Co., Ltd., v. Carmichael, 526 U.S. 137 (1999).

The survey which forms the basis of the Dimbert Report is quintessential hearsay evidence. WEINSTEIN, FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, p. 233 (2d ed. 2000). It simply records the statements of a declarant (survey participant) intended as an assertion (in this case, measuring the participant's opinion, understanding or belief after reading marketing materials) which were made other than as a testifying witness at trial or hearing (that is, assembled in a report and not as a live witness at trial) and is offered by the proponents for the truth of the matters asserted. See FED. R. EVID. 801 and 802. As an expert, Dimbert has nothing of relevance to say to this Court except to report the hearsay survey results which he obtained as part of his work in connection with this lawsuit. Such evidence is permitted only if, after scrutiny, this Court finds that the opinions in Dimbert's

---

[1] The citation form, exhibits, defined terms and abbreviations used in TrueLink's Brief in Support of Its Motion to Strike Testimony of Ronald Dimbert ("TrueLink's Brief") are also used herein.

Report "fit" the issues in this case and are reliable. This means that the opinions must be properly drawn from the survey on which they are based, and the survey itself, must have been conducted using proper methodology. As demonstrated in TrueLink's Brief, Dimbert did not design a survey that fits the relevant issues of this case nor did he conduct the survey according to the recognized scientific methodology, making the results irrelevant and unreliable. The hearsay survey results and the opinion testimony of Dimbert recorded in the Dimbert Report are not admissible.

## I. THE DIMBERT REPORT EXPRESSES OPINIONS WHICH DO NOT "FIT" THE ISSUES BEFORE THIS COURT.

Dimbert admits that his survey results cannot be legitimately interpreted to reflect the views of the members of the putative class proposed by Plaintiffs primarily because he did not survey a population that would allow him to draw valid conclusions as to this class. (TrueLink's Brief pp. 10-12.) Plaintiffs seek to sidestep this failing by arguing that the purpose of the report is to "evaluate perceptions and understandings of Kansas consumers regarding various assertions that are stated in Defendants' marketing materials." (Plaintiffs' Opposition p. 1.) As a result, Plaintiffs contend that "a proper survey participant is *any person* who has read the same marketing materials." (Id. at 8) (emphasis added). Plaintiffs concede that "[i]f Plaintiffs were using the survey to establish their entire claim for class certification, all by itself, then Defendants might have a valid argument that the survey should be limited to prospective class members." (Id. at 8-9). Yet, Plaintiffs have not articulated one purpose to which the Dimbert Report's survey of an irrelevant consumer population is germane. The Plaintiffs' argument that they are using the Dimbert Report for some "other purpose" is disingenuous at best.

Indeed, in Plaintiffs' Brief in Support of Motion for Class Certification, pp. 12-13, the Dimbert Report is cited as support for the proposition that TrueLink's "marketing materials

2

produce extremely high expectations among consumers," meaning, presumably, consumers of TrueLink's product. Similarly, in the Sum. Judgment Motion pp. 2 and 6, Plaintiffs cite to the Dimbert Report as support for the statement of facts describing what is important to Kansas residents and what they believe constitutes identity theft. Such determinations are material facts only if they relate to Plaintiffs or the putative class.

Despite Plaintiffs' current characterization, the only way the Dimbert Report could be relevant to a class certification motion is if it provides evidence relevant to the understanding of the marketing materials at issue by the members of the putative class. Such evidence, however, by Dimbert's own admission, cannot be drawn from the survey he conducted because it was not specific to the relevant class population. (TrueLink's Brief pp. 10-12.)

As to Plaintiff's motion for summary judgment, it is not relevant to know what the general population of the State of Kansas might think. Rather, as the cases cited by Plaintiffs show, (Plaintiffs' Opposition pp. 5-6), "[a] matter is material if it is one to which a reasonable person would attach importance in determining his or her choice of action in the transaction involved." See K.S.A. § 50-626(b)(2). Contrary to Dimbert's belief, the advertisements at issue are not pop-up pages which could arise on any internet user's computer regardless of search parameters. Rather, they are interior pages at TrueLink's truecredit.com website which can only be viewed by consumers who have already made inquiry with respect to credit reports, credit monitoring or identity theft products and been directed there after viewing other landing pages. (Duni Decl. ¶¶ 8-11.) Here, the general population of Kansas will never see the marketing material at issue. Nor will most users of the internet in Kansas ever encounter the material. Rather, the only persons in the State of Kansas who would ever see the TrueLink statements at

issue in this case are those persons who had purchased or who were interested in purchasing credit monitoring products.

