**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

STEVEN G. MILLETT, MELODY G. MILLETT,  )
On Behalf Of Themselves and All Others     )
Similarly Situated,                          )
                                        )
            Plaintiffs,               )
                                        )
v.                                   )  Case No. 05-599-SLR
                                        )
TRUELINK, INC.,                     )
A Trans Union Company,           )
                                        )
            Defendant.           )

**PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION TO STRIKE THE [SECOND] AFFIDAVIT OF MELODY MILLETT**

Christopher J. Curtin, Esquire
MacElree Harvey, Ltd.
5721 Kennett Pike
Centreville, DE  19807
Phone:  302.654.4454
Facsimile:  302.654.4954
Email:  ccurtin@macelree.com
Website:  macelree.com

COUNSEL FOR PLAINTIFFS
STEVEN G. MILLETT
AND MELODY J. MILLETT

FILED:  November 30, 2007

i

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................ii

TABLE OF CITATIONS ..............................................................................................ii

INTRODUCTION ........................................................................................................1

A. Paragraphs 1 through 3 ........................................................................................2

B. Paragraph 9.............................................................................................................5

C. Paragraph 11...........................................................................................................7

D. Paragraphs 10, 13, 15............................................................................................16

# TABLE OF CITATIONS

## FEDERAL CASES

Adusumilli v. City of Chicago, 164 F.3d 353 (7th Cir. 1998)......................................................15

Drake v. Minnesota Mining & Mfg., 134 F.3d 878 (7th Cir. 1998)..........................................4, 16

Disilverio v. Service Masters Professional, 2007 WL 1029759 (W.D. Pa. 2007)....................4, 15

Pelligrino v. McMillen Lumber Products Corp., 16 F.Supp.2d 574 (W.D. Penn, 1996) ..............15

Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co., 478 F.Supp.2d 1076, 1081
(S.D. Ind. 2007) ...........................................................................................................1

United States v. Golden Acres, 520 F. Supp. 1073, 1077-78 (D.Del. 1981)..................................6

W.G. Seafood Assoc's v. Eastern Shore Markets, 714 F.Supp.1336, 1350-51 (D.Del. 1989)........6

## FEDERAL RULES

Federal Rule of Civil Procedure 56(e) ......................................................................................3-18

Federal Rule of Evidence 803(1) and (2)......................................................................................3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

STEVEN G. MILLETT, MELODY J. MILLETT,    )
On Behalf of Themselves and All Others    )
Similarly Situated,    )
                       Plaintiffs,    )
    )    Case No. 05-599-SLR
v.    )
    )
TRUELINK, INC.,    )
A Trans Union Company,    )
    )
                Defendant.    )

## PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE THE AFFIDAVIT OF MELODY MILLETT

Plaintiffs, in response to Defendant's Motion to Strike the Affidavit of Melody Millett (Motion at D.I. 180), state in opposition as follows:

Ms. Millett's Affidavit was based upon her personal knowledge. (D.I. 166, Ex.6, line 1) The reference to "personal knowledge" in Rule 56(e) includes information recounted and personal knowledge learned from sensory experiences, sense data, as well as inferences drawn from that experience. Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co., 478 F.Supp.2d 1076, 1081 (S.D. Ind. 2007). Defendant's Motion, the second attempt to strike an Affidavit of Ms. Millett, contains legal arguments duplicative of the arguments made in the first motion to strike. (D.I. 160) Plaintiffs will not reargue the duplicative legal assertions to the Court but, in the interest of brevity, incorporate their legal arguments set forth in Plaintiffs' opposition to Defendant's first motion to strike. (D.I. 173) As with Defendant's first motion to strike, the Defendant isolates selected passages from the Affidavit in an attempt to make the passages appear to be unclear.

### A.  Paragraphs 1 to 3

Defendant claims that the Affidavit statements are not relevant.  For example, Defendant takes issue with Ms. Millett's Affidavit in those passages discussing insurance.  (D.I. 180, pp. 4-5)  Ms. Millett's discussion about insurance rates was offered in opposition to the statements in Defendant's Motion for Summary Judgment that the Milletts could not bring their claims because they had experienced no financial losses.  (D.I. 155, 13, 16, 18, 19)   In opposition to the Defendant's Motion for Summary Judgment, Plaintiffs met their burden to establish that Plaintiffs were "aggrieved" under the act and that there were harms which result when Defendants breach the contracts with consumers.  (D.I. 167, pp. 16-19, 25-30; D.I. 175)   Defendant now wishes to claim that any facts offered to rebut its summary judgment assertion are irrelevant.  (D.I. 180, p. 4)  It is not logical to assert that there are no losses resulting to consumers and no damages flowing from the breaches of contract in one pleading filed with this Court and also to argue, in another pleading filed with this Court, that the examples of those losses provided by Plaintiffs are irrelevant.

Defendant argues that the identity thief is unidentified in paragraphs 1 through 3.   The identity thief is identified within paragraphs 1 to 3.