Hence, as Philip Johnson, Defendant's expert, has explained, the only relevant universe is those persons who have purchased or who are planning to purchase credit security products. (Johnson Report p. 7.) To go outside of this universe renders the results invalid because the survey would be reporting opinions of persons who are not, and never could be, class members. See Wells Fargo & Co. v. Whenu.com, Inc. 293 F. Supp. 2d 734, 753 (E.D. Mich. 2003) (the relevant universe for measuring confusion caused by use of trademarks on plaintiff's website are those people who have used, or who are likely to use, plaintiff's online financial services.) As the court in the Wells Fargo case noted: "A meaningful survey must take into account not only the respondents' demographic characteristics, but also what they are doing at the time because consumers make decisions of different import with different mindsets." Id. See also Citizens Financial Group, Inc. v. Citizens National Bank of Evans City, 383 F. 3d 110, 120 (3rd Cir. 2004) (citing Trouble v. The Wet Seal, Inc., 179 F. Supp. 2d. 291, 306-308 (S.D.N.Y. 2001)) ("If the universe is skewed, then the conclusion will similarly be skewed. If an expert, a person with special knowledge and expertise, testifies as to the skewed results, a jury is likely to give special weight to the skewed conclusion.").

Plaintiffs' suggestion that the court in Millett v. Experian Information Solutions, Inc., Case Number SACV 05-879JVS (RNBx) ruled against them solely because they failed to submit survey evidence is incorrect. (*See* Plaintiffs' Opposition p. 6.) The court in the Experian Action found as a matter of law that the Plaintiffs' misreading of Experian's statements were both "impractical and undesirable." (Experian Order p. 4) There is nothing to suggest that a survey such as the Dimbert Report which measured general consumer reactions as opposed to one which

measured the opinion of people who, like the Milletts, were in the market for credit monitoring products, would have been probative or admissible. Thus, even if survey evidence is necessary to sustain Plaintiffs' burden of proving that Plaintiffs' subjective beliefs drawn from the TrueLink materials are reasonable, there is still no justification for using a survey of opinions from a population that would never have encountered the materials at issue. If survey evidence is required, it still must be relevant. As Dimbert's own testimony demonstrates that he could not extrapolate his findings in his survey to a universe comprised of persons who have purchased or who are likely to purchase credit monitoring services from TrueLink, (see Dimbert 148:3-9) the Dimbert Report is irrelevant and not a fit.

## II. DIMBERT'S METHODOLOGY IS FLAWED IN HIS FAILURE TO PRESENT THE STIMULI AS IT WOULD BE ENCOUNTERED BY REAL CONSUMERS.

It is a fundamental tenet for the admissibility of survey evidence that the stimulus used be presented in a manner as close as possible to how it could be encountered in real life. J&J Snack Foods, Corp. v. Earthgrains Co., 220 F.Supp.2d. 358, 371 (D.N.J. 2002), citing 5 McCarthy, Trademarks and Unfair Competition § 32:16 ("the closer the survey methods mirror the situation in which the ordinary person would encounter the [stimulus] …the greater the evidentiary weight of the survey results".) This is more than simply one "factor" to be considered in the admission of survey evidence as suggested by Plaintiffs. (Plaintiffs' Opposition p. 7.) Failure to adhere to this accepted practice has caused a number of courts to rule survey evidence inadmissible.