Defendant also argues that the first three paragraphs of the Affidavit should be stricken because Ms. Millett does not identify, in Affidavit paragraphs 1through 3, which litigation discovery she reviewed, what insurance company is being discussed, the identity of the insurance agent, and the identity thief involved.  (D.I. 180, p. 5)  Plaintiffs incorporate their prior briefing as to the meaning of "personal knowledge" in connection with Rule 56.   (D.I. 173)

Defendant contends that the Affidavit paragraphs 1 through 3 must be stricken because the information is too generalized and it is unfounded.  The information in the Affidavit of Ms. Millett was made available to Defendant.  (Ex. 1 attached)   Defendant does not dispute the accuracy of the Affidavit information about insurance in its motions to strike.

2

Defendant argues that a conversation Ms. Millett had with her insurance agent is hearsay. It offers no legal authority for this conclusion. Ms. Millett had the conversation with the agent. Ms. Millett is the affiant. There is no basis for Defendant's argument that the affiant cannot aver to statements made in a conversation with another. Even if the statements of the agent made to Ms. Millett could be considered hearsay, a contention Plaintiffs dispute, several exceptions to the hearsay rule would apply, including Federal Rule of Evidence 803(1) (present sense impression) or Federal Rule of Evidence 803(2) (excited utterance {surprise by agent}). Even if the statement of the insurance agent as to her surprise is excluded from the Affidavit, the remainder of the information in paragraphs 1 through 3 has been corroborated. The identity of the agent is not determinative of admissibility because the statement of the agent is not being asserted for the identity of the agent and the agent's comments are not being offered for the proof of the extra costs. Defendant does not dispute the fact that the identity thief and the Milletts utilized the same insurance company. (Ex. 1; Ex. 1B, Ex. 1C at Millett 00131) The paragraphs are not hearsay.

Defendant also argues that the insurance rate evidence is irrelevant because Defendant did not know about the information.[1] This is exactly the point. The information Defendant provides does not alert consumers to use of the consumer's information by another.

Plaintiffs have demonstrated to the Court and to Defendant why a consumer would require information about their personal identifiers in order to detect, prevent and protect from identity theft and credit fraud. (D.I. 156/147; D.I. 157/148; D.I. 158/149; D.I. 175) The insurance rates which were artificially elevated are an example of the harm to consumers resulting when another person utilizes the personal identification information of a subscriber. (D.I. 156/147; D.I. 157/148; D.I. 158/149; D.I. 175)

---

[1] Documents reflecting the insurer in question were made available to Defendant. (Affidavit of Yeager, Ex. 1 attached; D.I. 174, Ex. 1B pp. 135-36, 164-67, 286-87, 299-300)

Defendant relies upon <u>Drake v. Minnesota Mining & Mfg Co.</u>, 134 F.3d 878 (7th Cir. 1998).

Portions of affidavits in *Drake* were stricken because those statements were isolated conclusions

without specific supporting facts:

> "[T]he portion of the Shevely affidavit that was stricken stated that: 'Management, especially
> Dean Coleman, took a scapegoat approach in dealing with employee problems and generally
> tended to cover up matters.' Similarly, Hawkins stated that: 'Every time I, or any other
> African American employee went to Dean Coleman with a problem involving another
> employee, who was white, Dean Coleman would never conduct an investigation or take any
> action against that white employee.'"

<u>Drake</u>, 134 F.3d at 887.   In contrast, Ms. Millett states, in paragraphs 1 through 3:

1. As a result of information we discovered during litigation, I know that my family and an
   identity thief obtained homeowners insurance from the same insurance company.
2. I discussed this with my insurance agent. She was surprised to see that the insurance
   company had two insureds recorded with the same Social Security number. One of the
   accounts was our homeowners' policy. The other policyholder was a known identity thief.
3. After those credit accounts of the identity thief we discovered to date were closed, after our
   bank no longer associated banking accounts with Abundio Cuautle Perez, and after our
   automobile financing company no longer associated the identity thief's accounts with our
   Social Security number, our homeowners policy premium amount was reduced by $400 per
   year because our credit score had improved significantly. Our agent indicated she had been
   unaware of these issues.

(D.I. 166, Ex. 6)  This is ***not*** a conclusory statement that all insurance agents are unaware of the use

of duplicate Social Security numbers or that all identity theft involves increased insurance costs.  This

is exactly the substantiated personal knowledge of the affiant as concerns her family's insurance

coverage costs which is within Ms. Millett's personal knowledge.  It need not be stricken.

Defendant also alleges that any hearsay evidence should be stricken and Defendant relies

upon a passage from <u>Disilverio v. Service Master Professional</u>, 2007 WL 1029759 (W.D. Pa. 2007).

The Western District of Pennsylvania noted, however, that even if a statement is hearsay, it is

considered in connection with a motion for summary judgment when it is corroborated by

independent evidence.  <u>Id</u>. at *7.  Insurance coverage documents were produced.  (Ex. 1attached)

4

The statements in paragraphs 1 through 3 are in compliance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence.  There is no reason to strike paragraphs 1 through 3 or any portions of the statements made within the paragraphs.