In the case of Muha v. Encore Receivable Management, Inc., 2007 WL 2827408 (E.D. Wis. Sept. 28, 2007), *the* proffered survey offered extrinsic evidence of consumer confusion based on statements found in a collection letter. In an action brought under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq., the court noted that it need not entertain "a plaintiff's bizarre, peculiar or idiosyncratic interpretation of a collection letter" but rather, would

look to see whether a significant fraction of the population would be similarly mislead. Muha, 2007 WL 2827408, at *3 (citing to Bartlett v. Heibl, 128 F.3d 497, 500 (7th Cir. 1997) (other citations omitted).) Among other reasons discussed in its opinion, the court determined the survey was flawed because it asked participants to respond to portions of the collection letter which were taken out of context. As such, the court found that "the survey question does not measure the confusion experienced by the recipients of [the collection] ... letters. The survey withholds important information from the survey participants, artificially increasing the level of confusion measured by the survey." Id. at *12.[2] Similarly here, Dimbert presented his survey stimulus to consumers in a manner that they could never encounter it in real life. Each consumer would have had to go through one or more pages from the TrueLink and possibly another site in which there was additional information concerning the products at issue before arriving on the page that contained the statements in question. (Duni Decl. ¶¶ 8-10.)

The severity of the error in Dimbert's survey caused by his failure to present the stimulus in its real life context is made apparent in this case by Ms. Millett, herself. Her testimony shows that she had gained certain understandings concerning the TrueLink product presumably from having seen materials other than those shown to the survey participants which affected her interpretation of the statements in question. For example, she testified that she understood the product would not provide "complete identity theft protection under all circumstances" and that the TrueLink offerings were limited "as it relates to Trans Union's data." (M. Millett Dep. pp. 409-10, Exhibit B, TrueLink's Brief in Support of Motion for Partial Summary Judgment, D.I. 146.). She further recognized that it would be unreasonable for a consumer to read the phrase "complete identity theft protection" as relating to information outside the files of Trans Union.

---

[2] The *Muha* court also criticized the survey because questions were prepared by the attorneys for the plaintiff, they used close ended questions, did not sufficiently probe the participants' understanding, and they did not

Id. The Dimbert Report selectively lifts the statements he tested from their context. It, therefore, provides no reliable evidence as to what a reasonable consumer, who encountered these statements in their natural context, might actually understand them to mean.

Even surveys performed by persons who otherwise have been admitted as testifying experts in hundreds of other cases were excluded in those instances where they failed to present the stimulus as encountered in real life. See Kargo Global, Inc. v. Advance Magazine Publishers, Inc., 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007). The Kargo court found that the Jacobi survey was stripped of probative value because the survey "(1) employed a format that failed to approximate real-world conditions and was impermissibly leading, and (2) used improper stimuli." In the Kargo case the issue was trademark infringement, however, the two marks, "Kargo" for wireless services and "Cargo" for men's shopping magazines, were not likely to be seen in the same place or at the same time by consumers. Nonetheless, the Jacobi survey presented these the stimuli containing these respective marks in seriatim display. Id. at *7-8. The court found this back-to-back presentation of marks was impermissibly leading because this method of presentation was likely to generate a "demand effect" by suggesting the existence of a connection between the products that the respondents would not have made on their own. Id. at *8. Further, the court criticized the survey because it presented an advertisement which was not seen by the general population. Id. at *11. As a result, the court excluded the Jacoby survey because it found that the survey was so flawed that "its probative value is substantially outweighed by its potential for unfair prejudice and the likelihood that it will confuse or mislead the jury." Id. at *7.

Similarly, the Dimbert Report presents the stimuli in a manner that would never be encountered by a real consumer. It, too, has a design flaw creating a "demand effect" in that the

---

use any control group to filter out the baseline consumer confusion.

screen with the ad material was left up while the participant answered questions, suggesting there is a "correct answer" which could be looked up if the participant did not know or had not formed any relevant opinion. The Dimbert's survey's format created a "demand effect" that was likely to seriously skew the survey results. Like the Jacobi Survey in the Kargo case, the Dimbert Report in this case should be excluded.

### III.  PLAINTIFFS DO NOT ADDRESS THE SEVERITY OF ANY OF THE OTHER FLAWS INHERENT IN THE DIMBERT REPORT.

Plaintiffs state, without authority, that the Third Circuit does not require that a survey contain a control group. (Plaintiffs' Opposition p. 12.) The Third Circuit, however, unquestionably requires that the administration of a survey adhere to established scientific principles for obtaining market research and consumer opinion information. Citizens Financial Group, 383 F.3d at 121.