## B. Paragraph 9

Defendant alleges that paragraph 9 should be stricken because it contains conclusory information, is unsupported, and contains double hearsay.  (D.I. 180, p. 6)   Paragraph 9 reads:

> After the lawsuits were filed, we received some notifications to access our records because there had been a change, we were told, in the credit record.  On several occasions, no changes had been made to the records displayed to us.  My attorney talked to the attorney for Trans Union about this and we were told that the error was a computer problem.  After my attorney reported it to a defense attorney named Amanda from Texas, it happened again.

Ms. Millett discusses, in paragraphs 4 through 8 of her Affidavit, the history of her personal experiences with the product.  (D.I. 166, Ex. 6)   If the references in paragraph 9 are unclear, a concept Plaintiffs dispute, the reference in paragraph 10 would eliminate any possible confusion for any reader.  In paragraph 10, Ms. Millett continues her discussion on monitoring, a discussion she begins in paragraph 4.   The notifications discussed came **from** Defendant and the information and notifications were supplied **by** Defendant.  The conversations were conversations with counsel **of** Defendant.  The communications have been made exhibits to the summary judgment briefings.  The discussion Defendant isolates is only unclear or overly broad if it is taken in isolation and out of the context of the discussion of the Affidavit.

As to Defendant's second argument about double hearsay, Ms. Millett was told by her attorney that a conversation had taken place with counsel for Defendant.  Ms. Millett may testify to the subject matter of a conversation she had with her attorney.  Ms. Millett had personal knowledge of her conversation with her attorney and she related, in her Affidavit, the content of her conversation

with her attorney.[2]   That conversation concerned a computer error.  Defendant does not deny that

there were computer problems which caused the errors described.  In fact, Defendant referred this

Court to some of its computer errors.  (D.I. 163, pp. 21-25)  Defendant's motion, however, attempts

to place the statement in isolation and to strike the statement.  (D.I. 180, p. 6)

Defendant's motion cites, as support, W.G. Seafood Assoc. v. Eastern Shore Markets, 714

F.Supp. 1336, 1350-51 (D. Dela. 1989).   The affidavit in *W.G. Seafood* contained an estimation and

a calculation from someone who was not en expert.  The Defendant contends that the Millett

Affidavit paragraph 9 is also conclusory and does not adequately describe supporting details.  (D.I.

180, p. 6)  Defendant's records display the dates the Plaintiffs accessed the Defendant's web portal.

(D.I. 159/150)  Defendant's own documents corroborate the statements.  (D.I. 159/150; D.I. 175)

Defendant relies upon United States v. Golden Acres, Inc., 520 F.Supp. 1073, 1077-78

(D.Del. 1981).  The affiant in *Golden Acres* stated that the property subject to foreclosure had an

occupancy rate of over 90% and provided "adequate, safe and sanitary quarters."  Id. at 1077-78.

This statement was determined to be inadequate to establish the claim that the federal employee acted

outside his scope of discretion when deciding to foreclose.  Ms. Millett's statement in paragraph 9 is

being offered to demonstrate computer problems that existed with the monitoring product.  The

statements are corroborated by Defendant's business records.  (D.I. 159/150)  Defendant

acknowledges that there were computer errors.  (D.I. 163, pp. 21-25)

These two cited cases, as well as the holdings in *Disilverio*, do not support the conclusion that

uncorroborated statements are contained in Ms. Millett's Affidavit.  Defendant does not even offer to

contest the factual truth of the statement in paragraph 9.

---

[2]   A party represented by counsel must be contacted through counsel.  Defendant makes much, throughout its pleadings and depositions, that these Plaintiffs cannot have a claim because they did not violate this basic rule.

## C. Paragraph 11

Defendant asserts that paragraph 11 should be stricken.  Defendant alleges that the statement

is contradictory with deposition passages at page 318 and at pages 546 to 548 of the two day

deposition of Ms. Millett.   It is undisputed that, at one time, Ms. Millett found some value to the

product.  (See deposition text set out verbatim herein)  It is true that she believed, at one time, that the

product would detect against some forms of identity theft.  (See deposition text set out verbatim

herein)  It is also true, and undisputed by Defendant, that Ms. Millett learned, in the course of the

litigation, that the product would not protect against even "true name fraud."  (See deposition text set

out verbatim herein)   Ms. Millett is not changing her testimony in paragraph 11 of her Affidavit.  She

states in paragraph 11 exactly what she stated in the deposition testimony.  This testimony is also

consistent with the interview Defendant cites.

Consistently, Ms. Millett stated she once believed the product could provide some form of

detection and now no longer believes this to be true.  (See deposition text set out verbatim herein)

Paragraph 11 does not refute any prior testimony.   One deposition passage which Defendant alleges

to be inconsistent with the language in paragraph 11 of the Affidavit reads:

```
                             316
18    Q.  Okay.  And when you told "The New York
19  Times" that you thought it was still a valuable
20  product, then, what, you were lying then or
21  you've changed your mind since then?
22            MS. YEAGER:  Objection.
23  Misstates her testimony.  Misstates facts not in
24  evidence.  Foundation.
25     A.  "The New York Times" article does not
                             317
 1  characterize it in that way.
 2    Q.  (BY MR. O'NEIL) So, whenever the --
 3  you've read "The New York Times" article, right?
 4    A.  Yes, I participated in it.
 5    Q.  Okay.  And --
 6            MS. YEAGER:  Do we have a
 7  question?
 8            VIDEOGRAPHER:  Go ahead.
```