It is a standard practice, ignored by Dimbert in the conduct of his study, that an opinion survey measuring the effects of a challenged statement has some control group to filter out the consumers' general confusion or misunderstandings not attributable to the statements in question. See Muha, 2007 WL 2827408 *6 (citing Hernandez v. Attention, LLC, 429 F.Supp.2d 912, 917 (N.D. Ill. 2005)) ("in order for a survey to establish debtor confusion stemming from the non-statutory language of a letter, where the letter is not facially confusing, the Seventh Circuit has indicated that the survey must employ some mechanism to control for base line consumer confusion."). (See also Johnson Report, p. 4). "Courts have widely recognized the need for consumer surveys to adjust for so-called "background noise," i.e., extrinsic factors, pre-existing beliefs, general confusion or other factors, other than the stimulus at issue, that contribute to a survey's results." Wells Fargo & Co., 293 F.Supp.2d at 768. The control group accounts for effects such as those caused by the survey's questions and procedures which may

8

have influenced a participant's responses. Id. Plaintiffs give this Court no indication of how it can filter out the noise or determine the error rate for the statistics drawn from the Dimbert Report without the presence of a control group.

Further, Plaintiffs offer no explanation for how this Court can interpret the Dimbert Report in light of the compound questions that were asked. For example, Plaintiffs themselves point to the question of whether survey participants "thought that use of a person's social security number with a different name and address to obtain credit *or* employment constitutes identity theft." (See Plaintiffs' Opposition p. 1) (emphasis added). There is no way to determine from the response to this question whether the survey participants believe that use of a social security number by a third party to obtain employment, is identity theft, or whether or not they expect that such information would ever be reported to a credit bureau or included in the identity theft protection offered by the TrueLink product. This is material given that Ms. Millett admitted that where a subscriber's social security number was used by an imposter on an employment application but where that employer did not report the information to Trans Union, she did not expect TrueLink's product to advice of such activity. (M. Millett Dep. p. 410.) The survey's methodology, that is, the use of bad questions, makes the survey results non-interpretable on this point.

Cumulatively, there comes a point in which the failure to adhere to sound methodology renders the survey results so unsound that the probative value of its admission is substantially outweighed "by the prejudice, waste of time and confusion it will cause at trial." Muha, 207 WL 2827408, at *6 (citing Simon Property Group LP v. mySimon, Inc., 104 F.Supp.2d 1033, 1039 (S.D. Ind. 2000)) ("Expert testimony concerning survey results may not be reliable if the survey format does not accurately gage consumer confusion …").

9

## IV. THE DIMBERT REPORT CONTAINS FATAL FLAWS THAT GO BEYOND MERE TECHNICAL DEFICIENCIES.

Plaintiffs' assertion that "the relative merit of an expert's testimony should be resolved through means of cross-examination and presentation of contrary evidence" does not apply where the survey evidence does "not suffer from mere technical flaws, but from fatal flaws." Citizens Financial Group, 383 F.3d at 121. Here, Dimbert's opinions are based on the hearsay remarks of consumers, which were obtained under such flawed methodology, that the Dimbert Report has very limited, if any, probative value. The danger of unfair prejudice by admitting such evidence looms large, particularly here where Plaintiffs have demanded a trial by jury, and this Court has the responsibility to act as the gatekeeper of the evidence. See Kargo Global, Inc., 2007 WL 2258688, at *11 ("where a[n] ... action contemplates a jury trial, rather than a bench trial, the court should scrutinize survey evidence with particular care.")

Not surprisingly, none of the cases relied on by Plaintiffs for the proposition that all of the defects in their expert's report can be cured through effective cross examination involves the admission of survey evidence. For example, in the United States v. Mitchell, 365 F.3d 215 (3d Cir. 2004) the court dealt with challenges to government's fingerprint expert. The court held that the degree to which latent fingerprint identification was accepted by other scientists was an issue that could be handled on cross-examination. Similarly, in Pfizer, Inc. v. Tiva Pharmaceuticals USA, Inc., 461 F.Supp.2d 271 (D.N.J. 2006) the court considered dismissal motions against several medical experts. The court found that the fact that one doctor did not conduct an independent analysis of comparative therapeutic properties of the drugs in question, while another expert only considered documents given to him by counsel went to the weight to be afforded their testimony. The testimony of a third medical expert, however, who offered broad opinions as to the prescribing practices and general understanding of all physicians, without