7

 9          MS. YEAGER:  I'm sorry to
10    interrupt.
11     Q.   (BY MR. O'NEIL) Were you misquoted in
12    that article?
13     A.   No, you're misquoting the article.
14     Q.   Okay.  So, is everything in that
15    article accurate as far as you're concerned?
16     A.   Fairly accurate, yeah.
17     Q.   Fairly accurate?
18     A.   Uh-huh.
19     Q.   Okay.
20     A.   I mean, because the article isn't
21    100 percent about me, so I don't know.  I can't
22    attest to the accuracy of the rest of it.
23     Q.   I understand.  Obviously.  You're
24    quoted as saying, quote, "I still have credit
25    monitoring because of the simple fact that it is
                                          318
 1    the best tool available at this time."
 2     A.   And what's the rest of sentence?
 3     Q.   "It is not ideal, it is broken and it
 4    is not as advertised."  Is that an accurate
 5    statement?
 6     A.   That's the statement, yes.
 7     Q.   Okay.  So, it's still valuable enough
 8    for you to continue using it and continue buying
 9    it; isn't that correct?
10     A.   Well, I'm not buying it anymore, am I?
11     Q.   Well, you did for years and years and
12    years after you claimed that it didn't work?
13     A.   And I don't deny that.

( D.I. 174, Ex. 1B pp. 315-18)  Paragraph 11 is not a change in testimony.  Ms. Millett did not offer

testimony inconsistent with it.   (D.I. 173, pp. 5-6 )   The entire quote from the article is consistent

with the other deposition testimony of the affiant:

                                          252
 2     Q.   Okay, wait a minute.  August 6, 2003,
 3    did you think your husband was a victim of
 4    identity theft?
 5     A.   Of course.
 6     Q.   Okay.  So, why didn't you use it on the
 7    very first day?
 8     A.   Because their product services their --
 9    this is specifically supposed to be used for
10    services that are notified for you by the

11  monitoring service.  So, since I don't have --
12    Q.  Okay.
13    A.  You know, I can't call them up to say,
14  oh, you need to resolve this account from 2002,
15  because I wasn't a member in 2002.
16    Q.  That's your understanding?
17    A.  That's my understanding.
18    Q.  Okay.  Has your husband been a victim
19  of identity theft since August 2003?
20    A.  Yes.
21    Q.  In what way?
22    A.  Abundio Perez has obtained additional
23  activities that are related to credit that have
24  occurred since August of 2003, yes.
25    Q.  Using your husband's SSN?

                                                253
 1    A.  Yes.
 2    Q.  What activity is that?
 3    A.  Judgement from Ford Motor Credit for
 4  $4,000, public records information, criminal
 5  conviction, I believe, recorded against my
 6  husband's Social Security number in California
 7  that was not part of this record.
 8    Q.  I'm sorry, go ahead.
 9    A.  The J. C. Penney's account, which was
10  relabeled with my husband's address which then
11  resulted in Abundio Perez's mail being sent to
12  my house.  The Home Depot account which was
13  later relabeled with my husband's name and
14  address, still has his Social Security number,
15  but has Abundio Perez's telephone number.
16    Q.  So, when you learned all this after
17  August 6, 2003, did you call the fraud
18  resolutions services then?
19    A.  I didn't learn all of that until TU
20  began -- and some of it I didn't learn until
21  2005 when we started with subpoenas and
22  subpoenaed documents.  So, I mean, you know, I
23  didn't know it in 2003, no.

(D.I. 174, Ex. 1A pp. 51-52).

                                                 84
10    Q.  When did you come to the conclusion
11  that there was no purpose in purchasing the
12  credit monitoring service from TrueLink?
13    A.  Well, I mean, it's been some time over
14  the course of the litigation.  But, I mean, now

                                                  9

15  that I know that it really doesn't even cover
16  for anything, then there was just no point in
17  it, so I've discontinued it.
18      Q.  And when did you learn that?
19      A.  Like I said, that's been a evolving
20  process as new evidence has arised [sic] in this case
21  as we've gone along.  But, I mean, there have
22  been little things.  But, I mean, getting the
23  information, for example, that the -- that the
24  -- I'm drawing a blank here for a moment -- that
25  the Home Depot account had been relabeled and

85

1  that that information was still not presenting
2  in the product.  The fact that we had had false
3  alert triggers on and off throughout 2005, I
4  believe was the year that those were occurring
5  in.  That it serves no purpose, so I just
6  discontinued it.
7      Q.  Prior to November of 2006, you
8  discontinued it?
9      A.  No.  I didn't renew -- the last charge
10  was in November of 2006, and I've not placed a
11  new credit card in there.
12      Q.  Was November 2006 when you came to the
13  conclusion that there was no purpose for
14  purchasing the credit monitoring service?
15      A.  No.  It was when I made the conscious
16  decision to go in there and end it.  TrueLink's
17  monitoring service is a negative opt-in.  You
18  must specifically opt out or the subscription
19  continues automatically through no interference
20  or whatever of your own.
21      Q.  Did you ever cancel it affirmatively?
22      A.  What do you mean affirmatively?
23      Q.  Meaning what you just said, that you
24  called TrueLink and said cancel it?
25      A.  I already answered that, and I said no.