10

having performed any survey, was deemed unreliable and inadmissible. In <u>Kannankeril v. Terminix Int'l, Inc.</u>, 128 F.3d 802 (3d Cir. 1997) the court addressed challenges to a medical expert who did not consider all facts in the case before forming his opinion on causation. Again, the court determined that such matters could be dealt with effectively on cross-examination. In <u>Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.</u>, 161 F.3d 77 (1st Cir. 1998) the court determined that the expert's opinion on cocaine dosage based on measurements of the half-life of the drug in a patient's system was premised on an acceptable technique and embodied a methodology that had significant support in the relevant universe of scientific literature. Finally, in <u>Eclipse Electronics v. Chubb Corp.</u>, 176 F.Supp.2d 406, (E.D. Pa. 2001) the court admitted the expert's testimony with regard to the testing of inventory even though there may have been better and more reliable methods for determining the condition of the products at issue.

In each of the cases offered by Plaintiffs, the court made the determination that the expert's testimony was supported by proper methodology even if subject to attack for not considering all facts, or if other more credentialed experts might disagree. None of the courts suggested that the evidence should be admitted in instances where the methodology itself was so flawed that it produced prejudicial and unfair results that significantly outweighed the probative value of the proffered testimony.

"The court need not and should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than to its admissibility." <u>Simon Property Group L.P. v. MySimon, Inc.</u>, 104 F.Supp.2d 1033, 1039 (S.D. Ind. 2000). Where the flaws are too great, the court has the responsibility to the jurors "not to waste their time or to make their task unduly difficult by admitting evidence that is complex and time-consuming ... when it offers essentially nothing of real probative value." <u>Id.</u> at n.3.

Nonetheless, as has often been noted by courts considering the issue, a majority of contested survey evidence is presented during injunction hearings or at bench trials in which case, the safest course for a trial judge is "to admit the evidence and to treat the criticisms as going to the weight of the evidence." Kargo Global, Inc., 2007 WL 2258688, at *12. In the context of summary judgment or class certification such a flawed survey would be entitled to "no weight." Id. (and cases cited therein.) See also J & J Snacks Foods, 200 F.Supp.2d at 372 (after concluding that the survey "suffers from substantial flaws, it is unreliable and inadmissible under Rule 702, FED. R. EV." the court determined that "the survey will not be considered in this motion for summary judgment.") Therefore, in considering the Plaintiffs' pending motions for class certification and summary judgment, this Court should give the Dimbert Report no weight, even if the Court defers exclusion of the report until a time when this case is prepared for the jury.

## V.    CONCLUSION.

Defendant requests that this Court exercise its gate-keeping function under Daubert and exclude the Dimbert Report as unreliable and unhelpful to the trier of fact. In the alternative, TrueLink requests that should this Court not exclude the Dimbert Report at this time, that it should consider the report so lacking in probative value that it is given no weight in connection with the pending motions for class certification and summary judgment.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

By: /s/ Jay N. Moffitt
    William M. Lafferty (#2755)
    Jay N. Moffitt (#4742)
    1201 N. Market Street
    Wilmington, DE 19801
    Phone: (302) 658-9200
    Fax: (302) 658-3989
    *Attorneys for Defendant TrueLink Inc.*

OF COUNSEL:
Michael O'Neil
Paula D. Friedman
DLA Piper US LLP
203 North LaSalle Street, Suite 1900
Chicago, IL 60601-1293
Phone: (312) 368-4000
Fax:   (312) 236-7516

November 19, 2007

## CERTIFICATE OF SERVICE

I, Jay N. Moffitt, hereby certify that on November 19, 2007, I electronically filed the foregoing *Defendant TrueLink Inc.'s Reply Memorandum in Support of Its Motion to Strike the Report and Testimony of Ronald Dimbert* with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the following:

### BY ELECTRONIC SERVICE

Christopher J. Curtin
Erisman & Curtin
629 Mount Lebanon Road
P.O. Box 250
Wilmington, DE 19803

And that I served a copy this day by electronic mail and by depositing in the United States Mail, postage prepaid to:

### BY E-MAIL AND U.S. MAIL

Christopher J. Curtin
Erisman & Curtin
629 Mount Lebanon Road
P.O. Box 250
Wilmington, DE 19803

B. Joyce Yeager
Yeager Law Firm LLC
City Center Square, 26th Floor
1100 Main Street
Kansas City, MO  64105

Jay N. Moffitt