86

1  I allowed the subscription to lapse by not
2  giving them a new credit card number with the
3  correct expiration date.
4      Q.  Because you told the "New York Times"
5  reporter that there was some value to credit
6  monitoring, right?
7      A.  I told the "New York Times" reporter
8  that it was the best tool available, but it was
9  not as advertised.
10      Q.  Right.  And that you had continued to

10

11   purchase the product, right?
12      A.  Well, you still have to be able to look
13   at your credit report, sir.
14      Q.  Okay.  So, when you had the
15   conversation with the reporter for the "New York
16   Times", you still thought that there was value
17   in the credit monitoring service, right?
18      A.  Not the monitoring service.  There is
19   value in having access to your credit report on
20   an ongoing basis, especially when you already
21   know you're a victim of identity theft.
22   However, it is not complete identity theft
23   protection as is advertised.
24      Q.  Is that what TrueLink advertises?
25      A.  I believe that's what was on their

                        87
1   product advertisement, complete protection from
2   identity theft.
3      Q.  Do you want all the money that you ever
4   paid TrueLink back?
5      A.  Well, at this point in time, I'd settle
6   for the money for the product, because that's a
7   class-wide basis.  But, technically on an
8   individual basis, they probably should reimburse
9   me for all the credit reports they made me
10   purchase by receiving blank alerts.  You
11   know, for the betterment of the class, I'm
12   willing to forgo that if I have to.
13      Q.  You're concerned about the class?
14      A.  Oh, yes, I'm concerned about the class.
15      Q.  What do you want to get for the class?
16   All those things that you described before?
17      A.  You know, I want the company to
18   disclose to people up front in big letters when
19   they purchase this product that, you know, you
20   are not going to see everything for your Social
21   Security number, you are never going to see it,
22   and that we are legally going to sell credit
23   reports from our parent company for individuals
24   who are using your Social Security number
25   incorrectly.

                        88
1       I mean, really and truly.  I mean, that
2   we are going to pick and choose which
3   information we're going to display to you in
4   your reports.  And that if we, our parent
5   company, has made the decision to suppress that
6   information and keep it from you, that it will

                        11

7  not be displayed and you will not be made
8  notified of it.
9       That we may have more than one person
10  who has subscribed to credit monitoring using
11  your personal identifier, like your Social
12  Security number.
13       I mean, these are things that could
14  have been disclosed up front in advance that
15  were hidden behind deceptive marketing and
16  advertising that prey on people's fears and
17  weaknesses and assumptions about what credit
18  bureaus do and don't do in their business model.
19       I mean, do you know that the -- most of
20  the people that I've talked to are very confused
21  when I tell them that there's allowed to be sold
22  multiple credit reports with the Social Security
23  number.  They don't believe that that can
24  happen.

(D.I. 174, Ex. 1A pp. 84-88).   This testimony is also consistent with the other passages from Ms.

Millett's deposition alleged by Defendant to be contradictory.

                          545
20     Q.   (BY MR. O'NEIL) Mrs. Millett, I'm going
21  to show you what's been marked as Exhibit 37,
22  which was also an exhibit in the -- I think in
23  the Experian deposition, although I'm not sure.
24     A.  Yeah, because it's got the deposition
25  -- it's got the exhibit on the corner.
                          546
1   Q.  I'm sorry?
2     A.  I said it's got the Experian exhibit
3  number on the corner.
4     Q.  Yeah.  Is this a printout from a blog?
5     A.  No, this is a printout from a forum.
6     Q.  I thought you said Fight Back was a
7  blog?
8     A.   She has a blog page, but this is the
9  forums.
10     Q.  Got it.  So, it's a printout from a
11  forum on a blog?
12     A.  Right.
13     Q.  The first posting, is that by someone
14  who goes by the name "creditmonitoringsucks"?
15     A.  Yes.
16     Q.  Okay, is that you?
17     A.  Yes.
                          12

18    Q.   Okay.  And so the verbiage on -- wow --
19  so, all of the verbiage on this forum is all
20  written by you; is that right?  On this exhibit
21  at least.
22    A.   On this posting, yes.  This is an
23  individual single posting.  Notice it says "Post
24  No. 1."
25    Q.   So what does that mean?

547

1    A.   That's the first posting in the thread.
2  Somebody else could come in behind me and make
3  additional postings.  And as I testified in the
4  Experian case, there was one thread that they
5  produced where other people were responding and
6  they -- I had to tell them that that was not me
7  because that was additional posters.
. . . . .
14  got me there.  And so this is the first posting
15  that people can respond to.  However, you also
16  responded to other people's postings, right?
17    A.   Some, but not much.  Mostly I posted
18  stuff for people to --
19    Q.   Uh-huh.
20    A.   -- have as reference material.
21    Q.   Now, on the first page, you identify
22  two types of identity theft, right?
23    A.   Yes.
24    Q.   Okay.  And those are the only two types
25  of identity theft that you discuss, right?

548

**1    A.   At that time, yes.**
2  Q.   Okay.
3  A.   Uh-huh.
4  Q.   And then you define "true name fraud."
5  A.   Uh-huh.
6  Q.   And then you refer to something called
7  "SSN only fraud"?
8  A.   Correct.
. . . . .

549

. . . . .
3  Q.   Now, in 2003 --
4  A.   Uh-huh.
5  Q.   -- when you unfortunately had to learn
6  all about identity theft and you were learning
7  all about identity theft, did you understand at
8  that time that there was different types of
9  identity theft?

13

10    A.  No.  Are you talking about when I first
11  discovered the identity theft?
12    Q.  Well, actually, let's say August 2003.
13    A.  Yes.
14    Q.  Did you understand at that point that
15  there was more than one type of identity theft?
16    A.  Well, I mean, I understood that there
17  were like credit card identity theft, and then I
18  understood that there was like identity theft.
19  But I didn't necessarily understand at that
20  point the distinction like between true name
21  identity theft and just use of a Social Security
22  number.
23    Q.  Okay.
24    A.  So, I mean, that's one of those
25  evolving knowledge kind of things.

550

1    Q.  Okay.  So, in August of 2003, you
2  didn't understand that there were different
3  types of identity theft; is that right?
4    A.  Identity, I mean, to me identity theft
5  was identity theft.  I mean, we knew that our
6  identity theft involved the use of my husband's
7  Social Security number.  But, for example, I
8  didn't know about synthetic identity fraud, I
9  didn't know about mortgage fraud with the FHA.
10      I mean, there's so many different forms
11  of identity theft now that are out there that at
12  that point in time I wasn't necessarily aware of
13  all of them.
14    Q.  But my question was, were you aware
15  that there was more than -- there were types of
16  identity theft?
17    A.  Yeah, there were types of identity
18  theft and I knew that in August of 2003.
19    Q.  Okay.  And did you think that the
20  credit monitoring product that you purchased
21  from TrueLink would protect you and your husband
22  against all those types of identity theft?
23    A.  Well, it was advertising complete
24  identity theft protection.
25    Q.  Ma'am, can I just please have you

551

1  answer my question?  Rather than tell me
2  something else.  I was asking what you thought.
3    A.  Yes.
4    Q.  Okay.  So, just so the record's clear,
5  you thought in August of 2003 -- you were aware

14

```
 6   that there were different types of identity
 7   theft and you thought that the product that you
 8   purchased on behalf of your husband would
 9   protect against all of it?
10      A.  All of the ones that I knew about at
11   that point.
```

(D.I. 174, Ex. 1B pp. 544-50) (emphasis added).  The Affidavit is not inconsistent.

Defendant's own legal authorities do not support its motion to strike.  Ms. Millett's statements are not inconsistent with her deposition as was the case in Pellegrino v. McMillen Lumber Prods. Corp., 16 F.Supp. 2d 574 (W.D. Penn. 1996).  Counsel for Defendant in this instance took more than adequate time to determine the basis of Plaintiffs' claims and Plaintiffs consistently responded that their knowledge about the product increased during the course of litigation.

In fact, the analysis of the Western District of Pennsylvania upon which Defendant relies is not helpful at all to Defendant's assertions about deposition testimony.   In *Disilverio*, the Western District of Pennsylvania noted that clarification, supplementation, corroboration, correction, and documentation can all serve to assist the Court in its evaluation of compliance with Rule 56(e). Dilsilverio, at *6 and *7.  Rather than strike the Affidavit or paragraph 11, this Court will review the allegations of adequacy and determine that Defendant's motion to strike is unsupported.   The Affidavit is supported by the evidence and it is supportive of the evidence.

Ms. Millett's statement is also unlike the statement which was struck in Adusumilli v. City of Chicago, 164 F.3d 353 (7th Cir. 1998).   The Seventh Circuit addressed an obvious contradiction about the date when harassment of that plaintiff began:

> "[T]he district judge struck the following statement from Adusumilli's affidavit: "During my tenure at the 24th District, I was harassed on a near daily basis by my co-workers, Atkins, Muzupappa, and Zeliasz." (Adusumilli Aff. ¶ 2). The judge found that this statement "clearly contradicts" Adusumilli's deposition testimony to the effect that her first year at the Twenty-Fourth District was uneventful. *Adusumilli*, 1997 WL 769457 at *3. Specifically, when Adusumilli was asked whether "there [was] anything in the first year that made [her] feel that [she was] ... being discriminated against on the basis of [her] sex," she responded "[n]o." (Adusumilli Dep. at 60)"

15

Id. at 360.  The Millett Affidavit is not such a case of "direct contradiction."  Id.  Defendant's motion to strike must be denied.

### D. Paragraphs 10, 13, 15

Defendant moves to strike the testimony in paragraphs 10, 13, and 15 because the testimony refers to mixed data in credit files of Defendant's parent.  (D.I. 180, pp. 8-9)  Defendant alleges, once again, that the information is unsupported but offers no evidence that the statements are untrue.   Ms. Millett testified based upon her personal knowledge and the information was made available to Defendant.  (Ex. 1 attached)  The information was contained within documents provided in response to subpoenas.  (Ex. 1 attached, D.I. 159/150, Ex. P)   Defendant examined Ms. Millett about these documents throughout her two days of deposition testimony.   (D.I. 174, Ex. 1A and Ex. 1B)   The records were made an exhibit to pleadings.  (D.I. 174)   Ms. Millett indicates that she has personal knowledge of the information contained in her Affidavit.  (D.I. 166, Ex. 6, line 1)

Defense counsel indicates to this Court that a decision by the Seventh Circuit can be the basis of this Court's decision to strike these factual Affidavit statements.  Defendant directs the Court to Drake v. Minnesota Mining & Mfg. Co., 143 F.3d 878 (7th Cir. 1998).  As discussed herein in connection with other arguments, *Drake* is not applicable to this determination.  Defendant's claim that no department store produced documents is clearly incorrect.  (Ex. 1 attached)   Not only were the department store records identified in discovery for Defendant, defense counsel questioned Ms. Millett in her deposition about this.

```
                           441
   2     Q.  (BY MR. O'NEIL) Okay.  Do you blame
   3  TrueLink for this denial of credit by Sears?
   4     A.  Well, I don't blame TrueLink per se.
   5  But TrueLink at this point in time should have
   6  notified us that Sears was still reporting data
   7  for Abundio Perez.  Because they were calling
   8  them, TransUnion was calling them.
   9     Q.  TransUnion was calling who?
  10     A.  Sears.
```

16

11    Q.  Do you know who at TransUnion called
12    somebody at Sears?
13    A.  No, they were calling Ford too at that
14    time I think.
15    Q.  Who's "they"?
16    A.  The people from TransUnion were calling
17    the remaining open accounts that were still open
18    on the Abundio Perez file and telling them that
19    they needed to close them for fraud.
20    Q.  And when was that?
21    A.  That was in 2005.

(D.I. 174, Ex. 1B p.  441) (Ex. 1 attached)   The Sears documents were produced to Defendant.  The

Sears documents corroborate Ms. Millett's Affidavit and her deposition testimony concerning the

charge accounts.   In fact, the identity thief charges some Allstate insurance payments on the

department store charge account.  (Ex. 1C attached, e.g., p. Millett 01131)  This, too, was known by

Defendant when it filed its motions to strike.

Defendant adds an argument in its motion. "Similarly, [Ms. Millett] provides zero support for

her conclusion that credit monitoring didn't provide the Milletts with all appropriate alerts regarding

their credit."  (D.I. 180, p. 9)  Plaintiffs have provided significant and irrefutable support for Ms.

Millett's personal knowledge, contained in her Affidavit, that credit monitoring did not provide

notice about new or ongoing credit fraud and identity theft.  (D.I. 175; D.I. 156/147; D.I. 157/148;

D.I. 158/149)  The alerts were to be the notice to Plaintiffs of identity theft or credit fraud.   The

information about the ongoing credit fraud and identity theft came as a result of information accessed

in litigation and in the Lexis/Nexis search.  (D.I. 175)   Information about the fraudulent use of the

personal identifiers was available to Trans Union after credit monitoring was renewed.  (D.I. 175)

Defendant additionally asserts that the Affidavit can be stricken for two other reasons: 1)

because it does not meet evidentiary standards; and 2) because there is no evidence offered that

"appropriate alerts regarding [Plaintiffs'] credit" were not provided.  The Affidavit does meet

evidentiary standards.  The Affidavit does support the evidence, and is, in turn, supported by the

evidence.   Plaintiffs submitted evidence that Defendant's purported "appropriate alerts" about credit were inadequate as a tool to detect, prevent and protect from identity theft.   Defendant does not acknowledge, however, that consumers fail to receive notice of ongoing or new credit fraud or identity theft.   Defendant does not acknowledge that consumers purchased the product believing it would help.   (D.I. 179 {reasons consumers purchase monitoring}; D.I. 168, Ex. 10 {credit monitoring was provided by Trans Union, Defendant's parent, when Trans Union's data was breached; credit monitoring is marketed by family companies as a detection device for use of stolen personal identifiers})   The alerts and the "credit reports" provided are not notice sufficient to detect, prevent or protect from identity theft or credit fraud.

Credit monitoring did not, as Defendant phrases it in this motion, "provide the Milletts with all appropriate alerts regarding their credit."   The Milletts received alerts when there were computer problems (D.I. 175), but did not receive alerts when Mr. Millett became a named account holder of the Home Depot account of Abundio Cuautle Perez, the known identity thief.   (D.I. 175)   The evidence offered in the Affidavit is corroborated.   The "credit report" and "alerts" are ineffectual to someone who wants to detect identity theft.   (D.I. 175)   Defendant's conclusory statements that the evidence does not support the claims must be examined closely.   Defendant had this information when it filed its motion. [3]   These corroborated facts establish that when the Milletts renewed credit monitoring, Trans Union knew that information was reported which was indicative of fraud.   (D.I. 175)   Credit monitoring did not alert the Milletts.   (D.I. 175)   These material, relevant, corroborated

---

[3]    A business employee changed the credit information on a Home Depot account.   The account was not opened by Mr. Millett.   Trans Union came to learn of the account and Debi at Trans Union called someone about it.   The Home Depot account, which was not the Millett's account, was changed to show that Mr. Millett was the account holder.   The address of Mr. Millett and Ms. Millett was then reflected on the account.   No one told Plaintiffs about this.   The Milletts had paid for monitoring when Debi at Trans Union knew to call the record keeper of the account information to ask the employee whether the account was "fraud." (D.I. 175)   In addition, Sears continued to allow charges to an account reported with Mr. Millett's Social Security number.   (Ex. 1)

facts not only are applicable to Defendant's Motion for Partial Summary Judgment, these facts establish the claims of Plaintiffs.

Defendant also states, "[Ms. Millett] has also failed to provide any facts showing that TrueLink ever received any information regarding a credit mix-up and then failed to report it to the Milletts." (D.I. 180, pp. 9-10)  This is the point.  Defendant did not know the information about the "mix-up". (D.I. 175)  There was a mix of credit data identifiers and Plaintiffs established this. (See Footnote 3; D.I. 175)  This mix of data had consequences. (D.I. 175)  This mix of data is credit fraud or identity theft. (D.I. 159, Ex. H)  Defendant, however, continues to deny any responsibility for its faulty product.  This does not make the accounts, the mixed data, and the FHA home loans "immaterial," as Defendant asserts.  This establishes the breach of contract and consumer claims.

Defendant's arguments pertaining to the materiality of the Affidavit should be examined closely.  Defendant wishes to have consumers and subscribers assume the risks under the contract:

1) that Defendant will have information pertaining to subscribers;

2) that Defendant will give notice of information pertaining to subscribers; and

3) that necessary information is contained on the "credit reports" Defendant sells. (D.I. 175)

Defendant wishes consumers to pay the purchase price of credit monitoring *and* to assume these risks.[4]  Evidence provided in the Affidavit that the "credit reports" purchased by Plaintiffs did not contain the necessary information which would allow Plaintiffs to close fraudulently opened accounts is material.  Evidence supports the Affidavit content.  The Affidavit content is material and based upon Ms. Millett's personal knowledge.

Defendant's assertions are without merit.  Ms. Millett's Affidavit recounted factual instances, based upon personal knowledge, which demonstrated substantiating and substantiated facts.  This is

---

[4]   Unconscionability typically involves conduct by which a supplier seeks to induce or to require a consumer to assume risks which materially exceed the benefits to the consumer.   Willman v. Ewen, 230 Kan. 262, 266, 634 P.2d 1061 (1981). Kansas comment, 1973, K.S.A. § 2000 Supp. 50-627.   A contract requiring another party to assume all risks of the agreement is unconscionable.  Id.

the requirement of Federal Rule of Civil Procedure 56(e).  Drake, 134 F.3d at 887 (affidavit should

recount factual instances based upon personal knowledge which establish the claim).  For the reasons

stated herein, Defendant's Motion to strike the Affidavit of Ms. Millett (D.I. 180) must be denied.

**Respectfully submitted**,

MacElree Harvey, Ltd.
/s/ Christopher J. Curtin
Christopher J. Curtin, Esquire
MacElree Harvey, Ltd.
5721 Kennett Pike
Centreville, DE  19807
302.654.4454
Facsimile 302.654.4954
Electronic Mail: ccurtin@macelree.com

Barry R. Grissom, Esq., *pro hac vice*
KS Bar. Id. No. 10866
10990 Quivira, Ste. 200
Overland Park, Kansas 66210
Phone: (913) 341-6616

Bryson R. Cloon, *pro hac vice*
KS Bar. Id. No. 08660, MO Bar. Id. No. 36843
Cloon Law Firm
11150 Overbrook Road
Leawood, KS 66211
Phone: (913) 661-9600
Facsimile: (913) 661-9614

Yeager Law Firm
B. Joyce Yeager, *pro hac vice*
KS Bar No.  18932, MO Bar No. 46013
P.O. Box 2469
Mission, KS  66201-2469
(913) 648-6673/ (913) 544-2535
Facsimile (773) 326-3538

Michael W. Blanton, *pro hac vice*
MO Bar. Id. No. 46490
Swanson Midgley, LLC
2420 Pershing Road, Ste. 400
Kansas City, Missouri 64108
Phone: (816) 842-6100
**COUNSEL FOR PLAINTIFFS**

20

## CERTIFICATE OF SERVICE

I, Christopher J. Curtin, Esq., hereby certify that on November 30, 2007, I electronically filed the foregoing document with the Clerk of the District Court using CM/ECF, which will send notification of such filing to the following:

William M. Lafferty, Esq.
Jay N. Moffitt., Esq.
Morris Nichols Arsht & Tunnell
1201 N. Market St.
Wilmington, DE 19801
wlafferty@mnat.com

    s/ Christopher J. Curtin
Christopher J. Curtin, Esquire
MacElree Harvey, Ltd.
5721 Kennett Pike
Centreville, DE  19807
Phone:  302.654.4454
Facsimile:  302.654.4954
Email:  ccurtin@macelree.com
Website:  macelree.com

DATE: November 30, 2007